UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS

| | |
|---|---|
| Agilent Technologies, Inc., ) | |
|     Plaintiff, ) | |
| ) | |
| ) | |
| v. ) | Case No. 2:25-cv-02101 |
| ) | |
| Xpedient Management Group, LLC and St. ) | HEARING REQUESTED |
| Paul Fire and Marine Insurance Company, ) | |
|     Defendants ) | |

**PLAINTIFF AGILENT TECHNOLOGIES, INC.'S OPPOSITION TO ST. PAUL FIRE AND MARINE INSURANCE COMPANY'S MOTION TO DISMISS**

Plaintiff Agilent Technologies, Inc. ("Plaintiff" or "Agilent") submits the following Opposition to Defendant St. Paul Fire and Marine Insurance Company's ("St. Paul") Motion to Dismiss (the "Motion").

## I.    INTRODUCTION

This matter arises out of an incident in January of 2024 in which over $9 million of Agilent's inventory, stored in a warehouse in Memphis, Tennessee, was destroyed due to water damage following a severe weather event throughout the Southwest United States. The warehouse, located on Cromwell Avenue in Memphis (the "Cromwell Warehouse"), is owned by Defendant St. Paul and leased to Defendant Xpedient Management Group, LLC ("Xpedient"). Xpedient is a warehousing and logistics company, which operated the Cromwell Warehouse for purposes of storing Agilent's inventory pursuant to a set of warehousing services agreements (the "Warehousing Agreements").

At the time the storm hit, the Cromwell Warehouse, unbeknownst to Agilent, was completely unprotected from the cold—lacking basic utilities, a working HVAC system, and an uninsulated fire suppression system  These conditions, coupled with the severe drop in

temperatures from the storm, caused the pipes to burst and the fire suppression system to activate, soaking the warehouse from floor to ceiling and destroying Agilent's property in the process.

Following the loss, Agilent spent a year attempting to determine what had occurred, while Co-Defendants unhelpfully pointed the finger at each other. St. Paul has attempted to place all blame on Xpedient, arguing that, as a mere landlord, it had no part in Agilent's loss. In furtherance of this effort, it has spent months attempting to hide the critical fact that it had sole control over the natural gas line serving the building's HVAC system and a responsibility, under its lease agreement with Xpedient, to maintain the building's basic utilities, like the HVAC and fire suppression systems—failures which materially contributed to and/or caused the $9 million loss.

In challenging the sufficiency of Agilent's claim for negligence, St. Paul relies on three arguments: First, St. Paul contends that the absence of contractual privity is fatal to Plaintiff's claim of negligence against St. Paul. However, under Tennessee law, privity is not required in negligence actions seeking to recover for property damage. *See* Tenn. Code Ann. § 29-34-104. Second, St. Paul contends the loss was not "foreseeable." The Complaint, however, alleges that St. Paul knew, in advance of the severe winter storm, that there was no working heat in a warehouse protected by a wet sprinkler system that lacked the necessary insulation to protect it from freezing temperatures. Third, St. Paul contends that, as a landlord, it had no control over the warehouse. However, St. Paul's own communications with Xpedient set forth in the Complaint, establish the opposite.

As further detailed below, Agilent has sufficiently alleged a claim for negligence against St. Paul. Accordingly, St. Paul's Motion to Dismiss should be denied. Alternatively, Plaintiff should be granted leave to amend its Complaint as to St. Paul.

## II.    FACTUAL BACKGROUND

### A.    Agilent Seeks a Warehouse for Pipette Tips

Agilent is a world-leading supplier in life sciences, diagnostics, and applied chemical markets (Compl. ¶ 14, ECF 1), providing laboratories with instruments that help scientists at top-tier universities conduct faster, more accurate medical research (*Id*. ¶ 15). Some of Agilent's

instruments contain internal pipettes that measure, transport, and dispense liquid samples or specimens to be tested.  (*Id*. ¶ 16.)  In 2023, Agilent sought warehousing services, in the Memphis area, to store $12 million in pipette tips inventory (the "Tips Inventory").  (*Id*., ¶ 18.)  It ultimately selected Xpedient and the Cromwell Warehouse—owned by St. Paul. (*Id*. ¶¶ 19, 22–24.)

### B.     The Lease Agreement Between St. Paul and Xpedient

On May 19, 2023 (the same day Xpedient executed the Warehousing Agreements with Agilent), Xpedient executed a commercial lease with St. Paul (the "Lease Agreement").  (Sealed Ex. A to Compl. 6, ECF 2; Sealed Ex. 1 to Xpedient's Answer & Crossclaim § 17, ECF 22.)  The Lease Agreement placed numerous obligations upon St. Paul. (Sealed Ex. 1 to Xpedient's Answer & Crossclaim, *passim*.)  For example, the Lease Agreement required St. Paul to provide service connections for utilities:

### Article 4.00 UTILITIES AND SERVICE

> **4.01 Building Services**.  Lessor shall provide the normal utility service connections with separate metering for Lessee premises to the building. Lessee shall pay the cost of all utility services, including, but not limited to, initial connection charges, all charged for gas, electricity, water, sanitary and storm sewer service, and for all electric lights relating to Lessee's portion of the building. . . .

(*Id.* § 4.01; Xpedient's Answer & Crossclaim, ECF 26.)

In the Lease Agreement, St. Paul also warranted that the heating system would be in good working order:

### ARTICLE 5.00 REPAIRS AND MAINTENANCE

> **5.06 Systems Delivery.**  Lessor warrants to Lessee that the fire system, plumbing, electrical and heating, ventilation and air conditioning systems currently serving the Leased Premises (collectively, the "Mechanicals") shall be in good working order as of the Commencement Date. . . .

(Sealed Ex. 1 to Xpedient's Answer & Crossclaim § 5.06; Xpedient's Answer & Crossclaim 18—19.)

Under the Lease Agreement, St. Paul also retained control of multiple aspects of the Cromwell Warehouse. (Sealed Ex. 1 to Xpedient's Answer & Crossclaim, *passim*.) For example, the Lease Agreement restricts the uses of the property to "[w]arehouse, shipping, and receiving" and provides that St. Paul retains access to the property and, conversely, prohibits Xpedient from, for example, changing the locks. (*Id*. §§ 1.06, 3.05.) It also prohibits any signage on the Cromwell Warehouse except those specifically approved, in writing, by St. Paul. (*Id*. § 3.02.) The Rules and Regulations, incorporated into the Lease Agreement, likewise place innumerable restrictions on how the Cromwell Warehouse can be used, leave St. Paul in ultimate control over the HVAC system, and prohibit the installation or operation of any "HVAC apparatus" without St. Paul's written permission. (*Id*., Ex. B at § 4.)

### C.  Agilent Moves its Tips Inventory into a Warehouse in Disrepair

On or around May 22, 2023, Agilent began moving the Tips Inventory into the Cromwell Warehouse. (Compl. ¶ 30.) What Agilent did not know at the time was that the gas line was locked, the HVAC system was inoperative, and the utility account with Memphis Light Gas and Water ("MLGW") was never transferred from St. Paul to Xpedient. (*Id*. ¶ 31.) The ability to maintain temperatures above freezing, via an HVAC system or otherwise, was critical in the Cromwell Warehouse, which had a fire suppression wet sprinkler system that was unwrapped, without insulation, and exposed in the ceiling of the building. (*Id*. ¶ 33; *see also id*. ¶ 43–45.)

On or around May 23, 2023, days *after* execution of the Agreements and *after* some of the inventory had been moved into the Cromwell Warehouse, Xpedient contacted St. Paul, through its property manager ("Property Manager"), to discuss having the utility accounts associated with its leased sub-portion of the Cromwell Warehouse transferred to Xpedient. (*Id*. ¶ 34.) St. Paul's Property Manager responded on that same day and advised that an account with MLGW would need to be transferred to Xpedient. (*Id*. ¶ 35.) Communications among St. Paul, Xpedient, and MLGW, during the first several months of the Lease Agreement show that St. Paul tried initially to have the account transferred so that the gas line could be unlocked and the HVAC system repaired. But such efforts were thereafter abandoned. (*Id*. ¶ 37–38.) It would be nearly a year

into the Lease Agreement when St. Paul finally succeeded in transferring the utility account for the portion of the Cromwell Warehouse storing Agilent's inventory. (*Id*. ¶¶ 36, 69.) By this time, it was too late. (*Id*. ¶ 38.) Agilent was never advised that the gas meter had been locked since May 2023, and that, as a result, the portion of the Cromwell Warehouse storing the Tips Inventory could not be heated. (*Id*. ¶ 39.)

> D.     **Severe Weather Impacts the Cromwell Warehouse, Destroying the Majority of Agilent's Inventory**

Beginning in early January of 2024, news outlets nationwide warned of a freeze anticipated throughout the Southeast United States. (*Id.* ¶ 41.) On or around January 8, 2024, MLGW issued a news release advising its customers, including St. Paul, that "severe weather [was] expected this week including high winds, freezing temperatures, and possible snow" (the "Deep Freeze"). (*Id*. ¶ 42.) MLGW warned its customers that "water pipes can burst any time temperatures are below freezing," and instructed on measures that property owners should take to ensure against this, including insulating unwrapped pipes. (*Id*. ¶¶ 44–45.)

As predicted, beginning on or around January 14, 2024, the temperature in Memphis began to drop below freezing and the Mayor of the City of Memphis, Paul Young, declared a state of emergency. (*Id.* ¶ 50, 52.) As the Deep Freeze set in, St. Paul *took no action* to restore gas and heat to the Cromwell Warehouse or winterize the pipes and sprinkler system. (*Id.* ¶ 86.) On the evening of January 17, 2024, the Memphis Fire Department received a notification that the sprinkler system at the Cromwell Warehouse had activated due to "malfunction." (*Id.* ¶ 53.)

In response, St. Paul directed a third-party company, Security Fire Protection, to respond to and assess the damage at the Cromwell Warehouse. (*Id*. ¶¶ 56, 63.) Security Fire Protection allegedly reported to St. Paul that the Cromwell Warehouse had suffered water damage from frozen, burst, domestic pipes and the sprinkler system activation (hereinafter, the "Water Intrusion Event"). (*Id*. ¶ 56.) Agilent personnel later responded to the Cromwell Warehouse and reported that many of the boxes storing the tips were saturated with water from the Water Intrusion Event. (*Id*. ¶ 57.)

St. Paul's failure to ensure that the gas meter in the Cromwell Warehouse was unlocked, the gas regulator in good repair, and that the HVAC system was in working order and maintaining normal temperatures in the Cromwell Warehouse, materially contributed to and/or caused the Water Intrusion Event and Agilent's loss and damages in excess of $9 million.  (*Id*. ¶¶ 85–86.)

### E. In the Aftermath of the Water Intrusion Event, Months Lapse Before Basic Utilities are Restored to the Cromwell Warehouse

With a soaking wet warehouse and inability to further hide the lack of gas and functioning HVAC, St. Paul finally resumed its efforts to establish the correct account holder with MLGW, repair the broken gas regulator necessary to control the pressure of natural gas from the supply line to a safe level for use in the HVAC system, and hired a third-party HVAC vendor to restore heat to the Cromwell Warehouse (*Id.* ¶ 69).

Despite the gas line remaining unconnected for nearly a year after Agilent's inventory was placed in the Cromwell Warehouse and months after the Water Intrusion Event, and the HVAC system remaining in disrepair for an unknown period of time thereafter, to date, and through its present motion, St. Paul has denied all responsibility for Agilent's loss.  (*Id*. ¶¶ 80, 82–84.)

### III. PROCEDURAL HISTORY

Plaintiff initiated this action against St. Paul and Xpedient to recover for its losses arising from the Water Intrusion Event.  As to St. Paul, Plaintiff has pled a single claim of negligence. (Compl. ¶¶ 121–26.)  Xpedient answered the Complaint and has asserted Crossclaims against St. Paul for breach of contract, breach of indemnity agreement, and breach of covenant of quiet enjoyment against St. Paul. (Answer 1-17, ECF 21, ¶¶ 5-6; Crossclaim 17–22, ECF 26.)  St. Paul has moved to dismiss Xpedient's Crossclaim (St. Paul's Motion to Dismiss Xpedient's Crossclaim, ECF 36) and, through the present motion, moved to dismiss Agilent's claim of negligence (St. Paul's Motion to Dismiss, ECF 19).

### IV. LEGAL STANDARD

"Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Hensley Mfg,*

*Inc. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (internal quotation marks omitted). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *In re Regions Morgan Keegan ERISA Litigation*, 692 F. Supp. 2d 944, 952 (W.D. Tenn. 2010) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Accordingly, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the alleged conduct]." *Twombly*, 550 U.S. at 556.

Further, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d at 336 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c); *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)) (rejecting as "disingenuous" argument that certain documents were outside the pleadings where attached to the complaint and answer to the counterclaim but not to the counterclaim itself, which was subject to a motion to dismiss).[1]

---

[1] Here, while not attached to the Complaint, Agilent is permitted to rely on the Lease Agreement in opposing St. Paul's Motion. The Lease Agreement, which is clearly alleged and referenced in Agilent's Complaint, is integral to Agilent's claim of negligence against St. Paul and may be considered without converting St. Paul's Motion to one for summary judgment. (Compl. ¶¶ 24, 83, 123). Moreover, Agilent's failure to attach the Lease Agreement to the Complaint was not from lack of diligence. Rather, despite repeated requests, Agilent only received the Lease Agreement upon Xpedient's filing of its Answer and Crossclaim. (Sealed Ex. 1 to Xpedient's Answer & Crossclaim; Compl. ¶ 83 ("For an entire year, Agilent has undertaken reasonable efforts to resolve its dispute . . . requesting repair records *and the lease agreement between Xpedient and St. Paul*." (emphasis added)).)

Courts considering Rule 12(b)(6) motions "construe the complaint in the light most favorable to the plaintiff and accept the plaintiff's allegations as true." *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)). The Rule 12 pleading standards are more than satisfied here. The Complaint alleges detailed facts and circumstances that, when accepted as true, establish that Plaintiff is entitled to the relief sought in the Complaint.

## V.  ARGUMENT

"To prevail on a negligence claim, a plaintiff must prove the following: 1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation-in-fact; and 5) proximate, or legal, cause." *Borne v. Celadon Trucking Servs., Inc.*, 532 S.W.3d 274, 300 (Tenn. 2017) (quoting *King v. Anderson Cnty.*, 419 S.W.3d 232, 246 (Tenn. 2013)). In its Motion, St. Paul *only* challenges the first prong—duty of care. As set forth below, these challenges are unsuccessful.

### A.  Agilent has Sufficiently Pled that St. Paul Owed Agilent a Duty of Care

St. Paul's argument that Agilent has not set forth a legal duty owed by it to Agilent is twofold: (1) there was no contractual privity between the parties; and (2) the harm was not foreseeable. Both arguments fail. As discussed below, Tennessee has, by code, abolished any privity requirement for claims of negligence and the allegations in the Complaint clearly demonstrate that the loss was foreseeable.

#### i.  Tennessee Law Expressly Provides that No Contractual Privity is Required to Maintain a Claim of Negligence

In its Motion, St. Paul contends, without citation to any legal authority, that "lack of contract is the clearest argument" that St. Paul owed no duty to Agilent. This is incorrect. In Tennessee, recovery for property damage under a theory of negligence is permitted "regardless of privity requirements." *Corporate Air Fleet of Tenn., Inc. v. Gates Learjet, Inc.*, 589 F. Supp. 1076,

-8-

1079 (M.D. Tenn. 1984) (emphasis added) (citing Tenn. Code Ann. § 29-34-104).  Tennessee Code Annotated § 29-34-104 provides:

> **In all causes of action for** personal injury or **property damage brought on account of negligence**, strict liability or breach of warranty, including actions brought under the Uniform Commercial Code, compiled in title 47, chapters 1-9, **privity shall not be a requirement to maintain such action**.

(emphases added).  *See also Messer Griesheim Indus. v. Eastman Chem. Co.*, 194 S.W.3d 466, 471 (Tenn. Ct. Ap. 2005) ("[P]ursuant to statute, if the loss is properly characterized as property damage, then there is no need for privity for claims based on negligence . . . " (citing Tenn. Code Ann. § 29-34-104).).  The statute is consistent with Tennessee common law of negligence, which recognizes that it is the "conduct creating the risk" *not* the relationship between the parties, which "defines the line between duty and no-duty." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 362–63 (Tenn. 2008) (quoting Restatement (Third) of Torts § 37, Reporter's Note, cmt. c, at 721).

Accordingly, as Tennessee law expressly allows Agilent, as here, to maintain a claim of negligence against St. Paul even in the absence of direct privity of contract between them, St. Paul's argument necessarily fails.

        ii.       <u>The Allegations in the Complaint Sufficiently Plead Foreseeability</u>

As noted by St. Paul in its Motion, chief among the factors considered when determining whether a duty of care exists is the foreseeability of the harm.  *See Biscan v. Brown*, 160 S.W.3d 462, 479–80 (Tenn. 2005); *see also Satterfield*, 266 S.W.3d at 365 (courts "favor[] imposing a duty of reasonable care where a 'defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property'") (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). Here, construing the Complaint in the light most favorable to Agilent and accepting the allegations therein as true, Agilent has sufficiently pled that the loss was foreseeable, alleging: (1) St. Paul knew of the impending Deep Freeze and the risk it presented to the Cromwell Warehouse (Compl. ¶¶ 42–46), and (2) St. Paul knew, in the months preceding the Deep Freeze, that the utilities were

disconnected and the HVAC system broken, leaving the Cromwell Warehouse unheated, and that its sprinkler system "was unwrapped and without insulation" making it particularly vulnerable to frigid temperatures. (*Id*. ¶¶ 33–38). In opposition, St. Paul contends that the loss was not foreseeable for two reasons. Both arguments are unavailing.

First, St. Paul contends that it was unaware of the "*contents or make up* of the Inventory." (St. Paul's Memorandum in Support of Motion to Dismiss 5, ECF 19-1 (emphasis added).) This is irrelevant. While St. Paul attempts to highlight the "delicate" nature of what was being stored at the Cromwell Warehouse (*Id.* at 6), it is hard to imagine what products would be able to withstand the Water Intrusion Event that occurred. Specifically, as described in the Complaint, the "[p]ipes burst and the sprinkler system activated, *soaking the warehouse from floor to ceiling and the goods stored inside it*." (Compl. ¶ 5 (emphasis added); *see also, e.g.*, *id*. ¶ 57 ("[T]he boxes storing the tips were *saturated* with water following the Water Instruction Event.") (emphasis added).) Whether St. Paul had knowledge of the storage of the pipette tips specifically is irrelevant given the nature and extent of the harm that occurred.

St. Paul does not dispute (nor could it) that it knew *some type* of inventory was being stored in the Cromwell Warehouse for the benefit of Agilent. And Agilent squarely alleges this in the Complaint. (*Id.* ¶ 24 (Upon information and belief, at or around the time Xpedient and St. Paul entered into a lease agreement, St. Paul knew or should have known that Xpedient was leasing the Cromwell Warehouse space for Agilent's benefit and for the sole and exclusive purpose of providing warehousing services to Agilent for the Tips Inventory.")).) St. Paul dismisses this allegation because it is "based upon information and belief." (Memorandum in Support of Motion to Dismiss 5.) But "[i]t is not uncommon for pleadings to contain allegations based 'upon information and belief'" when, as here, "the matter is 'exclusively within knowledge and control of the opposing party.'" *Slowik v. Lambert*, 529 F. Supp. 3d 756, 762 (E.D. Tenn. 2021) (denying motion to dismiss where, as here, "[t]here are very few allegations made 'upon information and belief' and those concern matters that lie exclusively within the knowledge of Defendants and are

-10-

based on logical inferences given the factual circumstances") (quoting *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 512 (6th Cir. 2007)).[2]

Agilent alleges that the Lease Agreement between St. Paul and Xpedient was executed to "effectuate the assignment" from Agilent to store its inventory. (Compl. ¶¶ 2–3; *see also id*. at ¶¶ 23–24.) This is sufficient at the pleading stage. Moreover, the Lease Agreement between St. Paul and Xpedient signals it was executed for the benefit of Agilent—running for an almost identical 36-month term to the Warehousing Agreements, with both the Lease Agreement and Warehousing Agreements fully executed on the same date. (*See* Sealed Ex. A to Compl. § 2, ECF 2 (fully executed on or around May 19, 2023, and providing the term of the Agreements is May 15, 2023 to May 31, 2026)); Sealed Ex. 1 to Xpedient's Answer & Crossclaim §§ 1.03, 17 (fully executed on May 19, 2023, and providing that the term of the Lease Agreement is June 1, 2023 to June 1, 2026, and allowing early occupancy of the Cromwell Warehouse 30 days prior, *i.e.*, on or around May 2, 2023).)[3] Further, the Lease Agreement expressly provides that the only "Permitted Use" of the Cromwell Warehouse is for "[w]arehouse, shipping and receiving"—the exact services that Agilent sought. (*See* Sealed Ex. 1 to Xpedient's Answer & Crossclaim at § 1.06; Compl. ¶ 19 ("Agilent selected Xpedient to provide warehousing for the Tips Inventory.").)

<u>Second</u>, St. Paul asserts that the Complaint fails to allege "that St. Paul was aware of any potential issues with the water pipes or sprinkler system" prior to the Deep Freeze. (Memorandum in Support of Motion to Dismiss 6.) This is obviously incorrect, and it is difficult to understand how St. Paul could contend otherwise. For example, the Complaint specifically alleges, *inter alia*, that: (a) St. Paul was aware of the impending Deep Freeze and the need to protect the pipes and

---

[2] *See also Wu v. Passive Wealth Builders, LLC*, 2023 U.S. Dist. LEXIS 2910, at *15 (W.D. Tenn. Jan. 6, 2023) (finding, "even after the *Twombly* <u>and</u> *Iqbal* decisions," "allegations made upon information and belief support allowing a veil piercing claim to survive a motion to dismiss" as these "types of allegations 'are the appropriate manner to plead when a plaintiff is drawing reasonable inferences from the facts.'") (internal citations omitted, emphasis added); *Strobl v. Croft*, 2025 U.S. Dist. LEXIS 30406, at *15 (E.D. Tenn. Feb. 20, 2025) ("[A]llegations asserted upon information and belief are not *per se* insufficient to withstand a Rule 12(b)(6) motion; the Court must consider the pleading's factual allegations as a whole.") (italics in original).

[3] It appears St. Paul authorized the early occupancy, as "[o]n or around May 22, 2023, Agilent began moving the Tips Inventory into the Cromwell Warehouse." (Compl. ¶ 30.)

sprinkler system from the cold, (b) St. Paul was aware that the sprinkler system was "unwrapped and lacking insulation," and (c) St. Paul was aware of the issues with the HVAC system and utilities, which prevented the Cromwell Warehouse from being heated and which presented a high risk of the Water Intrusion Event that ultimately occurred, as follows:

- "On or around May 23, 2023, days *after* execution of the [Warehousing] Agreements and after certain of the Tips Inventory was placed in the Cromwell Warehouse, Xpedient contacted **St. Paul**, through its property manager ('Property Manager'), to discuss having the utility accounts associated with its leased sub-portion of the Cromwell Warehouse transferred to Xpedient." (Compl. ¶ 34 (first emphasis in original; second emphasis added).)

- "The Property Manager (a legal agent of St. Paul—authorized to bind St. Paul in all matters related to the Cromwell Warehouse) responded on that same date and advised that an account with Memphis Light, Gas, and Water ('MLGW')—the municipal public utility serving the City of Memphis—would need to be transferred to Xpedient." (*Id*. ¶ 35.)

- "Unfortunately for Agilent, such transfer of utility accounts appears to not have occurred for nearly a year following the storage of the Tips Inventory in the Cromwell Warehouse." (*Id*. ¶ 36.)

- "Upon information and belief, and based on the following series of communications between St. Paul, Xpedient, and MLGW, it appears that (1) Xpedient was never established as the account holder for the utilities serving the Cromwell Warehouse and (2) that both the gas line and HVAC systems were in disrepair: [describing a series of communications, *prior* to the Water Intrusion Event, between St. Paul's Property Manager and Xpedient regarding "HVAC work" and the utility account]." (*Id*. ¶ 37.)

- "Upon information and belief, following these sporadic communications during the summer and fall of 2023, Xpedient's and/or St. Paul's efforts to have the account transferred, the gas line unlocked, and HVAC system repaired, were abandoned." (*Id*. ¶ 38.)

- "On or around January 8, 2024, MLGW issued a news release advising its customers (which, upon information and belief, included Defendants at the time) that 'severe weather [was] expected this week including high winds, freezing temperatures, and possible snow" and warning its customers to "prepare their homes and businesses for the extreme cold by protecting water pipes and checking on automated sprinkler systems." (*Id*. ¶¶ 42–43.)

- "Both Defendants knew or should have known that, given the lack of heat in the Cromwell Warehouse, the impending deep freeze presented a significant risk of domestic pipe and sprinkler system failure (especially where such pipes, like those allegedly comprising the sprinkler system at the Cromwell Warehouse, were unwrapped and lacking insulation)." (*Id*. ¶ 62.)

- "Defendants—two companies in the warehousing, real estate, and/or insurance industries—neither acted nor warned Agilent of the conditions of the warehouse [e.g., "no gas, no heat, and no protection against the impending freeze"] and the risks they posed to Agilent's inventory." (*Id*. ¶ 4.)

In light of these specific allegations which, again, must be accepted as true for purposes of resolving a motion under Federal Rule of Civil Procedure 12(b)(6), St. Paul's argument that Agilent has not sufficiently alleged St. Paul's awareness of the conditions in the Cromwell Warehouse prior to the Water Intrusion Event make no sense.

Moreover, consistent with Agilent's well-pled allegations, Xpedient has likewise pled, in its Crossclaim against St. Paul, that St. Paul was aware of and responsible for the conditions at the Cromwell Warehouse that caused the Water Intrusion Event. (Crossclaim 18–19, ¶¶ 4–10; *id*. at 20, ¶ 13 (St. Paul "failed to provide the normal utility service connections and failed to provide a properly functioning heating system for the Subject Warehouse until after the freeze event.").)

Accordingly, Agilent has sufficiently pled that the loss was foreseeable and that St. Paul breached its duty of care.

**B.     Plaintiff has Sufficiently Pled that St. Paul is Liable for Harm Arising From Conditions at the Cromwell Warehouse**

St. Paul, in its only argument outside of Duty of Care, proposes that landlords are not liable to third parties for conditions on leased premises because, as landlord, they are not in control of the premises. This argument fails for two reasons. First, as alleged throughout the Complaint, St. Paul maintained critical responsibilities and control of the Cromwell Warehouse during the lease to Xpedient. As such, this "mere landlord" defense does not apply. Second, it is well-settled Tennessee law that landlords are *not* excused from liability for a harm caused by a dangerous condition arising from negligence or negligently performed repairs.

    i.     St. Paul Maintained Control of the Cromwell Warehouse

Agilent alleges, *inter alia*, that St. Paul (1) had "responsibility to ensure the Cromwell Warehouse had functioning utilities, such as an HVAC system, sprinkler system, and domestic

-13-

water pipes" (Compl. ¶ 61), (2) was "responsible for and ultimately did repair and/or replace the damaged domestic pipes and sprinkler system at the Cromwell Warehouse following the Water Intrusion Event" (*id.* ¶ 70), and perhaps most importantly, (3) had *sole access* to the gas line necessary for the HVAC system, sprinkler system, and domestic water pipes to function (Compl. ¶¶ 31–33; 36–37).[4]

St. Paul's control of the Cromwell Warehouse during Xpedient's tenancy is further corroborated by the Lease Agreement, which places significant restrictions upon Xpedient's ability to operate, provides that St. Paul will be responsible for ensuring normal utility service connections, and warrants that the heating system would be in "good working order." (Sealed Ex. 1 to Xpedient's Answer & Crossclaim §§ 1.06, 3.02, 3.05, 4.01, 5.06.) The Lease Agreement also places St. Paul in ultimate control over the HVAC system and prohibits the installation or operation of any "HVAC apparatus" without St. Paul's written permission—meaning St. Paul controlled whether the Cromwell Warehouse had heat, whether from the warehouse's HVAC system or otherwise. (*Id.*, Ex. B at § 4.)

In addition to the factual inaccuracy of St. Paul's "mere landlord" argument, it is worth noting that the authority upon which it relies is inapposite. All the cases cited by St. Paul on the issue of control were decided at the summary judgment stage or following trial, involved personal injury, and contain different facts from those alleged here. *See, e.g.*, *Gray v. McDonald's USA, LLC*, 874 F. Supp. 2d 743, 753–54 (W.D. Tenn. 2012) (granting summary judgment for defendant franchisor, in personal injury action arising out of an assault, where there was no evidence that defendant had "retained any control over the hiring, firing, or discipline of" the franchisee's employees or "retained control over the specific aspect of the premises leading to the harm—that is the employment of [the perpetrator]"); *Kingsul Theatres, Inc. v. Quillen*, 29 Tenn. App. 248

---

[4] Agilent's well-pled allegations that St. Paul maintained critical control of the Cromwell Warehouse during Xpedient's tenancy are again corroborated by Xpedient's Answer and Crossclaim. In its Answer, Xpedient "admits that St. Paul was responsible for and ultimately did repair and replace the damaged fire sprinkler system in the subject warehouse" (Answer ¶ 70), and in its Crossclaim alleges that St. Paul had control over the HVAC system and utilities that caused the Water Intrusion Event at the Cromwell Warehouse (Crossclaim 18–19, ¶¶ 5–9).

(Tenn. Ct. App. 1946) (affirming jury verdict for plaintiff against theater owner on negligence claim arising out of trip and fall). For example, unlike here, multiple of the cases turned on findings that the landlord or building owner was unaware of the dangerous conditions and/or not responsible for their repair. *See, e.g.*, *Lethcoe v. Holden*, 31 S.W.3d 254, 257–59 (Tenn. Ct. App. 2000) (affirming summary judgment where tenant employer was responsible for repairs of dangerous condition); *Lewis v. Fletcher*, 2023 Tenn. App. LEXIS 494 (Tenn. Ct. App. Nov. 29, 2023) (affirming summary judgment for defendant owner where lessee had sole possession of property and owner had no notice of faulty condition); *Priestas v. Kia Props.*, LLC, 2019 Tenn. App. LEXIS 606 (Tenn. Ct. App. Dec. 18, 2019) (affirming summary judgment for property owner where plaintiff failed to identify a relevant building code provision that imposed an affirmative duty on owner in support of negligence per se claim); *Fisher v. Villages at Henley Station, LLC*, 2020 Tenn. App.LEXIS 28 (Tenn. Ct. App. Jan. 24, 2020) (affirming summary judgment where landlord did not have constructive or actual knowledge of dangerous condition); *Whitsett v. McCort*, 1990 Tenn. App. LEXIS 611, at *14 (Tenn. Ct. App. 1990) (finding the trial court did not err in failing to direct a verdict for the defendants were there was "proof from which the jury could find that the defendants did not relinquish control of the premises to the contractor" and thus owed a duty of care to the subcontractor employee, but vacating the judgment where the jury instructions were unclear). In contrast to these decisions, as discussed above, Agilent has specifically pled that St. Paul knew of the conditions at the Cromwell Warehouse that led to the Water Intrusion Event and was responsible for the repairs following them.

      St. Paul's control over the Cromwell Warehouse is indisputable and well pled.

      ii.    <u>Under Tennessee Law, Landlords are Not Excused from Liability for Harm Caused by Negligence or Negligent Repairs</u>

Contrary to St. Paul's contention, Tennessee law places liability on landlords for a harm caused by a dangerous condition on their property where the dangerous condition arises from the landlord's "failure to make repairs or by negligence in performing repairs." *Lewis v. Fletcher*, 2023 Tenn. App. LEXIS 494, at *8 n.1 (Tenn. Ct. App. Nov. 29, 2023) (citing *Denton v. Hahn*,

-15-

2004 Tenn. App. LEXIS 605 (Tenn. Ct. App. Sept. 16, 2004)). For example, in *Ghormley v. Carl B. Cook, Inc.*, the Court of Appeals affirmed the jury's decision holding the lessor and lessee jointly and severally liable for plaintiff's injuries where the lessee had been requesting for months, prior to the incident, that the lessor undertake repairs to fix the dangerous condition, which lessor failed to do, causing plaintiff's injury. 756 S.W.2d 264, 267 (Tenn. Ct. App. 1988) ("where a landlord has agreed to keep premises in repair and, after notice, neglects to repair, he is liable for one injured by the defective condition.") (citation omitted); *see also id.* ("where the landlord fails to repair, his conduct toward injured third parties is tortious." (citing *Helton v. Reynolds*, 640 S.W.2d 5, 9 (Tenn. Ct. App. 1982)). That is precisely what occurred in this case.

St. Paul was responsible for ensuring there was a working HVAC system and utilities. (*See, e.g.*, Compl. ¶ 37 (prior to the Water Intrusion Event, St. Paul represents it would "separate out the utilities" and enable the "HVAC work").) St. Paul's failure to execute the necessary repairs contributed to and/or caused the Water Intrusion Event. (*Id.* ¶ 69 (after the Water Intrusion Event, "St. Paul takes responsibility for and has the 'bad' regulator fixed" which was necessary for the "safe . . . use . . . [of the] HVAC system"]; *id.* ¶ 62 (St. Paul "knew or should have known that, given the lack of heat in the Cromwell Warehouse, the impending deep freeze presented a significant risk of domestic pipe and sprinkler system failure (especially where such pipes . . . were unwrapped and lacking insulation)"); *id.* ¶ 124 ("St. Paul knew or should have known of the diminished condition of the Cromwell Warehouse, including, without limitation, the locked gas meter, broken gas regulator, inoperative HVAC system, uninsulated domestic pipes and/or sprinkler system, and general state of disrepair, and the impact of the same on Agilent's Tips Inventory.").) The Lease Agreement likewise confirms that St. Paul was obligated to provide service connections for utilities and warranted that the heating system would be in "good working order" upon the start of the lease. (Sealed Ex. 1 to Xpedient's Answer & Crossclaim §§ 4.01, 5.06.) Contrary to St. Paul's obligations, the gas line was ultimately not connected until April 10, 2024—nearly three months after the Water Intrusion Event—and that, even then, the HVAC system required additional repairs. (Compl., ¶ 69; Crossclaim 19, ¶ 9 ("Even though the natural

gas connection was established on or about April 10, 2024, the HVAC system for the Subject Warehouse would not properly function and required substantial work and/or replacement.").)

In conclusion, St. Paul played a major role in Agilent's loss and the facts supporting Agilent's well-founded negligence claim against it have been copiously pled in Agilent's Complaint. St. Paul's motion should be denied.

### C. If the Court Grants St. Paul's Motion, Plaintiff Should be Given Leave to Amend the Complaint

While Agilent respectfully submits that St. Paul's Motion should be denied for the reasons detailed above, if the Court finds any portion of St. Paul's Motion to be well taken, Agilent requests leave to amend its complaint. "When a motion to dismiss is granted, courts typically grant leave to amend the complaint. Generally, if it is 'at all possible' that the losing party can state a claim for relief in a more carefully drafted complaint, the court should provide at least one opportunity to amend." *In re Great Lakes Comnet, Inc.*, 588 B.R. 1, 23 (W.D. Mich. Bankr. 2018) (citing *Brown v. Matauszak*, 415 Fed. App'x 608, 614–15 (6th Cir. 2011)); *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 n.* (6th Cir. 2021) ("Dismissal with prejudice and without leave to amend is only appropriate when it is clear on de novo review that the complaint could not be saved by an amendment."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). This is the first motion to dismiss brought against Plaintiff's pleadings. Plaintiff requests leave to amend the Complaint if the Court grants the Motion.

### VI. HEARING REQUESTED

Pursuant to Local Rule 7.2(d), Plaintiff also hereby requests a hearing on the instant Motion. Plaintiff respectfully submits that a hearing and oral argument will aid the Court by allowing Plaintiff to elucidate the nuanced factual circumstances establishing St. Paul's liability under Tennessee law, which will be helpful or necessary to the Court in reaching its decision.

### VII. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Motion be denied in its entirety, and that St. Paul be ordered to file an answer within 14 days. In the event the Motion is

deemed granted in any form, Plaintiff should be allowed leave to amend since no such leave to amend has been previously requested or granted.

      RESPECTFULLY SUBMITTED, this the 24th day of March 2025.

      *s/ Douglas F. Halijan*
      Douglas F. Halijan (BPR # 16718)
      Elena R. Mosby (BPR # 40562)
      **Burch Porter & Johnson, PLLC**
      130 North Court Avenue
      Memphis, TN 38103
      Telephone: 901-524-5000
      Facsimile: 901-524-5024
      dhalijan@bpjlaw.com
      emosby@bpjlaw.com
      *Attorneys for Plaintiff*

      Amber Finch (#222321) (admitted *pro hac vice*)
      Margaret C. McDonald (#307008) (admitted *pro hac vice*)
      **Reed Smith LLP**
      515 South Flower, Suite 4300
      Los Angeles, CA 38103
      Telephone: 213-457-8000
      Facsimile: 213-457-8080
      afinch@reedsmith.com
      mcmcdonald@reedsmith.com
      *Attorneys for Plaintiff*