**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:25-cv-02101-BCL-cgc |
| XPEDIENT MANAGEMENT GROUP, LLC ) | |
| and ST. PAUL FIRE AND MARINE ) | Judge Brian C. Lea |
| INSURANCE COMPANY, ) | Magistrate Judge Charmaine |
| ) | Claxton |
|     Defendants. ) | |
| _____ ) | |
| ) | |
| XPEDIENT MANAGEMENT GROUP, LLC, ) | |
| ) | |
|     Cross-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| ST. PAUL FIRE AND MARINE INSURANCE ) | |
| COMPANY ) | |
| ) | |
|     Cross-Defendant, ) | |
| _____ ) | |
| ) | |
| FACTORY MUTUAL INSURANCE CO., as ) | |
| subrogee of Agilent Technologies, Inc., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:25-cv-02424-MSN-tmp |
| XPEDIENT MANAGEMENT GROUP, LLC ) | |
| and ST. PAUL FIRE AND MARINE ) | JURY DEMANDED |
| INSURANCE COMPANY, ) | |
| ) | |
|     Defendants. ) | |

**NOTICE OF CANCELLATION OF
30(b)(6) DEPOSITION OF AGILENT TECHNOLOGIES, INC.**

PLEASE TAKE NOTICE that the deposition of the 30(b)(6) representative of Agilent

Technologies, Inc. for April 9, 2026 is cancelled.  The deposition will be rescheduled for a later

date.

Respectfully submitted this the 17th day of March, 2026.

/s/ William P. Thomas

William P. Thomas (MS 102209)
Andrew B. Schrack (TN 037624)
**BUTLER SNOW LLP**
6075 Poplar Ave., Ste. 500
Memphis, TN 38119
T: 901-680-7200
F: 901-680-7201
will.thomas@butlersnow.com
andrew.schrack@butlersnow.com

*Attorneys for Defendant Xpedient Management Group, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 17, 2026 a copy of the foregoing document has been filed

electronically.  Notice of this filing will be served by operation of the Court's electronic filing

system to all parties indicated on the electronic filing receipt.  All other parties will be served via

electronic mail and/or first-class United States Mail, postage prepaid.  Parties may access this filing

through the Court's electronic filing system.


*/s/ William P. Thomas*
WILLIAM P. THOMAS

**EXHIBIT "A"**

**DEFINITIONS**

A. **"Action"** means the civil action(s) captioned *Agilent Technologies, Inc. v. Xpedient Management Group, LLC, et al.*, including the consolidated subrogation action, together with all claims, counterclaims, crossclaims, defenses, amendments, and related proceedings.

B. **"Agilent"** means Agilent Technologies, Inc., including all of its divisions, business units, operating groups, subsidiaries, parents, affiliates, predecessors, successors, joint ventures, and any entity acting or purporting to act on its behalf, and all of its current and former officers, directors, employees, agents, representatives, attorneys, consultants, and other persons acting for or on behalf of any of the foregoing.

C. **"Xpedient"** means Xpedient Management Group, LLC, and all persons acting or purporting to act on its behalf.

D. **"St. Paul"** means St. Paul Fire and Marine Insurance Company (including Travelers entities where applicable), and all persons acting or purporting to act on its behalf.

E. **"Factory Mutual" or "FM"** means Factory Mutual Insurance Company and all persons acting or purporting to act on its behalf.

F. **"Cromwell Warehouse"** means the facility/warehouse located at or commonly known as **4601 Cromwell Avenue, Memphis, Tennessee 38118**, including any sub-portion(s), leased premises, common areas, dock areas, office areas, yard areas, mechanical rooms, utility rooms, sprinkler riser rooms, and any other associated improvements, systems, and appurtenances.

G. **"Water Intrusion Event"** means the water intrusion/freeze event alleged to have occurred on or about **January 17, 2024**, including any freezing, bursting, leakage, discharge, or release of water from **domestic water lines and/or the fire sprinkler system**, and any related conditions, observations, inspections, remediation, and response activities.

H. **"MOSA"** means the **Master Operating Services Agreement for Logistics Services** between Agilent and Xpedient, including all appendices, exhibits, schedules, addenda, statements of work, incorporated documents, amendments, modifications, extensions, renewals, riders, and drafts.

I. **"SOA"** means the **Site Operating Agreement** relating to Agilent's operations at the Cromwell Warehouse, including all amendments, modifications, addenda, exhibits, schedules, and drafts.

J. **"Limitation"** means the **$1,000,000 contractual limitation of liability** set forth in the MOSA Paragraph 12(C)(c) (including any limitation-of-liability, cap, damages exclusion/waiver,

limitation on categories of damages, or similar risk-allocation provision), whether described as a "cap," "limitation," "limitation of liability," or otherwise.

**K. "Labcon Agreement"** means any contract(s), pricing agreement(s), supply agreement(s), revised or restated pricing agreement(s), capacity commitment(s), purchase arrangement(s), or other written or oral agreement(s) between Agilent (and/or its affiliates) and Labcon (and/or its affiliates) relating to pipette tips, including all amendments, addenda, exhibits, schedules, and drafts including but not limited to the Agreement produced at Bates range ATI_409-ATI_439.

**L. "Pipette Tips"** or **"pipette tip inventory"** means any pipette tips and/or related consumables stored at the Cromwell Warehouse, including all associated packaging, cartons, pallets, shrink wrap, inserts, labels, lot/batch identifiers, and associated SKUs/part numbers.

**M. "Inventory"** means all goods, products, materials, consumables, or other items owned by Agilent or held for Agilent at the Cromwell Warehouse, including damaged, allegedly damaged, potentially affected, and unaffected items.

**N. "Person"** means any natural person, corporation, partnership, proprietorship, association, governmental entity, insurer, broker, consultant, adjuster, expert, or other entity of any kind.

**O. "Identify"** when used with respect to:

1. **a person**: state the person's full name, job title/role, employer, last-known business address, and (if known) relationship to Agilent and involvement in the subject matter;
2. **a document**: state the title/description, date, author(s), recipient(s), custodian, file path/location, and Bates number(s) (if produced);
3. **a communication**: state the date, participants (including cc/bcc), method (email, phone, meeting, chat, etc.), and general subject matter.

**P. "Document"** has the broadest meaning under Fed. R. Civ. P. 34 and includes all writings and recorded matter in any medium, including ESI: emails, attachments, spreadsheets, presentations, databases, ERP extracts, claims files, photos, videos, audio, instant messages (Teams/Slack/SMS/WhatsApp), calendar invites, drafts, redlines, tracked changes, metadata, and any tangible thing from which information can be obtained.

**Q. "Communication"** means any transmission of information by any means (oral, written, electronic, or otherwise), including emails, texts, chats, Teams messages, letters, memoranda, notes of calls, meeting minutes, and voicemail.

**R. "Relating to," "regarding," "concerning," "referring to," or "in connection with"** mean directly or indirectly referencing, describing, evidencing, reflecting, constituting, containing, embodying, analyzing, discussing, reporting, responding to, or having any logical or factual relationship to the subject matter.

**S. "Including"** means including without limitation (i.e., "including, but not limited to").

**T. "Time Period"** unless a topic states otherwise, means **January 1, 2022 to the present**.

**U. "Draft"** means any non-final version of a document, including versions with tracked changes, comments, redlines, markups, or revision history, whether stored separately or within a versioning system.

## MATTERS FOR EXAMINATION

1. The corporate structure and organization of Agilent Technologies, Inc., including: its form of organization and ownership structure; number of operating divisions; number of employees (globally and in the United States); and annual revenue ranges.

2. The existence, structure, and staffing of Agilent's in-house legal department during the period 2022 to present, including the approximate number of attorneys employed, their general roles, and reporting structure.

3. All information contained in Agilent's responses to the Interrogatories propounded by any party in this action.

4. The documents produced by Agilent in response to the Requests for Production of Documents propounded in this action.

5. All allegations contained in the First Amended Complaint in this action.

6. The negotiation, drafting, review, and execution of the Master Operating Services Agreement ("MOSA"), including but not limited to any draft exchanges or revisions, amendments or related agreements, and the Agilent personnel involved with drafting, reviewing, and executing the MOSA.

7. The negotiation, purpose, and understanding of the $1,000,000 contractual limitation set forth in Paragraph 12(C)(c) of the Master Operating Services Agreement (the "Limitation"), including any discussions or negotiations leading to its inclusion; any attempts to modify, revise, or remove the Limitation; any internal risk analysis or evaluation conducted by Agilent in connection with the Limitation; the impact of the Limitation, if any, on pricing under the MOSA or the SOA; Agilent's insurance considerations or procurement decisions based on the Limitation; and Agilent's interpretation of the scope, meaning, and application of the Limitation.

8. All competing proposals or alternative providers considered when Agilent entered the MOSA with Xpedient including pricing information and substantive terms including but not limited to the Limitation.

6

9. The role of Agilent's legal department in reviewing, negotiating, approving, or advising on commercial contracts, including the MOSA with Xpedient.

10. The circumstances, timing, and substance of any communications, disclosures, or transmittals of the MOSA between Agilent and Xpedient to any insurance carrier, broker, agent, or underwriting representative for Agilent, including but not limited to whether the MOSA was provided (a) prior to execution, (b) at or after execution, or (c) at any time prior to January 17, 2024, and the identity of all persons involved in such communications.

11. The negotiation, drafting, review, and execution of the Site Operating Agreement ("SOA") for the Cromwell Warehouse, including but not limited to any amendments or related agreements, Agilent's personnel involved, and draft exchanges or revisions.

12. Agilent's communications, disclosures, specifications, or requirements provided to Xpedient concerning temperature conditions for storage of Agilent's inventory at the Cromwell Warehouse, including any minimum or maximum temperature ranges, environmental tolerances, or climate-control expectations, and the timing and method by which such information was conveyed.

13. Agilent's investigation of the January 17, 2024, Water Intrusion Event, including: personnel and third parties involved, inspections of the Cromwell Warehouse, environmental or contamination testing performed on the subject inventory, root cause analysis, determinations regarding source of water (sprinkler vs. domestic), and evidence preservation efforts.

14. Agilent's commercial sophistication and contracting practices, including its experience negotiating logistics and warehousing contracts; its standard practices and policies regarding limitation-of-liability provisions; its internal risk management procedures; the manner in which insurance considerations are integrated into its contracting decisions; and its internal review and approval process for commercial agreements, including the roles of legal, risk management, finance, and executive personnel.

15. Agilent's efforts to comply with all notice-of-claim and contractual notice provisions under Paragraph 12(C)(e) of the Master Operating Services Agreement, including when Agilent contends its notice obligations were triggered; the timing, manner, and content of any notice provided to Xpedient; and any internal deliberations, analyses, or discussions regarding the sufficiency, timing, or strategic considerations of such notice.

16. The identification of all Agilent personnel, contractors, or agents who inspected, visited, or otherwise accessed the Cromwell Warehouse prior to the Water Intrusion Event, including the dates of such access; the purpose of each visit; any observations made concerning the condition, utilities, heating, fire protection systems, or storage environment; and whether any notes, photographs, reports, or other documentation were created in connection with such visits.

7

17. Agilent's insurance claims and related communications arising out of the Water Intrusion Event, including all claims submitted to any insurer (including Factory Mutual), coverage analyses performed or obtained, inspections conducted, payments received or sought, internal discussions and strategic considerations regarding pursuit or non-pursuit of domestic water coverage, any decision not to pursue or accept domestic water insurance proceeds, the impact of such decisions on subrogation rights, and all coordination or communications between Agilent and its insurers relating to claim handling, valuation, and subrogation strategy.

18.  The nature, quantity, and characteristics of the pipette tip inventory stored at the Cromwell Warehouse, including the specific SKUs and quantities stored; the applicable storage requirements, including temperature, humidity, and environmental controls; shelf-life considerations; the sensitivity of the inventory to moisture or water exposure; and the packaging configuration in which the inventory was stored, including any protective wrapping, boxing, or palletization.

19. All intended, potential, and actual uses of the pipette tip inventory stored at the Cromwell Warehouse, including whether the inventory was designated for internal use, resale, or specific customer orders; any customer commitments associated with the inventory; whether any portion of the inventory was reused, repurposed, tested, or sold after the Water Intrusion Event; any alternative uses considered prior to disposal; and the factual and technical basis for Agilent's conclusion that the inventory was unusable.

20.  All facts relating to the damages Agilent alleges were sustained to its inventory stored at the Cromwell Warehouse on or about January 17, 2024, including the identification, inspection, segregation, valuation, and disposition of the allegedly damaged inventory, and Agilent's calculation of such alleged damages, including the methodology used; determination of replacement cost; consideration of depreciation; any tax treatment or tax benefit associated with the claimed losses; the identity and role of any consultants, adjusters, or experts involved in the evaluation; and the accounting treatment of the loss in Agilent's books and financial records.

21. The identification, quantity, condition, handling, and disposition of any pipette tip inventory or other Agilent inventory stored at the Cromwell Warehouse that Agilent contends was not damaged by the Water Intrusion Event, including whether such inventory was subsequently sold, transferred, repurposed, tested, or otherwise placed into commerce; the timing of any such sales or transfers; revenues received; customer communications regarding such inventory; and any inspections, testing, or quality assurance evaluations performed prior to sale or distribution.

22. The lifecycle, marketability, and commercial status of the pipette tip inventory stored at the Cromwell Warehouse, including whether any SKUs were discontinued, phased out, superseded, obsolete, or subject to reduced demand at any time before or after January 17, 2024; whether any portion of the inventory became obsolete or unsellable following the Water Intrusion Event.

8

23. All efforts undertaken by Agilent to mitigate its alleged damages arising from the Water Intrusion Event, including any salvage evaluations performed; testing conducted on allegedly damaged inventory; consideration of repackaging or remediation of affected products; decisions regarding disposal of inventory; the timing and rationale for replacement purchases; and any efforts made to minimize storage, warehousing, or related costs following the event.

24. The costs, logistics, and operational steps associated with the transportation, relocation, or disposition of inventory following the Water Intrusion Event, including the disposal of allegedly damaged inventory; the relocation of undamaged inventory; freight and transportation expenses incurred; and shipping costs associated with replacement inventory.

25. The negotiation, drafting, interpretation, and performance of the contract between Agilent and Labcon relating to pipette tip inventory, including any capacity commitments; the pricing structure; any obligations relating to replacement inventory; communications regarding the salvageability or usability of allegedly damaged inventory; and whether replacement inventory was contractually required under the agreement.

26. Agilent's decision to discontinue use of the Cromwell Warehouse, including the timing of that decision; the reasons for discontinuing use; alternative facilities that were considered and ultimately selected; internal business strategy considerations; and whether and to what extent the decision was related to or influenced by the Water Intrusion Event.

100031417.v1