**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

| | |
|---|---|
| **AGILENT TECHNOLOGIES, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | )   <u>EXHIBIT 1</u> |
| **v.** | ) |
| | ) |
| **XPEDIENT MANAGEMENT GROUP, LLC** | ) |
| **and ST. PAUL FIRE AND MARINE** | ) |
| **INSURANCE COMPANY,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |
| | ) |
| **XPEDIENT MANAGEMENT GROUP, LLC,** | ) |
| | ) |
| **Cross-Plaintiff,** | )   **Case No. 2:25-cv-02101-BCL-cgc** |
| | ) |
| **v.** | )   **Consolidated with** |
| | ) |
| **ST. PAUL FIRE AND MARINE INSURANCE** | )   **Case No. 2:25-cv-02424-BCL-tmp** |
| **COMPANY** | ) |
| | )   **JURY DEMANDED** |
| **Cross-Defendant,** | ) |
| | ) |
| | ) |
| **FACTORY MUTUAL INSURANCE CO., as** | ) |
| **subrogee of Agilent Technologies, Inc.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **XPEDIENT MANAGEMENT GROUP, LLC,** | ) |
| **ST. PAUL FIRE AND MARINE** | ) |
| **INSURANCE COMPANY and COLLIERS** | ) |
| **MANAGEMENT SERVICES-MEMPHIS,** | ) |
| **LLC,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## AMENDED COMPLAINT

Plaintiff Factory Mutual Insurance Company (hereinafter "FM" or "Plaintiff"), as subrogee of Agilent Technologies, Inc. ("Agilent"), by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 15(a)(1), respectfully files its Amended Complaint against defendants Xpedient Management Group, LLC ("Xpedient"), St. Paul Fire and Marine Insurance Company ("St. Paul") and Colliers Management Services-Memphis, LLC ("Colliers") (hereinafter collectively "Defendants") and states as follows:

## NATURE OF THE ACTION

1. This subrogation action arises from a devastating water loss event at a warehouse building owned by St. Paul, managed by Colliers and leased to Defendant Xpedient that destroyed Agilent's consumable goods inventory while that Inventory was in Xpedient's care, custody, and control. This action is based upon Xpedient's contractual breaches of the warehousing agreements between Agilent and Xpedient and all three Defendants' negligence, gross negligence and negligence per se, which left the subject warehouse unheated and the wet pipe sprinkler system therein unprotected from a well-publicized freeze event that caused sprinkler pipes to burst and the sprinkler system to activate, damaging the entirety of Agilent's consumable goods inventory stored inside the warehouse.

## THE PARTIES

2. FM is a corporation duly organized and existing pursuant to the laws of Rhode Island, with its principal place of business located in Johnston, Rhode Island. FM is duly authorized and licensed in the State of Tennessee to write property and casualty insurance coverage.

2

3.      FM's subrogor, Agilent, is a Delaware corporation with its principal place of business located at 5301 Stevens Creek Blvd., Santa Clara, California 95051, who at all times relevant to the allegations contained herein was in the business of supplying instruments, software, services, and expertise to customers in life sciences, diagnostics, and applied chemical markets.

4.      Xpedient, is a Tennessee limited liability company with a principal place of business at 100 Crescent Court, Suite 700, Dallas, Texas 75201.  Xpedient may be served with process by serving its registered agent at: Business Filings, Inc., 300 Montvue Road, Knoxville, Tennessee 37919.

5.      St. Paul, is a Connecticut corporation with a principal place of business at One Tower Square, Hartford, Connecticut 06183.  St. Paul may be served with process by serving its registered agent at: Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203.

6.      Colliers, formerly known as Colliers Management Services, LLC, is a Tennessee limited liability company with a principal place of business at 6363 Poplar Avenue, Suite 400, Memphis, Tennessee 38119. Colliers may be served with process by serving its registered agent Mark Bradley Kornegay, 6363 Poplar Avenue, Suite 220, Memphis, Tennessee 38119.

### JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states in that the citizenship of plaintiff is completely diverse from the citizenships of the defendants.

8.      Venue is appropriate in the United States District Court for the Western District of Tennessee pursuant to 28 U.S.C. §1391, in that a substantial portion of the events and acts and

3

omissions causing the loss which is the subject of this action occurred in the Western District of Tennessee.

9.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in Tennessee and routinely and regularly conduct business in this State and in the Western District of Tennessee, including owning and/or operating and/or managing facilities in this District.

## FACTUAL ALLEGATIONS

10.     Agilent supplies laboratories with instruments that help scientists conduct faster and more accurate medical research.

11.     Some of Agilent's instruments contain high-precision, liquid handling pipettes that measure, transport, and dispense liquid samples or specimens to be tested. These liquid-handling pipettes use single or limited-use, medical-grade disposable plastic tips that are considered "consumable" products typically discarded after a single use.

12.     In 2023, Agilent sought warehousing services in the Memphis area to store $12 million dollars in pipette tips inventory (the "Tips Inventory").

13.     Defendant Xpedient is a third-party logistics company that holds itself out as having "significant expertise in Warehousing" and offering "a finely tuned warehousing operation that delivers beyond expectations."

14.      In May 2023, Agilent entered into two (2) warehousing and logistics agreements with Xpedient for a three-year term whereby Xpedient agreed to provide storage, warehousing, and care for Agilent's Tips Inventory (hereinafter the "Agreements").[1]

---

[1]     True and accurate copies of the Agreements have been filed under Seal with this Court as ECF Doc. No. 2.

15. St. Paul is the owner of an approximately 76,000 square foot warehouse located at 4601 Cromwell Ave, Memphis, Tennessee 38118 ("Cromwell Warehouse").

16. From at least May 2023 to October 2024, St. Paul retained actual control over the entire Cromwell Warehouse.

17. During this time, St. Paul has alleged, in responses to requests for admission served by Agilent in this action, that St. Paul "contracted with Colliers to supervise, lease, and manage the Cromwell Warehouse" and "operate it" and thus Colliers, pursuant to St. Paul's authority, also had actual control over the entire Cromwell Warehouse.

18. Under St. Paul's contract with contract with Colliers,[2] Colliers was tasked with the care, protection, operation, maintenance, repair and replacement of the Cromwell Warehouse.

19. St. Paul, however, retained oversight of Colliers operations, requiring, for example, approval of any expense exceeding $5,000 in excess of the annual operating budget that St. Paul approved.

20. St. Paul's contract with Colliers also provided, that to the extent required of St. Paul in leases pertaining to the Cromwell Warehouse, make contracts for electricity, gas, water, telephone, . . . and other operating services or such of them as Colliers shall deem advisable and necessary, but in each case with St. Paul's prior approval of the terms of such contracts.

21. Thus, at all times material hereto, St. Paul and Colliers both retained actual control over the gas utility lines and connections, wet pipe sprinkler system and heating system serving the Cromwell Warehouse.

22. After contracting with Agilent to store, warehouse, and care for Agilent's Tips Inventory, Xpedient leased a portion of the Cromwell Warehouse from St. Paul so that it could

---

[2] St. Paul produced its contract with Colliers to FM on March 4, 2026.

store and warehouse the Tips Inventory.

23.     At the time Xpedient and St. Paul entered into their lease agreement for the Cromwell Warehouse, St. Paul and Colliers knew or should have known that Xpedient was leasing the Cromwell Warehouse space for the purpose of storing Agilent's Tips Inventory.

24.     On or around May 22, 2023, the Tips Inventory was moved into the Cromwell Warehouse.

25.     St. Paul and Colliers were aware or should have been aware as early as May 22, 2023 that Xpedient was storing Agilent's Tips Inventory in the Cromwell Warehouse.

26.     At all times material hereto, the interior of the Cromwell Warehouse contained a wet pipe fire sprinkler system that was unwrapped and without insulation, and that was exposed in the ceiling of the building.

27.     At all times material hereto, the HVAC (heating, ventilation, and air conditioning) system at the Cromwell Warehouse relied on natural gas.

28.     Unbeknownst to Agilent and FM, but fully known by Defendants, between May 22, 2023 and January 17, 2024, the Cromwell Warehouse was without a working gas line service and was unheated.

29.     At all relevant times, Defendants knew or should have known that the Cromwell Warehouse should be heated to at least 40° F as there was a wet pipe fire sprinkler system maintained therein.

30.     At all relevant times, Defendants knew or should have known that the Cromwell Warehouse was without a working gas service line and was unheated, and should have, but did not took any steps to remedy this dangerous condition (i.e., lack of heat in a building with a wet pipe sprinkler system).

6

31.     Beginning in early January of 2024, news outlets nationwide warned of a freeze anticipated throughout the southern United States.

32.     On or around January 8, 2024, Memphis Light, Gas, and Water ("MLGW"), the municipal public utility serving the City of Memphis, issued a news release advising its customers (which, upon information and belief, included Defendants) that "severe weather [was] expected this week including high winds, freezing temperatures, and possible snow."

33.      In the news release, MLGW asked its customers, which included Defendants, to "prepare their homes and businesses for the extreme cold by protecting water pipes and checking on automated sprinkler systems."

34.     MLGW also warned its customers, which included Defendants, that "water pipes can burst any time temperatures are below freezing" and that "[a] burst water pipe or water heater is considered to be an emergency situation and could pose a danger of flooding the building."

35.     MLGW advised that its "Customers should open cabinet doors and turn water to a slow drip to prevent pipes from freezing" and that its "Customers can also wrap pipes either in pipe insulation (available at hardware stores) or with towels, clothes, etc... to prevent pipes from freezing."

36.     In the notice, MLGW told its customers that "[i]f your pipes freeze, turn off the main valve . . . and call MLGW's emergency contact number…"

37.     MLGW's guidance conforms to the numerous resources available online for protecting or "winterizing" pipes and sprinkler systems during the colder months. For example, the National Fire Sprinkler Association ("NFSA"), warned, in a 2022 article entitled "How to Winterize A Fire Sprinkler System," that "[l]ack of proper maintenance is one of the leading vulnerable . . . . [and] [d]uring cold months, are more susceptible to catastrophic failure."

7

Accordingly, "[m]aintaining a minimum of 40 degrees (F) is imperative in ensuring the sprinkler pipes do not freeze."

38.    Where a temperature of 40 degrees (F) cannot be maintained, NFSA recommends that sprinkler systems should be "protected with a dry pipe or antifreeze system." However, such systems "require more thorough assessments and routine maintenance to keep the systems from freezing." Even then "wet portions of the dry pipe valve must be maintained at a minimum of 40 degrees (F) and the enclosure must be inspected daily to verify minimum temperature is maintained. . ."

39.    In short, NFSA cautions, "[w]hen not properly maintained, fire protection systems can freeze, burst, and fail to function entirely . . . . It is extremely important to ensure that these systems are properly maintained to ensure they are ready to operate in the event of an emergency."

40.    Defendants were aware of these requirements. For example, on January 4, 2024, Security Fire Protection Company, Inc. ("Security Fire Protection"), a company that holds itself out as specializing in fire sprinkler services, conducted an inspection of the wet fire sprinkler system at the Cromwell Warehouse. In its inspection report, directed to Colliers, Security Fire Protection warned, "RECOMMENDED MAINTAINING PROPER TEMPERATURE AT A MINIMUM OF 40°F DURING THE WINTER MONTHS."

41.    Notwithstanding abundant advance notice from public officials, MLGW and news outlets about the impending deep freeze conditions set to impact the Memphis area, Defendants - three companies in the warehousing, real estate, and/or insurance industries - took no steps to ensure the sprinkler pipes inside the Cromwell Warehouse would not freeze and took no steps to protect the Tips Inventory from water damage from a burst sprinkler pipe.

42.     As predicted, beginning on or around January 14, 2024, the temperature in Memphis began to drop below freezing.

43.     On January 15, 2024, the National Weather Service issued both a Winter Storm Warning and Wind Chill Advisory for the Memphis area, cautioning that there was a risk of "dangerously cold wind chills below 0 °F . . . ."

44.     The same day, the Mayor of the City of Memphis, Paul Young, declared a state of emergency (No. 1-2024) relating to "the severe winter weather impacting the City of Memphis," and "resulting in freezing temperatures and several inches of snow accumulation." The state of emergency was to be in effect for seven days through January 22, 2024, but was extended through January 29, 2024.

45.     On or around the evening of January 17, 2024, in the midst of the deep freeze, which resulted in temperatures inside the Cromwell Warehouse that were well below 32 degrees Fahrenheit, fire sprinkler piping located in the unheated Cromwell Warehouse froze and then burst, causing extensive water damage to Agilent's Tips Inventory (the "Water Loss Event").

46.     The Defendants' failure to keep the Cromwell Warehouse appropriately heated and/or the wet pipe fire sprinkler system winterized allowed the wet pipe fire sprinkler system to freeze, break and fail.

47.     Agilent was never notified by any party prior to the Water Loss Event that the Cromwell Warehouse was without a working gas line and/or that it was unheated.

48.     As a result of the aforementioned Water Loss Event, Agilent suffered damages in an amount in excess of $9 million.

9

49. FM provides property insurance to its customers. At all times material to the allegations of this Complaint, FM insured certain property and business interests of Agilent, including the Tips Inventory, pursuant to FM policy number 1115069 (hereinafter "the Policy").

50. FMIC has paid Agilent $4,787,087.40 for the damages Agilent sustained as a result of the Water Loss Event.

51. As a result of its payments and in accordance with common law principles of equitable and/or legal subrogation and the terms of the Policy, FM is now subrogated to the rights of Agilent to recover damages from third-persons, to the extent of the payment made by FM to Agilent.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT
**(Against Xpedient)**

52. Plaintiff hereby incorporates and re-alleges by reference Paragraphs 1 through 51 above as if fully stated herein.

53. The Agreements constitute valid and enforceable written agreements between Plaintiff's subrogor and Xpedient.

54. Pursuant to the Agreements, Xpedient agreed to provide warehousing, transportation management and inventory management services at the Cromwell Warehouse for Agilent's Tips Inventory.

55. Pursuant to the Agreements, Xpedient agreed to comply with the provisions of any local statute, regulation, rule, ordinance or order, applicable to the provision of services provided to Agilent under the Agreements.

56. Plaintiff's subrogor has performed and/or fully satisfied in a timely manner all material conditions required to be performed by it under the Agreements.

10

57.    Xpedient breached the Agreements by failing to ensure a working natural gas service to the building was in place, failing to ensure that the HVAC system was working, failing to winterize the wet pipe sprinkler system at the onset of freezing weather in violation of local ordinances, failing to ensure that temperature within the Cromwell Warehouse was at least 40° F in violation of local ordinances, permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Agilent's Tips Inventory, failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler system during freezing conditions, and ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing temperatures.

58.    As a direct and proximate result of Xpedient's contractual breaches, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

## COUNT II – BREACH OF BAILMENT AND/OR NEGLIGENT BAILMENT
### (Against Xpedient)

59.    Plaintiff hereby incorporates and re-alleges by reference Paragraphs 1 through 58 above as if fully stated herein.

60.    On or around May 22, 2023, as agreed by Agilent and Xpedient, Agilent began moving the Tips Inventory, which it owned, into the Cromwell Warehouse with Xpedient's express permission and at its direction.

61.    Xpedient's agreement to provide warehousing and storage of Agilent's Tips Inventory, defined as bailed property under the Agreements, and its acceptance of the Tips Inventory at its warehouse for such purpose, created and constitutes a bailment under Tennessee

11

law.

62.     The Tips Inventory was in good, new, and undamaged condition at the time such inventory was moved into the Cromwell Warehouse.

63.     Xpedient cannot return or redeliver the Tips Inventory to Agilent in good, new and/or undamaged condition because the Tips Inventory was destroyed while in Xpedient's exclusive possession from contact with water and/or other liquids from the sprinkler system and/or burst pipes at the Cromwell Warehouse.

64.     Xpedient's inability to return or redeliver the Tips Inventory to Agilent in good, new and/or undamaged condition is prima facie evidence of Xpedient's negligence as bailee.

65.     As a direct and proximate result of Xpedient's breach of bailment and/or negligence as bailee, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

## COUNT III – NEGLIGENCE
### (Against Xpedient)

66.     Plaintiff hereby incorporates and re-alleges by reference Paragraphs 1 through 65 above as if fully stated herein.

67.     Defendant Xpedient, as warehouser/tenant/operator of the Cromwell Warehouse, owed Plaintiff's subrogor a duty of care to operate and maintain the Cromwell Warehouse in a state capable of storing the Tips Inventory and preventing harm to the Tips Inventory.

68.     Defendant Xpedient owed Plaintiff's subrogor a duty to maintain, inspect and repair the wet pipe fire sprinkler system and the HVAC system within the Cromwell Warehouse, including a duty to ensure that the HVAC system was functioning and that the wet sprinkler system pipes were properly insulated and protected against freezing.

69.     Defendant Xpedient, by reason of its agents, employees and representatives,

12

breached its duty of care to Plaintiff's subrogor in the following ways:

    a.    failing to properly maintain and repair the wet pipe fire sprinkler system;

    b.    failing to properly inspect the wet pipe sprinkler system;

    c.    failing to ensure that the wet pipe sprinkler system was in good order and repair;

    d.    failing to winterize the wet pipe sprinkler system at the onset of freezing weather;

    e.    failing to properly inspect, maintain and repair the HVAC system;

    f.    failing to ensure that temperature within the Cromwell Warehouse was at least 40° F as there was a wet pipe fire sprinkler system maintained therein;

    g.    permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Plaintiff's subrogor's property;

    h.    failing to act as a reasonably prudent warehouser and/or operator of the Cromwell Warehouse;

    i.    failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler system during freezing conditions;

    j.    failing to maintain the utilities serving the Cromwell Warehouse;

    k.    ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing temperatures; and

    l.    otherwise failing to exercise reasonable care in ways which may be disclosed in discovery.

70.    As a direct and proximate result of Defendant Xpedient's negligence as aforesaid, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

**COUNT IV – GROSS NEGLIGENCE**
**(Against Xpedient)**

13

71.     Plaintiff hereby incorporates and re-alleges by reference paragraphs 1 through 70 above as if fully stated herein.

72.     Defendant Xpedient, as warehouser/tenant/operator of the Cromwell Warehouse, knew or should have known that the Cromwell Warehouse should be heated to at least 40° F as there was a wet pipe fire sprinkler system maintained therein.

73.     Defendant Xpedient, as warehouser/tenant/operator of the Cromwell Warehouse, knew or should have known that if the Cromwell Warehouse was not heated to at least 40° F then the wet pipe fire sprinkler system maintained therein should be insulated or winterized prior to the onset of freezing weather conditions.

74.     Defendant Xpedient was put on notice by MLGW that the Cromwell Warehouse's natural gas service was not functioning properly as early as May 2023.

75.     Defendant Xpedient allowed the natural gas service to the building to remain inoperable and in disrepair through the date of the Water Loss Event that destroyed Agilent's Tips Inventory.

76.     At least seven days prior to the Water Loss Event, Defendant Xpedient was warned by news outlets of the impending winter weather storm and put on further notice by MLGW that the incoming severe freezing weather in the Memphis-area required precautions from owners, tenants and operators of commercial buildings to ensure the prevention of frozen sprinkler pipes and subsequent pipe bursts.

77.     Defendant Xpedient ignored and disregarded these warnings and notices relaying the urgency to protect assets from potential damage caused by frozen pipes.

78.     Defendant Xpedient, in conscious disregard and indifference to the safety and property of Plaintiff's subrogor and others, failed to maintain a temperature of at least 40° F in the

14

Cromwell Warehouse and failed to insulate or winterize the wet pipe fire sprinkler system maintained therein.

79.    By failing to properly maintain a temperature of at least 40° F in the Cromwell Warehouse and by failing to insulate or winterize the wet pipe fire sprinkler system maintained therein, Defendant Xpedient failed to properly address a hazardous condition which posed a substantial risk of harm to life and property.

80.    Defendant Xpedient was grossly negligent in, *inter alia*:

a.    improperly maintaining the wet pipe fire sprinkler system;

b.    improperly inspecting the wet pipe sprinkler system;

c.    knowingly failing to ensure that the wet pipe sprinkler system was in good order and repair;

d.    knowingly failing or refusing to winterize the wet pipe sprinkler system at the onset of freezing weather;

e.    knowingly failing to properly inspect, maintain and repair the HVAC system;

f.    knowingly failing to ensure that temperature within the Cromwell Warehouse was at least 40° F as there was a wet pipe fire sprinkler system maintained therein;

g.    knowingly creating dangerous conditions posed by an unheated warehouse which contained a wet pipe fire sprinkler system that was unwrapped and without insulation;

h.    knowingly permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Plaintiff's subrogor's property;

i.    knowingly failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler system during freezing conditions;

j.    knowingly failing to maintain the utilities serving the Cromwell Warehouse; and

k.    knowingly ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing

15

temperatures.

81.　Such actions and omissions were negligent, undertaken with an utter lack of concern for the safety of the Tips Inventory, were reckless and/or demonstrated a reckless disregard for the rights of Agilent such that a conscious indifference to the consequences can be implied.

82.　As a direct and proximate result of Defendant Xpedient's gross negligence as aforesaid, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

### COUNT V– NEGLIGENCE *PER SE*
### (Against Xpedient)

83.　Plaintiff hereby incorporates and re-alleges by reference paragraphs 1 through 82 above as if fully stated herein.

84.　At all relevant times, Chapter 9-36 of the Code of Ordinances, City of Memphis, Tennessee ("Memphis City Code") adopted the 2021 ICC International Fire Code as the Fire Prevention Code of the City of Memphis ("Fire Code").

85.　One of the express purposes of the IFC is to establish a reasonable level of property protection from the hazards of dangerous conditions in existing buildings, structures, and premises.

86.　The Fire Code directly references and adopts NFPA 25 (2020), the Standard for the Inspection, Testing and Maintenance of Water-Based Fire Protection Systems.

87.　Pursuant to Chapter 9-36-3 of the Memphis City Code, "[a]ny person, firm or corporation violating any of the provisions of this chapter shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished as provided in <u>section 1-24-1</u> of this code."

88.　The Fire Code was enacted to protect a class of persons and their property, which includes Agilent and the Tips Inventory.

16

89.    The Fire Code is a public safety ordinance, as its Inspection, Testing and Maintenance of Water-Based Fire Protection Systems provisions are considered the minimum standards necessary to preserve and protect public health and safety.

90.    Sections 4.1.1 *et. seq.* and 4.1.2 *et. seq.*, of NFPA 25, *among other things*, requires the owner or the owner's designated representative to ensure that a water-filled wet pipe sprinkler fire protection system, like the one installed at the subject property, is maintained at a minimum temperature of 40°F (4°C) unless an approved antifreeze solution is utilized.

91.    Section 4.1.2.1 of NFPA 25, requires the owner or the owner's designated representative ensure that all areas of the building containing water-filled piping that does not have another means of freeze protection shall be maintained at a minimum temperature of 40°F (4°C).

92.    Pursuant NFPA 25, Section 5.3.4, if the temperatures in the Cromwell Warehouse were not maintained at 40°F, or higher, Defendants should have protected the wet pipe sprinkler system such as winterizing the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

93.    Defendant Xpedient had a duty to comply with the aforementioned Memphis City Code and Fire Code.

94.    The wet pipe fire sprinkler system in the unheated Cromwell Warehouse building failed to meet the requirements of the Memphis City Code and Fire Code.

95.    Defendant Xpedient violated the Memphis City Code and Fire Code by, *inter alia*, failing to properly maintain and repair the wet pipe fire sprinkler system in the Cromwell Warehouse so that the water in that system maintained a minimum temperature of 40°F (4°C).

96.    Defendant Xpedient violated the Memphis City Code and Fire Code by, inter alia, maintaining a wet pipe sprinkler system in the Cromwell Warehouse in an area where temperatures

17

were not maintained at 40°F, or higher, and by failing to winterize the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

97.    Defendant Xpedient's failure to comply with the Memphis City Code and Fire Code constitutes negligence *per se*.

98.    Defendant Xpedient knew or should have known of the violation of the Memphis City Code and Fire Code.

99.    Defendant Xpedient failed to take reasonable steps to remedy the violation of the Memphis City Code and Fire Code.

100.    As a direct and proximate result of Defendant Xpedient's violations of the Memphis City Code and Fire Code and negligence *per se*, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

**COUNT VI – NEGLIGENCE**
**(Against St. Paul)**

101.    Plaintiff hereby incorporates and re-alleges by reference Paragraphs 1 through 100 above as if fully stated herein.

102.    Defendant St. Paul, as the owner and operator in control of the entire Cromwell Warehouse, including its wet sprinkler system and heating system, owed Plaintiff's subrogor a duty of care to operate and maintain the entire Cromwell Warehouse in a state capable of storing the Tips Inventory and preventing harm to the Tips Inventory.

103.    Defendant St. Paul owed Plaintiff's subrogor a duty to maintain, inspect and repair the wet pipe fire sprinkler system and the HVAC system within the Cromwell Warehouse, including a duty to ensure that the HVAC system was functioning and that the wet sprinkler system pipes were properly insulated and protected against freezing.

18

104.    Defendant St. Paul (and/or Colliers jointly, severally, in the alternative), its agents, employees and representatives, breached its duty of care to Plaintiff's subrogor in the following ways:

a.   failing to properly maintain and repair the wet pipe fire sprinkler system;

b.   failing to properly inspect the wet pipe sprinkler system;

c.   failing to ensure that the wet pipe sprinkler system was in good order and repair;

d.   failing to winterize the wet pipe sprinkler system at the onset of freezing weather;

e.   failing to properly inspect, maintain and repair the HVAC system;

f.   failing to ensure that temperature within the Cromwell Warehouse was at least 40° F as there was a wet pipe fire sprinkler system maintained therein;

g.   permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Plaintiff's subrogor's property;

h.   failing to act as a reasonably prudent owner and operator of the Cromwell Warehouse;

i.   failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler system during freezing conditions;

j.   failing to maintain the utilities serving the Cromwell Warehouse;

k.   ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing temperatures;

l.   failing to verify and ensure that Colliers was adequately performing all duties and obligations imposed upon St. Paul under the lease agreement with Xpedient and performing all acts necessary to effect St. Paul's compliance with all laws, rules, ordinances, statutes, and regulations of any appropriate government authority applicable to the Cromwell Warehouse; and

m.   otherwise failing to exercise reasonable care in ways which may be disclosed in discovery.

105.    As a direct and proximate result of Defendant St. Paul's negligence as aforesaid,

19

Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

**COUNT VII – GROSS NEGLIGENCE**
**(Against St. Paul)**

106.    Plaintiff hereby incorporates and re-alleges by reference paragraphs 1 through 105 above as if fully stated herein.

107.    Defendant St. Paul, as owner of the Cromwell Warehouse, knew or should have known that the Cromwell Warehouse should be heated to at least 40° F as there was a wet pipe fire sprinkler system maintained therein.

108.    Defendant St. Paul, as owner of the Cromwell Warehouse,  knew or should have known that if the Cromwell Warehouse was not heated to at least 40° F then the wet pipe fire sprinkler system maintained therein should be insulated or winterized prior to the onset of freezing weather conditions.

109.    Defendant St. Paul was put on notice by MLGW that the Cromwell Warehouse's natural gas service was not functioning properly as early as May 2023.

110.    Defendant St. Paul allowed the natural gas service to the building to remain inoperable and in disrepair through the date of the Water Loss Event that destroyed Agilent's Tips Inventory.

111.    At least seven days prior to the Water Loss Event, Defendant St. Paul was warned by news outlets of the impending winter weather storm and put on further notice by MLGW that the incoming severe freezing weather in the Memphis-area required precautions from owners, tenants and operators of commercial buildings to ensure the prevention of frozen sprinkler pipes and subsequent pipe bursts.

112.    Defendant St. Paul ignored and disregarded these warnings and notices relaying

20

the urgency to protect assets from potential damage caused by frozen pipes.

113.    Defendant St. Paul, in conscious disregard and indifference to the safety and well-being of the property of Plaintiff's subrogor and others, failed to maintain a temperature of at least 40° F in the Cromwell Warehouse and failed to insulate or winterize the wet pipe fire sprinkler system maintained therein.

114.    By failing to properly maintain a temperature of at least 40° F in the Cromwell Warehouse and by failing to insulate or winterize the wet pipe fire sprinkler system maintained therein, Defendant St. Paul failed to properly address a hazardous condition which posed a substantial risk of harm to life and property.

115.    Defendant St. Paul was grossly negligent in, *inter alia*:

    a.   improperly maintaining the wet pipe fire sprinkler system;

    b.   improperly inspecting the wet pipe sprinkler system;

    c.   knowingly failing to ensure that the wet pipe sprinkler system was in good order and repair;

    d.   knowingly failing or refusing to winterize the wet pipe sprinkler system at the onset of freezing weather;

    e.   knowingly failing to properly inspect, maintain and repair the HVAC system;

    f.   knowingly failing to ensure that temperature within the Cromwell Warehouse was at least 40° F as there was a wet pipe fire sprinkler system maintained therein;

    g.   knowingly creating dangerous conditions posed by an unheated warehouse which contained a wet pipe fire sprinkler system that was unwrapped and without insulation;

    h.   knowingly permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Plaintiff's subrogor's property;

    i.   knowingly failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler

system during freezing conditions;

j.  knowingly failing to maintain the utilities serving the Cromwell Warehouse; and

k.  knowingly ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing temperatures.

116.  Such actions and omissions were negligent, undertaken with an utter lack of concern for the safety of the Tips Inventory, were reckless and/or demonstrated a reckless disregard for the rights of Agilent such that a conscious indifference to the consequences can be implied.

117.  As a direct and proximate result of Defendant St. Paul's gross negligence as aforesaid, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

## COUNT VIII – NEGLIGENCE
### (Against Colliers)

118.  Plaintiff hereby incorporates and re-alleges by reference Paragraphs 1 through 117 above as if fully stated herein.

119.  Defendant Colliers, as the alleged business operator in control of the Cromwell Warehouse, including its utilities, HVAC system, and domestic plumbing and sprinkler systems, owed Plaintiff's subrogor a duty of care to operate and maintain the entire Cromwell Warehouse in a state capable of storing the Tips Inventory and preventing harm to the Tips Inventory.

120.  Defendant Colliers owed Plaintiff's subrogor a duty to maintain, inspect and repair the wet pipe fire sprinkler system and the HVAC system within the Cromwell Warehouse, including a duty to ensure that the HVAC system was functioning and that the wet sprinkler system pipes were properly insulated and protected against freezing.

121.  Defendant Colliers, by reason of its agents, employees and representatives,

22

breached its duty of care to Plaintiff's subrogor in the following ways:

    a.   failing to properly maintain and repair the wet pipe fire sprinkler system;

    b.   failing to properly inspect the wet pipe sprinkler system;

    c.   failing to ensure that the wet pipe sprinkler system was in good order and repair;

    d.   failing to winterize the wet pipe sprinkler system at the onset of freezing weather;

    e.   failing to properly inspect, maintain and repair the HVAC system;

    f.   failing to ensure that temperature within the Cromwell Warehouse was at least 40° F as there was a wet pipe fire sprinkler system maintained therein;

    g.   permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Plaintiff's subrogor's property;

    h.   failing to act as a reasonably prudent owner's agent, operator and property manager of the Cromwell Warehouse;

    i.   failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler system during freezing conditions;

    j.   failing to maintain the utilities serving the Cromwell Warehouse;

    k.   ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing temperatures; and

    l.   otherwise failing to exercise reasonable care in ways which may be disclosed in discovery.

122.    As a direct and proximate result of Defendant Colliers' negligence as aforesaid, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

**COUNT IX – GROSS NEGLIGENCE**
**(Against Colliers)**

123.    Plaintiff hereby incorporates and re-alleges by reference paragraphs 1 through 122

23

above as if fully stated herein.

124.    Defendant Colliers, as owner's agent, operator and property manager of the Cromwell Warehouse, knew or should have known that the Cromwell Warehouse should be heated to at least 40° F as there was a wet pipe fire sprinkler system maintained therein.

125.    Defendant Colliers, as owner's agent, operator and property manager of the Cromwell Warehouse,  knew or should have known that if the Cromwell Warehouse was not heated to at least 40° F then the wet pipe fire sprinkler system maintained therein should be insulated or winterized prior to the onset of freezing weather conditions.

126.    Defendant Colliers was put on notice by MLGW that the Cromwell Warehouse's natural gas service was not functioning properly as early as May 2023.

127.    Defendant Colliers allowed the natural gas service to the building to remain inoperable and in disrepair through the date of the Water Loss Event that destroyed Agilent's Tips Inventory.

128.    At least seven days prior to the Water Loss Event, Defendant Colliers was warned by news outlets of the impending winter weather storm and put on further notice by MLGW that the incoming severe freezing weather in the Memphis-area required precautions from owners, tenants and operators of commercial buildings to ensure the prevention of frozen sprinkler pipes and subsequent pipe bursts.

129.    Defendant Colliers ignored and disregarded these warnings and notices relaying the urgency to protect assets from potential damage caused by frozen pipes.

130.    Defendant Colliers, in conscious disregard and indifference to the safety and well-being of the property of Plaintiff's subrogor and others, failed to maintain a temperature of at least 40° F in the Cromwell Warehouse and failed to insulate or winterize the wet pipe fire sprinkler

24

system maintained therein.

131.     By failing to properly maintain a temperature of at least 40° F in the Cromwell Warehouse and by failing to insulate or winterize the wet pipe fire sprinkler system maintained therein, Defendant Colliers failed to properly address a hazardous condition which posed a substantial risk of harm to life and property.

132.     Defendant Colliers was grossly negligent in, *inter alia*:

a.  improperly maintaining the wet pipe fire sprinkler system;

b.  improperly inspecting the wet pipe sprinkler system;

c.  knowingly failing to ensure that the wet pipe sprinkler system was in good order and repair;

d.  knowingly failing or refusing to winterize the wet pipe sprinkler system at the onset of freezing weather;

e.  knowingly failing to properly inspect, maintain and repair the HVAC system;

f.  knowingly failing to ensure that temperature within the Cromwell Warehouse was at least 40° F as there was a wet pipe fire sprinkler system maintained therein;

g.  knowingly creating dangerous conditions posed by an unheated warehouse which contained a wet pipe fire sprinkler system that was unwrapped and without insulation;

h.  knowingly permitting dangerous conditions to exist within the Cromwell Warehouse, when it knew, or should have known through the exercise of reasonable care, that such conditions would create an unreasonable risk of harm to Plaintiff's subrogor's property;

i.  knowingly failing to warn Plaintiff's subrogor that the Cromwell Warehouse building was unheated which posed a risk of failure and leaking of the wet pipe fire sprinkler system during freezing conditions;

j.  knowingly failing to maintain the utilities serving the Cromwell Warehouse; and

k.  knowingly ignoring MLGW's instructions of safeguarding the water pipes within the Cromwell Warehouse from potential damage caused by the freezing temperatures.

133.    Such actions and omissions were negligent, undertaken with an utter lack of concern for the safety of the Tips Inventory, were reckless and/or demonstrated a reckless disregard for the rights of Agilent such that a conscious indifference to the consequences can be implied.

134.    As a direct and proximate result of Defendant Colliers' gross negligence as aforesaid, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

## COUNT X – NEGLIGENCE *PER SE*
### (Against St. Paul and Colliers)

135.    Plaintiff hereby incorporates and re-alleges by reference paragraphs 1 through 134 above as if fully stated herein.

136.    At all relevant times, Chapter 9-36 of the Memphis City Code adopted the 2021 ICC International Fire Code as the Fire Code.

137.    One of the purposes of the IFC is to establish a reasonable level of property protection from dangerous conditions in existing buildings, structures, and premises.

138.    The Fire Code directly references and adopts NFPA 25 (2020), the Standard for the Inspection, Testing and Maintenance of Water-Based Fire Protection Systems.

139.    Pursuant to Chapter 9-36-3 of the Memphis City Code, "[a]ny person, firm or corporation violating any of the provisions of this chapter shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished as provided in section 1-24-1 of this code."

140.    The Fire Code was enacted to protect a class of persons which includes Agilent.

141.    The Fire Code is a public safety ordinance, as its Inspection, Testing and Maintenance of Water-Based Fire Protection Systems provisions are considered the minimum standards necessary to preserve and protect public health and safety.

142.    Sections 4.1.1 *et. seq.* and 4.1.2 *et. seq.*, of NFPA 25, *among other things*, requires the owner or the owner's designated representative ensure that a water-filled wet pipe sprinkler fire protection system, like the one installed at the subject property, is maintained at a minimum temperature of 40°F (4°C) unless an approved antifreeze solution is utilized.

143.    Section 4.1.2.1 of NFPA 25, requires the property owner or the property owner's designated representative ensure that all areas of the building containing water-filled piping that does not have another means of freeze protection shall be maintained at a minimum temperature of 40°F (4°C).

144.    Pursuant to NFPA 25, Section 5.3.4, if the temperatures in the Cromwell Warehouse were not maintained at 40°F, or higher, St. Paul and/or Colliers should have protected the wet pipe sprinkler system such as winterizing the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

145.    St. Paul and/or Colliers jointly, severally, or in the alternative individually, had a duty to comply with the aforementioned Memphis City Code and Fire Code.

146.    The wet pipe fire sprinkler system as maintained and operated by St. Paul and/or Colliers in the unheated Cromwell Warehouse building failed to meet the requirements of the Memphis City Code and Fire Code.

147.    St. Paul and/or Colliers, jointly, severally, or in the alternative, violated the Memphis City Code and Fire Code by, *inter alia*, failing to properly maintain and repair the wet pipe fire sprinkler system in the Cromwell Warehouse so that the water in that system maintained a minimum temperature of 40°F (4°C).

148.    St. Paul and/or Colliers, jointly, severally, or in the alternative, violated the Memphis City Code and Fire Code by, *inter alia*, maintaining a wet pipe sprinkler system in the

27

Cromwell Warehouse in an area where temperatures were not maintained at 40°F, or higher and by failing to winterize the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

149.    St. Paul and/or Colliers' failure to comply with the Memphis City Code and Fire Code constitutes negligence *per se*.

150.    St. Paul and/or Colliers knew or should have known of the violation of the Memphis City Code and Fire Code.

151.    St, Paul and/or Colliers failed to take reasonable steps to remedy the violation of the Memphis City Code and Fire Code.

152.    As a direct and proximate result of St. Paul's and Colliers' violations of the Memphis City Code and Fire Code and negligence *per se*, Plaintiff has been damaged in an amount to be proven at trial, but not less than $4,787,087.40 plus pre-judgment interest, post judgment interest, costs and attorney's fees.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff Factory Mutual Insurance Company prays that:

A.  Proper process be issued and served upon Defendants, requiring an answer hereto;

B.  This case be tried before a jury;

C.  Plaintiff recover a judgment against Defendants for compensatory damages in an amount to be proven at trial but not less than $4,787,087.40;

D.  Plaintiff be awarded punitive damages on its Gross Negligence causes of action;

28

E.  Plaintiff recover a judgment against Defendants for its costs and expenses, including

reasonable attorneys' fees as well as pre and post-judgement interest on such damages;

and

F.  Plaintiff has such other, further, and general relief to which it may be entitled.

Respectfully submitted,

*/s/ S. Joe Welborn*
S. Joe Welborn, TN BPR No. 21747
Brenden T. Holbrook, TN BPR No. 39485
Sam D. Jones, TN BPR No. 38436
SMITH CASHION & ORR, PLC
3100 West End Avenue
Suite 800 – One American Center
Nashville, TN 37203
(615) 742-8586 – Tel
jwelborn@smithcashion.com
bholbrook@smithcashion.com
sjones@smithcashion.com
*Attorneys for Plaintiff Factory Mutual Insurance*
*Company, as subrogee of Agilent Technologies, Inc.*

29