**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS**

_____

| | |
|---|---|
| **AGILENT TECHNOLOGIES, INC.,** ) | |
| ) | |
|     **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 2:25-cv-02101-BCL-cgc** |
| ) | |
| **XPEDIENT MANAGEMENT GROUP, LLC, ST.** ) | **Judge Brian C. Lea** |
| **PAUL FIRE AND MARINE INSURANCE** ) | **Magistrate Judge Charmiane Claxton** |
| **COMPANY, COLLIERS MANAGEMENT** ) | |
| **SERVICES – MEMPHIS, LLC** ) | |
| ) | |
|     **Defendants** ) | |
| ) | |

_____

| | |
|---|---|
| ) | |
| **XPEDIENT MANAGEMENT GROUP, LLC.,** ) | |
| ) | |
|     **Cross-Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ST. PAUL FIRE AND MARINE INSURANCE** ) | |
| **COMPANY,** ) | |
| ) | |
|     **Cross-Defendant** ) | |
| ) | |

_____

| | |
|---|---|
| ) | |
| **FACTORY MUTUAL INSURANCE CO., as** ) | |
| **subrogee of Agilent Technologies, Inc.,** ) | |
| ) | **Consolidated with** |
|     **Plaintiff,** ) | |
| ) | **Case No. 2:25-cv-02424-BCL-tmp** |
| **v.** ) | |
| ) | **JURY DEMANDED** |
| **XPEDIENT MANAGEMENT GROUP, LLC and** ) | |
| **ST. PAUL FIRE AND MARINE INSURANCE** ) | |
| **COMPANY** ) | |
| ) | |
|     **Defendants** ) | |
| ) | |

## SECOND AMENDED COMPLAINT

Plaintiff Agilent Technologies, Inc. ("Agilent" or "Plaintiff"), by its undersigned counsel, for its second amended complaint against Xpedient Management Group, LLC ("Xpedient"), St. Paul Fire and Marine Insurance Company ("St. Paul"), Colliers Management Services – Memphis LLC, LLC ("Colliers" with Xpedient and St. Paul, the "Defendants") hereby alleges the following:

## I.    NATURE OF THE ACTION

1.    This is a complaint for breach of contract, breach of bailment and/or negligent bailment, negligent misrepresentation, negligence *per se*, negligence and/or reckless acts or omissions, and declaratory relief against Xpedient and negligence and negligence *per se* against St. Paul and Colliers.  Plaintiff seeks the recovery of damages, litigation costs and expenses, and for any and all other relief to which Plaintiff may be entitled from Defendants arising from Defendants' destruction of Plaintiff's goods while in Defendants' care, custody, and control.

2.    Xpedient was engaged by Agilent for one primary job: the storage and care of $12 million of Agilent inventory.

3.    To effectuate this assignment, Xpedient leased from St. Paul a large warehouse space to hold the inventory and then executed a warehousing contract with Agilent for a three-year term.

4.    Since 2004, St. Paul has contracted with Colliers to supervise, lease and manage the operation of its warehouse space.

5.    Months into the warehousing contract, dispatches from news outlets around the country warned of a serious cold weather event that would affect the southern United States. Meanwhile, unbeknownst to Agilent, but fully known to Defendants, the warehouse space holding

2

its sensitive inventory had no gas, no heat, and no protection against the impending freeze. As a state of emergency was declared in Memphis, Defendants—three companies in the warehousing, real estate, and/or insurance industries—neither took action nor warned Agilent of the conditions of the warehouse and the risks they posed to Agilent's inventory.

6.     The weather event arrived as expected—a bitter winter freeze in Memphis and the surrounding region. The warehouse, unprotected from the cold, was not spared. Pipes burst and the sprinkler system activated, soaking the warehouse from floor to ceiling and the goods stored inside it, and forcing Agilent to dispose of most of its inventory and relocate the remainder at its own expense.

7.     Despite having destroyed the inventory and with it, Agilent's need for warehouse space, Defendants have denied all liability. Adding to this insult, Xpedient claims that Agilent remains bound to the full term of the warehousing contract and that it owes nothing to Agilent for the lost inventory, monthly fees, relocation expenses, and business interruption to Agilent.

8.     It has been two years since the loss. Dutifully, Agilent continues to pay tens of thousands of dollars per month for a warehouse that sits empty. Xpedient, by contrast, is better off than ever, collecting a check for a job no longer needed due to its own negligence and wrongdoing.

## II.     PARTIES

9.     Plaintiff Agilent Technologies, Inc. ("Agilent" or "Plaintiff") is a Delaware corporation with its principal place of business located at 5301 Stevens Creek Boulevard, Santa Clara, California 95051.

10.     Upon information and belief, defendant Xpedient Management Group, LLC ("Xpedient" or "XMG") is a Tennessee limited liability company with its principal place of

business located at 100 Crescent Court, Suite 700, Dallas, Texas 75201, and may be served through

its registered agent, Business Filings, Inc., at 300 Montvue Road, Knoxville, Tennessee 37919.

11.     Upon information and belief, defendant St. Paul Fire and Marine Insurance

Company ("St. Paul") is a Connecticut corporation with its principal place of business located at

One Tower Square, Hartford, Connecticut 06183, and may be served through its registered agent,

Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203.

12.     Upon information and belief, defendant Colliers Management Services – Memphis,

LLC ("Colliers"), formerly known as Colliers Management Services, LLC, is a Tennessee limited

liability company with its principal place of business located at 6363 Poplar Avenue, Suite 400,

Memphis, Tennessee 38119, and may be served through its registered agent, Mark Bradley

Kornegay, at 6363 Poplar Avenue, Suite 220, Memphis, Tennessee 38119.

## III.    JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1332,

1367 as Plaintiff is a citizen of Delaware and Defendants are citizens of Tennessee and Connecticut

respectively.

14.     The amount in controversy exceeds $75,000 exclusive of interest and costs.

15.     This Court has personal jurisdiction over Defendants, and venue is appropriate in

this Court pursuant to 28 U.S.C. § 1391, because, among other reasons, a substantial part of the

events giving rise to the claims described herein occurred in this judicial district and because

Defendants regularly conduct business in this Commonwealth and this District, including owning

and/or operating facilities in this District.

## IV.    BACKGROUND

### A.    Agilent Seeks a Warehouser for Surplus Pipette Tips

16.    Agilent is a world-leading supplier in life sciences, diagnostics and applied chemical markets.  Agilent advances quality of life with a broad range of high-quality solutions to customers.

17.    Agilent provides laboratories with instruments, services, consumables, applications, and expertise, enabling customers to achieve their research, production, therapeutic, and discovery goals. Agilent instruments, software, and sample preparation solutions help scientists at top-tier universities conduct faster, more accurate research to learn more about cancer, cardiovascular diseases, diabetes, Alzheimer's, Parkinson's, and other ailments.

18.    Some of Agilent's instruments, particularly those in its Bravo Automated Liquid Handling Platform, contain internal pipettes that measure and transport and dispense liquid samples or specimens to be tested.  These high-precision, liquid-handling pipettes found within the robotic instruments use single- or limited-use, medical-grade disposable plastic tips.  The Bravo instruments are used for high-throughput sample manipulation, meaning that the instruments use a large number of pipette tips (often either 96 or 386 tips per cycle).  The pipette tips are considered "consumable" products typically discarded after a single use.  The pipette tips allow the instruments to be used repeatedly and in a clean manner in the same way that a thermometer cover may be used to keep the thermometer fresh for consecutive users or measurements.

19.    To ensure the accuracy of measurements taken on Agilent's instruments, these pipette tips are manufactured in a tightly controlled environment and are subject to rigorous performance specifications and performance standards.

20.    In or around 2023, following a period of irregularity in worldwide supply chains, Agilent acquired a surplus of pipette tips to maintain assurance of supply.  With limited space of

its own, Agilent began looking for a logistics company in the Memphis area to provide warehousing for the surplus pipette tips inventory, valued at over \$12 million ("Tips Inventory").

**B.**    **Agilent's Selects Xpedient and The Cromwell Warehouse**

21.    In or around May 2023, Agilent selected Xpedient to provide warehousing for the Tips Inventory.

22.    Xpedient is a third-party logistics company that holds itself out as having "significant expertise in Warehousing" and offering "a finely tuned warehousing operation that delivers beyond expectations."

23.    On its website, Xpedient claims it can "locate the perfect site for your warehouse, design the layout, and set up processes and equipment . . . ."

24.    One such "perfect site" that Xpedient operated was an approximately 45,000-square-foot sub-portion of a warehouse located at 4601 Cromwell Avenue, Memphis, Tennessee 38118 ("Cromwell Warehouse").

25.    The Cromwell Warehouse is owned by St. Paul and lies in a large industrial neighborhood of Memphis that spans both sides of the Interstate.

26.    At all times material hereto, St. Paul retained actual control over the entire Cromwell Warehouse, including from at least May 2023 to October 2024.

27.    During this time, St. Paul has alleged, in responses to requests for admission served by Agilent in this action, that St. Paul "contracted with Colliers to supervise, lease, and manage the Cromwell Warehouse" and "operate it" and thus Colliers, pursuant to St. Paul's authority, also had actual control over the entire Cromwell Warehouse.

28.    Upon information and belief, at or around the time Xpedient and St. Paul entered into a lease agreement, St. Paul and Colliers knew or should have known that Xpedient was leasing

the Cromwell Warehouse space for Agilent's benefit and for the sole and exclusive purpose of providing warehousing services to Agilent for the Tips Inventory.

### C.  Agilent and Xpedient Enter into Warehousing Agreements

29.  On or around May 15, 2023, Agilent and Xpedient entered into two agreements: (1) a Master Operating Services Agreement for Logistics Services (the "MOSA") and (2) a Site Operating Agreement ("SOA," and, together with the MOSA, the "Agreements"). Attached hereto as **Exhibit A** is a true and correct copy of the MOSA and attached hereto as **Exhibit B** is a true and correct copy of the SOA, which are both filed under seal herewith because of the confidentiality clause in the MOSA.

30.  Under the MOSA, Xpedient agreed to provide logistics services to Agilent, including warehousing, transportation management, and consulting services, as further specified in the SOA.

31.  The SOA then specified the Cromwell Warehouse as the facility to be used to store the Tips Inventory and contained critical details of Xpedient's obligations, such as "facility management, including rent, utilities [*sic*] interest, tax, maintenance, repairs, and security."

32.  In exchange for these logistics services, Agilent agreed to pay Xpedient in excess of $1 million over the 36-month term of the Agreements.

33.  Upon information and belief, Xpedient knew or should have known that the primary purpose of the Agreements was the safe warehousing of Agilent's Tips Inventory.

34.  On or around May 22, 2023, Agilent began moving the Tips Inventory into the Cromwell Warehouse.

### D.  St. Paul and Xpedient Enter into the Lease Agreement

7

35.     In or around May 2023, and contemporaneous with Agilent and Xpedient entering into the Agreements, St. Paul and Xpedient entered into a commercial lease agreement for the Cromwell Warehouse (the "Lease Agreement").  Attached hereto as **Exhibit C** is a true and correct copy of the Lease Agreement, which is filed under seal herewith.  The Lease Agreement runs for an almost identical 36-month term as the Agreements.

36.     Notwithstanding the Lease Agreement, St. Paul retained actual control over utilities at the entire Cromwell Warehouse as well as its wet sprinkler system and HVAC (heating, ventilation, and air conditioning) system from at least May 2023 to October 2024.

37.     For example, pursuant to the Lease Agreement, St. Paul was responsible for providing "normal utility service connections with separate metering" for the leased premises of the Cromwell Warehouse.  Lease Agreement ¶ 4.01, Ex. C.

38.     St. Paul also warranted that the "heating, ventilation and air conditioning systems currently serving" the Cromwell Warehouse "shall be in good working order."  Lease Agreement ¶ 5.06, Ex. C.

39.     In the Lease Agreement, St. Paul also prohibited the "install[ation] or operat[ion]" of any "HVAC apparatus or carry on any mechanical operation without written permission of" St. Paul.  Lease Agreement ¶ 5.06, Ex. C at Ex. B, Rule 4.

40.     The Lease Agreement limited the use of the Cromwell Warehouse to those services sought by Agilent, providing that the only "Permitted Use" of the Cromwell Warehouse is for "[w]arehouse, shipping and receiving."  Lease Agreement ¶ 1.06, Ex. C.

41.     The Lease Agreement contemplates St. Paul's use of a property manager in respect to the Cromwell Warehouse, repeatedly describing "[St. Paul's] property manager" as St. Paul's "agent," and extending Xpedient's indemnification and insurance obligations under the Lease

Agreement to include both St. Paul and its "property manager." *See, e.g.*, Lease Agreement ¶¶ 7.04, 7.07, 7.08, Ex. C.

42. As Agilent later learned, St. Paul had contracted with Colliers, in or around June of 2004, to act as its property manager in respect to the Cromwell Warehouse pursuant to a Management and Leasing Agreement. St. Paul has represented to the parties and to this Court that this Management and Leasing Agreement governed Colliers obligations relating to the Cromwell Warehouse during the relevant period at issue in this action.

43. Under the Management and Leasing Agreement, Colliers was tasked with the "care, protection, operation, maintenance, repair and replacement" of the Cromwell Warehouse.

44. St. Paul, however, retained oversight of Colliers operations, requiring, for example, approval of any expense exceeding $5,000 in excess of the annual operating budget that St. Paul approved.

45. The Management and Leasing Agreement also provided, "To the extent required of Owner in leases pertaining to the Property, make contracts for electricity, gas, water, telephone, . . . and other operating services or such of them as manager shall deem advisable and necessary, but in each case with Owner's prior approval of the terms of such contracts."

46. Accordingly, Colliers also retained actual control over utilities at the entire Cromwell Warehouse as well as its wet sprinkler system and HVAC system from at least May 2023 to October 2024.

**E.     Defendants Fail to Maintain the Cromwell Warehouse**

47. What Agilent did not know at the time it moved the Tips Inventory into the Cromwell Warehouse was that the utilities were still to be transferred to Xpedient, that the gas line was locked, and that the HVAC system was not working.

48. Upon information and belief, the HVAC system at the Cromwell Warehouse relied on natural gas. Thus, without a working gas line, the Cromwell Warehouse was unable to generate heat.

49. A functioning HVAC system in the Memphis area is generally a necessity, in light of the humid, subtropical, climate and four distinct seasons, with drastic swings in temperature from the hot and humid summers to the ice storms and freezing rains of winter. The ability to maintain temperatures above freezing, via an HVAC system or otherwise, in response to these drops in temperature also was critical in the Cromwell Warehouse, which, at all relevant times, had a fire suppression wet sprinkler system that was unwrapped and without insulation, and exposed in the ceiling of the building.

50. On or around May 23, 2023, days *after* execution of the Agreements and *after* certain of the Tips Inventory was placed in the Cromwell Warehouse, Xpedient contacted St. Paul, through its agent and property manager, Colliers, to discuss having the utility accounts associated with its leased sub-portion of the Cromwell Warehouse transferred to Xpedient.

51. Colliers, a legal agent of St. Paul—authorized to bind St. Paul in all matters related to the Cromwell Warehouse, responded on that same date and advised that an account with Memphis Light, Gas, and Water ("MLGW")—the municipal public utility serving the City of Memphis—would need to be transferred to Xpedient.

52. Unfortunately for Agilent, such transfer of utility accounts appears to not have occurred for nearly a year following the storage of the Tips Inventory in the Cromwell Warehouse.

53. Based on the following series of communications between St. Paul, Xpedient, Colliers, and MLGW, it appears that (1) Xpedient was never established as the account holder for

the utilities serving the Cromwell Warehouse and (2) that both the gas line and HVAC systems

were in disrepair:

- **July 5, 2023** (on or around)    Colliers, acting as St. Paul's agent and property manager, notified Xpedient that they were going to "separate out the utilities" at the Cromwell Warehouse between the "vacant space" and the "XMG[] side."

- **July 6, 2023** (on or around)    Xpedient advised Colliers, acting as St. Paul's agent and property manager, that MLGW would not talk with Xpedient regarding the MLGW utility account(s) associated with the Cromwell Warehouse.

- **July 7, 2023** (on or around)    Colliers, acting as St. Paul's agent and property manager, notified Xpedient that "a lift was going to be delivered so they could get the gas split and meter set." Once completed, Colliers, acting as St. Paul's agent and property manager, alleged "HVAC work could begin" at the Cromwell Warehouse.

- **October 17, 2023** (on or around)    Xpedient received a "cut off" notice from MLGW.

- **October 17, 2023 — October 25, 2023** (on or around)    MLGW allegedly advised Xpedient, at that time, that the cut off notice was a "mistake" but that the account associated with the Xpedient sub-portion of the Cromwell Warehouse was "in dispute."

- **October 17, 2023** (on or around)    Xpedient received a notification from MLGW advising it that "billing [would] be delayed for further investigation, to ensure accurate billing from MLGW" and that its account was "under review."

54.    Upon information and belief, following these sporadic communications during the

summer and fall of 2023, Defendants efforts to have the account transferred, the gas line unlocked,

and HVAC system repaired, were abandoned.

55.     During this period, Agilent was never advised that the gas meter had been locked since May 2023, and that, as a result, that portion of the Cromwell Warehouse where the Tips Inventory was stored could not be heated.

56.     Ultimately, it was not until January 18, 2024, that Defendants resumed their communications with MLGW.  By this time, the damage had been done.

**F.      A Deep Freeze Hits Memphis**

57.     Beginning in early January of 2024, news outlets nationwide warned of a freeze anticipated throughout the Southwest United States.

58.     On or around January 8, 2024, MLGW issued a news release advising its customers, which, included Defendants at that time, that "severe weather [was] expected this week including high winds, freezing temperatures, and possible snow."

59.     In the release, MLGW asked that its customers, which included Defendants, to "prepare their homes and businesses for the extreme cold by protecting water pipes and checking on automated sprinkler systems."

60.     MLGW also warned its customers, which included Defendants, that "water pipes can burst any time temperatures are below freezing" and that "[a] burst water pipe or water heater is considered to be an emergency situation and could pose a danger of flooding the building."

61.     MLGW advised that its "Customers should open cabinet doors and turn water to a slow drip to prevent pipes from freezing" and that its "Customers can also wrap pipes either in pipe insulation (available at hardware stores) or with towels, clothes, etc... to prevent pipes from freezing."

62.     In the notice, MLGW told its customers, which included Defendants, that "[i]f your pipes freeze, turn off the main valve . . . and call MLGW's emergency contact number…"

63.    MLGW's guidance conforms to the numerous resources available online for protecting or "winterizing" pipes and sprinkler systems during the colder months.  For example, the National Fire Sprinkler Association ("NFSA") warned, in a 2022 article entitled "How to Winterize A Fire Sprinkler System," that "[l]ack of proper maintenance is one of the leading reasons for fire sprinkler system failures. . . . Systems exposed to cold weather are especially vulnerable . . . . [and] [d]uring cold months, are more susceptible to catastrophic failure."  Accordingly, "[m]aintaining a minimum of 40 degrees (F) is imperative in ensuring the sprinkler pipes do not freeze."

64.    Where a temperature of 40 degrees (F) cannot be maintained, NFSA recommends that sprinkler systems should be "protected with a dry pipe or antifreeze system."  However, such systems "require more thorough assessments and routine maintenance to keep the systems from freezing."  Even then "wet portions of the dry pipe valve must be maintained at a minimum of 40 degrees (F) and the enclosure must be inspected daily to verify minimum temperature is maintained. . ."

65.    In short, NFSA cautions, "[w]hen not properly maintained, fire protection systems can freeze, burst, and fail to function entirely . . . . It is extremely important to ensure that these systems are properly maintained to ensure they are ready to operate in the event of an emergency."

66.    Defendants were aware of these requirements.  For example, on January 4, 2024, Security Fire Protection Company, Inc. ("Security Fire Protection"), a company that holds itself out as specializing in fire sprinkler services, conducted an inspection of the wet fire sprinkler system at the Cromwell Warehouse.  In its inspection report, directed to Colliers, Security Fire Protection warned, "RECOMMENDED MAINTAINING PROPER TEMPERATURE AT A MINIMUM OF 40°F DURING THE WINTER MONTHS."

13

67.     Shortly thereafter, beginning on or around January 14, 2024, and as predicted, the temperature in Memphis began to drop below freezing.

68.     On January 15, 2024, the National Weather Service issued both a Winter Storm Warning and Wind Chill Advisory for the Memphis area, cautioning that there was a risk of "dangerously cold wind chills below 0 °F . . . ."

69.     The same day, the Mayor of the City of Memphis, Paul Young, declared a state of emergency (No. 1-2024) relating to "the severe winter weather impacting the City of Memphis," and "resulting in freezing temperatures and several inches of snow accumulation."  The state of emergency was to be in effect for seven days through January 22, 2024, but was extended through January 29, 2024.

### G.     The Deep Freeze Damages the Unheated Cromwell Warehouse, Destroying the Majority of the Tips Inventory

70.     On or around the evening of January 17, 2024, in the midst of the deep freeze, which resulted in temperatures inside the Cromwell Warehouse below 32 °F, the Memphis Fire Department received a notification that the sprinkler system at the Cromwell Warehouse had activated due to "malfunction."

71.     The Memphis Fire Department reported to the Cromwell Warehouse where, according to the Fire Department Incident Report, they stayed on site for approximately one hour to address the sprinkler system activation.

72.     On or around January 17, 2024, Xpedient also notified Colliers, acting as St. Paul's agent and property manager, that there were "busted [frozen] water pipes" in the Cromwell Warehouse.  (The January 17, 2024 water intrusion event at the Cromwell Warehouse, which is alleged to have included burst, frozen domestic water pipes and the sprinkler system activation, is herein referred to as the "Water Intrusion Event".)

14

73.    Colliers, acting as St. Paul's agent and property manager, directed Security Fire Protection to respond to and assess the damage at the Cromwell Warehouse from the Water Intrusion Event.  Security Fire Protection allegedly reported to Colliers that there was water damage at Cromwell Warehouse caused by the burst, frozen domestic pipes and the sprinkler system activation.

74.    Agilent personnel later responded to the Cromwell Warehouse and reported that many of the boxes storing the tips were saturated with water following the Water Intrusion Event.

75.    As the tips are intended for use with Agilent's highly sensitive instruments and given the importance of the diagnostic test results depending on the same, any contact with water and/or other liquids constitutes a contamination event destroying the tips' integrity.

76.    As explained in a 2018 article entitled "Maintaining Proper Sterile Storage Conditions," in *Infection Control Today*, the introduction of "[m]oisture will allow microorganisms from the air and surfaces to wick through packaging materials…. [and] sterile supplies should never be stored near sources of moisture."

77.    Accordingly, following the Water Intrusion Event, the majority of Agilent's Tips Inventory stored at the Cromwell Warehouse was destroyed from contact with water and/or other liquids from the sprinkler system and/or burst pipes, causing Agilent losses and damages in excess of $9 million.

78.    St. Paul, as the property owner, Colliers, as the property manager, and Xpedient, as the warehousing service provider, shared responsibility to ensure the Cromwell Warehouse had functioning utilities, a working HVAC system, and winterized sprinkler system and domestic water pipes.

15

79.     The Defendants knew or should have known that, given the lack of heat in the Cromwell Warehouse, the impending deep freeze presented a significant risk of domestic pipe and sprinkler system failure (especially where such pipes, like those allegedly comprising the sprinkler system at the Cromwell Warehouse, were unwrapped and lacking insulation).

**H.      Agilent Suffers Over $9 Million in Damages from the Water Intrusion Event**

80.     On or around January 18, 2024, Agilent learned of the Water Intrusion Event.

81.     Agilent acted immediately to preserve whatever portion of the Tips Inventory might still be saleable or otherwise usable.

82.     Agilent consulted with the third-party manufacturer of the Tips Inventory to assess the possibility of salvaging the damaged portion.

83.     After significant investigation and analysis, over $8.5 million worth of tips were found to have been damaged and/or destroyed as a result of the Water Intrusion Event.

84.     In addition to the $8.5 million loss of saleable inventory, Agilent was forced to spend hundreds of thousands of dollars transporting and disposing of the destroyed tips.

85.     In the end, Agilent was forced to devote innumerable personnel hours to addressing the business disruptions caused by the Water Intrusion Event.

**I.      In the Aftermath of the Water Intrusion Event, Months Lapse Before Basic Utilities are Restored to the Cromwell Warehouse**

86.     With a soaking wet warehouse and inability to further hide the lack of gas and functioning HVAC, Defendants resume their efforts to establish the correct account holder with MLGW and hire an HVAC vendor to finally bring heat to the Cromwell Warehouse:

- **January 18, 2024** (on or around) — MLGW advised Colliers, acting as St. Paul's agent and property manager, that the gas line affiliated with Xpedient's portion of the Cromwell Warehouse had "never been turned on" and that a gas inspection

|  |  |
|---|---|
| • **January 18, 2024** (on or around) | Colliers, acting as St. Paul's agent and property manager, informed Xpedient of the above communication from MLGW. |
| • **February 22, 2024** (on or around) | MLGW advised Xpedient that its account associated with the Cromwell Warehouse was under review and that "no bill has ever been released" in connection with it.  (This would have been consistent with MLGW's October 2023 communication to Xpedient.) |
| • **March 26, 2024** (on or around) | MLGW went to the Cromwell Warehouse to unlock the gas meter but was unable to, due to the regulator "being bad."  (A gas regulator controls and reduces the pressure of natural gas from the supply line to a level that is safe and suitable for use in appliances such as the HVAC system.) |
| • **April 2, 2024** (on or around) | St. Paul and/or Colliers takes responsibility for and has the "bad" regulator fixed. |
| • **April 10, 2024** (on or around) | MLGW unlocked the gas meter at the Cromwell Warehouse. |
| • **April 10, 2024** (on or around) | Following MLGW unlocking the gas meter, Xpedient called an HVAC provider to undertake preventative maintenance and to get the HVAC system "up and running." |
| • **Mid-September 2024** (on or around) | An HVAC assessment was performed at the Cromwell Warehouse. |
| • **October 15, 2024** (on or around) | An HVAC maintenance contract for the Cromwell Warehouse was approved and signed by Colliers, acting as St. Paul's agent and property manager,. |

(Context above the table: "would need to be completed prior to the gas line being turned on and the meter unlocked.")

87. St. Paul, Colliers, and/or Xpedient were responsible for and ultimately did repair and/or replace the damaged domestic pipes and sprinkler system at the Cromwell Warehouse

following the Water Intrusion Event and otherwise were responsible for repairing and/or remediating damage to the Cromwell Warehouse following the Water Intrusion Event.

88.     Prior to the commencement of this action, Xpedient had never clearly identified to Agilent when the Cromwell Warehouse was provisioned with working heat, via an HVAC system or otherwise.

J.    **Agilent Seeks Information about the Water Intrusion Event While Defendants Stonewall and Deny Wrongdoing**

89.     On or around February 6, 2024, Agilent sent Xpedient a notice entitled "Agilent Water Damage Notice" ("February Notice"), wherein, among other things, Agilent requested that Xpedient provide an explanation of the cause of the Water Intrusion Event.

90.     In response, Xpedient failed to mention that for almost seven months, the gas meter at the Cromwell Warehouse had been locked, the gas regulator broken, and that, consequently, the HVAC system was unable to produce heat.

91.     Instead, Xpedient's Senior Vice President of Finance obfuscated Xpedient's known role in failing to minimize or prevent the damage, stating, "[a]t this time it appears water lines froze and burst due to drop in temperatures.  Gas lines / meters feeding HVAC unit were not turned on.  Investigation related to reason for gas supply issues are ongoing."

92.     In March 2024, over two months having passed since the Water Intrusion Event, and Agilent still without any clear answers as to the cause of its lost inventory, Agilent wrote to Xpedient and requested a "final report signed by an executive member of Xpedient leadership[,]" to "include a timeline of the events that predate and lead up to the incident, explanation of the incident itself and cause, as well as the response and subsequent actions and steps that have occurred."  Agilent further specified that such report include: "(1) reasons for lack of heat/gas to

18

the building and efforts to enable heat/gas prior to the damage event; (2) whether there was any 'winterization' or preparation of the fire suppression system in the months leading up to the event; (3) what actions were taken to prepare the warehouse in advance of the cold front that came through Memphis over the January 22, 2024 time frame; and (4) the subsequent actions and steps that have occurred to remediate the water damage (including efforts to enable heat/gas to the building)."

93.     Xpedient's response was uninformative and evasive, stating that it "share[d] Agilent's need for answers."  By this point, Xpedient would have known *for months* that the gas meter was locked, that the HVAC system was inoperable, and the Cromwell Warehouse was thus unable to be heated.

94.     To date, neither the requested report nor a complete timeline of events has ever been provided by Xpedient to Agilent.  Instead, on or around November 26, 2024, Xpedient, through its counsel, provided a summary of alleged communications between Xpedient, MLGW, St. Paul and/or Colliers, acting as St. Paul's agent and property manager, relating to the Cromwell Warehouse and the Water Intrusion Event. This information presented a troubling snapshot of events and has ultimately raised more questions than answers.

95.     Lacking sufficient information to set forth Xpedient's liability for its loss, but seeking to make clear its efforts to follow the terms of the Agreements, Agilent provided yet another notice to Xpedient on or around June 7, 2024.  Having recently completed a provisional assessment of the total inventory loss, Agilent's June 7, 2024 notice (1) placed Xpedient on notice of its potential claim, based on Xpedient's possible role in the loss, (2) preliminarily quantified its loss based on information known at the time (approximately $8 million), and (3) reiterated its continued need for information relating to the Water Intrusion Event.

19

96.     Shortly thereafter, Agilent similarly notified St. Paul in a July 2024 letter, inviting St. Paul to inspect the damaged and/or destroyed Tips Inventory and advising of its then estimated $8.6 million loss.

97.     In response to these communications, both Xpedient and St. Paul have denied all liability for the Water Intrusion Event—casting blame on each other and accepting none themselves.

98.     On or around September 25, 2024, Xpedient advised Agilent that the Water Intrusion Event "was not a result of any failure of XMG to perform its obligations under [the Agreements]" and, then two months later, alleged that the "repair of the [Cromwell Warehouse] was the responsibility of [St. Paul]."

99.     Likewise, on or around November 27, 2024, St. Paul advised Agilent that it "denies liability in this matter," explaining "XMG controlled the space as the tenant in this portion of the warehouse" and was "required [] to maintain their section."

100.    For an entire year before commencing this action, Agilent undertook reasonable efforts to resolve its dispute with Xpedient over liability: requesting repair records and the lease agreement between Xpedient and St. Paul; requesting that Xpedient and/or its insurer make an initial payment for Agilent's inventory loss; and requesting that Xpedient and Agilent attend mediation.  All efforts were either rejected or substantively ignored.

101.    Agilent undertook the same efforts, to no avail, to resolve its dispute with St. Paul.

**K.      Defendants Benefit from their Breach and Wrongdoing While Agilent Continues to Perform Its Obligations under the Agreements**

102.    As detailed above, Defendants failed to remedy the dangerous conditions at the Cromwell Warehouse by, *inter alia*, failing to ensure that the gas meter in the Cromwell Warehouse was unlocked, the gas regulator in good repair, and that the HVAC system was in

working order and maintaining temperatures at 40°F or higher in the Cromwell Warehouse. These failures by Defendants materially contributed to and/or caused the Water Intrusion Event and Agilent's loss and damages in excess of $9 million.

103. Even worse, as a significant weather event loomed, Defendants failed to take any preventive actions to remedy the dangerous conditions at the Cromwell Warehouse, such as winterizing the domestic pipes and/or sprinkler system. These failures by Defendants likewise materially contributed to and/or caused the Water Intrusion Event and Agilent's loss and damages in excess of $9 million.

104. In stark contrast, Agilent has performed and continues to perform all material conditions required under the Agreements, including, without limitation, paying all fees, rates, and charges and notifying Xpedient of its claim, except to the extent that such performance has been excused, waived, or prevented by the representations, acts, or omissions of Xpedient.

105. Agilent's harm, already substantial, grows by the month, as Agilent, regrettably, pays Xpedient tens of thousands of dollars for an empty warehouse as demanded by Xpedient.

<u>**FIRST CAUSE OF ACTION**</u>
<u>**BREACH OF CONTRACT**</u>
**(Against Xpedient)**

106. Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 105 above as though fully set forth herein.

107. The Agreements constitute valid and enforceable written agreements between Agilent and Xpedient. Pursuant to the Agreements, Xpedient agreed to provide warehousing, transportation management and inventory management services at the Cromwell Warehouse and was responsible for the management of the Cromwell Warehouse, "including rent, utilities [*sic*] interest, tax, maintenance, repairs, and security."

108.   The Agreements also contain an implied covenant of good faith and fair dealing under which Xpedient should not take any action that would deprive Agilent of the rights and benefits due to Agilent under the Agreements.

109.   Agilent has performed and/or fully satisfied in a timely manner all material conditions required to be performed by it under the Agreements, including, without limitation, paying all rates, fees, and charges owed under the Agreements and providing timely notice of its claim, except to the extent that such performance has been excused, waived, or prevented by the representations, acts, or omissions of Xpedient.

110.   Xpedient breached the Agreements by failing to maintain and repair the Cromwell Warehouse, including, without limitation, ensuring that the gas meter was unlocked, that the HVAC system was working, and that the Tips Inventory would not be vulnerable to adverse weather due to conditions at the Cromwell Warehouse.

111.   Xpedient also breached the Agreements' implied covenant of good faith and fair dealing by engaging in a course of conduct designed to prevent Agilent from rights due under the Agreements.  Xpedient breached this implied covenant by, among other things, failing to timely disclose, both before and after the Water Intrusion Event, that the gas meter was locked, the regulator was broken, the HVAC system was inoperative, and that the domestic pipes and sprinkler system were not adequately protected against colder temperatures, at the Cromwell Warehouse, while continuing to collect all rates, fees, and charges from Agilent under the Agreements and claiming, after the Water Intrusion Event, that it "share[d] Agilent's need for answers" despite Xpedient having known or should have known of the aforementioned conditions.

112.    Xpedient's breaches of good faith and fair dealing were undertaken to protect Xpedient's own pecuniary interests, without regard to its obligations under the Agreements to Agilent.

113.    As a direct and proximate result of Xpedient's breaches, Agilent has been deprived of the benefit of Agreements for which it has paid Xpedient hundreds of thousands of dollars, and has sustained substantial damages in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court, including without limitation, actual damages, consequential damages, out-of-pocket expenses, and other foreseeable economic losses, all in a sum to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF BAILMENT AND/OR NEGLIGENT BAILMENT**
**(Against Xpedient)**

114.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 113 above as though fully set forth herein.

115.    On or around May 22, 2023, as agreed by Agilent and Xpedient, Agilent began moving the Tips Inventory, which it owned, into the Cromwell Warehouse with Xpedient's express permission and at its direction.

116.    Xpedient's agreement to provide warehousing and storage of Agilent's Tips Inventory, defined as bailed property under the Agreements, and its acceptance of the Tips Inventory at its warehouse for such purpose, created and constitutes a bailment under Tennessee law.

117.    The Tips Inventory was in good, new, and undamaged condition at the time such inventory was moved into the Cromwell Warehouse.

118.    Xpedient cannot return or redeliver the Tips Inventory to Agilent in good, new and/or undamaged condition because the Tips Inventory was destroyed while in Xpedient's exclusive possession from contact with water and/or other liquids from the sprinkler system and/or burst pipes at the Cromwell Warehouse.

119.    Xpedient's inability to return or redeliver the Tips Inventory to Agilent in good, new and/or undamaged condition is prima facie evidence of Xpedient's negligence as bailee.

120.    As a direct and proximate result thereof, Agilent has sustained substantial damages as a result of Xpedient's breach of bailment and/or negligence as bailee in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

**THIRD CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(Against Xpedient)**

121.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 120 above as though fully set forth herein.

122.    Xpedient was acting in the course of its regular business when it offered to provide warehousing and storage services to Agilent at the Cromwell Warehouse.

123.    Xpedient failed to exercise reasonable care and provided false information in communicating with Agilent regarding its present ability and intention to provide such services and to safeguard Agilent's Tips Inventory in conditions consistent with industry standards.

124.    Xpedient negligently misrepresented that it would provide functioning utilities and regular supervision, maintenance, and care of the facility at all times, and/or that it would inform Agilent immediately if conditions changed in a manner that would endanger the Tips Inventory.

125.    Xpedient had a pecuniary interest in making the above representations to Agilent so that Agilent would engage Xpedient to provide warehousing and storage services.

126.    Agilent reasonably and justifiably relied upon the representations made by Xpedient in selecting Xpedient to provide the services.

127.    As a direct and proximate result thereof, Agilent has sustained substantial damages due to Xpedient's negligent misrepresentations in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE AND/OR RECKLESS ACTIONS OR OMISSIONS
**(Against Xpedient)**

128.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 127 above as though fully set forth herein.

129.    At all times relevant hereto, Xpedient had a duty to exercise reasonable care and skill in complying with the Agreements and in reasonably and properly storing and protecting the Tips Inventory from damage.

130.    In taking the aforementioned actions and/or omissions, Xpedient breached its duty of care and skill as a warehouse provider, including without limitation, by (1) failing to timely ensure working utilities in its sub-portion of the Cromwell Warehouse, (2) failing to timely unlock the gas meter, (3) failing to timely fix the broken gas regulator, (4) failing to timely fix the inoperative HVAC system—all of which prevented the heating of the Cromwell Warehouse, and, (5) knowing of these conditions, failing to take any preventive measures to winterize the Cromwell Warehouse, including, without limitation, as to the sprinkler system and domestic pipes.

131.    Such actions and omissions were negligent, undertaken with an utter lack of concern for the safety of the Tips Inventory, were reckless and/or demonstrated a reckless disregard for the rights of Agilent that a conscious indifference to the consequences can be implied.

132.    As a direct and proximate result thereof, Agilent has sustained substantial damages due to Xpedient's negligence and/or reckless acts or omissions in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

133.    In addition to the above, Agilent avers that the actions of Xpedient were reckless or grossly negligent and in complete disregard of the duties it owed to Agilent.

**FIFTH CAUSE OF ACTION**
**DECLARATORY RELIEF**
**(Against Xpedient)**

134.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 123 above as though fully set forth herein.

135.    There is a justiciable and actual controversy between Agilent and Xpedient as to whether Agilent is obligated to pay any further amounts under the Agreements, including ongoing fees, rates and charges through May 31, 2026, given Xpedient's material breach of the Agreements and tortious conduct, discussed above, and as, following the destruction of most of the Tips Inventory due to the Water Intrusion Event, the purpose of the Agreements has been completely frustrated and eliminated Agilent's need for Xpedient's services under the Agreements.

136.    A judicial declaration is necessary and appropriate at this time to determine whether Agilent has any ongoing obligations under the Agreements given the complete frustration of the purpose of the Agreements due to the destruction of most of the Tips Inventory as a result of the Water Intrusion Event.

137.    The Court, therefore, should enter an Order determining the rights and obligations of the parties, if any, with respect to Agreements.

**SIXTH CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(Against Xpedient)**

138.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 137 above as though fully set forth herein.

139.    At all relevant times, Chapter 9-36 of the Code of Ordinances, City of Memphis, Tennessee ("Memphis City Code") adopted the 2021 ICC International Fire Code as the Fire Prevention Code of the City of Memphis (the "Fire Code").

140.    One of the express purposes of the Fire Code is to establish a reasonable level of property protection from the dangerous conditions in existing buildings, structures, and premises, and places a duty of care upon property owners or property owner's designated representative to maintain the fire protection system, including wet pipe sprinkler systems, on their property.

141.    The Fire Code directly references and adopts NFPA[1] 25 (2020), the Standard for the Inspection, Testing and Maintenance of Water-Based Fire Protection Systems.

142.    Pursuant to Chapter 9-36-3 of the Memphis City Code, "[a]ny person, firm or corporation violating any of the provisions of this chapter shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished as provided in section 1-24-1 of this code."

143.    The Fire Code is a public safety ordinance, as its Inspection, Testing and Maintenance of Water-Based Fire Protection Systems provisions are considered the minimum standards necessary to preserve and protect public health and safety.

144.    The Fire Code was enacted to protect a class of persons and their property, which includes Agilent and the Tips Inventory.

145.    Sections 4.1.1 *et. seq.* and 4.1.2 *et. seq.*, of NFPA 25, among other things, requires the property owner or the property owner's designated representative to ensure that a water-filled wet pipe sprinkler fire protection system, like the one installed at the Cromwell Warehouse, is

---

[1] "NFPA" refers to the National Fire Protection Association.

maintained at a minimum temperature of 40°F (4°C) unless an approved antifreeze solution is utilized.

146. Section 4.1.2.1 of NFPA 25, requires the property owner or the property owner's designated representative to ensure that all areas of the building containing water-filled piping that does not have another means of freeze protection shall be maintained at a minimum temperature of 40°F (4°C).

147. Pursuant NFPA 25, Section 5.3.4, if the temperatures in the Cromwell Warehouse were not maintained at 40°F, or higher, Defendants should have protected the wet pipe sprinkler system, such as by winterizing the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

148. Xpedient had a duty to comply with the aforementioned Memphis City Code and Fire Code.

149. At all relevant times, the wet pipe fire sprinkler system in the unheated Cromwell Warehouse building failed to meet the requirements of the Memphis City Code and Fire Code.

150. Xpedient violated the Memphis City Code and Fire Code by, *inter alia*, failing to properly maintain and repair the wet pipe fire sprinkler system in the Cromwell Warehouse so that the water in that system maintained a minimum temperature of 40°F (4°C).

151. Xpedient violated the Memphis City Code and Fire Code by, *inter alia*, maintaining a wet pipe sprinkler system in the Cromwell Warehouse in an area where temperatures were not maintained at 40°F, or higher, and by failing to winterize the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

152. Xpedient's failure to comply with the Memphis City Code and Fire Code constitutes negligence *per se*.

153.    Xpedient knew or should have known of the violations of the Memphis City Code and Fire Code.

154.    Xpedient failed to take reasonable steps to remedy the violations of the Memphis City Code and Fire Code.

155.    Xpedient's failure to maintain temperatures at 40°F or higher in the areas where the wet pipe sprinkler system in the Cromwell Warehouse was located and Xpedient's failure to winterize the wet pipe fire sprinkler system in the Cromwell Warehouse with anti-freeze prior to or at the onset of the January 2024 deep freeze, as required by the Memphis City Code and Fire Code, is the direct and proximate cause of the Water Intrusion Event, including the activation of the wet pipe fire sprinkler system, and Agilent's substantial resulting damages.

156.    As a direct and proximate result of Xpedient's violations of the Memphis City Code and Fire Code and negligence *per se*, Agilent has sustained substantial damages in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>**NEGLIGENCE**</u>
**(Against St. Paul and Colliers)**

157.    Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 156 above as though fully set forth herein.

158.    At all times relevant hereto, St. Paul, as the landowner, owner, and business operator in control of the Cromwell Warehouse, including its utilities, HVAC system, and domestic plumbing and sprinkler systems, and/or the agents, servants, workers, employees of the same, owed to Plaintiff a duty to use ordinary and reasonable care in the maintenance and management of its property, the Cromwell Warehouse, including, but not limited to, ensuring all utility lines and HVAC systems were working and operational, that the domestic pipes and

sprinkler systems were in good repair, and, as necessary protected against colder temperatures, and that the Cromwell Warehouse was generally fit for the purposes for which St. Paul held it out for business.

159.    Similarly, all times relevant hereto, Colliers, as the alleged business operator in control of the Cromwell Warehouse, including its utilities, HVAC system, and domestic plumbing and sprinkler systems, and/or the agents, servants, workers, employees of the same, owed to Plaintiff a duty to use ordinary and reasonable care in the maintenance and management of its property, the Cromwell Warehouse, including, but not limited to, ensuring all utility lines and HVAC systems were working and operational, that the domestic pipes and sprinkler systems were in good repair, and, as necessary protected against colder temperatures, and that the Cromwell Warehouse was generally fit for the purposes for which Colliers held it out for business.

160.    At all times relevant hereto, St. Paul and/or Colliers knew or should have known that the Cromwell Warehouse was being used for the benefit of Agilent and the storage of Agilent's Tips Inventory and, upon information and belief, was accepting payment from Xpedient for such purpose, which was to inure to the benefit of Agilent.

161.    St. Paul and/or Colliers jointly, severally, or in the alternative, breached this duty by, at minimum, failing to maintain the Cromwell Warehouse for the benefit of Agilent, and, at all relevant times, St. Paul and/or Colliers knew or should have known of the diminished condition of the Cromwell Warehouse, including, without limitation, the locked gas meter, broken gas regulator, inoperative HVAC system, uninsulated domestic pipes and/or sprinkler system, and general state of disrepair, and the impact of the same on Agilent's Tips Inventory. Each of the above said acts of negligence directly and proximately caused the Water Intrusion Event and the resulting loss and damage to Agilent.

162.   As a direct and proximate result thereof, Agilent has sustained substantial damages due to St. Paul and/or Colliers's negligence in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(Against St. Paul and Colliers)**

163.   Plaintiff re-alleges and reincorporates the allegations set forth in Paragraph 1 through 162 above as though fully set forth herein.

164.   At all relevant times, Chapter 9-36 of the Code of Ordinances, City of Memphis, Tennessee ("Memphis City Code") adopted the 2021 ICC International Fire Code as the Fire Prevention Code of the City of Memphis (the "Fire Code").

165.   One of the express purposes of the Fire Code is to establish a reasonable level of property protection from the dangerous conditions in existing buildings, structures, and premises, and places a duty of care upon property owners or property owner's designated representative to maintain the fire protection system, including wet pipe sprinkler systems, on their property.

166.   The Fire Code directly references and adopts NFPA 25 (2020), the Standard for the Inspection, Testing and Maintenance of Water-Based Fire Protection Systems.

167.   Pursuant to Chapter 9-36-3 of the Memphis City Code, "[a]ny person, firm or corporation violating any of the provisions of this chapter shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished as provided in section 1-24-1 of this code."

168.   The Fire Code is a public safety ordinance, as its Inspection, Testing and Maintenance of Water-Based Fire Protection Systems provisions are considered the minimum standards necessary to preserve and protect public health and safety.

169.   The Fire Code was enacted to protect a class of persons and their property, which includes Agilent and the Tips Inventory.

31

170.    Sections 4.1.1 *et. seq.* and 4.1.2 *et. seq.*, of NFPA 25, among other things, requires the property owner or the property owner's designated representative to ensure that a water-filled wet pipe sprinkler fire protection system, like the one installed at the Cromwell Warehouse, is maintained at a minimum temperature of 40°F (4°C) unless an approved antifreeze solution is utilized.

171.    Section 4.1.2.1 of NFPA 25, requires the property owner or the property owner's designated representative to ensure that all areas of the building containing water-filled piping that does not have another means of freeze protection shall be maintained at a minimum temperature of 40°F (4°C).

172.    Pursuant NFPA 25, Section 5.3.4, if the temperatures in the Cromwell Warehouse were not maintained at 40°F, or higher, St. Paul, as the property owner of the Cromwell Warehouse, and/or Colliers, as St. Paul's alleged designated representative, should have protected the wet pipe sprinkler system, such as by winterizing the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

173.    St. Paul and/or Colliers jointly, severally, or in the alternative, had a duty to comply with the aforementioned Memphis City Code and Fire Code.

174.    At all relevant times, the wet pipe fire sprinkler system in the unheated Cromwell Warehouse building failed to meet the requirements of the Memphis City Code and Fire Code.

175.    St. Paul and/or Colliers violated the Memphis City Code and Fire Code by, *inter alia*, failing to properly maintain and repair the wet pipe fire sprinkler system in the Cromwell Warehouse so that the water in that system maintained a minimum temperature of 40°F (4°C).

176.    St. Paul and/or Colliers violated the Memphis City Code and Fire Code by, *inter alia*, maintaining a wet pipe sprinkler system in the Cromwell Warehouse in an area where

32

temperatures were not maintained at 40°F, or higher, and by failing to winterize the wet pipe fire sprinkler system with anti-freeze at the onset of freezing weather.

177.    St. Paul and/or Colliers's failure to comply with the Memphis City Code and Fire Code constitutes negligence *per se*.

178.    St. Paul and/or Colliers knew or should have known of the violations of the Memphis City Code and Fire Code.

179.    St. Paul and/or Colliers failed to take reasonable steps to remedy the violations of the Memphis City Code and Fire Code.

180.    St. Paul and/or Colliers's failure to maintain temperatures at 40°F or higher in the areas where the wet pipe sprinkler system in the Cromwell Warehouse was located and St. Paul and/or Colliers' failure to winterize the wet pipe fire sprinkler system in the Cromwell Warehouse with anti-freeze prior to or at the onset of the January 2024 deep freeze, as required by the Memphis City Code and Fire Code, is the direct and proximate cause of the Water Intrusion Event, including the activation of the wet pipe fire sprinkler system, and Agilent's substantial resulting damages.

181.    As a direct and proximate result of St. Paul and/or Colliers' violations of the Memphis City Code and Fire Code and negligence *per se*, Agilent has sustained substantial damages in an amount to be determined at trial, but in excess of the jurisdictional limit of this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff Agilent Technologies, Inc. prays that:

A.      Proper process be issued and served upon Defendants, requiring it to answer hereto;

B.      This case be tried before a jury;

C. Judgment be entered in Plaintiff's favor against Defendants for compensatory damages in an amount to be proven at trial, plus any consequential, incidental, and such other damages as which may be proven;

D. Plaintiff be awarded punitive damages on the fourth claim for relief;

E. For the fifth claim for relief, a declaratory judgment that Agilent owes no present or continuing obligations under the Agreements, and any obligation by Agilent to pay fees, rates, and/or charges, under the Agreements, to Xpedient is terminated.

F. Plaintiff be awarded prejudgment and post-judgment interest on such damages at the maximum rate allowed by the law;

G. Plaintiff be awarded its reasonable costs and expenses;

H. The court costs in this cause be assessed against Defendants; and

I. For any and all other relief to which Plaintiff may be entitled, including, but not limited to the right to amend this Complaint.

Dated: April 2, 2026

/s/ Douglas F. Halijan
Douglas F. Halijan (BPR # 16718)
Elena R. Mosby (BPR # 40562)
Burch Porter & Johnson, PLLC
130 North Court Avenue
Memphis, TN 38103
Telephone: 901-524-5000
Facsimile: 901-524-5024
dhalijan@bpjlaw.com
emosby@bpjlaw.com

Amber Finch (*Admitted Pro Hac Vice*)
Margaret C. McDonald (*Admitted Pro Hac Vice*)
Reed Smith LLP

34

515 South Flower Street
Los Angeles, CA 90071
Telephone: 213-457-8000
Facsimile: 213-457-8080
afinch@reedsmith.com
mcmcdonald@reedsmith.com
*Attorneys for Plaintiff*