**From:** Adam Sepanski
**To:** chris.mulryan@agilent.com; christy.mcdaniel@agilent.com; gary.smith@agilent.com; krisztina_comeau@agilent.com
**Cc:** John Curry; John White; Mike St. Denis; Nate Haynes; Alicia Lyle
**Subject:** Xpedient Response to Agilent MOSA/SOA Redlines
**Date:** Tuesday, May 9, 2023 7:40:53 PM
**Attachments:** [redacted]

---

Chris & Team,

See attached our response to Agilent's redline of the MOSA and SOA. In the MOSA and SOA documents, we rejected or accepted Agilent's redlines where appropriate. The redlines you see on these documents are new redlines that we've added since Agilent sent us their revisions. Because we accepted or rejected Agilent's redlines, I attached a compare document for the MOSA and SOA as well, which shows Agilent's original redlines along with our comments.

Two call outs:

- There was a calculation error on the startup table with the margin, I updated it to match the language in the section.
- We're still discussing with our counsel on the shrinkage allowance changes. We will try to have a final redline tomorrow morning.

If you have any questions, please let me know.

Thanks,

Adam

**Adam Sepanski**
Senior Director of Solutions
(704) 724-2454
asepanski@xpedient.com
www.xpedient.com

This communication may contain confidential and/or privileged information. If it has been sent to you in error, please contact the sender for instructions concerning return or destruction, and do not use or disclose the contents to others.

**Master Operating Services Agreement**

**for**

**Logistics Services**

**between**

**Xpedient Management Group, LLC**

**and**

**Agilent Technologies Inc.**

This Agreement is Subject to an Agreement of Confidentiality and Shall Not be Distributed Except to the Parties

**MASTER OPERATING SERVICES AGREEMENT**

**FOR**

**LOGISTICS SERVICES**

This Master Operating Services Agreement (the "**Agreement**") is made and entered into as of _____________, 20____.

**BY AND BETWEEN:** **Xpedient Management Group, LLC**, a Tennessee limited liability company with an office at 200 Northpoint Drive, Suite 100 Coppell, Texas 75019 ("**XMG**")

**AND:** **Agilent Technologies Inc.**, with offices at 5301 Stevens Creek Blvd, Santa Clara, CA 95051, hereinafter to be referred to as (the "**Customer**") (XMG and Customer each a "**Party**" and collectively the "**Parties**").

## I. General Business Terms

**1. Services; Appendices** XMG agrees to provide to Customer such logistics and logistics-related services ("Services") which may include warehousing, transportation management, and consulting as may be agreed to by Customer and XMG which are set forth in Appendices (if one, an "Appendix" or more, "Appendices") attached hereto and made a part of this Agreement. Appendices may be modified by Customer and XMG from time to time, by execution of an amendment by both parties. Appendices set forth site-specific terms for all Services provided for each of Customer's sites (each of them a "Site" or "Facility") (the "Site Operating Agreements"). The Site Operating Agreements are attached hereto and incorporated herein by reference.

**2. Commencement of Services** No commitment to obtain Services from XMG is made by Customer except by the execution of this Agreement and the applicable Appendices by Customer. If Customer also issues purchase orders for the Services, all purchase orders issued by Customer will be subject to the terms and conditions of this Agreement and applicable Appendices. This Agreement and those Appendices executed at the time this Agreement is executed will become effective as of the effective date set forth in the Appendices (the "Effective Date"). Any Appendices added after the Effective Date will become effective as indicated in those Appendices.

**3. Term** "Term," "Initial Term," and "Renewal Term" are defined (A) in this Master Operating Service Agreement and any Appendices executed as of this Agreement's Effective Date, and (B) in each Site Operating Agreement for each Site at which Services later commence. If upon the expiration of any Site Operating Agreement, XMG is continuing to provide Services to Customer without another, or, in the case of an expired Site Operating Agreement, a superseding Site Operating Agreement, or other superseding document having been executed by the Parties, this Agreement, and any applicable Site Operating Agreement will be deemed to be continuing on a month-to-month basis, until superseded by another agreement between the Parties or terminated by either Party with ninety (90) days' notice.

**4. Terms in Appendices** In all cases where the terms of this Agreement and any Appendix are in disagreement, the terms in the Appendix shall control.

**5. Personnel and Equipment**

A. Personnel. The number and types of any personnel to perform the Services will be determined by XMG, and will be as described and identified in Appendices. ~~Customer will have the right from time to time to require XMG to remove any individual, including the employees or independent contractors of XMG and employees or independent contractors working in any subcontracted capacity through XMG, from working on Agilent account for any lawful reason, and XMG will complete such removal and replace such individual as soon as practicable while minimizing costs and impacts to the Services.~~ XMG will conduct a background screening and drug testing as required in the Site Operating Agreements.

B. Equipment. The Customer may or may not provide the equipment and related items required for XMG to provide the Services, as identified in the Site Operating Agreements (the "Equipment"). XMG shall be responsible for maintaining the Equipment in accordance with the Site Operating Agreements. To the extent Customer provides any Customer Equipment to XMG, such Customer Property is provided solely for the purposes of permitting the XMG to perform the Services, and XMG agrees to return all such property to Agilent upon request and/or upon termination or expiration of the Agreement. To the extent that Agilent Property includes software, XMG agrees to abide by Agilent's then-current software license terms, a copy of which is attached as reference.

Commented [AS1]: This is an Xpedient facility where we have internal policies and procedures. If there is a specific concern we can address on a case by case basis.

Commented [AS2]: We've added this to the SOA.

Commented [AS3]: Can Agilent comment on why they took out this sentence?

Commented [AS4]: Need to provide a copy to us.

**6. Facilities**

A. Facilities Defined. Services will be provided at one or more facilities (singly a "Facility" and if more than one, "Facilities") which are identified in each applicable Site Operating Agreement. The Facilities may be leased or owned by the Customer or XMG in accordance with the Site Operating Agreement.

Commented [C(U5]: Do we need to designate the class of facility – like Class A, etc. ? Do we need to designate minimize size? Do we need to reserve the right to approve the facility and/or change of facility? Appendix to Site Operating Agreement will define.

B. Facility Relocation If any event with respect to a Facility occurs prior to expiration of the applicable lease agreement resulting in a premature loss of use or possession of the Facility (such as a partial closure, termination for cause or convenience ~~by Customer~~, Force Majeure event), the cost and expense of transporting Product and Material to and from the Facility and to and from an alternate Facility and rent and all other expenses associated with the Facility identified in the Site Operating Agreement or an alternate Facility shall be paid for by Customer ~~as follows:~~

~~1. If the event occurred due to a breach of the lease agreement by XMG, XMG shall pay.~~

~~2. If the event occurred due to a breach or termination of this Agreement by Customer, except if due to termination for cause, then Customer will pay.~~

~~3. If the event occurred due to a breach of the lease agreement by the landlord, then XMG will use its best efforts to pass through and recover from the landlord the costs.~~

~~4. If the event occurred due to a Force Majeure, then the parties will resolve the costs according to Section 29.~~

Commented [AS6]: We're not set up to accept liability for transportation for this project. If this is a must, we will need to reprice the business.

**7. Rates and Charges** The initial rates, fees and charges to be charged to and paid by Customer are set forth in the applicable Site Operating Agreement for each Site (the "Fees"). Any change in Fees agreed to by XMG and Customer will be set forth in an amendment to the applicable Site Operating Agreement. The Fees specific to each Site Operating Agreement shall be reviewed annually and may be adjusted by agreement of the Parties.

If during any calendar year a Site Operating Agreement is in effect, the Services of that Site Operating Agreement vary to such a degree that either Party in good faith believes that a Fee adjustment(s) (whether an increase or decrease) would be equitable, it shall notify the other Party of the same, and the Parties shall endeavor in good faith to mutually agree upon a temporary or permanent adjustment as promptly as possible. If the Parties cannot agree on a Fee adjustment, then either Party may elect, upon ninety (90) days' prior written notice to the other, to terminate the Agreement effective upon the end of such notice (during which period the Parties will continue to perform their respective obligations at the Fees then in effect or as otherwise agreed to).

Commented [AS7]: This places the risk solely on XMG. The intent is to ensure that we are performing the services at a price that was agreed, and if the Services change, we need to reprice to reflect that, regardless of circumstance.

XMG will incur start-up costs ("Start-Up Costs") that will be disclosed in the applicable Site Operating Agreement. The Start-Up Costs will be paid by Customer as set forth in the applicable Site Operating Agreement.

8. **Payment** XMG will invoice Customer directly for its Fees and Customer will pay on each invoice, following receipt of the invoice as specified in Site Operating Agreement, but in all events no later than thirty (30) days after receipt of the invoice.

In the event of a good faith dispute regarding any Fees, Customer shall pay the Fees that are not in dispute, within thirty (30) days following receipt of a revised invoice only containing undisputed fees, and shall provide written notice of the dispute within thirty (30) days of receipt of XMG's invoice. Such notice shall include an explanation of the disputed portion of the Fees, the basis of the dispute and a proposed resolution. The Parties shall use commercially reasonable efforts to resolve all disputes in good faith and as promptly as possible. Customer may not offset payment of invoices for disputed claims (such as claims made by Customer for damage or loss) without the prior written consent of XMG.

Any Fees not disputed that are not timely paid shall accrue interest from the invoice due date until paid at the rate of the lesser of: (i) one and a half per cent (1.5%) per month or (ii) the maximum allowed by state or federal regulations.

**Commented [CL(M8]:** Normally, we do not agree to late payment interest clauses as this might have challenge to our account payable processes.

**Commented [AS8R2]:** XMG requires on-time payment, if Agilent doesn't pay on time, we are charged interest fees by our bank. We can change this to 1.5%

9. **Operational Control**

A. Control. As between the Parties, XMG is an independent contractor and will have sole and exclusive control over the manner in which XMG and its employees and subcontractors perform Services. XMG will engage, employ, or subcontract with such individuals or other entities as it may deem necessary in connection therewith, provided that the majority of the Services will be provided by XMG's employees. Such individuals will not be considered employees or subcontractors of Customer and will be subject to employment or engagement, and discharge, discipline, and control solely and exclusively by XMG. XMG, and not Agilent, shall have exclusive control over the timekeeping and payroll for its employees and subcontractors, and XMG shall maintain all records and make all wage payments to its employees. XMG shall ensure its Subcontractors comply with this provision. Supplier's employees, and if applicable Supplier's subcontractor's employees, will report all work hours to Supplier, not Agilent. XMG and XMG's subcontractors must comply with all wage and hour and wage payment laws as well as federal, state, and local taxes. XMG is also solely responsible and liable for any and all insurance premiums or other employment benefits respecting XMG's performance. Agilent does not provide any employee benefits programs to XMG or XMG's subcontractors. Agilent shall not have any liability for, and Supplier shall defend, indemnify, and hold Agilent harmless from, XMG's subcontractor's fees arising out of Supplier's failure to pay Supplier's subcontractors.

**Commented [C(U9]:** Statement regarding liability and responsibility to the same extent as XMG

B. Taxes. All amounts paid to XMG are exclusive of Sales, VAT, GST and similar taxes ("Transactions Taxes"). XMG is solely responsible and liable for any and all duties or taxes on such amounts paid under this Agreement or otherwise attributable to the Services, including all employment-related taxes. Agilent will pay to XMG applicable Transactions Taxes on receipt of an invoice compliant with all applicable Laws of the relevant jurisdiction

**Commented [AS10]:** Seems OK

~~B.~~C. Customer agrees to either pay directly or to reimburse XMG for all applicable fees identified in the Site Operating Agreement. For avoidance of doubt, Customer agrees to either pay directly or to reimburse XMG for all applicable property taxes, fees, licenses, charges and assessments imposed pursuant to applicable laws, rules and regulations or by any governmental authority upon Customer owned Equipment, or the Products. Such payment or reimbursement shall include any federal, provincial or local taxes, levies, duties, fees or other charges now or hereafter assessed that are levied

This Agreement is Subject to an Agreement of Confidentiality and Shall Not be Distributed Except to the Parties

or based on or related to any of the Products or Customer Equipment provided to -XMG under this Agreement but shall not include any income taxes based solely on or measured by the income of XMG. XMG shall be responsible for paying directly any social security or withholding, unemployment, employee insurance assessments/premiums, worker's compensation assessments/premiums or similar taxes required by the jurisdiction in which its employees are employed.

~~C.~~D. Products. The products and materials for which the Services are to be performed shall be those goods manufactured, sold or distributed by or on behalf of Customer (the "Products"). Customer shall always be the owner of the Products. In addition to the foregoing, all Products and Customer Equipment must be: -(i) clearly marked or tagged as Customer Property; (ii) held as personal property and not allowed to become a fixture to real property; (iii) kept free of liens and encumbrances; and (iv) kept only at the Facility unless otherwise authorized in writing by Customer. The Products and Customer Equipment will, at all times, constitute bailed property. Customer shall be responsible for marking or tagging Customer Property.

Commented [CL(M11]: We are stocking "Material" that we bought from Agilent Suppliers. Would that meet the definition in this clause?

**10. Cooperation in Operations** Both Parties will act in good faith and cooperate in all matters relating to the Services provided by XMG for Customer under this Agreement.

**11. Performance Metrics; Customer Systems Effect**

A. Metrics. Performance metrics, if any, are set by the Parties and are set forth in the applicable Site Operating Agreement.

B. Effect of Customer Systems. If Customer retains control over the operation of, or from time to time itself continues to control, operate, or manage, any portion of the Services (collectively referred to as "Customer Management"), or specifies that certain support services, hardware, software, or other equipment which will be used to provide the Services be obtained from a specific party, be it Customer, an affiliate of Customer, or a designated third party vendor to Customer, or specifies the party which obtains, repairs, maintains, or supports the aforesaid hardware, software, or other equipment (collectively referred to as "Support Designation"), then to the degree that Customer Management or Support Designation impedes XMG's ability to perform the Services or materially impedes the accurate measurement of XMG's performance, Customer will not hold XMG responsible for any applicable performance criteria regarding the Services and will have no action against XMG for any alleged failure to perform the Services or meet metrics set for that performance.

The Parties acknowledge that Customer employees or agents may have access to XMG's warehouse management system module ("WMS") with the ability to make inventory adjustments affecting the inventory status of the Products at a Facility. Customer agrees not to make any such adjustments without XMG's prior written consent. If such adjustments are inadvertently made without prior written notification and XMG identifies an inventory discrepancy, Customer shall cooperate with XMG in any such reconciliation. If XMG can reasonably demonstrate that any unaccounted-for Products were attributable to any Customer adjustments, XMG shall not be responsible for the associated loss.

**12. Inventory: Loss, Reconciliation and Claims**

A. Records Reports. XMG shall maintain complete records of the Products received by XMG showing quantities received and shipped, inventory on hand, damaged or lost Products. The Parties agree that the Site Operating Agreement shall designate the book of record for the purposes of this Agreement.

B. Inventory Accounting. Upon commencement of the Services, XMG shall conduct 1 (one) physical inventory of all Products received by XMG. Thereafter, XMG shall conduct periodic cycle counting according to the Site Operating Agreement. XMG will undertake additional physical inventories or cycle counts as reasonably requested by Customer at Customer's expense. Customer's duly authorized representatives shall have the right to be present at any physical inventory and, upon reasonable notice, shall have the right to visit, observe, and inspect each Facility, the Products and to inspect inventory records during XMG's normal business hours at such times and on such dates as are mutually agreed to by the Parties.

After XMG has completed a physical inventory (other than the initial inventory) or complete cycle count of all Products at each Facility, inventory shortages or overages shall be determined mutually by XMG and Customer – by netting the dollar amount of shortages and overages across all commodity groupings of Products at the time of the physical inventory or the final year-end cycle count reconciliation ("Final Cycle Count Reconciliation").

C. Inventory Loss.

(a) Loss of or Damage to Products. Subject to the limitations set forth herein, XMG shall be responsible for the Replacement Cost (defined as Customer's actual Product manufacturing cost or acquisition cost to replace the lost or damaged Products at their pre-loss condition, less salvage value, if any) of lost or damaged Products under its exclusive care, custody and control if the loss or damage was caused by XMG's failure to exercise such care as a reasonably careful person would exercise under like circumstances. However, XMG is not responsible for lost or damaged Products if the loss or damage could not have been avoided by the exercise of such care. Customer acknowledges that some damage or loss to Customer's Products at each Facility may occur during the performance of the Services. Accordingly, Customer agrees that XMG shall be entitled to a loss allowance as otherwise set forth in a Site Operating Agreement ("Allowance") which must be exceeded prior to XMG being liable for any damage, loss or shortages of Customer's Products.

(b) Products are not insured by XMG against loss or injury however caused.

(c) Limitation of Liability for Loss or Damage to Products. XMG's maximum liability to Customer arising out of or related to loss or damage to Products ("Product Losses") shall not exceed one million dollars ($1,000,000) per occurrence, two million dollars ($2,000,000) annually, or five million dollars ($5,000,000) in total over the life of this Agreement("Limit"). The Parties, which are both sophisticated commercial organizations negotiating at arm's length, jointly acknowledge and agree they have negotiated a commercially reasonable Limit that is not unreasonably disproportionate to the value of the Products and the Fees charged and that reasonably reflect the Parties' respective business interests.

**Commented [AS12]:** Our limit is $1M

**Commented [C(U13]:** Are these limits acceptable?

**Commented [CM14]:** Legacy contract only have $1M per occurrence.

(d) Exceptions to Liability. Notwithstanding anything contained in this Agreement or any Site Operating Agreement to the contrary, XMG shall not be liable for any loss or damage to the Products:

(i) occurring prior to or subsequent to XMG's care, custody and control of the Products (which shall commence when XMG accepts receipt of such Products and shall terminate when such Products are placed with a carrier for shipment);

(ii) that is within the Allowance or in excess of the Limit;

(iii) attributable to or otherwise caused by any defects in the manufacturing or packaging or inherent nature of Products;

(iv) attributable to or otherwise caused by the acts or omissions of transportation service providers;

(v) attributable to concealed damage; or

(vi) Attributable to or otherwise caused by the negligence or intentional misconduct of Customer or any of its employees, agents, subcontractors.

(e) Claims. Subject to the exceptions and limitations set forth in this Section, all claims for Products lost, or damaged at each Facility must be made promptly in writing and in all events no later than the earlier of: (i) ninety (90) days after Customer receives the results of the related year-end physical inventory or Final Cycle Count Reconciliation; or (ii) ninety (90) days after Customer has become aware (or reasonably should have become aware) of any such loss or damage. Such written notice shall contain facts sufficient to identify the Products involved, explain XMG's liability for alleged loss or damage and make claim for the payment of a specified or determinable amount of money. XMG, or its insurer, shall have the right to inspect any damaged Product. No action may be maintained by Customer for loss of or damage to Products pursuant to this Section unless a timely written claim has been given as provided for above and unless such action is commenced within twelve (12) months from the date of such written claim. Neither Party shall be liable to the other Party for any special, indirect, consequential, or punitive damages, including, but not limited to, loss of production, loss of income, or loss of profits even if the first Party was given prior notice of the possibility of such damages.

**Commented [KC15]:** 90 days needed for investigation

D. <u>Responsibility for Damage to or Loss of Product; Limitation of Damages — Transportation Management Services.</u>

(a) General. The Parties contemplate in the future entering into a Transportation Management Agreement and if they do, the following provisions will apply. In providing transportation management services, XMG shall provide the customary services for managing the transporting of Product, as further set forth in each Appendix and this Section. For clarity, if there is a conflict between any such separate agreement or a Site Operating Agreement and this Section, as it relates to transportation management services only, then the terms set forth in this Section shall control.

(b) Customer acknowledges, that, during the performance of the Transportation Management Services, XMG will only manage the transportation providers contracted by either Customer or XMG

to perform transportation services. It is understood by both Parties that such transportation providers, and not XMG, will have custody of Customer's Products while performing transportation services.

(c) Liability. Liability for any loss and/or damage to Customer's Products or for any other direct or actual damages resulting from the performance of its transportation management services will be mutually agreed in the Transportation Management Agreement.

(d) Claims. XMG shall have the authority to act on behalf of Customer in the processing and filing of claims against transportation providers for lost or damaged Product. XMG shall notify Customer of claims for lost or damaged Product that are received by XMG, and Customer shall promptly notify XMG of any such claims for Product received by Customer. .

**13. Confidentiality**

A. Obligation. The nature and details of the business relationship covered by this Agreement, and the business information regarding the other Party ("Disclosing Party") to which each Party ("Receiving Party") may become privy during the Term (collectively the "Information") constitute confidential and proprietary information, the disclosure, use, sale, copying or distribution of which could result in competitive harm to the Disclosing Party. Each Party agrees to maintain the other Party's Information in the strictest confidence and agrees not to disclose, copy, or distribute the other Party's Information, whether orally or in writing, directly or indirectly, in whole or in part, except to those of the Receiving Party's employees, agents, and subcontractors with a need to know the Information. XMG and Client further agree that they will require that all of their employees, agents, and subcontractors abide by the terms of these confidentiality obligations. The confidentiality obligations in this Section will continue in effect for five years from the termination or expiry date of this Agreement.

**Commented [KC16]:** Reference / attach CDA

B. Exceptions. Nothing herein will apply to any information (a) which is or becomes generally available to the public other than as a result of a disclosure by a Receiving Party or its representatives, (b) which was available on a nonconfidential basis prior to its disclosure by XMG or by Customer or their representatives, (c) which becomes available to a Receiving Party on a nonconfidential basis from a source other than the Disclosing Party or its representatives, provided that such source is not known to be subject to any prohibition against transmitting the information, or (d) which is disclosed pursuant to an order of court; provided that in the event that proprietary information is disclosed or threatened to be disclosed pursuant to this clause (d), the Receiving Party will give the original Disclosing Party prompt, written notice of such threatened disclosure and the right to defend against such disclosure, at its expense, and provided further that the original Receiving Party will cooperate reasonably in such defense. Customer recognizes and agrees that any Appendices attached hereto are XMG's Information and provided solely for use under this Agreement, and that disclosure of any of their contents could cause irreparable damage to XMG. Customer agrees to treat this Information with the utmost degree of care.

C. Publicity. Neither party may issue a press release or other public announcement with respect to this Agreement without the prior, written consent of the other party.

**14. Modifications to XMG's Systems.** Customer acknowledges that XMG's systems, excluding information retrieval and processing systems and XMG's hardware and software, (collectively "XMG Systems"), are the property of XMG. In order to provide the Services to Customer, XMG may agree to modify XMG Systems to meet special Customer needs. However, such modifications are to be made at the sole discretion of XMG and shall remain the property of XMG.

**II. Specific Warehousing Terms and Conditions**

**15. Parties Not to Offer Employment**. Except with the other Party's written consent, neither Party will solicit, hire, or employ, or cause any other person to solicit, hire or employ, any employees or contractors of the other Party, who are or were employed or engaged on the Effective Date of this Agreement or an applicable Site Operating Agreement or who became employed or engaged by that party during the Term of this Agreement or an applicable Site Operating Agreement; provided, however, that such employment, but not solicitation of employment, may occur when the subject employee has not been in the employ of the other Party to this Agreement or any person or entity related to or controlled by that Party for a period of at least twelve (12) sequential months unless otherwise specified in the Site Operating Agreements.

If either Party solicits and/or encourages other parties to solicit the employees of the other Party for employment during the life of this Agreement or an applicable Site Operating Agreement and for one year after its expiration, then the Party who solicits and/or encourages other parties to solicit the employee will pay a one time fee of 30% of the employee's annualized wages to the other Party.

**16. Logistics Services** If Customer engages XMG for warehousing, transportation management and/or general logistics services, those services may include storage, material handling, delivery scheduling, inventory location tracking, special labeling, performance tracking, product inspection, transporting, shuttling, hosteling, delivery, routing, tendering, freight pay, audit, vendor selection, service contracting, equipment purchasing, leasing and solution design etc. will be defined as ("Logistics Services"). The specific Logistic Services for which the Customer has engaged XMG are set forth in each applicable Site Operating Agreement.

**III. Other General Terms and Conditions**

**17. Technical Systems; Intellectual Property.**

A. Intellectual Property.

(a) XMG's work product which it markets, is the development and delivery of Logistics Services and technology. Customer desires to purchase such Logistics Services and technology from XMG for use at specific sites, as enumerated from time-to-time in Site Operating Agreements. XMG desires to sell Logistics Services and technology to Customer in the future for use at different facilities for Customer. Customer will have the right to use the above-described Logistics Services and technology solely for the operation at a Facility for which a Site Operating Agreement has been agreed to, executed, and incorporated as a part of this Agreement. Customer agrees not to utilize any technology developed by XMG for use at a particular Site or Facility at another site or facility for which a Site Operating Agreement has not been executed without paying the corresponding fees to XMG and executing the appropriate Site Operating Agreement. Upon expiration or earlier termination of this Agreement or a Site Operating Agreement, all technical systems, including but not limited to telecommunications and computer hardware and software, used to provide the Services to Customer which XMG owns and which have not been purchased by Customer will revert to XMG's possession and control and Customer warrants that it will make no copies of any of such systems. The use of any such information systems, hardware, or software, during the Term of this Agreement shall not be deemed to have given Customer a license to use or ownership rights in any such assets of XMG. If at the expiration or termination of this Agreement, excepting Customer's termination without cause, Customer requests continued use of hardware or software of XMG in the Facility, XMG will license Customer to use that hardware or software for a licensing fee determined by XMG, but only for the transition period until Customer's next logistics solution is in place.

(b) Customer from time-to-time develops systems to operate its businesses which it considers proprietary. Customer may give XMG the right to use these systems solely for the operation of the Facility for which a Site Operating Agreement has been agreed to and has been incorporated as a part of this Agreement. XMG agrees not to utilize any technology developed by Customer for use at a site or facility at

any other location without Customer's written consent. Upon expiration or earlier termination of this Agreement, all technical systems, including but not limited to telecommunications and computer hardware and software, developed by Customer and used to provide the Services to Customer will revert to Customer's possession and control and XMG warrants that it will make no unauthorized copies of any of such systems.

**18. Indemnification**

A. General. Except as otherwise provided herein, each Party (the "Indemnifying Party") will indemnify, defend, and hold harmless the other Party, its Affiliates and their respective officers, directors, employees, subcontractors, and agents (the "Indemnified Party") from and against any and all liabilities, damages, fines, penalties, costs, claims, interest, and expenses (including costs of defense, settlement, and reasonable 'attorneys' fees) which arise from claims, allegations, actions, causes of action, demands, assertions, adjudications, or suits which arise out of damage to or destruction of any property, or bodily injury (including death) suffered by any person including the Indemnified Party (hereafter referred to as "Losses") to the extent they are caused by (i) the acts or omissions of the Indemnifying Party or its agents, employees, and subcontractors or (ii) the violation by an Indemnifying Party of any applicable federal, provincial or local law, statute, regulation, rule, ordinance, order, or government directive governing or applicable to the Indemnifying Party's performance under this Agreement. Subject to any differing terms in the Transportation Management Services Agreement and notwithstanding the foregoing, XMG will have no obligation to indemnify, defend, or hold harmless Customer for acts or failures to act of any transportation carrier unless and to the extent such Losses are the result of negligence or willful misconduct on the part of XMG. Losses for which indemnification is provided under this Agreement shall not include Losses to the extent (but only to the extent) they relate to, result from or arise out of the negligence or willful misconduct on the part of an Indemnified Party.

B. Both Parties agree to waive any right to claim as losses or damages, for any reason, including but not limited to claims for indemnification, breach of contract, or otherwise (i) lost profits; indirect, special, incidental, or consequential damages; and any damages exceeding the damage limits herein provided in this Agreement, and/or (ii) Losses to the extent (but only to the extent) they relate to, result from, or arise out of the negligence or willful misconduct on the part of an Indemnified Party.

**19.Hazardous Materials**

A. Hazardous Substances. If in providing the Services Customer will require XMG to handle, warehouse, or broker transportation of Hazardous Substances (defined below), those Hazardous Substances must be listed by Customer in the applicable Site Operating Agreement. Customer immediately upon execution of this Agreement and each Site Operating Agreement will provide XMG with all necessary and legally prescribed handling and disposal instructions for the Hazardous Substances that Customer is required to provide under federal, state, and local law. Customer agrees to update the information required by this Section as other hazardous substances are added to its operations at the Facilities and without request therefor from XMG. Customer will not require XMG to dispose of Customer's Hazardous Substances, or anything otherwise considered hazardous waste under the Environmental Laws, defined below. For any waste or regulated material that is generated from the Products during XMG's performance of the Services, Customer shall be considered the waste generator and waste transporter. XMG's obligations with respect to such waste or regulated material shall be limited to preparing such waste for pickup at a Facility in accordance with Customer's procedures for pickup and disposal within the timeframe for removal and disposal of such waste as prescribed by applicable laws, rules and regulations (where such timeframe should not trigger the obligation to hold any authorization from any governmental authority) by a Customer-approved and licensed carrier or transporter under written contract with Customer for disposal at a permitted and licensed disposal site in accordance with applicable laws, rules and regulations.

B. Chemical Management. Customer acknowledges that chemicals may be necessary for the day-to-day operations of XMG, and that a reasonable inventory of same may be stored in Customer Facilities subject to XMG's obligations set forth herein. XMG shall obtain the prior, written approval of Customer before XMG

stores any reportable quantities of any Hazardous Substance within a Customer Facility, provided that such approval shall not be unreasonably withheld.

C. Indemnity. Each party (the "Indemnifying Party") will indemnify, defend, and hold harmless each and every other party and its officers, directors, employees, subcontractors, and agents (the "Indemnified Party") from and against any and all Losses arising from the breach of "Environmental Laws," as defined below or the emission, spilling, discharge, disposal, leaking, or other release, or any threat thereof, or knowingly allowing to be emitted, spilled, discharged, disposed of, leaked, or otherwise released, any Hazardous Substance into the environment or sewer system connected to a Facility ("Releases").

D. Definitions.

i. "Environmental Laws" means all federal, state, and local laws, including statutes, regulations, ordinances, codes, rules, directives, orders, and other governmental restrictions and requirements relating to the environment or Hazardous Substances. Reference to any statute, whether federal or state, shall include any statutes which amend or renew such acts, and any and all regulations, orders, rules, directives, and ordinances promulgated pursuant to such statutes, including any amendments to the same, as enacted from time to time.

ii. "Hazardous Substances" means any hazardous or toxic substance, material or waste which is or becomes regulated by any federal, provincial, or local government.

**20.** **Customer's and XMG's Property Waiver of Subrogation** Customer, for itself and its successors and assigns and for its insurers, hereby waives all right of recovery against XMG for any and all loss or damage, which occur to the building, equipment, inventory, or other tangible real or personal property owned or leased and used in connection with the Services rendered hereunder, to the extent that subrogation would make XMG responsible for losses to Customer for which XMG is not responsible under this Agreement.

XMG, for itself and its successors and assigns and for its insurers, hereby waives all right of recovery against Customer for any and all loss or damage, which occur to the building, equipment, inventory, or other tangible real or personal property owned or leased and used in connection with the Services rendered hereunder, to the extent that subrogation would make Customer responsible for losses to XMG for which Customer is not responsible under this Agreement.

**21.** **Notice and Opportunity to Defend; Limitations and Threshold Amounts** If any Losses covered by the indemnities set forth in this Agreement are asserted against an Indemnified Party, such Party shall notify the Indemnifying Party as promptly as practicable and give it an opportunity to defend the same. The Indemnified Party shall extend reasonable cooperation to the Indemnifying Party in connection with such defense. In the event that the Indemnifying Party in connection with such claim fails to defend against the claim within a reasonable time, the Indemnified Party shall be entitled to assume the defense thereof, and the Indemnifying Party shall be liable to repay the Indemnified Party entitled to indemnification for all its expenses reasonably incurred in connection with said defense (including reasonable attorneys' fees and settlement payments) until the Indemnifying Party assumes such defense.

**22.** **XMG's Insurance** During the Term of this Agreement, XMG will maintain and will require that its agents or subcontractors also maintain policies of insurance in the following types and amounts, unless different types and amounts are required due to the equipment or service requirements in specific Site Operating Agreements. Primary and Secondary insurance policies may be combined to provide the following limits:

A. Worker's Compensation and Employer's Liability. Workers' compensation and Employer's Liability insurance in an amount not less than the statutory limits for the states in which Services are to be performed.

B. Liability. Commercial General Liability Insurance (including Broad Form Contractual Liability Insurance) protecting XMG and Customer from claims for damages due to bodily injury (including death),

personal injury, or property damage alleged to have been caused by the negligent acts or omissions of XMG or any employee, contractor or agent of XMG excepting carriers which are not wholly owned subsidiaries of XMG, with minimum limits of two million dollars ($2,000,000) for bodily injury and property damage per occurrence, including contractual liability, personal injury and completed operations, naming Customer as an additional insured;

**Commented [AS17]:** We can agree to $2M

C. Automobile. Automobile liability insurance (including owned, non-owned, and hired vehicles) with minimum limits of not less than $1,000,000 per occurrence combined single limit providing that Customer shall be an additional insured;

D. Property. Warehouseman's legal liability insurance of one million dollars ($1,000,000) per occurrence. Cargo liability insurance of one hundred thousand dollars ($100,000) per truckload.

**Commented [AS18]:** Needs to be capped at liability for lost or damaged inventory

E. Certificates. Within ten (10) days of the Effective Date, XMG will furnish to Customer, certificates evidencing the insurance and endorsements required herein and such insurance where Customer is an additional insured will be primary. Each certificate will set forth the amount of coverage, policy number, and date of expiration, as to coverage required in this Section. Such certificates (i) will be provided at each renewal of the insurance provided for above (unless they are without termination) and for so long as this Agreement remains in effect; (ii) will show Customer as an additional insured as to coverage required in Section (B) above; and (iii) will provide that XMG will not terminate, cancel, or materially modify such insurance coverage without written notice to Customer at least ten (10) days prior to such termination, cancellation, or material modification.

F. XMG is not responsible for insuring the physical building at the Facilities unless the requirement is specifically written into the Site Operating Agreement.

**23. Customer's Insurance** **<Intentionally Omitted>**

**Commented [CM19]:** we do not provide this for any 3PL suppliers.

**Commented [AS19R2]:** OK

**Formatted:** Font: Bold

**24. Insurance Companies** All insurance policies required herein will be issued by reputable insurance companies authorized to do business under the laws of the state in which Services will be performed and with insurance companies having an A.M. Best Rating of at least A-, VII.

**25. Licenses and Permits**

A. Each Party, for every Facility it owns, operates or leases, shall obtain all required licenses or permits for the making of those repairs, alterations, improvements, or additions it chooses or is obligated to make whether by law or otherwise to its Facilities. Each Party, where necessary, will join with the other Party in applying for all such permits or licenses.

**Commented [AS20]:** This is a MOSA, if Agilent owns a facility they should be responsible for the following.

**Commented [AS21]:** Not foreseen but if Agilent is required to fill out permit or licenses we need cooperation.

B. XMG covenants that, subject to any permits, licenses, certificates, or approvals needed by Customer with respect to activities or conditions existing on the Effective Date of a Site Operating Agreement for a Customer Facility, all permits, licenses, certificates, and approvals required to provide the Services in a Facility will be obtained by XMG. XMG covenants that, once such permits, licenses, certificates, or approvals have been obtained, it will maintain all of them in full force and effect throughout the applicable Term.

**26. Termination Rights** The Parties will have those termination rights set forth below.

A. Insolvency. Notwithstanding anything contained in this Agreement to the contrary, either Party may immediately terminate this Agreement in the event that such other Party is adjudicated bankrupt, files a voluntary petition in bankruptcy, makes an assignment for the benefit of creditors or seeks protection against creditors under any applicable federal or provincial laws, or if there is a commencement of any bankruptcy, insolvency,

receivership or other similar proceeding against the other Party that is not dismissed within sixty (60) days after such filing.

B. Mutual Consent. This Agreement, or any Site Operating Agreement, may be terminated at any time by the mutual consent of Customer and XMG, or as expressly set forth in this Agreement or any Site Operating Agreement.

C. Breach.

(a) In the event that either Party commits a breach of its obligations under this Agreement, other than a payment obligation, the non-breaching Party will provide written notice describing the breach to the breaching Party. The breaching Party will have sixty (60) days to cure such breach, or, if the parties agree that a cure is not feasible within sixty (60) days, such period of time for cure as the Parties may agree in writing. If the breach is not cured within such period, then the Party not in breach may terminate this Agreement upon written notice. As to Services, a breach by XMG shall be defined as XMG's continuing and complete failure to improve its performance for more than sixty (60) days after a plan for corrective action has been determined and begun.

(b) If Customer fails to pay amounts due XMG for services within twenty (20) days after XMG's notice to Customer of its default in its obligations to pay XMG in full as invoiced, XMG may terminate this Agreement upon written notice.

**Commented [AS22]:** Counter 20

(c) Notwithstanding the foregoing, prior to such termination or removal by Customer of Products from a Facility, Customer shall pay to XMG any and all Fees and other amounts due to XMG not disputed in good faith by Customer, which Fees and other amounts shall not be subject to any right of offset by Customer.

**Commented [AS23]:** Regardless of termination, Customer is responsible for paying the costs.

## 27. Effect of Termination

The termination of this Agreement or any Site Operating Agreement shall not relieve or release either Party from any right, liability, or obligation that accrued prior to the date of such termination.

Customer acknowledges that in order to provide the Services, XMG may have: (i) either purchased or leased all or substantially all of the XMG Equipment; (ii) leased the Facility for Customer; and/or (iii) committed time and resources and made other expenditures with respect to the start-up of the Services (the "Start-Up Costs"). In consideration of the foregoing, upon the termination of this Agreement or any Site Operating Agreement for any reason, Customer agrees to the following, where applicable:

A. Equipment. Customer shall either: (i) purchase the Equipment, free and clear of all liens and encumbrances, for the net book value ("Book Value") of the Equipment at the time of termination or expiration as determined pursuant to the depreciation schedule attached to each Site Operating Agreement; or (ii) request that XMG sell the Equipment for the benefit of Customer. Customer shall be responsible for all necessary costs incurred by XMG relating to the transactions contemplated by this Section, including (but not limited to) commissions, taxes, transportation and handling costs and finance cost or carrying cost of such Equipment from the date of termination or expiration to the date of sale. If Customer requests XMG to sell the XMG Equipment, then XMG shall use commercially reasonable efforts to sell the Equipment within one hundred twenty (120) days of such request. If XMG is unable to sell the Equipment within such one hundred twenty (120) day period, then Customer shall be obligated to purchase the Equipment at the Book Value at the time of termination or expiration and pay for the same within (30) days of receipt of XMG's invoice. If any Equipment is leased, then Customer shall pay to XMG any lease termination fees or penalties within thirty (30) days of receipt of XMG's invoice for the same or shall, subject to the lessor's approval, assume such leases and obtain a general release of XMG from lessor.

**Commented [CM24]:** We are not liable for the equipment purchase by and owned by XMG. List of the equipment liable by Agilent need to be defined clearly in the Appendix / Site Operating Agreement. We need to add the reference in this section to avoid confusion.

**Commented [KC24R2]:** This clause is n/a

**Commented [AS24R3]:** This is non-negotiable, we can have specific termination language in the SOA that defines what the costs for termination are but they will include Equipment amortization.

B. Facilities. Customer shall pay to XMG any lease termination fees or penalties set forth in a Site Operating Agreement, within thirty (30) days of receipt of XMG's invoice for the same or shall, subject to the lessor's approval, assume such leases and obtain a general release of XMG from lessor.

Commented [CM25]: Need to define the lease termination fee in Appendix/Site Operation Agreement.

Commented [KC25R2]: Tied to Agilent's early termination or breach

C. Start Up Costs. Customer shall pay to XMG the balance, if any, of unamortized or unpaid Start-up Costs as of the date of termination or expiration as determined by XMG, acting reasonably if designated in a Site Agreement. Such amounts shall be payable on or before the date of termination or expiration, unless otherwise agreed to by the Parties in writing.

D. Products. Upon any termination of this Agreement or an applicable Site Operating Agreement, the Products and any equipment or materials owned or leased by Customer which are stored at the Facility will be transferred to a location specified by Customer. The transfer of these Products, equipment, and materials will be paid for by Customer. If Customer does not provide a location in a reasonable manner, any additional storage or handling charges incurred as a result, including but not limited to overflow facilities or storage trailers, will be at the expense of Customer.

Commented [AS26]: Repeat of earlier request

**28. Audits**

A. Of Customer. ~~If Customer's systems and equipment, including computer hardware, software, and data, are used to provide the Services, Customer will provide XMG, and its internal auditors, during reasonable business hours, access to such equipment and systems, to perform a physical inventory or audit, or both, as required to ascertain the status of XMG's provision of Services. Such inventories or audits will be conducted during normal business hours.~~

Commented [AS27]: Why is this being removed?

B. Of XMG. Customer shall have the right to physically inspect the Services being performed by XMG and the Facilities in which Services are provided, and to perform audits, including inspection of books, records and computer data relevant to provision of the Services, to ensure that inventory, quality, process and business controls are maintained; provided, however, that such inspections and audits shall be conducted upon reasonable notice to XMG and so as not to interfere with XMG's business.

**29. Force Majeure** Neither Party shall be liable to the other for failure to perform its obligations under this Agreement or any Site Operating Agreement if prevented from doing so because of an act of God, strikes, fire, flood, explosion, civil disturbance, acts of terrorism, pandemic events, interference by civil or military authority, accident, labor disputes or shortages arising out of external factors, or because the continuation of the Services at a Facility would be in violation of any governmental laws rules or regulations or would cause or create any material safety, health or environmental concerns or for other causes beyond the reasonable control of the Party ("Force Majeure"). Upon the occurrence of a Force Majeure event, the Party seeking to rely on this provision shall promptly give written notice to the other Party of the nature and consequence of the cause. Each Party shall use commercially reasonable efforts to minimize the effects of a Force Majeure event. If a Force Majeure event occurs with respect to any of the Services or obligations of the Parties under this Agreement or any Site Operating Agreement and such Force Majeure event is estimated to last beyond a period of time so that a Party's obligations or Services are materially disrupted, the Parties shall agree as to alternative temporary arrangements, the temporary cessation of Services and/or obligations or the termination of the affected Site Operating Agreement. During the period of any Force Majeure, the Services and the compensation for the affected Site Operating Agreement shall be adjusted to the level of Services provided but, unless otherwise agreed to by XMG, nothing herein shall be construed to relieve Customer from paying any fixed costs associated with space dedicated to providing Services to Customer or any unamortized Start-Up Costs, as the same are due and payable under the provisions of the affected Site Operating Agreement. Any applicable insurance proceeds or any rent abatement received by XMG shall be credited against the costs due XMG under this provision, and XMG shall make commercially reasonable efforts to obtain any such proceeds or abatements. The provisions hereof shall not apply to monetary amounts previously due and owing by either Party to the other.

Commented [CM28]: Does this mean that Agilent need to pay all the fixed cost even XMG could not provide the space required in "Force Majeure" situation?

Commented [KC28R2]: If Force Majeure impacts the Facility and ability to use the Facility, it should excuse performance of warehousing AND payment by Agilent

Commented [AS28R3]: We can't accept this. We are opening the warehouse on behalf of Agilent.

**30. General Provisions.**

A. Survival of Provisions. The provisions of this Agreement or any Site Operating Agreement shall survive the expiration or earlier termination of this Agreement, provided that those indemnities set forth above, shall survive for not more than five years after the expiration or termination of the applicable Site Operating Agreement for subject Facility or Services.

B. Notices. All notices, claims, certificates, requests, demands and other communications required or permitted hereunder must be in writing and will be deemed given if delivered personally or mailed (registered or certified mail, postage prepaid, return receipt requested) or delivered by courier, or emailed, addressed to the Party's address or email address set forth below:

XMG
200 Northpoint Dr
Suite 100
Coppell, TX 75019
Attn: John White, CEO
Email: Jwhite@xpedient.com

Agilent Technologies Inc.
Attn: CUSTOMER CONTACT, CUSTOMER TITLE
Email: CUSTOMER EMAIL

or to such other address as the Party to whom notice is to be given may have previously furnished to the other in writing in the manner set forth above, provided that notice of a change of address will be effective only upon receipt. The time of giving or making such notice, claim, certificate, request, demand or other communication shall be if delivered, when delivered, and if mailed, then on the third business day after the day of mailing thereof, provided that if mailed should there be between the time of mailing and the actual receipt of the notice, a mail strike, slow down or other labor dispute which might affect delivery of such notice then such notice shall only be effective if actually delivered.

C. Compliance with Laws**.** XMG will, and will require that all of its subcontractors also, comply with the provisions of any federal, state or local statute, regulation, rule, ordinance, or order, applicable to the provision of the Services to Customer, including but not limited to laws regarding worker safety and health (*i.e*., Occupational Safety and Health Act). Customer agrees that in the performance of its obligations under this Agreement and each Site Operating Agreement, Customer will comply with applicable laws, rules, regulations of governmental authorities in connection therewith and will not request that XMG provide Services that would cause, directly or indirectly, a violation of any applicable laws, rules or regulations. Customer further represents, warrants and covenants that all Customer equipment is in good working order, free of defects and fit for the purpose for which it is intended.

D. Customer has full corporate power and authority to enter into and perform its obligations under this Agreement and to the knowledge of Customer, there is no contract, agreement, promise or undertaking that would prevent the full corporate execution and performance by it of this Agreement, and the persons executing this Agreement on behalf of Customer are duly authorized to do so and have the authority to bind Customer.

E. XMG has full corporate power and authority to enter into and perform its obligations under this Agreement and to the knowledge of XMG, there is no contract, agreement, promise or undertaking that would prevent the full corporate execution and performance by it of this Agreement, and the persons executing this Agreement on behalf of XMG are duly authorized to do so and have the authority to bind XMG.

F. Waiver**.** Waiver by either Party of or the failure of any Party hereto to enforce at any time its rights with regard to any breach or failure to comply with any provision of this Agreement by the other Party shall not be

This Agreement is Subject to an Agreement of Confidentiality and Shall Not be Distributed Except to the Parties

construed as, or constitute, a continuing waiver of such provision, or a waiver of any other future breach of or failure to comply with the same provision or any other provision of this Agreement.

G. Governing Law; Invalidity. This Agreement will be construed and enforced in accordance with, and governed by, the laws of the state in which the Facility is located without regard to rules of conflict of laws. With respect to any issues that are not site related, the Agreement shall be construed in accordance with the laws of the state of Tennessee. If any provision of this Agreement is held invalid, then the remainder of this Agreement will continue in force as if the invalidated provision did not exist.

H. Modification. No release, discharge, abandonment, waiver, alteration, or modification of any of the provisions of this Agreement, or any of the Exhibits or Appendices referred to herein, will be binding upon either Party unless set forth in a writing signed by both Parties.

I. Entire Agreement. This Agreement, together with all attachments, Appendices, and Exhibits hereto, constitutes the entire agreement between Customer and XMG with respect to the subject matter hereof and supersedes all prior oral or written representations and agreements with regard to the same subject matter. The Parties acknowledge that this Agreement has been negotiated and incorporates their collective agreement as to the provisions to be contained herein. Therefore, no presumption will arise giving benefit of interpretation by virtue of authorship of any provision of this Agreement.

J. Assignment. Neither Party shall assign this Agreement without the prior written consent of the other Party. Both Parties agree not to unreasonably withhold consent of assignment to the other Party.

**Commented [AS29]:** We are reserving the right to not accept the assignment, we will not unreasonably withhold.

K. Execution in Counterparts. This Agreement may be executed in one or more counterparts and by facsimile or PDF, each of which will be deemed to be an original, and all of which will together shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each Party and provided to the other Parties.

L. Severability. If any part, term or provision of this Agreement is declared unlawful or unenforceable, by judicial determination or performance, the remainder of this Agreement will remain in full force and effect. If necessary, the Parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent.

M. Mediation. All disputes which arise under this Agreement or out of its subject matter shall be submitted to mediation prior to any other action being taken. To commence settlement mediation, if a dispute arises, the aggrieved Party will give notice to the other Party that the aggrieved Party has a claim against the other Party (the date that notice is delivered will be called the "Notice Date"). Written notice of a demand for mediation must be mailed to the other Party within sixty (60) days of the occurrence of the claimed breach or other event giving rise to the controversy or claim. Any demand for settlement mediation will identify the provision or provisions of this Agreement alleged to have been breached and will state the issue proposed to be resolved in mediation and the remedy sought. The Parties will, acting reasonably, mutually agree on a mediator to conduct the mediation at a neutral location. If after two (2) days of mediation the dispute is not settled, or if the mediator declares an impasse prior to the end of the two-day period, then if the Parties do not mutually agree to continue mediation, mediation shall terminate, and the Parties shall be free to pursue remedies in court or elsewhere.

**Commented [AS30]:** 1 year is too long.

N. Subsidiaries' and Affiliates' Adoption of Agreement. A Subsidiary or Affiliate of either Party may adopt this Agreement by executing an agreement setting forth its adoption of this Agreement and any necessary Appendices. Thereafter, wherever "Customer" or "XMG" is used herein, it shall include any and all such adopting Subsidiaries and Affiliates, as applicable, provided that neither Customer nor XMG shall be relieved of liability under this Agreement. "Subsidiary" shall mean an entity in which the Party holds the voting control and "Affiliate" shall mean an entity with which the Party is under common control.

O. No Third-Party Beneficiaries. This Agreement is entered into solely between, and may be enforced only by, the Parties and their permitted successors and assigns, and neither this Agreement nor any Site Operating

Agreement shall be deemed to create any rights in third parties including, without limitation, suppliers and customers of a Party, or to create any obligations of a Party to such third parties.

P. Reservation of Rights**.** A Party's waiver of any of its remedies afforded hereunder or by law is without prejudice and shall not operate to waive any other remedies that such Party shall have available to it, nor shall such waiver operate to waive such Party's right to any remedies due to a future breach, whether of a like or different character.

Q. Construction**.** This Agreement shall not be construed as if it had been prepared by one of the Parties, but rather as if both Parties had prepared the same.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

| **Xpedient Management Group, LLC** | **Agilent Technologies Inc.** |
|---|---|
| By: ______________________________ | By: ______________________________ |
| Title: _____________________________ | Title: ____________________________ |
| Date: _____________________________ | By: ______________________________ |
| | Title: ____________________________ |
| | Date: ____________________________ |

# Master Operating Services Agreement

**for**

**Logistics Services**

**between**

**Xpedient Management Group, LLC**

**and**

**Agilent Technologies Inc.**

Field Code Changed

This Agreement is Subject to an Agreement of Confidentiality and Shall Not be Distributed Except to the Parties

# MASTER OPERATING SERVICES AGREEMENT

# FOR

# LOGISTICS SERVICES

This Master Operating Services Agreement (the "**Agreement**") is made and entered into as of _____________, 20____.

**BY AND BETWEEN:** **Xpedient Management Group, LLC**, a Tennessee limited liability company with an office at 200 Northpoint Drive, Suite 100 Coppell, Texas 75019 ("**XMG**")

**AND:** **Agilent Technologies Inc.**, with offices at 5301 Stevens Creek Blvd, Santa Clara, CA 95051, hereinafter to be referred to as (the "**Customer**") (XMG and Customer each a "**Party**" and collectively the "**Parties**").

## I. General Business Terms

1. **Services; Appendices** XMG agrees to provide to Customer such logistics and logistics-related services ("Services") which may include warehousing, transportation management, and consulting as may be agreed to by Customer and XMG which are set forth in Appendices (if one, an "Appendix" or more, "Appendices") attached hereto and made a part of this Agreement. Appendices may be modified by Customer and XMG from time to time, by execution of an amendment by both parties. Appendices set forth site-specific terms for all Services provided for each of Customer's sites (each of them a "Site" or "Facility") (the "Site Operating Agreements"). The Site Operating Agreements are attached hereto and incorporated herein by reference.

2. **Commencement of Services** No commitment to obtain Services from XMG is made by Customer except by the execution of this Agreement and the applicable Appendices by Customer. If Customer also issues purchase orders for the Services, all purchase orders issued by Customer will be subject to the terms and conditions of this Agreement and applicable Appendices. This Agreement and those Appendices executed at the time this Agreement is executed will become effective as of the effective date set forth in the Appendices (the "Effective Date"). Any Appendices added after the Effective Date will become effective as indicated in those Appendices.

3. **Term** "Term," "Initial Term," and "Renewal Term" are defined (A) in this Master Operating Service Agreement and any Appendices executed as of this Agreement's Effective Date, and (B) in each Site Operating Agreement for each Site at which Services later commence. If upon the expiration of any Site Operating Agreement, XMG is continuing to provide Services to Customer without another, or, in the case of an expired Site Operating Agreement, a superseding Site Operating Agreement, or other superseding document having been executed by the Parties, this Agreement, and any applicable Site Operating Agreement will be deemed to be continuing on a month-to-month basis, until superseded by another agreement between the Parties or terminated by either Party with ninety (90) days' notice.

4. **Terms in Appendices** In all cases where the terms of this Agreement and any Appendix are in disagreement, the terms in the Appendix shall control.

5. **Personnel and Equipment**

A. Personnel. The number and types of any personnel to perform the Services will be determined by XMG, and will be as described and identified in Appendices. Customer will have the right from time to time to require XMG to remove any individual, including the employees or independent contractors of XMG and employees or independent contractors working in any subcontracted capacity through XMG, from working on Agilent account for any lawful reason, and XMG will complete such removal and replace such individual as soon as practicable while minimizing costs and impacts to the Services. XMG will conduct a background screening and drug testing as required in the Site Operating Agreements.

Commented [AS1]: We've added this to the SOA.

B. Equipment. The Customer may or may not provide the equipment and related items required for XMG to provide the Services, as identified in the Site Operating Agreements (the "Equipment"). XMG shall be responsible for maintaining the Equipment in accordance with the Site Operating Agreements. To the extent Customer provides any Customer Equipment to XMG, such Customer Property is provided solely for the purposes of permitting the XMG to perform the Services, and XMG agrees to return all such property to Agilent upon request and/or upon termination or expiration of the Agreement. To the extent that Agilent Property includes software, XMG agrees to abide by Agilent's then-current software license terms, a copy of which is attached as reference.

Commented [AS2]: Can Agilent comment on why they took out this sentence?

Commented [AS3]: Need to provide a copy to us.

Formatted: Indent: Left: 1", No bullets or numbering

C.

**6. Facilities**

A. Facilities Defined. Services will be provided at one or more facilities (singly a "Facility" and if more than one, "Facilities") which are identified in each applicable Site Operating Agreement. The Facilities may be leased or owned by the Customer or XMG in accordance with the Site Operating Agreement.

Commented [C(U4]: Do we need to designate the class of facility – like Class A, etc. ? Do we need to designate minimize size? Do we need to reserve the right to approve the facility and/or change of facility? Appendix to Site Operating Agreement will define.

B. Facility Relocation If any event with respect to a Facility occurs prior to expiration of the applicable lease agreement resulting in a premature loss of use or possession of the Facility (such as a partial closure, termination for causeor convenience by Customer, Force Majeure event), the cost and expense of transporting Product and Material to and from the Facility and to and from an alternate Facility and rent and all other expenses associated with the Facility identified in the Site Operating Agreement or an alternate Facility shall be paid for as follows:

1. If the event occurred due to a breach of the lease agreement by XMG, XMG shall pay.
2. If the event occurred due to a breach or termination of this Agreement by Customer, except if due to termination for cause, then Customer will pay.
3. If the event occurred due to a breach of the lease agreement by the landlord, then XMG will use its best efforts to pass through and recover from the landlord the costs.

4. If the event occurred due to a Force Majeure, then the parties will resolve the costs according to Section 29.by Customer.

Formatted: Indent: Left: 0.5", Hanging: 0.5"

**7. Rates and Charges** The initial rates, fees and charges to be charged to and paid by Customer are set forth in the applicable Site Operating Agreement for each Site (the "Fees"). Any change in Fees agreed to by XMG and Customer will be set forth in an amendment to the applicable Site Operating Agreement. The Fees specific to each Site Operating Agreement shall be reviewed annually and may be adjusted by agreement of the Parties.

If during any calendar year a Site Operating Agreement is in effect, either Party experiences an unforeseen substantial change in circumstances that cannot be mitigated or avoided with reasonable commercial effort suchthe Services of that Site Operating Agreement vary to such a degree that either Party in good faith believes that a Fee adjustment(s) (whether an increase or decrease) would be equitable, it shall notify the other Party of the same, and the Parties shall endeavor in good faith to mutually agree upon a temporary or permanent adjustment as promptly as possible. If the parties are unable toParties cannot agree to the changes, acting reasonably and in good faith, Customeron a Fee adjustment, then either Party may require XMG to continue the Services under the existing terms or terminate the applicable Site Operating Agreement elect, upon ninety (90) daysdays' prior written notice to XMGthe other, to terminate the Agreement effective upon the end of such notice (during which period the Parties will continue to perform their respective obligations at the Fees then in effect or

as otherwise agreed to).

XMG will incur start-up costs ("Start-Up Costs") that will be disclosed in the applicable Site Operating Agreement. The Start-Up Costs will be paid by Customer as set forth in the applicable Site Operating Agreement.

8. **Payment** XMG will invoice Customer directly for its Fees and Customer will pay on each invoice, following receipt of the invoice as specified in Site Operating Agreement, but in all events no later than thirty (30) days after receipt of the invoice.

In the event of a good faith dispute regarding any Fees, Customer shall pay the Fees that are not in dispute, within thirty (30) days following receipt of a revised invoice only containing undisputed fees, and shall provide written notice of the dispute within thirty (30) days of receipt of XMG's invoice. Such notice shall include an explanation of the disputed portion of the Fees, the basis of the dispute and a proposed resolution. The Parties shall use commercially reasonable efforts to resolve all disputes in good faith and as promptly as possible. Customer may not offset payment of invoices for disputed claims (such as claims made by Customer for damage or loss) without the prior written consent of XMG.

Any Fees not disputed that are not timely paid shall accrue interest from the invoice due date until paid at the rate of the lesser of: (i) one and a half per cent (1.5%) per month or (ii) the maximum allowed by state or federal regulations.

9. **Operational Control**

A. Control. As between the Parties, XMG is an independent contractor and will have sole and exclusive control over the manner in which XMG and its employees and subcontractors perform Services. XMG will engage, employ, or subcontract with such individuals or other entities as it may deem necessary in connection therewith, provided that the majority of the Services will be provided by XMG's employees. Such individuals will not be considered employees or subcontractors of Customer and will be subject to employment or engagement, and discharge, discipline, and control solely and exclusively by XMG. XMG, and not Agilent, shall have exclusive control over the timekeeping and payroll for its employees and subcontractors, and XMG shall maintain all records and make all wage payments to its employees. XMG shall ensure its Subcontractors comply with this provision. Supplier's employees, and if applicable Supplier's subcontractor's employees, will report all work hours to Supplier, not Agilent. XMG and XMG's subcontractors must comply with all wage and hour and wage payment laws as well as federal, state, and local taxes. XMG is also solely responsible and liable for any and all insurance premiums or other employment benefits respecting XMG's performance. Agilent does not provide any employee benefits programs to XMG or XMG's subcontractors. Agilent shall not have any liability for, and Supplier shall defend, indemnify, and hold Agilent harmless from, XMG's subcontractor's fees arising out of Supplier's failure to pay Supplier's subcontractors.

B. Taxes. All amounts paid to XMG are exclusive of Sales, VAT, GST and similar taxes ("Transactions Taxes"). XMG is solely responsible and liable for any and all duties or taxes on such amounts paid under this Agreement or otherwise attributable to the Services, including all employment-related taxes. Agilent will pay to XMG applicable Transactions Taxes on receipt of an invoice compliant with all applicable Laws of the relevant jurisdiction

~~B.~~

C. Customer agrees to either pay directly or to reimburse XMG for all applicable fees identified in the Site Operating Agreement. For avoidance of doubt, Customer agrees to either pay directly or to reimburse XMG for all applicable property taxes, fees, licenses, charges and assessments imposed pursuant to applicable laws, rules and regulations or by any governmental authority upon Customer owned Equipment, or the Products. Such payment or reimbursement shall include any federal,

**Commented [AS5]:** This places the risk solely on XMG. The intent is to ensure that we are performing the services at a price that was agreed, and if the Services change, we need to reprice to reflect that, regardless of circumstance.

**Commented [CL(M6]:** Normally, we do not agree to late payment interest clauses as this might have challenge to our account payable processes.

**Commented [AS6R2]:** XMG requires on-time payment, if Agilent doesn't pay on time, we are charged interest fees by our bank. We can change this to 1.5%

**Commented [C(U7]:** Statement regarding liability and responsibility to the same extent as XMG

**Formatted:** No underline

**Formatted:** No underline

**Commented [AS8]:** Seems OK

**Formatted:** Indent: Left: 1", No bullets or numbering

**Commented [KC9]:** Charges, fees and assessments imposed by government authority upon operating of the Facility Equipment, or Services are the responsibility of XMG. No charges or fees are applicable to the Products will be charged to XMG.

provincial or local taxes, levies, duties, fees or other charges now or hereafter assessed that are levied or based on or related to any of the Services, the Products, supplies and/ or materialsCustomer Equipment provided or to be provided by XMG under this Agreement but shall not include any income taxes based solely on or measured by the income of XMG. XMG shall be responsible for paying directly any social security or withholding, unemployment, employee insurance assessments/premiums, worker's compensation assessments/premiums or similar taxes required by the jurisdiction in which its employees are employed.

D. Products. The products and materials for which the Services are to be performed shall be those goods manufactured, sold or distributed by or on behalf of Customer (the "Products"). Customer shall always be the owner of the Products. In addition to the foregoing, all Products and Customer Equipment must be: (i) clearly marked or tagged as Customer Property; (ii) held as personal property and not allowed to become a fixture to real property; (iii) kept free of liens and encumbrances; (iv) kept separate from other materials, tools or property of XMG or held by XMG; and (vand (iv) kept only at the Facility unless otherwise authorized in writing by Customer. The Products and Customer Equipment will, at all times, constitute bailed property. Customer shall be responsible for marking or tagging Customer Property.

E.

F.

Formatted: Indent: Left: 0.5", Hanging: 0.5"

Commented [CL(M10]: We are stocking "Material" that we bought from Agilent Suppliers. Would that meet the definition in this clause?

Formatted: Indent: Left: 1", No bullets or numbering

10. **Cooperation in Operations** Both Parties will act in good faith and cooperate in all matters relating to the Services provided by XMG for Customer under this Agreement.

11. **Performance Metrics; Customer Systems Effect**

A. Metrics. Performance metrics, if any, are set by the Parties and are set forth in the applicable Site Operating Agreement.

B. Effect of Customer Systems. If Customer retains control over the operation of, or from time to time itself continues to control, operate, or manage, any portion of the Services (collectively referred to as "Customer Management"), or specifies that certain support services, hardware, software, or other equipment which will be used to provide the Services be obtained from a specific party, be it Customer, an affiliate of Customer, or a designated third party vendor to Customer, or specifies the party which obtains, repairs, maintains, or supports the aforesaid hardware, software, or other equipment (collectively referred to as "Support Designation"), then to the degree that Customer Management or Support Designation impedes XMG's ability to perform the Services or materially impedes the accurate measurement of XMG's performance, Customer will not hold XMG responsible for any applicable performance criteria regarding the Services and will have no action against XMG for any alleged failure to perform the Services or meet metrics set for that performance.

The Parties acknowledge that Customer employees or agents may have access to XMG's warehouse management system module ("WMS") with the ability to make inventory adjustments affecting the inventory status of the Products at a Facility. Customer agrees not to make any such adjustments without XMG's prior written consent. If such adjustments are inadvertently made without prior written notification and XMG identifies an inventory discrepancy, Customer shall cooperate with XMG in any such reconciliation. If XMG can reasonably demonstrate that any unaccounted-for Products were attributable to any Customer adjustments, XMG shall not be responsible for the associated loss.

12. **Inventory: Loss, Reconciliation and Claims**

This Agreement is Subject to an Agreement of Confidentiality and Shall Not be Distributed Except to the Parties

A. Records Reports. XMG shall maintain complete records of the Products received by XMG showing quantities received and shipped, inventory on hand, damaged or lost Products. The Parties agree that the Site Operating Agreement shall designate -the book of record for the purposes of this Agreement.

B. Inventory Accounting. Upon commencement of the Services, XMG shall conduct 1 (one) physical inventory of all Products received by XMG. Thereafter, XMG shall conduct periodic cycle counting according to the Site Operating Agreement. XMG will undertake additional physical inventories or cycle counts as reasonably requested by Customer at Customer's expense. Customer's duly authorized representatives shall have the right to be present at any physical inventory and, upon reasonable notice, shall have the right to visit, observe, and inspect each Facility, the Products and to inspect inventory records during XMG's normal business hours at such times and on such dates as are mutually agreed to by the Parties.

After XMG has completed a physical inventory (other than the initial inventory) or complete cycle count of all Products at each Facility, inventory shortages or overages shall be determined mutually by XMG and Customer – by netting the dollar amount of shortages and overages across all commodity groupings of Products at the time of the physical inventory or the final year-end cycle count reconciliation ("Final Cycle Count Reconciliation").

C. Inventory Loss.

(a) Loss of or Damage to Products. Subject to the limitations set forth herein, XMG shall be responsible for the Replacement Cost (defined as Customer's actual Product manufacturing cost or acquisition cost to replace the lost or damaged Products at their pre-loss condition, less salvage value, if any) of lost or damaged Products under its exclusive care, custody and control if the loss or damage was caused by XMG's failure to exercise such care as a reasonably careful person would exercise under like circumstances. However, XMG is not responsible for lost or damaged Products if the loss or damage could not have been avoided by the exercise of such care. Customer acknowledges that some damage or loss to Customer's Products at each Facility may occur during the performance of the Services. Accordingly, Customer agrees that XMG shall be entitled to a loss allowance as otherwise set forth in a Site Operating Agreement ("Allowance") which must be exceeded prior to XMG being liable for any damage, loss or shortages of Customer's Products.

(b) Products are not insured by XMG against loss or injury however caused.

(c) Limitation of Liability for Loss or Damage to Products. XMG's maximum liability to Customer arising out of or related to loss or damage to Products ("Product Losses") shall not exceed ~~the greater of: the value of the Products stored at the Facility at the time of the loss or~~ one million dollars ($1,000,000) per occurrence, two million dollars ($2,000,000) annually, or five million dollars ($5,000,000) in total over the life of this Agreement("Limit"). The Parties, which are both sophisticated commercial organizations negotiating at arm's length, jointly acknowledge and agree they have negotiated a commercially reasonable Limit that is not unreasonably disproportionate to the value of the Products and the Fees charged and that reasonably reflect the Parties' respective business interests.

**Commented [AS11]:** Our limit is $1M

**Commented [C(U12]:** Are these limits acceptable?

**Commented [CM13]:** Legacy contract only have $1M per occurrence.

(d) Exceptions to Liability. Notwithstanding anything contained in this Agreement or any Site Operating Agreement to the contrary, XMG shall not be liable for any loss or damage to the Products:

(i) occurring prior to or subsequent to XMG's care, custody and control of the Products (which shall commence when XMG accepts receipt of such Products and shall terminate when such Products are placed with a carrier for shipment);

(ii) that is within the Allowance or in excess of the Limit;

(iii) attributable to or otherwise caused by any defects in the manufacturing or packaging or inherent nature of Products;

(iv) attributable to or otherwise caused by the acts or omissions of transportation service providers;

(v) attributable to concealed damage; or

(vi) Attributable to or otherwise caused by the negligence or intentional misconduct of Customer or any of its employees, agents, subcontractors.

(e) Claims. Subject to the exceptions and limitations set forth in this Section, all claims for Products lost, or damaged at each Facility must be made promptly in writing and in all events no later than the earlier of: (i) ninety (90) days after Customer receives the results of the related year-end physical inventory or Final Cycle Count Reconciliation; or (ii) ninety (90) days after Customer has become aware (or reasonably should have become aware) of any such loss or damage. Such written notice shall contain facts sufficient to identify the Products involved, explain XMG's liability for alleged loss or damage and make claim for the payment of a specified or determinable amount of money. XMG, or its insurer, shall have the right to inspect any damaged Product. No action may be maintained by Customer for loss of or damage to Products pursuant to this Section unless a timely written claim has been given as provided for above and unless such action is commenced within twelve (12) months from the date of such written claim. Neither Party shall be liable to the other Party for any special, indirect, consequential, or punitive damages, including, but not limited to, loss of production, loss of income, or loss of profits even if the first Party was given prior notice of the possibility of such damages.

**Commented [KC14]:** 90 days needed for investigation

D. Responsibility for Damage to or Loss of Product; Limitation of Damages — Transportation Management Services.

(a) General. The Parties contemplate in the future entering into a Transportation Management Agreement and if they do, the following provisions will apply. In providing transportation management services, XMG shall provide the customary services for managing the transporting of Product, as further set forth in each Appendix and this Section. For clarity, if there is a conflict between any such separate agreement or a Site Operating Agreement and this Section, as it relates to transportation management services only, then the terms set forth in this Section shall control.

(b) Customer acknowledges, that, during the performance of the Transportation Management Services, XMG will only manage the transportation providers contracted by either Customer or XMG

to perform transportation services. It is understood by both Parties that such transportation providers, and not XMG, will have custody of Customer's Products while performing transportation services.

(c) Liability. Liability for any loss and/or damage to Customer's Products or for any other direct or actual damages resulting from the performance of its transportation management services will be mutually agreed in the Transportation Management Agreement.~~,~~

(d) Claims. XMG shall have the authority to act on behalf of Customer in the processing and filing of claims against transportation providers for lost or damaged Product. XMG shall notify Customer of claims for lost or damaged Product that are received by XMG, and Customer shall promptly notify XMG of any such claims for Product received by Customer. ~~XMG shall file claims with transportation providers in a timely manner, but in no event later than as required by the transportation provider contracts or, in the absence thereof, as provided for under applicable governmental laws, rules or regulations.~~.

**13. Confidentiality**

A. Obligation. The nature and details of the business relationship covered by this Agreement, and the business information regarding the other Party ("Disclosing Party") to which each Party ("Receiving Party") may become privy during the Term (collectively the "Information") constitute confidential and proprietary information, the disclosure, use, sale, copying or distribution of which could result in competitive harm to the Disclosing Party. Each Party agrees to maintain the other Party's Information in the strictest confidence and agrees not to disclose, copy, or distribute the other Party's Information, whether orally or in writing, directly or indirectly, in whole or in part, except to those of the Receiving Party's employees, agents, and subcontractors with a need to know the Information. XMG and Client further agree that they will require that all of their employees, agents, and subcontractors abide by the terms of these confidentiality obligations. The confidentiality obligations in this Section will continue in effect for five years from the termination or expiry date of this Agreement.

**Commented [KC15]:** Reference / attach CDA

B. Exceptions. Nothing herein will apply to any information (a) which is or becomes generally available to the public other than as a result of a disclosure by a Receiving Party or its representatives, (b) which was available on a nonconfidential basis prior to its disclosure by XMG or by Customer or their representatives, (c) which becomes available to a Receiving Party on a nonconfidential basis from a source other than the Disclosing Party or its representatives, provided that such source is not known to be subject to any prohibition against transmitting the information, or (d) which is disclosed pursuant to an order of court; provided that in the event that proprietary information is disclosed or threatened to be disclosed pursuant to this clause (d), the Receiving Party will give the original Disclosing Party prompt, written notice of such threatened disclosure and the right to defend against such disclosure, at its expense, and provided further that the original Receiving Party will cooperate reasonably in such defense. Customer recognizes and agrees that any Appendices attached hereto are XMG's Information and provided solely for use under this Agreement, and that disclosure of any of their contents could cause irreparable damage to XMG. Customer agrees to treat this Information with the utmost degree of care.

C. Publicity. Neither party may issue a press release or other public announcement with respect to this Agreement without the prior, written consent of the other party.

**14. Modifications to XMG's Systems.** Customer acknowledges that XMG's systems, excluding information retrieval and processing systems and XMG's hardware and software, (collectively "XMG Systems"), are the property of XMG. In order to provide the Services to Customer, XMG may agree to modify XMG Systems to meet special Customer needs. However, such modifications are to be made at the sole discretion of XMG and shall remain the property of XMG.

## II. Specific Warehousing Terms and Conditions

**15. Parties Not to Offer Employment.** ~~Intentionally Omitted.~~

Commented [KC16]: Agilent does not agree to non-solicitation clauses due to the difficulty in managing them and the legal questionability due to anti-competition concerns.

If either Party solicits and/or encourages other parties to solicit the employees of the other Party for employment during the life of this Agreement or an applicable Site Operating Agreement and for one year after its expiration, then the Party who solicits and/or encourages other parties to solicit the employee will pay a one time fee of 30% of the employee's annualized wages to the other Party.

**16. Logistics Services** If Customer engages XMG for warehousing, transportation management and/or general logistics services, those services may include storage, material handling, delivery scheduling, inventory location tracking, special labeling, performance tracking, product inspection, transporting, shuttling, hosteling, delivery, routing, tendering, freight pay, audit, vendor selection, service contracting, equipment purchasing, leasing and solution design etc. will be defined as ("Logistics Services"). The specific Logistic Services for which the Customer has engaged XMG are set forth in each applicable Site Operating Agreement.

## III. Other General Terms and Conditions

**17. Technical Systems; Intellectual Property.**

A. Intellectual Property.

(a) XMG's work product which it markets, is the development and delivery of Logistics Services and technology. Customer desires to purchase such Logistics Services and technology from XMG for use at specific sites, as enumerated from time-to-time in Site Operating Agreements. XMG desires to sell Logistics Services and technology to Customer in the future for use at different facilities for Customer. Customer will have the right to use the above-described Logistics Services and technology solely for the operation at a Facility for which a Site Operating Agreement has been agreed to, executed, and incorporated as a part of this Agreement. Customer agrees not to utilize any technology developed by XMG for use at a particular Site or Facility at another site or facility for which a Site Operating Agreement has not been executed without paying the corresponding fees to XMG and executing the appropriate Site Operating Agreement. Upon expiration or earlier termination of this Agreement or a Site Operating Agreement, all technical systems, including but not limited to telecommunications and computer hardware and software, used to provide the Services to Customer which XMG owns and which have not been purchased by Customer will revert to XMG's possession and control and Customer warrants that it will make no copies of any of such systems. The use of any such information systems, hardware, or software, during the Term of this Agreement shall not be deemed to have given Customer a license to use or ownership rights in any such assets of XMG. If at the expiration or termination of this Agreement, excepting Customer's termination without cause, Customer requests continued use of hardware or software of XMG in the Facility, XMG will license Customer to use that hardware or software for a licensing fee determined by XMG, but only for the transition period until Customer's next logistics solution is in place.

(b) Customer from time-to-time develops systems to operate its businesses which it considers proprietary. Customer may give XMG the right to use these systems solely for the operation of the Facility for which a Site Operating Agreement has been agreed to and has been incorporated as a part of this Agreement. XMG agrees not to utilize any technology developed by Customer for use at a site or facility at any other location without Customer's written consent. Upon expiration or earlier termination of this Agreement, all technical systems, including but not limited to telecommunications and computer hardware and software, developed by Customer and used to provide the Services to Customer will revert to Customer's possession and control and XMG warrants that it will make no unauthorized copies of any of such systems.

**18. Indemnification**

A. General. Except as otherwise provided herein, each Party (the "Indemnifying Party") will indemnify, defend, and hold harmless the other Party, its Affiliates and their respective officers, directors, employees, subcontractors, and agents (the "Indemnified Party") from and against any and all liabilities, damages, fines, penalties, costs, claims, interest, and expenses (including costs of defense, settlement, and reasonable 'attorneys' fees) which arise from claims, allegations, actions, causes of action, demands, assertions, adjudications, or suits which arise out of damage to or destruction of any property, or bodily injury (including death) suffered by any person including the Indemnified Party (hereafter referred to as "Losses") to the extent they are caused by (i) the ~~negligent~~ acts or omissions of the Indemnifying Party or its agents, employees, and subcontractors or (ii) the violation by an Indemnifying Party of any applicable federal, provincial or local law, statute, regulation, rule, ordinance, order, or government directive governing or applicable to the Indemnifying Party's performance under this Agreement. Subject to any differing terms in the Transportation Management Services Agreement and ~~aotwithstanding~~notwithstanding the foregoing, XMG will have no obligation to indemnify, defend, or hold harmless Customer for acts or failures to act of any transportation carrier unless and to the extent such Losses are the result of negligence or willful misconduct on the part of XMG. Losses for which indemnification is provided under this Agreement shall not include Losses to the extent (but only to the extent) they relate to, result from or arise out of the negligence or willful misconduct on the part of an Indemnified Party.

B. Both Parties agree to waive any right to claim as losses or damages, for any reason, including but not limited to claims for indemnification, breach of contract, or otherwise (i) lost profits; indirect, special, incidental, or consequential damages; and any damages exceeding the damage limits herein provided in this Agreement, and/or (ii) Losses to the extent (but only to the extent) they relate to, result from, or arise out of the negligence or willful misconduct on the part of an Indemnified Party.

**19.Hazardous Materials**

A. Hazardous Substances. If in providing the Services Customer will require XMG to handle, warehouse, or broker transportation of Hazardous Substances (defined below), those Hazardous Substances must be listed by Customer in the applicable Site Operating Agreement. Customer immediately upon execution of this Agreement and each Site Operating Agreement will provide XMG with all necessary and legally prescribed handling and disposal instructions for the Hazardous Substances that Customer is required to provide under federal, state, and local law. Customer agrees to update the information required by this Section as other hazardous substances are added to its operations at the Facilities and without request therefor from XMG. Customer will not require XMG to dispose of Customer's Hazardous Substances, or anything otherwise considered hazardous waste under the Environmental Laws, defined below. For any waste or regulated material that is generated from the Products during XMG's performance of the Services, Customer shall be considered the waste generator and waste transporter. XMG's obligations with respect to such waste or regulated material shall be limited to preparing such waste for pickup at a Facility in accordance with Customer's procedures for pickup and disposal within the timeframe for removal and disposal of such waste as prescribed by applicable laws, rules and regulations (where such timeframe should not trigger the obligation to hold any authorization from any governmental authority) by a Customer-approved and licensed carrier or transporter under written contract with Customer for disposal at a permitted and licensed disposal site in accordance with applicable laws, rules and regulations.

B. Chemical Management. Customer acknowledges that chemicals may be necessary for the day-to-day operations of XMG, and that a reasonable inventory of same may be stored in Customer Facilities subject to XMG's obligations set forth herein. XMG shall obtain the prior, written approval of Customer before XMG stores any reportable quantities of any Hazardous Substance within a Customer Facility, provided that such approval shall not be unreasonably withheld.

C. Indemnity. Each party (the "Indemnifying Party") will indemnify, defend, and hold harmless each and every other party and its officers, directors, employees, subcontractors, and agents (the "Indemnified Party")

from and against any and all Losses arising from the breach of "Environmental Laws," as defined below or the emission, spilling, discharge, disposal, leaking, or other release, or any threat thereof, or knowingly allowing to be emitted, spilled, discharged, disposed of, leaked, or otherwise released, any Hazardous Substance into the environment or sewer system connected to a Facility ("Releases").

D. Definitions.

i. "Environmental Laws" means all federal, state, and local laws, including statutes, regulations, ordinances, codes, rules, directives, orders, and other governmental restrictions and requirements relating to the environment or Hazardous Substances. Reference to any statute, whether federal or state, shall include any statutes which amend or renew such acts, and any and all regulations, orders, rules, directives, and ordinances promulgated pursuant to such statutes, including any amendments to the same, as enacted from time to time.

ii. "Hazardous Substances" means any hazardous or toxic substance, material or waste which is or becomes regulated by any federal, provincial, or local government.

**20. Customer's and XMG's Property Waiver of Subrogation** Customer, for itself and its successors and assigns and for its insurers, hereby waives all right of recovery against XMG for any and all loss or damage, which occur to the building, equipment, inventory, or other tangible real or personal property owned or leased and used in connection with the Services rendered hereunder, to the extent that subrogation would make XMG responsible for losses to Customer for which XMG is not responsible under this Agreement.

XMG, for itself and its successors and assigns and for its insurers, hereby waives all right of recovery against Customer for any and all loss or damage, which occur to the building, equipment, inventory, or other tangible real or personal property owned or leased and used in connection with the Services rendered hereunder, to the extent that subrogation would make Customer responsible for losses to XMG for which Customer is not responsible under this Agreement.

**21. Notice and Opportunity to Defend; Limitations and Threshold Amounts** If any Losses covered by the indemnities set forth in this Agreement are asserted against an Indemnified Party, such Party shall notify the Indemnifying Party as promptly as practicable and give it an opportunity to defend the same. The Indemnified Party shall extend reasonable cooperation to the Indemnifying Party in connection with such defense. In the event that the Indemnifying Party in connection with such claim fails to defend against the claim within a reasonable time, the Indemnified Party shall be entitled to assume the defense thereof, and the Indemnifying Party shall be liable to repay the Indemnified Party entitled to indemnification for all its expenses reasonably incurred in connection with said defense (including reasonable attorneys' fees and settlement payments) until the Indemnifying Party assumes such defense.

**22. XMG's Insurance** During the Term of this Agreement, XMG will maintain and will require that its agents or subcontractors also maintain policies of insurance in the following types and amounts, unless different types and amounts are required due to the equipment or service requirements in specific Site Operating Agreements. Primary and Secondary insurance policies may be combined to provide the following limits:

A. Worker's Compensation and Employer's Liability. Workers' compensation and Employer's Liability insurance in an amount not less than the statutory limits for the states in which Services are to be performed.

B. Liability. Commercial General Liability Insurance (including Broad Form Contractual Liability Insurance) protecting XMG and Customer from claims for damages due to bodily injury (including death), personal injury, or property damage alleged to have been caused by the negligent acts or omissions of XMG or any employee, contractor or agent of XMG excepting carriers which are not wholly owned subsidiaries of XMG, with minimum limits of ~~ten~~ two million dollars ($~~10~~2,000,000) for bodily injury and property damage per occurrence, including contractual liability, personal injury and completed operations, naming Customer as an additional insured;

**Commented [AS17]:** We can agree to $2M

C. Automobile. Automobile liability insurance (including owned, non-owned, and hired vehicles) with minimum limits of not less than $1,000,000 per occurrence combined single limit providing that Customer shall be an additional insured;

D. Property. Warehouseman's legal liability insurance of ~~ten~~one million dollars ($~~10~~1,000,000) per occurrence. Cargo liability insurance of one hundred thousand dollars ($100,000) per truckload.

E. Certificates. Within ten (10) days of the Effective Date, XMG will furnish to Customer, certificates evidencing the insurance and endorsements required herein and such insurance where Customer is an additional insured will be primary. Each certificate will set forth the amount of coverage, policy number, and date of expiration, as to coverage required in this Section. Such certificates (i) will be provided at each renewal of the insurance provided for above (unless they are without termination) and for so long as this Agreement remains in effect; (ii) will show Customer as an additional insured as to coverage required in Section (B) above; and (iii) will provide that XMG will not terminate, cancel, or materially modify such insurance coverage without written notice to Customer at least ten (10) days prior to such termination, cancellation, or material modification.

F. XMG is not responsible for insuring the physical building at the Facilities unless the requirement is specifically written into the Site Operating Agreement.

**23. Customer's Insurance** **<Intentionally Omitted>**

**24. Insurance Companies** All insurance policies required herein will be issued by reputable insurance companies authorized to do business under the laws of the state in which Services will be performed and with insurance companies having an A.M. Best Rating of at least A-, VII.

**25. Licenses and Permits**

A. ~~XMG~~Each Party, for every Facility it owns, operates or leases, shall obtain all required licenses or permits for the making of those repairs, alterations, improvements, or additions it chooses or is obligated to make whether by law or otherwise to its Facilities. Each Party, where necessary, will join with the other Party in applying for all such permits or licenses.

B. XMG covenants that, subject to any permits, licenses, certificates, or approvals needed by Customer with respect to activities or conditions existing on the Effective Date of a Site Operating Agreement for a Customer Facility, all permits, licenses, certificates, and approvals required to provide the Services in a Facility will be obtained by XMG. XMG covenants that, once such permits, licenses, certificates, or approvals have been obtained, it will maintain all of them in full force and effect throughout the applicable Term.

**26. Termination Rights** The Parties will have those termination rights set forth below.

A. Insolvency. Notwithstanding anything contained in this Agreement to the contrary, either Party may immediately terminate this Agreement in the event that such other Party is adjudicated bankrupt, files a voluntary petition in bankruptcy, makes an assignment for the benefit of creditors or seeks protection against creditors under any applicable federal or provincial laws, or if there is a commencement of any bankruptcy, insolvency,

**Commented [AS18]:** Needs to be capped at liability for lost or damaged inventory

**Commented [CM19]:** we do not provide this for any 3PL suppliers.

**Commented [AS19R2]:** OK

**Formatted:** Font: Bold

**Commented [AS20]:** This is a MOSA, if Agilent owns a facility they should be responsible for the following.

**Commented [AS21]:** Not foreseen but if Agilent is required to fill out permit or licenses we need cooperation.

receivership or other similar proceeding against the other Party that is not dismissed within sixty (60) days after such filing.

B. Mutual Consent. This Agreement, or any Site Operating Agreement, may be terminated at any time by the mutual consent of Customer and XMG, or as expressly set forth in this Agreement or any Site Operating Agreement.

C. Breach.

(a) In the event that either Party commits a breach of its obligations under this Agreement, other than a payment obligation, the non-breaching Party will provide written notice describing the breach to the breaching Party. The breaching Party will have sixty (60) days to cure such breach, or, if the parties agree that a cure is not feasible within sixty (60) days, such period of time for cure as the Parties may agree in writing. If the breach is not cured within such period, then the Party not in breach may terminate this Agreement upon written notice. As to Services, a breach by XMG shall be defined as XMG's continuing and complete failure to improve its performance for more than sixty (60) days after a plan for corrective action has been determined and begun.

(b) If Customer fails to pay amounts due XMG for services within ~~thirty (30~~twenty (20) days after XMG's notice to Customer of its default in its obligations to pay XMG in full as invoiced, XMG may terminate this Agreement upon written notice.

**Commented [AS22]:** Counter 20

(c) Notwithstanding the foregoing, prior to such termination or removal by Customer of Products from a Facility~~, except if termination is due to 26A or a breach by XMG pursuant to 26C~~, Customer shall pay to XMG any and all Fees and other amounts due to XMG not disputed in good faith by Customer, which Fees and other amounts shall not be subject to any right of offset by Customer.

**Commented [AS23]:** Regardless of termination, Customer is responsible for paying the costs.

## 27. Effect of Termination

The termination of this Agreement or any Site Operating Agreement shall not relieve or release either Party from any right, liability, or obligation that accrued prior to the date of such termination.

Customer acknowledges that in order to provide the Services, XMG may have: (i) either purchased or leased all or substantially all of the XMG Equipment; (ii) leased the Facility for Customer; and/or (iii) committed time and resources and made other expenditures with respect to the start-up of the Services (the "Start-Up Costs"). In consideration of the foregoing, upon the termination of this Agreement or any Site Operating Agreement for any reason, Customer agrees to the following, where applicable:

A. Equipment. – Customer shall either: (i) purchase the Equipment, free and clear of all liens and encumbrances, for the net book value ("Book Value") of the Equipment at the time of termination or expiration as determined pursuant to the depreciation schedule attached to each Site Operating Agreement; or (ii) request that XMG sell the Equipment for the benefit of Customer. Customer shall be responsible for all necessary costs incurred by XMG relating to the transactions contemplated by this Section, including (but not limited to) commissions, taxes, transportation and handling costs and finance cost or carrying cost of such Equipment from the date of termination or expiration to the date of sale. If Customer requests XMG to sell the XMG Equipment, then XMG shall use commercially reasonable efforts to sell the Equipment within one hundred twenty (120) days of such request. If XMG is unable to sell the Equipment within such one hundred twenty (120) day period, then Customer shall be obligated to purchase the Equipment at the Book Value at the time of termination or expiration and pay for the same within (30) days of receipt of XMG's invoice. If any Equipment is leased, then Customer shall pay to XMG any lease termination fees or penalties within thirty (30) days of receipt of XMG's invoice for the same or shall, subject to the lessor's approval, assume such leases and obtain a general release of XMG from lessor.

**Commented [CM24]:** We are not liable for the equipment purchase by and owned by XMG. List of the equipment liable by Agilent need to be defined clearly in the Appendix / Site Operating Agreement. We need to add the reference in this section to avoid confusion.

**Commented [KC24R2]:** This clause is n/a

**Commented [AS24R3]:** This is non-negotiable, we can have specific termination language in the SOA that defines what the costs for termination are but they will include Equipment amortization.

B. Facilities. Customer shall pay to XMG any lease termination fees or penalties set forth in a Site Operating Agreement, within thirty (30) days of receipt of XMG's invoice for the same or shall, subject to the lessor's approval, assume such leases and obtain a general release of XMG from lessor.

C. Start Up Costs. Customer shall pay to XMG the balance, if any, of unamortized or unpaid Start-up Costs as of the date of termination or expiration as determined by XMG, acting reasonably if designated in a Site Agreement. Such amounts shall be payable on or before the date of termination or expiration, unless otherwise agreed to by the Parties in writing.

D. Products. Upon any termination of this Agreement or an applicable Site Operating Agreement, the Products and any equipment or materials owned or leased by Customer which are stored at the Facility will be transferred to a location specified by Customer. The transfer of these Products, equipment, and materials will be paid for ~~in accordance with the Site Operation Agreement~~ by Customer. If Customer does not provide a location in a reasonable manner, any additional storage or handling charges incurred as a result, including but not limited to overflow facilities or storage trailers, will be at the expense of Customer.

**28. Audits**

A. Of Customer.

B. Of XMG. Customer shall have the right to physically inspect the Services being performed by XMG and the Facilities in which Services are provided, and to perform audits, including inspection of books, records and computer data relevant to provision of the Services, to ensure that inventory, quality, process and business controls are maintained; provided, however, that such inspections and audits shall be conducted upon reasonable notice to XMG and so as not to interfere with XMG's business.

**29. Force Majeure** Neither Party shall be liable to the other for failure to perform its obligations under this Agreement or any Site Operating Agreement if prevented from doing so because of an act of God, strikes, fire, flood, explosion, civil disturbance, acts of terrorism, pandemic events, interference by civil or military authority, accident, labor disputes or shortages arising out of external factors, or because the continuation of the Services at a Facility would be in violation of any governmental laws rules or regulations or would cause or create any material safety, health or environmental concerns or for other causes beyond the reasonable control of the Party ("Force Majeure"). Upon the occurrence of a Force Majeure event, the Party seeking to rely on this provision shall promptly give written notice to the other Party of the nature and consequence of the cause. Each Party shall use commercially reasonable efforts to minimize the effects of a Force Majeure event. If a Force Majeure event occurs with respect to any of the Services or obligations of the Parties under this Agreement or any Site Operating Agreement and such Force Majeure event is estimated to last beyond a period of time so that a Party's obligations or Services are materially disrupted, the Parties shall agree as to alternative temporary arrangements, the temporary cessation of Services and/or obligations or the termination of the affected Site Operating Agreement. During the period of any Force Majeure, the Services and the compensation for the affected Site Operating Agreement shall be adjusted to the level of Services provided but, unless otherwise agreed to by XMG~~.~~, nothing herein shall be construed to relieve Customer from paying any fixed costs associated with space dedicated to providing Services to Customer or any unamortized Start-Up Costs, as the same are due and payable under the provisions of the affected Site Operating Agreement. Any applicable insurance proceeds or any rent abatement received by XMG shall be credited against the costs due XMG under this provision, and XMG shall make commercially reasonable efforts to obtain any such proceeds or abatements. The provisions hereof shall not apply to monetary amounts previously due and owing by either Party to the other.

**30. General Provisions.**

A. Survival of Provisions. The provisions of this Agreement or any Site Operating Agreement shall survive the expiration or earlier termination of this Agreement, provided that those indemnities set forth

**Commented [CM25]:** Need to define the lease termination fee in Appendix/Site Operation Agreement.

**Commented [KC25R2]:** Tied to Agilent's early termination or breach

**Commented [AS26]:** Repeat of earlier request

**Commented [AS27]:** Why is this being removed?

**Commented [CM28]:** Does this mean that Agilent need to pay all the fixed cost even XMG could not provide the space required in "Force Majeure" situation?

**Commented [KC28R2]:** If Force Majeure impacts the Facility and ability to use the Facility, it should excuse performance of warehousing AND payment by Agilent

**Commented [AS28R3]:** We can't accept this. We are opening the warehouse on behalf of Agilent.

above, shall survive for not more than five years after the expiration or termination of the applicable Site Operating Agreement for subject Facility or Services.

B. Notices. All notices, claims, certificates, requests, demands and other communications required or permitted hereunder must be in writing and will be deemed given if delivered personally or mailed (registered or certified mail, postage prepaid, return receipt requested) or delivered by courier, or emailed, addressed to the Party's address or email address set forth below:

XMG
200 Northpoint Dr
Suite 100
Coppell, TX 75019
Attn: John White, CEO
Email: Jwhite@xpedient.com

Agilent Technologies Inc.
Attn: CUSTOMER CONTACT, CUSTOMER TITLE
Email: CUSTOMER EMAIL

or to such other address as the Party to whom notice is to be given may have previously furnished to the other in writing in the manner set forth above, provided that notice of a change of address will be effective only upon receipt. The time of giving or making such notice, claim, certificate, request, demand or other communication shall be if delivered, when delivered, and if mailed, then on the third business day after the day of mailing thereof, provided that if mailed should there be between the time of mailing and the actual receipt of the notice, a mail strike, slow down or other labor dispute which might affect delivery of such notice then such notice shall only be effective if actually delivered.

C. Compliance with Laws**.** XMG will, and will require that all of its subcontractors also, comply with the provisions of any federal, state or local statute, regulation, rule, ordinance, or order, applicable to the provision of the Services to Customer, including but not limited to laws regarding worker safety and health (*i.e*., Occupational Safety and Health Act). Customer agrees that in the performance of its obligations under this Agreement and each Site Operating Agreement, Customer will comply with applicable laws, rules, regulations of governmental authorities in connection therewith and will not request that XMG provide Services that would cause, directly or indirectly, a violation of any applicable laws, rules or regulations. Customer further represents, warrants and covenants that all Customer equipment is in good working order, free of defects and fit for the purpose for which it is intended.

D. Customer has full corporate power and authority to enter into and perform its obligations under this Agreement and to the knowledge of Customer, there is no contract, agreement, promise or undertaking that would prevent the full corporate execution and performance by it of this Agreement, and the persons executing this Agreement on behalf of Customer are duly authorized to do so and have the authority to bind Customer.

E. XMG has full corporate power and authority to enter into and perform its obligations under this Agreement and to the knowledge of XMG, there is no contract, agreement, promise or undertaking that would prevent the full corporate execution and performance by it of this Agreement, and the persons executing this Agreement on behalf of XMG are duly authorized to do so and have the authority to bind XMG.

F. Waiver**.** Waiver by either Party of or the failure of any Party hereto to enforce at any time its rights with regard to any breach or failure to comply with any provision of this Agreement by the other Party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other future breach of or failure to comply with the same provision or any other provision of this Agreement.

G. Governing Law; Invalidity. This Agreement will be construed and enforced in accordance with, and governed by, the laws of the state in which the Facility is located without regard to rules of conflict of laws. With respect to any issues that are not site related, the Agreement shall be construed in accordance with the laws of the state of Tennessee. If any provision of this Agreement is held invalid, then the remainder of this Agreement will continue in force as if the invalidated provision did not exist.

H. Modification. No release, discharge, abandonment, waiver, alteration, or modification of any of the provisions of this Agreement, or any of the Exhibits or Appendices referred to herein, will be binding upon either Party unless set forth in a writing signed by both Parties.

I. Entire Agreement. This Agreement, together with all attachments, Appendices, and Exhibits hereto, constitutes the entire agreement between Customer and XMG with respect to the subject matter hereof and supersedes all prior oral or written representations and agreements with regard to the same subject matter. The Parties acknowledge that this Agreement has been negotiated and incorporates their collective agreement as to the provisions to be contained herein. Therefore, no presumption will arise giving benefit of interpretation by virtue of authorship of any provision of this Agreement.

J. Assignment. Neither Party shall assign this Agreement without the prior written consent of the other Party. ~~Not withstanding the foregoing, Agilent may assign or transfer any of its rights or obligations under this Master Agreement upon notice in connection with a merger, reorganization, transfer, sale of assets or product lines, demerger or spin-off transaction or change of control or ownership of Agilent or its permitted successive assignees or transferees. Agilent may also require a partial assignment or transfer of this Master Agreement or the establishment of a second agreement with Supplier as a result of the planned split of Agilent into two separate companies. A partial assignment or transfer of rights and obligations will result in two separate agreements with the same terms and conditions for Agilent and its assignee or transferee, allowing both Agilent and its assignee or transferee to retain the benefits of the Master Agreement as independent parties.~~ Both Parties agree not to unreasonably withhold consent of assignment to the other Party.

**Commented [AS29]:** We are reserving the right to not accept the assignment, we will not unreasonably withhold.

K. Execution in Counterparts. This Agreement may be executed in one or more counterparts and by facsimile or PDF, each of which will be deemed to be an original, and all of which will together shall be considered one and the same agreement, and shall become a binding agreement when one or more counterparts have been signed by each Party and provided to the other Parties.

L. Severability. If any part, term or provision of this Agreement is declared unlawful or unenforceable, by judicial determination or performance, the remainder of this Agreement will remain in full force and effect. If necessary, the Parties shall negotiate in good faith to modify the Agreement to preserve (to the extent possible) their original intent.

M. Mediation. All disputes which arise under this Agreement or out of its subject matter shall be submitted to mediation prior to any other action being taken. To commence settlement mediation, if a dispute arises, the aggrieved Party will give notice to the other Party that the aggrieved Party has a claim against the other Party (the date that notice is delivered will be called the "Notice Date"). Written notice of a demand for mediation must be mailed to the other Party within ~~one year (1) year~~ sixty (60) days of the occurrence of the claimed breach or other event giving rise to the controversy or claim. Any demand for settlement mediation will identify the provision or provisions of this Agreement alleged to have been breached and will state the issue proposed to be resolved in mediation and the remedy sought. The Parties will, acting reasonably, mutually agree on a mediator to conduct the mediation at a neutral location If after two (2) days of mediation the dispute is not settled, or if the mediator declares an impasse prior to the end of the two-day period, then if the Parties do not mutually agree to continue mediation, mediation shall terminate, and the Parties shall be free to pursue remedies in court or elsewhere.

**Commented [AS30]:** 1 year is too long.

N. Subsidiaries' and Affiliates' Adoption of Agreement. A Subsidiary or Affiliate of either Party may adopt this Agreement by executing an agreement setting forth its adoption of this Agreement and any necessary Appendices. Thereafter, wherever "Customer" or "XMG" is used herein, it shall include any and all such

adopting Subsidiaries and Affiliates, as applicable, provided that neither Customer nor XMG shall be relieved of liability under this Agreement. "Subsidiary" shall mean an entity in which the Party holds the voting control and "Affiliate" shall mean an entity with which the Party is under common control.

O. No Third-Party Beneficiaries**.** This Agreement is entered into solely between, and may be enforced only by, the Parties and their permitted successors and assigns, and neither this Agreement nor any Site Operating Agreement shall be deemed to create any rights in third parties including, without limitation, suppliers and customers of a Party, or to create any obligations of a Party to such third parties.

P. Reservation of Rights**.** A Party's waiver of any of its remedies afforded hereunder or by law is without prejudice and shall not operate to waive any other remedies that such Party shall have available to it, nor shall such waiver operate to waive such Party's right to any remedies due to a future breach, whether of a like or different character.

Q. Construction**.** This Agreement shall not be construed as if it had been prepared by one of the Parties, but rather as if both Parties had prepared the same.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

**Xpedient Management Group, LLC**

By: ______________________________

Title: ______________________________

Date: ______________________________

**Agilent Technologies Inc.**

By: ______________________________

Title: ____________________________

By: ______________________________

Title: ____________________________

Date: ____________________________

**APPENDIX 1**

**SITE OPERATING AGREEMENT**

**Memphis, TN**

This Site Operating Agreement is made and entered into as of May 5, 2023

**BY AND BETWEEN:** **Xpedient Management Group, LLC**, with an office at 200 North Point, Suite 100 Coppell Texas 75019 ("**XMG**")

**AND:** **Agilent Technologies Inc.**, with an office at 5301 Stevens Creek Blvd, Santa Clara, CA 95051 (The "**Customer**")

**WHEREAS** pursuant to that certain Master Operating Services Agreement between Customer and XMG, made and entered into as of May 5, 2023 ("**Master Agreement**"); and

**WHEREAS** XMG provides, among other service offerings, warehousing, transportation management and inventory management services; Customer desires to have XMG provide logistics services as provided herein at the location described in Schedule 1 (the "**Facility**"); and Customer desires to engage XMG, and XMG agrees to perform the services described herein pursuant to the terms and conditions of this Site Operating Agreement and the Master Agreement;

**THEREFORE**, in consideration of the premises and of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Definitions. Capitalized terms used herein shall have the meaning given to them in the Master Agreement.

2. Term. This Site Operating Agreement shall be for a term commencing on May ~~5~~15, 2023 and terminating on May 31, 2026 (the "**Initial Term**") unless earlier terminated as provided for in Section 3 or Section 26 of the Master Agreement.

3. Termination Obligations. Upon termination of this Site Operating Agreement ~~by XMG for cause pursuant to Section 26B or by Customer pursuant to~~ for any reason or its expiration, XMG shall pick and ship to Customer, at Customer's cost, all Product in this Facility.

**Commented [A1]:** We can not accept this language.

4. Schedules. The following schedules are attached and incorporated into this Site Operating Agreement, as applicable:

   1 Facility
   2 Services
   3 Products
   4 Operating Parameters
   5 Fees, Rates and Charges
   6 XMG Asset List and Equipment Depreciation Schedule
   7 Start-Up Costs Amortization Schedule
   8 Shrinkage Allowance
   9 Early Termination Fees

5. Currency. Unless otherwise specified, all references to dollars in this Site Operating Agreement refer to US dollars.

6. Non-Solicitation. If either Party solicits and/or encourages other parties to solicit the employees of the other Party for employment during the life of this Agreement or an applicable Site Operating Agreement and for one year after its expiration, then the Party who solicits and/or encourages other parties to solicit the employee will pay a one time fee of 30% of the employee's annualized wages to the other Party.

**Commented [A2]:** Send us alternative language. Alternative to use just fees.

7. Execution. This Site Operating Agreement may be executed in counterparts, each of which shall be deemed to be an original and which, in the aggregate, shall be deemed to constitute, for all purposes, a single instrument.

8. Entire Agreement. The parties represent this Site Operating Agreement constitutes the agreement between the parties regarding the subject matter hereof and further changes to this Site Operating Agreement shall not be binding unless in writing and signed by the authorized representatives of each party.

**IN WITNESS WHEREOF**, the Parties have caused this Site Operating Agreement to be executed by their duly authorized representatives.

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
| --- | --- |
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 1**

**FACILITY**

| Facility | Address | Size |
|---|---|---|
| Memphis, TN | 4601 Cromwell Ave, Memphis, TN 38118 | Approximately 45,000 square feet |

Duly authorized representatives:

**Agilent Technologies Inc.**

Per:

By:

Title:

Date:

**Xpedient Management Group, LLC**

Per:

By:

Title:

Date:

**SCHEDULE 2**

**SERVICES**

**Warehouse Services**

Inbound

Customer will be responsible for trailer or container delivery, including transportation or drayage, to the Facility. Customer will provide the container arrival schedule to each Facility and inbound loads will be received directly into Customer's WMS. The Facilities will set unload appointments with the inbound carriers and unload the Product on containers. Inbound Product will be reconciled against the Container Manifest.

Product will be handled and stored in full pallet quantities in locations based on the WMS bin designation, which will based on item and batch, if applicable. XMG will have access to a Customer scanning unit with pre-loaded SAP WMS and will be able to scan each ~~pallet,~~box but will not need to break down ~~and scan~~ pallets. If the Customer scanner is not available, XMG will not have scanning capability.

After receiving, XMG will goods receipt the shipment in Customer's WMS.

Outbound

Facility will pick and stage outbound Product for carrier pickup. Orders will be emailed to XMG by Customer. The Product will be picked using Customer's Warehouse Management System. The Product will be staged on the dock and loaded by XMG. After loading the product onto the truck, XMG will confirm the Transfer transaction in Customer's WMS.

Partial pallet picks are not expected (full pallet moves only).

Inventory Control

On hand inventory will be maintained through continuous cycle counts and entire building must be counted and inspected quarterly to ensure on-hand inventory accuracy. Inventory adjustments and stock location corrections are fully researched. Additional inventory counts will occur as reasonably requested by Customer.

Customer's WMS system will be utilized as the book of record. The Parties acknowledge that in order to use the Customer's WMS as book of record, any inventory adjustments related to inventory kept at the Facility must be pre-approved by XMG in writing. If there are any adjustments in Customer's WMS that relate to inventory in the Facility that are not pre-approved by XMG, all liability for all lost or damaged inventory will be removed from XMG for the life of the Agreement.

Labeling

No labelling of Product is expected.

Distribution Center Administration and Management provided by Xpedient

- Workforce supervision (includes all hiring and resource allocation)
- Human Resource administration including drug screens and background testing upon hiring

- Financial administration and accounting services
- Workforce governmental and regulatory compliance
- Material handling equipment maintenance
- Inbound and outbound dock scheduling
- Facility management including rent, utilities interest, tax, maintenance, repairs, and security.

Systems

XMG will use Customer's WMS system as the book of record for inventory and bay location. Inbound orders and outbound orders will be emailed to XMG.

Supervision

XMG intends to operate the facility with 1 working manager. To provide for a backup in the event of sickness, vacation, sudden termination, or unexpected absences, Customer agrees to either:

(i) have a designated employee at Customer's facility who will be hired on a part-time basis by Xpedient who is able to clock out of Agilent's system and clock into Xpedient's system as needed to work at XMG's facility. If XMG must pay this Employee more than $19/hour, then a new hourly labor price will be agreed by both parties.

(ii) Or, agree that in rare instances Customer will have the ability to enter the facility without an XMG employee present and perform some of the services required for Customer. Both parties agree that prior to entering the site, Customer must receive written approval from XMG. Customer must state clearly: the timeline for entering the site, the employees that will enter, and the limited nature of the services to be provided. Customer agrees to indemnify and hold XMG harmless for any work performed at the site by Customer employees including, but not limited to: KPIs, inventory loss or damage, equipment damage, or property damage. While at the facility Customer employees must obey the rules and regulations established by XMG and the landlord.

Security

The facility will have motion and door alarms and camera coverage. Any additional security measures required at the facility will be performed at cost plus 10% margin.

Reporting

- ~~Daily inbound, outbound, and inventory report showing what was received, what was shipped, and what is in inventory in Customer's WMS.~~

- Customer's WMS will supply all required reporting.Out of Scope Services

- All Product rework (excluding damage to packaging material caused by XMG), recoup, returns, reclamation, re-labeling, and Product disposal.

- Pricing reflects storage on the floor with no double stacking of product. Any warehouse layout changes that would require other storage means will be priced separately.

- Any rented material handling or other equipment that may be reasonably required to accommodate volume increases above the current level (either short term or long term)
- Transportation Management Services
- All pallet or racking costs for storage
- Shipping Supplies required for outbound shipping (stretch wrap, pallets, banding, etc.)

The above Out of Scope Services may be performed by XMG upon mutual written agreement of the services and cost of the services between Customer and XMG.

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: ____________________ | Per: ____________________ |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 3**

**PRODUCTS**

The following are the Products that will be handled by the Facilities:

- Medical equipment or devices stored in boxes on pallets (not to exceed 2,500 lbs per pallet)

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: ______________________ | Per: ______________________ |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

SCHEDULE 4

OPERATING PARAMETERS

| | |
|---|---|
| Operating days | M-F |
| Hours of operations | 7:00 a.m. to 4:00 p.m. CST |
| Number of SKU's | 16 |
| Number of shifts | 1 |
| Max daily throughput inbound / outbound (trailers) | 2 |
| Holidays observed | Memorial Day<br>Labor Day<br>4th July<br>Thanksgiving Day<br>Day after Thanksgiving<br>Christmas Eve<br>Christmas Day<br>New Year's Eve<br>New Year's Day |

**Commented [A3]:** Intent is to match Agilent holidays.

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 5**

**FEES, RATES AND CHARGES**

Compensation Schedule:

XMG's compensation under the Agreement set forth below:

Billing:

## Fixed Costs

| Activity | Unit of Measurement | Rate |
|---|---|---|
| Fixed cost | $/Month | **$37,824** |

## Variable Costs

| Activity | Unit of Measurement | Rate |
|---|---|---|
| Labor (excluding Manager) | $/Hour | $27.00 |
| Overtime and holidays | $/Hour (min. 4 hours on weekend and holidays) | 150% of applicable rate |
| Additional MHE as needed | Cost + Margin | Cost + 10% margin |
| Payment of non-standard supplies or services | Cost + Margin | Cost + 10% margin |

- Fixed costs will be billed on the first of the month, regardless of volume. The first bill will be sent June 1, 2023
  - On ~~eachanniversary~~each anniversary of the Effective Date the fixed charges will increase by 3%.
  - A prorated amount will be billed for any storage that starts in the first month of the Term.
- Variable costs will be billed based on activity
  - On the anniversary of the Effective Date, all variable charges will be reviewed jointly and adjusted to align costs with local labor market conditions.
  - XMG will review labor market wages on a quarterly basis and if there are material changes to local market wages prior to the annual review, both parties agree to review and discuss potential surge pay that Customer will offer to XMG on a temporary basis so that XMG employee wages can be in line with the local market until the next annual review.
  - "MHE" means material, handling, and equipment.
  - Non-standard supplies or services will be mutually agreed.
  - Overtime and holiday work to be pre-approved by Customer.

The costs listed above are based on current labor laws federally and in the State of Tennessee as of March 1, 2023. In the event that changes to labor laws federally or in the State of Tennessee create a material change in XMG's cost, both parties agree to review the changes and mutually agree to adjust the associated costs.

Billing Procedures

On the first working day of each calendar month during the term of this Agreement, XMG will provide Customer with an invoice for the Fixed Costs provided for the current month fixed activities. The invoices for Fixed Costs are due within 30 days.

If Applicable, at the end of every month, XMG will provide Customer with an invoice for the Variable Costs provided for the previous months' services. The invoice for Variable Costs are due within 30 days.

Accessorial costs will be calculated as incurred and billed, as set forth above, in the following monthly billing.

Start-Up Costs:

XMG will incur estimated start-up costs to set up the Facility ("**Start-Up Costs**"). These Start-Up Costs are detailed below and are estimated at $~~16,861~~17,423. XMG will start incurring Start-Up Costs in May 2023 and expects all related start-up activity to be complete by August ~~1~~31, 2023. All start-up expenses will be paid by Customer as incurred, invoiced monthly, and payment of undisputed amounts is due within 30 days of the receipt of invoice. XMG will bill Customer its actual cost plus 10% margin for any related Start-Up Costs.

XMG will communicate to Customer any expenses expected to be incurred not listed below and obtain written pre-approval from Customer prior to commencing any items not listed below. XMG will also notify Customer if any expenses to be incurred from list below will exceed the amounts by more than ten percent (10%) and obtain pre-approval in writing from Customer before incurring the expense.

$1,807 per week of Permanent Staff Training will be charged to Customer on a weekly basis if XMG hires a manager to start employment prior to building lease commencement. Two weeks is included in the start-up estimate below.

Not included in this start-up estimate is 4 weeks of hourly labor support that will be billed at the hourly labor rate to Customer when product begins to be received in.

| **Startup** | | |
|---|---|---|
| Offsite Travel | $ | 6,456 |
| Permanent Staff Training | $ | 3,615 |
| Facility Setup | $ | 5,100 |
| Contingency | $ | 510 |
| Sub Total | **$** | **15,681** |
| Management Fee | $ | 1,180 |
| Total Startup Cost | **$** | **16,861** |

| Startup | | |
|---|---|---|
| Offsite Travel | $ | 6,456 |
| Permanent Staff Training | $ | 3,615 |
| Facility Setup | $ | 5,100 |
| Contingency | $ | 510 |
| **Sub Total** | **$** | **15,681** |
| Management Fee | $ | 1,742 |
| Total Startup Cost | **$** | **17,423** |

Duly authorized representatives:

**Agilent Technologies Inc.**

Per:

By:

Title:

Date:

**Xpedient Management Group, LLC**

Per:

By:

Title:

Date:

**SCHEDULE 6**
**EQUIPMENT - ASSET AND EQUIPMENT LIST**

The following Asset Register provides the estimated asset list to be purchased and maintained to efficiently operate the Facility and deliver the Services and scope of this Agreement at the agreed to Performance Metrics.

These are the assets needed to operate the facility while Product is stored on the floor. At the time of transition to storage on pallets, the assets may need altering to adjust to the operation which will be mutually agreed.

| Asset | Owner | Maintained By | Purchase or Lease | Number of Units | Included in Xpedient Price |
|---|---|---|---|---|---|
| Electric Walky Rider | Xpedient | Xpedient | Purchase | 1 | YES |
| Pallet Jack | Xpedient | Xpedient | Purchase | 1 | YES |
| PC and Computer Equipment for Xpedient Employees | Xpedient | Xpedient | Purchase | 1 | YES |

**Commented [A4]:** If these equipment ownership is Xpedient. Agilent should not liable as defined in Master contract

Duly authorized representatives:

**Agilent Technologies Inc.**

Per:

By:

Title:

Date:

**Xpedient Management Group, LLC**

Per:

By:

Title:

Date:

## SCHEDULE 7

## START-UP COSTS SCHEDULE

This section is intentionally left blank as Start-Up Costs will be billed as incurred monthly.

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: ______________________ | Per: ______________________ |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

## SCHEDULE 8

## SHRINKAGE ALLOWANCE

1. The Parties agree to a Shrinkage Allowance of .15% (0.0015) of annual-throughput. This allowance will be re-evaluated in the event of an increase or decrease in excess of 20% of contracted volume.

2. The Shrinkage Allowance will be calculated as: (total number of damaged and short Product - overages + net inventory adjustment ) / total number of Product received.

3. Provided, however, that notwithstanding the Shrinkage Allowance permitted by this section, XMG shall be responsible for any shrinkage or loss caused by, or attributable to, its own intentional conduct or negligence, or that of its employees, agents or subcontractors.

Except for shrinkage or loss attributable to the reasons stated in Section 3 above, XMG shall not be responsible for any shrinkage or loss attributable to, or otherwise caused by, XMG's performance of the Services or as otherwise instructed, in writing (applicable to services not covered by this agreement).

Duly authorized representatives:

**Commented [A5]:** The allowance in master agreement is 0.5% and not 0.15%

**Commented [A6]:** XMG may need to revise this, we will provide a response by 5/10 AM

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

## SCHEDULE 9

## EARLY TERMINATION FEES

In the event that this Agreement terminates prior to the expiration of the Initial Term, for any reason, the following fee will be paid to XMG based on the number of remaining months in the Initial Term. For avoidance of doubt, this fulfills all of Customer's obligations of the Master Agreement Section 27 in relation to Equipment and Facility charges.

| Remaining Months in Initial Term | Repayment Fee |
|---|---|
| 36 | $ 1,402,922.42 |
| 35 | $ 1,363,952.35 |
| 34 | $ 1,324,982.28 |
| 33 | $ 1,286,012.22 |
| 32 | $ 1,247,042.15 |
| 31 | $ 1,208,072.08 |
| 30 | $ 1,169,102.02 |
| 29 | $ 1,130,131.95 |
| 28 | $ 1,091,161.88 |
| 27 | $ 1,052,191.81 |
| 26 | $ 1,013,221.75 |
| 25 | $ 974,251.68 |
| 24 | $ 935,281.61 |
| 23 | $ 896,311.55 |
| 22 | $ 857,341.48 |
| 21 | $ 818,371.41 |
| 20 | $ 779,401.34 |
| 19 | $ 740,431.28 |
| 18 | $ 701,461.21 |
| 17 | $ 662,491.14 |
| 16 | $ 623,521.08 |
| 15 | $ 584,551.01 |
| 14 | $ 545,580.94 |
| 13 | $ 506,610.87 |
| 12 | $ 467,640.81 |
| 11 | $ 428,670.74 |
| 10 | $ 389,700.67 |
| 9 | $ 350,730.60 |
| 8 | $ 311,760.54 |
| 7 | $ 272,790.47 |
| 6 | $ 233,820.40 |
| 5 | $ 194,850.34 |
| 4 | $ 155,880.27 |
| 3 | $ 116,910.20 |
| 2 | $ 77,940.13 |
| 1 | $ 38,970.07 |
| 0 | $ 0.00 |

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
| --- | --- |
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

Formatted: Left, Space After: 0 pt

**APPENDIX 1**

**SITE OPERATING AGREEMENT**

**Memphis, TN**

This Site Operating Agreement is made and entered into as of May ~~1~~5, 2023

**BY AND BETWEEN:** **Xpedient Management Group, LLC**, with an office at 200 North Point, Suite 100 Coppell Texas 75019 ("**XMG**")

**AND:** **Agilent Technologies Inc.**, with an office at 5301 Stevens Creek Blvd, Santa Clara, CA 95051 (The "**Customer**")

**WHEREAS** pursuant to that certain Master Operating Services Agreement between Customer and XMG, made and entered into as of May ~~1~~5, 2023 ("**Master Agreement**"); and

**WHEREAS** XMG provides, among other service offerings, warehousing, transportation management and inventory management services; Customer desires to have XMG provide logistics services as provided herein at the location described in Schedule 1 (the "**Facility**"); and Customer desires to engage XMG, and XMG agrees to perform the services described herein pursuant to the terms and conditions of this Site Operating Agreement and the Master Agreement;

**THEREFORE**, in consideration of the premises and of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Definitions. Capitalized terms used herein shall have the meaning given to them in the Master Agreement.

2. Term. This Site Operating Agreement shall be for a term commencing on May 15, 2023 and terminating on May 31, 2026 (the "**Initial Term**") unless earlier terminated as provided for in Section 3 or Section 26 of the Master Agreement.

3. Termination Obligations. Upon termination of this Site Operating Agreement for any reason or its expiration, XMG shall pick and ship to Customer, at Customer's cost, all Product in this Facility.

4. Schedules. The following schedules are attached and incorporated into this Site Operating Agreement, as applicable:

   1 Facility
   2 Services
   3 Products
   4 Operating Parameters
   5 Fees, Rates and Charges
   6 XMG Asset List and Equipment Depreciation Schedule
   7 Start-Up Costs Amortization Schedule
   8 Shrinkage Allowance
   ~~8~~9 Early Termination Fees

5. Currency. Unless otherwise specified, all references to dollars in this Site Operating Agreement refer to US dollars.

**Formatted:** Font: Bold

**Commented [A1]:** We can not accept this language.

6. Non-Solicitation. If either Party solicits and/or encourages other parties to solicit the employees of the other Party for employment during the life of this Agreement or an applicable Site Operating Agreement and for one year after its expiration, then the Party who solicits and/or encourages other parties to solicit the employee will pay a one time fee of 30% of the employee's annualized wages to the other Party.

**Commented [A2]:** Send us alternative language. Alternative to use just fees.

7. Execution. This Site Operating Agreement may be executed in counterparts, each of which shall be deemed to be an original and which, in the aggregate, shall be deemed to constitute, for all purposes, a single instrument.

8. Entire Agreement. The parties represent this Site Operating Agreement constitutes the agreement between the parties regarding the subject matter hereof and further changes to this Site Operating Agreement shall not be binding unless in writing and signed by the authorized representatives of each party.

**IN WITNESS WHEREOF**, the Parties have caused this Site Operating Agreement to be executed by their duly authorized representatives.

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 1**

**FACILITY**

| Facility | Address | Size |
|---|---|---|
| Memphis, TN | 4601 Cromwell Ave, Memphis, TN 38118 | Approximately 45,000 square feet |

Duly authorized representatives:

**Agilent Technologies Inc.**

Per:

By:

Title:

Date:

**Xpedient Management Group, LLC**

Per:

By:

Title:

Date:

**SCHEDULE 2**

**SERVICES**

**Warehouse Services**

Inbound

Customer will be responsible for trailer or container delivery, including transportation or drayage, to the Facility. Customer will provide the container arrival schedule to each Facility and inbound loads will be received directly into Customer's WMS. The Facilities will set unload appointments with the inbound carriers and unload the Product on containers. Inbound Product will be reconciled against the Container Manifest.

Product will be handled and stored in full pallet quantities in locations based on the WMS bin designation, which will based on item and batch, if applicable. XMG will have access to a Customer scanning unit with pre-loaded SAP WMS and will be able to scan each box but will not need to break down pallets. If the Customer scanner is not available, XMG will not have scanning capability.

After receiving, XMG will goods receipt the shipment in Customer's WMS.

Outbound

Facility will pick and stage outbound Product for carrier pickup. Orders will be emailed to XMG by Customer. The Product will be picked using Customer's Warehouse Management System. The Product will be staged on the dock and loaded by XMG. After loading the product onto the truck, XMG will confirm the Transfer transaction in Customer's WMS.

Partial pallet picks are not expected (full pallet moves only).

Inventory Control

On hand inventory will be maintained through continuous cycle counts and entire building must be counted and inspected quarterly to ensure on-hand inventory accuracy. Inventory adjustments and stock location corrections are fully researched. Additional inventory counts will occur as reasonably requested by Customer.

Customer's WMS system will be utilized as the book of record. The Parties acknowledge that in order to use the Customer's WMS as book of record, any inventory adjustments related to inventory kept at the Facility must be pre-approved by XMG in writing. If there are any adjustments in Customer's WMS that relate to inventory in the Facility that are not pre-approved by XMG, all liability for all lost or damaged inventory will be removed from XMG for the life of the Agreement.

Labeling

No labelling of Product is expected.

Distribution Center Administration and Management provided by Xpedient

- Workforce supervision (includes all hiring and resource allocation)
- Human Resource administration including drug screens and background testing upon hiring

- Financial administration and accounting services
- Workforce governmental and regulatory compliance
- Material handling equipment maintenance
- Inbound and outbound dock scheduling
- Facility management including rent, utilities interest, tax, maintenance, repairs, and security.

Systems

XMG will use Customer's WMS system as the book of record for inventory and bay location. Inbound orders and outbound orders will be emailed to XMG.

Supervision

XMG intends to operate the facility with 1 working manager. To provide for a backup in the event of sickness, vacation, sudden termination, or unexpected absences, Customer agrees to either:

(i) have a designated employee at Customer's facility who will be hired on a part-time basis by Xpedient who is able to clock out of Agilent's system and clock into Xpedient's system as needed to work at XMG's facility. If XMG must pay this Employee more than $19/hour, then a new hourly labor price will be agreed by both parties.

(ii) Or, agree that in rare instances Customer will have the ability to enter the facility without an XMG employee present and perform some of the services required for Customer. Both parties agree that prior to entering the site, Customer must receive written approval from XMG. Customer must state clearly: the timeline for entering the site, the employees that will enter, and the limited nature of the services to be provided. Customer agrees to indemnify and hold XMG harmless for any work performed at the site by Customer employees including, but not limited to: KPIs, inventory loss or damage, equipment damage, or property damage. While at the facility Customer employees must obey the rules and regulations established by XMG and the landlord.

Security

The facility will have motion and door alarms and camera coverage. Any additional security measures required at the facility will be performed at cost plus 10% margin.

Reporting

- Customer's WMS will supply all required reporting.

Out of Scope Services

- All Product rework (excluding damage to packaging material caused by XMG), recoup, returns, reclamation, re-labeling, and Product disposal.

- Pricing reflects storage on the floor with no double stacking of product. Any warehouse layout changes that would require other storage means will be priced separately.

- Any rented material handling or other equipment that may be reasonably required to accommodate volume increases above the current level (either short term or long term)
- Transportation Management Services
- All pallet or racking costs for storage
- Shipping Supplies required for outbound shipping (stretch wrap, pallets, banding, etc.)

The above Out of Scope Services may be performed by XMG upon mutual written agreement of the services and cost of the services between Customer and XMG.

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
| --- | --- |
| Per: ______________________ | Per: ______________________ |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 3**

**PRODUCTS**

The following are the Products that will be handled by the Facilities:

- Medical equipment or devices stored in boxes on pallets (not to exceed 2,500 lbs per pallet)

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: ______________________ | Per: ______________________ |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

SCHEDULE 4

OPERATING PARAMETERS

| | |
|---|---|
| Operating days | M-F |
| Hours of operations | 7:00 a.m. to 4:00 p.m. CST |
| Number of SKU's | 16 |
| Number of shifts | 1 |
| Max daily throughput inbound / outbound (trailers) | 2 |
| Holidays observed | Memorial Day<br>Labor Day<br>4th July<br>Thanksgiving Day<br>Day after Thanksgiving<br>Christmas Eve<br>Christmas Day<br>New Year's Eve<br>New Year's Day |

**Commented [A3]:** Intent is to match Agilent holidays.

Duly authorized representatives:

**Agilent Technologies Inc.**

Per:

By:

Title:

Date:

**Xpedient Management Group, LLC**

Per:

By:

Title:

Date:

**SCHEDULE 5**

**FEES, RATES AND CHARGES**

Compensation Schedule:

XMG's compensation under the Agreement set forth below:

Billing:

## Fixed Costs

| Activity | Unit of Measurement | Rate |
|---|---|---|
| Fixed cost | $/Month | **$37,824** |

## Variable Costs

| Activity | Unit of Measurement | Rate |
|---|---|---|
| Labor (excluding Manager) | $/Hour | $27.00 |
| Overtime and holidays | $/Hour (min. 4 hours on weekend and holidays) | 150% of applicable rate |
| Additional MHE as needed | Cost + Margin | Cost + 10% margin |
| Payment of non-standard supplies or services | Cost + Margin | Cost + 10% margin |

- Fixed costs will be billed on the first of the month, regardless of volume. The first bill will be sent June 1, 2023
  - On each anniversary of the Effective Date the fixed charges will increase by 3%.
  - A prorated amount will be billed for any storage that starts in the first month of the Term.
- Variable costs will be billed based on activity
  - On the anniversary of the Effective Date, all variable charges will be reviewed jointly and adjusted to align costs with local labor market conditions.
  - XMG will review labor market wages on a quarterly basis and if there are material changes to local market wages prior to the annual review, both parties agree to review and discuss potential surge pay that Customer will offer to XMG on a temporary basis so that XMG employee wages can be in line with the local market until the next annual review.
  - "MHE" means material, handling, and equipment.
  - Non-standard supplies or services will be mutually agreed.
  - Overtime and holiday work to be pre-approved by Customer.

The costs listed above are based on current labor laws federally and in the State of Tennessee as of March 1, 2023. In the event that changes to labor laws federally or in the State of Tennessee create a material change in XMG's cost, both parties agree to review the changes and mutually agree to adjust the associated costs.

Billing Procedures

On the first working day of each calendar month during the term of this Agreement, XMG will provide Customer with an invoice for the Fixed Costs provided for the current month fixed activities. The invoices for Fixed Costs are due within 30 days.

If Applicable, at the end of every month, XMG will provide Customer with an invoice for the Variable Costs provided for the previous months' services. The invoice for Variable Costs are due within 30 days.

Accessorial costs will be calculated as incurred and billed, as set forth above, in the following monthly billing.

Start-Up Costs:

XMG will incur estimated start-up costs to set up the Facility ("**Start-Up Costs**"). These Start-Up Costs are detailed below and are estimated at $17,423. XMG will start incurring Start-Up Costs in May 2023 and expects all related start-up activity to be complete by August 31, 2023. All start-up expenses will be paid by Customer as incurred, invoiced monthly, and payment of undisputed amounts is due within 30 days of the receipt of invoice. XMG will bill Customer its actual cost plus 10% margin for any related Start-Up Costs.

XMG will communicate to Customer any expenses expected to be incurred not listed below and obtain written pre-approval from Customer prior to commencing any items not listed below. XMG will also notify Customer if any expenses to be incurred from list below will exceed the amounts by more than ten percent (10%) and obtain pre-approval in writing from Customer before incurring the expense.

$1,807 per week of Permanent Staff Training will be charged to Customer on a weekly basis if XMG hires a manager to start employment prior to building lease commencement. Two weeks is included in the start-up estimate below.

Not included in this start-up estimate is 4 weeks of hourly labor support that will be billed at the hourly labor rate to Customer when product begins to be received in.

| Startup | | |
|---|---|---|
| Offsite Travel | $ | 6,456 |
| Permanent Staff Training | $ | 3,615 |
| Facility Setup | $ | 5,100 |
| Contingency | $ | 510 |
| Sub Total | **$** | **15,681** |
| Management Fee | $ | 1,742 |
| Total Startup Cost | **$** | **17,423** |

Duly authorized representatives:

**Agilent Technologies Inc.** **Xpedient Management Group, LLC**

| | |
|---|---|
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 6**
**EQUIPMENT - ASSET AND EQUIPMENT LIST**

The following Asset Register provides the estimated asset list to be purchased and maintained to efficiently operate the Facility and deliver the Services and scope of this Agreement at the agreed to Performance Metrics.

These are the assets needed to operate the facility while Product is stored on the floor. At the time of transition to storage on pallets, the assets may need altering to adjust to the operation which will be mutually agreed.

| Asset | Owner | Maintained By | Purchase or Lease | Number of Units | Included in Xpedient Price |
|---|---|---|---|---|---|
| Electric Walky Rider | Xpedient | Xpedient | Purchase | 1 | YES |
| Pallet Jack | Xpedient | Xpedient | Purchase | 1 | YES |
| PC and Computer Equipment for Xpedient Employees | Xpedient | Xpedient | Purchase | 1 | YES |

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**SCHEDULE 7**

**START-UP COSTS SCHEDULE**

This section is intentionally left blank as Start-Up Costs will be billed as incurred monthly.

Duly authorized representatives:

| **Agilent Technologies Inc.** | **Xpedient Management Group, LLC** |
|---|---|
| Per: ______________________ | Per: ______________________ |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

## SCHEDULE 8

## SHRINKAGE ALLOWANCE

1. The Parties agree to a Shrinkage Allowance of .15% (0.0015) of annual-throughput. This allowance will be re-evaluated in the event of an increase or decrease in excess of 20% of contracted volume.

2. The Shrinkage Allowance will be calculated as: (total number of damaged and short Product - overages + net inventory adjustment ) / total number of Product ~~shipped~~received.

3. Provided, however, that notwithstanding the Shrinkage Allowance permitted by this section, XMG shall be responsible for any shrinkage or loss caused by, or attributable to, its own intentional conduct or negligence, or that of its employees, agents or subcontractors.~~"~~

Except for shrinkage or loss attributable to the reasons stated in Section 3 above, XMG shall not be responsible for any shrinkage or loss attributable to, or otherwise caused by, XMG's performance of the Services or as otherwise instructed, in writing (applicable to services not covered by this agreement).

Duly authorized representatives:

| Agilent Technologies Inc. | Xpedient Management Group, LLC |
|---|---|
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |

**Commented [A4]:** The allowance in master agreement is 0.5% and not 0.15%

**Formatted:** Font: (Default) Arial, 10 pt

**Formatted:** List Paragraph, Indent: Left: 0", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

**Commented [A5]:** XMG may need to revise this, we will provide a response by 5/10 AM

## SCHEDULE 9

## EARLY TERMINATION FEES

In the event that this Agreement terminates prior to the expiration of the Initial Term, for any reason, the following fee will be paid to XMG based on the number of remaining months in the Initial Term. For avoidance of doubt, this fulfills all of Customer's obligations of the Master Agreement Section 27 in relation to Equipment and Facility charges.

| Remaining Months in Initial Term | Repayment Fee |
|---|---|
| 36 | $ 1,402,922.42 |
| 35 | $ 1,363,952.35 |
| 34 | $ 1,324,982.28 |
| 33 | $ 1,286,012.22 |
| 32 | $ 1,247,042.15 |
| 31 | $ 1,208,072.08 |
| 30 | $ 1,169,102.02 |
| 29 | $ 1,130,131.95 |
| 28 | $ 1,091,161.88 |
| 27 | $ 1,052,191.81 |
| 26 | $ 1,013,221.75 |
| 25 | $ 974,251.68 |
| 24 | $ 935,281.61 |
| 23 | $ 896,311.55 |
| 22 | $ 857,341.48 |
| 21 | $ 818,371.41 |
| 20 | $ 779,401.34 |
| 19 | $ 740,431.28 |
| 18 | $ 701,461.21 |
| 17 | $ 662,491.14 |
| 16 | $ 623,521.08 |
| 15 | $ 584,551.01 |
| 14 | $ 545,580.94 |
| 13 | $ 506,610.87 |
| 12 | $ 467,640.81 |
| 11 | $ 428,670.74 |
| 10 | $ 389,700.67 |
| 9 | $ 350,730.60 |
| 8 | $ 311,760.54 |
| 7 | $ 272,790.47 |
| 6 | $ 233,820.40 |
| 5 | $ 194,850.34 |
| 4 | $ 155,880.27 |
| 3 | $ 116,910.20 |
| 2 | $ 77,940.13 |
| 1 | $ 38,970.07 |
| 0 | $ 0.00 |

**Formatted:** Centered

**Formatted:** Font: (Default) Arial, 10 pt

Duly authorized representatives:

| Agilent Technologies Inc. | Xpedient Management Group, LLC |
| --- | --- |
| Per: | Per: |
| By: | By: |
| Title: | Title: |
| Date: | Date: |