**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**AGILENT TECHNOLOGIES, INC., PLAINTIFF**

**VS CASE NO. 2:25-cv-02101-BCL-cgc**

**XPEDIENT MANAGEMENT GROUP, LLC,
ST.PAUL FIRE AND MARINE INSURANCE COMPANY,
COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC DEFENDANTS**

---

**XPEDIENT MANAGEMENT GROUP, LLC, CROSS PLAINTIFF**

**VS**

**ST PAUL FIRE AND MARINE INSURANCE COMPANY CROSS-DEFENDANTS
and COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC**

---

**FACTORY MUTUAL INSURANCE CO., AS
SUBROGEE OF AGILENT TECHNOLOGIES, Inc. PLAINTIFF**

**V.**

**XPEDIENT MANAGEMENT GROUP, LLC
and ST. PAUL FIRE AND MARINE INSURANCE COMPANY
and COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC DEFENDANTS**

---

**XPEDIENT MANAGEMENT GROUP, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

Xpedient Management Group, LLC ("Xpedient") moves for summary judgment as to all claims asserted by Agilent Technologies, Inc. ("Agilent") for failure to timely assert a notice of claim pursuant to Section 12(C)(e) of the Master Operating Services Agreement (the "MOSA"). In the alternative, any recovery for Product Losses arising from the January 17, 2024, water-intrusion event cannot exceed the parties' negotiated $1 million per-occurrence limit. Xpedient also seeks judgment that the MOSA bars the separate consequential and indirect expense claims Plaintiffs have added to the inventory claim and that Plaintiffs' heightened-culpability theories do not avoid the parties' contractual limitations.

This case arises from a January 17, 2024 water-intrusion event at a Memphis warehouse where Xpedient stored Agilent's pipette-tip inventory. Agilent alleges that frozen domestic-water and fire-sprinkler pipes burst and damaged the inventory. St. Paul's property manager, Colliers, was responsible for maintaining the wet-pipe fire-sprinkler system that failed, which required a minimum temperature for the warehouse.[1] Colliers retained Security Fire Protection to perform the system's ongoing quarterly, annual, and five-year inspections, testing, and maintenance, and it coordinated the post-loss repairs. On January 4, 2024, Colliers received a report from Security Fire Protection advising to maintain temperatures above 40 degrees in the warehouse.[2] Colliers did not communicate the 40 degree minimum temperature for the warehouse to Xpedient.

Agilent is a large and highly sophisticated multinational enterprise that negotiated the MOSA using professionals from multiple departments including its legal department. Before the loss, the MOSA prescribed when and how Agilent had to present a Product Loss claim, capped Xpedient's liability at $1 million per occurrence, excluded consequential and other indirect damages, and stated that Xpedient did not insure Agilent's Products. Agilent's own approval materials and emails, both before and after the loss, recognized that Xpedient's contractual exposure was $1 million and that Agilent's property insurance would address the balance. Yet Agilent and its subrogated insurer have disregarded the agreement and seek nearly $10 million in alleged underlying loss, plus interest and Factory Mutual's own adjustment expenses—far more than Agilent agreed Xpedient would bear.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Contract interpretation is particularly suited to summary judgment when the operative

[1] Colliers Responses to Interrogatories Exhibit "14".
[2] See Jan. 4, 2024 Security Fire Report Exhibit "15".

language is unambiguous. Under Tennessee law, the Court determines the parties' intent from the usual, natural, and ordinary meaning of the written words, and the legal effect of definite and undisputed contract language is a question of law. *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). Consistent with Local Rule 56.1, Xpedient submits a separate statement of undisputed material facts.

## ARGUMENT AND AUTHORITIES

### I. Agilent and Factory Mutual cannot maintain the Product Loss claims because Agilent did not provide the timely written claim required by Section 12(C)(e).

A. *Section 12(C)(e) creates an enforceable condition precedent to any action for Product Losses.*

Agilent and Xpedient entered the MOSA and the Memphis Site Operating Agreement (the "SOA") in May 2023 to govern Xpedient's storage of Agilent's pipette-tip inventory at the Memphis facility. Agilent MOSA Exhibit "1" and Agilent Memphis SOA Exhibit "2". Section 12(C) of the MOSA supplies an integrated framework for any Product Loss: it defines Xpedient's reasonable-care obligation and the direct replacement-cost measure, states that Xpedient does not insure Agilent's Products, limits liability, and prescribes the procedure for presenting a claim. MOSA §§ 12(C)(a)-(e).

Section 12(C)(e) provides:

> All claims for Products lost or damaged at each Facility must be made promptly in writing and in all events no later than the earlier of: (i) ninety (90) days after Customer receives the results of the related year-end physical inventory or Final Cycle Count Reconciliation; or (ii) ninety (90) days after Customer has become aware (or reasonably should have become aware) of any such loss or damage. Such written notice shall contain facts sufficient to identify the Products involved, explain XMG's liability for alleged loss or damage and make claim for the payment of a specified or determinable amount of money. . . . No action may be maintained by Customer for loss of or damage to Products pursuant to this Section unless a timely written claim has been given as provided for above.

The language is mandatory and outcome-determinative. Every Product Loss claim must be made promptly in writing and within 90 days after Agilent became aware or reasonably should have become aware of *any* loss or damage; the writing must identify the Products, explain

Xpedient's alleged liability, and demand a specified or determinable amount; and "[n]o action may be maintained" unless a timely written claim is given. MOSA § 12(C)(e). Tennessee's warehouse statute expressly authorizes "[r]easonable provisions as to the time and manner of presenting claims and commencing actions based on the bailment." Tenn. Code Ann. § 47-7-204(c). A 90-day written-claim period for a sophisticated commercial bailor is reasonable on its face and advances the evident purposes of prompt investigation, inspection, valuation, and preservation of allegedly damaged goods.

Tennessee decisions recognize both the validity of contractual notice conditions and the obligation to enforce unambiguous no-action language. In *Allstate Insurance Co. v. Wilson*, the Court of Appeals explained that, absent fraud or mistake, a contract must be enforced as written even when its terms may appear harsh, and that the parties' words must be given their ordinary meaning. 856 S.W.2d 706, 708–09 (Tenn. Ct. App. 1992), *overruled in part on other grounds by Alcazar v. Hayes*, 982 S.W.2d 845 (Tenn. 1998).[3] The policy in *Allstate*, like the MOSA here, required specified written notice and separately provided that no suit could be maintained absent compliance. The court treated those provisions as conditions precedent rather than optional procedural requirements. *Id.* at 709.

*Missouri Portland Cement Co. v. Shelbourne Enterprises, Inc.*, 673 S.W.2d 164 (Tenn. Ct. App. 1984), illustrates the materially different circumstances in which a ninety-day claim provision may present a factual issue. There, one quotation contained a ninety-day waiver clause, another did not, and the buyer's president testified that he had never seen the clause. The court

[3] Plaintiffs may invoke *Alcazar v. Hayes*, 982 S.W.2d 845 (Tenn. 1998), and *American Justice Insurance Reciprocal v. Hutchison*, 15 S.W.3d 811 (Tenn. 2000), but both decisions address forfeiture of coverage under occurrence-based insurance policies. Neither extends the insurance-law prejudice rule to a negotiated commercial warehouse claim-presentment provision expressly authorized by Tenn. Code Ann. § 47-7-204(c). See *Union Planters Bank, N.A. v. Continental Casualty Co.*, 478 F.3d 759, 766–67 (6th Cir. 2007) (declining to treat *Alcazar* as an across-the-board exception and emphasizing the parties' sophistication and ability to negotiate). Even if the rule applied by analogy, untimely notice would create a rebuttable presumption of prejudice that Agilent bears the burden to overcome. *Alcazar*, 982 S.W.2d at 856.

therefore could not determine on summary judgment whether the notice limitation was part of the parties' contract during the relevant period. *Id.* at 165–66. No comparable issue exists here. Section 12(C)(e) appears in the executed MOSA; Agilent does not dispute that the MOSA governs; and Agilent reviewed and negotiated the agreement through its Logistics, Procurement, Global Sourcing, and Legal personnel. The existence and content of the condition precedent are established by the signed agreement itself.

*Andrews Distributing Co. v. Oak Square at Gatlinburg, Inc.*, 757 S.W.2d 663, 668–69 (Tenn. 1988), further confirms that comparable "no suit" language makes timely written notice a condition precedent. There, the Tennessee Supreme Court treated a bond provision barring suit absent written notice within 90 days as enforceable and analyzed whether the claimant had substantially complied with the specified notice. *Id.* The MOSA is even more explicit: it identifies the required content, fixes the deadline, and states that no action may be maintained without compliance.

B. *Agilent's February correspondence was notice of an event, not the contractual claim, and the June 7 claim was late.*

Agilent knew almost immediately that its Products had sustained damage. On January 19, 2024, Agilent reported internally that a water break was "raining water down on the TIPS" and arranged a site assessment. By January 25, Agilent reported that 321 pallets were affected, was evaluating repair versus disposal, and was discussing who would bear the loss. See Jan. 19–25, 2024 Agilent Internal Emails ATI_000470-72 Exhibit "3". On February 7, Agilent itself wrote, that its Products had "experienced water damage." See Feb. 7, 2024 Agilent Internal Email ATI_004078 Exhibit "4".

The 90-day clock began no later than February 7, when Agilent stated in writing that its Products had "experienced water damage." The trigger is awareness of "any such loss or damage," not completion of a product-by-product investigation, a final salvage decision, or a

final damages calculation. The agreement accounts for an evolving quantum by permitting a claim for a "specified or determinable" amount. Measured from February 7, the deadline expired on May 7, 2024.

*Allstate* applies a materially similar objective trigger: the obligation to provide notice arises when an ordinarily or reasonably prudent person would know both that the event occurred and that it might reasonably be expected to produce a claim. 856 S.W.2d at 709. Agilent had far more than constructive knowledge by February 7. It knew that water had reached the Products, had identified hundreds of affected pallets, had begun assessing and segregating the inventory, and was already considering responsibility for the loss. Nothing in Section 12(C)(e) permitted Agilent to postpone notice until it completed every inspection or fixed the final amount of damages.

*Alcazar* likewise rejected the premise that notice may be deferred until the claimant fully understands the legal significance or ultimate extent of the loss. There, the insured delayed notice for nearly a year because he mistakenly believed the policy did not apply and did not intend to pursue coverage until he learned the extent of his injury. The Tennessee Supreme Court nevertheless concluded that there was no genuine factual dispute that the notice was untimely. 982 S.W.2d at 847–48 & n.2. Although *Alcazar* remanded for consideration of prejudice under the insurance-specific rule it adopted, its timeliness analysis confirms that uncertainty about ultimate damages does not suspend an otherwise triggered notice obligation.

The February letter did not satisfy the required content. It advised that Agilent was investigating, promised a later update after costs were determined, and requested information from Xpedient. It did not state that Xpedient was liable, demand payment, or identify an amount. Tennessee law distinguishes a claim for damages from a complaint or announcement that something has gone wrong. In *Bunn v. Navistar, Inc.*, 797 F. App'x 247, 253-55 (6th Cir. 2020), the Sixth Circuit, applying Tennessee law, held that notice must advise the other party that it will

be asked to meet a damages claim; repeated reports of defects were insufficient where they did not communicate an intent to assert breach and damages. Agilent's own contemporaneous statement that no claim had been filed confirms the same point. See Jan. 19–25, 2024 Agilent Internal Emails ATI_000470-72 Exhibit "3" and Feb. 7, 2024 Agilent Internal Email ATI_004078 Exhibit "4".

Agilent's first letter invoking Section 12(C)(e) arrived on June 7 - one month after the deadline. See June 7, 2024 Agilent Notice of Claim Ltr. ATI_011132 Exhibit "5". Even that letter called the matter a "potential claim" and acknowledged that Agilent could not yet provide two items the MOSA expressly required. Even assuming the June 7 letter otherwise qualified, it was untimely. Nor is this a case of substantial compliance like the bond claim in *Andrews*, where all required recipients received written notice of the existence and amount of the claim within the contractual period. 757 S.W.2d at 669. Here, no writing within 90 days asserted Xpedient's liability and demanded payment of any specified or determinable amount.

C. *Xpedient did not waive the notice defense.*

Xpedient's knowledge of the incident, cooperation in the investigation, and June 24 acknowledgment of the late claim do not rewrite Section 12(C)(e). Actual knowledge of the underlying facts is not the contractual notice that a damages claim is being asserted. *See Andrews*, 757 S.W.2d at 667. And the June 24 acknowledgment occurred after the deadline had expired; it could not have induced Agilent to miss the deadline. The response did not declare the claim timely or adequate and instead stated that Xpedient would proceed under the agreements' terms and conditions. See June 24, 2024 Xpedient Response to Claim Ltr XMG_0352 Exhibit "6".

The MOSA also forecloses waiver by informal conduct. Sections 30(F) and 30(H) state that non-enforcement is not a continuing waiver and that no waiver or modification is binding unless contained in a signed writing. See MOSA Exhibit "1". Tennessee law directs courts to

enforce such a provision: if a written contract provides that no waiver is valid unless in writing, "no court shall give effect to any such waiver unless it is in writing." Tenn. Code Ann. § 47-50-112(c). No signed waiver exists.

Nor did Xpedient induce Agilent to allow the contractual deadline to expire. In *Irving Pulp & Paper, Ltd. v. Dunbar Transfer & Storage Co.*, 732 F.2d 511, 514–15 (6th Cir. 1984), the court held a warehouse equitably estopped from invoking a contractual deadline because its representative repeatedly assured the bailor that the claim would be "taken care of," only to deny liability after the period had nearly run. Nothing comparable occurred here. Before the May 7 deadline, Xpedient neither represented that Agilent's claim would be paid nor told Agilent that compliance with Section 12(C)(e) was unnecessary.

## II. Section 12(C)(c) of the MOSA unambiguously caps Xpedient's aggregate liability for Product Losses arising from the January 17 occurrence at $1 million.

The agreement places a specific monetary limit on any timely Product Loss claim. Section 12(C)(a) preserves a reasonable-care standard and defines direct recovery as Agilent's actual manufacturing or acquisition cost to replace Products at their pre-loss condition, less salvage. Section 12(C)(b) states that the Products "are not insured by XMG against loss or injury however caused." Section 12(C)(c) then provides:

> XMG's maximum liability to Customer arising out of or related to loss or damage to Products ("Product Losses") shall not exceed one million dollars ($1,000,000) per occurrence, two million dollars ($2,000,000) annually, or five million dollars ($5,000,000) in total over the life of this Agreement ("Limit"). The Parties, which are both sophisticated commercial organizations negotiating at arm's length, jointly acknowledge and agree they have negotiated a commercially reasonable Limit that is not unreasonably disproportionate to the value of the Products and the Fees charged and that reasonably reflect the Parties' respective business interests.

Section 12(C)(d)(ii) reinforces the bargain by excluding liability for Product Losses "in excess of the Limit." The MOSA therefore preserves a direct replacement-cost remedy, but fixes the maximum amount of that remedy. See MOSA § 12(C)(a)-(d) Exhibit "1".

The starting and ending point is the text the parties executed. The cap applies to Xpedient's "maximum liability to Customer arising out of or related to loss or damage to Products." MOSA § 12(C)(c). That language is deliberately broader than any particular legal theory. It reaches the liability sought here because each Plaintiff seeks recovery for the same alleged physical damage to Agilent's stored Products. The paragraph then states that the maximum "shall not exceed" $1 million "per occurrence." "Shall not exceed" is mandatory; "maximum liability" is comprehensive; and "arising out of or related to" prevents circumvention by changing the caption of the claim.

The ceiling is also aggregate as between Agilent and Factory Mutual. The MOSA caps Xpedient's liability "to Customer"; it does not promise an additional limit to Customer's insurer after the insurer pays part of the same loss.

The Court should therefore hold that, even if liability is later established, the maximum combined amount that Agilent and Factory Mutual may recover from Xpedient for Product Losses arising from the January 17 occurrence is $1 million. That is a ceiling, not an admission. Xpedient preserves all defenses concerning duty, breach, causation, notice, valuation, mitigation, setoff, insurance payments, spoliation, comparative fault, and whether Plaintiffs are entitled to recover any amount at all.

## III. Tennessee's warehouse statute expressly authorizes the negotiated limitation.

Tennessee has enacted a specific statute governing exactly this type of agreement. A "warehouse" is a person engaged in the business of storing goods for hire. Tenn. Code Ann. § 47-7-102(a)(13). Plaintiffs allege that Xpedient acted as Agilent's warehouser and bailee, and the MOSA/SOA are storage agreements. Section 47-7-204(a) imposes the reasonable-care duty reflected in MOSA § 12(C)(a). Section 47-7-204(b) then provides:

> Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage beyond which the warehouse is not liable. Such a limitation is not effective with respect to the

> warehouse's liability for conversion to its own use. On request of the bailor in a record at the time of signing the storage agreement or within a reasonable time after receipt of the warehouse receipt, the warehouse's liability may be increased on part or all of the goods covered by the storage agreement or the warehouse receipt. In this event, increased rates may be charged based on an increased valuation of the goods.

Tenn. Code Ann. § 47-7-204(b). Subsection (c) separately authorizes reasonable provisions governing the time and manner of claims and actions based on the bailment. *Id.* § 47-7-204(c).

Section 12 of the MOSA mirrors this statutory design. It preserves the warehouse's reasonable-care responsibility, specifies replacement cost as the measure, states that Xpedient does not insure Agilent's Products, fixes a commercially negotiated maximum, and requires timely claims. The statute expressly contemplates that a bailor may request a higher declared valuation in exchange for higher rates. The negotiation evidence confirms that Agilent reviewed the precise limit, compared it with its prior arrangement, and accepted it. There is no evidence that Agilent requested a higher limit or agreed to pay the increased rates associated with one.

Tennessee's general contract law points the same way. Commercial parties are free to construct their own bargains and allocate future liability, particularly when the agreement allocates insurance responsibilities and the parties possess equivalent bargaining power. *Planters Gin*, 78 S.W.3d at 891-93. Limitations on liability for negligence and breach of contract are generally enforced absent fraud, overreaching, or a contrary statute. *Houghland v. Security Alarms & Services, Inc.*, 755 S.W.2d 769, 773-74 (Tenn. 1988). Here, there is not merely an absence of contrary legislation; the governing statute affirmatively authorizes the limitation.

The statutory exception is equally important. Section 47-7-204(b) makes a limitation ineffective for "conversion to [the warehouse's] own use." Plaintiffs do not plead conversion. They allege that water damaged the Products while stored, not that Xpedient appropriated, sold, used, or exercised ownership over them. The statutory exception therefore does not apply.

**IV. The negotiation record independently defeats any claim of surprise, adhesion, unconscionability, or overreaching.**

The Court need not resort to extrinsic evidence to interpret the unambiguous cap. *Planters Gin*, 78 S.W.3d at 889–90. The parties' commercial setting, negotiation history, and contemporaneous understanding are independently relevant to any effort by Agilent to avoid enforcement based on public policy, unequal bargaining power, surprise, overreaching, or unconscionability.

Agilent is a sophisticated multinational enterprise that used its Logistics, Procurement, Global Sourcing, and in-house Legal functions to evaluate and negotiate the MOSA. Before execution, Agilent's logistics manager expressly advised Xpedient that he was meeting with Agilent's Legal and Procurement teams to review the redlines, that those teams were redlining the MOSA, and that additional feedback would follow counsel's review. See May 3, 2023 Agilent/Xpedient Emails XMG_3343-44 Exhibit "7".

During negotiations, on the MOSA the parties specifically negotiated the amount of the product loss limitation. Agilent proposed Product Loss liability be the greater of the value of the Products or $1 million per occurrence, but Xpedient specifically rejected that proposal and responded, "Our limit is $1M."" See May 9, 2023 Xpedient/Agilent Emails, XMG_2733-2801 Exhibit "8". The redline also contains the comments "Are these limits acceptable?" and "Legacy contract only have $1M per occurrence." *Id.* at XMG_2757.

Most tellingly, Agilent's own pre-execution Contract Summary Sheet expressly identified the limitation and the method by which Agilent intended to manage the excess risk. Under "Legal risk highlights," Agilent recorded that "XMG's maximum liability coverage is $1 million" and, in the corresponding mitigation column, stated: "Agilent's insurance policy will cover the difference in loss." See Agilent's Contract Summary ATI_006893 Exhibit "9". The same approval document separately stated that Agilent's insurance policy would cover Agilent's

"loss of inventory and expenses associated with product damage." *Id.* Agilent therefore did not merely receive or overlook the cap. It expressly identified the $1 million maximum as a contractual risk and identified its own property insurance as the protection for losses exceeding that amount. Consistent with that contemporaneous understanding, the executed MOSA records the parties' negotiated conclusion that the Limit was commercially reasonable in relation to the value of the Products, the fees charged, and the parties' respective business interests.

Agilent's internal communications after the Water Intrusion Event confirm that it continued to understand the bargain in precisely that manner. In April 2024, Agilent's External Financial Reporting group asked whether the anticipated receivables from "insurance ($3.1m)" and the "warehouse ($1m)" were sufficiently certain to be booked, and requested separate confirmation concerning the claims against insurance and Xpedient. See April 22-24, 2024 Agilent Internal Emails, ATI_012818-012820 Exhibit "10". Agilent's contemporaneous financial presentation likewise stated, "Xpedient liability at $1 M per contract," and then addressed Agilent's separate claim under its Factory Mutual policy and the booking of insurance credits. See Agilent Financial Presentation April 23, 2024 Exhibit "11" at ATI_011537. And Agilent executive Rodney Gonsalves wrote that, although approximately $8.1 million of inventory would likely be disposed of, Agilent believed it could recover approximately $4.1 million "from the warehouse provider and insurance," leaving Agilent with an anticipated uncovered loss. See April 22-23, 2024 Agilent Internal Emails ATI_011061-62 Exhibit "12". These post-loss records confirm that Agilent understood and applied the same allocation reflected in its pre-contract approval materials: Xpedient's contractual exposure was limited to $1 million per occurrence, while Agilent would protect against the excess through its own property-insurance program.

This is the opposite of procedural unconscionability. Agilent knew the precise limitation, evaluated it with legal, procurement, sourcing, finance, and business personnel, compared it with

prior commercial arrangements, identified its own insurance as the means of addressing excess losses, and then approved and executed the agreement. Nor is the provision substantively unconscionable. It does not excuse Xpedient from all care or all liability. It provides a replacement-cost remedy up to a substantial per-occurrence amount while allocating catastrophic inventory risk above that amount to Agilent and its property insurer—exactly the allocation Agilent itself documented before execution and implemented after the loss. That allocation tracks § 47-7-204(b) and commercial reality: storage fees are not insurance premiums, and a warehouse need not become the guarantor of the full value of every item placed in storage unless the parties price and purchase that enhanced undertaking.

## V. Plaintiffs cannot evade the cap by repackaging Product Losses under alternative causes of action.

Agilent pleads breach of contract, breach of bailment and/or negligent bailment, negligent misrepresentation, negligence and/or reckless acts or omissions, declaratory relief, and negligence per se. Doc. 137, Counts I-VI. Factory Mutual pleads breach of contract, bailment, negligence, gross negligence, and negligence per se against Xpedient. Doc. 136, Counts I-V. Those theories all seek compensation for the same alleged damage to the same Products in the same occurrence. Because Section 12(C)(c) applies to liability "arising out of or related to" Product Losses, the cap follows the loss, not the label.

*Houghland* is directly instructive. The plaintiffs there pleaded contract, negligence, intentional and negligent misrepresentation, and other theories to recover a burglary loss notwithstanding contractual limitations. The Tennessee Supreme Court held that the viable breach-of-contract and negligent-performance claims remained subject to the contract; an unsupported negligent-misrepresentation theory did not vitiate the agreement, and no rescission was justified or sought. 755 S.W.2d at 770-74. The Court cautioned that negligent misrepresentation "does not

convert every breached promise or contractual undertaking into a basis for the rescission of otherwise valid contracts and the abrogation of their terms." *Id.* at 774.

The same analysis applies here. Agilent alleges negligent misrepresentation, not intentional fraud in the inducement. It seeks damages under and arising from the MOSA rather than rescission and restoration of the pre-contract status quo. Its asserted representations concern Xpedient's performance of the very storage undertaking governed by the MOSA. Even if a jury found negligent performance or negligent statements, *Houghland* requires enforcement of the agreed limitation.

## VI. Gross-negligence and recklessness labels do not displace the Section 12 limitation; alternatively, the record does not support those heightened theories.

### A. *The specific warehouse statute identifies conversion, not gross negligence, as the exception to a damages limitation.*

Plaintiffs are expected to rely on the general rule that an exculpatory release will not protect a party from gross negligence or willful misconduct. *See Adams v. Roark*, 686 S.W.2d 73, 75-76 (Tenn. 1985); *Planters Gin*, 78 S.W.3d at 893. That rule does not answer this case. *Adams* concerned a pre-injury release purporting to discharge a racetrack from all liability for a participant's personal injuries. 686 S.W.2d at 74-76. Section 12(C)(c), by contrast, is not a complete release. It preserves liability for failure to exercise reasonable care, provides replacement-cost damages, and limits the amount of a commercial property-loss recovery under a statute enacted specifically for warehouse storage agreements.

Here the general rule set forth in *Adams* is inapplicable because of the specific statute governing limitations of damages in the context of warehouse storage. Section 47-7-204(b) says that warehouse damages "may be limited," and then expressly identifies the circumstance in which the limitation "is not effective": conversion to the warehouse's own use. Reading an unwritten gross-negligence exception into the statute would add language the General Assembly did not use and diminish the contrast it drew between negligence-based storage loss and

appropriation of the goods. The more natural reading is that the only valid limitation remains an amount limitation even where a plaintiff alleges aggravated negligence, unless the warehouse converted the goods.

Courts construing materially identical U.C.C. § 7-204 language have reached that conclusion. In *Heather James, LLC v. Day & Meyer, Murray & Young Corp.*, 142 A.D.3d 842, 842-43, 37 N.Y.S.3d 524 (N.Y. App. Div. 2016), the court held that, contrary to the lower court's gross-negligence analysis, conversion was the only circumstance rendering the warehouse limitation inapplicable. Likewise, *Western Mining Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847, 851-52 (W.D. Pa. 1984), found no support in § 7-204 for a gross-negligence exception and enforced the agreed valuation absent conversion. Those decisions are persuasive because Tennessee adopted the same operative language.

Tennessee authority reinforces the distinction between total exculpation and an agreed limit on commercial damages. *Houghland* enforced a liquidated-damages provision that fixed the alarm company's monetary exposure while recognizing that limitations generally remain subject to fraud and intentional wrongdoing. 755 S.W.2d at 771, 773-74. Here, no conversion, fraud, or intentional destruction is alleged. The Court should hold that the Section 12 limitation remains enforceable notwithstanding Plaintiffs' gross-negligence and recklessness labels.

B. *In any event, Plaintiffs lack evidence of the required conscious mental state.*

Tennessee sharply distinguishes ordinary negligence from gross negligence and recklessness. Gross negligence requires more than a failure to use ordinary care; it involves a very great degree of negligence or conscious indifference to consequences. Recklessness requires proof that the defendant was subjectively aware of a substantial and unjustifiable risk and consciously disregarded it. *Lawson v. Hawkins County*, 661 S.W.3d 54, 61-63 (Tenn. 2023). A "knew or should have known" showing, missed maintenance, poor judgment, or an unreasonable

failure to investigate may support ordinary negligence, but it does not by itself prove the conscious mental state required for recklessness.

Agilent's heightened theory rests on the same five alleged omissions used to plead ordinary negligence: failure to secure working utilities, unlock a gas meter, repair a regulator, restore HVAC operation, and winterize the building systems. Doc. 137 ¶¶ 129-33. Factory Mutual similarly alleges what Xpedient "knew or should have known" concerning heat and winterization. Doc. 136 ¶¶ 72-82. The summary-judgment record, however, contains no evidence that any Xpedient decisionmaker actually knew that the specific sprinkler piping would freeze and consciously chose to accept that outcome.

There are no facts that permit a reasonable finding that Xpedient subjectively recognized a substantial risk of the particular loss and consciously disregarded it. The Court should grant summary judgment on the recklessness component of Agilent's Count IV and Factory Mutual's Count IV gross-negligence claim.

## VII. Section 12(C)(e) bars Plaintiffs' downstream expense claims, and Section 6(B) independently assigns relocation and facility expenses to Agilent.

### A. *The claimed disposal, replacement-freight, and inventory-count expenses are consequential or indirect damages, not the MOSA's direct Replacement Cost measure.*

Section 12(C)(e) excludes "special, indirect, consequential, or punitive damages," including but not limited to lost production, income, and profits. The exclusion is not confined to those examples. Under Tennessee law, consequential or special damages may be foreseeable and naturally follow an event, but they are not its necessary, direct result. *Spec's Family Partners, Ltd. v. First Data Merchant Services LLC*, Nos. 17-5884/5950, slip op. at 4-6 (6th Cir. June 7, 2019) (applying Tennessee law and affirming summary judgment that downstream third-party assessments were consequential damages); *Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994). The MOSA identifies the direct Product Loss measure: Agilent's actual manufacturing or

acquisition cost to replace Products at their pre-loss condition, less salvage value. MOSA § 12(C)(a).

Against that measure, three claimed categories are consequential as a matter of law on the undisputed descriptions supplied by Plaintiffs' own expert: (1) $103,773 paid to third parties to dispose of inventory after Agilent decided it was unusable; (2) $170,419 in estimated freight, calculated as two percent of later replacement purchases; and (3) $64,227 in post-event inventory-count expenses incurred to investigate and quantify the claim. None is Agilent's manufacturing or acquisition cost to replace a Product, and none necessarily results from water contact with stored goods. Each depends on separate post-loss decisions, services, and transactions. They therefore are special, indirect, or consequential damages barred by Section 12(C)(e). Even if any portion were characterized as part of the Product Loss itself, it would share - not enlarge - the single $1 million limit.

B. *The post-loss SOA payments and relocation charges are both indirect losses and expenses the MOSA expressly assigns to Agilent.*

Agilent also seeks $958,122 in monthly SOA payments made after January 17, 2024, which its expert labels "additional overhead damages," and $5,281 to move undamaged Products to another warehouse. See Grudzien Report at 6-8 Exhibit "13". Those amounts are not compensation for physical damage to a Product. They arise from Agilent's continuing payment obligations and its post-event relocation decision and are therefore indirect or consequential economic losses excluded by Section 12(C)(e).

Section 6(B) independently resolves those categories. It provides that when an event causes premature loss of use or possession of a Facility, the costs of transporting Products to an alternate facility, rent, and "all other expenses associated with the Facility" are paid by the Customer. The SOA likewise requires fixed costs to be billed regardless of volume. Agilent cannot transform expenses the contract affirmatively places on Agilent into damages recoverable

from Xpedient. The Court should enter judgment against the $958,122 post-loss SOA-payment claim and the $5,281 relocation claim.

C. *Factory Mutual stands in Agilent's shoes and cannot recover more than Agilent could recover under the MOSA.*

Factory Mutual sues solely as Agilent's subrogee. Under Tennessee law, a subrogated insurer stands in the shoes of its insured and acquires no greater rights than the insured possessed against the defendant. *Wimberly v. American Casualty Co. of Reading, Pennsylvania*, 584 S.W.2d 200, 203 (Tenn. 1979); *Westport Insurance Corp. v. Howard Tate Sowell Wilson Leathers & Johnson, PLLC*, 714 S.W.3d 463, 474–75 (Tenn. Ct. App. 2024), perm. app. denied (Tenn. Mar. 13, 2025). Factory Mutual therefore takes Agilent's claim subject to every contractual condition, limitation, exclusion, waiver, and defense that applies to Agilent. Section 20 confirms that allocation by providing that Agilent, "for itself . . . and for its insurers," waives recovery to the extent subrogation would make Xpedient responsible for losses for which it is not responsible under the MOSA. Subrogation thus cannot expand Xpedient's responsibility beyond the bargain Agilent made.

Accordingly, Agilent's failure to satisfy the MOSA's timely written-claim requirement bars Factory Mutual's derivative claim to the same extent. And even if some claim survives, Factory Mutual shares Agilent's single contractual recovery; it does not receive a separate claim or an additional limitation amount merely because it paid part of Agilent's loss. The combined recovery of Agilent and Factory Mutual for Product Losses arising from the January 17 occurrence therefore cannot exceed the $1 million per-occurrence Limit, and Factory Mutual remains subject to the MOSA's exclusions of special, indirect, consequential, and punitive damages. Allocation of any permissible recovery between Agilent and Factory Mutual does not increase Xpedient's aggregate exposure.

Factory Mutual likewise cannot add its own $335,446 in claim-adjustment expenses to Agilent's claim. Its damages expert identifies $318,478 for an industrial hygienist, $12,248 for a salvor, and $4,720 for a forensic accountant. See Grudzien Report at 9–10 Exhibit "13". Those are costs Factory Mutual incurred in investigating and adjusting its insured's claim—not Product Losses or other damages sustained by Agilent. Because Agilent possessed no claim for Factory Mutual's own claim-handling expenses, Factory Mutual acquired no such claim through subrogation. In any event, those third-party adjustment costs are indirect or consequential damages excluded by Section 12(C)(e). Any prejudgment interest must likewise be calculated, if at all, only on principal damages that survive the MOSA's notice requirement, per-occurrence cap, and damages exclusions.

## CONCLUSION

Xpedient respectfully requests summary judgment holding that Agilent and Factory Mutual may not maintain claims for loss of or damage to Products arising from the January 17, 2024 Water Intrusion Event because Agilent failed to provide the timely written claim required by MOSA Section 12(C)(e). Alternatively, the Court should declare that Xpedient's aggregate liability to Agilent and Factory Mutual for all Product Losses from that occurrence cannot exceed $1,000,000; that the limitation applies regardless of whether the Product Losses are pleaded in contract, bailment, negligence, negligence per se, negligent misrepresentation, recklessness, gross negligence, or another theory; and that Factory Mutual has no separate or additional limit.

The Court should also hold that Section 12(C)(e) bars special, indirect, consequential, and punitive damages - including the claimed disposal, replacement-freight, inventory-count, post-loss SOA-payment, relocation, and claim-adjustment expenses - and that Section 6(B) independently assigns relocation and facility expenses to Agilent. Xpedient further requests summary judgment on the recklessness component of Agilent's Count IV and Factory Mutual's

Count IV gross-negligence claim, or, alternatively, an order under Rule 56(g) establishing the undisputed contractual and notice facts identified above.

Respectfully submitted,

**BUTLER SNOW LLP**

*/s/ William P. Thomas*
William P. Thomas (MS Bar No. 102209)
Andrew B. Schrack (BPR No. 037624)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7200
will.thomas@butlersnow.com
andrew.schrack@butlersnow.com

*Attorneys for Xpedient Management Group, LLC*

## CERTIFICATE OF SERVICE

I certify that on September 21, 2026 the foregoing was filed through the Court's CM/ECF system, which sent notice to all counsel of record.

/s/ *William P. Thomas*____________________
William P. Thomas

102676440.v1