**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

AGILENT TECHNOLOGIES, INC.,
Plaintiff,

v.

XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,
Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,
Cross-Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,
Cross-Defendants.

---

FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,
Plaintiff,

v.

XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,
Defendants.

Case No. 2:25-cv-02101-BCL-cgc

Judge Brian C. Lea
Magistrate Judge Charmaine Claxton

Case No. 2:25-cv-02424-BCL-tmp

JURY DEMANDED

**PLAINTIFF FACTORY MUTUAL INSURANCE COMPANY'S MEMODRANDUM OF LAW IN OPPOSITION TO XPEDIENT MANAGEMENT GROUPS, LLC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Factory Mutual Insurance Company ("FM") submits this Memorandum in Opposition to Defendant Xpedient Management Group, LLC's ("Xpedient") Motion for Summary

Judgment as to all claims asserted against it by Agilent and FM ("Motion") [Doc. 259].

## I. INTRODUCTION

This case presents a straightforward question: whether a professional warehouse operator can escape liability for millions of dollars in property damage when it knowingly allows its warehouse to remain without working heat for months, disregards repeated indications that its natural gas service remains disconnected, and fails to take reasonable precautions against an approaching winter freeze. Xpedient seeks to avoid responsibility for precisely that conduct by invoking contractual limitations of liability. The evidence, however, is more than sufficient to permit a jury to reject all of Xpedient's contractual defenses.

On January 17, 2024, water-bearing fire-sprinkler pipes at the Cromwell Warehouse[1] in Memphis, Tennessee, froze and burst, causing extensive water damage to Agilent's laboratory pipette-tip inventory (the "Loss Event"). At the time, the inventory was in Xpedient's exclusive care, custody, and control. (FM's Statement of Additional Material Facts ("SAMF") ¶¶ 20, 22–23). This was not an unforeseeable accident involving a hidden defect that Xpedient had no reasonable opportunity to discover. Rather, Xpedient knew, at least by December 1, 2023, that the gas line to the warehouse's gas meter was locked and knew that Xpedient's leased premises lacked operational heat. (SAMF ¶¶ 15–16, 35–36). Despite that knowledge, Xpedient never verified that gas service had been restored or that the warehouse had working heating equipment during the six weeks preceding the loss. (SAMF ¶19 and ¶ 37).

The evidence is even more troubling when examined chronologically. Xpedient's Director of Operations for the Cromwell Warehouse knew when Xpedient's lease with St. Paul began that

[1] Unless otherwise noted, terms defined in FM's Amended Complaint (Doc. 136) will have the same meanings herein.

the warehouse's HVAC system was not in good working order. (SAMF ¶ 27). On November 15, 2023, Xpedient's management was still seeking an examination of the HVAC system. (SAMF ¶ 14). On December 1, 2023, the HVAC vendor advised Xpedient that it could return when the gas was unlocked. (SAMF ¶ 15). On January 9, 2024, Xpedient paid an HVAC invoice reflecting that the system still needed to be tested after restoration of gas service. (SAMF ¶ 60). Yet, Xpedient did not ensure that the gas was turned on, did not confirm that the heating system worked, did not implement a freeze-protection plan, did not investigate or confirm whether the overhead sprinkler system contained water susceptible to freezing, and did not advise Agilent that its multimillion-dollar inventory was being stored in an unheated warehouse during the winter. Even worse, hours before the pipes burst, Xpedient's on-site manager, Zachary Livingston, informed his superior, Dirk Updike, that the warehouse was cold, that snow was falling in Memphis, and that the gas was not turned on. (SAMF ¶ 38).

No meaningful protective measures followed. Xpedient did not deploy temporary space heaters in the warehouse storage area. (SAMF ¶ 42). The pipes subsequently froze and ruptured, damaging Agilent's inventory. Faced with this evidence, Xpedient seeks summary judgment based principally upon two contractual defenses: a 90-day written claim provision and a $1 million limitation of liability contained in the parties' Master Operating Services Agreement ("MOSA"). Neither defense warrants the sweeping judgment Xpedient requests.

***First***, Agilent provided Xpedient with written notice of the loss on February 7, 2024, followed by additional written correspondence on March 21, 2024 specifically identifying the absence of heat, lack of natural gas service, failure to winterize the sprinkler system, and failure to prepare for freezing weather. (SAMF ¶¶ 1–5). Xpedient acknowledged those communications, opened an insurance claim, participated in investigating the loss, and worked to identify and

segregate the damaged inventory. (SAMF ¶¶ 6–9). Those communications, considered together, provide substantial evidence that Agilent satisfied, or at least substantially complied with, the MOSA's notice requirements. Alternatively, Agilent's June 7, 2024 formal notice was timely under a reasonable interpretation of the contractual accrual provision because the extent and irreparable nature of the inventory damage remained under investigation through late March 2024. The manufacturer was evaluating whether the affected products could be salvaged, decontaminated, or re-sterilized. (SAMF ¶¶ 54–56). Further, because it withheld its own internal account of the loss while representing to Agilent that it was still investigating the causes and responsibility for the occurrence, Xpedient should be estopped from obtaining summary judgment using the 90-day notice provision. (SAMF ¶¶ 10–13, 58–59).

***Second***, Tennessee law recognizes a fundamental public-policy prohibition against enforcing contractual exculpatory provisions against claims for gross negligence or wanton/reckless conduct. Xpedient seeks to avoid that principle by characterizing the MOSA's $1 million ceiling as a limitation of damages rather than an exculpatory provision and by relying upon Tenn. Code Ann. § 47-7-204(b). However, the statute does not authorize Xpedient to insulate itself from the financial consequences of its own gross negligence or reckless conduct, nor does it expressly displace Tennessee's longstanding common-law public policy. Moreover, Xpedient's argument ignores substantial evidence from which a reasonable jury could find that its conduct constituted gross negligence. This is not a case involving an isolated mistake or a momentary lapse in judgment. The record permits a finding of prolonged, conscious disregard of a known and readily preventable danger to property entrusted to Xpedient for safekeeping.

***Third***, the evidence raises a separate question concerning the enforceability of the contractual liability limitation under Tenn. Code Ann. § 47-7-204(b). During negotiations, Agilent

expressly requested that Xpedient's liability extend to the full value of the Products stored at the facility if that value exceeded $1 million. Xpedient rejected that request with the response, "Our limit is $1M." (SAMF ¶ 57). The statute's increased-valuation provision must be considered in determining whether the negotiated limitation is enforceable.

***Finally***, Xpedient improperly treats expenses directly associated with identifying, protecting, disposing of, and replacing physically damaged inventory as though they were necessarily consequential damages. Tennessee law distinguishes incidental damages from consequential damages, and the MOSA's exclusion does not expressly identify incidental damages. The recoverability of each expense must be determined according to its nature and the complete contractual language, rather than Xpedient's blanket characterization of the same as "consequential damages." For these reasons, and more, discussed in detail below, Xpedient's Motion must be denied.

## II. RELEVANT FACTUAL BACKGROUND

### A. Xpedient assumed responsibility for operating the warehouse and safeguarding Agilent's inventory.

In May 2023, Agilent and Xpedient entered into the MOSA and the Memphis Site Operating Agreement ("SOA"), pursuant to which Xpedient agreed to provide warehousing and related logistics services at the Cromwell Warehouse. (FM's Responses to Xpedient's Statement of Material Facts ("RSUMF") ¶ 1). Xpedient agreed to maintain the warehouse and ensure that its utilities were operational. Xpedient's Rule 30(b)(6) designee, Nathaniel Haynes, confirmed these responsibilities. (SAMF ¶ 21). Xpedient also undertook responsibility for providing the space in which Agilent's Products would be stored. (SAMF ¶ 22). Importantly, Haynes acknowledged that Agilent's inventory remained within Xpedient's exclusive care, custody, and control. (SAMF ¶ 23). Xpedient's Director of Operations, Jamie Davis, understood that Xpedient was responsible

for establishing appropriate utility accounts with Memphis Light, Gas and Water ("MLGW"). (SAMF ¶ 24). Davis further acknowledged that he was responsible for knowing whether the warehouse's operational systems, including its heating equipment, were functioning properly. (SAMF ¶¶ 25–26). Xpedient's responsibility for its leased premises inside the Cromwell Warehouse was not merely theoretical. Its personnel controlled the thermostats serving its leased warehouse space and could adjust those thermostats without obtaining permission from the landlord or property manager. (SAMF ¶¶ 40–41). These admissions establish that Xpedient had operational responsibilities directly relevant to the conditions that caused the Water Intrusion Event.

**B. Xpedient knew that the warehouse lacked operational heat but failed to restore it.**

Xpedient's heating problems began long before the Loss Event. Xpedient's Operations Manager testified that he knew the warehouse's HVAC system was not in good working order when Xpedient began leasing the facility. (SAMF ¶ 27). He also acknowledged that Xpedient's normal practice was to establish an HVAC preventive-maintenance contract when beginning operations at a new facility. (SAMF ¶ 28). Nevertheless, he did not ensure that such an agreement was in place at Cromwell Warehouse before the Loss Event. (SAMF ¶ 29). By November 15, 2023, Xpedient's Director of Operations was asking about having the HVAC system examined. (SAMF ¶ 14) and on December 1, 2023, Xpedient's HVAC vendor advised that it could return when the gas was unlocked. (SAMF ¶ 15). Thus, by that date Xpedient knew that the gas service meter remained locked, there was no gas service for the HVAC units in the warehouse and the warehouse did not have working heat. (SAMF ¶ 16 and ¶ 30). Xpedient's Operations Manager even acknowledged that Xpedient's warehouse manager Livingston had failed to communicate the locked gas condition to him and that ***Livingston should have done so***. (SAMF ¶¶ 17–18). The

evidence therefore establishes both Xpedient's institutional knowledge of the heating problem and significant failures in its internal communication and supervision. Most importantly, Xpedient did not verify restoration of gas service or operational heat between December 1, 2023, and the January 17, 2024 Loss Event. (SAMF ¶ 19 and ¶ 37). A reasonable jury could therefore easily conclude that Xpedient knowingly permitted the warehouse to remain unheated throughout a period in which freezing winter weather was plainly foreseeable.

**C. Xpedient failed to investigate or prepare for the risk of freezing sprinkler piping.**

Xpedient's failures extended beyond the disconnected gas service. Xpedient's Operations Manager testified that Xpedient had no staff member assigned to monitor weather conditions affecting the Cromwell Warehouse. (SAMF ¶ 31). He also did not discuss winter-weather preparedness with Xpedient's on-site man Livingston before the occurrence and Xpedient had not implemented weather-preparedness practices at the facility, and had no established practice for protecting Xpedient's warehouses against freeze events. (SAMF ¶¶ 32–34). While he understood that the warehouse's fire-protection system involved water (SAMF ¶ 51), he admitted he did not check winter weather conditions in Memphis or investigate how water within the sprinkler piping was protected against freezing. (SAMF ¶¶ 52–53). Xpedient's on-site manager was similarly uninformed, as he did not know whether freezing weather could damage the sprinkler system or what minimum temperature was necessary to protect it (SAMF ¶¶ 43–44), and he had never asked anyone about the sprinkler system and could not identify anyone at Xpedient responsible for understanding its operation. (SAMF ¶¶ 45–46). Nor did he investigate whether the absence of heat created a freezing hazard or contact St. Paul or Colliers concerning that risk. (SAMF ¶¶ 47–48). Yet, ***he admitted that he understood that water escaping from overhead sprinkler piping would endanger Agilent's inventory*** and acknowledged that he could have determined whether the

sprinkler system contained water simply by contacting St. Paul. (SAMF ¶¶ 49–50). This evidence supports a finding that Xpedient failed to investigate a readily ascertainable danger involving the very systems located above the Products it was contractually obligated to protect.

**D. Xpedient received immediate warnings during the freeze but took no meaningful protective action.**

The circumstances immediately preceding the Loss Event are particularly significant. During the January 2024 freeze, Xpedient's on-site manager Livingston wore a coat inside the warehouse because of the cold conditions (SAMF ¶ 39) and hours before the loss, Livingston informed his superior that the building was cold, snow was falling, and the gas service remained off. (SAMF ¶ 38). Despite these warnings, Xpedient did not deploy space heaters in the warehouse storage area. (SAMF ¶ 42). The record also reflects no meaningful verification that the sprinkler piping was protected from freezing, and on January 17, 2024, the predictable hazard materialized. Fire-sprinkler piping froze and burst, causing extensive water intrusion and damaging Agilent's inventory. (RSUMF ¶ 11; SAMF ¶ 20).

**E. Agilent promptly notified Xpedient and continued investigating the nature and extent of the loss.**

Agilent provided written notice of the damage on February 7, 2024, identifying the affected Products and advising Xpedient that the extent and cost of the damage remained under investigation. (SAMF ¶¶ 1–2). On March 21, 2024, Agilent sent additional written correspondence requesting a formal incident report and specifically asking Xpedient to explain the absence of heat and gas service, whether the sprinkler system had been winterized, and what preparations had been undertaken before the January cold front. (SAMF ¶¶ 3–5, 58). Xpedient responded on March 29, 2024, acknowledging Agilent's request, advising that it had initiated a claim with its warehouse legal liability insurer, and indicating that its insurer would assist in evaluating responsibility under

the parties' agreements. (SAMF ¶¶ 6–9, 59). Meanwhile, Agilent continued investigating whether the affected pipette tips could be salvaged. On February 6, 2024, Agilent requested assistance from manufacturer Labcon concerning approximately 13,500 affected cases. (SAMF ¶ 54). Labcon subsequently evaluated potential remediation, including contamination testing and re-sterilization. (SAMF ¶ 56). On March 29, 2024, Labcon expressed substantial doubt that the contamination risks could be sufficiently mitigated and recommended scrapping the affected Products. (SAMF ¶ 55). Agilent subsequently transmitted its formal June 7, 2024 notice identifying a preliminary inventory loss exceeding $8 million. (RSUMF ¶ 16). These communications and investigations are central to the notice defense Xpedient now asserts.

## III. LAW AND ARGUMENT

### A. RULE 56 STANDARD.

Summary judgment is appropriate only when the moving party demonstrates that no genuine dispute of material fact exists and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion under Rule 56, the Court must examine the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The Supreme Court has emphasized that a court considering summary judgment may not weigh conflicting evidence, make credibility determinations, or resolve genuine factual disputes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986). Rather, the Court must determine whether the record presents a sufficient evidentiary disagreement to require submission to a jury. *Id.* at 251–52. The Sixth Circuit applies these same principles. See *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015); *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013). Significantly,

the existence of undisputed historical facts does not necessarily eliminate a genuine factual dispute where reasonable jurors could draw different material inferences from those facts. *Anderson*, 477 U.S. at 250–52.

Here, Xpedient's Motion requires the Court to accept its interpretation of the parties' notice correspondence, resolve competing inferences concerning the knowledge and conduct of its employees, and determine whether its prolonged failure to restore heat constituted ordinary negligence rather than gross negligence or recklessness. Because the enforceability of Xpedient's contractual defenses depend on disputed predicate facts, summary judgment cannot be based on resolving those facts against FM.

## B. XPEDIENT IS NOT ENTITLED TO SUMMARY JUDGMENT BASED UPON THE MOSA'S WRITTEN NOTICE PROVISION.

### i. The February and March 2024 written communications, considered together, support a finding of compliance with Section 12(C)(e).

Xpedient's notice argument rests on an unduly narrow examination of the parties' correspondence. Section 12(C)(e) requires a Product Loss claim to be presented in writing within the applicable contractual period and to identify the affected Products, explain Xpedient's alleged responsibility, and claim payment of a specified or determinable amount. (RSUMF ¶ 4). Xpedient focuses principally upon Agilent's February 7 communication and argues that it did not expressly demand payment or specify a dollar amount. That argument overlooks the additional written communications exchanged before expiration of the 90-day period Xpedient identifies. On February 7, Agilent informed Xpedient that its Products stored at the facility managed by Xpedient had experienced water damage. Agilent requested an explanation of the cause, a description of the remediation undertaken, and a plan to prevent recurrence. (SAMF ¶¶ 1–2). The communication plainly identified the occurrence, the affected customer, the facility, the general nature of the

damaged property, and the warehouse operator whose conduct required investigation. Agilent also expressly advised Xpedient that the scope and cost of the damage remained under investigation. The February correspondence was not the end of the matter.

On March 21, Agilent demanded a detailed incident report, signed by an executive of Xpedient, explaining the circumstances leading to the occurrence. (SAMF ¶¶ 3–5, 58). This March 2024 correspondence identified several specific areas of potential fault: the lack of working heat, the absence of natural gas service, possible failure to winterize the sprinkler system, and the preparations undertaken before the winter storm. These were not generalized inquiries about a warehouse accident. They concerned the precise operational failures that the subsequent discovery record identifies as central to Xpedient's liability. Xpedient acknowledged the March correspondence and confirmed that it had initiated an insurance claim involving the loss. (SAMF ¶¶ 6–8).

Section 12(C)(e) does not expressly require every element of a written claim to appear within one document. Nor does it expressly require a final judicial determination of liability or a completed forensic damages calculation before notice may be provided. The provision permits a claim for a determinable amount. FM submits that this language must be interpreted in the context of a physical inventory loss for which the MOSA itself establishes a replacement-cost formula. Xpedient already possessed or controlled the relevant inventory records, and it participated in the process of identifying damaged and potentially salvageable Products. (SAMF ¶ 9). Thus, a reasonable interpretation of the parties' communications is that Agilent was identifying a claim arising from the water damage to its stored inventory, the amount of which would be calculated by applying the contractual replacement-cost measure to the Products ultimately determined to be lost. The writings, considered together with their identification of the occurrence, affected

inventory, alleged operational failures, and ongoing valuation process, substantially satisfied the requirement for a determinable claim. At minimum, Xpedient has not demonstrated that its restrictive interpretation is the only reasonable construction of the provision.

**ii. Tennessee law recognizes substantial compliance with contractual notice requirements.**

Even if the Court concludes that Agilent's February and March correspondence did not literally satisfy every requirement of Section 12(C)(e), the communications support a finding of substantial compliance. In *Andrews Distributing Co. v. Oak Square at Gatlinburg, Inc.*, 757 S.W.2d 663, 668–69 (Tenn. 1988), the Tennessee Supreme Court addressed a contractual payment-bond provision requiring written notice within 90 days and restricting the commencement of suit absent such notice. The Court recognized that, unlike statutory lien notice requirements, contractual notice conditions may be satisfied through substantial compliance. It also recognized that reasonable delay may be excused under appropriate circumstances. Importantly, the Court did not treat the contractual condition precedent as automatically requiring strict adherence to every specified notice formality. Instead, it examined whether the relevant parties received written notice of the existence of the claim and whether the contractual requirements had been substantially fulfilled.

That distinction is significant here. Xpedient received written notice identifying Agilent's damaged inventory within weeks of the occurrence. It subsequently received written correspondence identifying the suspected failures involving heat, natural gas, winterization, and storm preparation. (SAMF ¶¶ 1–5). Xpedient's March 29 response confirms that it understood the occurrence was the subject of an insurance claim and an investigation into responsibility under the parties' agreements. (SAMF ¶¶ 6–9). Moreover, Xpedient was actively participating in the sorting and segregation of the damaged Products. (SAMF ¶ 9). These circumstances support the

conclusion that the principal commercial objectives of a warehouse claim-notice provision were being fulfilled: prompt identification of the loss, preservation of an opportunity to investigate, evaluation of the affected inventory, and determination of potential responsibility.

Xpedient cannot establish noncompliance simply by isolating the February 7 writing from the subsequent March correspondence and the parties' ongoing investigation. Nor should the Court construe Section 12(C)(e) to require Agilent to provide a final loss valuation while the manufacturer was still evaluating whether the inventory could be salvaged. The statutory context reinforces the importance of reasonableness. Tenn. Code Ann. § 47-7-204(c) authorizes reasonable contractual provisions governing the time and manner of presenting warehouse claims. The written communications here must be examined in light of the nature of the occurrence, the continuing investigation, and the purpose of the agreed notice requirements. Although *Andrews* involved a payment bond rather than a warehouse agreement, its substantial-compliance analysis provides substantial support for rejecting a forfeiture based on technical deficiencies where the essential purpose of notice has been achieved.

**iii. The June 7, 2024 notice independently satisfied the substantive requirements of Section 12(C)(e).**

Agilent's June 7, 2024 correspondence expressly invoked Section 12(C)(e) and was titled as a notice of claim under the MOSA. (RSUMF ¶¶ 15–16). It identified the water intrusion at the Cromwell Warehouse, the affected pipette-tip inventory, and Xpedient's potential responsibility for causing or permitting the loss. It also supplied a preliminary valuation of $8,054,398.96. Xpedient emphasizes the letter's characterization of the matter as a potential claim and Agilent's acknowledgment that its investigation remained incomplete. But the MOSA only requires a specified or determinable amount, not necessarily a final amount immune from subsequent

adjustment. The June 7 correspondence supplied an actual preliminary figure exceeding $8 million.

Similarly, the contractual requirement to explain liability should not be transformed into a requirement that the claimant establish liability conclusively before the warehouse operator has disclosed the facts concerning the occurrence. The letter identified the physical loss, the responsible warehouse operation, and the factual basis for investigating Xpedient's role in causing or allowing the damage. Those statements support a finding that the June notice satisfied the substantive content requirements of Section 12(C)(e).

**iv. Genuine issues of material fact exist concerning when the notice period began to run.**

Xpedient calculates the contractual deadline from February 7, 2024, reasoning that Agilent knew by that date that its Products had experienced water damage. (RSUMF ¶ 15). But the MOSA's notice provision must be interpreted according to its complete language, including its reference to when Agilent became aware, or reasonably should have become aware, of the relevant Product Loss and its alternative year-end inventory reconciliation trigger. (RSUMF ¶ 4). Agilent's awareness that inventory had been exposed to water is not necessarily equivalent to knowledge that all affected inventory had been permanently destroyed. The distinction is particularly important because the Products were medical-grade laboratory pipette tips, and Agilent undertook a substantial investigation into whether they could be salvaged. On February 6, Agilent requested assistance from Labcon concerning approximately 13,500 affected cases. (SAMF ¶ 54). Over the following weeks, Labcon explored contamination analysis, re-sterilization, and potential rework. (SAMF ¶ 56).

As late as March 29, 2024, Labcon was expressing its conclusion that the potential contamination risks could not be sufficiently mitigated and that the affected Products should be

scrapped. (SAMF ¶ 55). Thus, while Agilent knew that an incident involving water exposure had occurred in January, the extent to which the affected inventory constituted an irreparable Product Loss remained under active investigation. The contractual phrase concerning awareness of loss or damage should be construed in light of the parties' agreed replacement-cost and salvage provisions. Under that construction, the point at which Agilent reasonably knew that the affected Products could not be restored to their pre-loss condition is relevant to the commencement of the notice period. If the operative trigger occurred on March 29, 2024, the June 7 notice was within 90 days. Given the contractual context, the alternative reconciliation trigger, and the evidence concerning the continuing salvage investigation, there is clearly a basis for disputing Xpedient's proposed accrual date. Moreover, the reasonableness of the time required to investigate the loss is relevant under the substantial-compliance principles recognized in *Andrews*. Accordingly, Xpedient has not established that the June 7 notice was untimely under every reasonable interpretation of the MOSA.

**v. The doctrine of equitable estoppel bars Xpedient from using the notice provision as a defense given its concealment of its responsibility for the Loss Event.**

There is an additional, independent reason to deny summary judgment on Xpedient's notice defense. Xpedient possessed information concerning the cause of the occurrence that it did not disclose to Agilent, notwithstanding Agilent's repeated requests for that information. On March 21, 2024, Agilent specifically requested a detailed incident report, including a timeline of events, the cause of the occurrence, the absence of heat and gas service, and the steps taken to prepare for the freeze. (SAMF ¶¶ 3–5, 58). Xpedient had prepared an internal draft account describing the events preceding the loss. (SAMF ¶ 10). That draft identified the capped and locked gas service, the failure to restore gas following meter work, the involvement of an HVAC provider in December 2023, and the freezing and rupture of the domestic-water and sprinkler lines. (SAMF

¶¶ 11–13). Yet Xpedient did not provide that internal draft to Agilent. Instead, its March 29 response represented that it shared Agilent's need for answers and was working with the property manager and utility company to reconstruct the relevant timeline. (SAMF ¶ 59).

The significance of this evidence is readily apparent, as Xpedient now contends that Agilent's notices were inadequate because they failed to explain Xpedient's liability with sufficient specificity. But Xpedient possessed information directly relevant to that explanation and did not disclose it despite Agilent's express requests. Under Tennessee law, equitable estoppel may arise where a party with knowledge of the relevant facts engages in misleading conduct upon which another party reasonably relies to its detriment. See *Irving Pulp & Paper, Ltd. v. Dunbar Transfer & Storage Co.*, 732 F.2d 511, 514 (6th Cir. 1984). Xpedient's representations concerning its continuing investigation, coupled with its failure to disclose the internal timeline addressing the very subjects Agilent had identified, materially affected Agilent's ability to identify the specific operational failures underlying the loss. Xpedient should be estopped from asserting a defense arising from its own misleading conduct, as the relationship between Xpedient's representations, its withheld timeline, Agilent's ongoing investigation, and the timing and contents of Agilent's formal notice presents a factual issue requiring examination of the complete record. At minimum, Xpedient has not established the absence of a genuine factual dispute concerning whether its conduct contributed to the notice deficiency it now asserts. For these reasons, summary judgment based on Section 12(C)(e) should be denied.

### C. XPEDIENT IS NOT ENTITLED TO SUMMARY JUDGMENT ENFORCING THE $1 MILLION LIMITATION AGAINST GROSS NEGLIGENCE OR RECKLESS CONDUCT.

#### i. Tennessee does not permit a party to contractually exempt, or limit, itself from liability for gross negligence or reckless conduct.

The Tennessee Supreme Court has expressly held that "[a] party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing." *Copeland v. HealthSouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 270 (Tenn. 2018); *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 154 (Tenn. 2021). These decisions establish that contractual freedom must yield to Tennessee's public policy against permitting parties to escape responsibility for grossly negligent and reckless conduct. Importantly, this public policy cannot be circumvented merely by labeling a contractual provision a "limitation of liability" rather than an "exculpatory clause." The relevant inquiry must consider the substance and practical effect of the contractual provision, including whether its enforcement would effectively immunize the responsible party from meaningful liability for its misconduct.

The Tennessee Court of Appeals recently addressed precisely this distinction in *Signal Pump, LLC d/b/a Signal Power v. Arrow Electronics, Inc.*, No. E2024-01376-COA-R3-CV, 2026 Tenn. App. LEXIS 171, *35-41 (Tenn. Ct. App. Apr. 17, 2026). Although the parties' contract in *Signal Pump* was governed by New York substantive law, the Tennessee Court of Appeals' analysis is instructive because it examined whether a contractual provision denominated a limitation of liability operated, in substance, as an exculpatory clause. In *Signal Pump*, the defendant relied upon a contractual limitation of liability provision excluding various categories of damages including incidental, special, consequential, or punitive damages, lost profits, lost business or cost of procurement of substitute goods or services. *Id.* at *36. The plaintiff argued that the provision effectively eliminated its ability to obtain meaningful compensation for the defendant's breach. The defendant responded that the provision was not exculpatory because certain categories of contractual damages theoretically remained recoverable. The Tennessee Court of Appeals rejected the defendant's characterization of the provision. Rather than accepting

the label attached to the contractual clause, the Court examined the nature of the parties' agreement, the damages arising from the defendant's alleged misconduct and whether the provision effectively insulated the defendant from liability for failing to perform its principal contractual obligations. *Id.* at 38-41. The Court concluded that the contractual provision operated as an exculpatory clause because it effectively deprived the plaintiff of meaningful recourse for the defendant's breach. *Id.* at 40–41. The Court expressly held that the provision was exculpatory notwithstanding its designation as a limitation of liability and therefore could be rendered unenforceable by gross negligence under the applicable New York law.

The significance of *Signal Pump* lies in the Tennessee Court of Appeals' recognition that the legal effect of a contractual provision must be evaluated in light of its actual operation. A contractual provision that purports merely to limit liability may, depending upon its terms and practical consequences, function as an exculpatory clause by effectively insulating a party from responsibility for its misconduct. That reasoning applies with substantial force here. Xpedient contracted to provide warehousing and logistics services involving valuable inventory belonging to Agilent. The protection and preservation of that inventory were central purposes of the parties' contractual relationship. Yet the evidence establishes that the warehouse's heating system was not operational, that natural gas service necessary to operate the heating system had not been established, and that these conditions persisted because of Xpedient's indifference to the same for an extended period before the Loss Event.

The evidence further establishes that Xpedient failed to take even elementary precautions to protect the inventory against foreseeable freezing conditions. Among other things, Xpedient failed to ensure that the warehouse had operational heat, failed to follow up adequately on the unresolved gas-service problem, failed to appreciate the risks associated with freezing

temperatures and the building's wet-pipe sprinkler system, and failed to respond appropriately to conditions presenting an obvious danger of substantial property damage. These failures occurred notwithstanding the extended period during which the heating deficiencies remained unresolved and the foreseeable consequences of exposing a warehouse containing valuable inventory and water-filled piping to freezing temperatures.

These facts support considerably more than an allegation of ordinary negligence. A reasonable jury could conclude that Xpedient's prolonged failure to address the absence of operational heat, together with its failure to take basic precautions against foreseeable freezing conditions, constituted gross negligence or reckless disregard for the property entrusted to its care. Xpedient nevertheless contends that, regardless of the extent of its misconduct or the resulting damages, Section 12(C)(c) of the MOSA limits its liability to $1 million per occurrence.

The practical effect of Xpedient's position is extraordinary. The damages resulting from the loss exceed $9 million. Yet Xpedient asks this Court to enforce a contractual provision that would eliminate its responsibility for more than $8 million of those damages, even if a jury determines that the loss resulted from Xpedient's grossly negligent or reckless conduct. Thus, the proposed limitation would relieve Xpedient of liability for more than 88.9% of the loss. Rather than merely allocating ordinary commercial risks, enforcement of the provision under these circumstances would substantially immunize Xpedient from nearly 90% of the financial consequences of the very misconduct Tennessee public policy prohibits parties from excusing.

Put simply, a contractual provision does not necessarily cease to be exculpatory merely because it permits some recovery.[2] Otherwise, a contracting party could circumvent Tennessee's

---

[2] Indeed, courts in other jurisdictions have expressly held that a contractual limitation of liability is an exculpatory provision. *Ingersoll-Rand Co. v. El Dorado Chemical Co.*, 283 S.W.3d 191, 195 (Ark. 2008). Other courts have likewise recognized that the public policy restrictions

prohibition against exculpation for gross negligence by preserving a nominal or disproportionately small recovery while disclaiming responsibility for virtually all damages resulting from its egregious misconduct. Indeed, accepting Xpedient's position would create an obvious means of defeating the public policy articulated in *Copeland* and *Milan*. A party could accomplish indirectly what Tennessee law prohibits directly: immunizing itself from the consequences of gross negligence or reckless conduct, provided that its contract preserves some limited measure of liability. Such an approach would elevate contractual terminology over substance and undermine the public policy protections recognized by the Tennessee Supreme Court, and the reasoning of *Signal Pump* illustrates why that approach should be rejected and would deprive Plaintiffs of meaningful recourse for the misconduct at issue.

This Court should therefore decline to interpret or enforce Section 12(C)(c) in a manner that would permit such a result without first resolving the factual questions concerning the nature and degree of Xpedient's misconduct. At a minimum, the evidence presents genuine disputes of material fact concerning whether Xpedient's conduct constituted gross negligence or recklessness. Those factual disputes are material to whether enforcement of the limitation of liability would offend Tennessee public policy. Summary judgment enforcing the $1 million cap is therefore inappropriate where doing so would prematurely foreclose Plaintiffs' ability to establish that Xpedient engaged in conduct for which Tennessee law does not permit contractual exculpation.

Accordingly, the Court should deny Xpedient's Motion insofar as it seeks a determination

---

governing exculpatory clauses extend to contractual limitations of damages. See *New Light Co. v. Wells Fargo Alarm Services*, 525 N.W.2d 25, 30-31 (Neb. 1994) (holding that a contractual limitation of damages could not restrict liability for gross negligence or willful and wanton misconduct); *United States Fire Insurance Co. v. Sonitrol Management Corp.*, 192 P.3d 543, 548 (Colo. Ct. App. 2008) (applying the public policy exception for willful and wanton misconduct to both exculpatory clauses and limitations of liability).

that Section 12(C)(c) categorically limits Plaintiffs' recovery to $1 million, irrespective of whether Xpedient's conduct constituted gross negligence or recklessness. The jury should be permitted to determine the nature and extent of Xpedient's misconduct before the Court determines whether enforcement of the contractual limitation would violate Tennessee public policy.

**ii. Tennessee Code Annotated § 47-7-204 does not displace Tennessee's public policy prohibition against contractual protection for gross negligence.**

Seeking to sidestep Tennessee public policy, Xpedient argues, without citing any controlling authority, that Tennessee's adoption of a version of U.C.C. § 7-204 displaces the state's common law and shields a bailee from liability for its own gross negligence. Xpedient's reliance on Tenn. Code Ann. § 47-7-204(b) is misplaced. The statute authorizes limitations on warehouse liability for loss or damage to stored goods and expressly invalidates a limitation for conversion to the warehouse's own use. But nothing in § 47-7-204 states the Tennessee General Assembly intended to abrogate Tennessee's longstanding public-policy prohibition against contractual immunity for gross negligence, reckless conduct, or willful misconduct. In fact, Tennessee's version of the UCC itself directs courts to apply supplemental principles of law and equity unless displaced by particular provisions. Tenn. Code Ann. § 47-1-103(b). Xpedient's proposed negative implication—that because conversion is mentioned, every other form of misconduct is necessarily subject to the cap—is not compelled by the statutory text. Xpedient's reliance upon *Heather James, LLC v. Day & Meyer, Murray & Young Corp.*, 142 A.D.3d 842 (N.Y. App. Div. 2016) and *Western Mining Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847 (W.D. Pa. 1984) is likewise misplaced. Neither supports the result Xpedient seeks here: abrogation of Tennessee's public policy against limiting liability for gross negligence and reckless conduct.[3] The Court should

[3] In fact, decisions from at least one other federal court support preserving common-law restrictions upon limitations for gross negligence. In *Butler Manufacturing Co. v. Americold Corp.*,

therefore deny Xpedient's request for a categorical determination that the $1 million limit applies regardless of the degree of misconduct established at trial.

### D. THE RECORD CONTAINS SUBSTANTIAL EVIDENCE FROM WHICH A REASONABLE JURY COULD FIND THAT XPEDIENT WAS GROSSLY NEGLIGENT.

Xpedient's argument that FM cannot establish gross negligence because there is no evidence that a Xpedient decision maker "actually knew that the specific sprinkler piping would freeze and consciously chose to accept that outcome" misstates Tennessee law, improperly conflates gross negligence with intentional misconduct, and disregards the substantial circumstantial evidence from which a reasonable jury could find gross negligence.

*First*, Tennessee law does not require proof that a defendant intended, anticipated, or possessed actual knowledge that the particular injury ultimately sustained would occur. Although gross negligence requires substantially more culpable conduct than ordinary negligence, it remains distinct from intentional wrongdoing. As the Tennessee Supreme Court has explained, gross negligence encompasses conduct reflecting such an extreme departure from reasonable care that conscious indifference to the consequences may be inferred. *Lawson v. Hawkins County*, 661 S.W.3d 54, 61–63 (Tenn. 2023); *Craig v. Stagner*, 19 S.W.2d 234, 236 (Tenn. 1929).

Indeed, *Lawson*, the very decision upon which Xpedient relies, expressly recognizes that gross negligence may be established through conduct constituting an entire want of care sufficient to raise a presumption of conscious indifference to consequences. *Lawson*, 661 S.W.3d at 62–63.

---

835 F. Supp. 1274, 1281–83 (D. Kan. 1993), the court addressed a warehouse operator's attempt to enforce contractual limitations against claims involving gross negligence and willful or wanton conduct. The defendants emphasized that the contractual provisions had been negotiated by sophisticated commercial parties. The court nevertheless concluded that the applicable UCC provisions did not displace Kansas common-law restrictions against limiting liability for aggravated misconduct. Accordingly, it refused to enforce the contractual limitations to the extent they purported to restrict recovery for gross negligence and willful or wanton conduct.

This distinction is critical. While *Lawson* recognizes a mental-state component to gross negligence, it does not hold that a plaintiff must produce direct evidence that a defendant subjectively anticipated the precise injury that occurred. Rather, the requisite indifference may be established through the nature and circumstances of the defendant's conduct. The Tennessee Court of Appeals has similarly explained that gross negligence includes a negligent act committed with such disregard for the rights of others that conscious indifference to consequences is implied by law. *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003); see also *Twenty Holdings, LLC v. Land South TN, LLC*, No. M2018-01903-COA-R3-CV (Tenn. Ct. App. 2019).

*Second*, Xpedient's argument improperly substitutes knowledge of a particular outcome for awareness of a substantial risk**.** Even the heightened standard applicable to recklessness does not require that a defendant consciously desire, intend, or anticipate the precise resulting injury. In *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 38–39 (Tenn. 2005), the Tennessee Supreme Court explained that recklessness requires awareness and conscious disregard of a substantial and unjustifiable risk, but does not require that the actor direct his conduct toward a particular person or result. Thus, even under the more demanding recklessness standard, Xpedient's insistence upon evidence that its decision-makers actually knew the specific sprinkler pipes would freeze imposes a requirement that Tennessee law does not recognize. The question is not whether Xpedient knew precisely which pipe would freeze, where it would rupture, or how much damage would result. The question is whether the evidence permits a reasonable jury to conclude that Xpedient's conduct reflected the requisite indifference to the substantial and foreseeable risk of freezing and resulting property damage.

*Third*, the evidence in this case establishes considerably more than isolated mistakes, poor judgment, or routine maintenance omissions. The record reflects that Xpedient operated a

warehouse containing valuable inventory while the facility's heating system remained nonfunctional for an extended period. The natural gas meter remained locked, the heating system was not restored, and the necessary corrective measures were not completed despite communications identifying the unresolved utility problem. Indeed, the evidence reflects that the heating problem persisted for approximately several months before the Loss Event. Moreover, the warehouse contained a water-based fire suppression system and domestic water piping susceptible to freezing in the absence of adequate heat. The approaching winter conditions made the consequences of operating an unheated warehouse particularly serious. Yet Xpedient failed to ensure that the heating system was operational, failed to adequately investigate the facility's vulnerability to freezing temperatures, failed to take appropriate precautions to protect the water-filled systems, and continued operating the warehouse without resolving the conditions creating the risk. These facts cannot properly be evaluated as five unrelated maintenance omissions, as Xpedient attempts to characterize them. The cumulative evidence permits a reasonable jury to find a prolonged and extraordinary disregard for basic precautions necessary to protect the facility and its contents against a serious and foreseeable hazard.

Nor can Xpedient insulate itself from a gross negligence finding by asserting that its employees did not understand the specific configuration of the sprinkler system or appreciate the precise mechanism by which the loss would occur. A jury could reasonably conclude that the failure to investigate these matters, particularly while continuing to operate a warehouse without functioning heat during winter, was itself part of the extraordinary disregard for the safety of the property entrusted to Xpedient's care.

*Fourth*, Xpedient's position improperly asks the Court to resolve factual inferences in its favor. Whether Xpedient's extended failure to restore heat, investigate the consequences of that

failure, and implement protective measures constitutes ordinary negligence or gross negligence depends upon the totality of the circumstances and the reasonable inferences drawn from the evidence. A reasonable jury could conclude that Xpedient's conduct was not simply inadvertent or the product of an isolated oversight, but instead reflected an extended and substantial disregard for the risk created by operating an unheated warehouse during freezing conditions. The fact that Xpedient offers a less culpable interpretation of its employees' conduct does not entitle it to summary judgment where the record supports competing reasonable inferences. Ultimately, Xpedient's argument rests upon a false premise: that unless FM can identify an employee who admitted knowing that a sprinkler pipe would freeze and rupture, gross negligence cannot be established. That is not Tennessee law. Gross negligence does not require an intent to cause injury, advance knowledge of the precise resulting harm, or an admission of conscious indifference. The required mental state may be inferred from conduct and surrounding circumstances sufficiently extreme to support that conclusion. Because the evidence, viewed in the light most favorable to FM, permits a reasonable jury to find that Xpedient's prolonged failure to maintain heat and protect the warehouse against freezing constituted gross negligence, summary judgment on FM's gross negligence cause of action should be denied.

### E. XPEDIENT HAS NOT ESTABLISHED THAT ALL INVENTORY-RELATED EXPENSES ARE EXCLUDED AS CONSEQUENTIAL DAMAGES.

#### i. Tennessee law distinguishes direct, incidental, and consequential damages.

Xpedient seeks to exclude Agilent's inventory-counting, disposal, and replacement-freight expenses by characterizing them as consequential or indirect damages. That argument improperly assumes that every expense incurred after the physical loss, or paid to a third party, is necessarily consequential. Tennessee law distinguishes damages arising directly from a wrongful act from

damages resulting from additional consequences of that act. See *Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994).

In *Spec's Family Partners, Ltd. v. First Data Merchant Services LLC*, Nos. 17-5884/5950 (6th Cir. June 7, 2019), the Sixth Circuit considered downstream assessments imposed by third-party payment networks following data-security breaches. Those assessments involved additional contractual relationships and intervening determinations. They are materially different from expenses incurred to identify, handle, dispose of, and replace goods physically damaged while in a warehouse operator's custody.

Tennessee law also recognizes incidental damages as a category distinct from consequential damages. Indeed, in *Wills Electric Co. v. Mirsadi*, No. M2000-02477-COA-R3-CV, 2001 Tenn. App. LEXIS 915, *9-10 (Tenn. Ct. App. Dec. 13, 2001), the Tennessee Court of Appeals recognized that incidental damages and consequential damages "are not synonymous" and refer to two distinct forms of damages for the recovery of which very different standards apply. Importantly, Section 12(C)(e) excludes special, indirect, consequential, and punitive damages, but does not expressly identify incidental damages. (RSUMF ¶ 5). That omission is significant. Had the parties intended to exclude incidental damages as a separate category, they could have expressly included them.

**ii. Inventory-counting expenses are directly related to identifying the physical Product Loss.**

Agilent seeks $64,227 in expenses incurred to identify and count affected inventory following the Water Intrusion Event. (RSUMF ¶¶ 21, 24). These expenses were incurred in connection with determining which Products had been damaged, which could be salvaged, and which required replacement. Xpedient itself participated in the sorting and segregation of the Products for salvage determination. (SAMF ¶ 9). That participation demonstrates that Xpedient

understood the need to identify and segregate the affected inventory before the physical loss could be fully evaluated. Such activities are materially different from claims for lost profits, interrupted production, or liabilities arising from Agilent's separate business relationships. The expenses concern the damaged Products themselves. FM submits that commercially reasonable costs incurred to identify and evaluate physically damaged inventory are properly considered direct or incidental loss-related expenses rather than consequential damages. At minimum, Xpedient has not established that the entire $64,227 consisted of remote or collateral expenses excluded by Section 12(C)(e). The purpose of the work, its necessity, and its relationship to the contractual replacement-cost measure remain relevant and should be determined by the jury empaneled in this case.

**iii. Disposal expenses concern the disposition of physically damaged inventory.**

Agilent seeks $103,773 for disposal of Products determined to be unusable. (RSUMF ¶ 24). The evidence concerning the salvage investigation is important to this category. Agilent did not immediately assume that every water-exposed Product was permanently destroyed. Instead, it consulted with Labcon concerning potential salvage, contamination testing, and re-sterilization. (SAMF ¶¶ 54–56). Labcon ultimately expressed substantial doubt that the affected Products could be safely restored to their intended condition. (SAMF ¶ 55). Once Products were determined to be unusable, their disposal was closely connected to the physical loss itself.

Thus, the expense of disposing of damaged inventory is not necessarily equivalent to consequential damages arising from interruption of the owner's business. A reasonable factfinder could determine that the disposal expenses were incurred as a necessary consequence of dealing with the physically damaged Products rather than as a collateral business loss. Xpedient's Motion

does not establish that disposal expenses are consequential as a matter of law merely because a third party performed the work.

**iv. Replacement freight is closely related to the contractual replacement-cost measure.**

Agilent also seeks $170,419 in estimated freight associated with replacement inventory. (RSUMF ¶¶ 21, 24). Section 12(C)(a) identifies the actual manufacturing or acquisition cost of replacing damaged Products, subject to the contractual limitations and salvage adjustment, as the relevant Product Loss measure. (RSUMF ¶ 2). Transportation costs are a direct cost component of acquiring replacement products. Replacement goods must be delivered to the appropriate location to restore the inventory that was destroyed. Accordingly, reasonable freight directly associated with replacement inventory is distinguishable from remote economic losses such as lost sales or lost profits. The Court should reject Xpedient's categorical characterization and determine recoverability according to the contractual measure and the evidence concerning actual replacement costs.

**E. Xpedient has not established that all of FM's adjustment expenses are unrecoverable.**

Xpedient also seeks judgment concerning $335,446 in expenses identified by FM's damages expert, consisting of $318,478 for industrial-hygiene services, $12,248 for salvage services, and $4,720 for forensic-accounting services. (RSUMF ¶ 25). These expenditures should not be treated as a single undifferentiated category. Industrial-hygiene and salvage services involve physical inspection, contamination evaluation, protection of damaged property, and mitigation of additional loss. Those activities are materially different from ordinary insurance claim administration. The fact that FM paid for a service does not necessarily establish that the service was unrelated to the physical damage or performed exclusively for insurance-adjustment purposes.

The Court should therefore examine at trial the actual purpose of the expenditures and the legal basis asserted for each category.

## IV. CONCLUSION

The record presents substantial evidence that Xpedient knowingly operated the Cromwell Warehouse without working heat for weeks, failed to restore natural gas service despite repeated notice of the problem, failed to investigate the vulnerability of overhead water-bearing piping, and took no meaningful precautions after receiving immediate warnings of freezing conditions. A reasonable jury could conclude that this conduct constituted gross negligence or reckless disregard for the safety of Agilent's inventory. Xpedient has not established that Tennessee law permits its contractual limitation of liability to protect it against such misconduct. Nor has Xpedient established that Agilent’s February and March written communications failed to satisfy or substantially comply with the MOSA’s notice requirements, that the June 7 notice was necessarily untimely, or that Xpedient’s own conduct cannot support equitable estoppel. Finally, Xpedient has not demonstrated that every claimed expense associated with identifying, handling, disposing of, and replacing physically damaged inventory is excluded as consequential damages. For these reasons, Plaintiff Factory Mutual Insurance Company respectfully requests that the Court deny Xpedient’s Motion in its entirety.

Respectfully submitted,

*s/ S. Joe Welborn*
S. Joe Welborn, TN BPR No. 21747
SMITH CASHION & ORR, PLC
3100 West End Avenue
Suite 800 – One American Center
Nashville, TN 37203
(615) 742-8565 – Tel
jwelborn@smithcashion.com
*Attorney for Plaintiff Factory Mutual Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2026, I have served a true and correct copy of the foregoing pleading to the following via electronic mail:

Amber S. Finch
Margaret C. McDonald
Katherine P. Goetz
Reed Smith, LLP
515 South Flower St.
Suite 4300
Los Angeles, CA 90071
(213) 457-8000 – Tel
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan
Elena R. Mosby
Burch Porter & Johnson
130 N. Court Ave.
Memphis, TN 38103
(901) 524-5000 – Tel
dhalijan@bpjlaw.com
emosby@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

John Butler
Grant E. Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, Tennessee 37919
(865) 244 – 3945 – Tel
jbutler@bvblaw.com
gmitchell@bvblaw.com
*Attorney for Defendant Colliers Management Services – Memphis, LLC*

William P. Thomas
Andrew B. Schrack
Butler Snow, LLP
6075 Poplar Ave., Ste, 500
P.O. Box 171443
Memphis, TN 38187-1443
(901) 680-7200 – Tel
Will.Thomas@butlersnow.com
Andrew.Schrack@butlersnow.com
*Attorneys for Defendant/Cross-Plaintiff Xpedient Management Group, LLC*

Sean W. Martin
Carr Allison
633 Chestnut St.
Suite 2000
Chattanooga, TN 37450
(423) 648-9832 – Tel
swmartin@carrallison.com
*Attorneys for Defendant/Cross-Defendant St. Paul Fire and Marine Insurance Company*

*s/ S. Joe Welborn*
S. Joe Welborn