**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**AGILENT TECHNOLOGIES, INC., PLAINTIFF**

**VS CASE NO. 2:25-cv-02101-BCL-cgc**

**XPEDIENT MANAGEMENT GROUP, LLC,**
**ST.PAUL FIRE AND MARINE INSURANCE COMPANY,**
**COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC DEFENDANTS**

---

**XPEDIENT MANAGEMENT GROUP, LLC, CROSS PLAINTIFF**

**VS**

**ST PAUL FIRE AND MARINE INSURANCE COMPANY and**
**COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC CROSS-DEFENDANTS**

---

**FACTORY MUTUAL INSURANCE CO., AS**
**SUBROGEE OF AGILENT TECHNOLOGIES, INC. PLAINTIFF**

**VS. CASE NO. 2:25-cv-02424-BCL-tmp**

**XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE**
**INSURANCE COMPANY and COLLIERS MANAGEMENT**
**SERVICES-MEMPHIS, LLC DEFENDANTS**

**PLAINTIFF FACTORY MUTUAL INSURANCE COMPANY'S**
**STATEMENT OF ADDITIONAL MATERIAL FACTS**

**COMES NOW** Plaintiff, Factory Mutual Insurance Company ("FM"), as subrogee of Agilent Technologies, Inc. ("Agilent"), by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and LR 56.1(b), and identifies the following concise, separately numbered record facts material to the existence of genuine issues for trial:

1. Agilent transmitted a written notice of water damage to Xpedient Management Group, LLC ("Xpdeient") on February 7, 2024. *See* Feb. 7 notice, ATI_004078 attached as **Exhibit 1**.

**RESPONSE:**

2. The February notice stated that Agilent was investigating damage to its Products and would update Xpedient when resulting costs were determined. *See Id*.

**RESPONSE:**

3. On March 21, 2024, Agilent requested that Xpedient provide an executive-signed final report concerning the cause of the water damage ("March 21 letter"). *See* March 21 letter, ATI_000923-924 attached as **Exhibit 2**.

**RESPONSE:**

4. The March 21 letter specifically requested an explanation for the lack of heat and natural gas service at the warehouse. *See Id*.

**RESPONSE:**

5. The March 21 letter asked whether the sprinkler system had been winterized and what preparations had been made before the January 2024 cold front. *See Id*.

**RESPONSE:**

6. On March 29, 2024, Xpedient acknowledged via written response its receipt of Agilent's March 21 letter (the "March 29 response"). *See* Haynes Dep. 219:1–18, Ex. 200 attached as **Exhibit 3**.

**RESPONSE:**

7. In its March 29 response, Xpedient stated that it had initiated a claim with its warehouse legal liability insurer and that the insurer would assist in assessing the timeline of events and responsibilities under the parties' agreement. *See Id*.

**RESPONSE:**

8. Xpedient requested close collaboration between the parties' insurance and risk-management groups. *See Id*.

**RESPONSE:**

9. Xpedient stated that it was assisting Agilent with sorting and segregating Products for salvage determination and that its insurer had instructed it to submit invoices to Agilent for reimbursement of sorting and segregation expenses. *See Id.*

**RESPONSE:**

10. Xpedient manager Dirk Updike prepared an internal draft response (the "internal draft") describing the events leading to the loss; the draft was not sent to Agilent. *See* Updike Dep. 245:24–246:3, Ex. 186 attached as **Exhibit 4**.

**RESPONSE:**

11. The internal draft states that gas service was capped, turned off, locked during meter-separation work, and was not restored after the meter work. *See Id*.

**RESPONSE:**

12. The internal draft states that Xpedient worked with an HVAC provider concerning gas service in December 2023. *See Id.*

**RESPONSE:**

13. The internal draft states that both domestic-water and sprinkler lines froze and burst during the occurrence. *See Id*.

**RESPONSE:**

14. On November 15, 2023, Xpedient's Director of Operations asked about getting the Memphis Cromwell Warehouse HVAC system examined. *See* Davis Dep. 326:1–22 and Davis Dep. 191:2–7, and Ex. 163 attached as **Exhibit 5**.

**RESPONSE:**

15. On December 1, 2023, the HVAC vendor advised that it could return when the gas was unlocked. *See* Livingston Dep. 83:2–24, 84:2–23, 87:25–88:5, and Ex. 164 attached as **Exhibit 6**.

**RESPONSE:**

16. Xpedient's warehouse manager Livingston knew by December 1 that gas service remained locked. *See* Davis Dep. 327:4–13 attached as **Exhibit 5**. *See also* Livingston Dep. 259:21–25, 261:15–18 attached as **Exhibit 6**.

**RESPONSE:**

17. Livingston did not advise Davis that the gas remained locked. *See* Davis Dep. 327:14–19, 328:5–9 attached as **Exhibit 5**.

**RESPONSE:**

18. Davis testified that Livingston should have informed him of the locked gas service. *See Id*. at 328:5–9 attached as **Exhibit 5**.

**RESPONSE:**

19. Xpedient did not verify that gas service or operational heat had been restored before the Water Intrusion Event. *See* Livingston Dep. 83:2–24, 84:2–23, 87:15–19, 88:18–25, 90:2–10 attached as **Exhibit 6**.

**RESPONSE:**

20. The January 17, 2024 Water Intrusion Event involved frozen and burst water and sprinkler piping. *See* Davis Dep. 334:14–25, 335:1–13 attached as **Exhibit 5**. *See also* Plesofsky Dep. 164:8–25, 165:1–11 as **Exhibit 7**.

**RESPONSE:**

21. Xpedient agreed to maintain the Cromwell Warehouse and ensure that utilities serving the warehouse were operational. *See* Haynes Dep. 90:17–94:4 attached as **Exhibit 3**.

**RESPONSE:**

22. Xpedient was responsible for providing the space where Agilent's Products were stored. *See*

*Id* at 175:5–9 attached as **Exhibit 3**.

**RESPONSE:**

23. Agilent's inventory was within Xpedient's exclusive care, custody, and control. *See Id.* at 246:23–247:13 attached as **Exhibit 3**.

**RESPONSE:**

24. Xpedient understood that it was responsible for contacting MLGW to establish the appropriate utility accounts. *See* Davis Dep. 29:16–30:6, 112:10–21 attached as **Exhibit 5**.

**RESPONSE:**

25. Xpedient's Operations Manager Davis was responsible for knowing whether the warehouse systems were operational. *See Id.* at 324:14–325:18 attached as **Exhibit 5**.

**RESPONSE:**

26. Davis did not confirm that the warehouse HVAC system was operational before the loss. *See Id. at* 324:14–325:18 attached as **Exhibit 5**.

**RESPONSE:**

27. Davis knew at the beginning of the lease that the HVAC system was not in good working order. *See Id.* at 96:13–97:10 attached as **Exhibit 5**.

**RESPONSE:**

28. Xpedient's normal practice was to obtain an HVAC preventive-maintenance contract when beginning operations at a new facility. *See Id.* at 87:18–88:10 attached as **Exhibit 5**.

**RESPONSE:**

29. Davis did not ensure that an HVAC preventive-maintenance contract was in place at the Cromwell Warehouse before the loss. *See Id.* at 96:13–97:10 attached as **Exhibit 5**.

**RESPONSE:**

30. The Cromwell Warehouse did not have working heat before the January 17, 2024 loss. *See Id.* at 325:10–14 attached as **Exhibit 5**.

**RESPONSE:**

31. Xpedient had no staff member responsible for monitoring weather conditions affecting the Cromwell Warehouse. *See Id.* at 214:22–215:7 attached as **Exhibit 5**.

**RESPONSE:**

32. Davis did not discuss winter-weather preparedness for the Cromwell Warehouse with Livingston before the Water Intrusion Event. *See Id.* at 225:3–13 attached as **Exhibit 5**.

**RESPONSE:**

33. Xpedient had not implemented weather-preparedness practices at the Cromwell Warehouse. *See Id.* at 225:3–13 attached as **Exhibit 5**.

**RESPONSE:**

34. Xpedient had no practice for protecting its warehouses against freeze events. *See Id.* at 227:1–24 attached as **Exhibit 5**.

**RESPONSE:**

35. By December 1, 2023, Xpedient's knew the warehouse gas meter was locked. *See* Livingston Dep. 79:24–84:23, 86:13–90:10 attached as **Exhibit 6.** *See also* Updike Dep. 344:4–25 attached as **Exhibit 4**.

**RESPONSE:**

36. By December 1, 2023, Xpedient knew the warehouse lacked working heat. *See* Livingston Dep. 79:24–84:23 and 86:13–90:10 attached as **Exhibit 6**.

**RESPONSE:**

37. Between December 1, 2023 and January 17, 2024, Xpedient did not seek or receive confirmation that gas service had been restored or that the warehouse heaters were operational. *See* Updike Dep. 345:10–347:13 attached as **Exhibit 4**.

**RESPONSE:**

38. Hours before the loss, Xpedient's on-site manager Livingston told his superior Updike that the warehouse was cold, that gas was not turned on at the warehouse, and that it was snowing in Memphis. *See* Livingston Dep. 182:18–184:3 attached as **Exhibit 6**.

**RESPONSE:**

39. During the January freeze before the loss, Livingston wore his coat inside the warehouse. *See Id.* at 284:20–285:5 attached as **Exhibit 6**.

**RESPONSE:**

40. The thermostats in Xpedient's leased space were under Xpedient's control. *See* Updike Dep. 301:16–25 attached as **Exhibit 4**.

**RESPONSE:**

41. Xpedient's onsite manager could control the thermostats without Colliers' or St. Paul's approval. *See Id.* at 302:1–303:16 attached as **Exhibit 4**.

**RESPONSE:**

42. Xpedient did not deploy space heaters before the loss. *See* Haynes Dep. 247:14–248:11 attached as **Exhibit 3**. *See also* Updike Dep. 306:4–14 attached as **Exhibit 4**.

**RESPONSE:**

43. Xpedient's on-site warehouse manager Livingston did not know whether freezing weather could damage the sprinkler system. *See* Livingston Dep. 271:25–272:5 attached as **Exhibit 6**.

**RESPONSE:**

44. Xpedient's on-site warehouse manager Livingston did not know the minimum temperature needed to protect the sprinkler system. *See Id.* at 272:6–273:9 attached as **Exhibit 6**.

**RESPONSE:**

45. Xpedient's on-site warehouse manager Livingston never asked anyone about the sprinkler system before the loss. *See Id* at 273:10–12 attached as **Exhibit 6**.

**RESPONSE:**

46. Xpedient's on-site warehouse manager Livingston could not identify anyone at Xpedient responsible for understanding the sprinkler system. *See Id.* at 273:13–274:4 attached as **Exhibit 6**.

**RESPONSE:**

47. Xpedient's on-site warehouse manager Livingston did not assess whether loss of heat would affect the sprinkler system. *See Id*. at 278:21–279:10 attached as **Exhibit 6**.

**RESPONSE:**

48. Xpedient's on-site warehouse manager Livingston did not investigate whether the sprinkler system could freeze before the loss and did not contact Colliers or St. Paul about the sprinkler system before the loss. *See Id*. at 285:18–286:2 attached as **Exhibit 6**.

**RESPONSE:**

49. Xpedient's on-site warehouse manager Livingston acknowledged that water from the overhead sprinkler piping posed a hazard to Agilent's inventory. *See Id*. at 289:17–290:9 attached as **Exhibit 6**.

**RESPONSE:**

50. Xpedient's on-site warehouse manager Livingston testified he could have determined whether the sprinkler pipes contained water by calling the landlord. *See Id.* at 290:10–291:3 attached as **Exhibit 6**.

**RESPONSE:**

51. Xpedient's Operations Manager Davis understood months before the loss that the warehouse fire-protection system involved water. *See* Davis Dep. 115:8–118:6 attached as **Exhibit 5**.

**RESPONSE:**

52. Xpedient's Operations Manager Davis did not check winter weather conditions in Memphis. *See Id*. at 336:2–9 attached as **Exhibit 5**.

**RESPONSE:**

53. Xpedient's Operations Manager Davis never asked how water in the warehouse sprinkler piping was protected against freezing. *See Id*. at 341:14–22 attached as **Exhibit 5**.

**RESPONSE:**

54. Agilent asked manufacturer Labcon to help salvage the nearly 13,500 affected cases of tips on February 6, 2024. *See* Feb. 6. email, ATI_000407–408, attached hereto as **Exhibit 8**.

**RESPONSE:**

55. On March 29, 2024, Labcon expressed to Agilent its substantial doubt that the contamination risks could be sufficiently mitigated and recommended scrapping the affected Products. *See* March 29 email, ATI_00392, attached hereto as **Exhibit 9**.

**RESPONSE:**

56. Manufacturer Labcon shipped samples, explored bioburden analysis and re-sterilization, and pressed for a rework quote over a two-month period following Agilent's salvage request. *See* ATI_003301–3313 attached hereto as **Exhibit 10**.

**RESPONSE:**

57. Agilent proposed that Xpedient's maximum liability for Product Losses under Section 12(C)(c) be "the greater of: the value of the Products stored at the Facility at the time of the loss or one

million dollars ($1,000,000) per occurrence" during negotiations and Xpedient responded in redline, "Our limit is $1M". *See* XMG_2756–57 attached as **Exhibit 11**.

**RESPONSE:**

58. On March 21, 2024, Agilent requested an incident report singed by an executive member of Xpedient that included a timeline of events that predated and lead up to the incident, an explanation of the incident and its cause, and Xpedient's response and subsequent actions. *See* **Exhibit 2**.

**RESPONSE:**

59. On March 29, 2024, Xpedient sent a single page letter, omitting the timeline and stating that it "share[d] Agilent's need for answers" and was "working with the building property management company and local utility company on the timeline of events," and that it had already "initiated a claim with [its] warehouse legal liability insurance carrier." *See Id.*

**RESPONSE:**

60. Xpedient paid the vendor's invoice on January 9, 2024, which stated, "Need to come back and test system when they have the gas unlocked." *See* Livingston Dep. 87:22–88:20, and Ex. 164 attached as **Exhibit 6**.

**RESPONSE:**

Respectfully submitted,

*s/ S. Joe Welborn*

S. Joe Welborn, TN BPR No. 21747
SMITH CASHION & ORR, PLC
3100 West End Avenue
Suite 800 – One American Center
Nashville, TN 37203
(615) 742-8565 – Tel
jwelborn@smithcashion.com
*Attorney for Plaintiff Factory Mutual Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2026, I have served a true and correct copy of the foregoing pleading to the following via electronic mail:

Amber S. Finch
Margaret C. McDonald
Katherine P. Goetz
Reed Smith, LLP
515 South Flower St.
Suite 4300
Los Angeles, CA 90071
(213) 457-8000 – Tel
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan
Elena R. Mosby
Burch Porter & Johnson
130 N. Court Ave.
Memphis, TN 38103
(901) 524-5000 – Tel
dhalijan@bpjlaw.com
emosby@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

John Butler
Grant E. Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, Tennessee 37919
(865) 244 – 3945 – Tel
jbutler@bvblaw.com
gmitchell@bvblaw.com
*Attorney for Defendant Colliers Management Services – Memphis, LLC*

William P. Thomas
Andrew B. Schrack
Butler Snow, LLP
6075 Poplar Ave., Ste, 500
P.O. Box 171443
Memphis, TN 38187-1443
(901) 680-7200 – Tel
Will.Thomas@butlersnow.com
Andrew.Schrack@butlersnow.com
*Attorneys for Defendant/Cross-Plaintiff Xpedient Management Group, LLC*

Sean W. Martin
Carr Allison
633 Chestnut St.
Suite 2000
Chattanooga, TN 37450
(423) 648-9832 – Tel
swmartin@carrallison.com
*Attorneys for Defendant/Cross-Defendant St. Paul Fire and Marine Insurance Company*

*s/ S. Joe Welborn*
S. Joe Welborn