# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC.,

Plaintiff,

vs. Case No. 2:25-CV-02101-bcl-cgc

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AND COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,

Cross-Plaintiff,

vs.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Cross-Defendants.

---

(Caption continued on page 2.)

Deposition of

DIRK UPDIKE
Individually and 30(b)(6)

September 2, 2026

10:00 a.m.

Reported by:
Julie Lyle, RPR, LCR
Job No. 10199289

**Colliers had repeatedly advised Xpedient that it was responsible for Account 730? You saw that?**
A. I did see that.
**Q. Did you find those communications confusing?**
A. That process was a lot different yesterday in this group, walking him through step by step while having conversations between them and calling out unique situations, things like that.
So that was much more clear than trying to read through emails, check through chronological events, see what MLGW is saying, seeing what the landlord was saying. So that's not an apples-to-apples comparison.
**Q. But you would agree that everything, the communications and the invoices that were shown to Mr. Davis, which all were issued, say, before December 31, 2023, were all available to you?**
A. Correct.
**Q. They were all available to Xpedient, correct?**
A. Correct.
**Q. They were all available at the time of the water-intrusion event, correct?**
A. Correct.
MS. McDONALD: Okay. And I'm going to -- I'm going to mark as Exhibit 186, this is an

email exchange between you and Mr. Davis, copying Mr. Haynes, dated March 25 through March 27, 2024.

(Exhibit 186 was marked.)

BY MS. McDONALD:

**Q. And does this appear to be a true and correct copy of your email exchange?**

A. Looks to be.

**Q. Okay. And you say, on March 25th, "@Jamie Davis, can you review the below and let me know if you agree with this assessment" -- or "with assessment?"**

**Do you see that?**

A. I do.

**Q. And what was the assessment?**

A. It's what was written on the 1908. Or 19 --

**Q. 908?**

A. Sorry.

**Q. That's okay.**

A. 908 and 909.

**Q. Okay. And this is a draft email; is that correct?**

A. That is correct.

**Q. And who is this draft email to?**

A. Jamie Davis and Nate Haynes.

**Q. Well, if you look at the -- 908, it looks**

**possible?**

A. Yeah. I mean, I can't speak to how the ones in that warehouse work or to how all of them work, but that would be my understanding on how the process worked as a -- as a layman.

**Q. At least the ones where you called them dock blowers, right? They blew hot air and forced through ductwork?**

A. They blew hot air -- they blew hot air when they got turned on, correct.

**Q. And if there was no gas supplying the heat to heat the air, wouldn't -- if they turned on, they would just blow cold air, right?**

A. I don't know that for a fact. I'm not an HVAC professional.

**Q. Okay. And all of the thermostats within the leased space of Xpedient, once it took over the lease at the Cromwell warehouse, were under the exclusive control of Xpedient, correct?**

A. Can you say that again, please?

**Q. Sure. The thermostats that were in the leased space that Xpedient leased in the Cromwell warehouse were controlled by Xpedient during the term of the lease, correct?**

A. Yes, sir.

**Q. Okay. And the person that would have had the control to fix the temperature on those thermostats was Zach Livingston, correct?**

A. From, I believe, July through whenever his termination was. Prior to that, it would have been the individuals that were there before.

**Q. Okay. Yeah. Thank you for clarifying that.**

**From July 2023 when Xpedient took over the lease until -- we'll say until the event of January of 2024.**

A. Yeah. So whenever Zach got there until the event, yes, sir.

**Q. Okay.**

A. Zach -- just to clarify, Zach was not at the facility at the start-up point.

**Q. Oh, okay.**

**When did he get to the facility?**

A. I believe it was July.

**Q. Did he relocate to Memphis from somewhere?**

A. He did.

**Q. Where did he come from?**

A. Salt Lake City.

**Q. Okay. But then once he got to Memphis, did he take up permanent residence there --**

A. Yes, sir.

Q. -- from July until January of 2024?
A. I believe he was a permanent resident during that time.
Q. And so in the leased office space, when the temperature changed in 2023 from summer to winter and, therefore, you needed a change from air-conditioner to heat in that space, the person that would have switched from AC to heat would have been Zach between -- you know, in the fall of 2023, winter of 2023?
A. Yes. Yes, sir.
Q. Okay. And as far as you know, Xpedient didn't need to get approval from Colliers or St. Paul to manipulate the thermostat to a comfortable level for the space?
A. Not to my knowledge.
Q. So if I told you -- and I'll just ask you to assume that, based on historical weather data, the first night that the temperatures got below freezing in Memphis in 2023 -- in the fall of 2023 was October 30th, the day you started with Xpedient.
Would that seem like a reasonable day at least that Zach might have considered switching over to heat from AC?
MR. THOMAS: Object to form.

**Q. Do you know how tall the roof was in the Cromwell warehouse?**
A. I don't, off the top of my head.
**Q. Do you know if Zach or anyone with Xpedient employed space heaters prior to January of 2024 in the Cromwell warehouse?**
A. We did not deploy space heaters with -- inside our space before the event.
**Q. Okay. When you went there after the event on January -- when, you know, you went on that Saturday after the water event and you toured the warehouse, did you see any space heaters in the office space?**
A. I believe there was one in the office space. There was none on the warehouse floor.
**Q. Did Zach have a dedicated office in that office space?**
A. Dedicated room. It was a large room, just inside the vestibule/lunch area.
**Q. And did Xpedient build out any technology for him, computers, phones, printers, anything like that for him to work?**
A. We had a TV. We had computer -- I would say monitors were there for him, and he had a laptop.
**Q. All right. The -- I need to -- I thought I heard you say earlier that Zach's time, he -- did he**

**ask you questions as the representative of Xpedient. Okay?**
A. Understood.
**Q. So hopefully we'll streamline this.**
**You agree, don't you, that on December 1, 2023, Xpedient was aware the gas utility line serving Xpedient's leased premises at the Cromwell warehouse was locked, correct?**
A. On December 1st, 2023?
**Q. Yes.**
A. Yes, sir.
**Q. All right. You agree, don't you, that if the gas utility line serving the leased premises is locked, there's no natural gas serving the heaters in the leased premises, correct?**
A. Yes.
**Q. You agree, don't you, that if there's no natural gas serving the heaters in the leased premises, those heaters aren't heating the leased premises, correct?**
A. Correct.
**Q. So by December 1, 2023, Xpedient knew there was no operational heat in its leased premises, correct?**
A. Correct.

**Q. All right. And you agree, don't you, now that you know what went on, that Xpedient -- that there were no operational heaters in the leased premises between December 1, 2023, and January 17 of 2024, correct?**
A. December 1 of 2023, January 7 [sic], 2024.
**Q. Is that correct?**
A. Can you repeat the question? Sorry.
**Q. Yeah.**
**Xpedient agrees, doesn't it, that there were no operational heaters in its leased premises between December 1, 2023, and January 17 of 2024?**
A. By "operational," do you mean that blew heat?
**Q. That blew heat.**
A. Yes, sir.
**Q. Okay. Between December 1 of '23 and January 17 of 2024, you agree with me that Xpedient did not seek confirmation from its warehouse manager, Mr. Livingston, that the lock on the natural gas service line had been unlocked, correct?**
A. One more time, please.
**Q. Between December 1 of '23 and January 17 of '24 --**
A. Yep.
**Q. -- you agree with me, don't you, that**

Xpedient did not seek confirmation from Mr. Livingston that the lock on the gas line had been unlocked --
A. Yes, sir.
Q. -- correct?
A. Yes, sir.
Q. And Xpedient, during that time period, had not done anything to confirm with Mr. Livingston that the gas service had been established to its leased premises, correct?
A. The gas service, correct.
Q. Okay. And during that same period, December 1 to January 17, Xpedient did not receive any confirmation from Mr. Livingston that natural gas service had actually been established, correct?
A. That is correct.
Q. Okay. And prior to this loss event, Xpedient never sought confirmation from Mr. Livingston that the heaters serving the warehouse portion of the leased premises were operational; isn't that correct?
A. It's been a long day. Can you -- one more time, please, sir.
Q. Prior to the loss event --
A. Yep.

**Q. -- Xpedient never sought confirmation from Mr. Livingston that the heaters serving the warehouse portion of the leased premises were operational?**
A. That is correct.
**Q. Okay. You did not do that; Xpedient did not, correct?**
A. Not that I am aware of.
**Q. So despite knowing that there was a problem with the gas service by December 1, Xpedient took no action to verify that the problem had actually been corrected before the loss on January 17 of '24?**
A. That is correct.
**Q. All right. You were asked some questions by Mr. Martin about the impending winter weather event.**
**Prior to this loss event, Xpedient knew Memphis experienced freezing temperatures during the winter, right?**
A. Not that I am aware of.
**Q. Okay. Well, prior to this loss event at issue, Xpedient should have determined whether Memphis experienced freezing temperatures in the winter.**
**You agree with that, don't you?**
A. I would have -- I would say that you -- you

**From:** Jamie Davis <jdavis@xpedient.com>
**Sent:** Wednesday, March 27, 2024 6:56 AM
**To:** Dirk Updike <dupdike@xpedient.com>; Nate Haynes <nhaynes@xpedient.com>
**Subject:** RE: Cromwell Incident Report

Hi Dirk,

Sorry it took so long to get back to you. A lot of events and history to read through. I agree with the below and think it's a solid account of what occurred.

Thanks,

xpedient LOGISTICS

**Jamie Davis**
Director of Operations
(757) 355-2071
jdavis@xpedient.com

www.xpedient.com

Click here to book a meeting with me

**Ready to Xceed. Together.**

Visit us on

TODAY'S SAFETY CAN GUARANTEE TOMORROW'S FUTURE

**From:** Dirk Updike <dupdike@xpedient.com>
**Sent:** Monday, March 25, 2024 7:45 PM
**To:** Jamie Davis <jdavis@xpedient.com>; Nate Haynes <nhaynes@xpedient.com>
**Subject:** FW: Cromwell Incident Report

@Jamie Davis can you review the below and let me know if you agree with assessment.

Thank you,

xpedient LOGISTICS

**Dirk Updike**
Senior Director of Operations
(612) 207-3472

Dirk Updike Exhibit
**186**
J. Lyle 09.02.26

Dupdike@xpedient.com
www.xpedient.com

TODAY'S SAFETY CAN GUARANTEE TOMORROW'S FUTURE

Ready to Xceed. Together.

Visit us on

This message is intended only for the named recipients. This message may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any dissemination or copying of this message by anyone other than a named recipient is strictly prohibited. If you are not a named recipient or an employee or agent responsible for delivering this message to a named recipient, please notify us immediately, and permanently destroy this message and any copies you may have.

Hello Christy,

The below is in response to the letter received by Xpedient March 21, 2024. Please note, at this time the situation and root cause are still under investigation. Below are the details that we know at this time incorporated in the requested timeline format.

1. Xpedient Logistics procured facility located at 4601 Cromwell Ave in May 2023. At that time, we reached out to Colliers to get utilities transferred to Xpedient.
2. June 2024 - Colliers informed Xpedient all utilities had been transferred after Colliers spoke with MLGW.
3. July 2023 - Colliers communicated to Xpedient they would be splitting the gas line to add a second meter so Xpedient would have an independent meter. Prior to split, it was one meter for the whole facility (Xpedient only leases a portion of the facility.
    a. Gas was capped, turned off and locked during the split process.
        i. Gas was not turned back on upon completion.
4. October 2023 - Xpedient received a cut off notice to utilities.
    a. Xpedient reached out to Landlord for support.
    b. Colliers formally requested to move utilities back to Colliers when speaking with MLGW.
5. October 2023 - Xpedient reached out to MLGW to discuss cut off notice and was informed by MLGW it was a mistake. MLGW assured Xpedient that utilities would not be turned off and if they would, a representative would reach out before any services were turned off.
6. December 2023 - Xpedient worked with HVAC provider to see if they could support in setting up the gas service.
7. January 17th, 2024 around 9 PM Xpedient was made aware we had a water line leak within facility.
    a. Both domestic and sprinkler lines had frozen and burst. The pressure from the water freezing lead to water leaking out over product and flooding the office.
8. January 18th, 2024 Xpedient reached out to MLGW and Landlord to discuss the situation and how to get gas on within the facility.
9. January 2024 – Xpedient called Colliers and MLGW several times to get guidance on how to get gas line unlocked. Many times, met with little to no information from MLGW.
10. February 2024 - Xpedient after several conversations with the Landlord, HVAC provider and MLGW was given instructions of how to move forward. At that time, Xpedient went through the following processes per requirements from MLGW.
    a. Pressure Test
    b. Permit Shelby County

   c. Green Tagged for approval
   d. Permit Submission to MLGW
   e. Formal request MLGW to unlock gas line
11. February 2024 - Xpedient sent Continuous Improvement Manager to Memphis to setup process for sort, segregations and reporting to Agilent.
12. On February 26th, 2024, Xpedient contacted MLGW requesting gas to be unlocked after completing required steps. Steps that were completed months ago as well.
    a. MLGW stated on phone they would have someone out same day.
13. Service was not completed on February 26th, 2024. Xpedient then proceeded to call and follow up weekly. Xpedient has also reached out to Colliers to see if they can support with getting MLGW out to site. Xpedient has inquired about expedited service with MLGW and been told that service is not offered and that the department responsible is "understaffed and busy."
14. March 2024 (Current) – Gas is not unlocked at facility. Xpedient has hired legal team to help support reaching out to MLGW to unlock gas line. Xpedient has also reached out to the Memphis area Vice President of Property Management at Colliers.

Below are the items that have been completed post incident.

1. Sprinkler system fully repaired.
2. Domestic water fully repaired.
3. Ceiling fully replaced.
4. Bottom of drywall removed and replaced.
5. Office painted.
6. Lighting will be repaired week of 3/25/2024.
7. Humified has been placed in facility.
8. Space heaters on site for if/when the facility gets cold per direction of Colliers.
9. Moved all pallets per Agilent request.
10. Initial sort completed on damaged pallets as requested by Agilent.
11. Floor of warehouse has been cleaned with scrubber.
12. Mold test completed and submitted per Agilent request.
13. Team of 8-10 temps on site daily for sort and segregation.
14. Xpedient supplying sort information to Agilent daily.

Please note, in response to your question regarding winterization of the sprinkler system, Xpedient is not aware of actions taken to winterize the sprinkler system.

Thank you,

xpedient LOGISTICS

**Dirk Updike**
Senior Director of Operations
(612) 207-3472
Dupdike@xpedient.com
www.xpedient.com

TODAY'S SAFETY CAN GUARANTEE TOMORROW'S FUTURE

**Ready to Xceed. Together.**

Visit us on

This message is intended only for the named recipients. This message may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any dissemination or copying of this message by anyone other than a named recipient is strictly prohibited. If you are not a named recipient or an employee or agent responsible for delivering this message to a named recipient, please notify us immediately, and permanently destroy this message and any copies you may have.