# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC.,

Plaintiff,

vs. Case No. 2:25-CV-02101-bcl-cgc

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AND COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,

Cross-Plaintiff,

vs.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Cross-Defendants.

---

(Caption continued on page 2.)

Deposition of

JAMIE DAVIS
Individually and 30(b)(6)

September 1, 2026

10:00 a.m.

Reported by:
Julie Lyle, RPR, LCR
Job No. 10199288

BY MS. McDONALD:
**Q. Okay. But to your understanding, because this roof work was going on, it didn't make any sense to hire an HVAC vendor to do any preventative maintenance work of the HVAC systems, correct, in 2023?**
A. Until the HVAC system was up and running, it didn't make any sense to do a PM on it.
**Q. Okay. And, to your recollection, when was the HVAC system up and running?**
A. I believe mid-October.
**Q. Okay. And you mentioned vendors as being something on the start-up list.**
**Would vendors include utility companies?**
A. In some cases, yeah.
**Q. Okay. At the Cromwell warehouse, to your recollection, was Xpedient responsible for setting up any utilities for the facility?**
A. The PMs for sure and the utility transfer.
**Q. When you say "the PMs," you're referring to the preventative maintenance of the HVAC systems?**
A. Correct.
**Q. And then your testimony is that Xpedient was also responsible for the utility transfers?**
A. To transfer the accounts.

**Q. Okay. And who was responsible for transferring the accounts from the landlord to Xpedient?**
A. In this case?
**Q. Uh-huh.**
A. I was.
**Q. Okay. And the landlord was St. Paul Fire and Marine Insurance Company; is that correct?**
A. So at the time I would have -- I would have said Colliers.
**Q. Okay. But Colliers is St. Paul's property manager; is that correct? Is that what you've now learned?**
A. That's -- correct. Now I understand how they're tied.
**Q. Yeah. But for practical purposes, you saw Colliers as kind of the face of the landlord. Is that accurate?**
A. Yes.
**Q. Okay. And then how are your job responsibilities changing in this transition from director of operations to director of risk management and safety?**
A. Well, I think I'll keep a lot of the same responsibilities, minus the customer interaction.

Looking at this, there's -- there's some things that kind of look familiar and then stuff that I am fairly certain I've never seen.

BY MS. McDONALD:

**Q. Okay. And as a director of operations in 2023, did you have any responsibility to review the lease agreement to ensure the landlord was complying with its terms?**

A. Maybe -- maybe portions of it.

**Q. Okay. What -- like just give me the categories of the kind of portions that you would be responsible for.**

A. I would say things like rent amount. You know, I'd have to read through this whole thing. There's a lot in here that I would -- that would have -- that I wouldn't necessarily need to understand.

**Q. What about, say, facility systems such as the HVAC system?**

A. For that, it was my understanding that we were responsible for -- make sure we had PMs in place. Same thing, that we were taking care of the building in a responsible way, meaning, you know, not damaging walls. I want to say common sense things, but --

**Q. Okay.**
A. Leave it the way we came into it.
**Q. And having PMs in place, that would be a preventative maintenance contract with like an HVAC vendor, for example?**
A. Correct.
**Q. And that would be something that you would normally put in place at the start of taking over operations at a new facility?**
A. Correct.
**Q. Okay. And then were you involved at all in identifying the Cromwell warehouse as a potential facility for Agilent's inventory?**
A. No.
**Q. Okay. So is it accurate, too, by the time you started at the Cromwell warehouse in May of 2023, that the -- let me rephrase the question.**
**So by the time you became aware of Agilent and the Cromwell warehouse, it had already been decided this would be the facility to store Agilent's inventory; is that correct?**
A. It had already been decided?
MR. THOMAS: Are you asking him company knowledge or his knowledge?
MS. McDONALD: His knowledge.

THE WITNESS: I -- if I did, I can't remember. I'm not sure.
BY MS. McDONALD:
**Q. Okay. But you have no recollection of seeing it before; is that correct?**
A. I don't.
MS. McDONALD: Okay. And if we go -- this might be a good time to take a break.
MR. THOMAS: Okay. For lunch?
MS. McDONALD: Yeah.
(A lunch break was taken.)
BY MS. McDONALD:
**Q. Before we went off the record, we were talking about the HVAC system at the Cromwell warehouse, and you had testified that Xpedient did not undertake preventative maintenance of that system or systems when it first occupied the Cromwell warehouse; is that correct?**
A. We attempted to, but we couldn't because of the repairs that were being done.
**Q. And when you say you attempted to, did you actually contact an HVAC vendor to come out?**
A. Maybe. I'm not 100 percent sure. I know that I -- there was a lot of back-and-forth with me and Shellie on whether or not the work was done.

**Q. Okay. But you knew at the start of Xpedient's lease at the Cromwell warehouse that the HVAC system was not in good working order, correct?**
A. Correct. It -- yes, it prevented us from doing that. Yep.
**Q. Did you communicate that to Agilent?**
A. I don't believe so.
**Q. Okay. Do you know if anyone from Xpedient did?**
A. Not that I'm aware of.
**Q. Okay.**
MS. McDONALD: And then I'm going to introduce as Exhibit 156 --
MR. THOMAS: No, 157.
MS. McDONALD: 157. Okay.
(Exhibit 157 was marked.)
BY MS. McDONALD:
**Q. So this is a document that was produced by Xpedient in this action bearing Bates Number XMG2808 to 2812.**
**And does this appear to be a true and correct copy of your email -- your May 24, 2023, email to David Hare at Agilent, and you're attaching what's titled the "Xpedient Memphis Day 3 PowerPoint"?**
A. Yes.

them transfer a single account ending in 730 for Suite 10 at the Cromwell warehouse into Xpedient's name?
A. I do.
Q. Okay. And if you look, she then -- Ms. Edmonds then provides the MLGW Business Solutions Center number.
Do you see that?
A. Yes, I do.
Q. And did you call MLGW care/of their Business Solutions Center and ask them to transfer the account ending in 730 into Xpedient's name?
A. I did.
Q. And do you recall when you called MLGW?
A. Not the exact date, but I'm -- I'm assuming I would have done it within a couple days of this --
Q. Okay.
A. -- I think.
Q. And it was your responsibility, correct, to transfer the account into Xpedient's name?
A. Yes. Yeah.
Q. Okay. And when you called MLGW, did you request that this -- did you request that any other accounts be transferred into Xpedient's name?
MR. THOMAS: Object to form.

**in 2023, bill Xpedient for its share of the water usage at the Cromwell warehouse?**
A. I don't recall.
**Q. Do you recall ever having any conversations with anyone at Colliers about bills relating to water usage?**
A. For water usage, no.
**Q. Okay. And then I'm going to hand you what was previously marked as Exhibit 172.**
MR. THOMAS: You mean 72?
MS. McDONALD: Yeah, 72. I'm sorry. 72.
BY MS. McDONALD:
**Q. And I'll represent that this is a transcript of your May 24, 2023, call with the Business Solutions Center at MLGW, and this transcript was prepared by your counsel based on an audio recording produced by MLGW.**
A. Okay.
**Q. And then if -- so if you look at the -- the bottom half of the second page -- actually, let's start at the top.**
**So it says that MLGW rep says, "May I have the service address that you're calling about, please?"**

And then you identified the Cromwell warehouse, correct? Do you see that?
A. Correct. Yep.
Q. And then further down, the MLGW rep says, "So at 4601 Cromwell, we have one property that has water service only, and then we have one that just has fire protection only, and then we have a Unit 1 that has electric and gas, and then we have a separate location that has electric as well."
And then the rep asked, "So do you want all four locations?"
And then you say, "Can I give you an account number that it's currently on? Would that help?"
And the MLGW rep says, "Sure."
And then a little further down, you give them the account number ending in 730, correct?
A. That's correct.
Q. And then the rep says, "That's the only one that you want, just that one?"
And then you say, "Well, now you got me kind of curious. So what is on that?"
And the MLGW rep responds, "Electric only."
And then you say, "So we definitely want that one transferred to our name, but we're also going to need everything else you just mentioned. So water."

**And then the MLG rep responds, "So you want all four of those locations? Because all four of those locations are under that customer number."**
**And then you say, "Yeah, that should all go to us now. Yeah, that's correct."**
**And then the rep says, "What's the name that you're putting the service in?"**
**And then you say, "Xpedient," correct?**
A. Correct.
**Q. Okay. And does that refresh your recollection about how the four accounts got transferred into Xpedient's name?**
A. Uh-huh. Yeah. That's pretty much what I remember.
**Q. Okay. But, to your recollection, you never advised Colliers after this fact that you had, in fact, transferred four accounts, not just the account ending in 730 into Xpedient's name?**
MR. THOMAS: Object to form.
THE WITNESS: I don't recall.
BY MS. McDONALD:
**Q. Okay. And it says, if you look -- so the MLGW rep identified that one account was for water service.**
**Do you see that?**

A. Uhm-uhm.
**Q. And then another one was for fire protection.**
**Did you understand that to be water for the sprinkler system?**
A. Yeah. At the time I would have thought, okay, well, that's -- that's water.
**Q. Okay. And did you tell anyone at Xpedient that there were four accounts in Xpedient's name associated with the Cromwell warehouse?**
A. I don't believe I did.
**Q. Okay.**
A. Not -- not at this point, I didn't.
**Q. Okay. Did you tell them later?**
A. Yes.
**Q. Okay. And then I'm going to hand you what was previously marked as Exhibit 149.**
**And this is a document that was produced by Colliers in this action bearing Bates Number Colliers 03919. And just take a moment to look it over.**
**Does it appear to be a true and correct copy of your May 23, 2023, through July 10, 2023, email exchange with Jessica Edmonds? And the first part of this is -- it's a continuation of that conversation we were just looking at?**

whole building.
MS. McDONALD: Okay. And I'm going to mark at -- oh, sorry. Let me see about those.
MR. THOMAS: 163?
MS. McDONALD: 163. Thank you.
(Exhibit 163 was marked.)
BY MS. McDONALD:
**Q. And does this appear to be a true and correct copy of your November 15, 2023, email exchange with Mr. Livingston?**
A. Yes, it is.
**Q. Okay. And on November 15, 2023, you wrote to him asking, "Where are you with getting the HVAC looked at in Memphis"?**
**Do you see that?**
A. Yeah, I do.
**Q. And that's referring to the Cromwell warehouse, correct?**
A. Correct.
**Q. And the purpose of this HVAC inspection was to do that preventative maintenance work that we had discussed about at the beginning, right? That's part of the start-up process at any new facility that Xpedient takes over?**
A. That's correct.

BY MS. McDONALD:
**Q. -- correct?**
A. Yeah. It's water that's leaking from the roof, and he's asking, "Were any cartons damaged?"
**Q. From that water leaking from the roof, correct?**
A. Correct.
**Q. Okay. And then you respond to his email on the same day, and you say in the second paragraph, "The thunderstorm was very heavy, and we didn't know there was a leak until that morning."**
**You weren't in Memphis at that time, correct?**
A. No, I wasn't.
**Q. How did you know what the weather was?**
A. It had to have been a phone conversation with Zach.
**Q. Okay.**
A. I believe.
**Q. So was -- and Zach was living in Memphis at the time, correct?**
A. He was.
**Q. Okay. And as part of being the on-site manager, was Mr. Livingston responsible for monitoring weather conditions in the area?**
MR. THOMAS: Object to form.

THE WITNESS: No. I mean, no. I would say no, not really.
BY MS. McDONALD:
**Q. Did anyone at Xpedient have responsibility for monitoring weather conditions that might affect the Cromwell warehouse and the operations at it?**
A. At this time, no. Yeah, no.
**Q. At a later time?**
A. Yes, certain things. Fires, right? We had a fire come close to a building.
**Q. Was that in California?**
A. Yeah. That's something that they brought to our attention.
**Q. Who's "they"?**
A. Whoever the manager was at the site.
**Q. Okay. So certain Xpedient managers will monitor for weather conditions, but it's not a requirement of them, is that correct, in 2023?**
A. At that time -- at that time, yeah, it wouldn't be certain managers. I think it would maybe be certain circumstances.
**Q. Is Xpedient's practice now, to your understanding, to have on-site managers monitor for weather conditions that might impact the facility and its operations?**

A. I'm guessing.
**Q. It's a guess, so we'll just leave it at that.**
**And have you ever discussed any weather preparedness for the Cromwell warehouse with Mr. Livingston?**
A. No.
**Q. Had you implemented any weather preparedness practices at the Cromwell warehouse?**
A. No.
**Q. To your understanding, was it Xpedient's practice at this time to assess a facility's weather preparedness?**
A. No.
**Q. What about now?**
A. I think it would depend on where it's at, again, geographically. We may have -- you know, if -- if it were land in Florida, as an example, we would probably draw up some sort of hurricane -- right? -- preparedness plan.
If we were operating in Kansas, we'd definitely have a tornado plan, right? I mean, there's -- it just depends on where you're at.
**Q. Okay. But that's something that Xpedient has implemented after this event, correct?**
A. No. I mean, like Chicago, I believe, we had

**As the director of operations at Xpedient in 2023, did you have any understanding that severe, say, freeze events could present a risk to a warehouse facility?**

A. In Memphis?

**Q. Anywhere.**

A. No, no. I think I would be more concerned about employees getting to work, blizzard conditions, things like that, keep them safe.

**Q. Okay. But not -- no concerns about the facility itself in response to a freeze event?**

A. No.

**Q. But it was also -- at that time, to your understanding, Xpedient didn't have any practice in place to ensure its warehouse facilities were protected from freeze events, correct?**

MR. THOMAS: To his knowledge?

MS. McDONALD: To his knowledge. To his knowledge.

MR. THOMAS: Okay.

THE WITNESS: Not -- yeah, not just with Xpedient, but my entire career, that's -- with several companies, that's not a -- that's not something that's ever came up.

/ /

Q. So you were working together to oversee Xpedient's operations at that warehouse; is that right?
A. That's correct.
Q. And I specifically -- when I ask you questions today, I'm specifically interested in the time period between June 1 of 2023 -- okay? --
A. Okay.
Q. -- and January 17th of 2024, okay?
A. Okay.
Q. And I'm going to refer to that as "the relevant time period," okay?
A. Okay.
Q. All right. So you would agree with me, wouldn't you, that during the relevant time period, as director of operations for Xpedient, you should have been aware of what building systems in that warehouse were or were not operational, correct?
MR. THOMAS: Object to form.
THE WITNESS: I -- yes, I think I was.
BY MR. WELBORN:
Q. Okay. So you agree with me, then, that you should have been aware and your testimony is you were aware, correct?
A. Correct.

**Q. But the reality is that you were not aware that the heat didn't work, correct? That's what you've testified here to today, correct?**
A. Correct.
**Q. But Mr. --**
A. After the fact, yes, I learned that.
**Q. Okay. You became aware of that after the fact?**
A. Uhm-uhm.
**Q. But let's make sure that we're clear on this.**
**At no point in time during the relevant time period did the heat work in the warehouse. You agree with that, don't you?**
A. Yes.
**Q. Okay. And you became aware of that, as you've testified today, for the first time after the loss event, right?**
A. Correct.
**Q. And was it Mr. Livingston that told you that the heat wasn't working?**
A. I can't recall who told me the heat wasn't working. I don't know if it was him specifically.
**Q. All right. But we know from the documents that we've gone over today that -- and I can pull them out and refer them to you, but we've seen an**

email from you to Mr. Livingston, which is Exhibit 163, where you wrote to Mr. Livingston on November 15th of 2023, "Where are we with getting the HVAC system looked at in Memphis?"
Do you remember that email?
A. Yes.
Q. Okay. So as of November 15th of 2023, you at least had a question that the HVAC in that building needed to be looked at, correct?
A. It needed PMs.
Q. It needed PMs?
A. Uhm-uhm.
Q. Okay. And he responded to you, "I've got Crowe coming out tomorrow."
And you responded, "Awesome. Thanks, Zach."
Okay. So that's November 15 of 2023, right?
A. That's correct. Yep, that's correct.
Q. Then we also went over an exhibit today, Exhibit 164, which was an email from Crowe Services attaching an invoice for the work that they did on November 16, correct?
A. Correct.
Q. Okay. And the email and the invoice reference and state that the gas is unlocked, correct? That we need to get the gas unlocked,

**meaning it's locked, right?**
A. Which one? Sorry. I want to look at it.
**Q. I'm on Exhibit 164.**
**And -- and you agree with me that Crowe tells Mr. Livingston, "Let us know if we need to come back out when the gas is unlocked," right?**
A. That's correct.
**Q. Okay. So then you agree that Mr. Livingston certainly knew that the gas was locked at the building, correct, on December -- as of December 1, right?**
A. Correct. They sent this email on December 1st, that's correct.
**Q. But you've also testified that Mr. Livingston didn't tell you about that email, correct?**
A. That's correct.
**Q. And you've also testified that he didn't tell you that the heat didn't work, correct?**
A. That's correct.
**Q. Well, you agree with me that Mr. Livingston should have told you that the heat wasn't working in the warehouse, right?**
MR. THOMAS: Object to form.
MR. WELBORN: What's the basis of the objection? I'm asking his opinion as to what

Mr. Livingston should have told him, and it's based upon his 20-plus years of operating warehouses.
BY MR. WELBORN:
**Q. So, again, I'll ask the question.**
**You agree with me, don't you, sir, that Mr. Livingston, when he was made aware on December 1 via an email that the gas needed to be unlocked, that he should have told you that, correct?**
A. Yes.
**Q. And he should have also told you that the heat wasn't working in the warehouse prior to this loss event, correct?**
A. I don't know that I agree with that.
**Q. Well, why not? Why do you not agree with that statement -- or that question?**
A. I can't tell you what was in his head. I can't tell you that --
**Q. Well, I'm not asking you to tell me what was in his head. I'm asking you to tell me, do you agree that he should have told you that the heat wasn't on?**
**It's your -- I want to know what you think.**
A. If -- you're asking me what I would have done?
**Q. Yeah. What would you have done?**

BY MR. WELBORN:
**Q. Well, if you had been Zach, would you have just sat there and done nothing, or would you have contacted someone to come get the gas unlocked?**
MR. THOMAS: Object to form.
THE WITNESS: I think I would have done something.
BY MR. WELBORN:
**Q. As you sit here today, do you know what, if any, actions Mr. Livingston took, as his superior, before this freeze event on January 17th, 2024, to protect Agilent's inventory?**
A. No, I don't.
**Q. And you would agree with me, wouldn't you, that this -- the sprinkler pipes freezing and bursting -- and you've said you saw the water; it looked like snow on the video.**
A. Uhm-uhm.
**Q. That -- that event didn't occur because the heat just quit the day before the event, right?**
MR. THOMAS: Object to form.
BY MR. WELBORN:
**Q. This was not a situation where the heat just stopped working like a day before the loss event; the heat had not been working for months, correct?**

A. Well, are you asking me now or are you asking
me --
**Q. No. I'm asking you now.**
A. -- at the time?
**Q. No, I want to ask you now. I'm asking you to either agree with me or not agree with me with that question.**
A. Now that we've learned there was no heat, it makes sense.
**Q. So it wasn't like an emergency surprise thing that happened. Xpedient knew that the heat didn't work. We know that now, correct?**
A. Now we do. At the time we didn't.
**Q. Now, I want to ask you about the -- you were asked some questions earlier about the sprinkler system and the weather --**
A. Okay.
**Q. -- and you tell me if I'm wrong.**
**It sounds like, to me, that you really didn't care what the weather was like in Memphis in the winter.**
**Do you agree with that statement?**
MR. THOMAS: Objection.
THE WITNESS: I did not realize that it got nearly that cold in Memphis at any time.

BY MR. WELBORN:
**Q. So at no point in time, as the director of operations for Xpedient operating a warehouse in Memphis, Tennessee, during the relevant time period, did you ever check to see what the weather gets like in the winter months in Memphis?**
A. No.
**Q. Not once?**
A. No.
**Q. And you -- you knew that the leased premises in the Cromwell warehouse had a sprinkler system in it, correct?**
A. That it was in the lease or that the warehouse had a sprinkler system?
**Q. That it had it.**
A. I knew that it had a sprinkler system.
**Q. You knew that it had it?**
A. Sure.
**Q. But I believe you testified that you didn't know whether it was water-based or something like that.**
**Is that your testimony?**
A. Yeah. I didn't know what type of sprinkler system it was, no.
**Q. Okay. Well, you would agree with me it**

**testifying about the sprinklers at the other**
**warehouses that had -- like they were controlled**
**temperature, refrigerated warehouses, that you had**
**assumed that they had something in them, antifreeze**
**or something in them to prevent them from --**
A. There's -- there's one specific warehouse
where I worked, and it was in Hutchinson, Kansas,
frozen, that I asked the question, How does it -- it
was an ice cream room. It was negative
25 degrees -- how do those not freeze? And it was
ran off of a specialized ammonia system.
It was like, Oh, okay. That's different.
**Q. All right. That's good to know.**
**But here you didn't ask -- it sounds like ask**
**anyone, Well, how do these pipes not freeze if it**
**gets below freezing in this warehouse, did you?**
A. No, I did not.
**Q. In hindsight, don't you think you should have**
**asked that question?**
A. Yeah. If I had to relive this all over
again, that would definitely be a question I would
ask.
MR. WELBORN: Okay. That's all the
questions I have for you. Thank you.
MR. THOMAS: I think Brittany has some

**From:** Jamie Davis <jdavis@xpedient.com>
**Sent:** Wednesday, November 15, 2023 6:16 PM
**To:** Zachary Livingston <zlivingston@xpedient.com>
**Subject:** Re: HVAC

---

Awesome thanks Zach!

Get Outlook for iOS

---

**From:** Zachary Livingston <zlivingston@xpedient.com>
**Sent:** Wednesday, November 15, 2023 2:51:50 PM
**To:** Jamie Davis <jdavis@xpedient.com>
**Subject:** Re: HVAC

I got crowe HVAC coming tomorrow from 9-12
\

xpedient LOGISTICS

**Zachary Livingston**
Safety Manager
(801) 441-9790
zlivingston@xpedient.com

www.xpedient.com

Ready to Xceed. Together.

Visit us on

This message is intended only for the named recipients. This message may contain information that is privileged, confidential or exempt from disclosure under applicable law. Any dissemination or copying of this message by anyone other than a named recipient is strictly prohibited. If you are not a named recipient or an employee or agent responsible for delivering this message to a named recipient, please notify us immediately, and permanently destroy this message and any copies you may have.

---

**From:** Jamie Davis <jdavis@xpedient.com>
**Sent:** Wednesday, November 15, 2023 2:10 PM
**To:** Zachary Livingston <zlivingston@xpedient.com>
**Subject:** HVAC

Zach,

Where are we with getting the HVAC looked at in Memphis?

xpedient LOGISTICS

**Jamie Davis**
Director of Operations
(757) 355-2071
jdavis@xpedient.com

www.xpedient.com

Click here to book a meeting with me

**Ready to Xceed. Together.**

Visit us on