# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC. )
Plaintiff, ) Case No.
vs. ) 2:25-CV-02101
XPEDIENT MANAGEMENT ) (BCL)(CGC)
GROUP, LLC, et al., )
Defendants. )

------------------------------------------------------------

XPEDIENT MANAGEMENT GROUP, )
LLC, )
Cross-Plaintiff, )
vs. )
ST. PAUL FIRE AND MARINE )
INSURANCE COMPANY and )
COLLIERS MANAGEMENT )
SERVICES - MEMPHIS, LLC, )
Cross-Defendants. )

---

ORAL AND VIDEOTAPED DEPOSITION OF
ZACHARY LIVINGSTON
September 16, 2026

Reported By: SUSAN ASHE, CER
Job No.: 10200460

**And what Xpedient personnel were on-site when you visited the warehouse in July of 2023?**

A. I just remember Ernie Neumann being there.

**Q. And to your understanding, is Mr. Neumann still with Xpedient?**

A. I don't know.

**Q. Okay. Was he with the company in -- as of February 2026, when you left?**

A. I can't answer that. I hadn't seen him.

I don't remember talking to him for several months or whatever, so I don't know if he was still there or not at that time.

**Q. Okay. And what was the purpose of that first visit?**

A. See if I liked it and I wanted to move to Memphis.

**Q. And when you say to see if you liked it, do you mean see if you liked --**

A. The area.

**Q. -- Memphis?**

A. Yeah.

**Q. Okay. To see if you wanted to relocate there?**

A. Um-hum.

**Q. And that wasn't particular to the Cromwell**

**warehouse, but more about the city itself. Is that correct?**

A. Correct.

**Q. Okay.**

A. I was only at that warehouse very short period of time.

**Q. Well, it's accurate you were at the warehouse from approximately August 2023 until about February 2026. Is that correct?**

MR. THOMAS: I think he was referring to his time in July.

WITNESS: Correct.

**Q. Ah. I see. Thank you. I misunderstood your statement.**

A. Yeah.

**Q. Okay. And how long was that visit in July?**

A. About 10, 15 minutes.

**Q. To the warehouse itself?**

A. Yes.

**Q. Okay. And then the rest of the time was spent just exploring Memphis?**

A. Checking neighborhoods out, yeah.

**Q. Okay. So it was a pretty quick walk-through, then, of the warehouse itself?**

A. I mean, I didn't even walk through the whole place, really.

**Q. Okay.**

A. I walked in, said hi, kind of stood at the door and looked, and then left, when I'm -- not anything too detailed from that.

**Q. Okay. So no one from Xpedient walked you through or -- and said anything about, say, the condition of the warehouse or what still needed to be done?**

A. No.

**Q. Okay.**

A. Not at that time, no.

**Q. Were there any substantive discussions about the warehouse itself or the inventory at that point?**

A. No. Just that it's moving right along.

**Q. Okay. And when you returned permanently to the warehouse, say, from August 14, 2023, was there any information that you were provided by Xpedient personnel about items or tasks that still needed to be completed, related to the warehouse itself?**

MR. THOMAS: Object to form.

A. I mean, as far as the orders and

everything that needed to get done?
I mean, just telling me about the workflow, basically, how many trucks to expect and talking about capacity issues. I remember that.
**Q. Okay. And outside of inventory, were you given a task list or any items that still needed to be completed in relation to the warehouse itself, such as, say, getting a preventative maintenance agreement in place for the HVAC system?**
A. Well --
MR. THOMAS: Object to form.
A. What was first discussed was the construction for the dock plates, because they were installing automatic dock plates. And so, there needed to be some construction work done.
And then after that, to start setting up preventative maintenance plans.
**Q. Okay. And were you responsible for setting up the preventative maintenance plans?**
A. I was given the task to set up preventative maintenance, yes, on the dock plates, dock and dock doors, and the -- like you mentioned, the HVAC system.
**Q. And when were you given the task to set up a preventative maintenance plan for the HVAC system?**

A. It was after the dock plates were installed. So I'm not 100% sure on the timeline on that.

The construction part was something that was more of a focus on at that time, right when I got there.

**Q. Do you recall if you were tasked with getting a preventative maintenance plan in place for the HVAC system, say, by September 2023?**

A. No.

MR. THOMAS: Object to form.

A. There was -- again, I'm not sure on what the timeline was for that.

**Q. Okay. Do you think it was later than that?**

A. I don't think there even was a timeline. I think it was just -- might have been an item. Once the dock plates and everything are installed, that we set up preventative maintenance.

We weren't sure on how long the construction was going to take, so it was just an item listed. There wasn't a deadline or anything like that.

**Q. And when was that dock work completed, to your recollection?**

A. I don't recall.

**Q. And why was setting up a preventative maintenance plan for the HVAC system tethered to the dock work?**

A. Well, just from my experience, setting up preventative maintenance is you would do dock plates and dock doors. By -- and then, you know, we would need to do HVAC as well.

So as soon as the dock plates and everything were done, the matter of preventative maintenance was -- was brought up.

And you know, then, you know, we -- it was brought to my knowledge to set up preventative maintenance plan for HVAC.

**Q. But there was nothing that prevented a, say, HVAC preventative maintenance plan being put in place before the dock plates and doors work was completed. Correct?**

A. Um-um.

**Q. Is that --**

A. No.

**Q. -- a no?**

A. I don't believe so.

**Q. Okay. And do you recall who tasked you with setting up a preventative maintenance plan for**

**Q. Before November?**
A. Before December of '23.
**Q. Understood.**
**Do you recall if it was before November of '23?**
A. No.
**Q. Okay. And when you returned to the Cromwell warehouse in August of 2023, did you test out the HVAC system?**
A. No.
**Q. Did you have any understanding of whether there was multiple HVAC systems at the Cromwell warehouse, or a single system?**
A. No.
**Q. Okay. Did you attempt to turn on any HVAC system or heating system at the Cromwell warehouse prior to the water intrusion event?**
A. No.
**Q. Why not?**
A. Because there wasn't a need for me to even use anything in the HVAC. The temperature was fine.
And then by the time I had arranged a third party to look at it -- you know, I realized that there needed to be some extra work done on it.
So I never really needed to test it

myself. I had a third party do it.

**Q. Okay. And when you say you realized there needed to be worked on, what do you mean by that?**

A. In November, I had Crowe Heating & Air take a look at it. And -- yeah, they said they couldn't do it.

**Q. And why couldn't they do it?**

A. They said there was an issue with the meter.

**Q. And what was the issue with the meter?**

A. That there was a lock on it and they couldn't turn it on.

**Q. Okay. And did they point out the locked meter to you?**

A. No.

**Q. Were you there when they inspected the HVAC systems?**

A. Yes.

**Q. Okay. And did they tell you in person that the meter was locked?**

A. I don't recall.

**Q. When do you recall learning that the meter was locked?**

A. It was on my invoice.

MS. McDONALD: Okay. And I'm

going to hand you what was previously marked as Exhibit 164. If you could just take a moment to look it over.

(Whereupon, Plaintiff Exhibit 164, previously marked, was presented to the witness.)

MR. THOMAS: Do you have any extra copies?

MS. McDONALD: There should be multiple.

MR. THOMAS: Oh, okay.

MS. McDONALD: Sorry. It should be three there.

MR. THOMAS: Take one, Zach, and hand me the others.

WITNESS: Oh, I'm sorry. I didn't realize there was two.

(Witness reading.)

A. Yeah.

**Q. Is this the invoice you're referring to?**

A. Yes.

**Q. Okay. And they emailed this to you on December 1, 2023?**

A. Correct.

**Q. Okay. And then that first sentence says:**

**Let us know if we need to**

come back out when the gas is unlocked.

Do you see that?

A. Yes.

Q. Okay. And then if you turn the page, it's attaching the invoice. Is that right?

A. Yes.

Q. And then under "Description of Work," it says:

Need to come back and test system when they have the gas unlocked.

Do you see that?

A. Yes.

Q. And when it says "when they have the gas unlocked," did you understand that to mean when Xpedient got the gas unlocked?

A. Just that the meter had to be unlocked.

Q. Okay. And do you know whose responsibility it was to get the meter unlocked?

A. No.

Q. Okay. And did you forward this invoice to anyone at Xpedient?

A. It was part of our invento- -- or our invoice approval system.

MR. BUTLER: I'm sorry.
WITNESS: It was a part of our invoice approval system.
**Q. Okay. And how -- how would it be submitted to part of your invoice approval system?**
A. They would forward this to accounting.
**Q. You would forward it to accounting. Is that correct?**
A. I don't know if I did or they did, but it would have gotten forward to accounting at Xpedient.
**Q. And when you say "they," are you referring to Crowe or someone else?**
A. Crowe.
**Q. Okay. Did you instruct Crowe to forward it to Xpedient's accounting department?**
A. I don't remember.
**Q. Okay. And did you discuss the gas meter being locked with anyone at Xpedient --**
A. I don't remember.
**Q. -- at this time?**
A. I don't remember, at this time.
**Q. Do you recall if you raised the issue to Jamie Davis?**
MR. THOMAS: Object to form.
A. I don't recall.

A. Yeah, this looks familiar.
Q. Okay. And then on December 27, 2023, Tammy Griffin wrote to you and said:
Good morning, Zach.
We would like to schedule a visit on Friday to have the pallets that require placards attached. Will you be there normal hours Friday?
Do you see that?
A. Um-hum.
Q. And you responded:
Yes. 7 a.m. until 4 p.m.
Is that correct?
A. Yes.
Q. And Mr. Shipp responded on that same date, saying:
Is this the new time or just for Friday?
Do you see that?
A. Yes.
Q. And you said:
Eric, this is the time going forward.
And you ask:

**Can we still confirm meeting dates in the future as well?**

**Do you see that?**

A. Yes.

**Q. So why did the schedule change from 8 a.m. to 4:30, from 7 to 4 p.m.?**

A. It got dark at 4:30. I don't like being -- leaving downtown Memphis in the dark.

**Q. So it was your decision to move the schedule forward?**

A. Yes.

**Q. Did you consult with anyone at Xpedient about the change in the schedule?**

A. I don't remember if I did.

**Q. Okay. And you asked that Agilent still confirm meeting dates in the future as well. Is that correct?**

A. Correct.

**Q. Okay. And that was to enable you, if needed, to work from home that day or otherwise manage your appointments. Is that correct?**

A. Well, yeah. It's good standard practice to have scheduled -- scheduled deliveries.

**Q. Okay. And that 7 a.m. to 4 p.m. time,**

**it's your testimony that was just times that you came up with yourself. Is that correct?**

A. Yes.

**Q. And that was with no input from anyone else at Xpedient. Correct?**

A. Correct.

**Q. And no input from anyone at Agilent?**

A. Correct.

**Q. And beginning in January 2024, did the temperature start to change in Memphis or did they remain temperate?**

A. I don't remember.

**Q. Prior to the water intrusion event, do you recall seeing or hearing any weather advisories or storm warnings for the Memphis area?**

A. I don't remember if there were actual advisories of warnings, no.

**Q. Do you remember hearing any sort of general discussions with people that you knew, or otherwise, about bad weather coming to Memphis?**

A. Not necessarily, no.

I just remember waking up and seeing snow -- or not even waking up.

I don't even remember what time, but it started snowing a little bit.

or some other thing. But to me, that doesn't make very much sense if they're air-conditioning units.

And then, yeah, two of the -- two of the exhaust fans didn't have power.

MS. McDONALD: Okay. And then, I may have a question or two at the end. But I'm ready to hand it --

MR. THOMAS: Okay.

MS. McDONALD: -- hand it off.

MR. THOMAS: Do you want to take a break?

MS. McDONALD: Sure -- if that works for everybody.

VIDEOGRAPHER: We're going off the record. The time is 15:50.

(Whereupon, a recess was taken.)

VIDEOGRAPHER: We are on the record. The time is 16:03.

EXAMINATION

BY MR. BUTLER:

**Q. I think I'm next to ask you questions.**

**I'm John Butler, and I think we met before we started.**

(Court reporter request for clarity.)

MR. BUTLER: Can you hear me?

We had motion trackers in the building, and those would -- those would -- were what would initially notify me if there's something going on in the warehouse.

**Q. And it would notify you by dinging your phone or sending a text or...?**

A. It would set off the security alarm.

**Q. Okay. If you were at home at night and someone broke in, would you know?**

A. That I would get a phone call? Yes.

**Q. From the security company.**

A. From the security company.

**Q. Okay. So as I understand it, you could at any time go onto your phone or computer and look at the cameras. Is that right?**

A. Yeah; but the cameras themselves wouldn't notify me.

**Q. Okay. Were the cameras connected to the security system itself, or were they a separate system?**

A. I used a separate like application for that.

**Q. Is that like a Zoom -- I mean, a Ring camera. Or...?**

A. Basically.

places of water were coming from.

**Q. Okay. In the next day or the following days, were you able to just -- and I know you're not a sprinkler expert or anything, but were you able to tell, inside the warehouse, where the broken pipe was where you saw this significant stream of water coming out?**

A. I saw the area where the water was coming out.

I couldn't determine exactly where it was coming out of, but I was able to, you know, see, once -- once it was daylight, where it was coming from.

**Q. Okay. So you were asked about these -- the gas meter being locked based on Crowe's work and the Crowe email to you. Do you recall that?**

A. Through the Crowe email, yeah, that's when I learned, that the meter was locked.

**Q. Okay. And then after that, Crowe forwarded the invoice to accounting@xpedient.com?**

A. I believe it was Crowe, yes -- I mean, yeah, accounting received it, the Crowe invoice.

**Q. Directly from Crowe.**

A. I believe so, yes.

**Q. And they would have had to have gotten**

**that information from you, correct? -- to send it to "accounting@xpedient."**

A. Yeah, I would have told them to send it to accounting.

**Q. Okay. When would you have told them that?**

A. It -- probably when I scheduled the job.

I'm not 100% sure when during the job I told them to send it to accounting.

**Q. Okay. Well, that's my question -- because first they sent it directly to you, correct?**

A. Okay.

**Q. And it wasn't until January of '24 that they sent it to accounting@xpedient.com.**

**So I guess....**

A. January or December?

**Q. January the 9th.**

A. It was marked as paid, though.

**Q. Well, I guess my question is: After they were there in November, did you have any subsequent discussions with Crowe?**

A. I don't recall any conversation with Crowe.

**Q. Before January the 17th, 2024, did you ever contact MLGW about anything at that building?**

MR. THOMAS: Objection; asked

and answered.

A. The only time I contacted MLGW was that day when I called their toll-free number and I couldn't get through because I didn't have an account number.

**Q. And just so I'm clear, you learned that the gas meter was locked when you received the Crowe invoice December 1, 2024. Is that right?**

A. Right.

**Q. And you never elevated that or escalated that or told anybody at Xpedient.**

MR. THOMAS: Object to form.

**Q. Correct?**

A. I don't recall elevating it. It was....

From my understanding, once it receives accounting, it hits into our invoice system where anybody can see it -- you know, in my chain of command. So....

**Q. And in this invoice approval system that you were asked about, you were Step 1 of approving invoices for the Cromwell warehouse. Right?**

A. I was the bottom rung.

**Q. Okay. Bottom rung.**

A. Yeah.

**Q. And did all the invoices connected --**

**utilities or otherwise -- connected to the Cromwell warehouse run through that system to you first?**

A. Yeah.

I don't know about it being first, but I was definitely the first approval signoff on it.

**Q. Okay. And so, you would have signed off on any and all paid invoices that Xpedient received with respect to the Cromwell warehouse.**

A. Yes.

**Q. Okay. If Jamie Davis testified that you were the only person at Xpedient who knew that the gas was locked before the event, is that true?**

MR. THOMAS: Object to form.

A. I don't know if that would have been true, because the invoice was posted in December.

So I don't know what I would say to that.

**Q. How do you know the invoice was posted in December?**

A. Because it hit our accounting as it was paid.

It wouldn't have been paid by July 9th unless it was paid in December.

MR. THOMAS: You mean January?

WITNESS: Sorry. Yes.

A. If it would have been -- it was posted as

you're not sure if it caused any damage, but you still have to stop what you're doing to make sure that there isn't any damage. Right? So it constitutes a lost time.

So then that's an -- that's an internal documentation that you would take.

It doesn't inflate in any way to apply to any insurance company or to OSHA or anything like that, but it's still something we flag as an accident internally.

**Q. Okay. And this initial incident report, is it followed by subsequent follow-up reports, resolution-type report?**

A. Just a "5Y" countermeasure.

**Q. I'm sorry?**

A. A "5Y" is what it's called.

It's a -- it's a countermeasure report, but one wasn't completed on this one.

**Q. Why not?**

A. Just due to the length of time and the unknown causes and the current investigations going on, I just allowed it to be handled by my superiors at that point.

**Q. Okay. I believe you testified previously that you either don't recall or you say that Shellie**

**Moses did not -- and I'm needing the distinction -- offer to let Xpedient move product over on to the dry, vacant side.**

A. I never had communication -- I didn't have -- I didn't even know that offer was on the table, or -- and I don't think it was ever offered for us to move stuff over there.

It was not -- to the best of my knowledge, it was never offered to us to move our stuff to the dry side of the warehouse.

**Q. Was any offer made to move the stuff to a different warehouse?**

A. No.

**Q. Did you ever inquire about moving stuff to the dry side or to a different warehouse?**

A. No.

**Q. To your knowledge, did anyone at Xpedient ever inquire about getting the product out of the wet warehouse?**

A. No.

**Q. Do you recognize the numbers (801) 441-9790?**

A. Yes.

**Q. What number is that?**

A. It's my personal phone number.

build- -- like, what kind of building are we talking about?

**Q. Well, you're -- I'm talking specifically about the sprinkler system that's in the Cromwell warehouse.**

**And my question for you is: You did -- I want to make sure I understand your testimony. You did not know what the minimum temperature needed to be maintained in that Cromwell warehouse necessary to protect the sprinkler system --**

A. No.

**Q. -- in that warehouse.**

A. I did not, sir.

**Q. Okay. So you didn't know --**

A. No.

**Q. -- what temperature needed to be maintained --**

A. No.

**Q. -- to protect the system. Right?**

A. Correct.

**Q. And you didn't know what would happen if the sprinkler system, in the warehouse, remained below freezing, did you?**

A. I did not.

**Q. And you never asked anyone any questions**

**about that system, is that right?**
A. Correct.
**Q. Okay. Well, who at Xpedient was responsible for knowing those types of things if you weren't?**
MR. THOMAS: Object to form.
A. I'm not sure who would know that.
I don't know even -- I didn't know the responsibilities for when it came to setting up the building. So I wouldn't be able to tell you who would be in charge of that or who would -- supposed to know that.
**Q. And so is it your testimony that you are -- you do not know of anyone at Xpedient who was responsible for understanding the sprinkler system protecting this Cromwell warehouse. Correct?**
A. Yeah, correct. I cannot -- I could not identify that for you.
**Q. Okay. Now, you testified that you saw the sprinkler heads and you saw the sprinkler piping.**
**And you worked beneath that piping, correct?**
A. Yes.
**Q. Okay. And....**
**Hold on. Okay. And you stored Agilent's**

**inventory beneath that piping, is that right?**

A. Yes.

**Q. And you understood the sprinkler system in that warehouse, whether it was wet pipe or dry pipe -- it existed to suppress fire in the warehouse, right?**

A. Yes.

**Q. And what did you think came out of the sprinkler heads in the event of a fire?**

A. I'm not sure. It could have been -- like, I still don't know what you mean by "wet" and "dry."

So -- not 100%, anyway -- so I could only speculate what could come out of there, whether it's a mix- -- like some kind of retardant mixture or if it was just water, I'm not 100% sure.

**Q. Well, let me ask you this: What is your -- what is your general understanding of what comes out of a sprinkler system when it activates because of a fire?**

MR. THOMAS: Object to form; asked and answered.

A. I mean, what -- what can come out of a sprinkler system in the event of a fire? I guess you could assume some kind of -- some kind of water could be coming out of there.

building to get there. They didn't.

**Q. Okay. So explain that to me: If you had to go through the building to get there but they didn't, how would they get there?**

**That's what I'm trying to understand.**

A. So there's a steel -- there's a steel door, and there's a glass office door.

I had access to the glass office door that allows me to go through the building, through -- across the warehouse floor, walk through another door that has a lock -- an internal lock, just like a standard deadbolt lock. And then I could go into that room -- while the steel "man" door is just a door that opens up into that fire main room, where that you can just walk through or you can gain roof access to.

**Q. Is that -- is the room with the riser, is that located, though, inside of Xpedient's like leased premises in the warehouse, or is it in a different spot in the warehouse?**

A. I can't confirm if it's covered within the lease, but it's its own -- it's its own space.

It has three doors.

It has a door to the actual room where the riser is. It has a door that gives you access to

the warehouse floor. And then it has a door with the lock, with the key that I didn't have, that gives you access to outside.

And then the -- a roof access is located in that little hallway between the three doors, where you can climb the ladder and get to the roof.

**Q. Got it. Okay. Thank you for that explanation. Helpful.**

**When you took over as the operations manager at the Cromwell warehouse, what did you personally do to determine whether the sprinkler system presented any risk to Agilent's property that was stored in the building?**

A. I didn't do anything. I didn't -- I didn't realize that there was any kind of risk with the sprinkler system to Agilent's property.

**Q. Did you do any type of an assessment, when you took over at the Cromwell warehouse, overseeing the storage of Agilent's inventory, whether a loss of heat would have any impact on the sprinkler system in that building?**

A. No.

**Q. Now, you testified you knew that the warehouse had heaters during the -- I'm just going to call it the "relevant time period."**

**For me, the relevant time period for you was the date that you started at the warehouse on August 14th, and then the date of the -- of the water loss event, which is January 17th. That's what I'm calling the "relevant period."**

**Is that okay with you? -- so I don't have to keep saying the dates over and over.**

**Is that okay with you?**

A. Understood.

**Q. Okay. So during the relevant period, you knew the warehouse had heaters. Correct?**

A. Yes.

**Q. What was your understanding as to why the warehouse had those heaters? -- during the relevant time period.**

A. To...you know, it's just basic heating for the building.

**Q. Did you understand that the heaters there were for protecting the sprinkler system in the building?**

A. No; because two of them were overhead.

But then, the corner, there were some weird infrared heaters. And I don't even know what those were for.

They were pretty small. I guess you could

**From:** Crowe Services (Crowe Heating & Air ) <noreply+291789@servicetitan.com>
**Sent:** Friday, December 1, 2023 4:11 PM
**To:** Zachary Livingston <zlivingston@xpedient.com>
**Subject:** Your Invoice from Crowe Services
**Attach:** Invoice #52975802.pdf

---

You don't often get email from noreply+291789@servicetitan.com. Learn why this is important

**CAUTION: This email originated from OUTSIDE of the organization. Never click on a link or open attachments if it originated outside the Xpedient Network unless you know the content is safe.**

Hello Xpedient Logistics,

Let us know if we need to come back out when the gas is unlocked.

Please find your invoice from Crowe Services for 4601 Cromwell Avenue, Memphis, TN 38118 USA attached below.

For your convenience, you can now make a payment online by using the link below.

Make a Payment

If you have any questions regarding this invoice or would like to book future services, please give our office a call at (901) 413-5361 x0.

You may also leave us a Google review here

Sincerely,
Your Friends at Crowe Services

CROWE SERVICES

Crowe Heating & Air
6391 Ferrell Dr, Memphis, TN 38134
901-413-5361

**Invoice** 52975802
**Invoice Date** 11/16/2023
**Completed Date** 11/16/2023
**Customer PO**
**Payment Term** Due Upon Receipt
**Due Date** 11/16/2023

**Billing Address**
Xpedient Logistics
200 Northpoint Drive #100
Coppell, TX 75019 USA

**Job Address**
Xpedient Logistics
4601 Cromwell Avenue
Memphis, TN 38118 USA

**Description of Work**

Need to come back and test system when they have the gas unlocked.

| Task # | Description | Quantity | Your Price | Your Total |
|---|---|---|---|---|
| SCRE | Residential Service Call- Emergency | 1.00 | $125.00 | $125.00 |

| | |
|---|---|
| **Sub-Total** | $125.00 |
| **Tax** | $0.00 |
| **Total Due** | $125.00 |
| **Balance Due** | $125.00 |

Thank you for choosing Crowe Heating & Air

This invoice is agreed and acknowledged. Payment is due upon receipt. A service fee will be charged for any returned checks, and a financing charge of 1% per month shall be applied for overdue amounts.

I have inspected all of the work done by Crowe Services pursuant to the invoice terms agreed by me at the Job Address listed on this invoice.. I find that all work has been completed in a satisfactory and workmanlike manner. I have been given the opportunity to address concerns and/or discrepancies in the work provided, and I either have no such concerns or have found no discrepancies or they have been addressed by Crowe H&A to my satisfaction. My signature here signifies my full and final acceptance of all work performed by the contractor pursuant to the invoice as agreed.