**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**AGILENT TECHNOLOGIES, INC., PLAINTIFF**

**VS CASE NO. 2:25-cv-02101-BCL-cgc**

**XPEDIENT MANAGEMENT GROUP, LLC,**
**ST.PAUL FIRE AND MARINE INSURANCE COMPANY,**
**COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC DEFENDANTS**

---

**XPEDIENT MANAGEMENT GROUP, LLC, CROSS PLAINTIFF**

**VS**

**ST PAUL FIRE AND MARINE INSURANCE COMPANY and**
**COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC CROSS-DEFENDANTS**

---

**FACTORY MUTUAL INSURANCE CO., AS**
**SUBROGEE OF AGILENT TECHNOLOGIES, INC. PLAINTIFF**

**VS. CASE NO. 2:25-cv-02424-BCL-tmp**

**XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE**
**INSURANCE COMPANY and COLLIERS MANAGEMENT**
**SERVICES-MEMPHIS, LLC DEFENDANTS**

**PLAINTIFF FACTORY MUTUAL INSURANCE COMPANY'S OBJECTIONS AND RESPONSES TO DEFENDANT XPEDIENT MANAGEMENT GROUPS, LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

**COMES NOW** Plaintiff, Factory Mutual Insurance Company ("FM"), as subrogee of Agilent Technologies, Inc. ("Agilent"), by and through undersigned counsel, pursuant to Federal Rule of Civil Procedure 56 and LR 56.1, and for its Response to Defendant Xpedient Management Group, LLC's ("Xpedient") Statement of Undisputed Material Facts (Doc. 260) would state as follows:

## PRELIMINARY OBJECTION AND RESERVATION

LR 56.1(a) requires each fact in a separate numbered paragraph. Several of Xpedient's statements of fact combine independent assertions, contractual quotations, inferences, and legal conclusions. FM objects to that format but responds to each paragraph without waiving the objection. Admissions concerning the text of a document are not admissions of Xpedient's legal interpretation. A response stating that a proposition is disputed on legal grounds does not represent that the underlying quoted words are factually disputed.

## RESPONSES TO STATEMENT OF MATERIAL FACTS

### A. The parties' agreements and negotiated allocation of Product Loss risk.

1. Agilent Technologies, Inc. ("Agilent") and Xpedient executed the Master Operating Services Agreement for Logistics Services (the "MOSA") and the Memphis Site Operating Agreement (the "SOA") in May 2023. The SOA identified the facility as approximately 45,000 square feet at 4601 Cromwell Avenue in Memphis and established a term from May 15, 2023 through May 31, 2026. See MOSA Exhibit "1"; SOA Exhibit "2".

**RESPONSE:** **Undisputed.**

2. MOSA Section 12(C)(a) provides that, subject to the agreement's limitations, Xpedient may be responsible for Agilent's actual manufacturing or acquisition cost to replace Products at their pre-loss condition, less salvage value, when loss or damage is caused by Xpedient's failure to exercise reasonable care. Section 12(C)(b) states that the Products are not insured by Xpedient against loss or injury, however caused. See MOSA § 12(C)(a)-(b), at 4-5 Exhibit "1".

**RESPONSE:** **Undisputed as a description of the cited contractual text, without conceding its legal effect.**

3. Section 12(C)(c) states that Xpedient's maximum liability arising out of or related to loss of or damage to Products may not exceed $1 million per occurrence, $2 million annually, or $5 million over the life of the MOSA. The same paragraph states that the parties are sophisticated commercial organizations negotiating at arm's length and jointly agreed that the Limit was commercially reasonable in relation to the value of the Products, the fees charged, and their respective business interests. See MOSA § 12(C)(c), at 5 Exhibit "1".

**RESPONSE: Undisputed that §12(C)(c) contains the quoted limitation and recital. Disputed to the extent the paragraph asserts the limitation is enforceable against gross negligence or recklessness; that is a legal question, not a fact.**

4. Section 12(C)(d)(ii) excludes liability for Product Losses in excess of the Limit. Section 12(C)(e) requires every Product Loss claim to be made promptly in writing and no later than 90 days after Agilent became aware or reasonably should have become aware of the loss or damage; requires the writing to identify the Products, explain Xpedient's alleged liability, and claim payment of a specified or determinable amount; and states that no action may be maintained without a timely written claim. See MOSA § 12(C)(d)-(e), at 5-6 Exhibit "1".

**RESPONSE: Undisputed that the MOSA contains these provisions. Disputed insofar as this paragraph characterizes the contractual trigger without reproducing the alternative year-end inventory reconciliation trigger. No concession that Agilent failed to comply.**

5. Section 12(C)(e) also provides that neither party is liable for special, indirect, consequential, or punitive damages, including lost production, income, or profits. See MOSA § 12(C)(e), at 6 Exhibit "1".

**RESPONSE: Undisputed as to the existence of the quoted language; no concession that every claimed cost falls within its scope.**

6. MOSA Section 6(B) assigns to Agilent the cost of transporting Products to an alternate facility, rent, and all other facility expenses when an event causes a premature loss of use or possession of the facility. See MOSA § 6(B), at 2 Exhibit "1".

**<u>RESPONSE:</u> Undisputed that §6(B) contains language allocating certain facility expenses, but its application to the claimed damages is disputed and must be determined from the complete provision.**

7. The MOSA states that a failure to enforce a provision does not constitute a continuing waiver, and that no waiver, release, alteration, or modification is binding unless set forth in a writing signed by both parties. It also provides that Agilent, for itself and its insurers, waives recovery to the extent subrogation would make Xpedient responsible for losses for which it is not responsible under the MOSA. See MOSA §§ 20, 30(F), 30(H), at 9, 14 Exhibit "1".

**<u>RESPONSE:</u> Undisputed as to the existence of the cited provisions; disputed to the extent characterized as establishing the enforceability or reach of any particular waiver.**

8. Before execution, Agilent's Logistics Process Manager told Xpedient that he was meeting with Agilent's Legal and Procurement personnel to review all redlines, that Legal and Procurement were redlining the MOSA, and that more formal feedback would follow his call with Agilent's lawyer. See May 3, 2023 Agilent/Xpedient Emails XMG_3343-44 Exhibit "7".

**<u>RESPONSE:</u> Undisputed for purposes of this motion.**

9. The parties' written comments addressed the amount of the Product Loss limit. Xpedient wrote, "Our limit is $1M"; Agilent Commercial Counsel Krisztina Comeau asked, "Are these limits acceptable?"; and Agilent Global Sourcing representative Chon-Leong Choo noted that Agilent's contract with the prior provider had a $1 million per-occurrence limit. See May 9, 2023 Xpedient/Agilent Emails, XMG_2733-2801 Exhibit "8".

**<u>RESPONSE:</u> Undisputed that the identified written comments contain the quoted statements. Whether the cap extends to gross negligence or recklessness is disputed as a matter of law, not as a historical fact.**

10. Agilent's pre-execution Contract Summary Sheet identified as a legal risk that "XMG's maximum liability coverage is $1 million" and identified the mitigation as "Agilent's insurance policy will cover the difference in loss." See Agilent's Contract Summary ATI_006893 Exhibit "9". The same document stated that Agilent's insurance would cover inventory loss and expenses associated with product damage. *Id*.

**<u>RESPONSE:</u> Undisputed that the Contract Summary Sheet contains the quoted language. Factory Mutual disputes any inference that the document resolves the enforceability of the cap against gross negligence or recklessness.**

**B. The January 2024 event and Agilent's written communications concerning a claim.**

11. On January 17, 2024, water entered the Memphis warehouse after fire-sprinkler and domestic-water piping froze and burst. Agilent and Factory Mutual refer to the incident as the January 17, 2024 "Water Intrusion Event." (Doc. 137 ¶¶ 70-85; Doc. 136 ¶¶ 44-51).

**<u>RESPONSE:</u> Undisputed. The Water Intrusion Event occurred after months without working heat, and after Xpedient had been alerted to a locked gas meter. *See* Deposition of Xpedient's Jamie Davis ("Davis Dep.") 325:10–14 attached as <u>Exhibit 5</u> to FM's Statement of Additional Material Fact (hereinafter, "SAMF"); Deposition of Xpedient's Former Warehouse Manager Zack Livingston ("Livingston Dep.") 79:24–84:23 attached as <u>Exhibit 6</u> to SAMF.**

12. On January 19, 2024, Agilent's Chris Mulryan wrote internally that Xpedient had reported a water break "raining water down on the TIPS" and asked Agilent personnel to assess

the damage. On January 25, Mulryan reported that 321 pallets were impacted, discussed repair versus disposal, and addressed who would bear liability. See Jan. 19–25, 2024 Agilent Internal Emails ATI_000470-72 Exhibit "3".

**<u>RESPONSE:</u> Undisputed that the identified internal communications contain these statements. No admission that the full scope or value of loss had been established.**

13. On February 7, 2024, Agilent sent Xpedient an email stating that Agilent's Products had "experienced water damage," that Agilent was investigating the extent of the damage, and that Agilent would provide an update after the necessary steps and resulting costs were determined. See Feb. 7, 2024 Agilent Internal Email ATI_004078 Exhibit "4".

**<u>RESPONSE:</u> Undisputed that Agilent transmitted the February 7 written notice described. The description is incomplete without the March 21, 2024 and March 29, 2024 correspondence. See ATI_000923-924 attached as <u>Exhibit 2</u> to SAMF; See Deposition of Xpedient's Nathaniel Haynes ("Haynes Dep.") 219:1-18, Ex. 200 attached as <u>Exhibit 3</u> to SAMF. Xpedient did not advise Agilent before the loss that its heating system was inoperable. *See* Haynes Dep. 174:19–25 attached hereto as <u>Exhibit A</u>. *See* Davis Dep. 92:17–93:8 attached hereto as <u>Exhibit B</u>.**

14. The February 7 email requested information concerning the cause of the water damage, repairs and remediation, and measures to prevent recurrence. It did not state that Xpedient was liable, demand payment, or identify a specified or determinable amount claimed from Xpedient. *Id*.

**<u>RESPONSE:</u> Undisputed that the February 7, 2024 writing does not expressly state a dollar demand or declare Xpedient liable. Disputed to the extent the paragraph implies the February 7, 2024 letter was the only timely notice or that its legal sufficiency can be**

**determined in isolation. *See* ATI_000923-924 attached as Exhibit 2 to SAMF; Haynes Dep. 219:1-18, Ex. 200 attached as Exhibit 3 to SAMF. The March 21, 2024 letter specifically inquired into lack of heat, gas service, and winterization. *See* ATI_000923-924 attached as Exhibit 2 to SAMF.**

15. Ninety days after February 7, 2024 was May 7, 2024. Agilent did not send a writing invoking Section 12(C)(e) until June 7, 2024, 121 days after February 7 and 31 days after May 7. See June 7, 2024 Agilent Notice of Claim Ltr. ATI_011132 Exhibit "5".

**RESPONSE: Undisputed that June 7, 2024 was the date of the letter expressly invoking §12(C)(e), and that May 7, 2024 is ninety days after February 7, 2024. Disputed insofar as the statement implies Agilent supplied no other written claim-related communications before May 7. *See* ATI_000923-924 attached as Exhibit 2 to SAMF; Haynes Dep. 219:1-18, Ex. 200 attached as Exhibit 3 to SAMF. The legal adequacy of those writings is disputed.**

16. Agilent's June 7 letter was titled "Agilent's Notice of Claim Pursuant to Master Operating Services Agreement" and expressly invoked Section 12(C)(e). The letter characterized the matter as a "potential claim," stated that Agilent was unable to fully explain Xpedient's liability or make a claim for payment of a specified or determinable amount, and reported a preliminary estimate of $8,054,398.96 in irreparably damaged inventory after inspection and segregation concluded on March 29, 2024. *Id*.

**RESPONSE: Undisputed that the June 7 letter contains the identified statements and preliminary valuation. The characterization of the June letter does not negate the February and March writings. No admission that the June letter was the first claim-related notice.**

17. Xpedient's June 24 response acknowledged receipt of the June 7 letter, stated that Xpedient had provided it to its insurer and adjuster, and stated that Xpedient would work through the matter under the terms and conditions of the MOSA and SOA. The response did not state that the June 7 notice was timely or that Section 12(C)(e) had been waived. See June 24, 2024 Xpedient Response to Claim Ltr XMG_0352 Exhibit "6".

**RESPONSE: Undisputed as to what the June 24 letter states. Whether Xpedient is estopped from invoking the notice defense cannot be resolved from this letter alone. *See* Haynes Dep. 219:1-18, Ex. 200 attached as Exhibit 3 to SAMF.**

**C. Agilent's contemporaneous understanding of the $1 million allocation and Plaintiffs' claimed damages.**

18. On April 23, 2024, Agilent executive Rodney Gonsalves wrote that approximately $8.1 million in inventory would likely be disposed of and that Agilent expected to recover approximately $4.1 million "from the warehouse provider and insurance," leaving an anticipated uncovered loss. See April 22-24, 2024 Agilent Internal Emails, ATI_012818-012820 Exhibit "10".

**RESPONSE: Undisputed solely that the identified internal email contains the quoted estimate; not admitted as an accurate determination of recoverable damages.**

19. Agilent's April 2024 financial presentation stated, "Xpedient liability at $1 M per contract," and separately modeled a $1 million claim against Xpedient and a $3,114,300 insurance claim under Agilent's Factory Mutual policy. See Agilent Financial Presentation April 23, 2024 Exhibit "11" at ATI_011537.

**RESPONSE: Undisputed that the financial presentation contains the identified statements; disputed to the extent offered as a binding interpretation of Tennessee law or an enforceable concession concerning gross negligence or reckless conduct.**

20. On April 24, 2024, Agilent's External Financial Reporting group asked whether the anticipated receivables from "insurance ($3.1m)" and the "warehouse ($1m)" were sufficiently certain to be booked and requested separate confirmation regarding the insurance and Xpedient claims. *Id*.

**RESPONSE: Undisputed solely that the quoted internal inquiry was made; no admission that the amounts were fixed, recoverable, or that any contractual defense was conceded.**

21. Agilent's damages expert calculates $9,822,798 in alleged underlying loss before insurance payments and interest: $8,520,974 in replacement costs, $958,122 in post-event SOA payments, $103,773 in disposal costs, $170,419 in estimated replacement freight, $64,227 in inventory-count expense, and $5,281 to transport undamaged inventory. See Grudzien Report at 5 Exhibit "13".

**RESPONSE: Undisputed that the expert reports the listed figures, not that each amount is ultimately recoverable or correctly classified. The categories and totals remain subject to proof.**

22. The $8,520,974 replacement-cost calculation values 25,012 boxes of allegedly damaged pipette tips using contractual unit prices. Factory Mutual paid Agilent a total of $4,787,087 toward the claimed loss. See Grudzien Report at 6-8 at 5, 8 & Ex. A, Schedule 1 Exhibit "13".

**RESPONSE: Undisputed that the expert uses the stated quantity and prices and reports the identified insurer payment.**

23. The expert describes the $958,122 in post-event SOA payments as "additional overhead damages" arising from payments Agilent continued to make through January 2, 2026, and

describes the $5,281 transportation claim as the cost of moving undamaged Products to another Agilent warehouse. See Grudzien Report at 6-7 & Ex. A, Schedules 2, 6 Exhibit “13”.

**<u>RESPONSE:</u> Undisputed that the expert describes the costs in this manner; not admitted that the expenses are contractually excluded or that the expert’s terminology determines their legal character.**

24. The expert describes the $103,773 disposal claim as third-party costs to dispose of allegedly damaged Products; calculates the $170,419 freight claim as an estimate equal to two percent of replacement costs; and describes the $64,227 inventory-count claim as expenses incurred between February and April 2024 to count allegedly damaged inventory. See Grudzien Report at 6-7 & Ex. A, Schedules 3-5 Exhibit “13”.

**<u>RESPONSE:</u> Undisputed that the expert describes and calculates the costs as stated; their legal classification and recoverability are disputed.**

25. Factory Mutual sues as Agilent’s subrogee. Its damages expert also seeks $335,446 in Factory Mutual’s own adjustment expenses: $318,478 for an industrial hygienist, $12,248 for a salvor, and $4,720 for a forensic accountant. (Doc. 136 at 1; Ex. 9, Grudzien Report at 9-10 & Ex. B, Schedule 2 Exhibit 13).

**<u>RESPONSE:</u> Undisputed that FM asserts subrogation and the expert identifies these expenses. Disputed to the extent the paragraph assumes the expenditures are necessarily unrecoverable; proof of the contractual or independent basis for recovery is reserved.**

26. Agilent asserts contract, bailment, negligent-misrepresentation, negligence/recklessness, declaratory, and negligence-per-se theories against Xpedient; Factory Mutual asserts contract, bailment, negligence, gross-negligence, and negligence-per-se theories.

Each seeks recovery arising from the same alleged physical damage to Agilent's Products during the January 17 event. (Doc. 137, Counts I-VI; Doc. 136, Counts I-V).

**RESPONSE:** **Undisputed as to the pleaded causes of action and that they arise from the same occurrence. Disputed to the extent the paragraph assumes all theories are legally identical or subject to identical limitations.**

27. Neither Agilent nor Factory Mutual pleads a conversion claim or alleges that Xpedient appropriated the Products to its own use. (Doc. 137, Counts I-VI; Doc. 136, Counts I-V)

**RESPONSE:** **Undisputed for purposes of this motion that the cited complaints do not plead conversion to Xpedient's own use.**

**D. The sprinkler system and information known before the event.**

28. Colliers, St. Paul's property manager, contracted with Security Fire Protection Co., Inc. to perform ongoing quarterly, annual, and five-year inspections, testing, and maintenance of the wet-pipe sprinkler system. Colliers Responses to Interrogatories Interrog. Nos. 3, 7 Exhibit "14". A January 4, 2024 wet-sprinkler inspection report identified Colliers Property Manager Shellie Moses as the contact and recommended maintaining a minimum temperature of 40°F during winter. See Jan. 4, 2024 Security Fire Report COLLIERS_01321-40, at COLLIERS_01323 Exhibit "15".

**RESPONSE:** **Undisputed that Colliers retained Security Fire Protection and that the January 4 report included the 40°F recommendation. No admission that Xpedient lacked other notice of its own heating problem. The absence of evidence that Xpedient received this particular report does not eliminate its independent knowledge of the locked gas meter or its operational responsibility. *See* Haynes Dep. 90:17–94:4 attached as Exhibit 3 to SAMF; Deposition of Kirk Updike ("Updike Dep.") 344:4–25 attached as Exhibit 4 to SAMF.**

29. Colliers has identified no record that the January 4 report was forwarded, distributed, or transmitted to Xpedient before the January 17 event.

**RESPONSE: Undisputed solely that Colliers identified no record transmitting that particular January 4 report to Xpedient before the loss. Disputed to the extent Xpedient implies that it lacked independent notice of the heating/gas problem. *See* Livingston Dep. 83:2–24, 84:2–23 attached as Exhibit 6 to SAMF; Davis Dep. 327:4–19 as Exhibit 5 to SAMF. By December 1, 2023 Xpedient knew its gas meter was locked, and hours before the loss Livingston told Updike the building was cold and without gas. *See* Updike Dep. 344:4–25 attached as Exhibit 4 to SAMF; Livingston Dep. 182:18–184:3 attached as Exhibit 6 to SAMF.**

Respectfully submitted,

*s/ S. Joe Welborn*
S. Joe Welborn, TN BPR No. 21747
SMITH CASHION & ORR, PLC
3100 West End Avenue
Suite 800 – One American Center
Nashville, TN 37203
(615) 742-8565 – Tel
jwelborn@smithcashion.com
*Attorney for Plaintiff Factory Mutual Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2026, I have served a true and correct copy of the foregoing pleading to the following via electronic mail:

Amber S. Finch
Margaret C. McDonald
Katherine P. Goetz
Reed Smith, LLP
515 South Flower St.
Suite 4300
Los Angeles, CA 90071
(213) 457-8000 – Tel
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan
Elena R. Mosby
Burch Porter & Johnson
130 N. Court Ave.
Memphis, TN 38103
(901) 524-5000 – Tel
dhalijan@bpjlaw.com
emosby@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

John Butler
Grant E. Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, Tennessee 37919
(865) 244 – 3945 – Tel
jbutler@bvblaw.com
gmitchell@bvblaw.com
*Attorney for Defendant Colliers Management Services – Memphis, LLC*

William P. Thomas
Andrew B. Schrack
Butler Snow, LLP
6075 Poplar Ave., Ste, 500
P.O. Box 171443
Memphis, TN 38187-1443
(901) 680-7200 – Tel
Will.Thomas@butlersnow.com
Andrew.Schrack@butlersnow.com
*Attorneys for Defendant/Cross-Plaintiff Xpedient Management Group, LLC*

Sean W. Martin
Carr Allison
633 Chestnut St.
Suite 2000
Chattanooga, TN 37450
(423) 648-9832 – Tel
swmartin@carrallison.com
*Attorneys for Defendant/Cross-Defendant St. Paul Fire and Marine Insurance Company*

*s/ S. Joe Welborn*
S. Joe Welborn