**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| AGILENT TECHNOLOGIES, INC.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | ) | Case No. 2:25-cv-02101-BCL-cgc<br><br>Judge Brian C. Lea<br>Magistrate Judge Charmaine Claxton |
| XPEDIENT MANAGEMENT GROUP, LLC,<br>Cross-Plaintiff,<br><br>v.<br><br>ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Cross-Defendants. | ) | |
| FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | ) | Case No. 2:25-cv-02424-BCL-tmp<br><br>JURY DEMANDED |

**AGILENT TECHNOLOGIES, INC.'S OPPOSITION TO XPEDIENT MANAGEMENT GROUP, LLC'S MOTION FOR SUMMARY JUDGMENT**

Agilent Technologies, Inc. ("Agilent") submits this memorandum in support of its Opposition to Xpedient Management Group, LLC's ("Xpedient") Motion for Summary Judgment.

## INTRODUCTION

Xpedient knowingly stored Agilent's inventory in a warehouse lacking both gas service and functioning HVAC, beneath water-filled sprinkler pipes. When a widely publicized winter storm struck, and the temperatures in Memphis dropped to two degrees Fahrenheit, the pipes froze and burst, drenching over $8 million in inventory. Xpedient now asks the Court to allow it to escape responsibility for the harm it caused, relying on the (1) notice and (2) "limitation of liability" provisions from its agreement with Agilent. However, notice of Agilent's claim was timely and sufficient, and Xpedient had "actual knowledge" of the claim. Xpedient is further estopped from arguing untimeliness as it willfully hid the cause of the loss from Agilent in breach of the agreement. Having materially breached the agreements first, Xpedient also cannot escape liability by relying on an alleged later breach by Agilent. The limitation of liability provision is unenforceable in light of Xpedient's gross negligence. Tennessee law flatly forbids contracting away liability for gross negligence and the record here is replete with evidence from which a jury could reasonably find conscious indifference. The limitations provision is also void under Tennessee law because Xpedient refused Agilent's written request for full-value liability. And Agilent's claimed costs are direct damages as they simply placed Agilent back in its pre-loss position. At minimum, there are multiple disputed issues of material fact that the jury must decide before a determination is made whether or not these provisions apply. The Court should deny Xpedient's motion in its entirety.

## LEGAL STANDARD

Summary judgment is appropriate only when the movant establishes that no genuine

dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To defeat summary judgment, "the non-moving party must then 'set forth the specific facts showing that there is a genuine issue for trial.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). The Court "must view the evidence and draw all reasonable inferences therefrom in a light most favorable to the non-moving party." *PDV Midwest Ref., L.L.C. v. Armada Oil & Gas Co.*, 305 F.3d 498, 505 (6th Cir. 2002). The Court's function is "to determine whether there is a genuine issue for trial," not to weigh evidence or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment must be denied when the evidence presents a "sufficient disagreement" for a reasonable jury to find in the nonmoving party's favor. *Id.* at 251–52.

## ARGUMENTS AND AUTHORITIES

### I. The MOSA's Notice Provision Does Not Entitle Xpedient to Summary Judgment

Before discussing Agilent's notice of claim to Xpedient, a recounting of the parties' actions immediately following the Water Intrusion Event[1] is warranted: On January 17, 2024, the day Agilent's inventory was destroyed, Xpedient was first on the scene. (Statement of Additional Material Facts ("AMF"), ¶ 24.) It was an Xpedient manager who observed water raining down from the building's water pipes, soaking the inventory, and leaving inches of standing water. (*Id.*) Xpedient knew within one day what had occurred: Despite Agilent's inventory having occupied the building for about eight months, gas service to the building had never been initiated and the heating system was inoperable. (*Id.* ¶¶ 12, 14; SAC [ECF 137], ¶¶ 47–48, 55.) When the region's gravely anticipated winter freeze hit, there was nothing preventing the pipes from freezing and

[1] The Water Intrusion Event refers to the January 17, 2024 event at the Cromwell Warehouse when the pipes froze and burst, drenching Agilent's inventory. (SAC [ECF 137], ¶ 72.)

bursting, discharging a massive quantity of water onto Agilent's inventory. (AMF ¶ 24; SAC [ECF 137], ¶¶ 57-70, 77.)

From the outset, Agilent repeatedly asked Xpedient to explain what caused the water damage. Receiving no clear answer, on March 21, 2024, Agilent sent a letter to Xpedient, requesting *"a timeline of the events that predate[d] and lead up to the incident, explanation of the incident itself and cause."* (AMF ¶ 27.) In response, Xpedient prepared, internally, a detailed timeline of events, but never sent it. (*Id.* ¶ 28.) Instead, Xpedient responded by letter providing none of the requested information and, astoundingly, represented that it too "share[d] Agilent's need for answers." (*Id.* ¶ 29.) But, as a review of Xpedient's internal communications shows, Xpedient *did not* share Agilent's need for answers—it had them all. (*Id.* ¶ 14.) While Xpedient obfuscated, Agilent was complying with the MOSA and mitigating its damages (paying Xpedient extra to segregate the wet product from dry) and investigating whether the inventory was salable. (*Id.* ¶¶ 31, 33.) It is during this period of self-serving misinformation by Xpedient that Agilent provided notice of its claim. With this context in mind, Xpedient's notice argument fails for several reasons, set forth below, each of which independently requires a denial of summary judgment.

**A. The February Notice & Follow-Up Correspondence Satisfied Section 12(C)(e)**

Section 12(C)(e) of the Master Operating Services Agreement ("MOSA") provides that "all claims for Products lost, or damaged …. must be made promptly in writing . . . and in … ninety (90) days after Customer has become (or reasonably should have become aware) of any such loss or damage." (Ex. 1, § 12(C)(e).) The notice should include "facts sufficient to identify the Products involved," "explain XMG's liability for alleged loss or damage," and "make claim for the payment of a specified or determinable amount of money." (*Id.*) Each of these requirements was timely satisfied to the best of Agilent's ability given Xpedient's withholding the cause of and its role in the Event.

On February 7, 2024, Agilent sent an email to Xpedient's CEO, under the subject heading "Agilent Water Damage Notice" (the "February Notice"). (AMF ¶ 26.) The timeliness of this February Notice is uncontested. It was sent exactly three weeks after the loss event and significantly before the May 7, 2024 deadline that Xpedient contends applies.[2] Likewise, the substance of the February Notice complies with the requirements of Section 12(C)(e).

First, it contained "facts sufficient to identify the Products involved" by identifying all "Agilent product stored at the [Cromwell Warehouse] . . . [that] experienced water damage."

Second, Agilent "explain[ed] XMG's liability for alleged loss or damage" by stating that the damaged product was "stored at the Facility ***managed*** by Xpedient" and by demanding that Xpedient provide "[a]n explanation as to what caused the water damage"—a question posed for the dual purposes of communicating and ascertaining Agilent's claim. A warehouser told by its customer that the goods being stored were destroyed by water at the facility the warehouser manages and directed to explain the cause has been informed of the basis of its liability.

Third, Agilent made a "claim for the payment of a specified or determinable amount of money" by identifying the damaged inventory and advising it would update Xpedient once the "resulting costs are determined." Importantly, Section 12(C)(e) does not require a liquidated dollar figure. Xpedient also knew the value of the damaged inventory as it was responsible for identifying, segregating, and tracking that inventory. (*Id.* ¶¶ 30-31.) To illustrate, on February 6, 2024, one day before the February Notice was sent, Xpedient provided its insurance carrier with, *inter alia*, a "file with estimated or potentially damaged inventory ***and value***." (*Id.* ¶ 25.)

While the February Notice satisfies Section 12(C)(e), there is no requirement that notice under Section 12(C)(e) be given in a singular communication. Agilent's notice began even prior

[2] Agilent disagrees that the notice deadline ran on May 7, 2024. When the 90-day clock began to run and the notice deadline are contested issues of fact.

to the February Notice and was further clarified through the parties' correspondence during the 90 days that followed. This correspondence took place via phone calls and written communications throughout February, March, and April, as the parties continued to discuss, quantify, and manage the damaged inventory. (*Id.* ¶¶ 30-31.) Together, they clearly put Xpedient on notice that Agilent considered Xpedient responsible for the Water Intrusion Event, identified its liability, and informed Xpedient that Agilent was still quantifying its loss.

For example, Agilent's March 21, 2024 letter to Xpedient requested information regarding, *inter alia*, (1) the "reasons for lack of heat / gas to the building and efforts to enable [the same] prior to the [] event"; (2) "whether there was any 'winterization'" of the sprinkler system before the event; and (3) "what actions were taken to prepare the warehouse in advance" of the freeze event. (*Id.* ¶ 27.) While these are framed as questions, it would be absurd to ignore that, at this time, Agilent's ability to give notice in the typical verbiage was crippled by Xpedient's intentional concealment of what had occurred. They were also clearly informative as to the basis for Agilent's claim against Xpedient and met the requirements of Section 12(C)(e).

### B. At Minimum, the February Notice & Follow-Up Correspondence Substantially Complied with Section 12(C)(e)

Tennessee courts frequently find that substantial compliance is sufficient to satisfy notice provisions. *See e.g.*, *Andrews Distrib. Co. v. Oak Square at Gatlinburg, Inc.*, 757 S.W.2d 663, 668 (Tenn. 1988) ("[t]he notice given need only substantially comply with the requirements of the contract") (overruled on unrelated grounds by *Spence v. Allstate Ins. Co.*, 883 S.W.2d 586 (Tenn. 1994). Substantial compliance "means that a party has 'complied with the essential requirements'" of the contract. *Mayor v. W. Va. (In re Eagle-Picher Indus.)*, 285 F.3d 522, 525 n.3 (6th Cir. 2002). Even if the February Notice falls short of fully satisfying Section 12(C)(e), a jury could find that

Agilent substantially complied.[3] *Allstate Ins. Co. v. Fitzgerald*, 743 F. Supp. 539, 542 (W.D. Tenn. 1990) ("[T]he issue of compliance with a notice provision is ordinarily a question of fact for the jury.")

Courts also reject late notice defenses where the party has "actual knowledge." *Lee Masonry, Inc. v. City of Franklin*, 2010 WL 1713137, at *9 (Tenn. Ct. App. Apr. 28, 2010) (rejecting city's untimely-notice defense because "the City had ample notice of the events giving rise to [the] claims," "[i]t was impossible to know the extent of the damage" when notice was required, and "the City had actual knowledge of the delays and disruptions . . . so any further written notice would not have served any practical purpose"); *Writzmann v. Baust*, 1988 Tenn. App. LEXIS 671, at *8 (Tenn. Ct. App. 1988) (notice requirement satisfied where "the party entitled to receive notice has actual knowledge of the matter that would have been covered by the notice.")

As detailed above, that Agilent complied with the essential requirements of Section 12(C)(e) is beyond reasonable dispute. Any doubt about whether Xpedient had "actual knowledge" of the claim is dispelled by Xpedient's communications and actions in the months following the Water Intrusion Event. For example, Xpedient made an insurance claim within days of the loss and provided its insurer with documents detailing Agilent's inventory and value estimates of the claim. (AMF ¶ 25.) On February 6, 2024, Xpedient provided its insurer with a file containing the then "damaged inventory and value," and explaining that it did not have an "official … demand" yet as Agilent was still "in the process of establishing what inventory can be salvaged." (*Id.*) Sent the day before the February Notice, this email shows Xpedient knew a claim with a specific

[3] Xpedient does not contend that the MOSA requires strict compliance, and cannot make such an argument on reply. *Palazzo v. Harvey*, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019).

monetary demand was coming. If Xpedient did not expect its insurer to ultimately pay Agilent's claim on its behalf, there would be no reason to keep the insurer informed.

Xpedient also coordinated and performed the segregation of Agilent's inventory. (*Id.* ¶ 30.) It compiled and transmitted inventory reports of the on-site goods as of the date of loss, retained physical custody of the Cromwell Warehouse inventory, and hosted site inspections. (*Id.*) This confirms that Section 12(C)(e) functioned exactly as intended by preserving Xpedient's ability to conduct a prompt investigation, inspection, and valuation of the damaged goods.

Although Xpedient invokes *Andrews*, its holding supports Agilent. In *Andrews*, the court found substantial compliance with the notice provision where, as here, all parties to "whom notice . . . could have been given had written notice of the existence of plaintiff's claim," even though "that notice may not have been delivered in the method provided." 757 S.W.2d at 669; *see also Gollihue v. Nat'l City Bank*, 969 N.E.2d 1233, 1238 (Ohio Ct. App. 2011) ("[A] failure to give notice in writing, as required by a contract, will not necessarily preclude recovery on the contract."). *Bunn v. Navistar, Inc.*, 797 F. App'x 247 (6th Cir. 2020), is inapposite. It applied a statutory notice rule meant to let sellers cure, while Section 12(C)(e) is a contractual provision meant to let Xpedient investigate damages, which it had been doing since January 2024.

**C. The June Letter Also Satisfied Section 12(C)(e)**

On June 7, 2024, Agilent sent a letter to Xpedient under the subject heading "Agilent's Notice of Claim Pursuant to Master Operating Services Agreement" (the "June Letter"). (AMF ¶ 32.) As Agilent's corporate representative explained, this June Letter was *"a follow-up with [Agilent's] earlier notices to Xpedient."* (*Id.*) Like the February Notice, the June Letter (1) identified the damaged Products, (2) explained Xpedient's liability "based on [its] possible role in causing or allowing the Cromwell Warehouse to be impacted by water encroachment," and (3) claimed a determinable amount of approximately $8,054,398.96 in replacement costs. (Ex. 5.)

The June Letter also was timely. Although Agilent maintains that the February Notice satisfies Section 12(C)(e), that section can reasonably be read to mean that the 90-day period runs from when Agilent knew of actual loss or damage. Xpedient concedes as much. (Mot. at 5–7.) Following the Water Intrusion Event, Agilent worked with its tips' manufacturer, Labcon, to determine whether the inventory could be salvaged. (AMF ¶ 33.) Over the next two months, it shipped samples, explored bioburden analysis and re-sterilization, and pressed for a rework quote. (*Id.*) Only on March 29, 2024, did Labcon inform Agilent that it was unconvinced a path existed to "sufficiently mitigate the potential contamination risk" and that it "would scrap the affected product." (*Id.*) Although Agilent now knew that the impacted tips were a total loss, the extent of that loss remained unknown because Xpedient was still segregating the damaged from undamaged tips. (*Id.* ¶ 31.) The June Letter came well within 90 days of that date.[4]

Even if the Court found the June Letter delayed, Tennessee law excuses reasonable delay. *Andrews*, 757 S.W.2d at 668 ("delay in giving the required notice may be excused where reasonable"). After the Event, Agilent immediately began investigating the water's impact on its inventory. But it was Xpedient, not Agilent, that controlled the warehouse, the utilities, and the sort-and-segregate labor, and so any delay was Xpedient's. By late March, Xpedient was still "sorting and segregating products in the warehouse for salvage determination." (AMF ¶ 31.) Xpedient cannot call the June Letter untimely due to its own delay in completing its work.

[4] *Alcazar v. Hayes*, 982 S.W.2d 845 (Tenn. 1998), adopted the notice-prejudice rule in Tennessee, placing the burden on the insured to prove no prejudice, which Agilent easily carries. Xpedient knew of the loss from day one, controlled and segregated the damaged inventory for months, and its insurer inspected it. *Alcazar* also never addressed, let alone rejected, the argument that uncertainty about damages suspends the notice obligation as Xpedient claims.

### D. Xpedient Concealed Its Own Responsibility for the Loss and Is Equitably Estopped from Enforcing the Notice Deadline

Summary judgment should also be denied because Xpedient is equitably estopped from asserting noncompliance with Section 12(C)(e) and equitable estoppel raises questions of fact non-resolvable at summary judgment. *Spring Hill Beechcroft Rd. LLC v. Magna Seating of Am., Inc.*, 2025 LX 265673, at *8 (M.D. Tenn. Mar. 7, 2025). Estoppel is available "when one party has, with knowledge of the facts, engaged in misleading conduct with the expectation that such conduct shall be acted upon by another party and the other party justifiably relies on such conduct and acts upon it to its detriment." *Irving Pulp & Paper, Ltd. v. Dunbar Transfer & Storage Co.*, 732 F.2d 511, 514 (6th Cir. 1984). Those elements are clearly met here.

As explained above, shortly following the Event, Agilent began demanding an explanation from Xpedient. On March 21, 2024, Agilent demanded in writing, *"a timeline of the events that predate[d] and lead up to the incident, explanation of the incident itself and cause."* (AMF ¶ 27.) Xpedient prepared that timeline and explanation but never sent it. (*Id.* ¶ 28.) It only disclosed that information when discovery in this litigation required it. Meanwhile, it assured Agilent in a March 29, 2024 letter that it "understood the gravity of the situation," "share[d] Agilent's need for answers," and, in any event, had "initiated a claim with our warehouse legal liability insurance carrier." (*Id.* ¶ 29.) Xpedient itself did not suffer any damages, so the only losses that the claim would cover were Agilent's, which both parties understood. Having made an insurance claim for these losses, and informed Agilent of the same, Xpedient cannot now say it did not understand Agilent to have made a timely claim under Section 12(C)(e). This is especially true where Xpedient forced Agilent to delay disposal of the damaged inventory so its insurer could inspect it multiple times, and while Agilent continued to pay for its storage. (*Id.* ¶ 35.)

Xpedient also should be estopped from arguing that Agilent's multiple notices failed to satisfy Section 12(C)(e) because they lacked a detailed basis for Xpedient's liability or the inventory's value. As to damages, Xpedient was actively tallying the value of the damaged inventory. (*Id.* ¶ 25.) As to liability, this is the very information Xpedient ascertained immediately following the Event, but then actively concealed. To excuse such purposeful evasion would allow Xpedient to benefit from its own wrongdoing twice: first, by engaging in the gross negligence that caused the Water Intrusion Event and, second, by concealing its own gross negligence. The law cannot tolerate such an outcome.[5]

### E. At Minimum, Whether Xpedient Materially Breached the Agreements is a Disputed Issue, Precluding Summary Judgment on Notice

In Tennessee, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). In *Lee Masonry*, the Tennessee Court of Appeals found any late notice of claim by the plaintiff contractors did not prevent them from pursuing damages where the "City materially breached the contract first." 2010 WL 1713137, at *10. Here, as discussed above, Agilent alleges that Xpedient materially breached the agreements by failing to perform its obligations to manage and maintain the Cromwell Warehouse and protect Agilent's inventory. (AMF ¶¶ 3-23; SAC [ECF 137] ¶¶ 106-113, 135.) Xpedient also materially breached (a) the MOSA's cooperation clause by hiding its dereliction from Agilent before the Event and actively concealing it from Agilent afterwards, and (b) the Site Operating Agreement ("SOA") by failing to provide a dedicated warehouse manager as required. (AMF ¶¶ 28, 6.) Agilent

[5] The MOSA's waiver clauses and Tenn. Code Ann. § 47-50-112(c) do not apply to estoppel, which depends on misleading conduct and detrimental reliance—not the intentional relinquishment of a known right—and do not shield Xpedient from its misconduct here.

disputes that it breached the agreements in any way. But at minimum, whether Xpedient materially breached is a disputed issue of fact precluding summary judgment.

## II. Xpedient is Not Entitled to Summary Judgment on the Limitation of Liability

Xpedient admits it was responsible for utilities at the Cromwell Warehouse. (AMF ¶ 3.) Xpedient knew the inventory could not get wet. (*Id.* ¶ 7.) Xpedient knew, for at least six weeks prior to the Water Intrusion Event, that the warehouse had no heat and that water-filled pipes ran above the inventory. (*Id.* ¶¶ 8, 14.) Xpedient knew, as we all know, what freezing temperatures do to water-filled pipes. (*Id.* ¶ 8.) Xpedient was warned of the freezing temperatures well in advance of (including in the days preceding, and on the same day as) the Water Intrusion Event. (*Id.* ¶ 16-17.) The simplest precautions were available to protect the inventory. Xpedient took none until *after* the Event. Under Tennessee law, and these facts, the limitation of liability is unenforceable.

### A. In Tennessee, a Contractual Limitation Cannot Shield Liability for Gross Negligence

In Tennessee, parties cannot contract away liability for their own gross negligence or reckless conduct. *See Copeland v. HealthSouth/Methodist Rehab. Hosp.*, 565 S.W.3d 260, 270 (Tenn. 2018) ("[A] party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing."); *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 154 (Tenn. 2021) (same); *Adams v. Roark*, 686 S.W.2d 73, 75 (Tenn. 1985) (an "agreement contracting against liability for gross negligence" is "unenforceable"); *Buckner v. Varner*, 793 S.W.2d 939, 941 (Tenn. Ct. App. 1990) ("a contract against liability will not operate to protect a party who is guilty of gross negligence.").

In the face of this well-established public policy, Xpedient relies on Tennessee's adoption of U.C.C. § 7-204 to argue that conversion is the only set of facts that can defeat a warehouser's limitation of liability. (Mot. at 14-15, *citing* Tenn. Code Ann. § 47-7-204(b) ("Damages may be limited by a term in the warehouse receipt or storage agreement . . . . Such a limitation is not

effective with respect to the warehouse's liability for conversion to its own use.")). Xpedient, however, misreads the statute and cites no Tennessee caselaw in support of its interpretation.

While the statute invalidates limitations of liability where there is conversion, it does not state that is the only ground on which a limitation is ineffective. Xpedient cites two out-of-state decisions in support of its erroneous contention: *Heather James, LLC v. Day & Meyer, Murray & Young Corp.*, 142 A.D.3d 842 (N.Y. App. Div. 2016), and *Western Mining Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847 (W.D. Pa. 1984). In *Heather James*, a New York appellate court, in a one-page decision, affirmed the denial of a warehouser's motion for summary judgment seeking to cap its liability under the parties' contractual limitation, because the warehouser had failed to show it was not liable for conversion. In so doing, the court stated that "the only circumstance that would render the contractual limitation inapplicable in this case is defendant's conversion of the original box," not its gross negligence. The only authority cited for that statement was *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 664 (N.Y. 1980). *I.C.C. Metals*, however, does not address gross negligence at all. It only decided whether a limitation-of-liability clause protects a warehouser from liability for conversion, and held that it does not. *I.C.C. Metals, Inc.,* 50 N.Y.2d at 664-65; *see also Shimamoto v. S&F Warehouses*, 99 N.Y.2d 165, 175 (N.Y. 2002) (explaining that in *I.C.C. Metals*, "we held that a warehouse may limit its liability for loss of goods resulting from acts of ordinary negligence but not for conversion"). *I.C.C. Metals*

therefore provides no support for the proposition that a limitation clause shields a warehouser from liability for its gross negligence. Xpedient's reliance on *Western Mining Corp.* is similarly flawed.[6]

In sum, Tennessee public policy forbids limitations of liability for gross negligence, nothing in Tenn. Code Ann. § 47-7-204 overrides that policy, and whether Xpedient was "grossly negligent" is, under these facts, at minimum, a question for the jury. The Court should find that Section 12(C)(c) of the MOSA does not limit Xpedient's liability for its own gross negligence.

**B. Genuine Issue of Material Fact Exists as to Whether Xpedient Acted with Gross Negligence Before the Water Intrusion Event**

Xpedient argues that the record "contains no evidence that any Xpedient decisionmaker actually knew that the specific sprinkler piping would freeze and consciously chose to accept that outcome." (Mot. at 16.) Even if this were true (it is not), it misstates the standard. Although gross negligence requires proof of the defendant's subjective mental state, it is satisfied by a showing of an "indifference to injurious consequences, conscious recklessness of the rights of others." *Lawson v. Hawkins Cnty.*, 661 S.W.3d 54, 61–62 (Tenn. 2023) (cleaned up). It demands "more than . . . want of ordinary care," (*id*. at 61), yet "differs from ordinary negligence only in degree, not in kind." *Bishop v. AVR Express, LLC*, 2023 U.S. Dist. LEXIS 223234, at *10–11 (W.D. Tenn. 2023).

[6] In *Western Mining*, after rejecting *I.C.C. Metals*' conversion holding, the court noted that it was "unable to find any case decided under the [U.C.C.] which stands for the proposition that contractual limitations of liability are invalid where a bailee is shown to be grossly negligent," and was therefore "unwilling to create such an exception from whole cloth." 577 F.Supp. 847, 851 (W.D.Penn. 1984). But the court's decision did not rest on that observation, as "in any event," it found, "as a matter of law," that the bailee was not grossly negligent. *Id*. In the 42 years since *Western Mining*, courts nationwide have held, under Article 7 of the U.C.C. and the state statutes adopting it, that a contractual limitation of liability is invalid where the bailee is grossly negligent. For example, in *Butler Mfg. Co. v. Americold Corp.*, 835 F. Supp. 1274 (D. Kan. 1993), the defendant warehousers argued that the contract's limitation of liability capped damages for gross negligence because it was "negotiated by competent parties of equal bargaining power." *Id*. at 1282. The court rejected that argument, explaining that limiting damages for conduct beyond ordinary negligence, such as gross negligence, "is not contemplated by the UCC and . . . is not valid under Kansas common law." *Id*. at 1281. The court concluded that the "contractual provisions purporting to limit defendants' liability for damages caused by defendants' gross negligence and willful or wanton conduct are unenforceable under Kansas common law." *Id*. at 1283; *see also Jasphy v. Osinsky,* 364 N.J. Super. 13, 22 (N.J. App. 2003) (finding that New Jersey's version of U.C.C. § 7-204 "does not permit warehousemen to limit their liability in all possible ways, insulated from court review," but instead "must adhere to the limitations imposed by case law").

Agilent need not show that Xpedient predicted the exact point of failure. Instead, Agilent only needs to offer evidence from which a reasonable jury could find that Xpedient knew of a serious, obvious risk to goods in its exclusive custody and was consciously indifferent to it. *See, e.g., Bishop*, 2023 U.S. Dist. LEXIS 223234, *11 (denying defendant's summary judgment motion on plaintiff's gross negligence claim where "[a] reasonable jury could find that [defendant's] conduct is more than a departure from the duty of ordinary care and amounts to a conscious indifference to the consequences of his actions."). As detailed below, a reasonable jury could find so here.

First, Xpedient admits, as it must, that it was responsible for utilities at the Cromwell Warehouse. Under the parties' agreements, Xpedient was responsible for "facility management, including . . . utilities . . . [and] maintenance." (AMF ¶ 3.) Xpedient confirmed this at deposition, testifying that it agreed to "take care of the [Cromwell] warehouse," including "ensuring utilities were operational." (*Id.*)

Second, Xpedient failed to ensure that the Cromwell Warehouse had working gas service when the lease began, and for over eight months thereafter. Ensuring working utilities, such as HVAC, was the job of Xpedient's Director of Operations for the Cromwell Warehouse, Jamie Davis. (*Id.* ¶ 10.) Mr. Davis testified that, at no point prior to the Water Intrusion Event, did he investigate the HVAC system's function. (*Id.* ¶ 11.) Furthermore, while Xpedient's practice is to have an HVAC preventive maintenance contract in place when it takes over a new facility like the Cromwell Warehouse, Mr. Davis testified that he knew the HVAC system was not in good working order, but failed to arrange the typical preventive maintenance contract. (*Id.* ¶ 11.)

Third, not only has the evidence now confirmed that, at no point in 2023 did the Cromwell Warehouse have working heaters, but Xpedient also knew about the lack of heat weeks in advance

of the Water Intrusion Event. (*Id.* ¶ 12.) On November 16, 2023 (six months into the lease, but also two months prior to the Event), when Xpedient finally arranged for an HVAC vendor to visit the Warehouse, the vendor could not test the heating system because the gas meter was locked. (*Id.* ¶ 13-14.) Xpedient knew or should have known from that date that the gas line was locked and the HVAC system could not produce heat. Mr. Updike agreed that Xpedient knew its leased premises had no working heaters from December 1, 2023, through January 17, 2024.[7] (*Id.* ¶ 14.)

Fourth, Xpedient knew the inventory could not get wet. From the start of the parties' relationship, Agilent made this clear and repeated the message to Xpedient in the months before the Event. Xpedient's own internal communications, and its witnesses' testimony, likewise, confirmed that Xpedient understood this before the loss. (*Id.* ¶ 7.)

Fifth, Xpedient knew water-filled pipes ran above the inventory and the effect of freezing temperatures on water-filled pipes. Mr. Davis testified that the sprinkler system ran above Agilent's inventory the entire time it was stored at the Warehouse. (*Id.* ¶ 8.) As early as May 2023, Xpedient knew that one of the Warehouse's utility accounts included fire protection, which was understood to be "water." (*Id.* ¶ 9.) Around the same time, Colliers advised Xpedient that the Warehouse contained a wet-pipe sprinkler system. (*Id.*) Mr. Livingston admitted that water from that piping would be a hazard to the inventory. (*Id.* ¶ 8.) Speaking for the company, Mr. Updike testified that "Xpedient understands that . . . temperature can cause freezing when it comes to water," and that a frozen line "could burst or buckle and fall onto what's underneath it, whether that's inventory, whether that's the dock, whether it's office space." (Ex. D at 351:1-13.)

[7] Further establishing Xpedient knew or should have known that the Warehouse lacked heat: On January 9, 2024, just eight days before the Event, Xpedient paid a vendor's invoice, which stated, "Need to come back and test system when they have the gas unlocked." (*Id.* ¶ 15.) Both Mr. Livingston and an Xpedient Director of Operations reviewed the invoice before it was paid. (*Id.*)

Sixth, Xpedient was warned of the freezing temperatures in advance of the Event and did nothing. It is undisputed that Mr. Livingston took no steps to protect the Warehouse before temperatures dropped to two degrees.[8] (*Id.* ¶ 18.) During the freeze, he testified that he wore his coat indoors and brought a portable heater into his office. (*Id.* ¶ 16.) Yet, Xpedient took no steps to provide temporary heat to the leased space or inquire whether the sprinkler could freeze. (*Id.* ¶ 19.) Hours before the loss, Mr. Livingston told Mr. Updike that the warehouse was cold, it was snowing, and the gas was not on. (*Id.* ¶ 17.) Yet, Mr. Updike did not instruct Mr. Livingston to take any action to protect the Warehouse or verify what temperatures Memphis was experiencing. (*Id.*) A jury could reasonably find that response reflects conscious indifference to consequences.

Seventh, simple precautions were available to protect the inventory, and Xpedient took none of them. Between December 1, 2023, and January 17, 2024, Xpedient never sought or received confirmation that gas service had been restored to the Warehouse and/or that the heaters were working. (*Id.* ¶ 20.) Nor did it undertake any other measures that would have prevented the pipes from freezing, some of which were obvious, cheap, and quick. For example, during the same storm, Colliers, which was responsible for maintaining the Warehouse's vacant suite, faced the same lack of working heat. It placed space heaters throughout its side of the building and avoided any significant damage.

Eighth, Xpedient intentionally disregarded one of the bargained-for contractual duties that, if properly discharged, could have prevented the destruction of Agilent's inventory: Under the SOA, Xpedient was to "operate the facility with one working manager," available Monday through Friday from 7:00 a.m. to 4:00 p.m. (*Id.* ¶ 5.) That manager was Mr. Livingston. (*Id.* ¶ 6.) Xpedient

[8] Not only was the storm well publicized but it was impossible to ignore. Memphis temperatures stayed below freezing for three days before the Event and fell to the teens or lower in the last two. *See* https://www.weather.gov/wrh/Climate?wfo=meg

testified that Mr. Livingston "was dedicated to that facility" and that his "number one priority" was making sure "the facility and Agilent was taken care of." (*Id.* ¶ 6.) Despite Mr. Livingston's salary being included in the fixed costs that Xpedient charged Agilent (in exchange for which, Agilent believed it was receiving dedicated, full-time caretaking of its inventory), according to Mr. Livingston, he spent about 90% of his time on company-wide safety work unrelated to the Cromwell Warehouse. (*Id.*) A jury could find Xpedient acted with conscious indifference to the safety of Agilent's goods (if not intentional misrepresentation), in silently accepting the financial windfall of an employee paid for by a single customer (Agilent), but whose efforts were primarily dedicated elsewhere, including in the days before the Event where his attention was most needed but was occupied by other tasks for Xpedient. (Ex. E at 41:18-43:25, 111:25-114:4.)

Ultimately, Xpedient's claimed lack of awareness is a credibility question. Xpedient relies on Mr. Updike's testimony that the lack of gas was not treated as urgent because Xpedient allegedly did not know pipes froze in winter when unprotected from the cold. A jury need not accept that explanation, and could reasonably find that (1) an approximately 500-employee logistics company, operating throughout North America and serving regions including Canada, the Midwest, and Utah, absolutely knows that pipes inside buildings can freeze when temperatures drop to two degrees; (2) that Xpedient knew for six weeks that its warehouse had no heat; (3) knew water-filled pipes ran above Agilent's water-sensitive goods; (4) was told on the day of the loss that the building was cold and the gas was off, and (5) did nothing. That is evidence of conscious indifference to consequences and is a fact question for the jury. The Court should deny Xpedient's motion for summary judgment on gross negligence.

### C. Agilent's Damages Claims are Not Barred as Consequential Damages

Xpedient contends that the disposal and replacement freight costs are consequential damages excluded under the MOSA. (Mot. at 16.) Xpedient is wrong. Section 12(C)(a) of the MOSA adopts replacement cost as the direct measure for damaged products, which is exactly what these are. The $103,773 in disposal costs and $170,419 in replacement-freight costs are not collateral lost profits or remote third-party liabilities. (*Id*. at 17.) Destroyed inventory cannot practically be replaced without removing and disposing of the unusable goods, and replacement products do not materialize at the warehouse without transportation. These expenditures are part of placing Agilent in the position it would have occupied had Xpedient exercised the required care. Xpedient's cited consequential-damages cases do not establish that every post-loss expenditure is consequential as a matter of law. A jury could find these costs were the immediate and necessary result of the physical destruction of the products.

Further, Agilent's $958,122 in post-loss payments to Xpedient are not a claim for abstract "premature loss of use." (*Id*. at 17.) They are fixed payments made after Xpedient's material breach destroyed the inventory, eliminating the need for the contracted facility. A payment made for a facility whose sole purpose was to hold goods now destroyed is a direct economic consequence of the breach, not a remote downstream loss. The $5,281 relocation cost similarly reflects the immediate need to protect and move undamaged products after the warehouse failure. (*Id*. at 17.)

Section 6(B) does not compel judgment for Xpedient. That allocation addresses a neutral event causing premature loss of use or possession; it should not be construed to force Agilent to pay facility and relocation expenses caused by Xpedient's own gross negligence or reckless failure to winterize. At a minimum, whether the Event falls within Section 6(B), whether Xpedient

materially breached first, and whether the claimed payments bought any usable service present disputed issues of fact for the jury.

### D. The Limitation of Liability Is Unenforceable Because Xpedient Refused Agilent's Request for Full-Value Liability

Under the Uniform Commercial Code and Tennessee law, a warehouse may limit its liability *only if* the bailor has the opportunity to increase that liability by paying increased rates. *See* Tenn. Code Ann. § 47-7-204(b) ("[o]n request of the bailor in a record at the time of signing the storage agreement . . . the warehouse's liability may be increased on part or all of the goods covered by the storage agreement," and "increased rates may be charged based on an increased valuation of the goods.").[9] Where the warehouse does not provide that opportunity, the limitation is unenforceable. To illustrate, in *Hearst Corp. v. Bonded Services, Inc.*, 124 Misc. 2d 455, 476 N.Y.S.2d 733 (Sup. Ct. N.Y. Cnty. 1984), a warehouser argued that a storage agreement capped its liability for film damaged by water while in storage. The court explained that "as is apparent from the statutory language [U.C.C. § 7-204] . . . in order for the alleged contractual limitation of [the warehouse's] liability to be enforceable, the depositor of goods must have been given an opportunity to obtain an increased valuation by paying increased rates." *Id*. at 457. But the warehouser had not alleged "that [it] gave plaintiff the opportunity to pay a specified additional charge consonant with full liability." *Id*. For that reason, "the purported limitation of liability as alleged would not be enforceable" and the court struck the defense as a matter of law. *Id*.

Here, Agilent made the request that the statute contemplates. During negotiations, Agilent proposed that Xpedient's maximum liability for Product Losses under Section 12(C)(c) be "the greater of: the value of the Products stored at the Facility at the time of the loss or one million

[9] Xpedient concedes that this language is "materially identical" to U.C.C. § 7-204 and that "Tennessee adopted the same operative language."

dollars ($1,000,000) per occurrence." (AMF ¶ 34.) Xpedient's response struck that language and commented, "Our limit is $1M." (*Id.*) Xpedient's motion also admits that "Agilent proposed Product Loss liability be the greater of the value of the Products or $1 million per occurrence, but Xpedient specifically rejected that proposal and responded, 'Our limit is $1M.'" (Mot. at 11.)

Nothing in the record indicates that Xpedient offered an increased rate for full-value coverage. While Xpedient argues that "[t]here is no evidence that Agilent requested a higher limit" (Mot. at 10), this is contradicted by the evidence. Agilent did request, in writing at the time of signing, that Xpedient's liability cover the full value of the Products stored at the Facility. (AMF ¶ 34.) Agilent could not agree to pay increased rates that Xpedient never offered. Because Xpedient refused the request rather than offering increased rates, the statutory condition for enforcing the limitation was not met. *Hearst*, 124 Misc. 2d at 457. Xpedient's reliance on Agilent's sophistication and internal approval documents does not change this result as it does not excuse Xpedient's failure to satisfy a statutory condition. Accordingly, Section 12(C)(c) is unenforceable under Tenn. Code Ann. § 47-7-204(b), and the Court should deny summary judgment for this reason too.

## III. Conclusion

For the foregoing reasons, Agilent respectfully requests the Court deny Xpedient's motion for summary judgment.

DATED: October 19, 2026

Respectfully submitted,

*/s/ Margaret C. McDonald*
Amber Finch (#222321) (admitted *pro hac vice*)
Margaret C. McDonald (#307008) (admitted *pro hac vice*)
Katherine P. Goetz (#346205) (admitted *pro hac vice*)

REED SMITH LLP
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
Telephone: 213-457-8000
Facsimile: 213-457-8080
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan (BPR # 16718)
BURCH PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
Telephone: 901-524-5000
Facsimile: 901-524-5024
dhalijan@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*