| | |
|---|---|
| AGILENT TECHNOLOGIES, INC.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | Case No. 2:25-cv-02101-BCL-cgc<br><br>Judge Brian C. Lea<br>Magistrate Judge Charmaine Claxton |
| XPEDIENT MANAGEMENT GROUP, LLC,<br>Cross-Plaintiff,<br><br>v.<br><br>ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Cross-Defendants. | |
| FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | Case No. 2:25-cv-02424-BCL-tmp<br><br>JURY DEMANDED |

**AGILENT TECHNOLOGIES, INC.'S RESPONSE TO XPEDIENT MANAGEMENT GROUP, LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff Agilent Technologies, Inc. ("Agilent") hereby submits this response to Defendant Xpedient Management Group, LLC's ("Xpedient") Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

**RESPONSE TO XPEDIENT'S STATEMENTS OF FACTS**

1. Agilent Technologies, Inc. ("Agilent") and Xpedient executed the Master Operating Services Agreement for Logistics Services (the "MOSA") and the Memphis Site Operating Agreement (the "SOA") in May 2023. The SOA identified the facility as approximately 45,000 square feet at 4601 Cromwell Avenue in Memphis and established a term from May 15, 2023 through May 31, 2026. See MOSA Exhibit "1"; SOA Exhibit "2".

**RESPONSE:** Undisputed.

2. MOSA Section 12(C)(a) provides that, subject to the agreement's limitations, Xpedient may be responsible for Agilent's actual manufacturing or acquisition cost to replace Products at their pre-loss condition, less salvage value, when loss or damage is caused by Xpedient's failure to exercise reasonable care. Section 12(C)(b) states that the Products are not insured by Xpedient against loss or injury, however caused. See MOSA § 12(C)(a)-(b), at 4-5 Exhibit "1".

**RESPONSE:** Disputed that MOSA § 12(C)(a) provides that Xpedient "may be responsible." Ex. 1. MOSA § 12(C)(a) provides that Xpedient "*shall* be responsible for the Replacement Cost (defined as Customer's actual Product manufacturing cost or acquisition cost to replace the lost or damaged Products at their pre-loss condition, less salvage value, if any) of lost or damaged Products under its exclusive care, custody and control if the loss or damage was caused by XMG's failure to exercise such care as a reasonably careful person would exercise under

like circumstances." Ex. 1 § 12(C)(a) (emphasis added). Xpedient's paraphrase omits both the mandatory "shall" and the fact that the Products were under Xpedient's "exclusive care, custody and control." *Id.* Disputed to the extent that Xpedient characterizes § 12(C)(a) as "subject to the agreement's limitations." Section 12(C)(a) begins by stating, "Subject to the limitations set forth herein," meaning § 12(C)(a) is subject to the limitations set forth in that section, and not any other limitations in the MOSA or SOA. Ex. 1. Undisputed but irrelevant that § 12(C)(b) states, "Products are not insured by XMG against loss or injury however caused." Ex. 1 § 12(C)(b). Whether or not Xpedient has insurance for Agilent's products is immaterial.

3. Section 12(C)(c) states that Xpedient's maximum liability arising out of or related to loss of or damage to Products may not exceed $1 million per occurrence, $2 million annually, or $5 million over the life of the MOSA. The same paragraph states that the parties are sophisticated commercial organizations negotiating at arm's length and jointly agreed that the Limit was commercially reasonable in relation to the value of the Products, the fees charged, and their respective business interests. See MOSA § 12(C)(c), at 5 Exhibit "1".

**RESPONSE:** Disputed as to Xpedient's characterization and paraphrasing of MOSA § 12(C)(c) that the parties "agreed that the Limit was commercially reasonable in relation to the value of the Products, the fees charged, and their respective business interests." Ex. 1. MOSA § 12(C)(c) instead states that the Limit "is not unreasonably disproportionate to" the "value of the Products and the Fees charged and that reasonably reflect the Parties' respective business interests." *Id.* Disputed to the extent Statement No. 3 is offered to establish that the Limit is enforceable as applied to the conduct at issue, or that it reaches gross negligence, recklessness, or willful misconduct. Undisputed that MOSA § 12(C)(c) states that Xpedient's "maximum liability to [Agilent] arising out of or related to loss or damage to Products ('Product Losses') shall not

exceed one million dollars ($1,000,000) per occurrence, two million dollars ($2,000,000) annually, or five million dollars ($5,000,000) in total over the life of th[e] Agreement." Ex. 1 § 12(C)(c). Undisputed that MOSA § 12(C)(c) states, "The Parties, which are both sophisticated commercial organizations negotiating at arm's length, jointly acknowledge and agree they have negotiated a commercially reasonable Limit that is not unreasonably disproportionate to the value of the Products and the Fees charged and that reasonably reflect the Parties' respective business interests." *Id.*

4. Section 12(C)(d)(ii) excludes liability for Product Losses in excess of the Limit. Section 12(C)(e) requires every Product Loss claim to be made promptly in writing and no later than 90 days after Agilent became aware or reasonably should have become aware of the loss or damage; requires the writing to identify the Products, explain Xpedient's alleged liability, and claim payment of a specified or determinable amount; and states that no action may be maintained without a timely written claim. See MOSA § 12(C)(d)-(e), at 5-6 Exhibit "1".

**RESPONSE:** Disputed that Section 12(C)(d)(ii) excludes liability for Product Losses in excess of the Limit. The Limit is unenforceable as applied to the conduct at issue and does not reach Xpedient's gross negligence, recklessness, or willful misconduct. Disputed as to Xpedient's paraphrasing and characterization of MOSA § 12(C)(e). Instead, MOSA § 12(C)(e) states: "Subject to the exceptions and limitations set forth in this Section, all claims for Products lost, or damaged at each Facility must be made promptly in writing and in all events no later than…(ii) ninety (90) days after Customer has become aware (or reasonably should have become aware) of any such loss or damage." Ex. 1 § 12(C)(e). Undisputed that section 12(C)(e) provides that written notice "shall contain facts sufficient to identify the Products involved, explain [Xpedient's] liability for alleged loss or damage and make claim for the payment of a specified or determinable

amount," that section 12(C)(e) provides: "no action may be maintained by Customer for loss of or damage to Products pursuant to this Section unless a timely written claim has been given," and that section 12(C)(d)(ii) provides that "Notwithstanding anything contained in this Agreement or any Site Operating Agreement to the contrary, [Xpedient] shall not be liable for any loss or damage to the Products…that is within the Allowance or in excess of the Limit." Ex. 1.

5. Section 12(C)(e) also provides that neither party is liable for special, indirect, consequential, or punitive damages, including lost production, income, or profits. See MOSA § 12(C)(e), at 6 Exhibit "1".

**RESPONSE:** Disputed to the extent Statement No. 5 is offered to suggest that the damages Plaintiff seeks are limited by this section. Ex. 1 § 12(C)(e). Undisputed that the final sentence of MOSA § 12(C)(e) states: "Neither Party shall be liable to the other Party for any special, indirect, consequential, or punitive damages, including, but not limited to, loss of production, loss of income, or loss of profits." Ex. 1 § 12(C)(e).

6. MOSA Section 6(B) assigns to Agilent the cost of transporting Products to an alternate facility, rent, and all other facility expenses when an event causes a premature loss of use or possession of the facility. See MOSA § 6(B), at 2 Exhibit "1".

**RESPONSE:** Disputed. This is a mischaracterization of the provision. MOSA § 6(B) is captioned "Facility Relocation" and applies only "[i]f any event with respect to a Facility occurs prior to expiration of the applicable lease agreement resulting in a premature loss of use or possession of the Facility (such as a partial closure, termination for cause or convenience, Force Majeure event), the cost and expense of transporting Product and Material to and from the Facility and to and from an alternate Facility and rent and all other expenses associated with the Facility identified in the Site Operating Agreement or an alternate Facility shall be paid for by Customer."

Ex. 1 § 6(B). Disputed to the extent Statement No. 6 suggests that an "event" includes Xpedient's negligence or gross negligence.

7. The MOSA states that a failure to enforce a provision does not constitute a continuing waiver, and that no waiver, release, alteration, or modification is binding unless set forth in a writing signed by both parties. It also provides that Agilent, for itself and its insurers, waives recovery to the extent subrogation would make Xpedient responsible for losses for which it is not responsible under the MOSA. See MOSA §§ 20, 30(F), 30(H), at 9, 14 Exhibit "1"

**RESPONSE:** Disputed. Xpedient's paraphrasing of the MOSA is incomplete and misrepresents those provisions. The cited provisions of the MOSA state: "Waiver by either Party of or the failure of any Party hereto to enforce at any time its rights with regard to any breach or failure to comply with any provision of this Agreement by the other Party shall not be construed as, or constitute, a continuing waiver of such provision, or a waiver of any other future breach of or failure to comply with the same provision or any other provision of this Agreement" (MOSA § 30(F)); "Modification. No release, discharge, abandonment, waiver, alteration, or modification of any of the provisions of this Agreement, or any of the Exhibits or Appendices referred to herein, will be binding upon either Party unless set forth in a writing signed by both Parties" (*Id.*, § 30(H)); and "Customer, for itself and its successors and assigns and for its insurers, hereby waives all right of recovery against XMG for any and all loss or damage, which occur to the building, equipment, inventory, or other tangible real or personal property owned or leased and used in connection with the Services rendered hereunder, to the extent that subrogation would make XMG responsible for losses to Customer for which XMG is not responsible under this Agreement." (*Id.* § 20).

8. Before execution, Agilent's Logistics Process Manager told Xpedient that he was meeting with Agilent's Legal and Procurement personnel to review all redlines, that Legal and

Procurement were redlining the MOSA, and that more formal feedback would follow his call with Agilent's lawyer. See May 3, 2023 Agilent/Xpedient Emails XMG_3343-44 Exhibit "7".

**RESPONSE:** Disputed that he said, "formal feedback would follow." Instead, Mulryan stated he would, "have more formal feedback tomorrow after the call with the Lawyer." Ex. 7. Undisputed but immaterial that in a May 3, 2023 email, Chris Mulryan, Agilent's Logistics Process Manager at that time, wrote to Xpedient's Adam Sepanski: "I'm meeting my Legal and Procurement team tomorrow at 9:00 AM CST to review all redlines, but I wanted to send this over as a first draft. I was assigned the SOA, and Legal/Procurement are redlining the MOSA." Ex. 7.

9. The parties' written comments addressed the amount of the Product Loss limit. Xpedient wrote, "Our limit is $1M"; Agilent Commercial Counsel Krisztina Comeau asked, "Are these limits acceptable?"; and Agilent Global Sourcing representative Chon-Leong Choo noted that Agilent's contract with the prior provider had a $1 million per-occurrence limit. See May 9, 2023 Xpedient/Agilent Emails, XMG_2733-2801 Exhibit "8".

**RESPONSE:** Disputed as to Xpedient's characterization of the comments on the MOSA draft. Regarding the "Inventory Loss" limitation of liability provision, Xpedient omits that Agilent previously proposed that Xpedient's maximum liability be "the greater of: the value of the Products stored at the Facility at the time of the loss or one million dollars ($1,000,000) per occurrence." Ex. 8 (XMG_2757). Xpedient then struck that language. Ex. 8 (XMG_2739). Disputed that the Exhibit shows who at Agilent wrote the comments. *See id.* Undisputed that after striking Agilent's language, Xpedient wrote in a comment, "Our limit is $1M," and that there is a comment that states, "Are these limits acceptable?" *Id.*

10. Agilent's pre-execution Contract Summary Sheet identified as a legal risk that "XMG's maximum liability coverage is $1 million" and identified the mitigation as "Agilent's

insurance policy will cover the difference in loss." See Agilent's Contract Summary ATI_006893 Exhibit "9". The same document stated that Agilent's insurance would cover inventory loss and expenses associated with product damage. *Id.*

**RESPONSE:** Disputed that the Exhibit is a "pre-execution Contract Summary Sheet. Exhibit 9 is a "Global Sourcing Indirect Procurement Contract Summary Sheet." Ex. 9. Disputed to the extent Xpedient suggests Exhibit 9 establishes the meaning or enforceability of MOSA § 12(C)(c). Undisputed but immaterial that Exhibit 9 contains the quoted language. Ex. 9.

11. On January 17, 2024, water entered the Memphis warehouse after fire-sprinkler and domestic-water piping froze and burst. Agilent and Factory Mutual refer to the incident as the January 17, 2024 "Water Intrusion Event." (Doc. 137 ¶¶ 70-85; Doc. 136 ¶¶ 44-51).

**RESPONSE:** Undisputed that water entered the Memphis warehouse on January 17, 2024, when water-filled pipes froze and burst, and that Agilent and Factory Mutual refer to that incident as the "Water Intrusion Event."

12. On January 19, 2024, Agilent's Chris Mulryan wrote internally that Xpedient had reported a water break "raining water down on the TIPS" and asked Agilent personnel to assess the damage. On January 25, Mulryan reported that 321 pallets were impacted, discussed repair versus disposal, and addressed who would bear liability. See Jan. 19–25, 2024 Agilent Internal Emails ATI_000470-72 Exhibit "3".

**RESPONSE:** Disputed as a mischaracterization of the cited emails. The January 19, 2024 email states: "Xpedient notified Christy that they had a water main break this week, raining water down on the TIPS." Ex. 3 (ATI_000471). The January 25, 2024 email from Mulryan states: "Late last week, we were notified by Xpedient that a water pipe had burst at their site holding our TIPS," and lists as an action item "Victoria to check on impact - 321 pallets impacted." *Id.* (ATI_000470).

Disputed further that Mulryan "addressed who would bear liability." He wrote only: "The language in the contract isn't super clear as to who will bear the liability, and we don't want to start down that path." *Id.* (ATI_000470). Undisputed that the quoted language appears in the email.

13. On February 7, 2024, Agilent sent Xpedient an email stating that Agilent's Products had "experienced water damage," that Agilent was investigating the extent of the damage, and that Agilent would provide an update after the necessary steps and resulting costs were determined. See Feb. 7, 2024 Agilent Internal Email ATI_004078 Exhibit "4".

**RESPONSE:** Disputed that the communication was an "Agilent Internal Email." It is a written notice of claim titled "Agilent Water Damage Notice," sent by Chris Mulryan to Xpedient's CEO John White, as well as Dirk Updike, and Jamie Davis, which states: "On January 19, 2024, the Agilent product stored at the Facility managed by Xpedient Management Group, LLC experienced water damage, which was previously reported by Dirk Updike. Agilent is investigating the extent of the damage to the product and determining what steps must be taken in order to mitigate the damage to the product if possible. We will update you once the steps and resulting costs are determined." Ex. 4 (ATI_004078). Undisputed that the quoted language appears in the February 7, 2024 communication.

14. The February 7 email requested information concerning the cause of the water damage, repairs and remediation, and measures to prevent recurrence. It did not state that Xpedient was liable, demand payment, or identify a specified or determinable amount claimed from Xpedient. *Id.*

**RESPONSE:** Disputed. Statement No. 14 is an incomplete and misleading account of the February 7, 2024 notice. Disputed that Xpedient's paraphrasing of the email accurately captures what the email stated. The February 7 notice requested from Xpedient, "[a]n explanation as to

what caused the water damage," "[a] summary of what actions have been taken in order to repair /remediate the facility," and "[a] plan on what actions are planned going forward in order to prevent a similar incident from happening in the future." Disputed that the February 7 letter did not state that Xpedient was liable, demand payment, or identify a specified or determinable amount claimed from Xpedient. *See* Ex. 4. Agilent's February 7 letter noted that Agilent's "product stored at the Facility managed by Xpedient Management Group, LLC experienced water damage." Ex. 4. Xpedient's management of the Cromwell Warehouse is an explanation of Xpedient's liability, and the damaged Tips were a determinable amount of money and Agilent was making a claim for that determinable amount. Ex. 4.

15. Ninety days after February 7, 2024 was May 7, 2024. Agilent did not send a writing invoking Section 12(C)(e) until June 7, 2024, 121 days after February 7 and 31 days after May 7. See June 7, 2024 Agilent Notice of Claim Ltr. ATI_011132 Exhibit "5".

**RESPONSE:** Disputed that Agilent did not send a writing invoking Section 12(C)(e) until June 7, 2024. Agilent's February 7, 2024 Water Damage Notice was a prompt written claim under § 12(C)(e), and the provision requires no express citation to that section. Ex. 4. Undisputed that ninety days after February 7, 2024 was May 7, 2024.

16. Agilent's June 7 letter was titled "Agilent's Notice of Claim Pursuant to Master Operating Services Agreement" and expressly invoked Section 12(C)(e). The letter characterized the matter as a "potential claim," stated that Agilent was unable to fully explain Xpedient's liability or make a claim for payment of a specified or determinable amount, and reported a preliminary estimate of $8,054,398.96 in irreparably damaged inventory after inspection and segregation concluded on March 29, 2024. *Id.*

**RESPONSE:** Disputed that Xpedient's characterization of the letter is accurate, including

Xpedient's characterization that the letter "expressly invoked" Section 12(C)(e) or that the letter "characterized" the "matter" as a "potential claim." Ex. 5. The letter speaks for itself. Ex. 5. Undisputed that Agilent's June 7, 2024 letter is titled "Agilent's Notice of Claim Pursuant to Master Operating Services Agreement," cites Section 12(C)(e) of the MOSA, refers to a "potential claim," states that Agilent "is unable to fully 'explain XMG's liability for alleged loss or damage' or 'make [a] claim for the payment of a specified or determinable amount of money'" and reports that "upon preliminary inspection and segregation of damaged from undamaged inventory concluding on March 29, 2024, Agilent has determined that approximately $8,054,398.96 worth of inventory has been irreparably damaged." Ex. 5.

17. Xpedient's June 24 response acknowledged receipt of the June 7 letter, stated that Xpedient had provided it to its insurer and adjuster, and stated that Xpedient would work through the matter under the terms and conditions of the MOSA and SOA. The response did not state that the June 7 notice was timely or that Section 12(C)(e) had been waived. See June 24, 2024 Xpedient Response to Claim Ltr XMG_0352 Exhibit "6".

**RESPONSE:** Disputed as to Xpedient's characterization and incomplete paraphrasing of its June 24 response. Ex. 6. Undisputed that Xpedient's June 24, 2024 letter states: "We are in receipt of your 'Notice of Claim' letter dated June 7, 2024"; that "[o]ur insurers, AIG and their adjuster representatives at Engle Martin, have been in contact with Agilent's FM Global insurance group," that Xpedient "provided the 'Notice of Claim' letter to AIG and Engle Martin and they are working with FM Global to conduct a joint inspection of the product to gain alignment on the values in question"; and that "Xpedient is committed to working through this situation following the terms and conditions outlined in the Master Operating Services Agreement and Site Operating Agreement we have in place for the Cromwell Ave facility in Memphis, TN." Ex. 6.

18. On April 23, 2024, Agilent executive Rodney Gonsalves wrote that approximately $8.1 million in inventory would likely be disposed of and that Agilent expected to recover approximately $4.1 million "from the warehouse provider and insurance," leaving an anticipated uncovered loss. See April 22-24, 2024 Agilent Internal Emails, ATI_012818-012820 Exhibit “10”.

**RESPONSE:** Disputed as to Xpedient’s paraphrasing and characterization of Exhibit 10. Ex. 10. Rodney Gonsalves wrote on April 23, 2024: “$12.3M in inventory was impacted of which $8.1M will likely be disposed. We think we can recover $4.1M from the warehouse provider and insurance. ... This would leave us with a loss of $2.2M.” Ex. 10 (ATI_012819). Xpedient’s characterization of this email, including what “Agilent expected to recover” and its “anticipated uncovered loss,” is inconsistent with what the email states. Ex. 10. Disputed to the extent Statement No. 18 characterizes that email as reflecting a legal determination of the terms of the MOSA or SOA. Undisputed that the quoted language appears in the email.

19. Agilent’s April 2024 financial presentation stated, "Xpedient liability at $1 M per contract," and separately modeled a $1 million claim against Xpedient and a $3,114,300 insurance claim under Agilent’s Factory Mutual policy. See Agilent Financial Presentation April 23, 2024 Exhibit “11” at ATI_011537.

**RESPONSE:** Disputed as to Xpedient’s paraphrasing and characterization of Exhibit 11, including Xpedient’s characterization of Exhibit 11 as a “financial presentation.” The slides are titled, “Tips_Xpedient water damage issue.” Ex. 11. Disputed as to Xpedient’s characterization of a “$1 million claim *against* Xpedient.” Ex. 11 (emphasis added). Instead, the slide entitled, “Projected financial impact,” listed $1 million next to “Claim from Xpedient per contract.” Disputed to the extent Xpedient characterizes Exhibit 11 as containing Agilent’s actual financials, as the slide expressly labels these amounts as projections. Ex. 11. Undisputed that one of the two

scenarios on the "Projected financial impact" slide lists "3,114,300" as "Insurance claim from Agilent's FM Policy." Undisputed but immaterial that Agilent's April 23, 2024 internal presentation contains the quoted language.

20. On April 24, 2024, Agilent's External Financial Reporting group asked whether the anticipated receivables from "insurance ($3.1m)" and the "warehouse ($1m)" were sufficiently certain to be booked and requested separate confirmation regarding the insurance and Xpedient claims. *Id.*

**RESPONSE:** Disputed that Exhibit 10 shows that the April 24, 2024 email came from Agilent's "External Financial Reporting group." The email came from Amit Agarwal, whose signature line says, "External Financial Reporting." Ex. 10. Disputed as to Xpedient's characterization and paraphrasing of the email. The email does not use the language "anticipated receivables" or "sufficiently certain to be booked." Ex. 10. Nor did the email "request[] separate confirmation regarding the insurance and Xpedient claims." Ex. 10. Undisputed that the April 24, 2024 email contains the quoted language.

21. Agilent's damages expert calculates $9,822,798 in alleged underlying loss before insurance payments and interest: $8,520,974 in replacement costs, $958,122 in post-event SOA payments, $103,773 in disposal costs, $170,419 in estimated replacement freight, $64,227 in inventory-count expense, and $5,281 to transport undamaged inventory. See Grudzien Report at 5 Exhibit "13".

**RESPONSE:** Disputed that the amounts in Statement No. 21 reflect the final calculations from Agilent's damages expert. On September 28, 2026, Agilent's damages expert supplemented his expert report with new calculations. (Ex. AA.) Undisputed that Exhibit 13, which contains the damages expert's report prior to the supplemented report, lists Replacement Costs of Damaged

Pipettes of $8,520,974, Site Operating Agreement Payments to Xpedient of $958,122, Disposal Costs of $103,773, Freight Costs for Replacement Pipettes of $170,419, Damaged Inventory Count Expense of $64,227, and Transportation Costs of Undamaged Pipettes of $5,281, for a subtotal of $9,822,798. Ex. 13.

22. The $8,520,974 replacement-cost calculation values 25,012 boxes of allegedly damaged pipette tips using contractual unit prices. Factory Mutual paid Agilent a total of $4,787,087 toward the claimed loss. See Grudzien Report at 6-8 at 5, 8 & Ex. A, Schedule 1 Exhibit "13".

**RESPONSE:** Disputed that Statement No. 22 reflects the final opinion of Agilent's damages expert. On September 28, 2026, Agilent's damages expert supplemented his expert report. (Ex. AA.) Disputed that Xpedient's characterization and paraphrasing of Exhibit 13 is accurate. Exhibit 13 states that the Replacement Costs of Damaged Pipettes were $8,520,974, and that Grudzien reported he "calculated the value of replacing the 25,012 boxes of damaged pipette tips inventory," and "used the unit price per the most recent known contract price between Agilent and Labcon prior to the water intrusion event." Ex. 13. Disputed to the extent Statement No. 22 characterizes the inventory as merely "allegedly damaged." Disputed that Exhibit 13 supports the conclusion that "Factory Mutual paid Agilent a total of $4,787,087 toward the claimed loss." Undisputed that Exhibit 13 calculates $8,520,974 as the value of replacing 25,012 boxes of damaged pipette tips inventory. Ex. 13.

23. The expert describes the $958,122 in post-event SOA payments as "additional overhead damages" arising from payments Agilent continued to make through January 2, 2026, and describes the $5,281 transportation claim as the cost of moving undamaged Products to another Agilent warehouse. See Grudzien Report at 6-7 & Ex. A, Schedules 2, 6 Exhibit "13".

**RESPONSE:** Disputed that the amounts in Statement No. 23 reflect the final calculations from Agilent's damages expert. On September 28, 2026, Agilent's damages expert supplemented his expert report. (Ex. AA.) Disputed as to Xpedient's characterization and paraphrasing of Exhibit 13. In Exhibit 13, Agilent's damages expert states that he understood that "Agilent continued to make payments to Xpedient, despite not utilizing the warehouse after the loss event," and that he "detailed the invoiced amounts related to the use of the Xpedient warehouse involved in the water intrusion event since the date of the intrusion (January 17, 2024) and ha[s] included these as additional overhead damages," and that "these payments total $958,122 through January 2, 2026." Ex. 13 at 6. The Report further discusses "Transportation Costs of Undamaged Pipettes," calculates these costs to total $5,281, and states that "Agilent incurred costs to move undamaged inventory from the Cromwell Warehouse" to another Agilent warehouse. Ex. 13. Undisputed that the quoted language and subtotals are in Exhibit 13.

24. The expert describes the $103,773 disposal claim as third-party costs to dispose of allegedly damaged Products; calculates the $170,419 freight claim as an estimate equal to two percent of replacement costs; and describes the $64,227 inventory-count claim as expenses incurred between February and April 2024 to count allegedly damaged inventory. See Grudzien Report at 6-7 & Ex. A, Schedules 3-5 Exhibit "13"

**RESPONSE:** Disputed that the amounts in Statement No. 24 reflect the final calculations from Agilent's damages expert. On September 28, 2026, Agilent's damages expert supplemented his expert report. (Ex. AA.) Disputed as to how Xpedient characterizes and paraphrases Exhibit 13. Exhibit 13 states that the $103,773 is for "Disposal Costs for Damaged Pipettes" that were incurred "from CBRE, who subcontracted with Doxicom, to dispose of the damaged product from the Cromwell Warehouse, including shrink-wrapping"; states that freight costs for replacement

inventory were "estimated at 2% of the replacement costs based on our review of actual historical freight costs for Labcon purchases," totaling $170,419; and describes the $64,227 as the cost of "a physical count of the damaged inventory at the warehouse," "incurred between February and April 2024." Ex. 13. Disputed to the extent Statement No. 24 characterizes the inventory as merely "allegedly damaged." Undisputed that those subtotals are listed in Exhibit 13.

25. Factory Mutual sues as Agilent's subrogee. Its damages expert also seeks $335,446 in Factory Mutual's own adjustment expenses: $318,478 for an industrial hygienist, $12,248 for a salvor, and $4,720 for a forensic accountant. (Doc. 136 at 1; Ex. 9, Grudzien Report at 9-10 & Ex. B, Schedule 2 Exhibit 13)

**RESPONSE:** Disputed to the extent Statement No. 25 implies that $335,446 is a final calculation. On September 28, 2026, Agilent's damages expert supplemented his expert report. (Ex. AA.) Disputed as to the characterization that its damages expert is seeking an amount, instead of providing an expert opinion on damages. Undisputed that Exhibit 13 includes those subtotals, including $335,446 as "adjustment expenses" which include $318,478 for "Industrial hygienist," $12,248 for a "salvor" and $4,720 for a forensic accountant. Undisputed that Factory Mutual sues as Agilent's subrogee.

26. Agilent asserts contract, bailment, negligent-misrepresentation, negligence/recklessness, declaratory, and negligence-per-se theories against Xpedient; Factory Mutual asserts contract, bailment, negligence, gross-negligence, and negligence-per-se theories. Each seeks recovery arising from the same alleged physical damage to Agilent's Products during the January 17 event. (Doc. 137, Counts I-VI; Doc. 136, Counts I-V)

**RESPONSE:** Disputed to the extent Statement No. 26 characterizes those claims as co-extensive or as arising solely from "the same alleged physical damage to Agilent's Products during

the January 17 event." The claims rest on distinct duties and distinct conduct. (SAC.) Undisputed that Agilent's First Amended Complaint asserts claims for breach of contract, bailment, negligent misrepresentation, negligence/recklessness, declaratory judgment, and negligence per se against Xpedient, and that Factory Mutual asserts claims for breach of contract, bailment, negligence, gross negligence, and negligence per se.

27. Neither Agilent nor Factory Mutual pleads a conversion claim or alleges that Xpedient appropriated the Products to its own use. (Doc. 137, Counts I-VI; Doc. 136, Counts I-V)

**RESPONSE:** Disputed to the extent Statement No. 27 is offered to suggest that the absence of a conversion claim establishes that MOSA § 12(C)(c) is enforceable as to the conduct at issue. Undisputed, but immaterial, that neither Agilent nor Factory Mutual pleads a claim for conversion.

28. Colliers, St. Paul's property manager, contracted with Security Fire Protection Co., Inc. to perform ongoing quarterly, annual, and five-year inspections, testing, and maintenance of the wet-pipe sprinkler system. Colliers Responses to Interrogatories Interrog. Nos. 3, 7 Exhibit "14". A January 4, 2024 wet-sprinkler inspection report identified Colliers Property Manager Shellie Moses as the contact and recommended maintaining a minimum temperature of 40°F during winter. See Jan. 4, 2024 Security Fire Report COLLIERS_01321-40, at COLLIERS_01323 Exhibit "15".

**RESPONSE:** Undisputed.

29. Colliers has identified no record that the January 4 report was forwarded, distributed, or transmitted to Xpedient before the January 17 event.

**RESPONSE:** Disputed to the extent Statement No. 29 is offered to suggest that Xpedient was unaware of the wet-pipe sprinkler system, of the freeze risk to the piping in its leased space, or of the fact that its space had no heat during the January 2024 freeze. Undisputed that Colliers

has identified no record that the January 4, 2024 inspection report was forwarded, distributed, or transmitted to Xpedient before January 17, 2024.

DATED: October 19, 2026

Respectfully submitted,

*/s/ Margaret C. McDonald*
Amber Finch (#222321) (admitted *pro hac vice*)
Margaret C. McDonald (#307008) (admitted *pro hac vice*)
Katherine P. Goetz (#346205) (admitted *pro hac vice*)
REED SMITH LLP
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
Telephone: 213-457-8000
Facsimile: 213-457-8080
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan (BPR # 16718)
BURCH PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
Telephone: 901-524-5000
Facsimile: 901-524-5024
dhalijan@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*