| | |
|---|---|
| AGILENT TECHNOLOGIES, INC.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | Case No. 2:25-cv-02101-BCL-cgc<br><br>Judge Brian C. Lea<br>Magistrate Judge Charmaine Claxton |
| XPEDIENT MANAGEMENT GROUP, LLC,<br>Cross-Plaintiff,<br><br>v.<br><br>ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Cross-Defendants. | |
| FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | Case No. 2:25-cv-02424-BCL-tmp<br><br>JURY DEMANDED |

**AGILENT TECHNOLOGIES, INC.'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Federal Rule of Civil Procedure 56 and LR 56.1(b) Agilent Technologies, Inc. ("Agilent") identifies the following additional material facts:

1. Xpedient is a sophisticated logistics company that operates warehouses in cold climates, including Canada, the Midwest, and Utah, where many of its key personnel work, and, in 2023, it employed over 500 people and still does today. Ex. A, Ex. B. at 20:8-14, 151:3-152:1 Ex. C at 16:4-17:10, 156:7-19; Ex. D at 71:11-18, 72:8-16; Ex. E at 337:17-338:4.

2. At the time of the January 17, 2024 water intrusion event (the "Event") at the Cromwell Warehouse ("CW"), Agilent's inventory being stored in the CW was in Xpedient's exclusive care, custody, and control. Ex. 1; Ex. B at 155:25-156:19.

3. Under the MOSA and SOA, Xpedient was responsible for managing and maintaining the CW, including ensuring utilities were operational. Ex. 1; Ex. 2 at XMG_2925-26; Ex. B at 15:19-16:18, 91:16-92:5, 93:8-21.

4. Before the Event, three senior Xpedient employees each had responsibility for Agilent's inventory and the CW: Jamie Davis, Director of Operations; Dirk Updike, Senior Director of Operations; and Zachery Livingston, Safety Manager. Ex. B at 15:19-16:18, 27:20-32:9; Ex. D at 11:22-12:7, 27:11-22; Ex. C at 12:20-13:9, 13:18-23, 19:8-23, 65:25-66:18; Ex. E at 20:15-21:14, 28:9-16.

5. Under the SOA, Xpedient was required to "operate the facility with 1 working manager," available Monday through Friday from 7:00 a.m. to 4:00 p.m. Ex. 2 at XMG_2926.

6. Livingston was that manager, and although Xpedient's designees testified that his work was dedicated to the CW, Livingston testified that from August 2023 through January 2024 he spent about 90% of his time on company-wide safety work and only 10% on the CW, as he was promised when he took the job. Ex. B at 128:7-10; Ex. D at 18:7-19:2, 32:6-16; Ex. E at 38:24-

40:2, 41:18-43:25, 111:25-114:4.

7. From May 2023 and again in the months before the Event, Agilent told Xpedient that the inventory could never get wet, and Xpedient understood this. Ex. F; Ex. C. at 72:20-73:6, 99:3-14; Ex. D at 18:7-19:2, 62:17-22; Ex. E at 65:2-7.

8. Xpedient knew Agilent's inventory sat directly beneath the CW's sprinkler system throughout its storage there, that cold temperatures can freeze water lines, that a frozen line can burst or buckle and release water onto whatever is below, and that water from those pipes therefore posed a hazard to Agilent's inventory. Ex. D at 18:7-19:2, 351:1-13; Ex. C at 38:4-21; Ex. E at 65:2-25.

9. In May 2023, Colliers provided Xpedient with the CW's sprinkler type, and Xpedient put CW water utility account for the sprinkler system into its own name. Ex. G; Ex. B at 190:6-16, 191:23-192:20; Ex. C. at 115:14-118:6.

10. Davis was responsible for transferring all the CW utility accounts in Xpedient's name and for knowing whether the HVAC worked. Ex. C at 25:19–26:1, 29:16-30:6, 87:10–88:2.

11. Although Xpedient's practice is to put an HVAC preventive maintenance contract in place when it takes over a new facility, and although Davis knew the CW's HVAC system was not in good working order when the lease began, Davis neither put a preventive maintenance contract in place nor confirmed that the HVAC system was working at any point before the Event. Ex. C at 25:19-27:2, 87:18-88:10, 89:11-25, 92:8-14, 93:9-16, 153:23-154:12, 172:1-173:12, 191:20-193:2.

12. The CW had no working heaters at any point in 2023, and Xpedient controlled the thermostats in the leased space. Ex. H; Ex. D at 18:7-19:2, 296:21-24.

13. While Xpedient's lease of the CW began in May 2023, Xpedient did not discuss an

HVAC vendor until October 2023, and no HVAC vendor hired by Xpedient visited the CW from May 2023 until November 16, 2023, when Crowe Heating & Air ("Crowe") came out but could not test the system because the gas meter was locked. Ex. E. at 256:9-257:4; Ex. I; Ex. J.

14. On December 1, 2023, Crowe asked Livingston whether it "need[ed] to come back out when the gas is unlocked," and no later than that date, Xpedient knew the gas line was locked and the HVAC system could not produce heat. Ex. J; Ex. D at 18:7-19:2, 344:4-15.

15. On January 9, 2024, Xpedient approved and paid the Crowe invoice stating, "Need to come back and test system when they have the gas unlocked." Ex. K; Ex. E at 274:6-275:8.

16. During the January 2024 winter freeze, Livingston wore his coat indoors and used a portable heater in his own office. Ex. E at 138:7-139:13, 189:3-14.

17. Before the Event, Livingston told Updike that the CW was cold, it was snowing, the gas was not on, and the HVAC system could not produce heat, but after hearing this, Updike neither instructed Livingston to take protective action nor checked Memphis temperatures. Ex. E at 91:6-92:6; 191:16-192:10; Ex. D at 83:14-25, 122:2-7, 124:5-125:10, 344:4-347:13; 353:3-7.

18. Xpedient did not provide any temporary heat to the CW before the Event. Ex. C at 315:10-14.

19. Livingston never asked whether the sprinklers could freeze, though he agreed he could have found out by calling the landlord. Ex. E at 284:21-285:2, 301:22-302:21.

20. Between December 1, 2023, and January 17, 2024, Xpedient never confirmed whether the gas or heaters worked and took no action to unlock the gas until after the Event. Ex. J; Ex. D at 18:7-19:2, 345:10-347:13, 353:3-11.

21. Before the Event, Xpedient never told Agilent that the CW had no heat or that the gas meter was locked. Ex. C at 228:2-6; Ex. M at 14:17-24, 301:9-17.

22. Jessica Edmonds of Colliers testified that Xpedient never complained to Colliers about the lack of heat or the locked gas meter. Ex. N at 13:2-8, 65:21-24, 140:5-11.

23. Davis testified that no one at Xpedient monitored weather affecting the CW, that he never discussed or implemented weather-preparedness practices there, and that Xpedient had no practice of assessing weather preparedness or protecting its warehouses from freeze events. Ex. D at 18:7-19:2, 225:2-13, 227:13-24, 346:8-16.

24. During the Event, water pipes burst in the CW, and Xpedient's safety manager, Zachary Livingston, observed water "pouring out" of the CW, leaving "one to two inches" of standing water, and soaking much of Agilent's inventory. Ex. E at 20:15-21:14 27:7-22, 33:17-34:4, 203:5-2011:3; Ex. O, Ex. P, Ex. L.

25. In January 2024, Xpedient opened a claim with its insurer, and on February 6, 2024, sent the insurer inventory reports and receipts, including a file of "potentially damaged inventory and value" explaining that it had no "official … demand" because Agilent was still "in the process of establishing what inventory can be salvaged." Ex. Q; Ex. B at 15:19-16:18, 203:4-25.

26. On February 7, 2024, Agilent provided written notice to Xpedient pursuant to Section 12(C)(e) of the Master Operating Services Agreement ("MOSA"). Ex. 4.

27. On March 21, 2024, Agilent sent a letter to Xpedient requesting an incident report explaining the timeline of the events that predated the incident, an explanation of the incident and cause, and Xpedient's remediation efforts. Ex. S.

28. By March 25, 2024, Xpedient had drafted, but never sent, a response to the March 21 letter, which detailed a timeline of events, admitted the gas line was locked since July 2023, and stated that Xpedient was unaware of any actions taken to winterize the sprinkler system. Ex. L; Ex. D at 18:7-19:2, 245:24-246:24, 263:8-14, 265:13-24, 270:16-271:8, 281:18-282:5; Ex. M

at 14:17-24, 301:9-22.

29. On March 29, 2024, Xpedient responded to Agilent's March 21 letter, omitting the timeline, the months long locked gas line, and the lack of winterization, while stating that Xpedient "share[s] Agilent's need for answers," and has "initiated a claim with [its] warehouse legal liability insurance carrier." Ex. T.

30. In the months following the Event, Xpedient inspected and controlled the damaged inventory, compiled inventory reports, retained custody of the inventory, and hosted inspections, including an April 2, 2024 inspection attended by Livingston. Ex. U; Ex. T; Ex. V; Ex. W; Ex. X.

31. Xpedient coordinated and performed the segregation of Agilent's inventory, for which Agilent paid for additional workers, but did not begin until February 22, 2024, more than a month after the Event, and had not finished by March 29, 2024. Ex. T; Ex. 5; Ex. Y.

32. On June 7, 2024, Agilent followed up on its earlier MOSA § 12(C)(e) notices with a letter to Xpedient that identified the damaged Products, explained XMG's liability and claimed approximately $8,054,398.96 in replacement costs. Ex. 5; Ex. M at 14:17-24, 216:16-217:6.

33. After Agilent asked Labcon, the tips manufacturer, in February and March 2024 to help "salvage" the impacted tips, including by shipping samples, exploring bioburden analysis, and requesting a rework and sterilization quote, Labcon concluded on March 29, 2024 that it could not make the tips fit for market and recommended scrapping them. Ex. Z.

34. Xpedient rejected Agilent's request to have Xpedient's liability for Product Losses under Section 12(C)(c) be up to the "value of the Products stored at the Facility." Ex. 8 at XMG_2757.

35. Xpedient made Agilent delay destroying the damaged inventory so Xpedient's insurer could inspect it several times.

DATED: October 19, 2026

Respectfully submitted,

/s/ Margaret C. McDonald
Amber Finch (#222321) (admitted *pro hac vice*)
Margaret C. McDonald (#307008) (admitted *pro hac vice*)
Katherine P. Goetz (#346205) (admitted *pro hac vice*)
REED SMITH LLP
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
Telephone: 213-457-8000
Facsimile: 213-457-8080
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan (BPR # 16718)
BURCH PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
Telephone: 901-524-5000
Facsimile: 901-524-5024
dhalijan@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*