# EXHIBIT B

Deposition of

**Nathaniel Haynes**

September 03, 2026

Agilent Technologies, Inc.

vs.

Xpedient Management Group, LLC

aptus. COURT REPORTING
www.aptusCR.com | 866.999.8310

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC.,

Plaintiff,

vs. Case No. 2:25-CV-02101-bcl-cgc

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AND COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,

Cross-Plaintiff,

vs.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Cross-Defendants.

---

(Caption continued on page 2.)

Deposition of

NATHANIEL HAYNES
Individually and 30(b)(6)

September 3, 2026

10:00 a.m.

Reported by:
Julie Lyle, RPR, LCR
Job No. 10199263

---

FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,

Plaintiff,

vs.

XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES - MEMPHIS, LLC,

Defendants.

---

APPEARANCES:

For the Plaintiff, Agilent Technologies, Inc.:

Ms. Margaret C. McDonald
Reed Smith
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
(213)457-8000
mcmcdonald@reedsmith.com

For the Defendant and Cross-Plaintiff, Xpedient Management Group, LLC:

Mr. William P. Thomas
Butler Snow LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
(901)680-7200
will.thomas@butlersnow.com

Mr. Peter C. Sales
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
psales@bradley.com

APPEARANCES: (Continued)

For the Defendant and Cross-Defendant, Colliers Management Services - Memphis, LLC:

Mr. John W. Butler
Mr. Grant Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, TN 37919
(865)244-3925
jbutler@byblaw.com
gmitchell@byblaw.com

For the Defendant and Cross-Defendant, St. Paul Fire and Marine Insurance Company:

Ms. Brittany Nichole Lezu (via Zoom)
Carr Allison
633 Chestnut Street, Suite 2000
Chattanooga, TN 37450
(423)648-9832
blezu@carrallison.com

For the Plaintiff, Factory Mutual Insurance Company:

Mr. S. Joe Welborn
Smith Cashion & Orr, PLC
3100 West End Avenue, Suite 800
Nashville, TN 37203
(615)742-8586
jwelborn@smithcashion.com

The deposition of NATHANIEL HAYNES, appearing as a 30(b)(6) witness and individually, was taken by counsel for the Plaintiff, pursuant to notice, at 1221 Broadway, Suite 2400, Nashville, Tennessee, commencing at 10:00 a.m., on September 3, 2026, for all purposes under the applicable Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. It is agreed that Julie Lyle, being a licensed court reporter for the State of Tennessee, may swear the witness, and the reading and signing of the completed deposition is reserved.

* * *

* * *

NATHANIEL HAYNES,

was called as a witness, and after having been duly sworn, testified as follows:

* * *

EXAMINATION

BY MS. McDONALD:

**Q. Good morning. My name is Margaret McDonald. I'm counsel for plaintiff, Agilent Technologies.**

A. Good morning.

**Q. Good morning.**

**Can you please state your name for the record?**

A. Proper name is Nathaniel Haynes. I go by Nate.

**Q. Great. And, Mr. Haynes, have you ever given testimony before?**

A. I have not.

**Q. Okay. And as you've not been deposed before, I'm going to go over the ground rules, although I appreciate you've heard them twice already this week.**

**The court reporter has sworn you under oath. Do you understand the effect of that oath?**

A. Yes.

**that you have in front of you?**
A. This is the expert report on --
MR. THOMAS: From Xponent.
THE WITNESS: From Xponent.
MR. THOMAS: It's the pricing experts.
THE WITNESS: Yep.
BY MS. McDONALD:
**Q. Okay.**
A. The Kachura Engineering expert report. And the Robert J. Moran, CLP, report on -- what was this one?
MR. THOMAS: It's the warehousing expert.
THE WITNESS: Yeah, the warehousing expert.
BY MS. McDONALD:
**Q. Okay. Thank you.**
A. Welcome.
**Q. And you understand you're appearing in two separate capacities today, correct?**
A. Yes.
**Q. You're obviously appearing in your individual capacity, and you've also been designated by Xpedient as a corporate representative under Rule 30(b)(6) in regards to certain topics --**

A. Yes.
Q. -- is that correct?
And I know that you've seen the amended notice of deposition that we've marked as Exhibit 175.
And you understand that, when you answer a question on a notice topic, you're answering for Xpedient as a company, not just for yourself, correct?
A. Correct.
Q. And you understand your obligation was to educate yourself on the notice topics, including on matters of which you have no personal knowledge?
A. Yes.
Q. And that obligation includes reviewing Xpedient's documents even if you never saw them at the time?
A. Understand.
Q. Great.
And speaking with Xpedient employees who do have personal knowledge? Do you understand?
A. Yes.
Q. Great.
And besides the Xpedient current and former employees that you identified, did you speak with

**Q. And how have your responsibilities changed since being promoted to CFO?**

A. I built a team that has allowed me to be more strategic, and so the team does more work than -- does the work now that I used to do. So it's part of building a business, and progressing is being able to be more strategic in your role.

**Q. And how many -- do you have any understanding how many people are currently employed by Xpedient?**

A. Last I checked, there were 467 people in the U.S. and 49 in Canada.

**Q. And would those numbers have been roughly the same in 2023?**

A. They were a bit more then.

**Q. Okay.**

MR. BUTLER: I'm sorry. You said "more then"?

THE WITNESS: There were more then at that time.

MR. BUTLER: Thanks.

BY MS. McDONALD:

**Q. And how many more then in 2023?**

A. Less than 100.

**Q. Okay.**

A. How many more? There would have been, let's

the transcript. We were all sitting here. But I think her question is, substantively, was it Alicia Lyle's job to assess sprinkler systems or something to that effect.

THE WITNESS: It is not her job to do that.

BY MS. McDONALD:

**Q. Okay. Did she have any obligation -- or any responsibility in 2023 to assess what Xpedient's obligations were under a lease agreement?**

A. That wasn't part of her responsibility, no.

**Q. Okay. And did Ernie Neumann report to you?**

A. He did not.

**Q. Okay. And I know you testified that in 2023, Xpedient had around, say, 550, 600 employees, correct, between the U.S. and Canada?**

A. I don't think we were ever over 600, but ballpark is fine, I guess.

**Q. We can call it 500.**

**So of those 500 employees, how many held the title of director of operations in 2023, to the best of your recollection?**

A. Probably two or three. I don't think it ever really got higher than that. Maybe four if we're talking senior director. It's not something I

regularly keep track of.

**Q. And would you agree that given that there were only two to three people within the company in 2023 that held the name of director of operations, that that was a pretty senior role within Xpedient?**

MR. THOMAS: Object to form.

THE WITNESS: I don't know what "senior role" typically means. I don't know what that is.

BY MS. McDONALD:

**Q. Where were they in the hierarchy of the company in 2023?**

MR. THOMAS: Are you just asking him personally? Because I don't believe this is a topic.

MS. McDONALD: Yeah, that's fine. Just personally. We noticed him in an individual capacity.

MR. THOMAS: If you know or if you can answer the question.

THE WITNESS: They're upper to middle part of the organization if you look from top to bottom.

BY MS. McDONALD:

**Q. Okay. And how many employees, to your knowledge, are above them in 2023?**

A. From an operational perspective or from a total like ranking of role --
**Q. From an operational perspective.**
A. I'd say, from an operational perspective, three maybe.
**Q. Okay. And what about as to the company as a whole?**
A. What about it?
**Q. So the same question. So not limited to an operational perspective.**
A. Can you repeat your question, please?
**Q. Sure. How many people were above the -- in the company hierarchy were above directors of operation in 2023?**
A. I don't know. Five, six maybe.
**Q. Okay.**
A. I don't -- we have owners and CFO and -- anyway.
**Q. Okay. And what about warehouse manager? In 2023 on the operations side, how many people would be above the warehouse manager?**
A. How many people would be above the warehouse manager?
**Q. Or let me start over, actually.**
**In 2023, how many warehouse managers did**

**Xpedient employ, to the best of your recollection?**
A. I don't recall.
**Q. More than 10?**
A. Yes.
**Q. More than 20?**
A. Maybe.
**Q. And in 2023, how many safety managers did Xpedient employ?**
A. Probably one dedicated.
**Q. And that would be Mr. Livingston?**
A. He was partial, yes. I wouldn't say "dedicated." He was partially safety.
**Q. Was there anyone else that also held that role in 2023?**
A. In terms of title?
**Q. (Nods head.)**
A. No.
**Q. And in 2024, did Mr. Livingston retain the title of safety manager?**
A. I'd have to go look at the records.
**Q. And then my recollection from Mr. Updike's testimony yesterday was that a safety manager was slightly above a warehouse manager in terms of the Xpedient hierarchy.**
**Would you agree with that?**

A. Say it again, please.
**Q. Sure. That a safety manager in the Xpedient hierarchy was slightly above a warehouse manager.**
A. I would say that a safety manager possesses an understanding that could be above the understanding of a normal warehouse manager.
**Q. Okay.**
A. But that doesn't mean from a hierarchy, they're technically above or below. They just possess a different skill set.
**Q. Well, they possess a skill set, correct, of the warehouse manager, plus additional skills; is that accurate?**
A. Not necessarily. They could. You could have somebody that is better at safety than they are at running a warehouse or vice versa.
**Q. So in Mr. Livingston's case, was he better at safety than ran running a warehouse?**
MR. THOMAS: Object to form.
THE WITNESS: I don't -- I didn't -- I was never qualifying Mr. Livingston and his skills.
BY MS. McDONALD:
**Q. And in 2023, on the operations side in the Xpedient hierarchy, how many employees were above the safety manager and warehouse managers?**

MR. THOMAS: Again, you're just asking for his personal knowledge?

MS. McDONALD: Yep, just his personal knowledge.

THE WITNESS: How many people were above?

BY MS. McDONALD:

**Q. On the operations side.**

A. Five or six.

**Q. Okay. And what about as to the company as a whole?**

A. What do you mean? I don't understand.

**Q. Sure.**

A. What's the question?

**Q. So we -- the way that I understood your testimony was that above -- on the operations side of Xpedient's business, above -- there was about five to six people above the safety manager and the warehouse managers.**

A. Okay.

**Q. And then I know that you made a distinction between operations and the company generally. So as to the company generally, how many people were above safety managers and warehouse managers?**

MR. THOMAS: And just so we're clear,

Q. Okay. And then under "Warehouse Services," there's a -- under the "Warehouse Services" header, there's a subheader entitled "Distribution Center. Administration and management provided by Xpedient."
Do you see that?
A. I see it.
Q. Okay. And then it lists seven bullets.
Do you see that?
A. I see them.
Q. Okay. Great.
And as I know you've heard the last two days, the director of operations assigned to the Cromwell warehouse was generally responsible for the items listed in these bullets; is that correct?
A. Yes.
Q. Okay. And then looking at the last bullet, it says, "Facility management, including rent, utilities, interest, tax, maintenance, repairs, and security."
Do you see that?
A. I see that.
Q. And so facility management would include paying the rent at the Cromwell warehouse, correct?
A. Correct.
Q. And facility management would include paying

**the utilities, correct?**
A. Correct.
**Q. And facility management would include ensuring utilities were operational, correct?**
A. Correct.
**Q. And then can you explain to me what "interest" refers to in relation to facility management?**
A. I think there's supposed to be a comma after "utilities" here.
**Q. Okay. Thank you.**
A. And interest would be, in our business, like the cost of capital, right? I don't know why that's there because it typically doesn't have anything to do with facilities management --
**Q. Okay.**
A. -- unless there's some capital that we're putting into a building or something like that.
**Q. Okay. So, for example, say, Xpedient entered into a lease agreement for a warehouse facility and it makes some capital improvements. Those improvements would be borne by Xpedient rather than the customer?**
A. Yeah.
**Q. And then what about tax? Can you explain to**

**me what that means in relation to facility management?**
A. That would be the -- that would be the tax on the building.
**Q. Okay.**
A. But that comes through the -- the landlord or the property manager.
**Q. Okay. And then facility management also includes maintenance of the Cromwell warehouse, correct?**
A. To a certain extent, yes.
**Q. What maintenance would be excluded from facility management?**
A. In regards to the SOA, this is what we are saying to Agilent we are going to handle related to facility management. We're going to facility manage the Cromwell warehouse to store Agilent's property. That's it.
**Q. Can you expand on what you mean by that?**
A. That's all Agilent needed to know is that we were going to take care of the warehouse.
**Q. Okay. So as between Xpedient and Agilent, it was Xpedient's obligation to maintain the warehouse, correct?**
A. Correct.

costs. We have interest costs. We have overhead administrative corporate allocational costs. And we have a little bit of profit. That's the difference.

**Q. And the manager cost, that's the entirety of Mr. Livingston's salary, correct?**

A. I'm pretty sure.

**Q. Okay. But Mr. Livingston was only working on an as-needed basis, right, at the Cromwell warehouse?**

A. He was -- he was dedicated to that facility.

**Q. Okay. But you heard testimony from your colleagues that he also did work outside of the Cromwell warehouse, correct?**

A. He would at times. There's a difference between dedicated capacity -- right? -- which is what was provided, dedicated capacity.

**Q. Where does it say "dedicated capacity"?**

A. Through the hours of service and the needs that were in the contract, we dedicated to be there serving you during that time, or you, whoever.

**Q. Okay. And if you could go back to Section -- or turn to Section 1.9.A. That's Bates Number XMG2569.**

MR. THOMAS: So in Exhibit 110 or going back to --

Q. I'd have to go back into the Wayback Machine.
A. I can't answer that question, then.
Q. So as the CFO of Xpedient, you have no idea whether Xpedient considers itself to be sophisticated in warehouse services?
A. Currently, yes.
Q. Currently, it does consider itself to be sophisticated in warehouse services?
A. Yes. Yes.
Q. What about in 2023?
A. Was that something we stated back then?
Q. I'm just asking you in your opinion as CFO and former, what, senior vice president.
A. Sure.
Q. One of the top people in the company, correct?
A. Sure.
Q. In 2023?
A. Okay.
Q. And can you tell me, in 2023, whether Xpedient considered itself to be sophisticated in providing warehouse services?
A. I believe "sophisticated" is relative as well, but, yes, we understood logistics services.
Q. Including warehouse services, correct?

A. Correct.

**Q. And would you agree that being a reasonably careful person sometimes requires one to learn or investigate things that it does not already know or is told?**

MR. THOMAS: Object to the form. Hypothetical. And calls for a legal conclusion. And it's not a topic.

But to the extent you have an opinion.

THE WITNESS: I think it -- it -- I think it depends for everybody what "reasonably careful" means.

BY MS. McDONALD:

**Q. Would a reasonably careful person investigate whether it needed to maintain ambient temperatures in a warehouse that it leased during the winter months?**

MR. THOMAS: Object to the form. Hypothetical. Not a topic.

To the extent you know or have an opinion.

THE WITNESS: Not necessarily.

BY MS. McDONALD:

**Q. Why not?**

A. The product didn't require a specific

BY MS. McDONALD:
**Q. Xpedient.**
A. And "Xpedient" means what? One person or the whole company at that point in time?
**Q. Well, I assume all 550 people wouldn't know everything going on about the Cromwell warehouse.**
A. Okay.
**Q. Is that fair?**
A. That's fair.
**Q. For example, Mr. Livingston knew that the landlord or its agent had not provided utility service connections by January 17, 2024, correct?**
A. Yes, he had the opportunity to know that.
**Q. And he did, in fact, know that, correct?**
A. I believe that's the case. But I don't know -- I can't speak for Mr. Livingston. Based on what I've seen, he could have known.
**Q. Okay.**
MR. THOMAS: Was the question that he knew that the gas was locked?
THE WITNESS: It was did we know that the Cromwell warehouse did not have, I think, heat or utilities.
BY MS. McDONALD:
**Q. And if you could look at subsection 12.C.D.**

And then this says, "Notwithstanding anything contained in the agreement or any site operating agreement to the contrary, Xpedient shall not be liable for any loss or damage to the products."

And then subsection 1 says, "Occurring prior to or subsequent to Xpedient's care, custody, and control of the products, which shall commence when Xpedient accepts receipt of such products and shall terminate when such products are placed with the carrier for shipment."

Do you see that?

A. I do.

Q. And the Agilent inventory was in Xpedient's care, custody, and control at the time of the water-intrusion event, correct?

MR. THOMAS: Object to form.

THE WITNESS: We have warehouse receipts that designated the product in our care, custody, and control.

BY MS. McDONALD:

Q. Okay. And do you know if those warehouse receipts have been produced?

A. Yes.

Q. Okay. And then looking at Number 3, it says, "Xpedient shall not be liable for any loss or damage

of the transcription --
Q. Okay.
A. -- I would guess, or on -- he was probably the broker for St. Paul.
Q. All right. Thank you.
And on May 19, 2023, Mr. Sepanski writes, "Insurance is asking some building-related questions," and he says, "Can you advise on," and the last bullet says, "sprinkler type and details."
And this question was directed to Mr. Mashburn, correct?
A. Yes.
Q. Okay. And then Tim Mashburn responds, about three minutes later, and he identifies the sprinkler type and details as .26 gpm/2000 sprinkler?
A. Yes.
Q. And this was information that Xpedient's insurer was requesting, correct?
A. Insurance would have required this information, yes. We would have passed it along.
Q. Okay. And you routinely handle insurance issues for Xpedient as CFO, correct?
A. I do.
Q. Okay. And insurance is one of your areas of responsibility at Xpedient, correct?

A. It is.
**Q. And, in your experience, do Xpedient's -- property insurer, is that what we're looking at?**
A. This would have been just all kinds of insurance just in general. We go through a broker and communicate what we're doing.
**Q. Okay. And does Xpedient's insurer routinely ask for sprinkler system information?**
A. If we're doing a leased building, they would.
**Q. Okay. And since you've been at Xpedient, Xpedient has entered into a number of leases, correct?**
A. Yes.
**Q. And for all of those, did Xpedient obtain insurance?**
A. Yes.
**Q. Okay. Are you able to give me an estimate as to how many leases Xpedient executed since you joined the company in 2018?**
A. A dozen or more.
**Q. Okay.**
A. Maybe. Renewals, you know.
**Q. And you were copied on this email, correct?**
A. I was.
**Q. And Mr. Mashburn's response that the**

**sprinkler type and details was**
**.26 gpm/2000 sprinkler, did you understand that to**
**refer to a wet pipe sprinkler system?**
A. No, I wouldn't have expected that to be a wet system.
**Q. Why not?**
A. Or a wet water stored in system. That is the pressure and the flow of the water once it happens. It could have been a charged system. It could have been a different type of a -- that's just describing for insurance what's available.
**Q. But it's describing the flow of water through the system, correct?**
A. It doesn't mean the water is in the -- is present at all times.
**Q. Okay. But you understood that the way that the sprinkler system at the Cromwell warehouse would potentially put out a fire was through the use of water, right?**
A. Sure.
**Q. Not some sort of --**
A. I -- I guess it would have been. I mean --
**Q. Can I just finish my question?**
A. Yeah. Sure.
**Q. You understood that it would be water, not**

I got the time right. There you go.
MR. THOMAS: You should sleep more.
BY MS. McDONALD:
**Q. Okay. And does this appear to be a true and correct copy of your email to --**
A. Yes. Yes. This is what I was referring to when I said I might have. Oh, I do have pictures.
MR. BUTLER: I'm sorry. What exhibit?
MS. McDONALD: 194.
MR. THOMAS: 195.
MS. McDONALD: 195.
THE WITNESS: Okay.
BY MS. McDONALD:
**Q. And you write, "Wanted to advise of an issue we have at our 4601 Cromwell, Memphis, Tennessee, facility. It appears sprinklers went off this evening. We don't know root cause or damage at this point but wanted to bring to your attention."**
**And then you say, "Attached is our customer contract and lease agreement. Let's try to touch base tomorrow if you're available." And then you say, "Pictures below."**
A. Sure.
**Q. And then if you turn the page, are those the images that Mike St. Denis sent to you?**

COURT REPORTER'S CERTIFICATE

STATE OF TENNESSEE:

I, JULIE K. LYLE, Licensed Reporter for the State of Tennessee, CERTIFY:

1. The foregoing deposition was taken before me at the time and place stated in the foregoing styled cause with the appearances as noted;

2. Being a Court Reporter, I then reported the deposition stenographically to the best of my skill and ability, and the foregoing pages contain a full, true and correct transcript of my said stenographic notes then and there taken;

3. I am not in the employ of and am not related to any of the parties or their counsel, and I have no interest in the matter involved.

WITNESS MY SIGNATURE, this, the 14th day of September, 2026.

Julie Lyle
_______________________________
JULIE LYLE, RPR, LCR
LCR Number: 850
Expiration: 6/30/2028