# EXHIBIT C

Deposition of

**Jamie Davis**

September 01, 2026

Agilent Technologies, Inc.

vs.

Xpedient Management Group, LLC

aptus. COURT REPORTING

www.aptusCR.com | 866.999.8310

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC.,

Plaintiff,

vs. Case No. 2:25-CV-02101-bcl-cgc

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AND COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,

Cross-Plaintiff,

vs.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Cross-Defendants.

---

(Caption continued on page 2.)

Deposition of

JAMIE DAVIS
Individually and 30(b)(6)

September 1, 2026

10:00 a.m.

Reported by:
Julie Lyle, RPR, LCR
Job No. 10199288

---

FACTORY MUTUAL INSURANCE CO., as
subrogee of Agilent Technologies, Inc.,

Plaintiff,

vs.

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

APPEARANCES:

For the Plaintiff, Agilent Technologies, Inc.:

Ms. Margaret C. McDonald
Reed Smith
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
(213)457-8000
mcmcdonald@reedsmith.com

For the Defendant and Cross-Plaintiff, Xpedient Management Group, LLC:

Mr. William P. Thomas
Butler Snow LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
(901)680-7200
will.thomas@butlersnow.com

Mr. Peter C. Sales
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
psales@bradley.com

APPEARANCES: (Continued)

For the Defendant and Cross-Defendant, Colliers Management Services - Memphis, LLC:

Mr. John W. Butler
Mr. Grant Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, TN 37919
(865)244-3925
jbutler@bvblaw.com
gmitchell@bvblaw.com

For the Defendant and Cross-Defendant, St. Paul Fire and Marine Insurance Company:

Ms. Brittany Nichole Lezu (via Zoom)
Carr Allison
633 Chestnut Street, Suite 2000
Chattanooga, TN 37450
(423)648-9832
blezu@carrallison.com

For the Plaintiff, Factory Mutual Insurance Company:

Mr. S. Joe Welborn
Smith Cashion & Orr, PLC
3100 West End Avenue, Suite 800
Nashville, TN 37203
(615)742-8586
jwelborn@smithcashion.com

The deposition of JAMIE DAVIS, appearing as a 30(b)(6) witness and individually, was taken by counsel for the Plaintiff, pursuant to notice, at 1221 Broadway, Suite 2400, Nashville, Tennessee, commencing at 10:00 a.m., on September 1, 2026, for all purposes under the applicable Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. It is agreed that Julie Lyle, being a licensed court reporter for the State of Tennessee, may swear the witness, and the reading and signing of the completed deposition is reserved.

* * *

A. Hutchinson Community College.
**Q. Okay. And what did you study there?**
A. It was just basic -- I took a few basic courses. It was like Microsoft Excel. I think -- I believe an accounting course and a math course.
**Q. Okay. And do you hold any professional licenses or certifications?**
A. I do. Certifications are OSHA related, so safety, OSHA 30 -- OSHA 300, HACCP certification, which is a food -- food certification. An expired CPR and first responder.
**Q. Great.**
**Anything else?**
A. No.
**Q. Okay. And you're currently employed by Xpedient, correct?**
A. Correct.
**Q. And when did you start working for Xpedient?**
A. I believe October of 2020.
**Q. And what is your current title at Xpedient?**
A. Director of operations. I'm sorry. Let me rephrase that. I'm transitioning right now. It's director of risk and safety.
**Q. So you were previously director of operations, and now you're transitioning to the role**

**of director of risk and safety; is that correct?**
A. Yes.
**Q. And how long did you hold the title of director of operations?**
A. A majority of the time within -- almost five years. So it's recently a switch.
**Q. Okay. And what title did you hold when you first joined Xpedient?**
A. Director of operations.
**Q. Okay. So you've held that title until you became the director of risk management and safety?**
A. Right. Right.
**Q. Okay. And you became the director of risk management and safety within the last few months; is that accurate?**
A. Currently, within the last almost 30 days. We're in the middle of a transition right now.
**Q. Okay. So is it accurate that, from October of 2020 until -- I don't even know where we are anymore -- say, end of July 2026, you were the director of operations at Xpedient?**
A. You could even say I still am. I'm in the middle of transitioning now so --
**Q. Okay. So you're wearing both hats currently?**
A. Correct.

BY MS. McDONALD:
**Q. Currently.**
A. Six.
**Q. And did you oversee approximately six warehouses annually for the entire time you were director of operations at Xpedient?**
A. No. It's went up and down --
**Q. Okay.**
A. -- depending on the year.
**Q. What's the lowest it's gone?**
A. Right now.
**Q. Oh. So six is the lowest number?**
A. Six is the lowest, yeah.
**Q. Are you able to give me an average?**
A. Average, I would say over the course of the five years, ten.
**Q. Okay. And do you recall how many warehouses you were overseeing in 2023?**
A. Between eight and ten.
**Q. Okay. And would you say it was between eight and ten in 2022?**
A. No, it was probably lower. I would say seven.
**Q. Okay.**
A. I would have to, like, write them out by year

in my head and figure it out, but --
**Q. Okay. No problem.**
**And then 2024, how many that year, approximately?**
A. Just about the same. It was about ten.
**Q. Okay. And where -- in 2023, for example, where were those warehouses located?**
A. Okay. Canada. Memphis. Salt Lake City. California. Atlanta. Or Georgia, I should say. Chicago.
**Q. Okay. And in 2022 was it roughly the same areas that the warehouses were located?**
A. Take maybe minus a couple of those. I'm not sure.
**Q. Okay. In 2022, did you oversee warehouse operations in Chicago and Salt Lake and Canada?**
A. I believe so.
**Q. Okay. And what about when you joined Xpedient in 2020? Were you -- you were overseeing warehouses then, correct?**
A. I was, but it was one that I was helping, I guess, assimilate as I came on with the company. Was there for, you know, four to six months. Went to a different warehouse, stayed with that one warehouse for about six months. And then after

MR. THOMAS: Object to form.
BY MS. McDONALD:
**Q. In 2023.**
A. It would depend on which warehouses. I mean, they're all -- no, I shouldn't say they were all operated differently, but not every warehouse is the same, so --
**Q. So what about the Cromwell warehouse in 2023? What were your responsibilities?**
A. Yep. So for that one, it was a start-up, which was a little bit different than taking over a normal warehouse. The primary responsibility was understanding the -- I mean, the entire process in terms of, you know, when is -- when is the product going to get into the building. Once it's in the building, how are we going to set it up.
Once it's set up, how are we going to keep track of the inventory. When it's time for it to be shipped out, how is that going to happen, both physically, systematically, et cetera.
Yeah, handling, okay -- you know, understanding how the handling requirements work. A lot of customer interaction there too. Training.
**Q. And you were responsible for training at the Cromwell warehouse in 2023?**

they brought in their inventory team to just help us understand the product and how to, you know, understand batch numbers, which was how you identify things, and things like that. So when I say "training," it was more inventory related.

**Q. Okay. And you're based in Kansas, correct?**

A. Correct. Yeah.

**Q. So how long were you based at the Cromwell warehouse at the start of the project with Agilent?**

A. I would say safely, based off of my memory, sometime -- sometime in late May. Or, no, I'm sorry. It would have been probably the entire month of May.

**Q. Okay. And any portion of June?**

A. I believe I was there -- without looking at a calendar, I think I might have crossed from May into June by like a week. So maybe the first week of June.

**Q. Okay. And were you responsible for ensuring the -- say, for example, the preventative maintenance on the HVAC system was done at the Cromwell warehouse while you were there in May and June?**

A. I -- I'm going to answer this two ways. Yes, but I couldn't get the preventative maintenance done

at that time.
**Q. What's the general procedure for getting preventative maintenance done on an HVAC system for a new facility that Xpedient is taking over?**
A. It's usually pretty simple. Call, you know, an HVAC provider that does that, and they'll come in and do it usually within a day. And then it's either everything is good or, you know, they may say hey, you got one unit that needs a coil replaced or whatever. Any kind of -- any kind of known issues that they see, they'll report back to us so that we can get ahead of it and fix it.
**Q. Okay. And you indicated there was something that prevented you from doing that in regards to the Cromwell warehouse?**
A. Uhm-uhm.
**Q. What was that?**
A. They were doing a lot of roof work and replacing units on top of the building at the same time.
**Q. And when you say "units on the top of the building," you mean HVAC units?**
A. I believe it was ACs, the air-conditioning.
**Q. Okay. And did you ever call any HVAC vendor in that May/June period to come out and look at the**

**HVAC systems at the Cromwell warehouse?**
A. I don't believe I did.
**Q. Okay.**
A. I could have, but I don't know why I -- why I would have because I knew -- I knew that they were doing work on the roof. And I was in contact with either Shellie or Jessica about are we ready for the PMs yet, and they were still working.
**Q. Okay. And when you say "Shellie and Jessica," you're referring to Shellie Moses and Jessica Edmonds of Colliers?**
A. Correct.
**Q. And so it was your opinion that it was better to defer doing the preventative maintenance of any of the HVAC systems until the roof was complete?**
A. No, it wasn't an opinion. They can't do a PM if it's not functioning.
**Q. Okay. But the Cromwell warehouse also has unit heaters, right? Is that correct --**
A. Yes.
**Q. -- in 2023?**
A. Yes.
**Q. And those unit heaters aren't connected to the HVAC system that service the office units; is that correct?**

BY MS. McDONALD:
**Q. Okay. But to your understanding, because this roof work was going on, it didn't make any sense to hire an HVAC vendor to do any preventative maintenance work of the HVAC systems, correct, in 2023?**
A. Until the HVAC system was up and running, it didn't make any sense to do a PM on it.
**Q. Okay. And, to your recollection, when was the HVAC system up and running?**
A. I believe mid-October.
**Q. Okay. And you mentioned vendors as being something on the start-up list.**
**Would vendors include utility companies?**
A. In some cases, yeah.
**Q. Okay. At the Cromwell warehouse, to your recollection, was Xpedient responsible for setting up any utilities for the facility?**
A. The PMs for sure and the utility transfer.
**Q. When you say "the PMs," you're referring to the preventative maintenance of the HVAC systems?**
A. Correct.
**Q. And then your testimony is that Xpedient was also responsible for the utility transfers?**
A. To transfer the accounts.

**Q. Okay. And who was responsible for transferring the accounts from the landlord to Xpedient?**
A. In this case?
**Q. Uh-huh.**
A. I was.
**Q. Okay. And the landlord was St. Paul Fire and Marine Insurance Company; is that correct?**
A. So at the time I would have -- I would have said Colliers.
**Q. Okay. But Colliers is St. Paul's property manager; is that correct? Is that what you've now learned?**
A. That's -- correct. Now I understand how they're tied.
**Q. Yeah. But for practical purposes, you saw Colliers as kind of the face of the landlord. Is that accurate?**
A. Yes.
**Q. Okay. And then how are your job responsibilities changing in this transition from director of operations to director of risk management and safety?**
A. Well, I think I'll keep a lot of the same responsibilities, minus the customer interaction.

A. Cold temperature.
**Q. Cold temperature?**
A. Yeah.
**Q. Okay. And you mentioned there was -- is it a frozen food component to the prior work?**
A. Uh-huh.
**Q. Was that kept in freezers or --**
A. Both. So on -- on trucks, there would be a bulkhead that would separate frozen from perishable within the warehouse. It was a wall that separated frozen from perishable.
**Q. Okay. And were there sprinkler systems in these warehouses?**
A. There were.
**Q. Okay. And in the frozen section, did the sprinkler system, to your knowledge, have some sort of antifreeze protection?**
A. I don't know. I mean, I'm sure it did or else it would have froze, I guess.
**Q. Okay.**
A. I don't know.
**Q. To your knowledge, if, say, a sprinkler system is exposed to freezing temperatures and doesn't have antifreeze protection, then it's reasonable to assume that the pipes are at risk of**

send you the invoice directly, or would you receive it and then flip it to them? How would that work in 2023?

A. I believe, but I'm not certain, that it was coming through our system electronically.

Q. Okay. So for the Cromwell warehouse, the utility bill was received electronically?

A. I believe so.

Q. Do you know what email address received that utility bill?

A. I believe it would have been our accounting inbox.

Q. Okay. And then if you look further down, there's a header entitled "Supervision." It goes "Systems" and then it goes "Supervision."

Do you see that?

A. Uh-huh. Yep.

Q. And then the first sentence says, "Xpedient intends to operate the facility with one working manager."

And in regards to the Cromwell warehouse, that one working manager referred to Zachary Livingston, correct?

A. That's correct.

Q. And what were Mr. Livingston's job

**responsibilities in 2023?**
A. In regards to Agilent?
**Q. To the Cromwell warehouse.**
A. It would have been to be in communication with the customer. I think, you know, at that point, once the start-up phase was over with, I didn't, you know, schedule the in- and outbound loads. That was Zach's responsibility, manage the inventory.
There was a process he had for just making sure stuff was -- you know, he knew where everything was at within the warehouse. So, basically, it was just managing the inventory and making sure stuff got in and out on time that was scheduled.
**Q. Okay. And was he responsible at all for any day-to-day management of the Cromwell warehouse itself?**
A. Yeah. Yes.
**Q. Can you describe that for me? And I'm talking about 2023.**
A. Hold on. Yeah. So he -- I mean, things like making sure the building is secure, the doors are locked, you know, if he's not there. Things are in good working order, such as, you know, dock doors. Again, back to the -- for whatever reason, if volume

bring a pallet into the building when we want it, send it back -- okay? -- and don't break it.

**Q. You used the phrase "don't cause damage to the product."**

A. Uhm-uhm.

**Q. How did you understand damage could be caused to the product?**

A. Meaning -- so I'll give you one example. If we got a -- let's say a quarter of a pallet, not to stack, like, something super heavy on top of it -- right? -- to where it would crush the boxes.

If we were to, you know, ship -- ship pallet out, shrink-wrapped, so that you're not sending loose cases where they fall over inside the truck during transit, so just handling.

**Q. What about water? Did Agilent say anything to water coming into contact with the medical equipment?**

A. To me directly, no.

**Q. To your understanding, did Agilent mention water at all to anyone at Xpedient in 2023?**

A. Yes. There was a roof leak, and I can't give you the exact time frame. I'm thinking late 2023 maybe. I don't even want to tell you what month because I'm not sure.

But I know that there was a -- a couple instances of roof leaks. One before we put any product in there so we were able to segregate it and keep -- keep the product away from the leaks while the roof got repaired, which got -- we thought got taken care of.

**Q. Okay.**

A. And then there was another leak that happened, you know, at some point that I don't believe touched any product, but it happened. So we had to get the roof -- or Colliers had to get the roof repaired again.

**Q. Okay. And that second leak was sometime in late 2023, to the best of your recollection?**

A. I believe so.

**Q. Okay. And then if you could turn to Schedule 4, it's entitled "Operating Parameters."**

A. Uh-huh.

**Q. And it says, "Operating days, Monday through Friday, 7:00 a.m. to 4:00 p.m."**

**Do you see that?**

A. That's correct, yeah.

**Q. And these are the days and hours that Mr. Livingston was supposed to be on-site; is that correct?**

Looking at this, there's -- there's some things that kind of look familiar and then stuff that I am fairly certain I've never seen.

BY MS. McDONALD:

**Q. Okay. And as a director of operations in 2023, did you have any responsibility to review the lease agreement to ensure the landlord was complying with its terms?**

A. Maybe -- maybe portions of it.

**Q. Okay. What -- like just give me the categories of the kind of portions that you would be responsible for.**

A. I would say things like rent amount. You know, I'd have to read through this whole thing. There's a lot in here that I would -- that would have -- that I wouldn't necessarily need to understand.

**Q. What about, say, facility systems such as the HVAC system?**

A. For that, it was my understanding that we were responsible for -- make sure we had PMs in place. Same thing, that we were taking care of the building in a responsible way, meaning, you know, not damaging walls. I want to say common sense things, but --

**Q. Okay.**
A. Leave it the way we came into it.
**Q. And having PMs in place, that would be a preventative maintenance contract with like an HVAC vendor, for example?**
A. Correct.
**Q. And that would be something that you would normally put in place at the start of taking over operations at a new facility?**
A. Correct.
**Q. Okay. And then were you involved at all in identifying the Cromwell warehouse as a potential facility for Agilent's inventory?**
A. No.
**Q. Okay. So is it accurate, too, by the time you started at the Cromwell warehouse in May of 2023, that the -- let me rephrase the question.**
**So by the time you became aware of Agilent and the Cromwell warehouse, it had already been decided this would be the facility to store Agilent's inventory; is that correct?**
A. It had already been decided?
MR. THOMAS: Are you asking him company knowledge or his knowledge?
MS. McDONALD: His knowledge.

THE WITNESS: Well, are you asking me if we had signed a lease and then I became involved?

No, I don't think so. I think -- I think I knew -- I knew of the building, I knew of the potential, I think, prior to the lease being signed.

BY MS. McDONALD:

**Q. Okay.**

A. But it could have been within -- I mean, it could have been on top of each other.

**Q. Yeah. And did you walk through the building, for example, to assess its suitability before the lease was signed?**

A. Yeah, I believe I did one visit prior to the lease. Now, I'm not 100 percent sure of that.

**Q. Okay. And do you recall if you checked any systems, like the HVAC system, while you were on-site?**

A. No, it was a -- what I'll call a preliminary walk-through, meaning I'm looking for more operational-type things. You know, is the concrete floor in place or is it going to cause a bunch of damage. Is -- you know, do the doors close. Is it fit for, you know, basic in-and-out movement of goods.

**air-conditioning systems being in good working order means that it must be in good condition and fully functional?**

MR. BUTLER: Object to the form.

THE WITNESS: I'm sorry. What was the question again? I'm sorry.

BY MS. McDONALD:

**Q. So what do you understand right here where it says, "The HVAC system must be in good working order"?**

A. That it should be in good working order.

**Q. Okay. And that means fully functional, to your --**

A. Fully functional, yes. Correct.

**Q. And then I'll represent to you that the commencement date is June 1, 2023.**

**And it's your testimony, correct, that the HVAC system was not in good working order as of June 1, 2023, correct?**

MR. THOMAS: Object to form.

THE WITNESS: I knew that we couldn't have the PMs done because they were working on the roof and what I believed to be the AC.

BY MS. McDONALD:

**Q. Okay. So is it correct, then, that as of**

**June 21, 2023, it was your understanding that the HVAC system at the Cromwell warehouse was not in good working order?**

MR. THOMAS: Object to form.

THE WITNESS: Again, I --

BY MS. McDONALD:

**Q. That it wasn't fully functional, correct?**

A. Yes. That would be my understanding.

**Q. Okay. Just so we're clear, so as of June 1, 2023, it was your understanding that the HVAC system was not fully functional, correct, at the Cromwell warehouse?**

A. Yes. But specifically that the AC unit wasn't fully functional because that's what I saw them working on, or what I believed to be the AC units on the roof.

**Q. And how is that different from the HVAC system more generally?**

A. Well, so there's -- you know, there's heating, air-conditioning, and duct unit. I didn't know exactly what they were doing with the AC unit, but I knew that they were working on it. I knew that they were working on the roof. I didn't know exactly what they were doing with it, though. I just knew that the AC couldn't be PM'd.

in the building, that there was potential to expand it maybe.

**Q. Okay. And then if you look at the page ending in Bates Number XMG2810, you see the third bullet down, it says, "Blue circle in picture and yellow highlighted area in map not being used due to leak but included in the 13-row count."**

**So you were intentionally not putting pallets in that row because of concerns about water damage; is that correct?**

A. Correct.

**Q. And Agilent had communicated to you that the inventory could not get wet; is that correct?**

A. Correct.

**Q. Okay. And did you communicate to Colliers that the inventory could not get wet at this time and that it was important, you know, for that reason to fix the roof leak?**

A. Yeah. I'm -- do I remember a specific conversation? No. But I'm sure I -- that was a concern. Otherwise, I wouldn't have brought it up.

**Q. And Colliers, you know, slash the landlord was responsible for fixing the roof leaks; is that correct?**

A. Yes. Correct.

**in 2023, bill Xpedient for its share of the water usage at the Cromwell warehouse?**

A. I don't recall.

**Q. Do you recall ever having any conversations with anyone at Colliers about bills relating to water usage?**

A. For water usage, no.

**Q. Okay. And then I'm going to hand you what was previously marked as Exhibit 172.**

MR. THOMAS: You mean 72?

MS. McDONALD: Yeah, 72. I'm sorry. 72.

BY MS. McDONALD:

**Q. And I'll represent that this is a transcript of your May 24, 2023, call with the Business Solutions Center at MLGW, and this transcript was prepared by your counsel based on an audio recording produced by MLGW.**

A. Okay.

**Q. And then if -- so if you look at the -- the bottom half of the second page -- actually, let's start at the top.**

**So it says that MLGW rep says, "May I have the service address that you're calling about, please?"**

And then you identified the Cromwell warehouse, correct? Do you see that?
A. Correct. Yep.
Q. And then further down, the MLGW rep says, "So at 4601 Cromwell, we have one property that has water service only, and then we have one that just has fire protection only, and then we have a Unit 1 that has electric and gas, and then we have a separate location that has electric as well."
And then the rep asked, "So do you want all four locations?"
And then you say, "Can I give you an account number that it's currently on? Would that help?"
And the MLGW rep says, "Sure."
And then a little further down, you give them the account number ending in 730, correct?
A. That's correct.
Q. And then the rep says, "That's the only one that you want, just that one?"
And then you say, "Well, now you got me kind of curious. So what is on that?"
And the MLGW rep responds, "Electric only."
And then you say, "So we definitely want that one transferred to our name, but we're also going to need everything else you just mentioned. So water."

**And then the MLG rep responds, "So you want all four of those locations? Because all four of those locations are under that customer number."**

**And then you say, "Yeah, that should all go to us now. Yeah, that's correct."**

**And then the rep says, "What's the name that you're putting the service in?"**

**And then you say, "Xpedient," correct?**

A. Correct.

**Q. Okay. And does that refresh your recollection about how the four accounts got transferred into Xpedient's name?**

A. Uh-huh. Yeah. That's pretty much what I remember.

**Q. Okay. But, to your recollection, you never advised Colliers after this fact that you had, in fact, transferred four accounts, not just the account ending in 730 into Xpedient's name?**

MR. THOMAS: Object to form.

THE WITNESS: I don't recall.

BY MS. McDONALD:

**Q. Okay. And it says, if you look -- so the MLGW rep identified that one account was for water service.**

**Do you see that?**

A. Uhm-uhm.
**Q. And then another one was for fire protection.**
**Did you understand that to be water for the sprinkler system?**
A. Yeah. At the time I would have thought, okay, well, that's -- that's water.
**Q. Okay. And did you tell anyone at Xpedient that there were four accounts in Xpedient's name associated with the Cromwell warehouse?**
A. I don't believe I did.
**Q. Okay.**
A. Not -- not at this point, I didn't.
**Q. Okay. Did you tell them later?**
A. Yes.
**Q. Okay. And then I'm going to hand you what was previously marked as Exhibit 149.**
**And this is a document that was produced by Colliers in this action bearing Bates Number Colliers 03919. And just take a moment to look it over.**
**Does it appear to be a true and correct copy of your May 23, 2023, through July 10, 2023, email exchange with Jessica Edmonds? And the first part of this is -- it's a continuation of that conversation we were just looking at?**

A. We were actively -- Jessica and I were actively working together to try and figure out, I believe, that -- the different -- accounts going to the right suites, trying to figure that out.

So in unison with that, when we'd get stumped, I'd stop, call MLGW. They wouldn't talk to me. The answer was always we're not going to cut off your power; your bill is under review.

And at that point, I'm like, okay, well, we're safe; you're not going to cut off any of our services. So we'll keep trying to work it until we get to the bottom of it.

**Q. Okay.**

A. But I wasn't going to pay it until I knew exactly what it was.

**Q. Okay. And, say, in October 2023, I know you said that they represented they weren't going to cut off your services. Did you know if all of the utility services were working at the Cromwell warehouse?**

A. I thought they were all -- everything was working, full working order.

**Q. Okay. And did Xpedient ultimately have an HVAC vendor come out to do the preventative maintenance check?**

A. We did. I can't remember the exact month. I don't remember if it was October -- I feel like it was October or November. But I could be off.

**Q. Okay. And do you remember what the outcome of that was?**

A. No. Not at the time I didn't.

**Q. Okay. Do you know now?**

A. I do now.

**Q. And what was the outcome?**

A. That the gas was locked and not on.

**Q. Okay. And when did you end up learning that?**

A. After the fact.

**Q. And then -- Mr. Livingston was on-site, though, correct?**

A. Yes, he was.

**Q. So he was on-site in November and December, correct?**

A. Uh-huh. Yes.

**Q. Do you know if Mr. Livingston ever tried to run the unit heaters or the HVAC systems that were serving the office space?**

A. No, I don't.

**Q. Okay. And he never communicated to you that they weren't working?**

A. No.

**Q. Okay. So it gets cold in Memphis, correct, in the winter? Are you aware of that?**
MR. THOMAS: Object to form.
THE WITNESS: I was not aware of that. It was hot in August.
BY MS. McDONALD:
**Q. Okay. Okay. So you say you live in Kansas, right?**
A. Yeah.
**Q. Does it get hot in the summer in Kansas in Hutchinson?**
A. Yes, it does.
**Q. What about in the winter?**
A. It gets cold.
**Q. Does it get temperatures below freezing?**
A. Oh, yeah.
**Q. Okay. And you've worked at warehouse facilities in Hutchinson, correct?**
A. Yes.
**Q. Okay. Did those warehouse facilities have heat?**
A. No.
**Q. Were they cold in the winter?**
A. They were cold because we had to keep them -- actually, yeah, I mean, they were cold because we

**Q. But at this point you had no understanding whether the gas was actually connected, correct?**
A. I -- it -- well, what date is this?
**Q. October 10, 2023.**
A. I thought the gas -- I think -- I think at that point I was under the impression the gas was on.
**Q. And why did you have that impression?**
A. Because I was told at some point. And I believe it was in October, I was told that the HVAC was good to go.
**Q. Who told you that?**
A. Shellie.
**Q. And did you have -- Mr. Livingston was on-site at that point, correct, when Shellie made the representation about the HVAC?**
A. Yeah, he would have been.
**Q. Did you ask him to test the HVAC system?**
A. No. When she said the HVAC -- because it was the HVAC and the roof kind of tied together, so she said the roof repairs and HVAC are good to go.
So at that point that's when I had started lining up with Zach, hey, let's -- okay. It's good to go. We're working now. Let's get the PMs taken care of.

**Q. Okay. And then -- go ahead.**

A. So by good working order -- and, again, I'm not a mechanic or an HVAC specialist, but if an HVAC is up and running, that means -- if it's good to go, it's been tested, and you can't test it unless the gas is on. So from that point forward, I thought the gas was on.

And there's some confusion about locks and some other things that I'm sure we'll get into, but this is -- this is kind of the point where, from here on out, I thought we were good to go with all utilities.

**Q. Okay.**

A. My concern was there was an accounting issue within MLGW between the three of us, MLGW, Colliers, and us, that was going to cause a shut-off. And that's -- I mean, for the rest of this time, that's pretty much where I was at.

**Q. Okay. But here the MLGW rep tells you that the account ending in 29 has now been changed into St. Paul's name.**

**Do you see that?**

A. I do, yeah.

**Q. Okay. So -- and then we saw that earlier email, right, where Ms. Edmonds communicated to you**

whole building.
MS. McDONALD: Okay. And I'm going to mark at -- oh, sorry. Let me see about those.
MR. THOMAS: 163?
MS. McDONALD: 163. Thank you.
(Exhibit 163 was marked.)
BY MS. McDONALD:
**Q. And does this appear to be a true and correct copy of your November 15, 2023, email exchange with Mr. Livingston?**
A. Yes, it is.
**Q. Okay. And on November 15, 2023, you wrote to him asking, "Where are you with getting the HVAC looked at in Memphis"?**
**Do you see that?**
A. Yeah, I do.
**Q. And that's referring to the Cromwell warehouse, correct?**
A. Correct.
**Q. And the purpose of this HVAC inspection was to do that preventative maintenance work that we had discussed about at the beginning, right? That's part of the start-up process at any new facility that Xpedient takes over?**
A. That's correct.

**Q. Okay. And the -- is it correct that the reason Xpedient waited -- I guess this is, what, six months since Xpedient moved into the facility, to actually undertake that preventative maintenance work, was because of the roof repairs?**
A. That's correct.
**Q. And the HVAC repairs that the landlord was performing at the space?**
A. That's correct.
**Q. Okay. And Mr. Livingston responds that same day, stating, "I had got Crowe HVAC coming tomorrow from 9:00 to 12:00."**
**He's referring to Crowe Heating & Air, correct?**
A. Yes.
**Q. Okay. And Crowe was an HVAC vendor hired by Xpedient?**
A. Yes.
**Q. Okay. And did Crowe come out on November 16th?**
A. I'm not sure.
**Q. Did you follow up with Mr. Livingston after this point to see if Crowe came out?**
A. I don't believe so.
**Q. Did Mr. Livingston report to you what the**

**outcome of Crowe's HVAC inspection was?**
A. No.
**Q. Would it have been Mr. Livingston's responsibility to relay to you what the outcome of the HVAC inspection was?**
A. Yes.
**Q. Do you know why he didn't do that here?**
A. No.
**Q. Did you talk with him about it?**
A. No.
**Q. Did you follow up with him at any point after November 16th about the status of the HVAC inspection?**
A. No.
**Q. Why not?**
A. I'm trying to recall what conversations we would have had. So this is -- this is kind of the time -- somewhere in this -- again, the process after the event or just during the water intrusion where Dirk came in and was -- Zach reported directly to Dirk.
**Q. But I thought your testimony was that Mr. Livingston didn't start reporting to Mr. Updike until the very end of 2023 and early 2024.**
A. Right.

BY MS. McDONALD:
**Q. Okay. And, to your knowledge, did Mr. Livingston ever communicate to Agilent at any point, you know, up to January 17, 2024, that the gas meter was locked?**
A. No.
MR. THOMAS: Object to form.
THE WITNESS: Not to my knowledge.
BY MS. McDONALD:
**Q. Okay. How did you first learn of the water-intrusion event on January 17, 2024?**
A. It was -- it was that evening. I had gotten a security alert and checked a camera to see a burglary or whatnot, and the fire department was out front.
**Q. Did you call Mr. Livingston?**
A. I did.
**Q. Did you preserve that footage?**
A. I think so. I can't be sure, but --
**Q. So you -- and what did it show on the security alert?**
A. So the first view was the fire department out front. And then there was a way to switch cameras, so I switched a camera and -- it was really hard to tell. I couldn't really figure out what was going

**November/December 2023, he's freezing his butt off, isn't he?**

MR. THOMAS: Object to form.

THE WITNESS: Yeah, I don't know what the weather was like in November, so --

BY MR. BUTLER:

**Q. What about December?**

A. I don't know what the weather was like in December either.

**Q. Okay. And, to your knowledge, did Mr. Livingston or anyone else do anything to provide temporary heat to Xpedient's space prior to the freeze?**

A. No, not to my knowledge.

**Q. You -- you -- you were in the warehouse, and you were asked a little bit earlier and learned after the fact, I think you said, that Mr. Livingston had a little space heater in his office?**

A. That's correct.

**Q. Was there any damage to his office, any pipes freeze above that office?**

A. Honestly, I'm not sure. I didn't go there physically. I don't remember seeing pictures of that space. There was a really big office away from

COURT REPORTER'S CERTIFICATE

STATE OF TENNESSEE:

I, JULIE K. LYLE, Licensed Reporter for the State of Tennessee, CERTIFY:

1. The foregoing deposition was taken before me at the time and place stated in the foregoing styled cause with the appearances as noted;

2. Being a Court Reporter, I then reported the deposition stenographically to the best of my skill and ability, and the foregoing pages contain a full, true and correct transcript of my said stenographic notes then and there taken;

3. I am not in the employ of and am not related to any of the parties or their counsel, and I have no interest in the matter involved.

WITNESS MY SIGNATURE, this, the 14th day of September, 2026.

JULIE LYLE, RPR, LCR
LCR Number: 850
Expiration: 6/30/2028