# EXHIBIT D

Deposition of

**Dirk Updike**

September 02, 2026

Agilent Technologies, Inc.

vs.

Xpedient Management Group, LLC

aptus. COURT REPORTING
www.aptusCR.com | 866.999.8310

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC.,

Plaintiff,

vs. Case No. 2:25-CV-02101-bcl-cgc

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AND COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,

Cross-Plaintiff,

vs.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Cross-Defendants.

---

(Caption continued on page 2.)

Deposition of

DIRK UPDIKE
Individually and 30(b)(6)

September 2, 2026

10:00 a.m.

Reported by:
Julie Lyle, RPR, LCR
Job No. 10199289

---

FACTORY MUTUAL INSURANCE CO., as
subrogee of Agilent Technologies, Inc.,

Plaintiff,

vs.

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

APPEARANCES:

For the Plaintiff, Agilent Technologies, Inc.:

Ms. Margaret C. McDonald
Reed Smith
515 South Flower Street, Suite 4300
Los Angeles, CA 90071
(213)457-8000
mcmcdonald@reedsmith.com

For the Defendant and Cross-Plaintiff, Xpedient
Management Group, LLC:

Mr. William P. Thomas
Butler Snow LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38119
(901)680-7200
will.thomas@butlersnow.com

Mr. Peter C. Sales
Bradley Arant Boult Cummings LLP
1221 Broadway, Suite 2400
Nashville, TN 37203
psales@bradley.com

APPEARANCES: (Continued)

For the Defendant and Cross-Defendant, Colliers Management Services - Memphis, LLC:

Mr. John W. Butler
Mr. Grant Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, TN 37919
(865)244-3925
jbutler@byblaw.com
gmitchell@byblaw.com

For the Defendant and Cross-Defendant, St. Paul Fire and Marine Insurance Company:

Mr. Sean Martin (via Zoom)
Carr Allison
633 Chestnut Street, Suite 2000
Chattanooga, TN 37450
(423)648-9832
smartin@carrallison.com

For the Plaintiff, Factory Mutual Insurance Company:

Mr. S. Joe Welborn
Smith Cashion & Orr, PLC
3100 West End Avenue, Suite 800
Nashville, TN 37203
(615)742-8586
jwelborn@smithcashion.com

The deposition of DIRK UPDIKE, appearing as a 30(b)(6) witness and individually, was taken by counsel for the Plaintiff, pursuant to notice, at 1221 Broadway, Suite 2400, Nashville, Tennessee, commencing at 10:00 a.m., on September 2, 2026, for all purposes under the applicable Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. It is agreed that Julie Lyle, being a licensed court reporter for the State of Tennessee, may swear the witness, and the reading and signing of the completed deposition is reserved.

* * *

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

* * *

DIRK UPDIKE,

was called as a witness, and after having been duly sworn, testified as follows:

* * *

EXAMINATION

BY MS. McDONALD:

**Q. Good morning. My name is Margaret McDonald. I'm counsel for plaintiff, Agilent Technologies, Incorporated.**
**Can you please state your name for the record?**
A. Dirk Updike.
**Q. And have you ever given testimony before?**
A. No, ma'am.
**Q. As you've never been deposed before, while I appreciate you were sitting here yesterday, I'm just going to go over the ground rules quickly.**
A. Thank you.
**Q. The court reporter has sworn you under oath. Do you understand the effect of that oath?**
A. Yes, ma'am.
**Q. Okay, great.**
**You understand that you've been sworn to tell the truth and that I would expect you to provide**

A. I couldn't tell you the numbers or anything, but it would have been documents supplied as part of the --

**Q. Production?**

A. Yes, ma'am.

**Q. Okay.**

A. Part of the production.

**Q. Perfect.**

**And did you bring any documents with you today?**

A. I just brought the United States District Court from Western Tennessee Division --

MR. THOMAS: It's the 30(b)(6) notice.

THE WITNESS: The 30(b)(6).

BY MS. McDONALD:

**Q. Perfect.**

**So it's the amended notice of deposition, right at the bottom of the page, is that --**

A. Amended Notice of Deposition of Xpedient Management Group, 30(b)(6).

**Q. Perfect.**

**And you understand you're appearing in two separate capacities today, correct?**

A. Yes, ma'am.

**Q. Okay. First, you're obviously appearing in**

**your individual capacity, and then you're also appearing as the designated representative -- corporate representative of Xpedient under Rule 30(b)(6) in regards to certain topics identified in that notice that you have in front of you, correct?**

A. Yes.

MR. THOMAS: If you'd like me to, I can identify the topics that he's going to cover.

MS. McDONALD: They're consistent with the chart that you circulated, right?

MR. THOMAS: They are.

MS. McDONALD: Have they changed?

MR. THOMAS: No, but, you know, I would like the record to reflect that this witness will cover the topics in Xpedient's Amended Notice of Deposition, Topic Number 7, Topic Number 8, Topic Number 9.

MR. BUTLER: Oh, wait.

MS. McDONALD: Wait. You had Nate as 9.

MR. BUTLER: You had Nate for 9.

MR. THOMAS: Yeah. Yeah. That is a change, so 9 is a change. 10, 11, 12, 14.

MR. BUTLER: Not 13 anymore?

MS. McDONALD: Not 13?

here.

MR. THOMAS: One is two-sided, so you might want to stick with this one.

MS. McDONALD: It's ongoing drama in this case.

BY MS. McDONALD:

**Q. So, Mr. Updike, you understand that Xpedient has selected you to testify on its behalf in regards to the topics that your counsel just identified, correct?**

A. Yes.

**Q. Okay. And you understand that when you answer a question on a notice topic that you're answering for Xpedient as a company, not just for yourself, correct?**

A. Yes.

**Q. And you understand your obligation was to educate yourself on the notice topics, including on matters of which you have no personal knowledge, correct?**

A. Yes.

**Q. And that obligation included reviewing Xpedient's documents even if you never saw them?**

A. Yes.

**Q. And speaking with Xpedient employees for**

**their personal knowledge?**
A. Yes.
**Q. Did you speak with any Xpedient employees for their personal knowledge to prepare for today's deposition?**
A. Current employees, former employees, can you define that?
**Q. Both.**
A. I spoke, obviously, with Nate Haynes. I spoke with our HR department on anything that would be required through HR. I spoke with Zach Livingston and Jamie Davis.
**Q. Who in the HR department did you speak with?**
A. It would have been Jasmine Casciotti. Sorry. I don't know how to pronounce her name.
MR. THOMAS: Nate, you can't answer. I'm sorry.
MR. SALES: If he doesn't remember, he doesn't remember.
MS. McDONALD: Okay.
BY MS. McDONALD:
**Q. And was anyone else present for your conversation with Mr. Livingston?**
A. It would have been over the course of time, but at times, no.

fully came over.
**Q. Okay. And prior to that, had Mr. Livingston ever reported to you?**
A. Prior to that?
**Q. Yeah.**
A. No.
**Q. Okay. And when he started reporting to you on February 1st, 2024, what was his title at that time?**
A. Safety manager.
**Q. Okay. And how long have you been employed by Xpedient?**
A. My first day at Xpedient was October 30th of 2023.
**Q. And what was your title at the time you joined Xpedient?**
A. Senior director.
**Q. Was that senior director of operations or just senior director?**
A. Yeah, senior director of operations.
**Q. And how long did you hold that title?**
A. Until August of 2025.
**Q. Okay. And what were your responsibilities as senior director of operations at Xpedient?**
A. I was responsible for safety. So safety came

**Q. But it did require Mr. Livingston to do other work outside of the Cromwell warehouse and any services Xpedient provided to Agilent under the agreements, correct?**
A. Correct.
**Q. Do you know how much -- well, I guess, you were his supervisor, right, from February 2024?**
**Can you give me an estimate, from that point forward until he left the company, how much of his time was spent on safety?**
A. An estimate? That's going to be really hard, but 10 to 30 percent, depending.
His number one priority would have been to make sure the facility and Agilent was taken care of, and the remainder of the time would have been filled in with the safety.
**Q. And that's 10 to 30 percent of a week, on average?**
A. Sure.
**Q. Okay. And when you said his main responsibility would be to take care of Agilent and the facility, what were his responsibilities to take care of the facility?**
A. He was responsible for being there on a day-to-day basis, loading and unloading trucks, and

But, obviously, we would not want anything to get wet.
**Q. Okay. And if you'd turn to Schedule 3 --**
A. Page number?
**Q. 2591.**
A. Okay. Thank you.
**Q. It's titled "Products," correct?**
A. Schedule 3, "Products"?
**Q. Yeah. Do you see that?**
A. Yep.
**Q. And it says, "The following are the products that will be handled by the facilities," and then it says, "Medical equipment or devices stored in boxes on pallets not to exceed 2,500 pounds per pallet."**
**Do you see that?**
A. Yes, ma'am.
**Q. Given that Xpedient knew that it would be storing medical equipment or devices for Agilent, it's safe to assume that Xpedient understood that water or other substances should not come into contact with that medical equipment?**
A. I would make that assumption, yes.
**Q. Okay. And then if you go back to page 2589, do you see the subheader "Supervision," middle of the page?**

A. -- then, yes. But in this situation, we didn't have any knowledge of the sprinkler system. We weren't responsible for it.

**Q. You knew there were water pipes in the building, though, right?**

A. Are you asking me as an organization or as an individual?

**Q. As an organization.**

A. We understood there was water pipes in the building, yes.

**Q. Okay. And you live -- you currently live in Minneapolis; is that correct?**

A. That is correct.

**Q. How long have you lived in Minneapolis?**

A. So all but, let's say, five years. All but five years. I went to college for five years.

**Q. Okay. And where did you go to college?**

A. Iowa.

**Q. Okay.**

A. Not the University of Iowa. In the state of Iowa.

**Q. Okay. What school did you go to in Iowa?**

A. Simpson College.

**Q. Okay. And did you obtain a degree from Simpson College?**

A. I did.
**Q. What was that degree?**
A. I believe it's Bachelor's of Science --
**Q. Okay.**
A. -- with a major in business management and a minor in French.
**Q. Okay. Great.**
**And Iowa and Minneapolis both get pretty cold in the winter, correct?**
MR. THOMAS: Object to form.
THE WITNESS: It can.
BY MS. McDONALD:
**Q. It can get cold?**
A. Uhm-uhm.
**Q. It can routinely get below freezing, correct?**
A. Yes.
**Q. Okay. And having lived in locations where, in winter, temperatures routinely get below freezing, are you familiar with pipes freezing due to the cold weather?**
A. No. In Minnesota, that's -- you're -- everything is built out and you don't -- freezing pipes isn't really a thing.
**Q. So you've never had a water-intrusion event or a pipe burst because of cold weather, in your**

A. Yes.
**Q. What did he say?**
A. On what caused it?
**Q. Yeah.**
A. There was no heat in the warehouse.
**Q. And that was because the gas meter was locked; is that correct?**
A. Yeah, to my understanding, the gas meter was locked.
**Q. And Mr. Livingston knew before the water-intrusion event that the gas meter was locked, correct?**
A. Yes.
**Q. And would it have been Mr. Livingston's responsibility to alert the director of operations at the Cromwell warehouse that the gas meter was locked?**
A. Yeah. It would have been Mr. Livingston's responsibility to elevate that concern through the chain of command.
**Q. Okay. And did Mr. Livingston ever elevate that concern through the chain of command prior to the water-intrusion event?**
A. From what I'm seeing, he has not elevated -- did not elevate that concern appropriately.

A. Not that I'm aware of.
**Q. Did Mr. Livingston ever make any complaints about the lack of heat at the Cromwell warehouse to anyone at Xpedient?**
A. I vaguely remember him making a comment about it being cold, and that would be the extent of what I heard.
**Q. And what did you say in response to that?**
A. I've been told it's cold in a warehouse I can't even tell you how many times. Our guys in California will tell us it's cold when it's 70 degrees in a warehouse.
**Q. So what do you normally say in response to that when an employee complains about the cold?**
A. It would depend on the case.
**Q. What did you say to Mr. Livingston?**
A. I -- I couldn't even tell you where the conversation was, if it was a group conversation, if it was a one-on-one conversation.
**Q. But if he was speaking to you at that point, you would have been transitioning to the role of his supervisor, correct?**
MR. THOMAS: Object to form.
THE WITNESS: No. I worked for the organization from 10/30 to -- starting on 10/30, I

MR. THOMAS: Object to form.

THE WITNESS: You're saying -- say it again.

BY MS. McDONALD:

**Q. Okay. You just told me, correct, that Mr. Livingston, prior to the water-intrusion event --**

A. Yeah.

**Q. -- told you that the warehouse was very cold?**

MR. THOMAS: Object to form. I don't think he's saying --

BY MS. McDONALD:

**Q. The Cromwell warehouse was cold?**

MR. THOMAS: I don't think he knew when it happened.

THE WITNESS: I don't know when the conversation happened. I don't know if it was even directly at me.

BY MS. McDONALD:

**Q. But was it before the water-intrusion event?**

A. Yes.

**Q. Okay. And you don't know if it was directed at you because there might have been other participants?**

A. Correct.

**Q. Was Mr. Davis a participant?**
A. I couldn't tell you. I vaguely remember it.
**Q. That he was a participant?**
A. No, that he said that it was cold.
**Q. But you have no other recollections about this conversation?**
A. I do not.
**Q. And you didn't follow up with him at the time?**
A. I did not.
**Q. And when did you start working with Mr. Livingston to work on the safety component, the transitioning to safety manager from warehouse manager?**
A. I would say sometime in --
MR. THOMAS: Let her finish.
THE WITNESS: Oh, sorry. I apologize. Go ahead.
BY MS. McDONALD:
**Q. That's okay.**
**So my question was, when did you start working with Mr. Livingston when he was transitioning from warehouse manager to safety manager?**
A. I wasn't working with him when he

this situation I was looking at the portal, trying to get information from the portal because I'm calling out that I can't see the backside of the invoice.

**Q. Okay.**

A. Or, sorry. I'm calling out that I can't see the itemized breakdown.

**Q. Okay. But MLGW, to your understanding, actually mailed copies of the invoices to Xpedient, correct, to your Texas address?**

A. I don't know at the start if they were mailing them or they were coming over the email.

**Q. But either way, they would have had that detailed summary, correct?**

A. I would have to look back to answer that, to be able to say yes, I'm comfortable with answering that appropriately. Do you have a document that I can look at?

**Q. I mean, I have copies of the invoices. I'm happy to show you those.**

A. Yeah, yeah. I'm just -- for me, I would have to look at it and say I can confidently say yes, that's the case.

**Q. Okay. Let's look at one.**

MR. THOMAS: I have 42 here.

**Xpedient?**
A. I do not.
**Q. Okay.**
THE WITNESS: I don't know where this came from.
MR. THOMAS: You can just set it right there.
THE WITNESS: Okay.
BY MS. McDONALD:
**Q. And then if you look at Ms. Edmonds' response, she says, "No, this was not a shared account, and we had to pay everything to MLGW that was related to the split of the gas prior to it being done."**
**And then she goes on to say, "From what I've been told, this was a security deposit that was charged to you-all."**
**And then she says, "The account is not in our name, nor do we manage the account under your name, so MLGW will not give me much details, but that is what I was told."**
**Do you see that?**
A. Paragraph 2 on 1588, correct?
**Q. Yes.**
A. Yes, ma'am.

**Colliers had repeatedly advised Xpedient that it was responsible for Account 730? You saw that?**
A. I did see that.
**Q. Did you find those communications confusing?**
A. That process was a lot different yesterday in this group, walking him through step by step while having conversations between them and calling out unique situations, things like that.
So that was much more clear than trying to read through emails, check through chronological events, see what MLGW is saying, seeing what the landlord was saying. So that's not an apples-to-apples comparison.
**Q. But you would agree that everything, the communications and the invoices that were shown to Mr. Davis, which all were issued, say, before December 31, 2023, were all available to you?**
A. Correct.
**Q. They were all available to Xpedient, correct?**
A. Correct.
**Q. They were all available at the time of the water-intrusion event, correct?**
A. Correct.
MS. McDONALD: Okay. And I'm going to -- I'm going to mark as Exhibit 186, this is an

email exchange between you and Mr. Davis, copying Mr. Haynes, dated March 25 through March 27, 2024.

(Exhibit 186 was marked.)

BY MS. McDONALD:

**Q. And does this appear to be a true and correct copy of your email exchange?**

A. Looks to be.

**Q. Okay. And you say, on March 25th, "@Jamie Davis, can you review the below and let me know if you agree with this assessment" -- or "with assessment?"**

**Do you see that?**

A. I do.

**Q. And what was the assessment?**

A. It's what was written on the 1908. Or 19 --

**Q. 908?**

A. Sorry.

**Q. That's okay.**

A. 908 and 909.

**Q. Okay. And this is a draft email; is that correct?**

A. That is correct.

**Q. And who is this draft email to?**

A. Jamie Davis and Nate Haynes.

**Q. Well, if you look at the -- 908, it looks**

other Xpedient personnel?
A. Yes, ma'am.
Q. Okay. And was that the principal document that you looked at in putting together this timeline?
A. I couldn't tell you. I don't know. I don't recall.
Q. Okay. And then looking at item Number 6, it says, "December 2023, Xpedient worked with HVAC provider to see if they could support in setting up the gas service."
Do you see that?
A. I do.
Q. What's that referring to?
A. That's an assumption of the Crowe invoice.
Q. But the Crowe invoice is dated November 16, 2023, correct?
A. But I believe it was emailed in December.
Q. But -- okay. So what activity in December besides receiving an invoice for work that occurred in November did Xpedient do with Crowe to see if they could support in setting up the gas service?
A. I'm not -- I'm not sure.
Q. Are you aware of anything, sitting right here?

**Q. And what was the basis for saying that the gas was locked during the split process?**

A. The gas line was locked.

**Q. I get that you wrote that --**

A. Yeah.

**Q. -- but what was the basis -- what facts or documents did you look at to say -- to be able to say that the gas was locked during the split process?**

A. I wrote this almost three years ago, two and a half years ago. I can't -- I can't recall everything I looked at that put this together.

**Q. Okay. But it's my understanding that you've been designated, and maybe your counsel will correct me, as the corporate representative on utilities, correct?**

A. That is correct.

**Q. And so in that capacity, are you able to tell me whether the gas line was actually locked during the split process, as it states here?**

A. I believe we have -- we have an understanding that the gas line was locked long before this.

**Q. Okay. So this is incorrect?**

A. Yes, this was incorrect.

**Q. Okay.**

Q. Have you ever seen any communications from a legal team on behalf of Xpedient to MLGW relating to the Cromwell warehouse?
A. To MLGW?
Q. Uh-huh.
A. I have not.
Q. Are you aware of any legal team providing support to Xpedient to help with its communications with MLGW?
A. We hired a legal team to, obviously, support us through this situation.
Q. Uhm-uhm.
But did -- did they have any communications with MLGW?
A. I do not recall.
Q. Okay. And then it says, "Below are the items that have been completed post-incident." Number 1 says, "Sprinkler system fully repaired."
Did the landlord pay for those repairs?
A. Yes.
Q. And then Number 2, "Domestic water fully repaired." Did the landlord pay for those repairs?
A. Yes.
Q. And 3 says, "Ceiling fully replaced."
Did the landlord pay for those repairs?

A. Yes.
**Q. Okay. And then 4 -- 4 and 5 was additional repairs.**
**Did the landlord pay for those as well?**
A. Bottom drywall removed and replaced, office painted. You said 6 too?
**Q. No. Just 4 and 5.**
A. Yes, the landlord paid for those.
**Q. Okay. And what about 6? Were those ultimately paid for by the landlord?**
A. I believe so, but I do not know for a fact on that.
**Q. Okay. And 7 says, "Humefied has been placed at facility."**
**Can you explain what that means?**
A. That probably meant humidifier.
**Q. Okay. That makes sense.**
**And then Number 8 says, "Space heaters on-site for if/when the facility gets cold per direction of Colliers"?**
A. That is correct.
**Q. And is that that March 18, 2024, text message that we were looking at from Ms. Moses?**
A. That would be my assumption, yes.
**Q. Okay. Do you recall having any other**

**Xpedient's name?**
A. I would say there is experience. But, again -- sorry. I apologize.
But, again, it depends on the situation and where it lies. So we're not responsible for utility -- we have facilities that we run where our people are just in there, right? And the customer is there, running the facility and stuff like that. So it would depend on the situation and the individuals that are involved in it.
**Q. Okay. But for those facilities that Xpedient manages, it has experience?**
A. We have experience -- the organization has experience with transferring utilities.
**Q. Okay. And it had experience in 2023, correct?**
A. It did.
**Q. Okay. And was this draft email that we were just looking at ever sent to Christy or anyone at Agilent?**
A. I do not recall.
**Q. Okay. So then you have no idea whether or not it was sent?**
A. I do not -- I do not recall if it was sent to --

Q. Sent to anyone at Agilent.
A. Sent to anyone at Agilent. I don't recall.
Q. Do you know why it would not be sent to anyone at Agilent?
A. I do not.
Q. Okay. And then I'm just going to quickly hand you what was previously marked as Exhibit 114.
Okay. And if -- does this appear to be a true and correct copy of an email exchange you had with Scott Anderson in March 2024?
A. It does.
Q. Okay. And then it -- on March 22nd, 2024, you wrote to Mr. Anderson -- it's the third sentence -- "We are unable to get MLGW out to turn on the gas. We have been working on this for almost a year with MLGW and Shellie Moses."
Do you see that?
A. Yep.
Q. Okay. But as I understood your testimony, while Mr. Livingston knew at some point, knew at least from November 16, 2023, that the gas line was locked at the Cromwell warehouse, Xpedient had not taken any action to unlock that gas line until after the water-intrusion event, correct?
A. Correct.

**Q. Okay. Oh, okay. It's on the roof.**
**Is it -- does it look like the other traditional roof HVAC units, just a square box?**
A. I don't -- I couldn't tell you what it looked like on top of the roof. I can tell you exactly what it looks like from the inside.
**Q. Okay. And does it -- does it work by blowing the hot air into the warehouse?**
A. Yeah, it has multiple large openings that face a couple different directions and would blow -- will blow heat out into the warehouse.
**Q. And are they -- were those, in your recollection, controlled by a single thermostat?**
A. They each had their own thermostat.
**Q. Okay. Each of the two dock blowers? So there were two -- a separate thermostat for each dock blower that you saw in there?**
A. Correct. One right outside the man door that we were assigned, and then one on the other side of the utility/pump room.
**Q. And both of those thermostats were -- would be considered inside the space that Xpedient leased, correct?**
A. That is correct.
**Q. All right. And the infrared heaters that you**

**ask you questions as the representative of Xpedient. Okay?**
A. Understood.
**Q. So hopefully we'll streamline this.**
**You agree, don't you, that on December 1, 2023, Xpedient was aware the gas utility line serving Xpedient's leased premises at the Cromwell warehouse was locked, correct?**
A. On December 1st, 2023?
**Q. Yes.**
A. Yes, sir.
**Q. All right. You agree, don't you, that if the gas utility line serving the leased premises is locked, there's no natural gas serving the heaters in the leased premises, correct?**
A. Yes.
**Q. You agree, don't you, that if there's no natural gas serving the heaters in the leased premises, those heaters aren't heating the leased premises, correct?**
A. Correct.
**Q. So by December 1, 2023, Xpedient knew there was no operational heat in its leased premises, correct?**
A. Correct.

Q. All right. And you agree, don't you, now that you know what went on, that Xpedient -- that there were no operational heaters in the leased premises between December 1, 2023, and January 17 of 2024, correct?
A. December 1 of 2023, January 7 [sic], 2024.
Q. Is that correct?
A. Can you repeat the question? Sorry.
Q. Yeah.
Xpedient agrees, doesn't it, that there were no operational heaters in its leased premises between December 1, 2023, and January 17 of 2024?
A. By "operational," do you mean that blew heat?
Q. That blew heat.
A. Yes, sir.
Q. Okay. Between December 1 of '23 and January 17 of 2024, you agree with me that Xpedient did not seek confirmation from its warehouse manager, Mr. Livingston, that the lock on the natural gas service line had been unlocked, correct?
A. One more time, please.
Q. Between December 1 of '23 and January 17 of '24 --
A. Yep.
Q. -- you agree with me, don't you, that

**Xpedient did not seek confirmation from Mr. Livingston that the lock on the gas line had been unlocked --**
A. Yes, sir.
**Q. -- correct?**
A. Yes, sir.
**Q. And Xpedient, during that time period, had not done anything to confirm with Mr. Livingston that the gas service had been established to its leased premises, correct?**
A. The gas service, correct.
**Q. Okay. And during that same period, December 1 to January 17, Xpedient did not receive any confirmation from Mr. Livingston that natural gas service had actually been established, correct?**
A. That is correct.
**Q. Okay. And prior to this loss event, Xpedient never sought confirmation from Mr. Livingston that the heaters serving the warehouse portion of the leased premises were operational; isn't that correct?**
A. It's been a long day. Can you -- one more time, please, sir.
**Q. Prior to the loss event --**
A. Yep.

Q. -- Xpedient never sought confirmation from Mr. Livingston that the heaters serving the warehouse portion of the leased premises were operational?
A. That is correct.
Q. Okay. You did not do that; Xpedient did not, correct?
A. Not that I am aware of.
Q. So despite knowing that there was a problem with the gas service by December 1, Xpedient took no action to verify that the problem had actually been corrected before the loss on January 17 of '24?
A. That is correct.
Q. All right. You were asked some questions by Mr. Martin about the impending winter weather event.
Prior to this loss event, Xpedient knew Memphis experienced freezing temperatures during the winter, right?
A. Not that I am aware of.
Q. Okay. Well, prior to this loss event at issue, Xpedient should have determined whether Memphis experienced freezing temperatures in the winter.
You agree with that, don't you?
A. I would have -- I would say that you -- you

**Q. So Xpedient understood, then, why maintaining heat in a warehouse was important to protecting what is stored in the warehouse --**

MR. THOMAS: Object to form.

BY MR. WELBORN:

**Q. -- right?**

A. Xpedient understands that temp -- that that -- that temperature can cause freezing when it comes to water and that there is -- if water got to a point where it froze enough inside a line, it could burst or buckle and fall onto what's underneath it, whether that's inventory, whether that's the dock, whether it's office space.

**Q. And does Xpedient have any understanding of how long temperatures need to be below freezing to freeze water?**

A. It would depend on the scenario, right? I think a temperature under 32 degrees outside has a different effect on water that's under 32 degrees on the inside of a building.

**Q. You were asked questions about Mr. Livingston and this weather event. Xpedient -- you agree with me, don't you, that Mr. Livingston should have been paying attention to the local weather in Memphis in the days leading up to January 17 of '24, right?**

rest of the organization may not have seen or been aware of.

**Q. Okay. And notwithstanding the existence of those warnings, which you acknowledge, Xpedient did nothing to verify the temperature in the warehouse before this loss event between the time of the warning and the loss, right?**

A. We did not.

**Q. And did nothing to verify that the heaters were working, right?**

A. We did not.

**Q. Did nothing to inspect the sprinkler system at all?**

A. We weren't responsible for the sprinkler system at this location.

**Q. Okay. Well, you didn't contact the owner or Colliers and say you need to get out here and look at this sprinkler system, did you?**

A. We're not responsible for the sprinkler system within the building. That is their responsibility.

**Q. But it's water that's above your inventory.**

MR. THOMAS: Object to form.

THE WITNESS: We didn't know that the sprinkler system had water in it.

COURT REPORTER'S CERTIFICATE

STATE OF TENNESSEE:

I, JULIE K. LYLE, Licensed Reporter for the State of Tennessee, CERTIFY:

1. The foregoing deposition was taken before me at the time and place stated in the foregoing styled cause with the appearances as noted;

2. Being a Court Reporter, I then reported the deposition stenographically to the best of my skill and ability, and the foregoing pages contain a full, true and correct transcript of my said stenographic notes then and there taken;

3. I am not in the employ of and am not related to any of the parties or their counsel, and I have no interest in the matter involved.

WITNESS MY SIGNATURE, this, the 14th day of September, 2026.

Julie Lyle

JULIE LYLE, RPR, LCR
LCR Number: 850
Expiration: 6/30/2028