# EXHIBIT E

Videotaped Deposition of

**Zachary Livingston**

September 16, 2026

Agilent Technologies, Inc.

vs.

Xpedient Management Group, LLC

aptus. COURT REPORTING

www.aptusCR.com | 866.999.8310

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC. )
Plaintiff, ) Case No.
vs. ) 2:25-CV-02101
XPEDIENT MANAGEMENT ) (BCL)(CGC)
GROUP, LLC, et al., )
Defendants. )

-----------------------------------------------------

XPEDIENT MANAGEMENT GROUP, )
LLC, )
Cross-Plaintiff, )
vs. )
ST. PAUL FIRE AND MARINE )
INSURANCE COMPANY and )
COLLIERS MANAGEMENT )
SERVICES - MEMPHIS, LLC, )
Cross-Defendants. )

---

ORAL AND VIDEOTAPED DEPOSITION OF

ZACHARY LIVINGSTON

September 16, 2026

Reported By: SUSAN ASHE, CER

Job No.: 10200460

Wednesday, September 16, 2026
10:14 a.m. Eastern Daylight Time

Oral and videotaped deposition of ZACHARY LIVINGSTON, taken on behalf of the Plaintiff, beginning at 10:14 a.m., on Wednesday, September~16, 2026, at the law offices of Reed Smith LLP, 1301 K~Street, Northwest, Washington, D.C., before Susan Ashe, Certified Electronic Reporter and a Notary Public in the District of Columbia.

APPEARANCE OF COUNSEL:

On behalf of the Plaintiff Agilent Technologies:

REED SMITH LLP
BY: MARGARET C. McDONALD, ESQ.
515 South Flower Street, Suite 4300
Los Angeles, California 90071
(213) 457-8000
mcmcdonald@reedsmith.com

- and -

BRADLEY ARANT BOULT CUMMINGS LLP
BY: PETER C. SALES, ESQ. (Via Zoom)
BY: ELIZABETH T. PETRAS, ESQ. (Via Zoom)
1221 Broadway, Suite 2400
Nashville, Tennessee 37203
(615) 244-2582
psales@bradley.com
bpetras@bradley.com

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendant Xpedient Management Group, LLC and the Witness:

BUTLER SNOW
BY: WILLIAM P. THOMAS, ESQ.
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi 39157
(601) 948-5711
will.thomas@butlersnow.com

On behalf of the Defendant Factory Mutual Insurance Company:

SMITH CASHION & ORR, PLC
BY: S. JOE WELBORN, ESQ. (Via Zoom)
3100 West End Avenue, Suite 800
Nashville, Tennessee 37203
(615) 742-8555
jwelborn@smithcashion.com

APPEARANCE OF COUNSEL (Continued):

On behalf of the Defendant Colliers Management Services - Memphis, LLC:

BUTLER, VINES AND BABB, PLLC
BY: JOHN BUTLER, ESQ.
2701 Kingston Pike
Knoxville, Tennessee 37919
(865) 637-3531
jbutler@bvblaw.com

On behalf of the Defendant St. Paul Fire and Marine Insurance Company:

CARR ALLISON
BY: SEAN W. MARTIN, ESQ. (Via Zoom)
633 Chestnut Street, Suite 2000
Chattanooga, Tennessee 37450
(423) 648-9832
swmartin@carrallison.com

ALSO PRESENT:

Melissa Black, Esq.
In-House Counsel
Agilent Technologies, Inc.

David Armstrong, Videographer

MOTION TO STRIKE AS NONRESPONSIVE

| Page/Line | Page/Line | Page/Line |
|---|---|---|
| 304/10 | | |

(REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily denote an exact quote from the document.)

That no emergency exits are blocked.
Hand and power tool use is machine guarded.
Fire extinguishers are charged.
**Q. Okay. And at a very high level, what type of services does MEI industries provide?**
A. Just crane services, rigging services.
**Q. And these are for construction projects?**
A. Correct.
**Q. Okay. Are these commercial construction projects, generally?**
A. Generally.
**Q. Okay. And where did you work before MEI?**
A. Xpedient Logistics.
**Q. Okay. And when did you last work for Xpedient Logistics?**
A. End of February 2026.
**Q. And how long did you work for Xpedient?**
A. Seven years.
**Q. So from approximately....**
A. March 2019.
**Q. Okay. Thank you.**
**And what was your title at the time you left Xpedient?**
A. Safety manager.

**Q. Okay. And what about when you joined?**
A. Operations manager.
**Q. And as an operations manager at Xpedient, what were your job responsibilities?**
A. Inventory management, new hire, inventory accuracy, KPI reports.
**Q. What's a KPI report?**
A. Just like -- like a volume -- daily volume report.
**Q. Okay.**
A. Efficiency report.
**Q. And how long were you an operations manager at Xpedient?**
A. Till August of 2023.
**Q. And as an operations manager at Xpedient, did you have any responsibility for facility management?**
MR. THOMAS: Object to form.
A. I mean, for the facility, just preventative maintenance scheduling.
MR. BUTLER: I'm sorry. Could you please speak up, if you can.
WITNESS: Sorry.
A. As a operations manager, I was -- I did have a responsibility for preventative maintenance

**But the general process was that you would provide the first-level approval.**

A. Correct.

**Q. First-level review and approval, I should say.**

A. Correct.

**Q. Okay. And you indicated that your title changed in August 2023. Is that correct?**

A. Yes.

**Q. What did your title change to?**

A. Safety manager.

**Q. Okay. And in your opinion, was this a promotion?**

A. Yes.

**Q. Okay. And how did your job responsibilities change when you were promoted to safety manager?**

A. I was in charge of creating safety documentation for the company. This involved, you know, things like emergency response plans, training programs, things of that nature; investigation, reporting.

**Q. Okay. And when you were promoted to safety manager, did preparing these safety docs -- documents take up the majority of your time?**

MR. THOMAS: Object to form.
WITNESS: What does that mean?
MR. THOMAS: You can ask her.
I --
WITNESS: Oh.
MR. THOMAS: -- I can't....
A. What is that? I mean -- okay. Yeah,
there -- it depends on the day.
**Q. Okay. Did you retain any of your responsibilities as an operations manager when you were promoted to safety manager?**
A. Some.
**Q. Which responsibilities did you retain?**
A. Operating powered industrial equipment, inventory accuracy, shipping and receiving duties, security, general housekeeping.
**Q. What does "general housekeeping" mean?**
A. Dust mopping the floor, sweeping the floor, vacuuming the carpet, cleaning the toilets.
**Q. Anything else?**
A. No.
**Q. And were there any responsibilities that you had had as an operations manager that you no longer had when you were promoted to a safety manager?**

A. Yes.
Q. Okay. And is it accurate that in August 2023, you relocated to Memphis, Tennessee?
A. Yes.
Q. Prior to that, had you always lived in the Salt Lake area?
A. Yes.
Q. Okay. And what year were you born?
A. 1986.
Q. Okay. And are you -- and you're familiar with the property located at 4601 Cromwell Avenue. Correct?
A. Yes.
Q. Okay. And is it okay if I refer to that as the "Cromwell warehouse"?
A. Yeah.
Q. Okay. And you testified a moment ago that you moved to Memphis in August 2023. Is that correct?
A. Correct.
Q. And why did you relocate to Memphis?
A. Job relocation.
Q. And what was the job?
A. Safety manager at Xpedient Logistics and I'd oversee the Memphis warehouse, Cromwell

warehouse.
**Q. Okay. And what were your responsibilities for overseeing the Cromwell warehouse?**
A. Operations and inventory management.
**Q. Can you describe what that includes?**
A. Receiving and shipping product, inventory accuracy.
Also, there was going to be a point where I would be putting -- yeah. And I guess that still falls under inventory accuracy within their system.
**Q. And what about operations management; what does that include?**
A. Well, operations involves securely receiving and shipping out product, maintaining the quality of the inventory, making everything -- making sure everything's accurate with the inventory.
So I guess that whole part, inventory accuracy, is still part of operations, technically, so....
**Q. What do you have to do to maintain the quality of inventory?**
A. Just, you know, make sure that nothing's expired. Some of the product had expiration dates on it. So we kind of had a FIFO operations, first

**recollection of anyone from Agilent instructing you to look at the expiration date.**

A. I absolutely have no recollection of that, no.

**Q. Okay. And were you promoted to safety manager at the same time that you relocated to the Cromwell warehouse?**

A. Yes.

**Q. And did you apply to become safety manager?**

A. No.

**Q. Do you know why you were --**

A. Well, I formally had to apply, yes, if that's what you mean.

I had to formally put in an application to be a safety manager, yes.

**Q. Okay. And did you formally have to put in an application to be transferred to the Cromwell warehouse?**

A. No.

**Q. Did you request to be transferred to the Cromwell warehouse?**

A. No. It was offered to me.

**Q. And when it was offered to you, what was the explanation of your responsibilities at the**

**Cromwell warehouse?**

A. That I would handle operations about 10% of the time. And then 90% of the time, I would have to work on the safety program for the company.

**Q. Okay. And that 10%/90% split, did that hold true for the -- say, from August 2023 until about January 2024?**

A. Yeah, I'd say so.

**Q. Okay. So about 90% of your time was safety management work, and then 10% of your time was operations management for the Cromwell warehouse?**

A. Correct.

**Q. Okay. And your responsibilities as a safety manager were not particular to the Cromwell warehouse. Correct?**

A. Correct.

**Q. That was for the company as a whole?**

A. Yes. Yes.

**Q. Okay. And so, your safety management work was not in any way particular to the Cromwell warehouse. Correct?**

A. Correct.

**Q. Okay. Would you say that most of your safety management work related to other facilities**

**that Xpedient operated?**
A. Just -- yeah, just operations as a whole.
**Q. Is it accurate that safety management work focuses largely on the safety of employees?**
A. Yeah, it's for -- baseline, it's to follow OSHA regulations.
**Q. Okay. And at the Cromwell warehouse, the only permanent employee of Xpedient was you. Correct?**
A. Yes.
**Q. Okay. And did you receive any training when you became operations manager for the Cromwell warehouse?**
MR. THOMAS: Object to form.
A. I'm sorry. Training -- training for operations --
**Q. Yes.**
A. -- while I was at the Cromwell warehouse?
I received training in the Agilent system.
And then I also was -- basically, as far as training goes for inventory management at Xpedient, was -- you know, I was given an Excel spreadsheet with bin locations.
And then that's just how we maintained the recordkeeping there. It was just basically a map,

"a sessional" -- essentially, with empty and full bins.

So when I received a pallet and put it in a certain location, I would update the map.

And that's as far as we took it. And then I was receiving some training from Agilent, as far as putting it into their system. I don't know exactly how far we got into that.

I also, you know, did some, you know, of their training portal stuff that they required me to do.

**Q. Okay. And what do you recall was required on your training -- on the training portal?**

A. Bunch of legal stuff; you know, anti-corruption, things like that.

I can't -- I remember the anti-corruption presentation, but not anything else, really.

**Q. Okay. And upon being promoted to safety manager in August 2023, did you become responsible for preparing Xpedient's OSHA logs?**

A. Yes.

**Q. And can you just describe to me what OSHA logs are?**

A. OSHA logs is a formula -- or is a record that you use to present your safety rating, based on

the number of hours worked against the number of incidents that are happened -- that happened at your facility, paired up against the national average for hours worked at a facility, as determined by OSHA.

**Q. Okay. And you prepare a log for each facility. Is that accurate?**

A. Correct.

**Q. And when are these logs due, generally?**

A. They are due -- you have to have them posted by February 1.

**Q. Okay. And were you responsible for submitting the OSHA logs on February 1, 2024?**

A. Yes.

**Q. And how many OSHA logs did you submit, if you recall?**

A. Over nine.

**Q. And when did you start working on these logs?**

A. I believe I started recordkeeping for those as early as '21 or '22.

**Q. And I apologize. I think I asked -- let me reask the question.**

**When did you start working on the OSHA logs that were submitted in February of 2024?**

A. Oh. I believe December, as early as

December.

**Q. And on average, how long did it take you to prepare one log?**

A. Oh, hours. I wasn't very -- I didn't have a system built up for it yet.

It took a lot of data confirmations. So for one log, probably eight hours.

**Q. Okay. In 2023 -- or, strike that.**

**The February 1, 2024 submission was the first time that you had been responsible for preparing and submitting OSHA logs. Is that correct?**

A. No.

**Q. No?**

A. Before I -- before my time in Memphis, I had responsibilities to maintain the OSHA logs as well.

**Q. Okay. And is it accurate that each log took about eight hours-ish to prepare for this February 1, 2024 submittal?**

A. I would say the whole thing took me about 50 to 60 hours to complete.

**Q. Okay. And were you working on that in January?**

A. Yeah.

reach the inventory when it rained.

**Q. Okay. So Agilent communicated to you that the inventory could not get wet. Is that accurate?**

A. Correct.

**Q. And that was prior to the water intrusion event?**

A. Correct.

**Q. And was that on one --**

A. Well, not the -- yeah. The -- that it couldn't -- that we couldn't have water touching the pallets is what -- you know, what I was told. Right?

Because whether -- because it's medical grade equipment. It's not sanitary to do that. Right? So to keep the water away from the medical equipment.

**Q. Okay. So it's accurate that -- or, strike that.**

**Is it correct that Agilent communicated to you that --**

A. The conditions needed to be dry.

**Q. Okay. Thank you.**

**And that was before the water intrusion event?**

A. Correct.

**Q. At this time?**

**What about Dirk Updike?**

MR. THOMAS: Are you talking about at any time or only on December the 1st?

**Q. From the time that you received this email on December 1st until the time of the water intrusion event, do you recall discussing the gas meter being locked with anyone at Xpedient?**

A. I mean, the only time that we discussed -- that I can remember discussing getting the gas on was the actual day of the event.

And I was instructed to, you know, reach out to MLGW to get the gas turned on.

**Q. And who instructed you to reach out to MLGW?**

A. Dirk.

**Q. Okay.**

A. I don't even think he told me to reach out to MLGW. I think he told me to just get the gas turned on.

**Q. Okay. And how did he become aware that the gas was locked?**

A. I don't even think he knew that the gas was, per se, locked. He just knew that I didn't

have heat.
Because I had mentioned, in our meeting that we had that day, that I was cold and I needed to get the heat turned on -- you know, that it was cold and that I needed to get the heat -- heat going.
**Q. Okay. But it's your testimony that you actually never attempted to turn on the HVAC system or any of the heating units, or anything like that, in the Cromwell warehouse. Correct?**
A. Correct.
**Q. And that's because you knew the gas meter was locked. Is that why?**
MR. BUTLER: Object to form.
MR. THOMAS: Object to form.
A. I didn't....
I don't know if I even attempted to -- when I attempted or if I attempted to turn on the heat myself.
All I know is that it was somewhat cold in the building around that time. It was starting to get cold, and then that -- and that I was cold.
**Q. Okay.**
A. And I had mentioned that it was cold in the building. And so, he had told me to get the

one-on-one was -- you know, I don't know -- yeah, we had spoken one on one probably right around -- the first time, right before the intrusion event.

So....

**Q. Okay. And that's when you communicated to Mr. Updike, when you were speaking with him one on one, that the gas meter was locked. Is that correct?**

MR. THOMAS: Object to form.

A. I said that the warehouse was cold.

**Q. Did you --**

A. And that I needed to get the heat on.

**Q. Do you explain that you could not get the heat on because the gas meter or line was locked?**

A. I don't recall that.

**Q. Okay. Did he ask you why it was cold?**

A. Yeah, I don't recall if he asked me why.

**Q. And then No. 4, it says:**

**Instructed to reach out to Devin for Conti (phonetic) video.**

**Do you know what that refers to?**

A. Yeah. I was working on a promotional video for a customer.

**Q. Okay. And then, No. 5 says "OSHA Logs."**

**And then, 5(b)(2) says:**

**Dominated Zach time this month.**

**Do you see that?**

A. Yeah.

**Q. So was he saying that it was dominating your time in January or December or both?**

A. Just whenever we discussed that, yeah, it was taking up the majority of my time. As far as all my items, that was receiving the most attention.

**Q. Okay. And then, under 5(b)(3), it says:**

**Goal is site per day after Tuesday meeting.**

**Does that mean a goal of completing an OSHA log per day?**

A. Yeah.

**Q. Okay. And you said those took, on average, about eight hours a day?**

A. Yeah. And so, I'm calculating the hours.

So I had all the data. I just needed to complete the forms by that time.

So I was getting close to completing them and then starting to complete the forms for it.

**Q. Okay. And that -- so kind of from this meeting, the goal was to try and get those done**

**within about a week, week and a half. Is that correct?**

A. Right.

**Q. Okay.**

A. From the time we talked, yeah.

**Q. And how many hours per day would it take to get the logs completed, kind of from the time of this meeting?**

**I know you said you got together some of the data, but....**

A. Well, the majority of the time took about 60 hours. Because what I had to do was pull the hours for every single employee in the company and then separate it out by site and then determine who had time off, and then also had to calculate salary hours, which were not listed in the system, and then also go back with that data and run it up against the incidents that have happened, calculate how many time was off and missed.

So it was all just pretty much grabbing the bulk data and then separate -- and then fine-tuning it and then separating it out.

So at this point, I'd pretty much finished all my calculation totals, and now I was working on filling the forms out.

**Q. Okay.**
A. So....
**Q. And was that pretty time-intensive to fill out the forms?**
A. Filling out the forms...I was electronically submitting them. So it was -- it took a -- took a bit of time to get it all finalized and confirmed.
Because once I had everything filled out onto the form, I'd confirm the data. So it would take me a full eight hours to do a form.
**Q. Okay. And then, No. 6 is "HVAC."**
**And do you recall anything of your discussion with Mr. Updike regarding it?**
A. No, just -- I don't.
**Q. Okay. And then No. 7 says:**
**Captive reimbursement package.**
**And then 7(b) says:**
**3-month learning module for safety module.**
**Was that something you were in charge of?**
A. Yes.
**Q. Okay. Was that taking up a lot of your time?**

MS. McDONALD: "Part of the building's HVAC," that was the end of the question.
COURT REPORTER: Thank you.
(Pause.)
BY MS. McDONALD:
**Q. Okay. Let me reask the question.**
**So sitting here today, do you have any recollection whether at that point in time -- so, prior to the water intrusion event -- you understood that there were multiple devices capable of providing heat on the warehouse floor?**
A. I know there were two small handheld infrared -- or, not handheld, but small infrared heaters that were left over inside the building that you could plug into the wall.
**Q. And did you test those at all before the water intrusion event?**
A. One of them.
**Q. Did it work?**
A. Yes.
**Q. Did you have it running prior to the water intrusion event?**
MR. THOMAS: Object to form.
A. What do you mean by "running"?

**Q. Did you have it turned on and generating heat prior to the water intrusion event?**

A. I -- when I was there, I would turn it on as a means of comfort and put it on my desk.

**Q. Was this just like a space heater?**

A. Yes.

**Q. Okay. And was this something that you found at the building, or it was something you brought to the building?**

A. I found it.

**Q. Where do you find it?**

A. Storage -- storage locker, like a storage office area.

**Q. And approximately how big -- is it okay if I call it a "space heater"?**

A. Um-hum.

**Q. Would you agree that it was a space heater?**

A. Yeah.

**Q. Okay. How big was the space heater?**

A. It just literally looked like a cooking wok that you would turn on its side and put a plug in, and it was made of aluminum on the middle. And then you'd plug it in, and it'd turned red.

**Q. Okay. And when did you start using the**

don't have working heat while it was snowing.

**Q. Were you concerned at all that the Cromwell warehouse did not have working heat when it started snowing?**

A. No.

**Q. Why not?**

A. I mean, it wasn't even single digits. And to me, it wasn't that cold.

I put on my coat, and I was fine. I had one little space heater, and I was still able to work.

The snow wasn't going to last that long. It was already clearing up, starting to melt during the day. So I wasn't really concerned about it.

**Q. Okay. And so, you didn't take any measures to protect the Cromwell warehouse against the snowy weather or cold weather prior to the water intrusion event, correct?**

MR. THOMAS: Object to form.

A. I mean, there wasn't anything that I felt like I needed to protect for the weather that was occurring, because I didn't believe that what was occurring would affect the building in any way.

**Q. Okay.**

MS. McDONALD: And I'm going to

A. Yes.
**Q. And it's your testimony that Heena Rathod is in the accounting department at Xpedient. Is that correct?**
A. Yes.
**Q. Okay. And had you had any communications with MLGW before you sent this email?**
A. The reason that I asked "him" for the account number is because when you call -- when I called MLGW that morning, I couldn't talk to anybody unless I had an account number.
**Q. Was the morning of January 17th the first time that you had called MLGW relating to the Cromwell warehouse?**
A. As far as I recall, yes.
**Q. Okay. And what prompted you to call on the morning of January 17th?**
A. I had had a meeting with Dirk. And he said we need to work on getting the gas turned on.
**Q. Okay.**
A. So I took steps.
The first thing I did was call MLGW, and I couldn't talk to anybody because I didn't have an account number.
So that's when I contacted Heena in

accounting to see if I could get an account number.

**Q. And how, to your understanding, did Dirk become aware that the gas was not turned on?**

A. I had mentioned that it was cold, that the weather -- that it actually snowed, and it was a surprise and, you know, that I had my coat on still, because the warehouse was a little cold.

**Q. And did you communicate to him that the gas was not turned on?**

A. I believe so.

**Q. Okay. And once he learned that, he then instructed you to get the gas turned on?**

A. He told me to get it on.

**Q. Okay.**

COURT REPORTER: You told him to get it on, is that what you said?

WITNESS: Yeah, he told me to get it on. Yeah.

**Q. And that was to get the gas on, correct?**

A. Correct.

**Q. Okay. And that was before the water intrusion event. Correct?**

A. It's the day of.

**Q. But before, yes?**

A. Yes.

**Crowe that you arranged, you're unaware of any HVAC vendor coming out between August of 2023 and the time of the event, correct?**

A. Correct.

**Q. Okay. And how did you first learn of the water intrusion event?**

A. I was at my house, and it was like probably around 8 o'clock at night. And Jamie calls me, and he'd asked me to look at the video on my phone.

So I open it up. He says he needs -- wants me to go check. It looks like it's snowing in the warehouse.

So I'm thinking, oh, maybe the roof guy messed up and there's a hole in the roof now and now it's snowing in there. I really didn't know what was going on.

So then I had to drive down there and go check it out.

**Q. And do you recall about what time that was?**

A. Between 10 and 11 o'clock is when I left.

**Q. Okay. And do you recall what time it was that Mr. Davis called you?**

A. It was that evening. So my -- I'd say

around 8 o'clock.

**Q. Okay. And then, what happened when you arrive at the Cromwell warehouse that evening?**

A. Well, I drove up, and I saw the fire department there, and I saw water pouring out of the dock doors.

They hadn't tried to get in yet, so I went ahead and unlocked the door for them to get inside.

**Q. Okay. So you let the fire department into -- inside the warehouse?**

A. Yes.

**Q. And what happened when the fire department went inside?**

A. We went in, looked around. It was a little steamy in there. There wasn't much to see.

There was about an inch of water on the ground.

And they went in and did what they had to do, but it didn't stop -- entirely stop all the water.

**Q. And what did they have to do?**

A. I don't know what they had to do, but they went in and tried something to see what was going on.

I guess they were looking to see if there

was a fire or something. So....

**Q. And did they turn off the water?**

A. No.

**Q. Who turned off the water, if anyone?**

A. They had to call somebody else to turn off the water.

**Q. And "they" -- that's the fire department or someone else?**

A. Someone else.

**Q. Who --**

A. The fire department had to get somebody else to turn off the water.

**Q. Do you know who the fire department had turn off the water?**

A. No.

**Q. And you didn't turn off the water?**

A. I did not.

**Q. Did you call anyone to have the water turned off?**

A. No.

**Q. Were you there when the vendor arrived to turn off the water?**

A. Yes.

**Q. Do you recall the name of that vendor?**

A. I do not.

Q. Was it just one person or multiple people?
A. I don't know.
Q. And how soon after you arrived was the water turned off?
A. About an hour.
Q. So the water was running for about an hour after you arrived at the Cromwell warehouse?
A. Yep -- yes.
Q. And then once the water was turned off, did the water keep running?
A. No.
Q. It stopped pretty quickly thereafter?
A. Yes.
Q. Okay. And you said there was about an inch of water on the ground in the warehouse floor, is that correct?
A. Yes.
Q. And that water just -- and that was when you arrived, right?
A. Yes.
Q. And then the water kept increasing for an hour while you were there, before the water got turned off. Is that right?
A. I don't say -- I wouldn't say it was increasing. It just stayed steady until it was

turned off.
**Q. Okay. And the water was flowing out as well, outside of the dock doors. Is that right?**
A. Yeah. Just out of anywhere it could, really.
**Q. And you said it was steamy.**
**Can you expand on what you mean by that?**
A. It was -- it felt warmer in there.
So -- yeah, it felt -- with the water going, it just felt warmer in there.
**Q. Like humid?**
A. Yeah.
**Q. Okay. And did the lights work?**
A. Yeah.
**Q. Did you turn them on?**
A. No.
**Q. Why not?**
A. Because I didn't want to get electrocuted.
**Q. Fair enough.**
A. But my surge protector was plugged into my office, and I remember reaching down in the water and feeling a stinging sensation in my hand.
So, yeah, the power was still definitely on when it was happening.
**Q. And you said "reaching down into the**

**water." What do you....**
A. In my office.
**Q. The water was high enough that it covered the....**
A. It was about that -- that high off in the -- on the floor throughout the entire warehouse.
**Q. Okay. And that looks more like two to three inches to me. Is that correct?**
A. Inch or two, let's say.
**Q. Okay.**
A. It was -- covered a surge protector.
Like a small surge protector, that was -- it was that deep. That that -- like a surge protector can be submerged underneath.
**Q. Okay. And that was consistent throughout the entire warehouse, both in the office base and the warehouse floor?**
A. I can't confirm that. I don't know how consistent it was about -- it could have been more shallow somewhere else.
But honestly, I couldn't -- I didn't walk all the way through the entire warehouse like that.
**Q. Okay. But from what you saw, in most places in the warehouse that you visited.**
A. That seemed about the average of where --

sorry.
COURT REPORTER: I'm sorry, but I can only hear one person at a time.
Would you please repeat the end of your question.
**Q. Sure. But from most places that you saw in the warehouse that evening, there was about one to two inches of water, consistent with your description just now, throughout the facility. Is that correct?**
MR. THOMAS: Object to the form.
A. From where I walked through the warehouse, that seemed to be the average of depth.
I didn't walk through the entire warehouse.
**Q. Okay. And you walked part of the warehouse floor that evening. Correct?**
A. Part of it, yes.
COURT REPORTER: "Part of it"?
WITNESS: "Part of it," yes.
**Q. And where -- in the warehouse floor specifically, where was the water coming out from?**
A. There was a spot -- I think it was by our fifth or sixth door down. That's where I saw the water coming out of.

It was about 20 to 25 feet away from those dock doors going into the warehouse.

**Q. Was it shooting out?**

A. Spraying downwards, yeah.

**Q. And do you know -- are you able to estimate how far the water sprayed downwards?**

A. No. I mean, just -- it was coming out a little bit. You know, just a steady -- maybe like a foot out and then down.

**Q. Okay. And were any of the overhead pipes in the warehouse floor releasing water?**

A. I didn't see that, no.

**Q. And did you notice whether or not any of the inventory was saturated with water?**

A. I mean, I -- it was wet in there. I don't know what you mean by "saturated," but....

**Q. Were a lot of the boxes wet?**

A. I mean, yeah. There was some -- some places where it was wet and some places where it didn't get wet at all.

**Q. Would you say most of the inventory got wet?**

MR. THOMAS: Object to form.

A. I -- I wouldn't say most of it.

**Q. Half?**

A. Maybe half.
**Q. Okay.**
A. Maybe.
**Q. And that's half that you saw that evening?**
A. That evening, I didn't know what got wet, how much got wet. It was the middle of the night, and the lights were off.
**Q. Okay. So you couldn't see that well.**
**Is that accurate?**
A. Yes.
**Q. You could just tell that there was a lot of water on the ground and still water coming out from the ceiling.**
A. From that one spot, yes.
**Q. Okay. And otherwise it was, I presume, very dark in the warehouse floor?**
A. Yes.
**Q. With poor visibility. Is that accurate?**
A. Yes. It was foggy and it was dark.
**Q. Okay. And did you have a flashlight? How did you see, at all?**
A. The fire department had a flashlight. I think I had my phone light.
**Q. Okay. And that was it?**
A. Yes.

**Q. Okay.**
A. Oh, wait -- no. I'm sorry. This is -- this is for the heating. Never mind.
Yeah, this does look familiar, though.
**Q. And who performed this testing of the heating?**
A. I can't 100% confirm it, if it was -- it might have been Soefker that did it.
**Q. And from the time that you had been stationed at the Cromwell warehouse from "April of 2023," was this the first time that you're aware of that the heating systems at the Cromwell warehouse were tested?**
MR. THOMAS: Object to form.
A. As of 20- -- April 2024, I am not aware of any other testing.
**Q. And that's between August 2023 and April 2024?**
A. I mean, I don't know what Crowe attempted to do when they came over.
**Q. Okay.**
A. So....
**Q. Other than the Crowe visit.**
A. Other than the Crowe visit -- yeah, I'm not familiar -- I can't recall anybody else doing

testing like this.
Q. Okay. And that Crowe visit was on November 16, 2023. Correct?
A. Correct.
Q. Okay. And the only way an HVAC vendor would have had access to the Xpedient side during the period of August 2023 to April 2024 was if you let them in, correct?
A. Correct -- unless there was a rare occurrence where I was on vacation and somebody else let them in.
But to my knowledge, it would have only been me.
Q. Okay. And then at the end, you summarize. You say:

Of the six units, one does not have a thermostat, two need total repair, one needs the heating repaired, and two are fully functioning.

Do you see that?
A. Yes.
Q. So out of the six heating units, four were not fully operational. Is that correct?
MR. BUTLER: Object to form.

**utilities or otherwise -- connected to the Cromwell warehouse run through that system to you first?**

A. Yeah.

I don't know about it being first, but I was definitely the first approval signoff on it.

**Q. Okay. And so, you would have signed off on any and all paid invoices that Xpedient received with respect to the Cromwell warehouse.**

A. Yes.

**Q. Okay. If Jamie Davis testified that you were the only person at Xpedient who knew that the gas was locked before the event, is that true?**

MR. THOMAS: Object to form.

A. I don't know if that would have been true, because the invoice was posted in December.

So I don't know what I would say to that.

**Q. How do you know the invoice was posted in December?**

A. Because it hit our accounting as it was paid.

It wouldn't have been paid by July 9th unless it was paid in December.

MR. THOMAS: You mean January?

WITNESS: Sorry. Yes.

A. If it would have been -- it was posted as

paid in January, that means it was paid in December. So....

**Q. Okay.**

A. And that invoice cannot get paid without everybody approving it -- me, including my supervisors.

And Jamie being my supervisor, you know, he would have seen the invoice.

**Q. How would -- how would we find out when it reached Xpedient's accounting?**

A. It would have been created like in a report. It was like a SAP reporting system. And the item would have been -- had a creation date.

**Q. In an SAP -- if I was going to ask Xpedient, "Show me whatever documents exist as to when that invoice from Crowe was received," what would I ask for?**

A. Just like, I guess, some sort of approval log -- because we use a software to sign off on invoices.

**Q. Prior to this January 17 freeze event -- January 17, 2024 freeze event -- did anyone from Agilent ever say anything to you or write anything to you about, hey, we've got this major storm event coming?**

build- -- like, what kind of building are we talking about?

**Q. Well, you're -- I'm talking specifically about the sprinkler system that's in the Cromwell warehouse.**

**And my question for you is: You did -- I want to make sure I understand your testimony. You did not know what the minimum temperature needed to be maintained in that Cromwell warehouse necessary to protect the sprinkler system --**

A. No.

**Q. -- in that warehouse.**

A. I did not, sir.

**Q. Okay. So you didn't know --**

A. No.

**Q. -- what temperature needed to be maintained --**

A. No.

**Q. -- to protect the system. Right?**

A. Correct.

**Q. And you didn't know what would happen if the sprinkler system, in the warehouse, remained below freezing, did you?**

A. I did not.

**Q. And you never asked anyone any questions**

**about that system, is that right?**
A. Correct.
**Q. Okay. Well, who at Xpedient was responsible for knowing those types of things if you weren't?**
MR. THOMAS: Object to form.
A. I'm not sure who would know that.
I don't know even -- I didn't know the responsibilities for when it came to setting up the building. So I wouldn't be able to tell you who would be in charge of that or who would -- supposed to know that.
**Q. And so is it your testimony that you are -- you do not know of anyone at Xpedient who was responsible for understanding the sprinkler system protecting this Cromwell warehouse. Correct?**
A. Yeah, correct. I cannot -- I could not identify that for you.
**Q. Okay. Now, you testified that you saw the sprinkler heads and you saw the sprinkler piping.**
**And you worked beneath that piping, correct?**
A. Yes.
**Q. Okay. And....**
**Hold on. Okay. And you stored Agilent's**

So in your case, when you're saying, am I worried about a bunch of plastic tips, you know, getting cold -- no, not necessarily.

**Q. Thanks.**

**But it's not just plastic tips and getting cold. It's medical-grade -- I'm using your wording -- inventory that you're storing in that Cromwell warehouse. Right?**

A. Yeah, it's medical-grade inventory.

**Q. Yes. And medical-grade inventory that you had been told by the owner -- owner's vice -- the owner's vice president -- the owner of that inventory's vice president -- that water could not get near the pallets that that inventory was sitting on. Right?**

A. Correct.

**Q. So you knew and you understood that water shouldn't get near that inventory.**

A. Yes.

**Q. Right?**

A. Yes.

**Q. Okay. So then you agree with me that if water comes out of a sprinkler system or piping that's connected to a sprinkler system, that's going to be a hazard and a problem for that inventory you**

**were storing. Right?**

A. I mean, yeah -- if there was a risk to the water coming out of the pipe, yes.

**Q. Okay. And how long would it have taken you to call the landlord to figure out whether the sprinkler system in that warehouse had water running through those pipes?**

MR. THOMAS: Object to form.

A. I don't --

**Q. Five minutes? five-minute call?**

A. I mean, that's assuming that I would think that water's in those pipes in the first place.

**Q. Well, how long would it have taken you -- how long would it have taken you to call the landlord to ask if there is water in those pipes?**

A. It depends on if I could have gotten ahold of the landlord or not.

**Q. Okay. But you agree with me that it's as simple as placing a call and continuing to call until you get an answer, right?**

A. Till hopefully I get an answer, yes.

**Q. Okay. And did anyone from Xpedient instruct you not to contact the landlord or its property manager about the sprinkler system and whether it had water in the pipes?**

**did they get the water turned off?**
A. I would say on the back end of it.
So as soon as they were able to get to the water off, they got the heck out of there.
So it was -- as soon as it was turned off, they -- I think they were out of there with- -- less than 10 minutes.
**Q. But when they left, the water was off.**
A. Yes.
**Q. Okay. Now, before you moved to Memphis to work in the Cromwell warehouse, you had worked in other warehouses. Correct?**
A. Yes.
**Q. About how many warehouses had you worked in before moving to Memphis?**
A. Maybe four.
**Q. About how many years had you worked in warehouses before moving to Memphis?**
A. Maybe six years or so.
**Q. Were all those warehouses in Salt Lake City?**
A. Yes.
**Q. And as far as the temperature that you get in Salt Lake City, it's considerably colder than Memphis, Tennessee. Would you agree?**

A. Yes.
**Q. And you got freezing temperatures routinely in Salt Lake.**
A. Yes.
**Q. When you were at those warehouses in Salt Lake City for those years -- when you would get freezing temperatures, would there be any need to do anything special to the warehouses?**
A. No. I mean, I wasn't aware of anything specially done -- you know, maybe salt the sidewalk, but not for like anything else.
**Q. In those years you worked in those warehouses and all the freezing temperatures, did you ever have to bring portable heaters in?**
A. No.
**Q. So the fact that somebody would suggest, oh, it's going to get cold in Memphis, the idea of bringing in portable heaters would be foreign to you at that time.**
A. Right, yes.
**Q. And when you were in Salt Lake City at all those warehouses all those years and it would get cold outside, would it likewise be cold in the warehouse?**
A. You know, by the doors and stuff, but

CERTIFICATE

I, SUSAN ASHE, a Certified Electronic Reporter and Notary Public, hereby certify that the foregoing is a true and accurate transcript of the deposition of said witness, who was first duly sworn by me on the date and place hereinbefore set forth.

I FURTHER CERTIFY that I am neither attorney nor counsel, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

Dated this 24th day of September 2026.

______________________________

Susan Ashe, Notary Public

of the District of Columbia

My commission expires: May 14, 2028.