**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| AGILENT TECHNOLOGIES, INC.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | Case No. 2:25-cv-02101-BCL-cgc<br><br>Judge Brian C. Lea<br>Magistrate Judge Charmaine Claxton |
| XPEDIENT MANAGEMENT GROUP, LLC,<br>Cross-Plaintiff,<br><br>v.<br><br>ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Cross-Defendants. | |
| FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,<br>Plaintiff,<br><br>v.<br><br>XPEDIENT MANAGEMENT GROUP, LLC, ST. PAUL FIRE AND MARINE INSURANCE COMPANY, and COLLIERS MANAGEMENT SERVICES – MEMPHIS, LLC,<br>Defendants. | Case No. 2:25-cv-02424-BCL-tmp<br><br>JURY DEMANDED |

**FACTORY MUTUAL INSURANCE COMPANY'S REVISED MEMORANDUM OF LAW IN OPPOSITION TO XPEDIENT MANAGEMENT GROUPS, LLC'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Factory Mutual Insurance Company ("FM"), consistent with the Court's Order entered today [Doc. 277], submits this Revised Memorandum in Opposition to Defendant

Xpedient Management Group, LLC's ("Xpedient") Motion for Summary Judgment as to all claims asserted against it by Agilent and FM ("Motion") [Doc. 259]. This Revised Memorandum shall serve as a substitute and replacement for FM's previously filed Response in Opposition to Xpedient's Motion [Doc. 267].

## I. INTRODUCTION

This case presents a straightforward question: whether a professional warehouse operator can escape liability for millions of dollars in property damage when it knowingly allows its warehouse to remain without working heat for months, disregards repeated indications that its natural gas service remains disconnected, and fails to take reasonable precautions against an approaching winter freeze. Xpedient seeks to avoid responsibility for precisely that conduct by invoking contractual limitations of liability. The evidence, however, is more than sufficient to permit a jury to reject all of Xpedient's contractual defenses.

On January 17, 2024, water-bearing fire-sprinkler pipes at the Cromwell Warehouse[1] in Memphis, Tennessee, froze and burst, causing extensive water damage to Agilent's laboratory pipette-tip inventory (the "Loss Event"). At the time, the inventory was in Xpedient's exclusive care, custody, and control. (FM's Statement of Additional Material Facts ("SAMF") ¶¶ 20, 22–23). This was not an unforeseeable accident involving a hidden defect that Xpedient had no reasonable opportunity to discover. Rather, Xpedient knew, at least by December 1, 2023, that the gas line to the warehouse's gas meter was locked and knew that Xpedient's leased premises lacked operational heat. (SAMF ¶¶ 15–16, 35–36). Despite that knowledge, Xpedient never verified that

[1] Unless otherwise noted, terms defined in FM's Amended Complaint (Doc. 136) will have the same meanings herein.

gas service had been restored or that the warehouse had working heating equipment during the six weeks preceding the loss. (SAMF ¶19 and ¶ 37).

The evidence is even more troubling when examined chronologically. Xpedient's Director of Operations for the Cromwell Warehouse knew when Xpedient's lease with St. Paul began that the warehouse's HVAC system was not in good working order. (SAMF ¶ 27). On November 15, 2023, Xpedient's management was still seeking an examination of the HVAC system. (SAMF ¶ 14). On December 1, 2023, the HVAC vendor advised Xpedient that it could return when the gas was unlocked. (SAMF ¶ 15). On January 9, 2024, Xpedient paid an HVAC invoice reflecting that the system still needed to be tested after restoration of gas service. (SAMF ¶ 60). Yet, Xpedient did not ensure that the gas was turned on, did not confirm that the heating system worked, did not implement a freeze-protection plan, did not investigate or confirm whether the overhead sprinkler system contained water susceptible to freezing, and did not advise Agilent that its multimillion-dollar inventory was being stored in an unheated warehouse during the winter. Even worse, hours before the pipes burst, Xpedient's on-site manager, Zachary Livingston, informed his superior, Dirk Updike, that the warehouse was cold, that snow was falling in Memphis, and that the gas was not turned on. (SAMF ¶ 38).

No meaningful protective measures followed. Xpedient did not deploy temporary space heaters in the warehouse storage area. (SAMF ¶ 42). The pipes subsequently froze and ruptured, damaging Agilent's inventory. Faced with this evidence, Xpedient seeks summary judgment based principally upon two contractual defenses: a 90-day written claim provision and a $1 million limitation of liability contained in the parties' Master Operating Services Agreement ("MOSA"). Neither defense warrants the sweeping judgment Xpedient requests.

***First***, Agilent provided Xpedient with written notice of the loss on February 7, 2024, followed by additional written correspondence on March 21, 2024 specifically identifying the absence of heat, lack of natural gas service, failure to winterize the sprinkler system, and failure to prepare for freezing weather. (SAMF ¶¶ 1–5). Xpedient acknowledged those communications, opened an insurance claim, participated in investigating the loss, and worked to identify and segregate the damaged inventory. (SAMF ¶¶ 6–9). Those communications, considered together, provide substantial evidence that Agilent satisfied, or at least substantially complied with, the MOSA's notice requirements. Alternatively, Agilent's June 7, 2024 formal notice was timely under a reasonable interpretation of the contractual accrual provision because the extent and irreparable nature of the inventory damage remained under investigation through late March 2024. The manufacturer was evaluating whether the affected products could be salvaged, decontaminated, or re-sterilized. (SAMF ¶¶ 54–56). Further, because it withheld its own internal account of the loss while representing to Agilent that it was still investigating the causes and responsibility for the occurrence, Xpedient should be estopped from obtaining summary judgment using the 90-day notice provision. (SAMF ¶¶ 10–13, 58–59).

***Second***, Tennessee law recognizes a fundamental public-policy prohibition against enforcing contractual exculpatory provisions against claims for gross negligence or wanton/reckless conduct. Xpedient seeks to avoid that principle by characterizing the MOSA's $1 million ceiling as a limitation of damages rather than an exculpatory provision and by relying upon Tenn. Code Ann. § 47-7-204(b). However, the statute does not authorize Xpedient to insulate itself from the financial consequences of its own gross negligence or reckless conduct, nor does it expressly displace Tennessee's longstanding common-law public policy. Moreover, Xpedient's argument ignores substantial evidence from which a reasonable jury could find that its conduct

constituted gross negligence. This is not a case involving an isolated mistake or a momentary lapse in judgment. The record permits a finding of prolonged, conscious disregard of a known and readily preventable danger to property entrusted to Xpedient for safekeeping.

***Third***, the evidence raises a separate question concerning the enforceability of the contractual liability limitation under Tenn. Code Ann. § 47-7-204(b). During negotiations, Agilent expressly requested that Xpedient's liability extend to the full value of the Products stored at the facility if that value exceeded $1 million. Xpedient rejected that request with the response, "Our limit is $1M." (SAMF ¶ 57). The statute's increased-valuation provision must be considered in determining whether the negotiated limitation is enforceable.

***Finally***, Xpedient improperly treats expenses directly associated with identifying, protecting, disposing of, and replacing physically damaged inventory as though they were necessarily consequential damages. Tennessee law distinguishes incidental damages from consequential damages, and the MOSA's exclusion does not expressly identify incidental damages. The recoverability of each expense must be determined according to its nature and the complete contractual language, rather than Xpedient's blanket characterization of the same as "consequential damages." For these reasons, and more, discussed in detail below, Xpedient's Motion must be denied.

## II. RELEVANT FACTUAL BACKGROUND

### A. Xpedient assumed responsibility for operating the warehouse and safeguarding Agilent's inventory.

In May 2023, Agilent and Xpedient entered into the MOSA and the Memphis Site Operating Agreement ("SOA"), pursuant to which Xpedient agreed to provide warehousing and related logistics services at the Cromwell Warehouse. (FM's Responses to Xpedient's Statement of Material Facts ("RSUMF") ¶ 1). Xpedient agreed to maintain the warehouse and ensure that its

utilities were operational. Xpedient's Rule 30(b)(6) designee, Nathaniel Haynes, confirmed these responsibilities. (SAMF ¶ 21). Xpedient also undertook responsibility for providing the space in which Agilent's Products would be stored. (SAMF ¶ 22). Importantly, Haynes acknowledged that Agilent's inventory remained within Xpedient's exclusive care, custody, and control. (SAMF ¶ 23). Xpedient's Director of Operations, Jamie Davis, understood that Xpedient was responsible for establishing appropriate utility accounts with Memphis Light, Gas and Water ("MLGW"). (SAMF ¶ 24). Davis further acknowledged that he was responsible for knowing whether the warehouse's operational systems, including its heating equipment, were functioning properly. (SAMF ¶¶ 25–26). Xpedient's responsibility for its leased premises inside the Cromwell Warehouse was not merely theoretical. Its personnel controlled the thermostats serving its leased warehouse space and could adjust those thermostats without obtaining permission from the landlord or property manager. (SAMF ¶¶ 40–41). These admissions establish that Xpedient had operational responsibilities directly relevant to the conditions that caused the Water Intrusion Event.

**B. Xpedient knew that the warehouse lacked operational heat but failed to restore it.**

Xpedient's heating problems began long before the Loss Event. Xpedient's Operations Manager testified that he knew the warehouse's HVAC system was not in good working order when Xpedient began leasing the facility. (SAMF ¶ 27). He also acknowledged that Xpedient's normal practice was to establish an HVAC preventive-maintenance contract when beginning operations at a new facility. (SAMF ¶ 28). Nevertheless, he did not ensure that such an agreement was in place at Cromwell Warehouse before the Loss Event. (SAMF ¶ 29). By November 15, 2023, Xpedient's Director of Operations was asking about having the HVAC system examined. (SAMF ¶ 14) and on December 1, 2023, Xpedient's HVAC vendor advised that it could return

when the gas was unlocked. (SAMF ¶ 15). Thus, by that date Xpedient knew that the gas service meter remained locked, there was no gas service for the HVAC units in the warehouse and the warehouse did not have working heat. (SAMF ¶ 16 and ¶ 30). Xpedient's Operations Manager even acknowledged that Xpedient's warehouse manager Livingston had failed to communicate the locked gas condition to him and that ***Livingston should have done so***. (SAMF ¶¶ 17–18). The evidence therefore establishes both Xpedient's institutional knowledge of the heating problem and significant failures in its internal communication and supervision. Most importantly, Xpedient did not verify restoration of gas service or operational heat between December 1, 2023, and the January 17, 2024 Loss Event. (SAMF ¶ 19 and ¶ 37). A reasonable jury could therefore easily conclude that Xpedient knowingly permitted the warehouse to remain unheated throughout a period in which freezing winter weather was plainly foreseeable.

**C. Xpedient failed to investigate or prepare for the risk of freezing sprinkler piping.**

Xpedient's failures extended beyond the disconnected gas service. Xpedient's Operations Manager testified that Xpedient had no staff member assigned to monitor weather conditions affecting the Cromwell Warehouse. (SAMF ¶ 31). He also did not discuss winter-weather preparedness with Xpedient's on-site man Livingston before the occurrence and Xpedient had not implemented weather-preparedness practices at the facility, and had no established practice for protecting Xpedient's warehouses against freeze events. (SAMF ¶¶ 32–34). While he understood that the warehouse's fire-protection system involved water (SAMF ¶ 51), he admitted he did not check winter weather conditions in Memphis or investigate how water within the sprinkler piping was protected against freezing. (SAMF ¶¶ 52–53). Xpedient's on-site manager was similarly uninformed, as he did not know whether freezing weather could damage the sprinkler system or what minimum temperature was necessary to protect it (SAMF ¶¶ 43–44), and he had never asked

anyone about the sprinkler system and could not identify anyone at Xpedient responsible for understanding its operation. (SAMF ¶¶ 45–46). Nor did he investigate whether the absence of heat created a freezing hazard or contact St. Paul or Colliers concerning that risk. (SAMF ¶¶ 47–48). Yet, ***he admitted that he understood that water escaping from overhead sprinkler piping would endanger Agilent's inventory*** and acknowledged that he could have determined whether the sprinkler system contained water simply by contacting St. Paul. (SAMF ¶¶ 49–50). This evidence supports a finding that Xpedient failed to investigate a readily ascertainable danger involving the very systems located above the Products it was contractually obligated to protect.

**D. Xpedient received immediate warnings during the freeze but took no meaningful protective action.**

The circumstances immediately preceding the Loss Event are particularly significant. During the January 2024 freeze, Xpedient's on-site manager Livingston wore a coat inside the warehouse because of the cold conditions (SAMF ¶ 39) and hours before the loss, Livingston informed his superior that the building was cold, snow was falling, and the gas service remained off. (SAMF ¶ 38). Despite these warnings, Xpedient did not deploy space heaters in the warehouse storage area. (SAMF ¶ 42). The record also reflects no meaningful verification that the sprinkler piping was protected from freezing, and on January 17, 2024, the predictable hazard materialized. Fire-sprinkler piping froze and burst, causing extensive water intrusion and damaging Agilent's inventory. (RSUMF ¶ 11; SAMF ¶ 20).

**E. Agilent promptly notified Xpedient and continued investigating the nature and extent of the loss.**

Agilent provided written notice of the damage on February 7, 2024, identifying the affected Products and advising Xpedient that the extent and cost of the damage remained under investigation. (SAMF ¶¶ 1–2). On March 21, 2024, Agilent sent additional written correspondence

requesting a formal incident report and specifically asking Xpedient to explain the absence of heat and gas service, whether the sprinkler system had been winterized, and what preparations had been undertaken before the January cold front. (SAMF ¶¶ 3–5, 58). Xpedient responded on March 29, 2024, acknowledging Agilent's request, advising that it had initiated a claim with its warehouse legal liability insurer, and indicating that its insurer would assist in evaluating responsibility under the parties' agreements. (SAMF ¶¶ 6–9, 59). Meanwhile, Agilent continued investigating whether the affected pipette tips could be salvaged. On February 6, 2024, Agilent requested assistance from manufacturer Labcon concerning approximately 13,500 affected cases. (SAMF ¶ 54). Labcon subsequently evaluated potential remediation, including contamination testing and re-sterilization. (SAMF ¶ 56). On March 29, 2024, Labcon expressed substantial doubt that the contamination risks could be sufficiently mitigated and recommended scrapping the affected Products. (SAMF ¶ 55). Agilent subsequently transmitted its formal June 7, 2024 notice identifying a preliminary inventory loss exceeding $8 million. (RSUMF ¶ 16). These communications and investigations are central to the notice defense Xpedient now asserts.

## III. LAW AND ARGUMENT

### A. Rule 56 Standard.

Summary judgment is appropriate only when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and draw reasonable inferences in FM's favor, without weighing evidence or resolving credibility disputes. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 255 (1986); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

Even undisputed historical facts may present jury questions where reasonable jurors could draw competing material inferences. *Anderson*, 477 U.S. at 250–52. Here, Xpedient's defenses depend upon disputed interpretations of the notice correspondence, competing inferences concerning its employees' knowledge and conduct, and whether its prolonged disregard of the heating and freezing hazards constituted gross negligence. These issues cannot be resolved against FM on summary judgment.

### B. Xpedient Is Not Entitled to Summary Judgment Based on the MOSA's Written Notice Provision.

#### 1. Agilent's February and March writings support compliance with Section 12(C)(e).

Section 12(C)(e) of the MOSA requires written notice of a Product Loss claim identifying the affected Products, explaining Xpedient's alleged responsibility, and claiming payment of a specified or determinable amount. (RSUMF ¶ 4). Xpedient isolates the February 7 communication and argues that it lacked an express payment demand and dollar amount. That argument ignores the subsequent writings and surrounding circumstances.

Agilent's February 7 notice identified the damaged inventory, warehouse, occurrence, and continuing investigation. (SAMF ¶¶ 1–2). Its March 21 correspondence identified specific potential failures involving operational heat, natural gas, sprinkler winterization, and freeze preparedness. (SAMF ¶¶ 3–5, 58). Xpedient acknowledged the correspondence, initiated an insurance claim, and participated in identifying and segregating damaged inventory. (SAMF ¶¶ 6–9).

Section 12(C)(e) does not expressly require every notice element to appear in a single writing or demand a completed damages calculation. It permits a determinable amount. The MOSA itself establishes a replacement-cost measure, and Xpedient possessed or controlled

relevant inventory records while participating in the loss investigation. Thus, the writings collectively identified the claim, its factual basis, and an inventory loss whose amount could be determined through the contractual valuation process. At minimum, Xpedient has not established that its restrictive interpretation is the only reasonable construction of the notice provision.

**2. Tennessee recognizes substantial compliance with contractual notice requirements.**

In *Andrews Distributing Co. v. Oak Square at Gatlinburg, Inc.*, 757 S.W.2d 663, 668–69 (Tenn. 1988), the Tennessee Supreme Court recognized that contractual notice conditions, unlike statutory lien requirements, may be satisfied through substantial compliance and that reasonable delay may be excused under appropriate circumstances. Here, Xpedient received prompt written notice of the damaged Products, followed by correspondence identifying the operational failures potentially responsible. It acknowledged the claim, involved its insurer, and participated in segregating and evaluating the damaged inventory. (SAMF ¶¶ 1–9). Thus, the essential commercial purposes of notice were served: identifying the loss, permitting investigation, preserving relevant information, and evaluating responsibility.

Moreover, Tenn. Code Ann. § 47-7-204(c) authorizes only reasonable contractual provisions governing the time and manner of warehouse claims. Although *Andrews* involved a payment bond, its substantial-compliance analysis supports rejecting forfeiture based on technical notice deficiencies where the essential purpose of the contractual requirement has been fulfilled.

**3. The June 7 notice satisfied the substantive requirements of Section 12(C)(e).**

Agilent's June 7 correspondence expressly invoked Section 12(C)(e), identified the occurrence, affected inventory, and Xpedient's potential responsibility, and supplied a preliminary valuation of $8,054,398.96. (RSUMF ¶¶ 15–16). Xpedient emphasizes that Agilent described its claim as potential and acknowledged an incomplete investigation. But Section 12(C)(e) requires a

specified or determinable amount, not a final valuation immune from adjustment. Nor does it require Agilent to conclusively prove Xpedient's responsibility before receiving the operational information necessary to complete its investigation. The June 7 letter satisfied the provision's substantive content requirements.

**4. Genuine disputes exist concerning commencement of the 90-day period.**

Xpedient calculates the deadline from February 7, when Agilent knew its inventory had experienced water exposure. (RSUMF ¶ 15). But knowledge of exposure is not necessarily equivalent to knowledge that the affected Products constituted an irreparable Product Loss. The MOSA's accrual language must be considered together with its replacement-cost and salvage provisions and alternative year-end inventory reconciliation trigger. (RSUMF ¶ 4). Agilent and Labcon continued evaluating whether the Products could be decontaminated, re-sterilized, or salvaged. (SAMF ¶¶ 54–56). Only on March 29 did Labcon express substantial doubt concerning successful remediation and recommend scrapping the Products. (SAMF ¶ 55).

Under a reasonable construction tying awareness of Product Loss to knowledge that the affected inventory could not be restored, the June 7 notice fell within 90 days. At minimum, the continuing salvage investigation and contractual language undermine Xpedient's contention that February 7 necessarily triggered the deadline. The reasonableness of the investigation also bears upon substantial compliance under *Andrews*.

**5. Xpedient's withholding of material information supports equitable estoppel.**

Xpedient possessed an internal draft account identifying the locked gas service, failure to restore gas, December HVAC involvement, and freezing and rupture of water-bearing piping. (SAMF ¶¶ 10–13). Yet it withheld that account despite Agilent's March 21 request for precisely this information. Instead, Xpedient represented that it was still working to reconstruct the

occurrence and determine responsibility. (SAMF ¶¶ 58–59). Xpedient now argues that Agilent's earlier writings inadequately explained Xpedient's responsibility. But Xpedient possessed information material to that explanation and did not disclose it. Under Tennessee law, equitable estoppel may arise from misleading conduct by a party possessing material facts upon which another reasonably relies to its detriment. *Irving Pulp & Paper, Ltd. v. Dunbar Transfer & Storage Co.*, 732 F.2d 511, 514 (6th Cir. 1984). A reasonable factfinder could determine that Xpedient's representations and withholding of material information contributed to Agilent's continued investigation and the timing and contents of its formal notice. Whether Agilent reasonably relied upon that conduct to its detriment presents a factual issue. Xpedient should not obtain summary judgment based on deficiencies it allegedly helped produce. For these reasons, summary judgment under Section 12(C)(e) should be denied.

### C. Xpedient Is Not Entitled to Enforce the $1 Million Liability Limitation Against Gross Negligence or Reckless Conduct.

#### 1. Tennessee public policy prohibits contractual exculpation for gross negligence and reckless conduct.

The Tennessee Supreme Court has expressly held that "[a] party may not, for public policy reasons, exempt itself from liability for gross negligence, reckless conduct, or intentional wrongdoing." *Copeland v. HealthSouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 270 (Tenn. 2018); *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 154 (Tenn. 2021). That public policy cannot necessarily be circumvented by denominating an exculpatory provision a "limitation of liability." The substance and practical effect of the provision must be considered.

The Tennessee Court of Appeals recently addressed this distinction in *Signal Pump, LLC d/b/a Signal Power v. Arrow Electronics, Inc.*, No. E2024-01376-COA-R3-CV, 2026 Tenn. App. LEXIS 171, at *35–41 (Tenn. Ct. App. Apr. 17, 2026). Although applying New York substantive

law, the court examined whether a contractual damages limitation functioned as an exculpatory provision. Rather than accepting the provision's label or the theoretical availability of some damages, the court considered its practical operation and whether it deprived the plaintiff of meaningful recourse for breach of the defendant's principal obligations. Id. at *38–41. The court concluded that the limitation operated as an exculpatory clause notwithstanding its designation as a damages limitation.

*Signal Pump* is instructive because it recognizes that contractual terminology does not control the provision's legal effect. A limitation may operate as an exculpatory clause when its practical consequences substantially insulate a party from responsibility for its misconduct. Here, Xpedient's principal obligations included safeguarding Agilent's valuable inventory. Yet the record permits a finding that Xpedient knowingly operated the warehouse without heat for weeks, failed to resolve disconnected gas service, disregarded freezing hazards involving water-bearing piping, and failed to respond even after receiving immediate warnings.

A jury could find that this prolonged conduct constituted gross negligence or recklessness. Nevertheless, Xpedient seeks to limit liability to $1 million despite damages exceeding $9 million. Enforcement would eliminate responsibility for more than $8 million, or nearly 90% of the loss, even upon a finding of gross negligence. That is not merely a routine allocation of ordinary commercial risk. Under these circumstances, the limitation would substantially immunize Xpedient from the financial consequences of the very misconduct Tennessee public policy prohibits parties from excusing.

A contractual provision does not necessarily cease to be exculpatory merely because some recovery remains available. Otherwise, parties could evade *Copeland* and *Milan* by preserving a disproportionately small recovery while disclaiming responsibility for virtually all damages caused

by gross negligence. Courts in other jurisdictions have likewise recognized that public-policy restrictions on exculpatory clauses may extend to contractual damages limitations.[2] Accordingly, the Court should reject Xpedient's request to enforce the $1 million ceiling categorically, irrespective of the degree of misconduct established. At minimum, the jury should determine whether Xpedient was grossly negligent or reckless before the Court decides whether enforcement of the limitation would violate Tennessee public policy.

**2. Tenn. Code Ann. § 47-7-204 does not expressly displace Tennessee's public policy.**

Xpedient argues that Tenn. Code Ann. § 47-7-204(b), which permits contractual limitations of warehouse liability and expressly invalidates limitations for conversion to the warehouse's own use, authorizes its cap even for gross negligence. But nothing in the statute expressly abrogates Tennessee's common-law prohibition against contractual exculpation for gross negligence or reckless conduct. Indeed, Tenn. Code Ann. § 47-1-103(b) directs courts to apply supplemental principles of law and equity unless displaced by particular UCC provisions. Xpedient's proposed negative implication, that expressly prohibiting limitations for conversion necessarily permits limitations for every other form of aggravated misconduct, is not compelled by the statutory text. Nor do *Heather James, LLC v. Day & Meyer, Murray & Young Corp.*, 142 A.D.3d 842 (N.Y. App. Div. 2016), or *Western Mining Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847 (W.D. Pa. 1984), establish that Tennessee's adoption of § 47-7-204 abrogated its public policy concerning gross negligence. Indeed, *Butler Manufacturing Co. v. Americold Corp.*, 835 F. Supp. 1274, 1281–

[2] Courts in other jurisdictions have recognized that contractual liability limitations may operate as exculpatory provisions or violate public policy when applied to aggravated misconduct. See *Ingersoll-Rand Co. v. El Dorado Chemical Co.*, 283 S.W.3d 191, 195 (Ark. 2008); *New Light Co. v. Wells Fargo Alarm Services*, 525 N.W.2d 25, 30–31 (Neb. 1994); *United States Fire Insurance Co. v. Sonitrol Management Corp.*, 192 P.3d 543, 548 (Colo. Ct. App. 2008).

83 (D. Kan. 1993), supports preserving common-law restrictions on contractual limitations for aggravated warehouse misconduct.[3] Accordingly, Xpedient has not demonstrated that § 47-7-204(b) entitles it to judgment enforcing the $1 million cap regardless of its degree of culpability.

**3. The statutory increased-valuation provision presents an additional enforceability issue.**

Section 47-7-204(b) also addresses the bailor's ability to request an increased valuation of stored goods, with corresponding implications for warehouse liability and rates. During negotiations, Agilent expressly requested that Xpedient's liability extend to the full value of stored Products if that value exceeded $1 million. Xpedient rejected the request, responding, "Our limit is $1M." (SAMF ¶ 57). This evidence is material to whether the contractual limitation complied with the statutory increased-valuation framework. Although the record must establish the relevant contractual terms and statutory prerequisites, Xpedient cannot obtain summary judgment merely by pointing to the negotiated $1 million ceiling without addressing the legal significance of Agilent's express request for increased protection. The Court should therefore consider this additional statutory issue before determining that Section 12(C)(c) is enforceable as a matter of law.

**D. Substantial Evidence Supports a Jury Finding of Gross Negligence.**

Xpedient argues that FM cannot establish gross negligence absent proof that a decision-maker "actually knew that the specific sprinkler piping would freeze and consciously chose to accept that outcome." That argument imposes a requirement Tennessee law does not recognize. Gross negligence does not require intent to cause the resulting injury or advance knowledge of its

[3] In *Butler Manufacturing Co. v. Americold Corp.*, 835 F. Supp. 1274, 1281–83 (D. Kan. 1993), the court concluded that the applicable UCC provisions did not displace Kansas common-law restrictions on contractual limitations for gross negligence and willful or wanton misconduct, notwithstanding the parties' commercial sophistication.

precise mechanism. Tennessee recognizes gross negligence where conduct demonstrates an entire want of care sufficient to support an inference of conscious indifference to consequences. *Lawson v. Hawkins County*, 661 S.W.3d 54, 61–63 (Tenn. 2023); *Craig v. Stagner*, 19 S.W.2d 234, 236 (Tenn. 1929). Conscious indifference may be inferred from the nature and circumstances of the conduct. *Leatherwood v. Wadley*, 121 S.W.3d 682, 694 (Tenn. Ct. App. 2003). Even recklessness does not require a defendant to desire or anticipate the precise resulting injury. Rather, it concerns awareness and conscious disregard of a substantial and unjustifiable risk. *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 38–39 (Tenn. 2005). Thus, the question is not whether Xpedient knew which sprinkler pipe would freeze, where it would rupture, or the exact amount of resulting damage. The question is whether its conduct and knowledge permit a reasonable inference of the culpability required for gross negligence or recklessness.

The evidence readily supports such an inference. Xpedient knew its heating equipment was deficient when its lease began. (SAMF ¶ 27). By December 1, it knew gas service remained disconnected and that the HVAC system could not be completed and tested until gas was restored. (SAMF ¶¶ 15–16). Yet it failed to verify restoration of operational heat during the ensuing six weeks. (SAMF ¶¶ 19, 37). Meanwhile, Xpedient had no meaningful freeze-preparedness practices, did not investigate whether its overhead water-bearing sprinkler system was protected against freezing, and failed to assign responsibility for understanding that system. (SAMF ¶¶ 31–34, 43–53).

Most significantly, hours before the loss, Xpedient's on-site manager specifically advised his superior that the warehouse was cold, snow was falling, and gas service remained off. (SAMF ¶ 38). Even then, Xpedient did not deploy temporary heating in the storage area. (SAMF ¶ 42). These facts cannot properly be reduced to five unrelated maintenance omissions. Considered

cumulatively, they permit a finding of prolonged disregard of a serious, foreseeable, and readily preventable danger to valuable property entrusted to Xpedient's exclusive care. Nor does Xpedient's professed unfamiliarity with the sprinkler system defeat gross negligence. A jury could find that its failure to investigate the freezing vulnerability of water-bearing piping while knowingly operating without heat was itself evidence of an extraordinary departure from reasonable care. Xpedient may offer a less culpable interpretation of its conduct, but the Court cannot adopt that interpretation over competing reasonable inferences favoring FM. *Anderson*, 477 U.S. at 250–52. Because the evidence permits a jury to conclude that Xpedient's prolonged inaction reflected an entire want of care or conscious indifference to consequences, summary judgment on FM's gross negligence claim must be denied.

**E. Xpedient Has Not Established That All Inventory-Related Expenses Are Excluded as Consequential Damages.**

**1. Tennessee distinguishes direct, incidental, and consequential damages.**

Xpedient seeks to exclude inventory-counting, disposal, and replacement-freight expenses by labeling them consequential or indirect damages. But an expense does not become consequential merely because it was incurred after physical damage or paid to a third party. Tennessee distinguishes direct damages from losses resulting from additional consequences of a wrongful act. *Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994).

Xpedient's reliance upon *Spec's Family Partners, Ltd. v. First Data Merchant Services LLC*, Nos. 17-5884/5950 (6th Cir. June 7, 2019) is misplaced. In *Spec's*, the Sixth Circuit considered downstream assessments imposed through separate payment-network relationships following data breaches. Those losses differ materially from costs incurred to identify, dispose of, and replace goods physically damaged in a warehouse operator's custody. Importantly, Tennessee also recognizes that incidental and consequential damages are distinct categories governed by

different standards. *Wills Electric Co. v. Mirsadi*, No. M2000-02477-COA-R3-CV, 2001 Tenn. App. LEXIS 915, at *9–10 (Tenn. Ct. App. Dec. 13, 2001).

Section 12(C)(e) excludes special, indirect, consequential, and punitive damages but does not expressly exclude incidental damages. (RSUMF ¶ 5). That omission matters. The recoverability of each expense must therefore be evaluated according to its actual nature and the complete contractual language.

**2. Inventory-counting expenses concern identification of the physical Product Loss.**

Agilent seeks $64,227 for identifying and counting affected inventory. (RSUMF ¶¶ 21, 24). These services helped determine which Products were damaged, salvageable, or required replacement. Xpedient itself participated in sorting and segregating the inventory. (SAMF ¶ 9). These expenditures concern the damaged Products themselves, not collateral business losses such as lost profits or production interruptions. They may constitute direct or incidental expenses necessary to establish the physical Product Loss. At minimum, Xpedient has not demonstrated that the entire amount is excluded as consequential damages.

**3. Disposal expenses concern physically damaged Products.**

Agilent seeks $103,773 for disposal of unusable inventory. (RSUMF ¶ 24). These costs followed Labcon's investigation into contamination, remediation, and potential re-sterilization, culminating in its recommendation that the affected Products be scrapped. (SAMF ¶¶ 54–56). Disposal of physically damaged and unusable Products is closely related to the loss itself. It is not necessarily a collateral economic consequence merely because a third party performed the work. Xpedient has not established that these expenses are categorically excluded.

**4. Replacement freight relates directly to replacement inventory.**

Agilent also seeks $170,419 in estimated replacement freight. (RSUMF ¶¶ 21, 24). Section 12(C)(a) measures Product Loss by actual manufacturing or acquisition cost of replacement Products, subject to contractual limitations and salvage adjustments. (RSUMF ¶ 2). Reasonable transportation charges incurred to acquire and deliver replacement inventory may constitute part of the acquisition cost or an incidental expense directly related to replacing damaged Products. Such costs are distinguishable from remote losses involving lost profits or interrupted business. Their recoverability depends upon the contractual language and evidence establishing the nature and amount of the expense, not Xpedient's categorical characterization.

**F. Xpedient Has Not Established That All of FM's Adjustment Expenses Are Unrecoverable.**

Xpedient also challenges $335,446 identified by FM's damages expert, consisting of $318,478 in industrial-hygiene services, $12,248 in salvage services, and $4,720 in forensic-accounting services. (RSUMF ¶ 25). These expenditures should not be treated as one undifferentiated category. Industrial-hygiene and salvage services may involve physical inspection, contamination evaluation, protection of damaged property, and mitigation of additional loss. Those activities differ from ordinary insurance claim administration. The fact that FM paid an expense does not conclusively establish that it was incurred solely for insurance adjustment rather than protecting, evaluating, or mitigating damage to the Products. Although the recoverability of each expenditure depends upon its purpose, supporting evidence, and applicable contractual or legal basis, Xpedient has not established that every challenged expense is unrecoverable as a matter of law.

## IV. CONCLUSION

The evidence permits a jury to find that Xpedient knowingly operated the Cromwell Warehouse without heat, disregarded unresolved natural gas service, failed to investigate and

protect water-bearing piping against freezing, and took no meaningful protective action despite immediate warnings. A reasonable jury could conclude that this conduct constituted gross negligence or recklessness. Xpedient has not established that Tennessee law permits enforcement of its $1 million limitation against such misconduct. Nor has it demonstrated that Agilent failed to comply or substantially comply with the MOSA's notice provision, that the June 7 notice was necessarily untimely, or that equitable estoppel is unavailable. Finally, Xpedient has not shown that every expense associated with identifying, handling, disposing of, and replacing physically damaged inventory is excluded as consequential damages. For these reasons, Plaintiff Factory Mutual Insurance Company respectfully requests that the Court deny Xpedient's Motion for Summary Judgment in its entirety.

Respectfully submitted,

*s/ S. Joe Welborn*

S. Joe Welborn, TN BPR No. 21747
SMITH CASHION & ORR, PLC
3100 West End Avenue
Suite 800 – One American Center
Nashville, TN 37203
(615) 742-8565 – Tel
jwelborn@smithcashion.com
*Attorney for Plaintiff Factory Mutual Insurance Company*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2026, I have served a true and correct copy of the foregoing pleading to the following via electronic mail:

Amber S. Finch
Margaret C. McDonald
Katherine P. Goetz
Reed Smith, LLP
515 South Flower St.
Suite 4300
Los Angeles, CA 90071
(213) 457-8000 – Tel
afinch@reedsmith.com
mcmcdonald@reedsmith.com
kgoetz@reedsmith.com

Douglas F. Halijan
Elena R. Mosby
Burch Porter & Johnson
130 N. Court Ave.
Memphis, TN 38103
(901) 524-5000 – Tel
dhalijan@bpjlaw.com
emosby@bpjlaw.com

*Attorneys for Plaintiff Agilent Technologies, Inc.*

John Butler
Grant E. Mitchell
Butler, Vines and Babb, PLLC
2701 Kingston Pike
Knoxville, Tennessee 37919
(865) 244 – 3945 – Tel
jbutler@bvblaw.com

William P. Thomas
Andrew B. Schrack
Butler Snow, LLP
6075 Poplar Ave., Ste, 500
P.O. Box 171443
Memphis, TN 38187-1443
(901) 680-7200 – Tel
Will.Thomas@butlersnow.com
Andrew.Schrack@butlersnow.com
*Attorneys for Defendant/Cross-Plaintiff Xpedient Management Group, LLC*

Sean W. Martin
Carr Allison
633 Chestnut St.
Suite 2000
Chattanooga, TN 37450
(423) 648-9832 – Tel
swmartin@carrallison.com
*Attorneys for Defendant/Cross-Defendant St. Paul Fire and Marine Insurance Company*

gmitchell@bvblaw.com
*Attorney for Defendant Colliers Management Services – Memphis, LLC*

*s/ S. Joe Welborn*
S. Joe Welborn