**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

**AGILENT TECHNOLOGIES, INC., PLAINTIFF**

**VS CASE NO. 2:25-cv-02101-BCL-cgc**

**XPEDIENT MANAGEMENT GROUP, LLC,**
**ST.PAUL FIRE AND MARINE INSURANCE COMPANY,**
**COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC DEFENDANTS**

---

**EXPEDIENT MANAGEMENT GROUP, LLC, CROSS PLAINTIFF**

**VS**

**ST PAUL FIRE AND MARINE INSURANCE COMPANY CROSS-DEFENDANTS**
**and COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC**

---

**FACTORY MUTUAL INSURANCE CO., AS**
**SUBROGEE OF AGILENT TECHNOLOGIES, Inc. PLAINTIFF**

**V.**

**XPEDIENT MANAGEMENT GROUP, LLC**
**and ST. PAUL FIRE AND MARINE INSURANCE COMPANY**
**and COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC DEFENDANTS**

---

**XPEDIENT MANAGEMENT GROUP, LLC'S RESPONSE TO AGILENT TECHNOLOGIES, INC.'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

---

Defendant Xpedient Management Group, LLC ("Xpedient") responds to Agilent Technologies, Inc.'s Statement of Additional Material Facts pursuant to Local Rule 56.1(c). Xpedient admits only those matters expressly admitted. Its responses identify genuine disputes concerning the propositions asserted and do not concede that any fact is material.

1. Xpedient is a sophisticated logistics company that operates warehouses in cold climates, including Canada, the Midwest, and Utah, where many of its key personnel work, and,

in 2023, it employed over 500 people and still does today. Ex. A, Ex. B. at 20:8-14, 151:3-152:1 Ex. C at 16:4-17:10, 156:7-19; Ex. D at 71:11-18, 72:8-16; Ex. E at 337:17-338:4.

**<u>RESPONSE:</u> Undisputed that Xpedient is a logistics company and has operated facilities in colder climates and employs over 500 people. Disputed to the extent "sophisticated" suggests expertise in the design, inspection, or freeze protection of the Cromwell fire-suppression system. The legal significance of other locations is disputed.**

2. At the time of the January 17, 2024 water intrusion event (the "Event") at the Cromwell Warehouse ("CW"), Agilent's inventory being stored in the CW was in Xpedient's exclusive care, custody, and control. Ex. 1; Ex. B at 155:25-156:19.

**<u>RESPONSE:</u> RESPONSE: Undisputed that Agilent's Products were in Xpedient's exclusive possession for purposes of warehouse services.**

3. Under the MOSA and SOA, Xpedient was responsible for managing and maintaining the CW, including ensuring utilities were operational. Ex. 1; Ex. 2 at XMG_2925-26; Ex. B at 15:19-16:18, 91:16-92:5, 93:8-21.

**<u>RESPONSE:</u> Undisputed to the extent the SOA includes facility management, utilities, and certain maintenance services. Disputed that these general undertakings made Xpedient solely responsible for every building system or relieved St. Paul/Colliers of responsibility for the fire-suppression system.**

4. Before the Event, three senior Xpedient employees each had responsibility for Agilent's inventory and the CW: Jamie Davis, Director of Operations; Dirk Updike, Senior Director of Operations; and Zachery Livingston, Safety Manager. Ex. B at 15:19-16:18, 27:20-

32:9; Ex. D at 11:22-12:7, 27:11-22; Ex. C at 12:20-13:9, 13:18-23, 19:8-23, 65:25-66:18; Ex. E at 20:15-21:14, 28:9-16.

**<u>RESPONSE:</u> It is undisputed that Davis, Updike, and Livingston held the stated roles, subject to the precise periods and titles established by the cited testimony. Disputed insofar as the statement implies each had the same authority, responsibilities, or expertise regarding building systems**.

5. Under the SOA, Xpedient was required to "operate the facility with 1 working manager," available Monday through Friday from 7:00 a.m. to 4:00 p.m. Ex. 2 at XMG_2926.

**<u>RESPONSE:</u> Disputed insofar as Agilent substitutes "required" for the SOA's actual language that Xpedient "intends to operate the facility with 1 working manager." The SOA does not state that the manager must remain on site at all times or work exclusively on Agilent matters. It is undisputed that the SOA describes specified availability hours, and that there is no express requirement that a particular manager remain physically on-site for the entire period.**

6. Livingston was that manager, and although Xpedient's designees testified that his work was dedicated to the CW, Livingston testified that from August 2023 through January 2024 he spent about 90% of his time on company-wide safety work and only 10% on the CW, as he was promised when he took the job. Ex. B at 128:7-10; Ex. D at 18:7-19:2, 32:6-16; Ex. E at 38:24- 1 Case 2:25-cv-02101-BCL-cgc Document 274 Filed 10/19/26 Page 3 of 7 PageID 2927 40:2, 41:18-43:25, 111:25-114:4.

**<u>RESPONSE:</u> It is undisputed that Livingston was assigned operational responsibilities at Cromwell and testified regarding allocation of his time to other Xpedient duties. Disputed that the cited allocations establish noncompliance with the SOA. The agreement contains no exclusive-assignment or continuous-physical-presence requirement.**

7. From May 2023 and again in the months before the Event, Agilent told Xpedient that the inventory could never get wet, and Xpedient understood this. Ex. F; Ex. C. at 72:20-73:6, 99:3-14; Ex. D at 18:7-19:2, 62:17-22; Ex. E at 65:2-7.

**RESPONSE: It is undisputed only that Agilent communicated concerns about water exposure to inventory, as reflected in the identified communications. Disputed to the extent "could never get wet" is offered as an independently established contractual storage specification or shows Xpedient knew the sprinkler system was inadequately protected.**

8. Xpedient knew Agilent's inventory sat directly beneath the CW's sprinkler system throughout its storage there, that cold temperatures can freeze water lines, that a frozen line can burst or buckle and release water onto whatever is below, and that water from those pipes therefore posed a hazard to Agilent's inventory. Ex. D at 18:7-19:2, 351:1-13; Ex. C at 38:4-21; Ex. E at 65:2-25.

**RESPONSE: It is undisputed Agilent's inventory was stored beneath overhead fire-suppression piping and that freezing water can cause pipes to burst and release water onto objects below. Disputed that Xpedient knew, before the loss, that the Cromwell Warehouse's sprinkler system contained standing water, was configured as a wet-pipe system, lacked adequate freeze protection, or presented a known substantial risk to Agilent's inventory. Indeed, Xpedient's corporate designee, Dirk Updike, expressly testified: "We didn't know that the sprinkler system had water in it." Updike Dep. 353:24–25, Exh. D to Agilent's Statement of Additional Material Facts (Doc. # 274-4, p. 37). Livingston likewise testified that he did not understand the distinction between wet-pipe and dry-pipe sprinkler systems, while Davis acknowledged that he did not know what type of sprinkler system the warehouse had. Livingston Dep. 285:3–286:15, 301:22–302:16; Davis Dep. 336:19–24. Agilent's assertion improperly conflates general knowledge that water can freeze and burst**

**pipes with actual knowledge that this particular sprinkler system contained water, lacked adequate freeze protection, and presented a substantial risk of damage to the Products.**

9. In May 2023, Colliers provided Xpedient with the CW's sprinkler type, and Xpedient put CW water utility account for the sprinkler system into its own name. Ex. G; Ex. B at 190:6-16, 191:23-192:20; Ex. C. at 115:14-118:6.

**RESPONSE:** **It is undisputed that Colliers provided Xpedient with sprinkler-related information in May 2023 and that Xpedient arranged for the transfer of utility accounts associated with the Cromwell Warehouse, including a fire-protection account. Disputed that Colliers informed Xpedient that the sprinkler system was a wet-pipe system or that water was continuously present in the overhead piping. The May 19, 2023 correspondence merely described the system as "26gpm/2,000 sprinkler." Exh. G to Agilent's Statement of Additional Material Facts (Doc. # 274-7 [XMG_3349]). When specifically asked whether he understood that description to mean a wet-pipe system, Xpedient's corporate designee, Nate Haynes, testified: "No, I wouldn't have expected that to be a wet system." He explained that the description concerned "the pressure and the flow of the water" and that it could have referred to a different type of system. Haynes further testified: "It doesn't mean the water is in the -- is present at all times." Haynes Dep. 192:1–15, Exh. B to Agilent's Statement of Additional Material Facts (Doc. # 274-2, p. 27). Similarly, although Davis acknowledged that he understood the fire-protection utility account involved water, he testified that he did not know what type of sprinkler system the warehouse had. Davis Dep. 118:2–6, 336:19–24. Thus, the cited evidence does not establish that Xpedient knew the overhead sprinkler pipes contained standing water before the loss or that the system lacked adequate freeze protection.**

10. Davis was responsible for transferring all the CW utility accounts in Xpedient's name and for knowing whether the HVAC worked. Ex. C at 25:19–26:1, 29:16-30:6, 87:10–88:2.

**<u>RESPONSE:</u> It is undisputed that Davis had responsibilities concerning utility-account transfers and operations. Disputed to the extent the assertion treats a general operational responsibility as proof Davis personally knew the heating system was inoperable before the loss. Davis testified he first learned of the absence of heat after the event. Davis Dep. 325:1–18.**

11. Although Xpedient's practice is to put an HVAC preventive maintenance contract in place when it takes over a new facility, and although Davis knew the CW's HVAC system was not in good working order when the lease began, Davis neither put a preventive maintenance contract in place nor confirmed that the HVAC system was working at any point before the Event. Ex. C at 25:19-27:2, 87:18-88:10, 89:11-25, 92:8-14, 93:9-16, 153:23-154:12, 172:1-173:12, 191:20-193:2.

**<u>RESPONSE:</u> It is undisputed that the lease required Xpedient to maintain the HVAC system, that Xpedient ordinarily arranges for preventative maintenance ("PM") when commencing operations at a new warehouse, and that a PM contract had not been implemented before the Event. Disputed insofar as Agilent's assertion suggests that Xpedient simply disregarded its maintenance obligations or made no effort to have the HVAC system inspected. When Xpedient took possession of the Cromwell Warehouse, it was aware that Colliers was coordinating substantial roof repairs, splitting gas lines, having an additional meter installed, and HVAC replacement work that left portions of the system inoperable and delayed Xpedient's ability to arrange preventative maintenance. As Davis explained, the landlord was "doing a lot of roof work and replacing units on top of the building at the same time," and "[t]hey can't do a PM if it's not functioning." Davis Dep. 26:17–27:17 Exhibit A**

**hereto. Davis further testified that Colliers represented in approximately October 2023 that the roof repairs and HVAC work were complete and the system was "good to go," leading him to believe the utilities were operational and to proceed with arranging preventative maintenance. Davis Dep. 172:1–173:12 Exhibit A hereto. Consistent with those efforts, on November 15, 2023, Davis asked Livingston about the status of the HVAC inspection, and Livingston confirmed that Crowe Heating & Air was scheduled to visit the following day. Davis Dep. 191:7–24; 192:10–18 Exhibit A hereto. Thus, while Xpedient acknowledges that a PM contract was not in place before the Event, the cited testimony establishes that the delay occurred against the backdrop of ongoing landlord-coordinated building repairs, and that Xpedient took steps to arrange an HVAC inspection rather than simply ignoring the system.**

12. The CW had no working heaters at any point in 2023, and Xpedient controlled the thermostats in the leased space. Ex. H; Ex. D at 18:7-19:2, 296:21-24.

**RESPONSE:** **It is undisputed that Xpedient's leased-space thermostats were controlled by its personnel. Disputed as phrased that there were "no working heaters at any point in 2023" absent proof addressing each heater and the whole calendar year. Xpedient acknowledges the evidence that natural-gas service was not available by December 1, 2023. Updike Dep. 344:4–25.**

13. While Xpedient's lease of the CW began in May 2023, Xpedient did not discuss an HVAC vendor until October 2023, and no HVAC vendor hired by Xpedient visited the CW from May 2023 until November 16, 2023, when Crowe Heating & Air ("Crowe") came out but could not test the system because the gas meter was locked. Ex. E. at 256:9-257:4; Ex. I; Ex. J.

**RESPONSE:** **It is undisputed that Crowe Heating & Air visited the Cromwell Warehouse on November 16, 2023, and could not complete testing of the HVAC system**

**because the gas meter was locked. Disputed insofar as Agilent's assertion suggests that Xpedient unreasonably delayed securing HVAC services or disregarded its maintenance obligations. Although Xpedient's lease required HVAC maintenance, the warehouse was undergoing substantial landlord-coordinated roof repairs and HVAC replacement work that prevented Xpedient from implementing its customary preventative maintenance ("PM") program. As Davis explained, Colliers was "doing a lot of roof work and replacing units on top of the building at the same time," and "[t]hey can't do a PM if it's not functioning." Davis Dep. 26:17–27:17 Exhibit A hereto. Davis further testified that Colliers represented in approximately October 2023 that the roof and HVAC work had been completed and the system was "good to go." Davis Dep. 172:1–173:12 Exhibit A hereto. Thereafter, Xpedient took steps to arrange an HVAC inspection. On November 15, 2023, Davis inquired about the status of the HVAC work, and Livingston confirmed that Crowe was scheduled to visit the following day. Davis Dep. 191:7–24 Exhibit A hereto; Ex. I to Agilent's Statement of Additional Material Facts. Thus, the November inspection was part of Xpedient's efforts to establish preventative maintenance following the landlord-coordinated repairs, not evidence that Xpedient simply ignored the HVAC system.**

14. On December 1, 2023, Crowe asked Livingston whether it "need[ed] to come back out when the gas is unlocked," and no later than that date, Xpedient knew the gas line was locked and the HVAC system could not produce heat. Ex. J; Ex. D at 18:7-19:2, 344:4-15.

**<u>RESPONSE:</u> It is undisputed that Crowe's December 1 email referred to the locked gas meter and that** Livingston **received that communication. Disputed any inference that receipt proved Xpedient knew the fire-suppression system was unprotected or at risk of rupturing. Livingston Dep. 87:22–89:21; Updike Dep. 344:4–25.**

15. On January 9, 2024, Xpedient approved and paid the Crowe invoice stating, "Need to come back and test system when they have the gas unlocked." Ex. K; Ex. E at 274:6-275:8.

**RESPONSE:** **It is undisputed that by January 9, 2024 the Crowe invoice that stated, "Need to come back and test system when they have the gas unlocked." Disputed any inference that invoice payment** established **knowledge that sprinkler piping was water-filled and inadequately protected.**

16. During the January 2024 winter freeze, Livingston wore his coat indoors and used a portable heater in his own office. Ex. E at 138:7-139:13, 189:3-14.

**RESPONSE:** **It is undisputed that Livingston testified about wearing a coat and using a portable heater, in the office** area **of the lease space. Disputed that personal cold-weather precautions established knowledge of a particular fire-suppression hazard.**

17. Before the Event, Livingston told Updike that the CW was cold, it was snowing, the gas was not on, and the HVAC system could not produce heat, but after hearing this, Updike neither instructed Livingston to take protective action nor checked Memphis temperatures. Ex. E at 91:6-92:6; 191:16-192:10; Ex. D at 83:14-25, 122:2-7, 124:5-125:10, 344:4-347:13; 353:3-7.

**RESPONSE:** **It is undisputed that Livingston informed Updike on January 17, 2024, that the warehouse was cold and the gas was not on. Disputed that Updike failed to instruct Livingston to take corrective action. Agilent's assertion is directly contradicted by the very testimony it cites. Livingston** testified **that, after informing Updike of the conditions, Updike instructed him to restore gas service. Livingston Dep. 192:11–25, Exh. E to Agilent's Statement of Additional Material Facts (Doc. # 274-5, p. 32).**

**Livingston separately testified: "I had had a meeting with Dirk. And he said we need to work on getting the gas turned on." He explained that he then took steps to comply, first calling MLGW and subsequently contacting Xpedient's accounting department to obtain the**

**account number necessary to speak with the utility. Livingston Dep. 191:12–25, 192:1, Exh. E (Doc. # 274-5, pp. 31–32). Thus, the record affirmatively establishes that Updike directed corrective action and Livingston undertook efforts to restore gas service before the Event. To the extent Agilent separately asserts that Updike did not check Memphis temperatures, that assertion does not negate his express instruction to restore heat.**

18. Xpedient did not provide any temporary heat to the CW before the Event. Ex. C at 315:10-14.

**<u>RESPONSE:</u> Admitted that Xpedient did not deploy temporary heat on the warehouse floor before the event, as reflected in Updike Dep. 306:4–14. Disputed only insofar as the assertion implies that a portable heater was required or technically capable of protecting the warehouse sprinkler piping.**

19. Livingston never asked whether the sprinklers could freeze, though he agreed he could have found out by calling the landlord. Ex. E at 284:21-285:2, 301:22-302:21.

**<u>RESPONSE:</u> It is undisputed that Livingston did not inquire about sprinkler freeze protection before the loss. Disputed that this omission establishes actual pre-loss knowledge that the overhead pipes contained standing water or lacked adequate protection. When asked about whether water coming from the fire sprinkler pipes would be a hazard to inventory Livingston testified, "I mean, that's assuming that I would think that water's in those pipes in the first place." Livingston Dep. 301:22–302:16.**

20. Between December 1, 2023, and January 17, 2024, Xpedient never confirmed whether the gas or heaters worked and took no action to unlock the gas until after the Event. Ex. J; Ex. D at 18:7-19:2, 345:10-347:13, 353:3-11.

**<u>RESPONSE:</u> It is undisputed that Xpedient did not obtain confirmation before January 17, 2024, that gas service had been restored or that the warehouse heaters were**

**operational. Updike Dep. 345:10–347:13. Disputed that Xpedient "took no action to unlock the gas until after the Event." Before the Event, Livingston informed Updike that the gas was not on, and Updike expressly instructed him to restore service. As Livingston testified, Updike "told me to get it on." Livingston Dep. 192:11–25. Livingston further testified that he attempted to comply by calling MLGW, but could not proceed because he lacked the account number needed to speak with the utility. Livingston Dep. 271:23–272:5.**

**Agilent's assertion also omits the circumstances surrounding the interruption of gas service. The landlord, through Colliers and its contractors, undertook the project to separate the building's gas service and establish separate metering for Xpedient's leased premises. During that work, the gas was capped, turned off, and locked, and service was not restored when the work was completed. Updike's Incident Chronology, Exh. 4 to Factory Mutual's Statement of Additional Material Facts (Doc. # 269, XMG_0908–0909). Although Xpedient had contractual responsibilities concerning facility management, utilities, and HVAC preventive maintenance, those obligations did not make Xpedient the contractor responsible for performing the landlord's gas-line connection. Thus, while Xpedient acknowledges that it did not verify restoration of gas service before the Event, the assertion that it took no action whatsoever is contradicted by the cited testimony.**

21. Before the Event, Xpedient never told Agilent that the CW had no heat or that the gas meter was locked. Ex. C at 228:2-6; Ex. M at 14:17-24, 301:9-17.

**<u>RESPONSE:</u> Undisputed.**

22. Jessica Edmonds of Colliers testified that Xpedient never complained to Colliers about the lack of heat or the locked gas meter. Ex. N at 13:2-8, 65:21-24, 140:5-11.

**<u>RESPONSE:</u> It is undisputed that Jessica Edmonds testified that, to her knowledge, Xpedient had not complained to Colliers about the lack of heat or the locked gas**

**meter before the Event. Disputed** insofar **as Agilent suggests that Colliers was unaware of the condition of the warehouse's heating systems or that Xpedient was the sole source from which Colliers could have learned of those conditions. Colliers had been directly involved in overseeing substantial roof repairs, HVAC replacement work, and modifications to the building's gas service. Davis testified that he communicated with Colliers personnel, including Shellie Moses and Jessica Edmonds, concerning when the HVAC equipment would be ready for preventive maintenance, but was advised that work remained ongoing. Davis Dep. 26:1–17 Exhibit A hereto. Davis further explained that preventative maintenance could not be performed on equipment that was not functioning. *Id.* at 26:13–17, 27:1–8 Exhibit A hereto.**

**Moreover, Colliers' involvement was not limited to receiving complaints from Xpedient. Its contractors had firsthand familiarity with the building's HVAC equipment and its operational problems. Accordingly, Edmonds's testimony concerning the absence of complaints from Xpedient does not establish that Colliers lacked independent knowledge of the heating problems, that its contractors were unaware of those problems, or that Colliers reasonably believed the heating equipment was operational.**

23. Davis testified that no one at Xpedient monitored weather affecting the CW, that he never discussed or implemented weather-preparedness practices there, and that Xpedient had no practice of assessing weather preparedness or protecting its warehouses from freeze events. Ex. D at 18:7-19:2, 225:2-13, 227:13-24, 346:8-16.

**RESPONSE:** **Undisputed as to Davis' testimony.**

24. During the Event, water pipes burst in the CW, and Xpedient's safety manager, Zachary Livingston, observed water "pouring out" of the CW, leaving "one to two inches" of

standing water, and soaking much of Agilent's inventory. Ex. E at 20:15-21:14 27:7-22, 33:17-34:4, 203:5-2011:3; Ex. O, Ex. P, Ex. L.

**<u>RESPONSE:</u> It is undisputed that water escaped from ruptured piping at the Cromwell Warehouse, that Livingston observed water flowing from the warehouse and standing water on the floor, and that some of Agilent's inventory became wet. Disputed insofar as Agilent's assertion implies** that **Livingston conducted a comprehensive inspection of the warehouse or was able to determine the extent of water damage to Agilent's inventory. Livingston expressly testified that he did not inspect the entire warehouse and could not confirm whether the water depth was consistent throughout the facility. Livingston Dep. 208:15–22, 209:12–18, Exh. E to Agilent's Statement of Additional Material Facts (Doc. # 274-5, pp. 38–39). Moreover, Livingston testified that visibility was extremely limited because the incident occurred at night, the warehouse lights were off, and conditions were foggy. He explained: "That evening, I didn't know what got wet, how much got wet. It was the middle of the night, and the lights were off." Livingston Dep. 211:4–10 Exhibit B hereto. When asked how he could see, Livingston testified: "The fire department had a flashlight. I think I had my phone light."** ***Id.*** **at 211:20–25. He also explained that he did not turn on the warehouse lights because he feared electrocution.** ***Id.*** **at 207:13–24. Finally, although Livingston observed wet inventory, he specifically testified that some areas were wet while others "didn't get wet at all," and when asked whether most of the inventory became wet, answered, "I -- I wouldn't say most of it."** ***Id.*** **at 210:13–24. Accordingly, Livingston's limited nighttime observations do not establish the quantity, location, or condition of all inventory allegedly damaged in the Event.**

25. In January 2024, Xpedient opened a claim with its insurer, and on February 6, 2024, sent the insurer inventory reports and receipts, including a file of "potentially damaged inventory

and value" explaining that it had no "official … demand" because Agilent was still "in the process of establishing what inventory can be salvaged." Ex. Q; Ex. B at 15:19-16:18, 203:4-25.

**RESPONSE:** **It is undisputed that Xpedient notified its insurer in January and provided inventory/value materials on February 6 while Agilent was evaluating salvage. This is consistent with Xpedient's position that notice of an occurrence and investigation are distinct from Agilent's formal claim for payment under MOSA § 12(C)(e). See Exh. U to Agilent's Additional Facts (Doc. # 274-21, pp. 2–4).**

26. On February 7, 2024, Agilent provided written notice to Xpedient pursuant to Section 12(C)(e) of the Master Operating Services Agreement ("MOSA"). Ex. 4.

**RESPONSE:** **Disputed. Admitted that Agilent transmitted a writing to Xpedient on February 7, 2024, concerning the water intrusion, but disputed that the writing constituted a claim satisfying § 12(C)(e) of the Master Operating Services Agreement ("MOSA"). Section 12(C)(e) requires a written claim for payment of a specified or determinable amount of money. The February 7 email, titled "Agilent Water Damage Notice," reported damage, requested an explanation and remediation information, and expressly deferred any determination of costs: "We will update you once the steps and resulting costs are determined." It neither demanded payment nor identified any specified or determinable amount. February 7 Mulryan Email, Exh. 4 to Xpedient's Motion (Doc. # 248-4, ATI_004078); MOSA § 12(C)(e), Exh. 1 (Doc. # 248-1).**

**Agilent's contemporaneous internal correspondence confirms that it distinguished notification of the incident from the assertion of a claim. In a February 2, 2024 email, Chris Mulryan expressly stated: "We aren't filing a claim with Xpedient for this product yet." He explained that Agilent anticipated potentially salvaging and repackaging the Products and that "we aren't filing a claim until Product experts determine the risk factor." February 2**

**Mulryan Emails (ATI_002866), attached as Exhibit C hereto. In the same correspondence, Agilent's global category manager explained that Agilent needed to determine the claim process while continuing its damage assessment. *Id.* (ATI_002865). These communications demonstrate that, immediately before sending the February 7 notice, Agilent understood that investigating damage and communicating with Xpedient did not themselves constitute the filing of a claim.**

**Agilent's subsequent correspondence is consistent with that understanding. On February 8, 2024, the day after transmitting the purported contractual claim, Mulryan wrote: "I am not aware of any claims being filed, or insurance adjusters arriving on site yet." February 8 Mulryan Email, Exh. 3 to Xpedient's Motion (Doc. # 248-3, ATI_000472).**

**Furthermore, on April 26, 2024, Factory Mutual specifically advised Agilent to "file claim with XMG per the terms and conditions of the MOSA and place XMG and their insurance carrier on formal written notice." April 26 Robinson Email (ATI_011552–011553) attached as Exhibit D hereto. Agilent's Nita Baindur then forwarded that recommendation internally, explaining that Factory Mutual was recommending that Agilent file a claim with Xpedient under the MOSA and requesting guidance concerning the appropriate Agilent legal contact.**

**Agilent did not transmit a document expressly identifying itself as a notice of claim pursuant to § 12(C)(e), and demanding payment for the inventory loss, until June 7, 2024. June 7 Notice of Claim, Exh. 5 to Xpedient's Motion (Doc. # 248-5, ATI_011132).**

**Accordingly, Agilent's assertion that its February 7 email constituted written notice "pursuant to Section 12(C)(e)" is a disputed contractual characterization, not an undisputed material fact. Xpedient relies on February 7 as the latest possible commencement date for**

**the contractual 90-day claim period, without conceding that Agilent first acquired knowledge of its loss on that date.**

27. On March 21, 2024, Agilent sent a letter to Xpedient requesting an incident report explaining the timeline of the events that predated the incident, an explanation of the incident and cause, and Xpedient's remediation efforts. Ex. S.

**RESPONSE:** **RESPONSE: It is undisputed that Agilent sent a March 21 letter seeking a chronology, cause analysis, and remediation information. Disputed that this document asserted the written monetary claim required by § 12(C)(e). March 21 Agilent letter, Exh. S to Agilent's Additional Facts (Doc. # 274-19).**

28. By March 25, 2024, Xpedient had drafted, but never sent, a response to the March 21 letter, which detailed a timeline of events, admitted the gas line was locked since July 2023, and stated that Xpedient was unaware of any actions taken to winterize the sprinkler system. Ex. L; Ex. D at 18:7-19:2, 245:24-246:24, 263:8-14, 265:13-24, 270:16-271:8, 281:18-282:5; Ex. M at 14:17-24, 301:9-22.

**RESPONSE:** **RESPONSE: Admitted that Updike circulated an internal proposed chronology in March 2024 that was not sent in that form to Agilent. Disputed that the draft constitutes a admission of responsibility for gas restoration or shows concealment of a fact Agilent needed to know to assert a contractual claim. The draft itself says the root cause was under investigation and describes Colliers' gas-line separation and interactions with MLGW. Exh. L to Agilent's Additional Facts; Exh. 4 to Factory Mutual's Additional Facts (Doc. # 269).**

29. On March 29, 2024, Xpedient responded to Agilent's March 21 letter, omitting the timeline, the months long locked gas line, and the lack of winterization, while stating that Xpedient

"share[s] Agilent's need for answers," and has "initiated a claim with [its] warehouse legal liability insurance carrier." Ex. T.

**RESPONSE:** **RESPONSE: Admitted that Xpedient's March 29 letter was shorter than its internal working draft and did not reproduce a chronology. The letter said Xpedient and property management/utility** providers **were working on the sequence and noted the insurance claim. Disputed that those omissions alone demonstrate intentional concealment or excuse Agilent's obligation to assert a timely monetary claim. March 29 St. Denis letter, Exh. T to Agilent's Additional Facts (Doc. # 274-20).**

30. In the months following the Event, Xpedient inspected and controlled the damaged inventory, compiled inventory reports, retained custody of the inventory, and hosted inspections, including an April 2, 2024 inspection attended by Livingston. Ex. U; Ex. T; Ex. V; Ex. W; Ex. X.

**RESPONSE:** **It is undisputed that Xpedient retained physical custody of Agilent's inventory, prepared inventory reports, assisted with segregation and inspection activities, and facilitated access to the warehouse for inspections, including the April 2, 2024 inspection. Disputed insofar as Agilent's assertion suggests that Xpedient exercised exclusive decision-making authority over the damaged Products or independently determined how the inventory would be inspected, evaluated, salvaged, or disposed of.**

**Agilent remained the owner of the Products and retained contractual rights to inspect the inventory and direct its disposition. MOSA §§ 10(D), 12(B), 28(B). Following the Event, Xpedient cooperated with Agilent, its representatives, and the parties' insurers by maintaining the inventory, compiling reports, and facilitating access and inspections. Agilent, meanwhile, was actively evaluating whether the Products could be salvaged. Indeed, in a February 6, 2024 email to Xpedient's insurance adjuster, Nate Haynes explained: "We do not have an official claim/demand from our customer, Agilent Technologies, for the**

**damage. They are in the process of establishing what inventory can be salvaged." Exh. U to Agilent's Statement of Additional Material Facts (Doc. # 274-21, p. 2, XMG_1273).**

**Agilent also independently consulted the product manufacturer, Labcon, concerning potential salvage, rework, and sterilization before determining that the affected Products could not be returned to market. See Agilent's Additional Material Fact No. 33 and Exh. Z. Thus, Xpedient's continued possession of the inventory and assistance with inspections do not establish that it exercised exclusive control over the post-loss decision-making process. Rather, Xpedient was performing warehouse services and facilitating the investigation while Agilent retained ownership and participated in decisions concerning the Products' evaluation and disposition.**

31. Xpedient coordinated and performed the segregation of Agilent's inventory, for which Agilent paid for additional workers, but did not begin until February 22, 2024, more than a month after the Event, and had not finished by March 29, 2024. Ex. T; Ex. 5; Ex. Y.

**<u>RESPONSE:</u>** **Admitted that Xpedient coordinated and performed inventory segregation activities, including providing additional workers whose costs were paid by Agilent, and that those activities continued into March 2024. Disputed insofar as Agilent's assertion suggests that Xpedient independently initiated, directed, or controlled the scope and timing of the segregation work. Xpedient performed the segregation activities at Agilent's direction and for Agilent's benefit, providing the warehouse personnel and logistical assistance necessary to carry out Agilent's instructions concerning its Products. Agilent retained ownership of the inventory, controlled its evaluation for potential salvage or rework, and participated in determining how the Products would be handled. See MOSA §§ 10(D), 12(B), 28(B); February 6, 2024 Haynes Email, Exh. U to Agilent's Statement of Additional Material Facts (Doc. # 274-21, XMG_1273). Accordingly, the fact that segregation**

**began on February 22, 2024, and continued through March 29, 2024, does not establish that Xpedient unilaterally determined when the work would begin, how it would proceed, or when it would be completed**.

32. On June 7, 2024, Agilent followed up on its earlier MOSA § 12(C)(e) notices with a letter to Xpedient that identified the damaged Products, explained XMG's liability and claimed approximately $8,054,398.96 in replacement costs. Ex. 5; Ex. M at 14:17-24, 216:16-217:6.

**<u>RESPONSE:</u> Admitted that Agilent sent Xpedient a letter dated June 7, 2024, identifying approximately $8,054,398.96 in allegedly irreparably damaged inventory. Disputed that the June 7 letter merely "followed up" on earlier notices satisfying MOSA § 12(C)(e). The June 7 letter is expressly captioned "Agilent's Notice of Claim Pursuant to Master Operating Services Agreement" and begins: "This notice is pursuant to Section 12(C)(e) of the Master Operating Services Agreement." Significantly, the letter does not reference the February 7 email, identify any earlier notice of claim, or state that Agilent had previously complied with § 12(C)(e). Instead, it describes itself as placing Xpedient on notice of Agilent's "potential claim."**

**Moreover, notwithstanding its identification of approximately $8,054,398.96 in damaged inventory, the letter expressly acknowledges that Agilent remained unable to fully "explain XMG's liability for alleged loss or damage" or "make [a] claim for the payment of a specified or determinable amount of money" as required by the Agreement. June 7, 2024 Letter, Exh. 5 to Xpedient's Motion (Doc. # 248-5, ATI_011132).**

**Thus, Agilent's characterization of the letter as a follow-up to earlier compliant contractual notices is unsupported by the letter's language. The June 7 letter was transmitted after the expiration of the 90-day claim period, which expired no later than May 7, 2024, using February 7 as the latest possible date Agilent acquired knowledge of its loss.**

33. After Agilent asked Labcon, the tips manufacturer, in February and March 2024 to help "salvage" the impacted tips, including by shipping samples, exploring bioburden analysis, and requesting a rework and sterilization quote, Labcon concluded on March 29, 2024 that it could not make the tips fit for market and recommended scrapping them. Ex. Z.

**RESPONSE:** **Admitted that Agilent and Labcon considered salvage or rework of the impacted tips and that Labcon recommended scrapping the affected product. Disputed to the extent the assertion suggests that Labcon definitively determined on March 29, 2024, that no further assessment or mitigation was possible. Agilent's subsequent April 2024 records reflect that Labcon provided a rework quotation of $23.30 per carton, expressly declined to commit to the project at that time, and identified additional steps that could be undertaken to evaluate whether a viable mitigation path existed. Agilent continued to evaluate rework alternatives after March 29, including the technical feasibility and financial implications of reworking water-marked inventory. See Agilent Email and Presentation ATI_001007, ATI_001015–001017 attached hereto as Exhibit E; Lim Dep. 145–149 attached hereto as Exhibit F. In any event, any subsequent evaluation of salvage or rework did not postpone Agilent's earlier awareness of Product damage, the operative notice trigger under Section 12(C)(e) of the MOSA.**

34. Xpedient rejected Agilent's request to have Xpedient's liability for Product Losses under Section 12(C)(c) be up to the "value of the Products stored at the Facility." Ex. 8 at XMG_2757.

**RESPONSE:** **Admitted. Agilent proposed greater coverage and Xpedient rejected it, stating "Our limit is $1M." Exh. 8 to XMG's Motion (Doc. # 248-8, p. 25 [XMG_2757]). Agilent thereafter executed the MOSA containing the negotiated $1 million**

**per-occurrence limitation. The legal effect of this negotiation is disputed, not the occurrence of the exchange.**

35. Xpedient made Agilent delay destroying the damaged inventory so Xpedient's insurer could inspect it several times.

**<u>RESPONSE:</u> The contemporaneous documents establish that Agilent independently elected to preserve the inventory pending completion of the insurance investigations. On August 15, 2024, Agilent's counsel expressly stated that Agilent would not dispose of its damaged inventory until St. Paul, Xpedient, and Agilent's own insurer, FM Global, agreed that disposal was appropriate. On August 28, 2024, FM Global expressly instructed Agilent to continue retaining the inventory while awaiting Xpedient's adjuster's inspection. Agilent's counsel separately acknowledged that Agilent wanted to ensure there was no further need for examination before proceeding with disposal.**

**On October 24, 2024, Agilent confirmed that FM Global had completed its inspection and that Xpedient, AIG, St. Paul, and Zurich had been afforded opportunities to inspect the inventory. The following day, FM Global confirmed it had no objection to Agilent's planned disposal and expressly distinguished an opportunity to inspect from an inspection actually performed. These documents do not establish that Xpedient compelled Agilent to postpone destruction or that Xpedient's insurer conducted "several" inspections. Rather, they reflect a coordinated insurance investigation during which Agilent and its own insurer participated in decisions concerning preservation and disposal.**

Respectfully submitted,

*s/ William P. Thomas*

William P. Thomas (MS Bar No. 102209)
Andrew B. Schrack (BPR No. 037624)
**BUTLER SNOW LLP**
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7200
will.thomas@butlersnow.com
andrew.schrack@butlersnow.com

Attorneys for Xpedient Management Group, LLC

## CERTIFICATE OF SERVICE

I certify that on November 2, 2026, the foregoing was filed through the Court's CM/ECF system, which sent notice to all counsel of record.

*s/ William P. Thomas*
William P. Thomas