**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| **AGILENT TECHNOLOGIES, INC.,** | **PLAINTIFF** |
| **VS** | **CASE NO. 2:25-cv-02101-BCL-cgc** |
| **XPEDIENT MANAGEMENT GROUP, LLC,**<br>**ST.PAUL FIRE AND MARINE INSURANCE COMPANY,**<br>**COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC** | **DEFENDANTS** |
| **EXPEDIENT MANAGEMENT GROUP, LLC,** | **CROSS PLAINTIFF** |
| **VS** | |
| **ST PAUL FIRE AND MARINE INSURANCE COMPANY**<br>**and COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC** | **CROSS-DEFENDANTS** |
| **FACTORY MUTUAL INSURANCE CO., AS**<br>**SUBROGEE OF AGILENT TECHNOLOGIES, Inc.** | **PLAINTIFF** |
| **V.** | |
| **XPEDIENT MANAGEMENT GROUP, LLC**<br>**and ST. PAUL FIRE AND MARINE INSURANCE COMPANY**<br>**and COLLIERS MANAGEMENT SERVICES-MEMPHIS, LLC** | **DEFENDANTS** |

# XPEDIENT MANAGEMENT GROUP, LLC'S RESPONSES TO FACTORY MUTUAL INSURANCE COMPANY'S STATEMENT OF ADDITIONAL MATERIAL FACTS

Defendant Xpedient Management Group, LLC ("Xpedient") responds to Factory Mutual Insurance Company's ("FM") Statement of Additional Material Facts (Doc. # 269), pursuant to Local Rule 56.1, as follows. Xpedient admits only the expressly admitted portions of each statement.

**1. FACTORY MUTUAL'S ASSERTION:** Agilent transmitted a written notice of water damage to Xpedient Management Group, LLC ("Xpdeient") on February 7, 2024. See Feb. 7 notice, ATI_004078 attached as Exhibit 1.

**RESPONSE: It is undisputed that Agilent sent a February 7, 2024 email notifying Xpedient of water damage. Disputed insofar as "written notice" is intended to mean a contractual claim under MOSA § 12(C)(e).**

**2. FACTORY MUTUAL'S ASSERTION:** The February notice stated that Agilent was investigating damage to its Products and would update Xpedient when resulting costs were determined. See Id.

**RESPONSE: It is undisputed that the February 7 stated: "We will update you once the steps and resulting costs are determined." The communication did not contain a specified or determinable payment demand under MOSA § 12(C)(e).**

**3. FACTORY MUTUAL'S ASSERTION:** On March 21, 2024, Agilent requested that Xpedient provide an executive-signed final report concerning the cause of the water damage ("March 21 letter"). See March 21 letter, ATI_000923- 924 attached as Exhibit 2.

**RESPONSE: It is undisputed that Agilent requested an incident report on March 21, 2024. The request sought an explanation of the event and Xpedient's investigation, not payment of a specified or determinable sum under MOSA § 12(C)(e).**

**4. FACTORY MUTUAL'S ASSERTION:** The March 21 letter specifically requested an explanation for the lack of heat and natural gas service at the warehouse. See Id.

**RESPONSE: It is undisputed that Agilent's March 21 correspondence sought an explanation concerning the absence of heat and gas service. The request for an investigation is distinct from a monetary claim under MOSA § 12(C)(e).**

**5. FACTORY MUTUAL'S ASSERTION:** The March 21 letter asked whether the sprinkler system had been winterized and what preparations had been made before the January 2024 cold front. See Id.

**RESPONSE: It is undisputed that the March 21 letter asked about sprinkler winterization and preparations for the cold front.**

**6. FACTORY MUTUAL'S ASSERTION:** On March 29, 2024, Xpedient acknowledged via written response its receipt of Agilent's March 21 letter (the "March 29 response"). See Haynes Dep. 219:1–18, Ex. 200 attached as Exhibit 3.

**RESPONSE: It is undisputed that Xpedient sent a March 29 response acknowledging Agilent's March 21 inquiry.**

**7. FACTORY MUTUAL'S ASSERTION:** In its March 29 response, Xpedient stated that it had initiated a claim with its warehouse legal liability insurer and that the insurer would assist in assessing the timeline of events and responsibilities under the parties' agreement. See Id.

**RESPONSE: It is undisputed that Xpedient's March 29 response advised it had initiated a claim with its warehouse legal-liability insurer. Xpedient's opening of its own insurance file was not Agilent's assertion of a monetary claim under MOSA § 12(C)(e).**

**8. FACTORY MUTUAL'S ASSERTION:** Xpedient requested close collaboration between the parties' insurance and risk-management groups. See Id.

**RESPONSE: It is undisputed that Xpedient stated acknowledged a need for collaboration among the parties' insurance and risk-management teams. That request is consistent with cooperation and investigation, not an admission of legal liability.**

**9. FACTORY MUTUAL'S ASSERTION:** Xpedient stated that it was assisting Agilent with sorting and segregating Products for salvage determination and that its insurer had instructed it to submit invoices to Agilent for reimbursement of sorting and segregation expenses. See Id.

**RESPONSE: It is undisputed that Xpedient assisted with sorting and segregation and addressed reimbursement for additional labor. Disputed insofar as the assertion implies Xpedient alone determined the scope, timing, or disposition of the Products. Xpedient performed logistical segregation activities at Agilent's direction, while Agilent retained ownership and evaluated salvage and rework.**

**10. FACTORY MUTUAL'S ASSERTION:** Xpedient manager Dirk Updike prepared an internal draft response (the "internal draft") describing the events leading to the loss; the draft was not sent to Agilent. See Updike Dep. 245:24–246:3, Ex. 186 attached as Exhibit 4.

**RESPONSE: It is undisputed that Updike prepared an internal draft chronology and that the draft was not sent to Agilent in that form. Disputed that the mere existence of an unsent working draft establishes concealment, reliance, or waiver of MOSA § 12(C)(e).**

**11. FACTORY MUTUAL'S ASSERTION:** The internal draft states that gas service was capped, turned off, locked during meter-separation work, and was not restored after the meter work. See Id.

**RESPONSE: Admitted that the draft recounts gas service being capped, shut off, and locked during the landlord-coordinated gas-meter separation project and that service remained unrestored following that work but Xpedient does not concede that all facts set forth in the draft email are accurate.**

**12. FACTORY MUTUAL'S ASSERTION:** The internal draft states that Xpedient worked with an HVAC provider concerning gas service in December 2023. See Id.

**RESPONSE: Admitted that the draft describes Xpedient's contact with an HVAC provider in December 2023 but Xpedient does not concede that all facts set forth in the draft email are accurate.**

**13. FACTORY MUTUAL'S ASSERTION:** The internal draft states that both domestic-water and sprinkler lines froze and burst during the occurrence. See Id.

**RESPONSE: Admitted that the internal post-loss draft attributes the Event to freezing and rupture of domestic-water and sprinkler piping but Xpedient does not concede that all facts set forth in the draft email are accurate.**

**14. FACTORY MUTUAL'S ASSERTION:** On November 15, 2023, Xpedient's Director of Operations asked about getting the Memphis Cromwell Warehouse HVAC system examined. See Davis Dep. 326:1–22 and Davis Dep. 191:2– 7, and Ex. 163 attached as Exhibit 5.

**RESPONSE: It is undisputed that Davis inquired on November 15, 2023 about the status of HVAC inspection and Livingston confirmed Crowe Heating & Air was scheduled to visit on November 16. Davis Dep. 191:7–24, 192:10–18 Exhibit A hereto. This supports Xpedient's ongoing efforts to arrange inspection against the backdrop of landlord-coordinated roof repairs and HVAC replacement. Davis Dep. 26:17–27:17, 172:1–173:12 Exhibit A hereto.**

**15. FACTORY MUTUAL'S ASSERTION:** On December 1, 2023, the HVAC vendor advised that it could return when the gas was unlocked. See Livingston Dep. 83:2–24, 84:2–23, 87:25–88:5, and Ex. 164 attached as Exhibit 6. 4

**RESPONSE: It is undisputed that Crowe's November 16, 2023 invoice stated "need to come back and test system when they have the gas unlocked" and that Zach Livingston testified that he received that invoice on December 1, 2023.**

**16. FACTORY MUTUAL'S ASSERTION:** Xpedient's warehouse manager Livingston knew by December 1 that gas service remained locked. See Davis Dep. 327:4–13 attached as Exhibit 5. See also Livingston Dep. 259:21–25, 261:15–18 attached as Exhibit 6.

**RESPONSE: Undisputed.**

**17. FACTORY MUTUAL'S ASSERTION:** Livingston did not advise Davis that the gas remained locked. See Davis Dep. 327:14–19, 328:5–9 attached as Exhibit 5.

**RESPONSE: It is undisputed that Davis testified Livingston had not advised him the gas remained locked. Qualified: Livingston later discussed the absence of gas service with Updike, who directed him to get the gas turned on. Davis Dep. 327:14–19, 328:5–9; Livingston Dep. 191:12–192:25 Exhibit B hereto.**

**18. FACTORY MUTUAL'S ASSERTION:** Davis testified that Livingston should have informed him of the locked gas service. See Id. at 328:5–9 attached as Exhibit 5.

**RESPONSE: It is undisputed that during his deposition Davis expressed the view that Livingston should have informed him about the locked gas service.**

**19. FACTORY MUTUAL'S ASSERTION:** Xpedient did not verify that gas service or operational heat had been restored before the Water Intrusion Event. See Livingston Dep. 83:2–24, 84:2–23, 87:15–19, 88:18–25, 90:2–10 attached as Exhibit 6.

**RESPONSE: It is undisputed that Xpedient did not obtain confirmation before January 17, 2024 that gas service had been restored or that the warehouse heaters were operational. Updike Dep. 345:10–347:13. This is different from saying Xpedient took no action: after discussing the cold conditions, Updike instructed Livingston to get the gas turned on; Livingston attempted to contact MLGW but needed an account number. Livingston Dep. 191:12–192:25, 271:23–272:5 Exhibit B hereto.**

**20. FACTORY MUTUAL'S ASSERTION:** The January 17, 2024 Water Intrusion Event involved frozen and burst water and sprinkler piping. See Davis Dep. 334:14–25, 335:1–13 attached as Exhibit 5. See also Plesofsky Dep. 164:8–25, 165:1–11 as Exhibit 7.

**RESPONSE: It is undisputed that frozen and ruptured piping was involved in the January 17 water intrusion event.**

**21. FACTORY MUTUAL'S ASSERTION:** Xpedient agreed to maintain the Cromwell Warehouse and ensure that utilities serving the warehouse were operational. See Haynes Dep. 90:17–94:4 attached as Exhibit 3.

**RESPONSE: It is undisputed that Xpedient's warehouse services included facility management and utility responsibilities.**

**22. FACTORY MUTUAL'S ASSERTION:** Xpedient was responsible for providing the space where Agilent's Products were stored. See 5 Id at 175:5–9 attached as Exhibit 3.

**RESPONSE: It is undisputed that Xpedient supplied warehouse space as part of its contracted services.**

**23. FACTORY MUTUAL'S ASSERTION:** Agilent's inventory was within Xpedient's exclusive care, custody, and control. See Id. at 246:23–247:13 attached as Exhibit 3.

**RESPONSE: Admitted that Xpedient held physical custody of Products stored at the warehouse for purposes of its warehousing services. Disputed to the extent "exclusive" suggests Agilent surrendered ownership, inspection rights, or control over inventory orders and disposition. MOSA §§ 10(D), 12(B), 12(C)(d)(i), 28(B); SOA Schedule 2.**

**24. FACTORY MUTUAL'S ASSERTION:** Xpedient understood that it was responsible for contacting MLGW to establish the appropriate utility accounts. See Davis Dep. 29:16–30:6, 112:10–21 attached as Exhibit 5.

**RESPONSE: Admitted that Davis was responsible for transferring an MLGW account to Xpedient's name.**

**25. FACTORY MUTUAL'S ASSERTION:** Xpedient's Operations Manager Davis was responsible for knowing whether the warehouse systems were operational. See Id. at 324:14–325:18 attached as Exhibit 5.

**RESPONSE: It is undisputed that Davis testified that he should have been aware of what building systems were operational. Disputed insofar as the assertion equates knowledge with responsibility for operational systems.**

**26. FACTORY MUTUAL'S ASSERTION:** Davis did not confirm that the warehouse HVAC system was operational before the loss. See Id. at 324:14–325:18 attached as Exhibit 5.

**RESPONSE: It is undisputed that Davis did not personally confirm the heating system was operational before the loss. The record nevertheless reflects Davis's efforts to arrange an HVAC vendor after Colliers advised in approximately October 2023 that its roof and HVAC work was "good to go," including his November 15 inquiry concerning Crowe's visit. Davis Dep. 172:1–173:12, 191:7–24 Exhibit A hereto.**

**27. FACTORY MUTUAL'S ASSERTION:** Davis knew at the beginning of the lease that the HVAC system was not in good working order. See Id. at 96:13–97:10 attached as Exhibit 5.

**RESPONSE: It is undisputed that Davis knew at the beginning of the lease that HVAC work was ongoing and the equipment was not then in good working order. This was during landlord-coordinated roof repairs and HVAC replacement. Davis testified that "they can't do a PM if it's not functioning" and that Colliers later represented the system was "good to go." Davis Dep. 26:17–27:17, 172:1–173:12 Exhibit A hereto.**

**28. FACTORY MUTUAL'S ASSERTION:** Xpedient's normal practice was to obtain an HVAC preventive-maintenance contract when beginning operations at a new facility. See Id. at 87:18–88:10 attached as Exhibit 5.

**RESPONSE: Undisputed. Davis described Xpedient's normal practice of arranging HVAC preventative maintenance when opening a warehouse. He also explained that landlord-coordinated**

**roof repairs and HVAC unit replacements delayed its implementation at Cromwell because the system was not functioning. Davis Dep. 26:17–27:17; Xpedient's response to Agilent Fact No. 11.**

**29. FACTORY MUTUAL'S ASSERTION:** Davis did not ensure that an HVAC preventive-maintenance contract was in place at the Cromwell Warehouse before the loss. See Id. at 96:13–97:10 attached as Exhibit 5.

**RESPONSE: It is undisputed that no HVAC preventive-maintenance contract was implemented at Cromwell before the loss. Disputed insofar as this suggests Xpedient made no effort to engage HVAC services. Colliers was coordinating roof repairs and HVAC replacement; Davis was informed in October that the work was "good to go"; Crowe visited November 16 but could not test with the gas locked. Davis Dep. 26:17–27:17, 172:1–173:12, 191:7–24 Exhibit A hereto.**

**30. FACTORY MUTUAL'S ASSERTION:** The Cromwell Warehouse did not have working heat before the January 17, 2024 loss. See Id. at 325:10–14 attached as Exhibit 5.

**RESPONSE: Admitted that the warehouse lacked operational natural-gas heat immediately before the Event.**

**31. FACTORY MUTUAL'S ASSERTION:** Xpedient had no staff member responsible for monitoring weather conditions affecting the Cromwell Warehouse. See Id. at 214:22–215:7 attached as Exhibit 5.

**RESPONSE: It is undisputed that Xpedient did not have a specifically assigned employee responsible for weather monitoring. Disputed insofar as the assertion implies that the MOSA or SOA imposed a dedicated weather-monitoring staffing requirement.**

**32. FACTORY MUTUAL'S ASSERTION:** Davis did not discuss winter-weather preparedness for the Cromwell Warehouse with Livingston before the Water Intrusion Event. See Id. at 225:3–13 attached as Exhibit 5.

**RESPONSE: Undisputed.**

**33. FACTORY MUTUAL'S ASSERTION:** Xpedient had not implemented weather-preparedness practices at the Cromwell Warehouse. See Id. at 225:3–13 attached as Exhibit 5.

**RESPONSE: Undisputed.**

**34. FACTORY MUTUAL'S ASSERTION:** Xpedient had no practice for protecting its warehouses against freeze events. See Id. at 227:1– 24 attached as Exhibit 5.

**RESPONSE: It is undisputed that Xpedient did not have designated practice for warehouse freeze events.**

**35. FACTORY MUTUAL'S ASSERTION:** By December 1, 2023, Xpedient's knew the warehouse gas meter was locked. See Livingston Dep. 79:24–84:23, 86:13–90:10 attached as Exhibit 6. See also Updike Dep. 344:4–25 attached as Exhibit 4.

**RESPONSE: It is undisputed that Livingston learned by December 1 that the gas meter was locked.**

**36. FACTORY MUTUAL'S ASSERTION:** By December 1, 2023, Xpedient knew the warehouse lacked working heat. See Livingston Dep. 79:24–84:23 and 86:13–90:10 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston was aware by December 1 that the gas meter was locked, such that the gas-fired heaters could not be tested.**

**37. FACTORY MUTUAL'S ASSERTION:** Between December 1, 2023 and January 17, 2024, Xpedient did not seek or receive confirmation that gas service had been restored or that the warehouse heaters were operational. See Updike Dep. 345:10–347:13 attached as Exhibit 4.

**RESPONSE: It is undsputed that Xpedient did not verify before January 17 that the gas had been unlocked and heat restored. Disputed insofar as this implies no efforts whatsoever: Updike instructed Livingston to obtain gas service and Livingston attempted to speak with MLGW but lacked the necessary account number. Livingston Dep. 191:12–192:25, 271:23–272:5 Exhibit B hereto.**

**38. FACTORY MUTUAL'S ASSERTION:** Hours before the loss, Xpedient's on-site manager Livingston told his superior Updike that the warehouse was cold, that gas was not turned on at the warehouse, and that it was snowing in Memphis. See Livingston Dep. 182:18–184:3 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston informed Updike that the facility was cold and the gas was not on. Disputed insofar as the assertion suggests Updike failed to direct corrective action. Livingston testified that Updike "told me to get it on," and described his subsequent attempt to contact MLGW.**

**39. FACTORY MUTUAL'S ASSERTION:** During the January freeze before the loss, Livingston wore his coat inside the warehouse. See Id. at 284:20–285:5 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston testified he wore a coat indoors during the January freeze. Disputed to the extent that personal cold-weather precautions demonstrate knowledge that water stood in sprinkler pipes or that freeze protection was absent.**

**40. FACTORY MUTUAL'S ASSERTION:** The thermostats in Xpedient's leased space were under Xpedient's control. See Updike Dep. 301:16–25 attached as Exhibit 4.

**RESPONSE: Undisputed.**

**41. FACTORY MUTUAL'S ASSERTION:** Xpedient's onsite manager could control the thermostats without Colliers' or St. Paul's approval. See Id. at 302:1–303:16 attached as Exhibit 4.

**RESPONSE: Undisputed.**

**42. FACTORY MUTUAL'S ASSERTION:** Xpedient did not deploy space heaters before the loss. See Haynes Dep. 247:14–248:11 attached as Exhibit 3. See also Updike Dep. 306:4–14 attached as Exhibit 4.

**RESPONSE: It is undisputed that Xpedient did not deploy temporary space heaters to heat the warehouse floor or overhead sprinkler system before the loss.**

**43. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston did not know whether freezing weather could damage the sprinkler system. See Livingston Dep. 271:25–272:5 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston did not demonstrate specialized knowledge about sprinkler freeze protection. Disputed insofar as the assertion assumes Xpedient knew the pipes were filled with standing water or lacked protective measures.**

**44. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston did not know the minimum temperature needed to protect the sprinkler system. See Id. at 272:6–273:9 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston did not establish knowledge of a required minimum temperature for the sprinkler system. The facility's owner and fire-protection contractor were involved in maintenance of the building-wide system. Disputed if the assertion is offered to establish Xpedient's knowledge of an unprotected wet-pipe system.**

**45. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston never asked anyone about the sprinkler system before the loss. See Id at 273:10–12 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston did not make a pre-loss inquiry specifically about sprinkler freeze protection. This omission does not establish actual knowledge of a wet-pipe system or absence of freeze protection.**

**46. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston could not identify anyone at Xpedient responsible for understanding the sprinkler system. See Id. at 273:13–274:4 attached as Exhibit 6.

**RESPONSE: Undisputed that at his deposition Livingston could not identify anyone at Xpedient responsible for understanding a sprinkler system that Xpedient was not responsible for. Disputed to the extent the assertion equates Livingston's inability to identify an Xpedient sprinkler**

**specialist with proof that no other entity managed the sprinkler system. The building owner, Colliers, and the fire-protection contractor had roles concerning that system.**

**47. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston did not assess whether loss of heat would affect the sprinkler system. See Id. at 278:21–279:10 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston testified that he did not personally evaluate how lost heat could affect sprinkler piping before the loss. Disputed that this establishes Xpedient actually knew the overhead sprinkler pipes contained standing water or lacked adequate freeze protection.**

**48. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston did not investigate whether the sprinkler system could freeze before the loss and did not contact Colliers or St. Paul about the sprinkler system before the loss. See Id. at 285:18–286:2 attached as Exhibit 6.

**RESPONSE: It is undisputed that Livingston did not investigate sprinkler freeze protection or contact Colliers specifically about that issue before the water intrusion event. Disputed insofar as this is treated as proof that Xpedient knew the pipes were filled with water and unprotected.**

**49. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston acknowledged that water from the overhead sprinkler piping posed a hazard to Agilent's inventory. See Id. at 289:17–290:9 attached as Exhibit 6.

**RESPONSE: It is disputed that Livingston had any pre-loss awareness that the specific sprinkler system was continuously water-filled and endangered inventory. Livingston testified, "I didn't realize there was any kind of risk with the sprinkler system." Livingston Dep. 290:9–16.**

**50. FACTORY MUTUAL'S ASSERTION:** Xpedient's on-site warehouse manager Livingston testified he could have determined whether the sprinkler pipes contained water by calling the landlord. See Id. at 290:10–291:3 attached as Exhibit 6.

**RESPONSE: It is disputed that Livingston testified he could have asked the landlord about the sprinkler system. Disputed that a theoretical opportunity to inquire establishes pre-loss knowledge of a continuously water-filled or inadequately protected sprinkler system.**

**51. FACTORY MUTUAL'S ASSERTION:** Xpedient's Operations Manager Davis understood months before the loss that the warehouse fire-protection system involved water. See Davis Dep. 115:8–118:6 attached as Exhibit 5.

**RESPONSE: Undisputed that Davis knew, before the Event, that an account with MLGW associated with the Cromwell Warehouse was designated for fire protection and that the fire-protection system involved water. Disputed that Davis had pre-loss knowledge that the overhead sprinkler piping was continuously filled with water or that the Cromwell Warehouse employed a wet-pipe sprinkler system. Although Davis understood that the MLGW account related to fire protection, he expressly testified that he did not know what type of sprinkler system was installed at the warehouse. Davis Dep. 336:19–24 Exhibit A hereto. Thus, knowledge that the warehouse maintained an MLGW account for fire protection does not establish knowledge that its sprinkler piping contained standing water or was susceptible to freezing because of an absence of adequate freeze protection..**

**52. FACTORY MUTUAL'S ASSERTION:** Xpedient's Operations Manager Davis did not check winter weather conditions in Memphis. See Id. at 336:2–9 attached as Exhibit 5.

**RESPONSE: Undisputed.**

**53. FACTORY MUTUAL'S ASSERTION:** Xpedient's Operations Manager Davis never asked how water in the warehouse sprinkler piping was protected against freezing. See Id. at 341:14–22 attached as Exhibit 5.

**RESPONSE: Undisputed.**

**54. FACTORY MUTUAL'S ASSERTION:** Agilent asked manufacturer Labcon to help salvage the nearly 13,500 affected cases of tips on February 6, 2024. See Feb. 6. email, ATI_000407–408, attached hereto as Exhibit 8.

**RESPONSE: It is undisputed that Agilent asked Labcon in February 2024 to evaluate whether affected tips could be salvaged.**

**55. FACTORY MUTUAL'S ASSERTION:** On March 29, 2024, Labcon expressed to Agilent its substantial doubt that the contamination risks could be sufficiently mitigated and recommended scrapping the affected Products. See March 29 email, ATI_00392, attached hereto as Exhibit 9.

**RESPONSE: Disputed. Labcon expressed concern on March 29 about whether the affected Products were contaminated but Labcon nevertheless quoted a rework price of $23.30 per carton and other assessment steps.**

**56. FACTORY MUTUAL'S ASSERTION:** Manufacturer Labcon shipped samples, explored bioburden analysis and re-sterilization, and pressed for a rework quote over a two-month period following Agilent's salvage request. See ATI_003301–3313 attached hereto as Exhibit 10.

**RESPONSE: It is undisputed that Labcon explored a bioburden analysis and quoted a rework price of $23.30 per carton and other assessment steps.**

**57. FACTORY MUTUAL'S ASSERTION:** Agilent proposed that Xpedient's maximum liability for Product Losses under Section 12(C)(c) be "the greater of: the value of the Products stored at the Facility

at the time of the loss or one 10 million dollars ($1,000,000) per occurrence" during negotiations and Xpedient responded in redline, "Our limit is $1M". See XMG_2756–57 attached as Exhibit 11.

**RESPONSE: It is undisputed that Agilent proposed increasing the Product Loss limitation to the value of Products at the Facility and Xpedient rejected that alternative, stating "Our limit is $1M." Agilent subsequently executed the MOSA containing the negotiated $1 million per-occurrence cap.**

**58. FACTORY MUTUAL'S ASSERTION:** On March 21, 2024, Agilent requested an incident report signed by an executive member of Xpedient that included a timeline of events that predated and lead up to the incident, an explanation of the incident and its cause, and Xpedient's response and subsequent actions. See Exhibit 2.

**RESPONSE: It is undisputed that Agilent requested an incident report and chronology on March 21, 2024. This request sought information about the event and its causes, not a specified or determinable monetary payment demand under MOSA § 12(C)(e).**

**59. FACTORY MUTUAL'S ASSERTION:** On March 29, 2024, Xpedient sent a single page letter, omitting the timeline and stating that it "share[d] Agilent's need for answers" and was "working with the building property management company and local utility company on the timeline of events," and that it had already "initiated a claim with [its] warehouse legal liability insurance carrier." See Id.

**RESPONSE: It is undisputed that Xpedient's March 29 response was a one-page letter that did not contain the chronology and stated that Xpedient shared Agilent's desire for answers and was working with its insurer. Disputed that the omission alone establishes intentional concealment or excuses the obligation to submit a timely monetary claim under MOSA § 12(C)(e).**

**60. FACTORY MUTUAL'S ASSERTION:** Xpedient paid the vendor's invoice on January 9, 2024, which stated, "Need to come back and test system when they have the gas unlocked." See Livingston Dep. 87:22–88:20, and Ex. 164 attached as Exhibit 6.

**RESPONSE: It is undisputed that the Crowe invoice was marked paid and contained the statement, "Need to come back and test system when they have the gas unlocked." Livingston testified that the invoice was marked paid.**

Respectfully submitted,

_*/s/William P. Thomas*_______________________
William P. Thomas (MS Bar No. 102209)
Andrew B. Schrack (BPR No. 037624)
**BUTLER SNOW LLP**
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7200
will.thomas@butlersnow.com
andrew.schrack@butlersnow.com

Attorneys for Xpedient Management Group, LLC

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2026, the foregoing was filed through the Court's CM/ECF system, which sent notice to all counsel of record.

*s/ William P. Thomas*
William P. Thomas