**255126IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**AGILENT TECHNOLOGIES, INC.,**
**Plaintiff,**

**v.**

**XPEDIENT MANAGEMENT GROUP, LLC; ST. PAUL FIRE AND MARINE INSURANCE COMPANY; and COLLIERS MANAGEMENT SERVICES - MEMPHIS, LLC,**
**Defendants.**

**No. 2:25-cv-02101-BCL-cgc**

**Judge Brian C. Lea**
**Magistrate Judge Charmaine Claxton**

**JURY DEMANDED**

---

**XPEDIENT MANAGEMENT GROUP, LLC,**
**Cross-Plaintiff,**

**v.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY and COLLIERS MANAGEMENT SERVICES - MEMPHIS, LLC,**
**Cross-Defendants.**

---

**FACTORY MUTUAL INSURANCE CO., as subrogee of Agilent Technologies, Inc.,**
**Plaintiff,**

**v.**

**XPEDIENT MANAGEMENT GROUP, LLC; ST. PAUL FIRE AND MARINE INSURANCE COMPANY; and COLLIERS MANAGEMENT SERVICES - MEMPHIS, LLC,**
**Defendants.**

**Consolidated with:**
**No. 2:25-cv-02424-BCL-tmp**

---

**XPEDIENT MANAGEMENT GROUP, LLC'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

Agilent Technologies, Inc. ("Agilent") offers three inconsistent ways around the MOSA's written-claim requirement. It calls its February 7 email a timely claim even though no claim was made. Instead that email sought information and deferred discussion of costs. Alternatively, it contends that the ninety days had not begun because Agilent did not know until March 29 that the inventory was a total loss. And failing those positions, it alleges Xpedient withheld information and therefore cannot enforce the deadline. None of these arguments change the contract's trigger—awareness of any loss or damage—or its distinct requirement of a written claim for payment. February 7 is the ***latest*** date Xpedient contends the deadline could have begun, not a concession that Agilent lacked the requisite knowledge in January.

Agilent also seeks to escape the MOSA's $1 million per-occurrence cap. It expressly requested greater liability, was told "Our limit is $1M," signed the agreement anyway, and documented its plan to insure the excess itself. It now relies principally on a 1984 New York trial-court decision to undo that negotiated allocation. But Tennessee's revised warehouse statute expressly permits monetary limits, uses different language from the statute governing carriers, and operates within a UCC that respects commercial freedom of contract.

Finally, Plaintiffs attempt to convert possible ordinary negligence into gross negligence from the fact that the warehouse lacked heat. The loss, however, involved failures of building piping, including a sprinkler system inspected and maintained through the landlord's property manager. The record does not establish that Xpedient received Colliers' specific 40°F warning or understood the sprinkler system to be continuously water-filled and unprotected. Even if a culpability question remains for trial, the Court should determine the independent contractual limitation and damages-allocation issues under Rule 56.

**I. Plaintiffs did not timely present the written claim for payment required by the MOSA.**

**A. Knowledge of damage triggered the deadline no later than February 7, 2024.**

Section 12(C)(e) requires written claims for lost or damaged Products ninety days after it knew or reasonably ***should have known*** of "any such loss or damage." The claim notice must identify the Products, explain Xpedient's alleged liability, and "make claim for the payment of a specified or determinable amount of money." The MOSA states that "[n]o action may be maintained" without a timely written claim.[1] Tennessee permits reasonable warehouse provisions governing the time and manner of presenting claims. Tenn. Code Ann. § 47-7-204(c).

Agilent's January 19–25 communications already described water entering stored Products and identified affected pallets.[2] Thus, Xpedient's position is that knowledge—and the contractual clock—arose before February 7. *At the very latest*, Agilent indisputably knew of damage by February 7, when it reported that Products had "experienced water damage."[3] Even using that latest possible trigger, the ninety days expired May 7, 2024. The contract turns on awareness of damage, not final determination that inventory is unsalvageable. Its allowance for a "determinable" amount accommodates continued investigation of salvage, replacement cost, and valuation. Agilent cannot postpone the trigger until Labcon's March 29 recommendation to scrap the Products.

**B. The February 7 email reported damage but did not assert a claim for payment.**

Agilent's email was titled "Agilent Water Damage Notice"—and that is what it was. Mulryan described damage and ongoing mitigation efforts but promised: "We will update you once the steps and resulting costs are determined."[4] Under "In the interim," he sought the cause

[1] MOSA § 12(C)(e), Exh. 1 to XMG's Motion for Summary Judgment (Doc. # 248-1, pages 5-6 [XMG_3255–56])

[2] January 2024 Agilent emails, Exh. 3 to XMG's Motion (Doc. # 248-3, pages 1–2 [ATI_000470–71]).

[3] February 7 Mulryan email, Exh. 4 to XMG's Motion (Doc. # 248-4, page 1 [ATI_004078]).

[4] February 7 Mulryan email, Exh. 4 to XMG's Motion (Doc. # 248-4, page 1 [ATI_004078]).

of the incident, repair and prevention plans, and weekly meetings. He did not demand reimbursement, assert any payment obligation, or make a claim for even a determinable sum. Xpedient does not require a particular form, express citation to the MOSA, or a final dollar calculation. It requires the substance the parties specified: *a claim for payment*. The March 21 request for an executive-signed incident chronology concerning gas, heat, and winterization similarly sought information, not payment.[5] Knowledge of the incident by Xpedient or its insurer cannot substitute for Agilent's contractually required claim.

Nor does substantial compliance cure the omission. *Andrews Distributing Co. v. Oak Square at Gatlinburg, Inc.*, 757 S.W.2d 663, 668–69 (Tenn. 1988), addressed procedural imperfections in writings that communicated a claim and amount. Here, the absent element is substantive: neither timely writing claimed payment. A request for the information needed to decide whether and how to make a later claim is not the claim itself.

**C. Agilent's contemporaneous communications confirm the distinction—and the June claim was late.**

Agilent's own conduct corroborates the email's words. On February 2, Mulryan explained that Agilent was "not filing a claim with Xpedient for this product yet" while assessing possible salvage.[6] On February 8, the author of the alleged February 7 claim wrote: "I am not aware of any claims being filed, or insurance adjusters arriving on site yet."[7] That statement gives no indication that Mulryan regarded his previous email as a payment claim.

More significantly, on April 26—while time still remained under Xpedient's latest possible May 7 deadline—Factory Mutual's adjuster reviewed the MOSA, estimated an

---

[5] March 21 Agilent letter, Exh. S to Agilent's Statement of Additional Material Facts (Doc. # 274-19, page 2 [ATI_000924]).

[6] February 2 Mulryan emails, Exh. C to XMG's Response to Agilent's Statement of Additional Undisputed Facts [ATI_002865–66] (Doc. # 292-3).

[7] February 8 Mulryan email, Exh. 3 to XMG's Motion (Doc. # 248-3, page 3 [ATI_000472]).

approximately $8 million loss, identified a heating and freeze-protection theory of Xpedient's responsibility, and recommended that Agilent "file claim with XMG per the terms and conditions of the MOSA" and provide "formal written notice." Agilent's Nita Baindur circulated that recommendation, planned to confer with Aon, and asked which Agilent lawyer should handle it.[8] The adjuster did not definitively rule out earlier communications; the significance is that Agilent then possessed sufficient information to assert a contingent monetary claim and was still arranging to do so.

Agilent finally sent a letter titled "Agilent's Notice of Claim Pursuant to Master Operating Services Agreement" on June 7—thirty-one days after May 7. Unlike the February email, it invoked § 12(C)(e), attributed potential responsibility to Xpedient, and reported approximately $8,054,398.96 in damaged inventory.[9] Even that letter stated that Agilent could not fully explain liability or make a specified or determinable payment claim in the contractual terms. *Id.*[10] The contrast confirms that the February communication reported an occurrence; it did not make the written payment claim required within ninety days of awareness of damage.

**D. Neither alleged concealment nor an earlier breach excuses failure to claim payment.**

Plaintiffs allege that Xpedient withheld an internal chronology showing the gas had remained locked and failed to provide a complete explanation in its March 29 response.[11] Xpedient does not claim that the chronology was furnished. But estoppel requires detrimental reliance that caused noncompliance—not merely an incomplete explanation. *Irving Pulp &*

---

[8] April 26 Baindur email, Exh. D to XMG's Response to Agilent's Statement of Additional Undisputed Facts [ATI_011552–53] (Doc. # 292-4).
[9] June 7 Agilent Notice of Claim, Exh. 5 to XMG's Motion (Doc. # 248-5, page 1 [ATI_011132]).
[10] XMG Opening Memorandum (Doc. # 259, page 10).
[11] Agilent Opp'n (Doc. # 271, pages 9–11); Factory Mutual Opp'n (Doc. # 267, pages 15–16).

*Paper, Ltd. v. Dunbar Transfer & Storage Co.*, 732 F.2d 511, 514–15 (6th Cir. 1984). Xpedient made no promise to pay or extend the notice period in its March 29 letter.[12]

In fact, by February 2 Agilent had attributed the event to cold weather and stagnant water and noted a similar incident at another Agilent facility.[13] And the April 26 insurer correspondence identified the reportedly nonoperational heat, discussed the 40°F protection issue, estimated the loss, and proposed a liability theory and claim language before May 7. Those statements were the insurer's assessment, not admissions by Xpedient; they nonetheless refute the suggestion that Agilent could not assert a monetary claim without Xpedient's internal chronology. Agilent also possessed contractual, reasonably scheduled rights to inspect the warehouse and inventory.[14]

Agilent's assertion that Xpedient materially breached the agreements first fares no better. In particular, Agilent contends that Xpedient breached the SOA because Zach Livingston devoted time to other company responsibilities rather than working exclusively at the Cromwell Warehouse. But the SOA contains no such requirement. It states that Xpedient "intends to operate the facility with 1 working manager"; it does not require that manager to devote 100% of his time to Agilent, prohibit other responsibilities, or remain physically present at every moment. Indeed, the agreement expressly anticipates circumstances in which no Xpedient employee will be present.[15] Agilent cannot transform its expectation of a dedicated, full-time employee into a contractual obligation the parties never agreed upon. Nor do its broader allegations of negligent warehouse management or inadequate cooperation automatically excuse compliance with §

---

[12] Exh. T to Agilent's Statement (Doc. # 274-20, page 4 [ATI_001950]).

[13] February 2 Mulryan emails, Exh. A to XMG's Response to Agilent's Statement of Additional Undisputed Facts [ATI_002865–66] (Doc. # 292-3).

[14] MOSA §§ 12(B), 28(B), Exh. 1 to XMG's Motion (Doc. # 248-1, pages 4, 12 [XMG_3254, XMG_3262]).

[15] SOA, Exh. 2 to XMG's Motion (Doc. # 248-2 [XMG_2926]).

12(C)(e). Otherwise, virtually every alleged breach resulting in Product Loss would eliminate the very claim-presentment requirement specifically negotiated to govern such losses. *Lee Masonry, Inc. v. City of Franklin*, 2010 WL 1713137, at *9–10 (Tenn. Ct. App. Apr. 28, 2010), does not compel that result.

Nor does the insurance-policy notice-prejudice rule announced in *Alcazar v. Hayes*, 982 S.W.2d 845 (Tenn. 1998), establish an actual-prejudice requirement for this negotiated commercial warehouse claim condition. The MOSA requires written payment presentment, not merely notice sufficient to permit an investigation; Agilent did not provide it within the contractual period.

## II. The parties' $1 million per-occurrence limitation governs the Product Loss.

### A. The MOSA preserves a remedy, caps damages, and binds the subrogee.

MOSA § 12(C)(a) imposes a duty of reasonable care and defines Product Replacement Cost as actual manufacturing or acquisition cost, less salvage. Section 12(C)(c) sets Xpedient's "maximum liability" for Product Loss at $1 million per occurrence, and § 12(C)(d)(ii) excludes losses exceeding that limit.[16] Tennessee expressly permits warehouse agreements to limit "the amount of liability" for loss or damage, except for conversion "to its own use," which is not alleged here. Tenn. Code Ann. § 47-7-204(b). Official Comment 2 recognizes limits measured per occurrence, rather than only by item or weight.

### B. The text of Article 7 does not make rejection of a higher limit fatal to the agreed cap.

Agilent argues that because it requested greater liability protection and Xpedient declined, § 47-7-204(b) invalidates the cap. The statute does not say that. It authorizes contractual limits, expressly makes them ineffective for conversion to the warehouse's own use,

[16] MOSA, Exh. 1 to XMG's Motion (Doc. # 248-1, page 5 [XMG_3255]).

and provides that upon a bailor's request recorded at signing, liability "may be increased" and higher rates "may be charged." It does not expressly require a warehouse to accept the request, furnish a premium quotation, or forfeit its agreed ceiling if it declines. Tenn. Code Ann. § 47-7-204(b). Those omissions are significant when the same Article expressly conditions a *carrier's* limitation on a consignor's opportunity to declare a higher value and notice of that opportunity. Tenn. Code Ann. § 47-7-309(b). The Legislature used an express "if" condition for carriers; it did not do so for warehouses.

The UCC also expressly respects freedom of contract. Tenn. Code Ann. § 47-1-302(a), (c); U.C.C. § 1-302 cmt. 1. Parties may vary its provisions unless otherwise restricted, though they may not disclaim duties of good faith, diligence, reasonableness, or care. Tenn. Code Ann. § 47-1-302(b). The MOSA preserves Xpedient's reasonable-care duty and caps the amount recoverable for Product Loss. Freedom of contract cannot override a mandatory statutory condition; the question is whether § 47-7-204(b) imposes the additional condition Agilent proposes. Unlike § 47-7-309(b), it does not expressly do so. Xpedient's construction gives meaning to the request mechanism without converting a *rejected proposal* into a unilateral power to nullify the subsequently executed agreement.

*Hearst Corp. v. Bonded Services, Inc.*, 124 Misc. 2d 455, 457–58, 476 N.Y.S.2d 733 (Sup. Ct. 1984), does not decide that question. It interpreted former UCC § 7-204(2) and declined to enforce a $5-per-reel limitation appearing on recurring invoices where the original contract or receipt was not produced and no opportunity to increase liability at a stated charge was shown. The former provision used a per-item or weight-based limitation and a higher-valuation proviso. Tennessee's 2008 revision permits a limit on the amount of liability, separates the permissive increased-valuation language, and, according to Official Comment 2,

accommodates per-occurrence ceilings. The former statute also used permissive wording; the revision alone therefore does not dispose of the issue. The decisive additional distinction is that *Hearst* did not concern an express rejection of a proposed increase followed by an informed, individually negotiated agreement accepting the lower limit. Nor did it decide the significance of Tennessee's differently worded carrier provision or § 47-1-302.

Here Agilent proposed liability equal to the greater of the Products' value or $1 million. Xpedient rejected that request: "Our limit is $1M." May 9, 2023 negotiation/redline,."[17] Xpedient does not contend it offered a higher amount at an additional quoted rate. The parties disagreed; Agilent nonetheless signed. Its Legal and Procurement personnel reviewed the MOSA, and its internal approval memorandum expressly recognized Xpedient's $1 million maximum and stated that "Agilent's insurance policy will cover the difference in loss."[18] XMG corrects the erroneous statement in its opening memorandum that Agilent never requested a higher limit. Agilent did; XMG rejected it.[19]

That allocation reflects the commercial function of warehouse limits: permitting parties to allocate insurance risk in advance. *Mitsui & Co. (USA), Inc. v. Hudson Tank Terminals Corp.*, 790 F.2d 226, 234 (2d Cir. 1986). *Mitsui* involved an increased-valuation option and did not decide the rejected-request question; its insurance rationale is nevertheless apt. Factory Mutual's own adjuster described Xpedient's contractual exposure as "$1,000,000 per occurrence" when recommending a formal claim.[20] That is not a binding legal concession, but it confirms the negotiated cap was understood during claim evaluation. Agilent's rule would allow a bailor to

[17] Exh. 8 to XMG's Motion (Doc. # 248-8, page 25 [XMG_2757]).

[18] May 2023 review emails, Exh. 7 to XMG's Motion (Doc. # 248-7, pages 1-2 [XMG_3343–44]); Agilent Contract Summary, Exh. 9 to XMG's Motion (Doc. # 248-9, page 2 [ATI_006893]).

[19] XMG Opening Memorandum (Doc. # 259, page 10).

[20] April 26 Baindur email, Exh. B to XMG's Response to Agilent's Statement of Additional Undisputed Facts [ATI_011552–53] (Doc. #292-4).

seek a higher limit, accept its rejection, execute and insure around the lower limit, and then invalidate the agreement because its proposal was refused. Neither Article 7's text nor *Hearst* requires that result.

**C. Plaintiffs' allegations support, at most, ordinary negligence—not automatic gross negligence.**

Tennessee distinguishes ordinary negligence from gross negligence or recklessness. *Lawson v. Hawkins County*, 661 S.W.3d 54, 61–63 (Tenn. 2023). Gross negligence requires an extreme lack of care supporting conscious indifference; recklessness requires conscious disregard of a substantial, unjustifiable risk. The Sixth Circuit affirmed summary judgment on gross-negligence claims while allowing ordinary-negligence issues from the same transaction to proceed. *Menuskin v. Williams*, 145 F.3d 755, 766–67 (6th Cir. 1998). Its explanation is apt: "Negligence does not become 'gross' just by saying so." *Id.* at 767 (quoting *Jones v. Sherrill*, 827 F.2d 1102, 1106 (6th Cir. 1987)). *Menuskin*, relying on *Buckner v. Varner*, 793 S.W.2d 939, 941 (Tenn. Ct. App. 1990), also rejects the contention that gross negligence invariably goes to a jury. The evidence must support the *heightened* inference, viewed favorably to Plaintiffs.

Plaintiffs emphasize that Xpedient knew gas service remained locked, failed to verify restoration of heat, and received warnings of cold conditions. But the SOA prescribed no minimum storage temperature for these Products; the water damage came from failing sprinkler and domestic-water piping, not direct exposure of pipette tips to cold air.[21] The landlord and Colliers arranged the physical separation of the building's gas service, and the restoration process involved MLGW.[22] That does not absolve Xpedient from ensuring its own utilities

[21] SOA, Exh. 2 to XMG's Motion (Doc. # 248-2).
[22] Colliers Discovery Responses, Exh. 14 to XMG's Motion (Doc. # 248-14, pages 2–4).

worked, but it complicates Plaintiffs' attempt to characterize the problem as a conscious decision to expose inventory to known water damage.

The overhead fire-suppression system was a building-wide system inspected and maintained through Colliers and Security Fire—not a system Xpedient designed or serviced.[23] NFPA 25 (2020) §§ 4.1.1–4.1.2 assign maintenance and freeze-protection responsibility for water-filled fire-suppression piping to the property owner or designated representative and recognize a minimum 40°F temperature where appropriate alternative protection is lacking. See also NFPA 25 §§ 4.1.2.1–4.1.2.4 (including accepted alternative protection methods). Security Fire's January 4 inspection recommended maintaining 40°F and identified Colliers' property manager as contact; Colliers has identified no record that it forwarded that recommendation to Xpedient before the loss.[24] Depending on the system's design, freeze-protection measures can include appropriate insulation, listed heat tracing, antifreeze, or a dry-pipe arrangement; Xpedient does not suggest those alternatives were actually installed here. But Xpedient did not manage the fire-suppression system, and it cannot reasonably be expected to look up at overhead sprinkler pipes and know that they were continuously filled with water, lacked adequate freeze protection, or failed to satisfy applicable NFPA standards. Those are matters of system design, configuration, and maintenance—not facts apparent from the presence of overhead piping.

Nor does the cited deposition testimony show that Xpedient actually knew this sprinkler system contained standing water without adequate freeze protection. Updike testified: "We didn't know that the sprinkler system had water in it."[25] Livingston did not understand the wet/dry distinction and explained that an inquiry about water in the pipes would have required

---

[23] Colliers Discovery Responses (Doc. # 248-14, pages 4–6).

[24] Security Fire Report, Exh. 15 to XMG's Motion (Doc. # 248-15, pages 1, 3); Colliers Discovery Responses (Doc. # 248-14, pages 9–11).

[25] Updike Dep. 353:24–25, Exh. D to Agilent's Statement (Doc. # 274-4, page 37).

him first to "think that water's in those pipes in the first place."[26] Davis understood that the fire-protection utility account involved water but testified that he did not know the type of sprinkler system.[27]

Knowledge of the existence of sprinklers or their general water supply does not automatically establish knowledge that overhead pipes were continuously filled and unprotected from freezing. On this record, Xpedient seeks judgment on the asserted gross-negligence and recklessness theories rather than a finding that every aspect of its facility management was faultless.

**D. The statutory amount limit remains different from an exculpation clause.**

Plaintiffs invoke Tennessee's rule against contractual exemption from gross negligence, recklessness, or intentional wrongdoing. *Copeland v. HealthSouth/Methodist Rehab. Hosp., LP*, 565 S.W.3d 260, 270 (Tenn. 2018); *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 154 (Tenn. 2021). Xpedient recognizes that Tenn. Code Ann. § 47-1-103(b) preserves supplemental common-law principles unless displaced. But those cases address exculpation, whereas § 47-7-204(b) expressly authorizes monetary warehouse limitations. Here Xpedient remains subject to a reasonable-care duty and a substantial $1 million direct-damages remedy; liability is limited, not erased. *Heather James, LLC v. Day & Meyer, Murray & Young Corp.*, 142 A.D.3d 842, 842–43, 37 N.Y.S.3d 524 (1st Dep't 2016), held that gross negligence alone did not defeat an Article 7 warehouse limit. *Western Mining Corp. v. Standard Terminals, Inc.*, 577 F. Supp. 847, 851–52 (W.D. Pa. 1984), similarly rejected a gross-negligence exception. *Butler Manufacturing Co. v. Americold Corp.*, 835 F. Supp. 1274, 1281–83 (D. Kan. 1993), went the other way under Kansas law. *Signal Pump, LLC v. Arrow Electronics, Inc.*, No. E2024-

[26] Livingston Dep. 286:10–15, 302:10–12, Exh. 6 to Factory Mutual's Statement (Doc. # 269).
[27] Davis Dep. 118:2–6, 336:19–24, Exh. 5 to Factory Mutual's Statement (Doc. # 269).

01376-COA-R3-CV (Tenn. Ct. App. Apr. 17, 2026), applied New York law to a limitation functioning as practical exculpation; it did not decide Tennessee's Article 7 question. The Court should enforce the ceiling independently, or at least resolve its application to claims not dependent on aggravated misconduct.

**III. The MOSA independently allocates or excludes the claimed ancillary expenses.**

**A. Section 6(B) assigns facility and relocation expenses to Agilent.**

Agilent seeks reimbursement of approximately $1,118,632 in SOA payments made after the January 2024 loss, through May 1, 2026, arguing that Xpedient's alleged breach destroyed the inventory and rendered the contracted warehouse services unnecessary. Agilent also seeks $5,281 to relocate undamaged Products.[28] But the parties expressly addressed who would bear facility and relocation expenses following an event disrupting warehouse operations.

MOSA § 6(B), entitled "Facility Relocation," applies when "any event" causes a premature loss of use or possession of a facility, expressly including "a partial closure, termination for cause or convenience, [or] Force Majeure event." In that circumstance, the parties agreed that expenses for transporting Products to and from the original or alternate facility, together with "rent and all other expenses associated with the Facility," would "be paid for by Customer."[29] Agilent argues that § 6(B) concerns only neutral events, not losses caused by Xpedient's alleged wrongdoing. But the provision says "any event" and expressly includes termination "for cause." Agilent cannot read into the clause an exception the parties did not negotiate.

The SOA independently establishes Agilent's continuing fixed-payment obligation. Schedule 5 expressly provides that "[f]ixed costs will be billed on the first of the month,

---

[28] Agilent Opp'n (Doc. # 271, pages 18–19); Grudzien Supplemental Report, Exh. AA to Agilent's Responses (Doc. # 272-1, page 3).

[29] MOSA § 6(B), Exh. 1 to XMG's Motion (Doc. # 248-1, page 2 [XMG_3252]).

regardless of volume," distinguishing those charges from variable fees based on actual activity.[30] Agilent therefore cannot establish recoverable damages merely by showing that inventory volume declined or that it continued paying the agreed fixed charges after the loss. To the extent Agilent claims premature loss of the facility's use, § 6(B) governs qualifying relocation and facility expenses; to the extent it claims payments for unnecessary services, Schedule 5 expressly distinguishes fixed charges from activity-based fees. The Court should enforce those allocations and exclude the $5,281 relocation claim and any SOA charges that Agilent was contractually required to bear, while requiring Agilent to identify any genuinely distinct payments for services not provided.

**B. Section 18(B) expressly excludes incidental damages.**

Factory Mutual attempts to avoid the MOSA's damages exclusion by distinguishing "incidental" damages from "consequential" damages. It argues that § 12(C)(e) expressly excludes consequential damages but omits incidental damages, supposedly leaving inventory-counting, disposal, and replacement-related expenses recoverable as direct or incidental losses. That argument overlooks another express provision of the same agreement.

Section 18(B) provides that "[b]oth Parties agree to waive any right to claim as losses or damages, for any reason," including claims for "indemnification, breach of contract, or otherwise," any "indirect, special, incidental, or consequential damages," and damages exceeding the agreed contractual limits.[31] Although § 18(B) appears under the heading "Indemnification," its language expressly reaches claims for breach of contract "or otherwise" and is not limited to third-party indemnification demands.

---

[30] SOA Schedule 5, Exh. 2 to XMG's Motion (Doc. # 248-2, page 9 [XMG_2930]).
[31] MOSA, Exh. 1 to XMG's Motion (Doc. # 248-1, page 9 [XMG_3258]).

Factory Mutual is correct that incidental and consequential damages are legally distinct categories. But that distinction does not help it where the parties expressly excluded both. Section 12(C)(e)'s omission of the word "incidental" cannot override § 18(B)'s affirmative inclusion of that term. The provisions must be read together, giving effect to the parties' express exclusion rather than treating one provision's silence as permission to recover damages prohibited by another.

**C. Plaintiffs' additional expenses must satisfy the agreed Product Replacement Cost measure.**

Plaintiffs also contend that expenses incurred to identify, dispose of, and replace damaged inventory are necessarily recoverable because they resulted directly from the water intrusion.[32] But the MOSA does not provide for reimbursement of every expenditure connected with damaged inventory. Section 12(C)(a) defines recoverable "Replacement Cost" as Agilent's "actual Product manufacturing cost or acquisition cost to replace the lost or damaged Products at their pre-loss condition, less salvage value, if any."[33] That agreed measure must be considered together with § 18(B)'s exclusion of incidental and consequential damages.

Agilent seeks $103,773 in disposal costs and $64,227 for inventory counting. Plaintiffs characterize these as necessary expenses of identifying damaged inventory and mitigating the loss. But counting, evaluating, and disposing of Products are separate post-loss services, not themselves the manufacturing or acquisition cost of replacement Products. Agilent also seeks $170,419 in replacement freight, calculated using a two-percent historical-cost estimate.[34] Any properly established Product Replacement Cost remains subject to the single $1 million per-occurrence limitation.

---

[32] Agilent Opp'n (Doc. # 271, pages 18–19); Factory Mutual Opp'n (Doc. # 267, pages 26–29).
[33] MOSA, Exh. 1 to XMG's Motion (Doc. # 248-1, page 6 [XMG_3255]).
[34] Grudzien Report, Exh. 13 to XMG's Motion (Doc. # 248-13, pages 6–7).

Factory Mutual separately seeks $335,446 for industrial-hygiene services ($318,478), salvage services ($12,248), and forensic accounting ($4,720). *Id.*, pages 9–10. Factory Mutual argues that some services involved contamination assessment and mitigation rather than ordinary insurance adjustment.[35] But Factory Mutual sues as Agilent's subrogee and acquires no greater contractual rights than Agilent possessed. Expenses incurred solely to investigate, value, or adjust Factory Mutual's insurance claim do not become recoverable Product Losses merely because they concern the same occurrence. Any expense genuinely incurred to mitigate physical Product damage must be separately identified, supported by evidence, and measured against the MOSA's Replacement Cost definition, damages exclusions, and liability limit. The Court should exclude nonrecoverable categories and resolve undisputed components even if a particular expense requires further proof.

**CONCLUSION**

Xpedient requests summary judgment enforcing the written-payment-claim condition of § 12(C)(e). Alternatively, it seeks enforcement of one $1 million per-occurrence ceiling against Agilent and Factory Mutual; judgment on heightened-culpability theories; enforcement of §§ 6(B) and 18(B); and adjudication of the specified expense categories. If necessary, the Court should enter separate legal and undisputed-fact determinations under Rule 56(a) and (g). Xpedient does not seek judgment on its crossclaims or admit liability.

---

[35] Factory Mutual Opp'n (Doc. # 267, pages 28–29).

Respectfully submitted,

*/s/William P. Thomas*
William P. Thomas (MS Bar No. 102209)
Andrew B. Schrack (BPR No. 037624)
**BUTLER SNOW LLP**
6075 Poplar Avenue, Suite 500
Memphis, Tennessee 38119
Telephone: (901) 680-7200
will.thomas@butlersnow.com
andrew.schrack@butlersnow.com

Attorneys for Xpedient Management
Group, LLC

**CERTIFICATE OF SERVICE**

I certify that on November 2, 2026, the foregoing was filed through the Court's CM/ECF system, which sent notice to all counsel of record.

*/s/William P. Thomas*
William P. Thomas