# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

AGILENT TECHNOLOGIES, INC.,

Plaintiff,

vs. Case No. 2:25-CV-02101-bcl-cgc

XPEDIENT MANAGEMENT GROUP, LLC,
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AND COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Defendants.

---

XPEDIENT MANAGEMENT GROUP, LLC,

Cross-Plaintiff,

vs.

ST. PAUL FIRE AND MARINE INSURANCE
COMPANY and COLLIERS MANAGEMENT
SERVICES - MEMPHIS, LLC,

Cross-Defendants.

---

(Caption continued on page 2.)

Deposition of

NATHANIEL HAYNES
Individually and 30(b)(6)

September 3, 2026

10:00 a.m.

Reported by:
Julie Lyle, RPR, LCR
Job No. 10199263

**that you have in front of you?**
A. This is the expert report on --
MR. THOMAS: From Xponent.
THE WITNESS: From Xponent.
MR. THOMAS: It's the pricing experts.
THE WITNESS: Yep.
BY MS. McDONALD:
**Q. Okay.**
A. The Kachura Engineering expert report. And the Robert J. Moran, CLP, report on -- what was this one?
MR. THOMAS: It's the warehousing expert.
THE WITNESS: Yeah, the warehousing expert.
BY MS. McDONALD:
**Q. Okay. Thank you.**
A. Welcome.
**Q. And you understand you're appearing in two separate capacities today, correct?**
A. Yes.
**Q. You're obviously appearing in your individual capacity, and you've also been designated by Xpedient as a corporate representative under Rule 30(b)(6) in regards to certain topics --**

A. Yes.
Q. -- is that correct?
And I know that you've seen the amended notice of deposition that we've marked as Exhibit 175.
And you understand that, when you answer a question on a notice topic, you're answering for Xpedient as a company, not just for yourself, correct?
A. Correct.
Q. And you understand your obligation was to educate yourself on the notice topics, including on matters of which you have no personal knowledge?
A. Yes.
Q. And that obligation includes reviewing Xpedient's documents even if you never saw them at the time?
A. Understand.
Q. Great.
And speaking with Xpedient employees who do have personal knowledge? Do you understand?
A. Yes.
Q. Great.
And besides the Xpedient current and former employees that you identified, did you speak with

**anyone else outside of the organization or your counsel to prepare for today's deposition?**
A. No.
**Q. And can you describe your educational background.**
A. Bachelor's of Accountancy.
**Q. And where did you receive that degree?**
A. Ohio University.
**Q. And did you attend graduate school or do you hold any advanced degrees?**
A. I do not.
**Q. Do you hold any professional licenses or certifications?**
A. I do not.
**Q. And you're currently employed by Xpedient, correct?**
A. I am.
**Q. When did you begin working for Xpedient?**
A. June of 2018. Yes.
**Q. Okay. And what is your current title?**
A. CFO.
**Q. And how long have you held this role?**
A. A year or so, I think. Maybe less. I don't know. I don't know what's -- let me give you a better answer. It's been less than a year, I'd say.

Q. Okay. So sometime mid to late last year, you were --
A. It's probably been about a year.
Q. Okay.
-- you were promoted to CFO?
A. Correct.
Q. And what was your title before that?
A. Senior vice president of finance.
Q. Okay. And how long were you in the role of senior vice president of finance?
A. Two to three years maybe.
Q. What role with Xpedient did you hold before that?
A. Vice president finance.
Q. And how long were you in that role?
A. Three to four years. Should be about eight --
Q. Okay.
A. -- if you add it up.
Q. Thank you --
A. Welcome.
Q. -- for my math. I didn't go into law because I love math.
Okay. And so VP of finance was the title that you had when you joined Xpedient, correct?

**Q. And how have your responsibilities changed since being promoted to CFO?**

A. I built a team that has allowed me to be more strategic, and so the team does more work than -- does the work now that I used to do. So it's part of building a business, and progressing is being able to be more strategic in your role.

**Q. And how many -- do you have any understanding how many people are currently employed by Xpedient?**

A. Last I checked, there were 467 people in the U.S. and 49 in Canada.

**Q. And would those numbers have been roughly the same in 2023?**

A. They were a bit more then.

**Q. Okay.**

MR. BUTLER: I'm sorry. You said "more then"?

THE WITNESS: There were more then at that time.

MR. BUTLER: Thanks.

BY MS. McDONALD:

**Q. And how many more then in 2023?**

A. Less than 100.

**Q. Okay.**

A. How many more? There would have been, let's

the transcript. We were all sitting here. But I think her question is, substantively, was it Alicia Lyle's job to assess sprinkler systems or something to that effect.

THE WITNESS: It is not her job to do that.

BY MS. McDONALD:

**Q. Okay. Did she have any obligation -- or any responsibility in 2023 to assess what Xpedient's obligations were under a lease agreement?**

A. That wasn't part of her responsibility, no.

**Q. Okay. And did Ernie Neumann report to you?**

A. He did not.

**Q. Okay. And I know you testified that in 2023, Xpedient had around, say, 550, 600 employees, correct, between the U.S. and Canada?**

A. I don't think we were ever over 600, but ballpark is fine, I guess.

**Q. We can call it 500.**

**So of those 500 employees, how many held the title of director of operations in 2023, to the best of your recollection?**

A. Probably two or three. I don't think it ever really got higher than that. Maybe four if we're talking senior director. It's not something I

regularly keep track of.
**Q. And would you agree that given that there were only two to three people within the company in 2023 that held the name of director of operations, that that was a pretty senior role within Xpedient?**
MR. THOMAS: Object to form.
THE WITNESS: I don't know what "senior role" typically means. I don't know what that is.
BY MS. McDONALD:
**Q. Where were they in the hierarchy of the company in 2023?**
MR. THOMAS: Are you just asking him personally? Because I don't believe this is a topic.
MS. McDONALD: Yeah, that's fine. Just personally. We noticed him in an individual capacity.
MR. THOMAS: If you know or if you can answer the question.
THE WITNESS: They're upper to middle part of the organization if you look from top to bottom.
BY MS. McDONALD:
**Q. Okay. And how many employees, to your knowledge, are above them in 2023?**

A. From an operational perspective or from a total like ranking of role --
**Q. From an operational perspective.**
A. I'd say, from an operational perspective, three maybe.
**Q. Okay. And what about as to the company as a whole?**
A. What about it?
**Q. So the same question. So not limited to an operational perspective.**
A. Can you repeat your question, please?
**Q. Sure. How many people were above the -- in the company hierarchy were above directors of operation in 2023?**
A. I don't know. Five, six maybe.
**Q. Okay.**
A. I don't -- we have owners and CFO and -- anyway.
**Q. Okay. And what about warehouse manager? In 2023 on the operations side, how many people would be above the warehouse manager?**
A. How many people would be above the warehouse manager?
**Q. Or let me start over, actually.**
**In 2023, how many warehouse managers did**

**Xpedient employ, to the best of your recollection?**
A. I don't recall.
**Q. More than 10?**
A. Yes.
**Q. More than 20?**
A. Maybe.
**Q. And in 2023, how many safety managers did Xpedient employ?**
A. Probably one dedicated.
**Q. And that would be Mr. Livingston?**
A. He was partial, yes. I wouldn't say "dedicated." He was partially safety.
**Q. Was there anyone else that also held that role in 2023?**
A. In terms of title?
**Q. (Nods head.)**
A. No.
**Q. And in 2024, did Mr. Livingston retain the title of safety manager?**
A. I'd have to go look at the records.
**Q. And then my recollection from Mr. Updike's testimony yesterday was that a safety manager was slightly above a warehouse manager in terms of the Xpedient hierarchy.**
**Would you agree with that?**

A. Say it again, please.
**Q. Sure. That a safety manager in the Xpedient hierarchy was slightly above a warehouse manager.**
A. I would say that a safety manager possesses an understanding that could be above the understanding of a normal warehouse manager.
**Q. Okay.**
A. But that doesn't mean from a hierarchy, they're technically above or below. They just possess a different skill set.
**Q. Well, they possess a skill set, correct, of the warehouse manager, plus additional skills; is that accurate?**
A. Not necessarily. They could. You could have somebody that is better at safety than they are at running a warehouse or vice versa.
**Q. So in Mr. Livingston's case, was he better at safety than ran running a warehouse?**
MR. THOMAS: Object to form.
THE WITNESS: I don't -- I didn't -- I was never qualifying Mr. Livingston and his skills.
BY MS. McDONALD:
**Q. And in 2023, on the operations side in the Xpedient hierarchy, how many employees were above the safety manager and warehouse managers?**

MR. THOMAS: Again, you're just asking for his personal knowledge?
MS. McDONALD: Yep, just his personal knowledge.
THE WITNESS: How many people were above?
BY MS. McDONALD:
**Q. On the operations side.**
A. Five or six.
**Q. Okay. And what about as to the company as a whole?**
A. What do you mean? I don't understand.
**Q. Sure.**
A. What's the question?
**Q. So we -- the way that I understood your testimony was that above -- on the operations side of Xpedient's business, above -- there was about five to six people above the safety manager and the warehouse managers.**
A. Okay.
**Q. And then I know that you made a distinction between operations and the company generally. So as to the company generally, how many people were above safety managers and warehouse managers?**
MR. THOMAS: And just so we're clear,

this is all estimations, correct?
MS. McDONALD: Estimations, yeah, in 2023.
THE WITNESS: How many -- can you repeat it one more time, please? I'm trying to understand and answer you the best I can here, and I don't understand the question necessarily.
MS. McDONALD: Would you mind repeating back the question? Or I'll just reask it.
BY MS. McDONALD:
**Q. So in 2023 --**
A. Okay.
**Q. -- how many Xpedient employees in the Xpedient hierarchy were above warehouse and safety managers?**
A. From the operations?
**Q. No.**
A. Total?
**Q. Total.**
MR. THOMAS: If you know.
THE WITNESS: I don't -- I mean, from -- if you're including all of the business, it was more than five or six.
BY MS. McDONALD:
**Q. Okay.**

A. Because those are the people that support, right?

**Q. Uh-huh.**

A. I'll have to say between six and ten people. And I don't know what you mean by "above," but I'm just saying maybe those --

**Q. Well, so the --**

A. What is your definition of "above"?

**Q. They're more senior within the company and have more responsibilities.**

**Like would you agree that, say, Mr. White is above a safety manager at Xpedient?**

A. I would.

**Q. Okay. And you would agree that your role is above a safety manager at Xpedient?**

A. I would.

**Q. And would you agree that a director of operations is above a safety manager at Xpedient?**

A. Typically.

**Q. Okay. And in the case of Mr. Livingston in 2023, would a director of operations be considered more senior to Mr. Livingston?**

A. Yes.

**Q. So in 2023, Mr. Davis was more senior to Mr. Livingston; is that correct?**

**Q. Okay. And you're aware that, as of November 16, 2023, Crowe had communicated to Mr. Livingston that the gas meter was locked, correct?**

A. I know that now.

**Q. Okay. So you would agree that the meter was locked at this point, correct?**

A. Yeah, probably.

**Q. Do you have any understanding why Mr. Davis wasn't 100 percent certain the meter was locked?**

A. I can't speak for what Mr. Davis is 90 or 100 or 105 percent --

**Q. Okay.**

A. -- on.

MS. McDONALD: And then I'm going to mark as Exhibit 197 -- this is another email from Mr. Davis to you and Mike St. Denis containing some notes regarding a call Mr. Davis had with MLGW.

(Exhibit 197 was marked.)

BY MS. McDONALD:

**Q. Does this appear to be a true and correct copy?**

A. Yep.

**Q. And why was Mr. Davis sending updates to both you and Mike St. Denis?**

THE WITNESS: Same response. I don't have any record of anybody complaining about the temperature in the warehouse.
BY MS. LEZU:
**Q. Okay. Okay. Under the lease, Xpedient was responsible for paying all utility services including gas, correct?**
A. Usage, the consumption, and setting up of the accounts and the cost of that, yes.
**Q. And Colliers told Xpedient that it was Xpedient's responsibility to get the accounts transferred and the services activated, correct?**
MR. THOMAS: Object to the form of the question. It's not exactly what --
THE WITNESS: I believe there was dialogue around one account.
MR. THOMAS: It's not a topic.
THE WITNESS: But I don't -- it wasn't a very clear situation, as we've gone through.
Typically, a landlord lays utilities in our lap.
BY MS. LEZU:
**Q. But either way, on November 16, 2023, Xpedient knew the gas meter serving its side of the building was locked, correct?**

MR. THOMAS: Objection. Not a topic.

THE WITNESS: I believe Zach Livingston understood that at that time.

BY MS. LEZU:

**Q. And after learning that it was locked, Xpedient dealt directly with MLGW to get the gas service activated, correct?**

MR. THOMAS: Objection. It's not a topic. To the extent he knows.

THE WITNESS: I'm sorry?

BY MS. LEZU:

**Q. After learning -- oh, sorry.**

A. Go ahead. What was the question again?

**Q. I was just --**

A. What was the statement?

**Q. Yeah. After learning the meter was locked, Xpedient dealt directly with MLGW to get the gas service activated, correct?**

MR. THOMAS: Objection. Not a topic.

THE WITNESS: I don't know what time period you're talking about. I can't answer the question.

BY MS. LEZU:

**Q. After November 16, 2023, after they determined that the gas meter on their side was**

COURT REPORTER'S CERTIFICATE

STATE OF TENNESSEE:

I, JULIE K. LYLE, Licensed Reporter for the State of Tennessee, CERTIFY:

1. The foregoing deposition was taken before me at the time and place stated in the foregoing styled cause with the appearances as noted;

2. Being a Court Reporter, I then reported the deposition stenographically to the best of my skill and ability, and the foregoing pages contain a full, true and correct transcript of my said stenographic notes then and there taken;

3. I am not in the employ of and am not related to any of the parties or their counsel, and I have no interest in the matter involved.

WITNESS MY SIGNATURE, this, the 14th day of September, 2026.

JULIE LYLE, RPR, LCR
LCR Number: 850
Expiration: 6/30/2028