# EXHIBIT 14

Inviscid
Consulting

**CONFIDENTIAL EXPERT REPORT**

**Agilent Technologies, Inc.**
(Plaintiff)
v.
**Xpedient Management Group, LLC and**
**St. Paul Fire and Marine Insurance Company**
(Defendants)

and

**Factory Mutual Insurance Company,**
**as subrogee of Agilent Technologies, Inc.**
(Plaintiff)
v.
**Xpedient Management Group, LLC and**
**St. Paul Fire and Marine Insurance Company**
(Defendants)

United States District Court for the Western District of Tennessee
Western Division at Memphis

Case No. 2:25-cv-02101-MSN-cgc
consolidated with
Case No. 2:25-cv-02424-MSN-tmp

Prepared by
Stephen T. Hopper, P.E.

Prepared for
Reed Smith LLP and Smith Cashion & Orr, PLC

February 17, 2026

## Table of Contents

Table of Contents ........ 2

Professional Qualifications ........ 3

Assignment by Counsel ........ 5

Introduction and Factual Background of the Case ........ 7

Professional Opinions ........ 9

Warehousing Industry Practices Regarding Cold Weather ........ 9

Compliance with Warehousing Industry Practices – Xpedient ........ 16

Compliance with Warehousing Industry Practices – St. Paul ........ 25

Personal Declarations and Closing Comments ........ 31

Appendix A: Sources Considered ........ 32

Appendix B: Curriculum Vitae of Stephen T. Hopper, P.E. ........ 35

## Professional Qualifications

My name is Stephen (Steve) T. Hopper, P.E., and I am Founder and Principal with Inviscid Consulting (Inviscid), an industrial engineering and management consulting firm.[1] As an independent, objective, and unbiased consultant, my consulting services include advising my clients regarding planning and improving warehousing, fulfillment, distribution, and logistics operations. I have never been employed by either the plaintiffs or the defendants in this case.

I earned a Bachelor of Industrial Engineering (BIE) degree from the Georgia Institute of Technology (Georgia Tech) in 1986. I am a licensed and registered Professional Engineer (P.E.).[2] In addition to my traditional consulting work with Inviscid, I have served as an advisor and expert witness in litigation involving supply chain operations in the US, Canada, and Australia. I have also advised private-equity and venture-capital firms regarding supply chain operations. Occasionally I also author articles for industry publications, speak at industry events, and give interviews for the supply chain industry media.

Additional details about my qualifications are shown in my current curriculum vitae (CV), which is provided in Appendix B of this report. My CV also includes publications I have authored, as well as a list of all the cases in which I have testified as an expert at deposition or trial. My education, knowledge, training, skills, work experience, and related qualifications are directly relevant to this case.

My time is being billed as follows:

---

[1] https://www.inviscidconsulting.com.
[2] https://gapelsb.evokeplatform.com/app/verification/license/64940.

- Remote, pretrial work is billed at $840 per hour.

- In-person, pretrial work is billed at $890 per hour.

- Participation or testimony at depositions or trial is billed at $940 per hour.

## Assignment by Counsel

I have been retained by Reed Smith LLP ("Reed Smith") and Smith Cashion & Orr, PLC ("SCO"), the law firms serving as legal counsel for the plaintiffs. Reed Smith and SCO asked me to review the case materials and to provide my professional opinions with respect to certain specific questions outlined in this report.

My compensation is in no way contingent upon my professional opinions stated herein or upon the outcome of the case. My professional opinions stated in this report are my true, accurate, and independent opinions based on a reasonable degree of professional certainty, and they are drawn from the following:

- My review of the facts of this case as I understand them, ascertained by my review of the case materials made available to me by Reed Smith, SCO, or otherwise requested by me, as outlined in Appendix A of this report or otherwise cited in this report;

- My review of publicly available information;

- My education, knowledge, training, skills, work experience, and related qualifications as a full-time industrial engineer specializing in the field of warehousing, fulfillment, distribution, and logistics operations;

- Relevant standards published by organizations and thought leaders in the logistics industry;

- Generally accepted and common practices of the warehousing, fulfillment, distribution, and logistics industry; and

- My decades of professional experience, including consulting engagements with hundreds of clients who operate warehousing, fulfillment, distribution, and logistics operations.

As of the date of this report, I understand that fact discovery in this case remains ongoing. Accordingly, I reserve the right to amend and supplement this report, and the opinions contained herein, as additional evidence, testimony, and other information related to this matter may become available to me or be found by me.

During trial, I may use demonstrative exhibits containing information related to or referenced in this report.

## Introduction and Factual Background of the Case

Agilent Technologies, Inc. ("Agilent") provides instruments, software, services, and consumables for laboratories.[3] Factory Mutual ("FM") is a property-and-casualty insurer that specializes in loss prevention services for large corporations, particularly in the property insurance market.[4]

Xpedient Management Group, LLC ("Xpedient") is a full-service third-party logistics (3PL) provider.[5]

St. Paul Fire & Marine Insurance Company ("St. Paul") is a property-and-casualty insurer that operates within the Travelers insurance group as a wholly owned subsidiary of The Travelers Companies, Inc.[6]

This consolidated lawsuit arises from a significant winter water damage loss event ("Water Intrusion Event") at a facility owned by St. Paul, located at 4601 Cromwell Avenue in Memphis, Tennessee. The Water Intrusion Event occurred on or about January 17, 2024.[7]

Agilent retained Xpedient to store and handle Agilent's inventory at this facility as described under the terms of the *Master Operating Services Agreement for Logistics*

---

3 https://www.agilent.com/about/companyinfo/index.html.
4 https://www.fm.com/.
5 https://xpedient.com/.
6 https://www.travelers.com/about-travelers/travelers-history.
7 *First Amended Complaint* (Agilent), November 3, 2025.

*Services* (MOSA) and its accompanying *Appendix 1 Site Operating Agreement* (collectively, "the Agreements.[8,9]

In connection with the services it agreed to provide for Agilent under the Agreements, Xpedient executed a commercial lease ("Lease Agreement") with St. Paul for a sub-portion of the facility (the "Cromwell Warehouse").[10] Based on the evidence I reviewed, including correspondence, work orders, and invoices, Colliers International ("Colliers") served as St. Paul's representative and property management company for the facility.[11] The Lease Agreement also identifies Colliers by name, repeatedly references the role of a "property manager," and characterizes the "property manager" as an "agent" of St. Paul.[12,13]

I have been asked to assume that the Water Intrusion Event resulted in the destruction of inventory owned by Agilent while it was under the possession and control of Xpedient and stored in the facility owned, managed, and controlled by St. Paul. Consequently, Agilent filed a lawsuit against Xpedient and St. Paul seeking to recover its losses sustained as a result of the Water Intrusion Event.[14] Based on payments it made to Agilent for certain losses resulting from the Water Intrusion Event, FM, as Agilent's subrogated property insurer, also filed a lawsuit against Xpedient and St. Paul seeking to recover its subrogated losses.[15]

---

[8] *Master Operating Services Agreement for Logistics Services between Xpedient Management Group, LLC and Agilent Technologies Inc.*, May 19, 2023.
[9] *Appendix 1 Site Operating Agreement*, May 19, 2023.
[10] *Standard Commercial Lease*, May 19, 2023.
[11] https://www.colliers.com/.
[12] XMG_2050.
[13] XMG_2055.
[14] *First Amended Complaint* (Agilent), November 3, 2025.
[15] *Complaint* (FM), April 17, 2025.

## Professional Opinions

Based on my review and analysis of the facts of this case, my professional opinions are outlined below, based on a reasonable degree of certainty in the field of warehousing, fulfillment, distribution, and logistics.

### Warehousing Industry Practices Regarding Cold Weather

1. **Is it customary in the warehousing industry to winterize warehouse facilities?**

   Yes.

   The warehousing industry regards the freezing of water pipes and fire-protection components, such as wet pipe sprinkler systems, as a foreseeable risk that requires reasonable preventive measures.[16,17] It is therefore customary for warehouse owners and operators with facilities in colder climates to "winterize" facilities (i.e., to take measures to prevent freeze-related damage to building systems in colder months).

[16] *Winterizing Your Sprinkler System*, NFPA, October 10, 2019.
[17] *9-18 Prevention of Freeze-Ups, Property Loss Prevention Data Sheets*, Factory Mutual Insurance Company, July 2022.

**2. What are the generally accepted industry standards and practices of warehouse owners and operators related to winterizing warehouse facilities, including the maintenance and protection of sprinkler systems, domestic pipes, and HVAC systems, particularly in regions subject to freezing temperatures?**

In freeze-prone regions such as Memphis, Tennessee (where the Cromwell Warehouse is located), winterization practices include (but are not limited to) the following cold-weather controls:[18,19]

- Maintaining adequate heat (for example, above 40°F);
- Providing interim heat sources if a sufficient HVAC system is not available;
- Sealing drafts and providing adequate insulation to protect pipes from freezing;
- Tracking temperatures and providing low-temperature alarms; and
- Inspecting and monitoring the HVAC system to ensure fuel (e.g., natural gas) is available and that it is working properly before and during freezing events.

---

[18] Ibid.
[19] *Cold-Climate Buildings Design Guide*, Second Edition, ASHRAE, 2022.

**3. Was the Cromwell Warehouse that St. Paul leased to Xpedient winterized in accordance with the generally accepted customs and practices of the warehousing industry in or around January 2024?**

No.

I have seen no evidence that any winterization practices, such as the ones I identified in response to Question 2, were ever followed by either Xpedient or St. Paul at the Cromwell Warehouse before the Water Intrusion Event occurred in January 2024, at least with respect to maintaining reasonable heat and implementing controls to prevent pipes from freezing when heat was uncertain.

Xpedient admitted the following:

- That "the gas meter serving the Cromwell Warehouse was locked from November 17, 2023 until April 1, 2024;"[20]

- That at least 60 days prior to the Water Intrusion Event, it knew the meter was locked;[21]

- That "at the time of the Water Intrusion Event…no portable heaters were located in the Cromwell Warehouse area leased by Xpedient;"[22]

---

[20] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1.
[21] Ibid., at Response to Request No. 2.
[22] Ibid., at Response to Request No. 5.

- That "there was ongoing uncertainty and lack of clarity…regarding responsibility for gas metering, inspections, and activation necessary to commission the HVAC system."[23]

These facts clearly indicate that the portion of the Cromwell Warehouse that St. Paul leased to Xpedient was not winterized in accordance with the generally accepted customs and practices of the warehousing industry in or around January 2024.

**4. Did Xpedient and St. Paul's conduct in preparing the Cromwell Warehouse for the January 2024 winter storm fail to meet the generally accepted customs and practices of the warehousing industry and reasonable standards of care?**

Yes.

I have seen no evidence that Xpedient and/or St. Paul prepared adequately for the major winter storm that occurred in Memphis in January 2024, at least with respect to maintaining reasonable heat and implementing controls to prevent pipes from freezing when heat was uncertain.

On or around January 8, 2024, approximately nine days before the Water Intrusion Event occurred, Memphis Light, Gas, and Water ("MLGW"), the municipal public utility serving the City of Memphis, issued a news release

[23] Ibid., at General Response Applicable to All Requests.

advising its customers that "severe weather [was] expected" that week, "including high winds, freezing temperatures, and possible snow."[24]

In early-to-mid January 2024, the week before the Water Intrusion Event occurred, national news outlets warned of a major winter storm that was anticipated in the central and southern United States.[25,26,27]

On January 15, 2024, approximately two days before the Water Intrusion Event occurred, the National Weather Service issued a Wind Chill Advisory for the Memphis area, cautioning that there was a risk of "dangerously cold wind chills below 0°F."[28]

Also on January 15, 2024, the Mayor of the City of Memphis, Paul Young, declared a State of Emergency regarding "the severe winter weather impacting the City of Memphis" and "resulting in freezing temperatures and several inches of snow accumulation."[29] The state of emergency was originally to be in effect for seven days through January 22, 2024, but it was later extended through January 29, 2024.[30]

In spite of these public warnings from the local utility, national news outlets, the National Weather Service, and local government officials, Xpedient and St. Paul failed to prepare the Cromwell Warehouse for the oncoming storm.

---

[24] https://www.mlgw.com/news/news_jan2024preparedforsevereweather.
[25] https://www.npr.org/2024/01/13/1224616521/extreme-weather-us-blizzard-flooding-storms.
[26] https://www.cnn.com/2024/01/14/weather/south-winter-storm-arctic-blast-monday.
[27] https://www.cnn.com/2024/01/16/weather/winter-storm-snow-northeast-tuesday.
[28] https://storymaps.arcgis.com/stories/65054344o8f143d4950180d2777084a3.
[29] https://www.localmemphis.com/article/weather/severe-weather/shelby-county-memphis-mayors-state-of-emergency-snow-freezing-temps/522-f14d0f4e-961e-45d5-98de-42c322ba3d23.
[30] Ibid.

Xpedient admitted the following:

- That "the gas meter serving the Cromwell Warehouse was locked from November 17, 2023 until April 1, 2024;"[31]
- That at least 60 days prior to the Water Intrusion Event, it knew the meter was locked;[32]
- That "at the time of the Water Intrusion Event…no portable heaters were located in the Cromwell Warehouse area leased by Xpedient;"[33]
- That "there was ongoing uncertainty and lack of clarity…regarding responsibility for gas metering, inspections, and activation necessary to commission the HVAC system."[34]

Based on the evidence I reviewed, St. Paul also knew the following about the Cromwell Warehouse before January 17, 2024:[35,36]

- That the gas meter was locked;
- That the HVAC system was unable to deliver heat; and

[31] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1.
[32] Ibid., at Response to Request No. 2.
[33] Ibid., at Response to Request No. 5.
[34] Ibid., at General Response Applicable to All Requests.
[35] Colliers_00140-144.
[36] Colliers_00293-312.

- That temperatures must be maintained above 40°F in the winter months to protect the wet sprinkler system.

It is also my understanding that St. Paul understood the importance of maintaining heat in the facility. Xpedient admitted that St. Paul "informed [Xpedient] that portable heaters were being utilized by [St. Paul] or [Colliers] in vacant portions of the" facility.[37] Plus, St. Paul also knew that the gas meter remained locked until April 2024.[38]

These facts are inconsistent with the reasonable standards of care with respect to warehouse owners and operators preparing for severe cold-weather conditions, especially in 3PL warehouses containing customer inventory. Clearly Xpedient and St. Paul's conduct in preparing the Cromwell Warehouse for the January 2024 winter storm failed to meet the generally accepted customs and practices of the warehousing industry.

---

[37] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 4.
[38] St.Paul000049.

**Compliance with Warehousing Industry Practices – Xpedient**

5. **During the seven-month period after the Agreements were executed, did Xpedient comply with the generally accepted customs and practices of the warehousing industry regarding ensuring that the gas meter was properly connected, the gas line was unlocked, the gas regulator was functioning properly, and the HVAC system was in good working order, to mitigate the risk of damage due to cold weather?**

No.

Based on the evidence I reviewed, Xpedient substantially deviated from the generally accepted customs and practices of the warehousing industry. 3PL providers are expected to do the following:

- Establish and maintain appropriate, reliable, functional, and adequately maintained HVAC systems, especially when their customers' inventory is foreseeably exposed to damage from cold weather;
- Implement interim safeguards and controls when heat is uncertain (e.g., temporary heat where permitted, low-temperature alarms, increased monitoring and inspections); and
- Communicate foreseeable risks related to noncompliant and/or deteriorating heating conditions to the customer.

If a natural gas-heated warehouse facility has water pipes and/or a wet pipe sprinkler system, then an appropriate system to be provided by the 3PL

provider would certainly be expected to include an unlocked and functioning meter and a functioning gas supply line, especially when water pipes and inventory are foreseeably exposed to cold-weather damage.

However, Xpedient admitted the following:

- That "the gas meter serving the Cromwell Warehouse was locked from November 17, 2023 until April 1, 2024;"[39]

- That at least 60 days prior to the Water Intrusion Event, it knew the meter was locked;[40]

- That "at the time of the Water Intrusion Event…no portable heaters were located in the Cromwell Warehouse area leased by Xpedient;"[41]

- That "there was ongoing uncertainty and lack of clarity…regarding responsibility for gas metering, inspections, and activation necessary to commission the HVAC system."[42]

I also reviewed various email correspondence, work orders, and invoices showing that Xpedient was aware of these issues but failed to act on them. Xpedient had received notice of the locked gas line, the malfunctioning gas

---

[39] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1.
[40] Ibid., at Response to Request No. 2.
[41] Ibid., at Response to Request No. 5.
[42] Ibid., at General Response Applicable to All Requests.

regulator, and the inoperable HVAC system, and the need to take mitigating action.

For example, on November 15, 2023, Xpedient scheduled an appointment for Crowe Services ("Crowe") to address the HVAC issues on November 16, 2023.[43] The following day, Crowe Services sent a technician to the Cromwell Warehouse to service the HVAC system.[44] The invoice for that visit stated that the Crowe technician "[n]eed[ed] to come back and test system when they have the gas unlocked."[45,46] The Crowe invoice clearly notified Xpedient that the HVAC system could not even be tested until the gas line was unlocked.

Despite this explicit notice, Xpedient failed to have the gas unlocked before the Water Intrusion Event occurred. Two months after the visit by Crowe's technician, and mere hours before the Water Intrusion Event occurred, Zachary Livingston ("Livingston"), a Safety Manager with Xpedient, sent an internal email requesting "a copy of the invoice for MLGW, I need to contact them to get our gas line unlocked."[47]

In addition, these communications indicate that Xpedient understood that measures could be taken to prevent damage, even in the absence of a working HVAC system. For example, on March 17, 2024, two months after the Water Intrusion Event occurred, Dirk Updike ("Updike"), Senior Director of Operations with Xpedient, texted Shellie Moses ("Moses") of Colliers, stating,

---

[43] XMG_1434.
[44] XMG_1431.
[45] CROWE_00012.
[46] XMG_2192.
[47] XMG_1437.

"Zach [Livingston] just told me we are going to be below freezing there tomorrow night. We've had a request in with MLGW for 3 weeks and no gas yet. Do we need to drain lines?"[48] The following day, Updike emailed Moses, stating that "Xpedient's plan for tonight is to get 4 space heaters setup in the warehouse, 10-20 feet clear of any items as suggested."[49,50]

These communications also indicate that Xpedient understood the generally accepted customs and practices of the warehousing industry regarding mitigating the risk of damage due to cold weather. Yet Xpedient failed to do so before the Water Intrusion Event occurred.

These facts are inconsistent with the expectations of a 3PL provider. Clearly, therefore, Xpedient substantially deviated from the generally accepted customs and practices of the warehousing industry, described previously, with respect to its duty to ensure that the gas meter was properly connected, the gas line was unlocked, the gas regulator was functioning properly, and the HVAC system was in good working order, to mitigate the risk of damage due to cold weather.

---

[48] XMG_1790.
[49] Colliers_00053.
[50] St.Paul000062.

6. **During the seven-month period after the Agreements were executed, did Xpedient comply with the generally accepted customs and practices of the warehousing industry regarding sufficiently warning Agilent about the lack of heat, the locked gas meter, and the inoperable HVAC system?**

No.

Based on the evidence I reviewed, Xpedient substantially deviated from the generally accepted customs and practices of the warehousing industry. 3PL providers are expected to warn their customers about risks to inventory, such as the risk of a malfunctioning HVAC system at a warehouse facility during the winter months.

If a natural gas-heated warehouse facility has water pipes and/or a wet pipe sprinkler system, the customer of a 3PL provider would certainly expect to be warned about cold-weather risk conditions (e.g., lack of reliable heat, a locked gas meter, a malfunctioning HVAC system) a reasonable time before cold weather arrives, especially when water pipes and inventory are foreseeably exposed to cold-weather damage.

However, Xpedient admitted the following:

- That at least 60 days prior to the Water Intrusion Event, it knew the meter was locked;[51]

[51] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 2.

- That "in the sixty (60) days prior to the Water Intrusion Event it had no communication with Agilent regarding the status of the HVAC system at the Cromwell Warehouse;"[52] and

- That "it did not represent to Agilent that it had definitive confirmation… that a gas meter was locked during that period."[53]

These facts are inconsistent with the expectations of a 3PL provider. Clearly, therefore, Xpedient substantially deviated from the generally accepted customs and practices of the warehousing industry, described previously, with respect to its duty to warn Agilent regarding the lack of heat, the locked gas meter, and the inoperable HVAC system.

**7. During the seven-month period after the Agreements were executed, did Xpedient comply with the generally accepted customs and practices of the warehousing industry regarding safeguarding Agilent's inventory?**

No.

As with other forms of outsourcing, businesses usually contract with 3PL providers to manage their supply chain operations because they either do not have the internal resources to manage them, or because their internal resources do not have sufficient expertise and experience to do so.

---

[52] Ibid., at Response to Request No. 8.
[53] Ibid., at Response to Request No. 3.

Consequently, the supply chain industry generally recognizes 3PL providers to be among the most respected experts in supply chain management, and 3PL providers serve a vital purpose within the supply chain ecosystem.

The supply chain industry generally recognizes 3PL providers to be among the most respected experts in supply chain management, and 3PL providers are expected to be among the most competent managers of warehousing operations. For example:

- The International Warehouse Logistics Association (IWLA) describes 3PL warehouses as "an integral part of the domestic and international supply chain" that "ensure[s] the security and safety of products moving through their hands."[54]

- The Council of Supply Chain Management Professionals (CSCMP), the largest professional organization for individuals in the supply chain industry, stated in its 29th Annual (2025) *Third-Party Logistics Study* that "(3PL customers) have high expectations of their logistics and supply chain service providers" and that "their relationships [with 3PL providers] are successful and that both sides experience positive benefits."[55]

- *The Wall Street Journal*, published an article stating that "[p]artnering with a world-class 3PL makes competitive sense because it accesses experts who know how to efficiently move goods across suppliers,

[54] https://iwla.com/iwla-legislative-agenda/.
[55] *Third-Party Logistics Study*, 29th Annual Edition, CSCMP, 2025.

> vendors, and customers. It also offers a level of control that previously may have been lacking."[56]

Based on the evidence I reviewed, Xpedient substantially deviated from the generally accepted customs and practices of the warehousing industry. 3PL providers are expected to safeguard their customers' inventory while it is in their possession and control.

If a customer hires a 3PL provider and places its inventory under the care and control of a 3PL provider, then the 3PL provider is fully responsible for the customer's inventory, even if the 3PL provider does not take title to the goods. The Uniform Commercial Code (UCC) stated that "a warehouse is liable for damages for loss of or injury to the goods caused by its failure to exercise care with regard to the goods that a reasonably careful person would exercise under similar circumstances."[57] (Note: The UCC defines "Warehouse" as "a person engaged in the business of storing goods for hire.")[58]

However, Xpedient admitted the following:

- That "the gas meter serving the Cromwell Warehouse was locked from November 17, 2023 until April 1, 2024;"[59]

---

[56] "Busting 3PL Myths," *The Wall Street Journal*, June 28, 2017.
[57] UCC § 7-204.
[58] UCC § 7-102(a)(13).
[59] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1.

- That at least 60 days prior to the Water Intrusion Event, it knew the meter was locked;[60]

- That "at the time of the Water Intrusion Event…no portable heaters were located in the Cromwell Warehouse area leased by Xpedient;"[61]

- That "there was ongoing uncertainty and lack of clarity…regarding responsibility for gas metering, inspections, and activation necessary to commission the HVAC system."[62]

In addition to the materials noted above, I reviewed various documents and communications that noted prolonged issues relating to the lack of heat at the Cromwell Warehouse and the steps taken (or discussed) to restore service.

These facts are inconsistent with the expectations of a 3PL provider. Clearly, therefore, Xpedient substantially deviated from the generally accepted customs and practices of the warehousing industry, described previously, with respect to its duty to safeguard Agilent's inventory.

---

[60] Ibid., at Response to Request No. 2.
[61] Ibid., at Response to Request No. 5.
[62] Ibid., at General Response Applicable to All Requests.

**Compliance with Warehousing Industry Practices – St. Paul**

**8. In Xpedient's portion of the Cromwell Warehouse, during the seven-month period after the Lease Agreement was executed, did St. Paul comply with the generally accepted customs and practices of the warehousing industry regarding ensuring that the utilities were properly transferred to Xpedient?**

No.

Based on the evidence I reviewed, St. Paul substantially deviated from the generally accepted customs and practices of the warehousing industry. Landlords (lessors) of industrial facilities are expected to ensure that utilities are properly transferred to their tenants (lessees).

Under the standard practices of the warehousing industry, the tenant is typically responsible for requesting and establishing utility accounts directly with the utility providers (e.g., natural gas, electricity, water). The landlord, however, is typically responsible for providing functional, metered connections for these utilities, so the tenant can access the necessary services.

The Lease Agreement between St. Paul and Xpedient stated the following:

- That "Lessor shall provide the normal utility service connections with separate metering for Lessee premises to the building;"[63] and

[63] *Standard Commercial Lease*, May 19, 2023, at § 4.01.

- That "the fire system, plumbing, electrical and heating, ventilation and air conditioning systems currently serving the Leased Premises (collectively, the "Mechanicals") shall be in good working order" at the commencement of the Lease Agreement.[64]

However, Xpedient admitted that "the gas meter serving the Cromwell Warehouse was locked from November 17, 2023 until April 1, 2024."[65]

Based on the evidence I reviewed, St. Paul also knew the following about the Cromwell Warehouse before January 17, 2024:[66,67]

- That the gas meter was locked;
- That the HVAC system was unable to deliver heat; and
- That temperatures must be maintained above 40°F in the winter months to protect the wet sprinkler system.

It is also my understanding that St. Paul understood the importance of maintaining heat in the facility. Xpedient admitted that St. Paul "informed [Xpedient] that portable heaters were being utilized by [St. Paul] or [Colliers] in

[64] Ibid., at § 5.06.
[65] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1.
[66] Colliers_00140-144.
[67] Colliers_00293-312.

vacant portions of the" facility.[68] Plus, St. Paul also knew that the gas meter remained locked until April 2024.[69]

This fact indicates that natural-gas service at the facility St. Paul leased to Xpedient was not connected for an extended period—nearly a year after the Lease Agreement was executed. This was evident from the locked meter and from the fact that the natural-gas service remained disconnected.

Under the generally accepted customs and practices of the warehousing industry, one would expect a landlord, whether directly or through its property management company, to manage the property actively and efficiently, including ensuring that the utilities are properly connected and that HVAC systems are operable. However, I reviewed various email correspondence showing that St. Paul was aware of the locked meter and HVAC problems from the commencement St. Paul's Lease Agreement with Xpedient, but St. Paul repeatedly failed to act on them.

For example, on the day the Lease Agreement was executed (May 19, 2023), Moses identified that the utilities and HVAC system needed attention.[70] By June 21, 2023, St. Paul's own HVAC vendor, Soefker, confirmed that "the gas to the building is locked out," preventing completion of any HVAC work.[71] In the months that followed, St. Paul proceeded with the gas-line work and the gas pressure test for Xpedient's portion of the Cromwell Warehouse, and the meter

[68] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 4.
[69] St.Paul000049.
[70] Colliers_00220-221.
[71] Colliers_00170.

unlock was approved on August 8, 2023.[72] However, St. Paul still failed to follow through with having the meter unlocked.

St. Paul was reminded of this failure in the months leading up to the Water Intrusion Event. For example, St. Paul received explicit notice of this failure on September 26, 2023, when Chuck Plesofsky ("Plesofsky") of Soefker emailed Jessica Edmonds ("Edmonds") and Moses of Colliers, asking "Did you guys ever call in for the meter to be unlocked for the new tenant? We just went by there to do a heat start up on the unit that was replaced a month or so ago and the gas meter is still locked out."[73] Plesofsky confirmed that "the west end should be able to be unlocked now."[74]

Despite these clear assessment of the situation, St. Paul still failed to connect gas service. On October 17, 2023, Moses sent an internal email stating that "Gas has been turned over to our name but we will need to call MLGW to have someone turn it on."[75]

St. Paul still failed to act. On November 16, 2023, nearly two months after Soefker had explicitly informed St. Paul that the meter needed to be unlocked, an invoice from Xpedient's HVAC contractor, Crowe, stated that Crowe's technician "[n]eed[ed] to come back and test system when they have the gas unlocked."[76,77] On December 5, 2023, St. Paul was still "having issues with

[72] Colliers_00036.
[73] Colliers_00139-140.
[74] Ibid.
[75] St.Paul000044.
[76] CROWE_00012.
[77] XMG_2192.

MLGW getting the gas on" due to addressing discrepancies that St. Paul had failed to resolve.[78]

These facts are inconsistent with the expectations of a landlord. Clearly, therefore, St. Paul substantially deviated from the generally accepted customs and practices of the warehousing industry with respect to its duty to transfer the utilities to its tenant, Xpedient.

**9. During the seven-month period after the Lease Agreement was executed, did St. Paul comply with the generally accepted customs and practices of the warehousing industry regarding ensuring that the gas meter was properly connected, the gas line was unlocked, the gas regulator was functioning properly, and the HVAC system was in good working order, to mitigate the risk of damage due to cold weather?**

No.

Based on the evidence I reviewed, St. Paul substantially deviated from the generally accepted customs and practices of the warehousing industry. Landlords (lessors) of industrial facilities are expected to ensure utility services, such as natural gas, are provided to and available at the properties leased by their tenants (lessees).

The landlord is typically responsible for providing functional, metered utility-service connections (e.g., natural gas, electricity, water).

[78] Colliers_00036-37.

The lease agreement between St. Paul and Xpedient stated the following:

- That "Lessor shall provide the normal utility service connections with separate metering for Lessee premises to the building;"[79] and

- That "the fire system, plumbing, electrical and heating, ventilation and air conditioning systems currently serving the Leased Premises (collectively, the "Mechanicals") shall be in good working order" at the commencement of the lease.[80]

The facts indicate that St. Paul did not comply with either of these stipulations in the lease.[81,82] Plus, emails exchanged between Moses and Updike mentioned additional delays caused by the regulator. For example, Moses's email on March 26, 2024, stated that "[s]adly, there is a bad regulator so gas is not being turned on today," but that St. Paul was "getting our HVAC vendor out to get the regulator fixed."[83,84]

Clearly, therefore, St. Paul substantially deviated from the generally accepted customs and practices of the warehousing industry regarding ensuring that the gas meter was properly connected, the gas line was unlocked, the gas regulator was functioning properly, and the HVAC system was in good working order, to mitigate the risk of damage due to cold weather.

---

[79] *Standard Commercial Lease*, May 19, 2023, at § 4.01.
[80] Ibid., at § 5.06.
[81] St.Paul000034-38.
[82] Colliers_00066-70.
[83] Colliers_00069.
[84] Colliers_00068.

## Personal Declarations and Closing Comments

I reserve the right to amend and/or supplement this report based upon any additional facts, other documents that might come to my attention, or other information, including expert reports, deposition testimony, and related documents, which might become available to me before the trial. If I am called upon to testify, then I also reserve the right to prepare demonstrative aids, such as drawings, tables, or graphs.

Respectfully submitted,



Stephen T. Hopper, P.E.