# EXHIBIT 15

Inviscid Consulting

**CONFIDENTIAL EXPERT REBUTTAL REPORT**

**Agilent Technologies, Inc.**
(Plaintiff)
v.
**Xpedient Management Group, LLC and**
**St. Paul Fire and Marine Insurance Company**
(Defendants)

and

**Factory Mutual Insurance Company,**
**as subrogee of Agilent Technologies, Inc.**
(Plaintiff)
v.
**Xpedient Management Group, LLC and**
**St. Paul Fire and Marine Insurance Company**
(Defendants)

United States District Court for the Western District of Tennessee
Western Division at Memphis

Case No. 2:25-cv-02101-MSN-cgc
consolidated with
Case No. 2:25-cv-02424-MSN-tmp

Prepared by
Stephen T. Hopper, P.E.

Prepared for
Reed Smith LLP and Smith Cashion & Orr, PLC

May 13, 2026

## Table of Contents

Table of Contents .......... 2
Professional Qualifications .......... 3
Assignment by Counsel .......... 5
Introduction and Factual Background of the Case .......... 7
Professional Opinions .......... 9
Personal Declarations and Closing Comments .......... 18
Appendix A: Sources Considered .......... 19
Appendix B: Curriculum Vitae of Stephen T. Hopper, P.E. .......... 20

## Professional Qualifications

My name is Stephen (Steve) T. Hopper, P.E., and I am Founder and Principal with Inviscid Consulting (Inviscid), an industrial engineering and management consulting firm.[1] As an independent, objective, and unbiased consultant, my consulting services include advising my clients regarding planning and improving warehousing, fulfillment, distribution, and logistics operations. I have never been employed by either the plaintiffs or the defendants in this case.

I earned a Bachelor of Industrial Engineering (BIE) degree from the Georgia Institute of Technology (Georgia Tech) in 1986. I am a licensed and registered Professional Engineer (P.E.).[2] In addition to my traditional consulting work with Inviscid, I have served as an advisor and expert witness in litigation involving supply chain operations in the US, Canada, and Australia. I have also advised private-equity and venture-capital firms regarding supply chain operations. Occasionally, I also author articles for industry publications, speak at industry events, and give interviews for the supply chain industry media.

Additional details about my qualifications are shown in my current curriculum vitae (CV), which is provided in Appendix B of this report. My CV also includes publications I have authored, as well as a list of all the cases in which I have testified as an expert at deposition or trial. My education, knowledge, training, skills, work experience, and related qualifications are directly relevant to this case.

My time is being billed as follows:

---

[1] https://www.inviscidconsulting.com.
[2] https://gapelsb.evokeplatform.com/app/verification/license/64940.

- Remote, pretrial work is billed at $840 per hour.

- In-person, pretrial work is billed at $890 per hour.

- Participation or testimony at depositions or trial is billed at $940 per hour.

## Assignment by Counsel

I have been retained by Reed Smith LLP ("Reed Smith") and Smith Cashion & Orr, PLC ("SCO"), the law firms serving as legal counsel for the plaintiffs. Reed Smith and SCO asked me to review the expert report of Robert J. Moran, CLP ("Moran").[3] Counsel also asked me to provide rebuttal opinions within my area of expertise regarding Moran's opinions concerning the generally accepted and common practices of the warehousing, fulfillment, distribution, and logistics industry.

My compensation is in no way contingent upon my professional opinions stated herein or upon the outcome of the case. My professional rebuttal opinions stated in this report are my true, accurate, and independent opinions based on a reasonable degree of professional certainty, and they are drawn from the following:

- My prior review of the facts of this case as I understand them, ascertained by my review of the case materials made available to me by Reed Smith, SCO, or otherwise requested by me, as referenced in my affirmative expert report;[4]

- My review of Moran's report;[5]

- My review of any additional materials specifically cited or referenced in this rebuttal report;

- My review of publicly available information;

[3] Expert report of Robert J. Moran, CLP, April 17, 2026.
[4] *Confidential Expert Report*, Stephen T. Hopper, P.E., February 17, 2026.
[5] Expert report of Robert J. Moran, CLP, April 17, 2026.

- My education, knowledge, training, skills, work experience, and related qualifications as a full-time industrial engineer specializing in the field of warehousing, fulfillment, distribution, and logistics operations;

- Relevant standards published by organizations and thought leaders in the logistics industry;

- Generally accepted and common practices of the warehousing, fulfillment, distribution, and logistics industry; and

- My decades of professional experience, including consulting engagements with hundreds of clients who operate warehousing, fulfillment, distribution, and logistics operations.

As of the date of this report, I understand that fact discovery in this case remains ongoing. Accordingly, I reserve the right to amend and supplement this report, and the opinions contained herein, as additional evidence, testimony, and other information related to this matter may become available to me or be found by me.

## Introduction and Factual Background of the Case

I previously provided a summary of the factual background of this matter in my affirmative expert report.[6] I include that summary and background by reference and do not repeat it in full here. This rebuttal report is limited to responding to Moran's opinions.

In brief, Agilent Technologies, Inc. ("Agilent") retained Xpedient, a full-service third-party logistics (3PL) provider, to store and handle Agilent's inventory at a warehouse facility located at 4601 Cromwell Avenue in Memphis, Tennessee ("the Cromwell Warehouse"). Xpedient occupied a portion of that facility through a commercial lease with St. Paul Fire & Marine Insurance Company ("St. Paul"), the property owner and a property-and-casualty insurer. Colliers Management Services – Memphis, LLC ("Colliers") served as St. Paul's representative and property management company for the facility.[7]

This consolidated lawsuit arises from a significant winter water-damage loss event ("Water Intrusion Event") that occurred at the Cromwell Warehouse on or about January 17, 2024. The materials I reviewed indicate that, before the event, the facility experienced unresolved issues involving natural-gas service, the functionality of the HVAC system, and the availability of heat. Xpedient admitted that the gas meter serving the Cromwell Warehouse was locked from November 17, 2023 until April 1, 2024, and

---

[6] *Confidential Expert Report*, Stephen T. Hopper, P.E., February 17, 2026.

[7] Note: My initial report, dated February 17, 2026, misidentified Colliers Management Services – Memphis, LLC as Colliers International. All references to Colliers in both reports should be understood to refer to Colliers Management Services – Memphis, LLC.

that Xpedient knew the meter was locked at least 60 days before the Water Intrusion Event.[8]

[8] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1 and Request No. 2.

## Professional Opinions

Based on my review of Mr. Moran's report, the materials cited in my February 17, 2026 expert report, and the additional materials referenced in this rebuttal report, my rebuttal opinions are stated below.

My opinions are limited to my field of expertise: warehousing, fulfillment, distribution, third-party logistics operations, facility-planning practices, and related operational standards of care. I do not offer opinions on legal liability, contract interpretation, sprinkler-system engineering, HVAC engineering, gas-regulator mechanics, product contamination, or damages. To the extent Mr. Moran addresses those issues, I respond only as necessary to explain how his opinions relate to the generally accepted and common practices of the warehousing, fulfillment, distribution, and logistics industry.

Moran's report generally concludes that Xpedient met the standard of care. I disagree with Moran's conclusion because Xpedient had an industry-standard operational duty as the 3PL provider responsible for caring for Agilent's inventory.

1. **Rebuttal to Moran Opinion 1: "Xpedient was not responsible for providing natural-gas utility service or a well-functioning sprinkler system."**[9]

   I disagree with this conclusion.

   In my professional opinion, since Xpedient was the 3PL provider responsible for caring for Agilent's inventory, it had responsibilities that were separate from

[9] Expert report of Robert J. Moran, CLP, April 17, 2026, at § 1.

St. Paul's and Colliers's responsibilities under the Lease Agreement and as the owner and property manager, respectively, of the Cromwell Warehouse. Xpedient's responsibilities included the following:

- Identifying and responding to known facility conditions that created risks to the inventory, including cold-weather risk;
- Escalating those conditions as necessary;
- Inspecting warehouse and climate conditions;
- Ensuring all facility systems in the portion of the Cromwell Warehouse leased to Xpedient were functional;
- Draining vulnerable lines where appropriate;
- Implementing reasonable interim safeguards within its authority, such as temporary heat;
- Relocating inventory where feasible; and
- Notifying Agilent of substantial risk conditions.

Based on the materials I reviewed, Xpedient did not act appropriately with respect to its responsibilities listed above before the Water Intrusion Event occurred.

### 2. Rebuttal to Moran Opinions 2 and 3: Xpedient "could not have anticipated the cause and outcomes of the [Water Intrusion Event]."[10]

I disagree with this conclusion.

In my professional opinion, Moran's conclusion that Xpedient could not reasonably foresee a substantial risk to Agilent's inventory unless it knew the exact sprinkler-system design and the precise mechanism by which the loss would occur is unreasonable.

A 3PL provider does not need to know every technical detail of a sprinkler system or a water-pipe system to recognize that an unheated warehouse with water-bearing systems, such as the Cromwell Warehouse, presents a serious risk when cold weather arrives. This is especially true for weather events like this one, when many news outlets and local officials warned of an imminent major winter storm in Memphis and surrounding areas in the days before the Water Instruction Event occurred.[11] And as Moran admits, Xpedient had a "general awareness of [this] cold weather risk."[12]

To be clear, the relevant operational issue here is not whether Xpedient could predict this precise failure, but rather whether Xpedient knew enough to recognize that the Cromwell Warehouse lacked reliable heat during freezing weather and that its customer's inventory was being stored under those

---

[10] Ibid., at §§ 2 and 3.
[11] *Confidential Expert Report*, Stephen T. Hopper, P.E., February 17, 2026, at § 4.
[12] Expert report of Robert J. Moran, CLP, April 17, 2026, at § 3.

conditions. As Moran admits, “Xpedient was aware of the absence of natural gas and therefore the absence of heat in the building.”[13]

**3. Rebuttal to Moran Opinion 4: “Xpedient had no duty to winterize the sprinkler system in this lease.”**[14]

I disagree with this conclusion.

Moran’s opinion addresses sprinkler-system control, but it does not address Xpedient’s separate warehouse-operations responsibilities. In my professional opinion, Xpedient had an industry-standard operational duty, as the 3PL provider responsible for caring for Agilent’s inventory, to respond reasonably to the known absence of reliable heat. My previous response #1, above, lists several of Agilent’s responsibilities in this role.

**4. Rebuttal to Moran Opinion 5: “There is no industry standard for Xpedient to warn Agilent of an impending water intrusion event.”**[15]

I disagree with this conclusion.

Moran’s mischaracterizes my opinion. I am not opining that Xpedient had to predict and warn Agilent of the specific Water Intrusion Event. In my professional opinion, Xpedient should have warned Agilent of known

[13] Ibid., at § 2.
[14] Ibid., at § 4.
[15] Ibid., at § 5.

conditions at the Cromwell Warehouse that could create such an event, including the following:

- Lack of reliable heat;
- A locked gas meter; and
- An HVAC system that could not be commissioned or tested because gas service was not available.

Those conditions were seriously detrimental to the storage of Agilent's inventory at the Cromwell Warehouse during severe winter weather, regardless of whether Agilent's inventory was specifically designated as temperature-controlled goods. Furthermore, months before the Water Intrusion Event, Xpedient had been notified that Agilent's inventory could not get wet.[16]

**5. Rebuttal to Moran Opinion 6: "The subsequent remedial measures identified by Hopper are not customary actions in the industry and would not have been expected prior to the incident."**[17]

I disagree with this conclusion.

I do not rely on Xpedient's post-event conduct as the sole basis for my opinions. To be clear, my opinions are based primarily on what Xpedient knew *before* the Water Intrusion Event occurred, including the following:

[16] XMG_1363.
[17] Expert report of Robert J. Moran, CLP, April 17, 2026, at § 6.

- That the gas meter was locked;
- That the HVAC system that could not be commissioned or tested because gas service was not available;
- That freezing weather was foreseeable.

Xpedient's post-event communications are relevant, however, because they show that Xpedient understood the operational relationship between lack of heat, freezing temperatures, and potential protective measures. In my experience, any reasonable, experienced 3PL provider would understand this relationship.

In my professional opinion, when freezing temperatures are possible and reliable heat is unavailable, any reasonable 3PL provider's responsibilities include those described in my previous response #1, above.

**6. Rebuttal to Moran Opinion 9: "Xpedient met the standard of care for Agilent's inventory."**[18]

I disagree with this conclusion.

In my professional opinion, Xpedient's alleged lack of authority to modify certain systems at the Cromwell Warehouse did not reduce or eliminate its

[18] Ibid., at § 9.

industry-standard operational duty as the 3PL provider responsible for caring for Agilent's inventory.

A 3PL provider might initially rely on a landlord to deliver appropriate facility systems. However, when a 3PL provider is aware for an extended period of time that its facility lacks reliable heat and continues storing its customer's inventory without adequate mitigation, reliance on the landlord alone is unreasonable. And in this case, Xpedient admitted knowing that the gas meter was locked and the HVAC system was not functioning properly, months before the Water Intrusion Event occurred.[19]

7. **Further Rebuttal to Moran Opinion 5: "Absent product-specific handling requirements or communicated sensitivities, there was no basis for Xpedient to conclude that ordinary ambient temperature fluctuations—even cold ones—posed a material risk of damage requiring a warning."**[20]

I disagree with this conclusion.

In my professional opinion, regardless of whether a 3PL provider's customer specifies that its inventory has temperature-control requirements, the 3PL provider has an industry-standard operational duty to protect the inventory against cold-weather risks. Furthermore, if a 3PL provider is informed of

[19] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1 and Response to Request No.2.
[20] Expert report of Robert J. Moran, CLP, April 17, 2026, at § 5.

product-specific handling requirements or "sensitives," it has an even greater responsibility to ensure that those risks are addressed and mitigated.

To be clear, my opinions are not based on Agilent's products being damaged by the ambient air in the warehouse. They are based on the following known risks:

- That the Cromwell Warehouse had a wet sprinkler system;
- That it also had a domestic water pipe system;
- That it had inadequate heat; and
- That Agilent's inventory could not get wet.

This combination could foreseeably result in serious, freeze-related failures that could subsequently damage inventory stored in the Cromwell Warehouse. This was a facility-risk issue, not merely a product-temperature issue.

## 8. Rebuttal to Moran Opinions 7 and 8: The sole "cause[s]" of the Water Intrusion Event were the "specific failure[s]" of St. Paul and Colliers, and their "deviat[ion] from the applicable standard of care were the direct causes of the loss."[21]

I disagree with this conclusion.

[21] Ibid., at §§ 7 and 8.

While St. Paul and Colliers substantially contributed to the conditions that resulted in the Water Intrusion Event, I do not agree that their failures reduce or eliminate Xpedient's separate, industry-standard operational duty as the 3PL provider responsible for caring for Agilent's inventory.

In my professional opinion, in warehousing practice, responsibility is not necessarily exclusive. A landlord might be responsible for facility failures, while a 3PL provider remains responsible for reasonable mitigation of known facility risks that could damage its customer's inventory. And, based on the materials I reviewed, Xpedient did not take action to mitigate these risks before the Water Intrusion Event occurred, despite knowing that the gas meter was locked and the HVAC system was not functioning properly, months before the Water Intrusion Event occurred.[22]

This conduct is not consistent with the industry standard for 3PL providers like Xpedient.

---

[22] *Xpedient Management Group, LLC's Responses to Plaintiff's First Set of Requests for Admission*, February 4, 2026, at Response to Request No. 1 and Response to Request No.2.

## Personal Declarations and Closing Comments

I reserve the right to amend and/or supplement this report based upon any additional facts, other documents that might come to my attention, or other information, including expert reports, deposition testimony, and related documents, which might become available to me before the trial. If I am called upon to testify, then I also reserve the right to prepare demonstrative aids, such as drawings, tables, or graphs.

Respectfully submitted,

Stephen T. Hopper, P.E.